UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CHRISTOPHER CREMEANS,

                                    Plaintiff,

v.                                                              5:20-cv-00535
                                                                (BKS/TWD)
PO DANIEL MILLER, PO PATRICK BENNETT,
and PO BRIAN MAHAR,

                                    Defendants.[1]

_____

APPEARANCES:                                      OF COUNSEL:

CHRISTOPHER CREMEANS
*Plaintiff, pro se*
6259 North Kirkville Rd.
Kirkville, NY 13082

HON. LETITIA JAMES                               ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York       STACEY A. HAMILTON, ESQ.
*Counsel for Defendants*                          Assistant Attorney General
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.      INTRODUCTION

        This matter has been referred for a report and recommendation by the Hon. Brenda K.

Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Christopher Cremeans ("Plaintiff") brings this *pro se* civil rights action against Parole Officer

("PO") Daniel Miller, PO Patrick Bennett, and PO Brian Maher (together "Defendants")

_____

[1]  The Clerk is respectfully directed to amend the caption as set forth above.

asserting claims pursuant to 42 U.S.C. § 1983 for violations of his First and Fourteenth

Amendment rights while a parolee on post-release supervision by the New York State

Department of Corrections and Community Supervision ("DOCCS").  (Dkt. No. 1.)

 Presently before the Court is Defendants' motion for summary judgment seeking

dismissal of the complaint in its entirety, along with a request to seal certain exhibits in support

thereof.  (Dkt. Nos. 37,[2] 38.)  Plaintiff opposes the motion.  (Dkt. Nos. 40, 41.[3])  For the reasons

set forth below, Defendants' motion to seal is denied and it is recommended that Defendants'

motion for summary judgment be granted in part and denied in part.

## II. BACKGROUND[4]

 Plaintiff is a convicted sex offender who, in November 2005, pled guilty in New

Hampshire Superior Court, Hillsborough County, to two counts of aggravated felonious sexual

assault and two counts of endangering the welfare of a child, for which he was given an

indeterminate prison sentence of seventeen and one-half to thirty-five years.   (Dkt. No. 38-2 at

¶¶ 1, 2; Dkt. No. 1 at ¶ 7.)  Plaintiff confessed to committing the crimes in New Hampshire

between the years of 1995 to 1998.  (Dkt. No. 38-2 at ¶ 2.)

 The victims of Plaintiff's crimes are BM (born in 1989) and RM (born in 1990).  *Id*. at ¶

3.[5]  KC is the biological mother of BM and RM.  *Id*. at ¶ 4.  Plaintiff and KC married in 1994,

---

[2]  Defendants request to seal Dkt. No. 38-5, Exhibit B to Knapp Declaration, Bates Nos. 000001-000156 and Dkt. No. 38-7, Exhibit A to Miller Declaration, Bates Nos. 001-082.  (Dkt. No. 37.)

[3]  Plaintiff's opposition submission includes a CD labeled "Parole Hearing".  (Dkt. No. 42.)

[4]  The facts are drawn from Defendants' statement of material facts, (Dkt. No. 38-2), Plaintiff's response thereto, (Dkt. No. 41), and the attached affidavits, declarations, exhibits, and depositions.  Additional facts are drawn from the verified complaint.  (Dkt. No. 1.)  The facts are taken in the light most favorable to Plaintiff.  *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[5]  To protect the identities of the crime victims, the Court refers to certain individuals by first and last initial.  *See also* Part III.A., *infra*.

separated in 1997, and divorced in 2000. *Id*. at ¶ 5. Plaintiff is not the biological or adoptive

father of BM or RM. *Id*. at ¶ 6. BM has a son, AM (born in 2006). *Id*. at ¶ 7.

On June 20, 2019, the New Hampshire Adult Parole Board conducted a parole hearing

and, as a result, Plaintiff was granted parole. *Id*. at ¶ 9.[6] With the granting of parole, Plaintiff

was required to comply with several conditions and restrictions set by the New Hampshire Adult

Parole Board. *Id*. at ¶ 10.

After parole was granted, Plaintiff requested a transfer from New Hampshire to New

York under the Interstate Compact for Adult Offender Supervision ("ICAOS"). *Id*. at ¶ 12.

Plaintiff signed the application on July 19, 2019, which states, in relevant part:

> I understand that my supervision in another state may be different
> than the supervision I would be subject to in this state, and that the
> receiving state will determine the manner in which I will be
> supervised. I agree to accept any differences that may exist
> because I believe that transferring my supervision to New York
> (receiving state) will improve my chances for making a good
> adjustment in the community. I FULLY UNDERSTAND AND
> ACKNOWLEDGE ALL OF THE ABOVE CONDITIONS AND
> FREELY AND KNOWINGLY WAIVE ANY CHALLENGE TO
> THESE REQUIREMENTS OF TRANSFER, INCLUDING THE
> CONDITIONS OF SUPERVISION IN THE STATE TO WHICH
> I REQUEST TRANSFER.
>
> In support of my application for transfer I make the following
> statements:
>
> 1.  I will comply with the terms and conditions of my supervision
>     that have been placed on me, or that will be placed on me by
>     New Hampshire (sending state) and New York (receiving
>     state).
> 2.  I understand that if I do not comply with all the terms and
>     conditions that the sending state or the receiving state, or both,
>     placed on me, that it will be considered a violation and there
>     may be consequences including return to the sending state.

---

[6] As noted, Plaintiff included an audio recording of the parole hearing. (Dkt. No. 42.)

(Dkt. No. 38-6 ("Miller Decl."), Exhibit A, Bates p. 001; *see also* Dkt. No. 38-2 at ¶¶ 14, 15, 16.) Plaintiff's application was granted and he was transferred to parole supervision in New York in August 2019.  (Dkt. No. 38-2 at ¶ 17.)

Defendants are employed by DOCCS as parole officers at the Syracuse Metro Parole Office.  *Id.* at ¶¶ 19, 35, 48.  Their job duties include, among other things, supervising parolees, establishing special conditions of release to community supervision, and monitoring compliance with parole conditions/special conditions.  *Id.* at ¶¶ 22, 38, 51.  Defendants perform their job duties under the supervision of Senior Parole Officer ("SPO") John Snyder.  *Id.* at ¶¶ 23, 39, 52.

Miller served as Plaintiff's assigned parole officer in August and September 2019, and Bennett supervised Plaintiff from October 2019 to March 2020.  *Id.* at ¶¶ 21, 36.  Maher was assigned to be Plaintiff's parole officer in March 2020, and continues to serve in that capacity.  *Id.* at ¶ 49.

On May 12, 2020, Plaintiff commenced this action.  (Dkt. No. 1.)  He sues Defendants in their individual and official capacities.  *Id.* at 2.[7]  Generally, Plaintiff alleges Defendants violated his rights under the First and Fourteenth Amendments by subjecting him to certain special conditions of parole such as: (1) denying Plaintiff access to the internet, state parks, and church; (2) denying Plaintiff contact with BM and AM; (3) denying Plaintiff "due process and full faith and credit" and (4) "by subjecting him to parole restrictions that involve a greater deprivation of liberty than is reasonably necessary to achieve goals of punishment, rehabilitation or deterrence[.]"  *Id.* at 7-9.  Plaintiff's prayer for relief includes a request for declaratory and injunctive relief and monetary damages.  *Id.* at 9-10.  Defendants filed an answer to the

---

[7]  Unless otherwise noted, page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

complaint on August 19, 2020, and discovery ensued.  (Dkt. No. 9.)  Plaintiff was deposed on

May 27, 2021.  (Dkt. No. 38-4.)

On August 31, 2021, the Court granted Defendants' letter motion, construed as a request

to file certain exhibits to their summary judgment motion under seal and, on September 2, 2002,

Defendants forwarded the subject documents to the Court via first class mail for an *in camera*

inspection.  (Dkt. Nos. 35, 36, 37.)

On September 8, 2021, Defendants filed their motion for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 38.)  Generally, in support of their

motion, Defendants contend they are entitled to Eleventh Amendment immunity and qualified

immunity, and argue the special conditions do not violate Plaintiff's constitutional rights.  (Dkt.

No. 38-14.)  Plaintiff opposes the motion.  (Dkt. Nos. 40, 41.)

## III.    DEFENDANTS' MOTION TO SEAL

### A.    Legal Standard

"The notion that the public should have access to the proceedings and documents of

courts is integral to our system of government."  *United States v. Erie Cty., N.Y.*, 763 F.3d 235,

238-39 (2d Cir. 2014).[8]  "Indeed, the common law right of public access to judicial documents is

said to predate even the Constitution itself."  *Id*. at 239.  The First Amendment to the United

States Constitution "also protects the public's right to have access to judicial documents."  *Id*.  A

party seeking to seal documents submitted to a court bears the burden of showing that sealing is

proper.  *See DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

---

[8]  Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

The common law and the First Amendment accord a presumption of public access to judicial documents. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006). A "judicial document" is "a filed item that is relevant to the performance of the judicial function and useful in the judicial process." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016). Documents submitted for the court's consideration in relation to a motion are judicial documents. *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13-CV-2581, 2021 WL 4135007, at *2 (S.D.N.Y. Sept. 10, 2021). To overcome the presumption of public access over a judicial document, the court must make "specific, on the record findings" that sealing (1) is necessary "to preserve higher values," and (2) "is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120.

Examples of "higher values" may include enforcement interests, the privacy of innocent parties, and the attorney-client privilege. *Doe v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-01359 (BKS/CFH), 2020 WL 6586290, at *2 (N.D.N.Y. Nov. 10, 2020). A sealing request is "narrowly tailored" when it seeks to seal only that information that needs to be sealed in order to preserve higher values. *Susquehanna Int'l Grp. Ltd. v. Hibernia Express (Ir.) Ltd.*, 2021 WL 3540221, at *4 (S.D.N.Y. Aug. 11, 2021). Portions of documents "with no apparent relation" to sensitive material generally should not be redacted or sealed. *Id.* (denying motion to seal where proposed redactions were "extensive" and covered non-commercially sensitive information).

### B.    Analysis

The exhibits at issue are submitted in support of Defendants' motion for summary judgment, Dkt. No. 38-5, Exhibit B to Knapp Declaration, Bates Nos. 000001-000156 and Dkt. No. 38-7, Exhibit A to Miller Declaration, Bates Nos. 001-082. They are, therefore, judicial

documents to which a presumption of the right of public access attaches.  *CBF Industria de Gusa S/A*, 2021 WL 4135007, at *2.

In support of their motion, Defendants contend the documents at issue contain highly sensitive information about the details of Plaintiff's crimes and, even with redactions, are concerned that the identity of Plaintiff's two victims could be ascertained from the records. (Dkt. No. 35.)  To be sure, there is a compelling reason to limit the general public's access to these documents: safeguarding the identity of the victims.  Courts frequently recognize the privacy interest in protecting "the identity of a sexual assault victim" as "an important and recognized basis to limit public access" to judicial documents.  *See Kemp v. North*, No. 20-CV-9121, 2021 WL 1512712, at *2 (S.D.N.Y. Apr. 15, 2021) (collecting cases).  Courts assign especially heavy weight to innocent third parties' privacy interests.  *Doe v. Gooding*, No. 20-CV-06569 (PAC), 2021 WL 5991819, at *4 (S.D.N.Y. July 29, 2021).

However, the Court finds sealing the entirety of the subject exhibits is not narrowly tailored to serve the reasons asserted.  The documents comprise a significant portion of the factual record before the Court, and they pertain to matters that "directly affect" the Court's adjudication of Defendants' motion for summary judgment.  Indeed, it would be difficult for a member of the public to get a full picture of the Court's reasoning without access to those documents.  *See Scott v. Graham*, No. 16-CV-2372, 2016 WL 6804999, at *2 (S.D.N.Y. Nov. 17, 2016) ("[R]edact[ing] the names of the victim and her mother (as opposed to requesting that the Court seal this entire proceeding) is 'narrowly-tailored' to serve the higher value of safeguarding the victim's identity.").  Thus, the Court finds that redacting the exhibits, and specifically the names, addresses, phone numbers, and dates of birth contained therein, would be more appropriate than allowing the exhibits to remain under seal.

Therefore, the Court denies Defendants' motion to seal Exhibit B to Knapp Declaration, Bates Nos. 000001-000156 and Exhibit A to Miller Declaration, Bates Nos. 001-082. (Dkt. No. 37.) Defendants are directed to redact the subject documents to protect the identities of the victims, such as their names, addresses, and related information. Defendants should also redact any irrelevant personal information from non-parties from these exhibits such as names, dates of birth, and/or addresses to protect the identities of the victims. Defendants are instructed to carefully review the documents at issue to ensure that their redactions throughout their filings are consistent and narrowly tailored to protect the identities of Plaintiff's victims and highly sensitive information about the details of Plaintiff's crimes that has not already been publicly disclosed through filings in this litigation or otherwise.

Accordingly, in light of the foregoing, Defendants must file, within fourteen (14) days of the date of this Report-Recommendation and Order, Exhibit B to Knapp Declaration and Exhibit A to the Miller Declaration, in their REDACTED forms, which will replace Dkt. No. 38-5 and Dkt. No. 38-7.

## IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553-54; *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### B.    Eleventh Amendment Immunity

Defendants seek dismissal of Plaintiff's official capacity claims for money damages. (Dkt. No. 38-14 at 3-4.) Plaintiff opposes the motion. (Dkt. No. 40 at 1-2.)

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

U.S. Const. amend. XI.  Regardless of the nature of the relief sought, in the absence of the

State's consent or waiver of immunity, a suit against the State or one of its agencies or

departments is proscribed by the Eleventh Amendment.  *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 100 (1984).  "New York State has not consented to suit in federal

court."  *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y.

2007).

Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.

*See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979).  "[C]laims against a government employee in

his official capacity are treated as a claim against the municipality," and, thus, cannot stand

under the Eleventh Amendment.  *Hines v. City of Albany*, 542 F. Supp. 2d 218, 227 (N.D.N.Y.

2008).

However, "[u]nder the doctrine in *Ex Parte Young*, a plaintiff may avoid the Eleventh

Amendment bar to suit and proceed against individual state officers . . . in their official

capacities, provided his complaint (a) alleges an ongoing violation of federal law and (b) seeks

relief properly characterized as prospective."  *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir.

2013).  "A plaintiff may not use this doctrine to adjudicate the legality of past conduct," meaning

there must be some "plausible threat of future violations."  *Id.*; *see W. Mohegan Tribe & Nation*

*v. Orange Cty.*, 395 F.3d 18, 21 (2d Cir. 2004) (noting that, "in determining whether the *Ex*

*Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit, a court need only

conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of

federal law and seeks relief properly characterized as prospective"); *see also New York State*

*Corr. Officers & Police Benev. Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y.

2012) (D'Agostino, J.) ("[D]eclaratory relief is not permitted under *Ex Parte Young*, when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

Here, Plaintiff seeks both monetary and non-monetary relief and has plausibly alleged "plausible threat of future violations." (Dkt. No. 1 at 9-10.) Insofar as Plaintiff sues Defendants for money damages in their official capacities, those claims are barred by Eleventh Amendment immunity. *See Malarczyk v. Lovgren*, No. 1:19-CV-42 (DNH), 2022 WL 374271, at *4 (N.D.N.Y. Feb. 8, 2022) ("[I]t is beyond cavil that an official-capacity claim for money damages under § 1983 is barred by the Eleventh Amendment."); *see also Gunn v. Bentivegna*, No. 1:20-CV-2440 (LLS), 2020 WL 2571015, at *3 (S.D.N.Y. May 19, 2020) ("DOCCS officials enjoy Eleventh Amendment immunity from suit under § 1983 for damages in their official capacities.").

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of all claims for monetary damages against Defendants in their official capacities be granted. (Dkt. No. 38-14 at 3-4.)

## C. Constitutional Claims Related to Special Conditions

Defendants move for summary judgment and dismissal of Plaintiff's claims challenging the special conditions of parole. (Dkt. No. 38-14 at 5-9.) Initially, Defendants argue Plaintiff should be estopped from obtaining relief in this action. *Id*. at 5. Defendants argue even if Plaintiff is not estopped, summary judgment should be granted because the conditions are reasonably related to Plaintiff's past conduct and designed to deter recidivism and prevent re-offense. *Id*. at 5-9.

1.    **Waiver**

Defendants contend, in a cursory manner, that by requesting a transfer from New Hampshire to New York under the ICAOS, and by signing the application, Plaintiff "should be stopped from obtaining the relief in this action." (Dkt. No. 38-14 at 6.) The Court agrees with Plaintiff that by signing the transfer application on July 19, 2019, and requesting a transfer from New Hampshire to New York, Plaintiff acknowledged New York could impose different conditions upon him. (*See* Dkt. No. 41 at ¶¶ 14, 15, 16; Dkt. No. 40 at 3.) Nevertheless, the record demonstrates that at the time he signed the application, Plaintiff did not know what special conditions of parole would be imposed by New York and, therefore, Plaintiff did not consent to the imposition of the alleged unconstitutional conditions.[9] *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). Therefore, the Court finds Defendants' argument unavailing, and recommends denying Defendants' motion on this basis. (Dkt. No. 38-14 at 5-6.)

2.    **Fourteenth Amendment Due Process**

Through the fourth cause of action, the complaint alleges Defendants violated and continue to violate the Fourteenth Amendment by subjecting Plaintiff "to parole restrictions that involve a greater deprivation of liberty than is reasonably necessary to achieve goals of punishment, rehabilitation or deterrence where the record does not substantiate a basis for identifying a connection between the conditions and likelihood of harm and the conditions related to the nature and circumstance of the crime of conviction nor to the plaintiff's history and

---

[9]  Plaintiff acknowledges that while he understood parole would be different in New York, "he fully expected" New York would "impose constitutionally valid conditions." (Dkt. No. 41 at ¶ 14; *see also id.* at ¶¶ 15, 16.)

characteristics, thereby causing irreparable harm to the plaintiff."  (Dkt. No. 1 at 8-9.)
Defendants contend this claim has no merit.  (Dkt. No. 38-14 at 7-8.)

"Parolees are entitled to some form of due process in the imposition of special conditions
of parole."  *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11,
2019).  This "limited due process right" entitles a parolee to conditions of parole that are
reasonably related to his prior conduct or to a legitimate government interest such as
rehabilitation, the prevention of recidivism and future offenses, and protection of the public.  *See*
*Singleton v. Doe*, No. 14-CV-0303, 2014 WL 3110033, at *3 (E.D.N.Y. July 7, 2014); *United*
*States v. Myers*, 426 F.3d 117, 123-24 (2d Cir. 2005) (summary order); *Robinson v. Pagan*, No.
05-CV-1840, 2006 WL 3626930, at *6 (S.D.N.Y. Dec. 12, 2006).  "If a special condition
implicates a fundamental liberty interest," the court "must carefully examine it to determine
whether it is 'reasonably related' to the pertinent factors, and 'involves no greater deprivation of
liberty than is reasonably necessary[.]'"  *Myers*, 426 F.3d at 126; *see also Doe v. Lima*, 270 F.
Supp. 3d 684, 702 (S.D.N.Y. 2017) ("The Second Circuit has applied strict scrutiny to
restrictions on liberty incident to post-prison supervisory regimes, whether denominated as
parole (as in New York State) or as supervised release (as in the federal system).").  "Courts
'must use common sense to guide [their] interpretation of supervised release conditions.'"
*Peoples v. Leon*, No. 9:18-CV-1349 (LEK/ML), 2021 WL 1582173, at *8 (N.D.N.Y. Jan. 4,
2021) (quoting *United States v. Moritz*, 651 F. App'x 807, 810 (10th Cir. 2016)), *report-*
*recommendation adopted*, 2021 WL 977222 (N.D.N.Y. Mar. 16, 2021).

In support of the instant motion, Miller, who supervised Plaintiff in August and
September 2019, provided a Declaration, and swears that he reviewed Plaintiff's application for
ICAOS Interstate Compact Transfer and the associated documents.  (Dkt. No. 38-6 ("Miller

Decl.") at ¶ 10; *see* Dkt. No. 38-7, Exhibit A.). He considered the nature of the crimes that

Plaintiff had committed (aggravated felonious sexual assault and endangering the welfare of a

child), the age of the two victims, police and court records, statements made by Plaintiff, and

statements made by the victims. (Miller Decl. at ¶ 10.) Based on his review of Plaintiff's

application and associated documents, Miller established special conditions for Plaintiff's parole

supervision in New York. *Id*. at ¶ 11. Miller avers that his recommendations were tailored to

Plaintiff's circumstances and aimed toward his rehabilitation. *Id*.

Miller further states the special conditions that he established were in accordance with

DOCCS' then existing policies, which were reviewed and approved by SPO Snyder. *Id*. at ¶¶

15, 16. To that end, it was DOCCS' policy to impose special conditions to (1) prohibit a sex

offender from having contact with the victim(s) of his crime and with children under the age of

18 when the sex offender committed a felony offense and the victim of the offense was a child,

and (2) prohibit a sex offender from using the internet when the sex offender committed a felony

offense, and the victim of the offense was a child. *Id*. at ¶¶ 12, 13.

Bennett, who served as Plaintiff's assigned parole officer from October 2019 until March

2020, also provided a Declaration in support of the motion. (Dkt. No. 38-9 ("Bennett Decl.") at

¶ 7.) During that time, he established special conditions on three occasions, which Bennett states

were tailored to Plaintiff's circumstances and aimed toward his rehabilitation. *Id*. On October 1,

2019, Bennett established special conditions that permitted Plaintiff to open an e-mail account

strictly for job search purposes. *Id*. at ¶ 8. On October 8, 2019, he established special conditions

that pertained to Halloween and on November 5, 2019, he established special conditions that

allowed Plaintiff to enter school grounds only for the purpose of voting on Election Day. *Id*. at

¶¶ 9, 10. SPO Snyder reviewed and approved the special conditions that Bennett established. *Id*.

at ¶ 12.  Bennett states he played no role in establishing the parole conditions/special conditions that were initially imposed for Plaintiff's transfer to parole supervision in New York.  *Id*. at ¶ 15.

Maher also provided a Declaration.  (Dkt. No. 38-11 ("Maher Decl.").)  As noted, he was assigned to serve as Plaintiff's parole officer in March 2020, and he continues to serve in that capacity.  *Id*. at ¶ 10.  Like Bennett, Maher states he played no role in establishing the parole conditions/special conditions that were initially imposed for Plaintiff's transfer to community supervision in New York.  *Id*. at ¶ 7.

In his Declaration, Maher explains special conditions must be in accordance with DOCCS' policies and are established to ensure public safety, decrease the likelihood of re-offense, and provide a framework for a successful completion of parole supervision.  *Id*. at ¶ 6.  In June 2020, Maher added an addendum to the standard conditions for Plaintiff's parole supervision.  *Id*. at ¶ 11.  He also established special conditions in March and May 2021.  *Id*. at ¶ 12.  Maher avers the specials conditions that he established in 2021 modify previous restrictions and are tailored to Plaintiff's circumstances and aimed toward his rehabilitation.  *Id*. at ¶ 13.  To that end, on March 2, 2021, Maher established a special condition that permits Plaintiff to use his mother's computer for legal research and, on May 4, 2021, he established a special condition that allows Plaintiff to have contact with BM.  *Id*. at ¶ 15, 16.

Here, Plaintiff makes only general objections/challenges to the special conditions of release imposed upon his release.  (*See* Dkt. No. 1 at 8-9.)  Plaintiff's conclusory allegations fail to demonstrate there is a material dispute of fact that would necessitate a trial on his fourth cause of action.  Consequently, the undersigned recommends granting Defendants' motion for summary judgment on this basis because Plaintiff does not have a liberty interest in being free from any such conditions.  (Dkt. No. 38-14 at 7-8.)

15

The Court addresses Plaintiff's specific challenges below.

### 3.    First Amendment Free Speech and Free Exercise

Through the first cause of action, the complaint alleges Defendants violated and continue

to violate the First Amendment by denying Plaintiff access to the internet, and to places where

children congregate, including state parks and church.  (Dkt. No. 1 at 7.)

### a.    Parks and Church

Plaintiff objects to the following special condition, which was established in August 2019

by Miller:

> 13(a17):  I shall not enter or remain in any place (parks, schools,
> playgrounds, video galleries, shopping malls, bowling alleys,
> swimming pools, beaches, etc.) where children congregate without
> prior written permission of my parole officer.  I also understand
> that I must obtain written permission to obtain a library card and
> visits to any (public) library.

(Dkt. No. 38-8 at 8; Dkt. No. 1 at 7.)  Defendants argue the special conditions that restrict

Plaintiff from having contact with children under the age of 18 and from entering and remaining

in places where children congregate, such as parks and churches, do not violate Plaintiff's First

Amendment rights because the restrictions are rationally related to Plaintiff's criminal history,

which includes sexually assaulting two young girls, BM and RM, on multiple occasions.  (Dkt.

No. 38-14 at 8-9.)  Defendants further contend the restrictions are reasonably related to the

justifiable purposes of protecting the public and decreasing the likelihood of re-offense.  *Id*. at 9.

Moreover, Defendants state that in 2019, it was DOCCS' policy to impose special conditions to

prohibit a sex offender from having contact with children under the age of 18 where, as here, the

sex offender committed a felony offense, and the victim of the offense was a child.  (Miller Decl.

at ¶¶ 12, 16; Bennett Decl. at ¶ 15, Maher Decl. at ¶ 8.)

"First Amendment rights may be curtailed only by the least drastic means." *United States v. Kahane*, 396 F. Supp. 687, 699 (E.D.N.Y. 1975). As to the restriction on parks, courts have generally upheld provisions prohibiting sex offender from frequenting locations where children are likely to congregate. *See United States v. Johnson*, 446 F.3d 272, 280-81 (2d Cir. 2006) (upholding a provision of supervised release that prohibited the defendant from being in "any" area where children are "likely" to congregate); *see also Scott v. Rosenberger*, No. 19-CV-1769 (CS), 2020 WL 4274226, at *7 (S.D.N.Y. July 24, 2020) (finding that "restricting [the plaintiff's] access to minors is thus reasonably related to [p]laintiff's past conduct and is designed to prevent Plaintiff from committing further offenses"); *United States v. MacMillen*, 544 F.3d 71 (2d Cir. 2008) (upholding special condition of supervised release prohibiting sex offender from frequenting locations where children are likely to congregate); *United States v. Raftopoulos*, 254 F. App'x 829 (2d Cir. 2007) (indicating that conditions requiring sex offenders to stay away from parks where children congregate is permissible, but cannot be impermissibly vague); *see also Lewandowski v. United States*, No. CR DKC 14-0082, 2018 WL 3818857, at *5 (D. Md. Aug. 10, 2018) (upholding restriction that convicted sex offender "will not congregate or loiter near any school, park, playground, arcade, or other places frequented by children under the age of 18").

Additionally, Plaintiff does not allege that, during his time on parole, he requested, and was unreasonably denied, permission to access a park. Accordingly, because the evidence suggests the condition is reasonably related to Plaintiff's criminal history and to the goals of protecting the public, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge of the special condition prohibiting him to enter "parks" be granted. (Dkt. No. 38-14 at 8-9.)

The Court reaches a different result, however, as to restrictions regarding Plaintiff's access to church. "Any limitation on exercise of religious freedom rights must be as narrow as practicable and clearly related to an appropriate governmental need. Limitations must affect prisoners and parolees with the least denigration of the human spirit and mind consistent with the needs of a structured correctional society." *Centonze v. Munson*, No. 1:19-CV-1017 (MAD/ATB), 2020 WL 730608, at *8 (N.D.N.Y. Feb. 13, 2020) (quoting *United States v. Hernandez*, 209 F. Supp. 3d 542, 546 (E.D.N.Y. 2016)). "A condition that prevents defendant from attending his place of worship because minors attend the same services is not the least drastic means of ensuring the public's safety. It violates defendant's right to religious observance." *Hernandez*, 209 F. Supp. 3d at 546.

Presently, it does not appear that there is a condition of Plaintiff's probation that relates specifically to church services; rather, as set forth above, special condition 13(a17) provides Plaintiff "shall not enter or remain in any place (parks, schools, playgrounds, video galleries, shopping malls, bowling alleys, swimming pools, beaches, etc.) where children congregate without prior written permission of my parole officer."

In the verified complaint, Plaintiff claims he "was told that he could not attend the local church where several of his family members attend." (Dkt. No. 1 at 4.) Plaintiff states he met with the pastor, who was aware of Plaintiff's convictions, and the pastor contacted Bennett but "Bennett still denied [Plaintiff] the ability to attend church." *Id*. at 4-5. A copy of the pastor's letter, dated April 21, 2020, is attached as an exhibit to Plaintiff's complaint. *See id*. at 33. Defendants have not addressed this special condition beyond asserting a church is a place where "children congregate", nor do they address the pastor's letter. (Dkt. No. 38-14 at 8-9.)

To be entitled to summary judgment on the issue of the constitutionality of the church restriction, Defendants must prove that the condition does not violate Plaintiff's constitutional rights, and, on the present record, the Court finds that Defendants have not met that burden. *See Hernandez*, 209 F. Supp. 3d at 546 (Although the First Amendment rights of paroled sex offenders are circumscribed, and conditions preventing defendants convicted of sex offenses from associating with minors have been upheld, "[n]o compelling government interest justifies prohibiting attending religious services where a minor is present.").

Upon review of the entire record, the Court finds issues of material fact as to whether the special conditions of parole prohibiting Plaintiff from attending communal worship in a church are "arbitrary and capricious" precluding an award of summary judgment. Accordingly, the Court recommends Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge prohibiting him to enter "church" be denied. (Dkt. No. 38-14 at 8-9.)

### b.    Internet

Plaintiff also objects to the following special condition, which was established in August 2019 by Miller:

> SC(a36). I will **NOT** own possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices, and/or the internet, unless I obtain prior written permission from the PAROLE OFFICER. Furthermore, if approved: If I am permitted by the PAROLE OFFICER to possess a computer at my residence, permission will be granted for only one computer.

(Dkt. No. 38-8 at 7; *see* Dkt. No. 1 at 7.) As described above, Miller reviewed Plaintiff's application and the associated documents and established special conditions for Plaintiff's parole supervision in New York. (Miller Decl. at ¶ 10.) He further avers this condition was tailored to Plaintiff's circumstances and aimed toward his rehabilitation. *Id.* at ¶ 11. Additionally, at the

time he established the special condition, it was DOCCS' policy to impose special conditions to

prohibit a sex offender from using the internet when the sex offender committed a felony

offense, and the victim of the offense was a child.  *Id*. at ¶ 13.  SPO Snyder reviewed and

approved the special condition.  *Id*. at ¶ 15.  On August 26, 2019, Plaintiff signed the special

condition to certify that he read and understood them.  (Dkt. No. 38-2 at ¶ 27.)

In October 2019, Bennett established the special condition that permitted Plaintiff to open

an e-mail account strictly for job search purposes.  (Bennett Decl. at ¶ 8.)  Bennett avers the

special condition was tailored to Plaintiff's circumstances and aimed toward his rehabilitation.

*Id*. at ¶ 7.  The special condition was approved by SPO Snyder and was in accordance with

DOCCS' then existing policies.  *Id*. at ¶¶ 12, 13.

In March 2021, Maher modified the restriction allowing Plaintiff use of his mother's

computer for legal research and, in May 2021, established a special condition titled "REVISED

ESTOP," which provides:

> I will not use the internet to access pornographic material,
> communicate with other individuals or groups for the purpose of
> promoting sexual relations with persons under the age of eighteen,
> and communicate with a person under the age of eighteen unless I
> receive written permission from the Board of Parole to use the
> internet to communicate with a minor child under eighteen years of
> age who I am the parent of and who I am not otherwise prohibited
> from communicating with.

(Maher Decl. at ¶¶ 15, 22, 24.)  Miller explains he established the "REVISED ESTOP" after

DOCCS directed that it be imposed on parolees who did not use the internet in the underlying

sex offense.  *Id*. at ¶ 24.  Again, SPO Snyder reviewed and approved the special conditions

Maher established.  *Id*. at ¶ 25.

Plaintiff contends that the aforementioned conditions were improperly imposed and

unrelated to his criminal history because his crimes did not involve the internet.  (Dkt. No. 41 at

66.)  Liberally construed, Plaintiff seeks to invalidate these conditions relying upon the Supreme

Court's decision in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).  In *Packingham*, the

Court held that a broad North Carolina criminal statute barring registered sex offenders from

accessing commercial social networking websites was unconstitutional.  *Id*. at 1237.  The Court

reasoned that, "to foreclose access to social media altogether is to prevent the user from engaging

in the legitimate exercise of First Amendment rights."  *Id*. at 1737; *see Yunus*, 2019 WL 168544,

at *16 ("Under *Packingham*, blanket limitations on an individual's ability to access social media

will receive intermediate scrutiny, even when imposed as conditions of parole."); *see also United

States v. Eaglin*, 913 F.3d 88, 94-97 (2d Cir. 2019) (holding that "*Packingham* establishes that,

in modern society, citizens have a First Amendment right to access the internet" and "the

imposition of a total internet ban as a condition of supervised release inflicts a severe deprivation

of liberty").

Defendants argue *Packingham* does not apply because the restrictions at issue were

imposed as parole conditions.  (Dkt. No. 38-14 at 8.)  This Court does not agree with

Defendants' restrictive interpretation of the holding in *Packingham*.  *See Peoples v. Leon*, 2021

WL 1582173, at *17-20 (surveying the recent caselaw where courts considered, and rejected,

similar arguments); *see, e.g.*, *Yunus*, 2019 WL 168544, at *16 ("There is no indication in

*Packingham* that parolees are exempted from the Court's decision[.]  In fact, the [Supreme]

Court was clear that the distinction between those who were presently under the supervision of

the criminal justice system and those who no longer were was not a basis for its holding[.]");

*Lopez v. Stanford*, No. 18-CV-3493, 2020 WL 6900909, at *8 (E.D.N.Y. Nov. 24, 2020)

(rejecting the defendants' argument that *Packingham* is inapplicable to parole conditions);

*Hartwick v. Annucci*, No. 5:20-CV-408 (DNH), 2020 WL 6781562, at *9 (N.D.N.Y. Nov. 18,

2020) (citing to *Packingham* in context of the plaintiff's challenge to parole conditions); *Manning v. Powers*, 281 F.Supp.3d 953, 961 (C.D. Cal. 2017) (holding that the plaintiff's challenge to a social media parole condition "is controlled by the Supreme Court's recent decision in *Packingham*")).

Here, the record is devoid of any evidence establishing that the internet factored into any of Plaintiff's crimes or criminal history. On the present record, the Court finds Defendants have not proven, with competent admissible evidence, the special conditions of parole restricting Plaintiff's use of the internet is "narrowly tailored" so as not to burden Plaintiff's First Amendment rights more than necessary. *See Scott*, 2020 WL 4274226, at *9 (holding that because the plaintiff's underlying crime did not involve computers or the internet, the restrictions on all computer or internet use without permission were not reasonably related to the plaintiff's conduct); *Yunus*, 2018 WL 3455408 at *32 (holding that parole conditions restricting access to computers and social media were not "narrowly tailored" as required by the Constitution because the plaintiff had never been charged with any internet-related criminal conduct); *cf. United States v. Savastio*, 777 F. App'x 4, 5 (2d Cir. 2019) (summary order) (upholding condition relating to adult pornography and other sexually explicit material of defendant who viewed child pornography).

In light of the foregoing, the Court finds issues of material fact as to whether the special condition of parole restricting Plaintiff's use of the internet is "arbitrary and capricious" precluding an award of summary judgment to Defendants on this claim. Accordingly, the Court recommends Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge of the special conditions restricting access to the internet be denied. (Dkt. No. 38-14 at 8-9.)

### 4.    First Amendment Right of Familial Association

Through the second cause of action, the complaint alleges Defendants violated and

continue to violate the First Amendment by denying Plaintiff contact with AM and BM.  (Dkt.

No. 1 at 7.)  Relatedly, through the third cause of action, Plaintiff claims the special conditions

violate his right to "due process and full faith and credit" under the Fourteenth Amendment

because the special conditions are in "direct contraction to the Hillsborough County Court's

ruling included in [P]laintiff's sentence[.]"  *Id*. at 8.  Specifically, Plaintiff objects to the

following conditions established by Miller in August 2019:

> 13(a14):  I shall not have any in person contact or attempt to
> contact any members of my VICTIM's family by means of letter,
> telephone, third party, or any other methods without the knowledge
> and written permission of my parole officer.  Specifically, RM,
> BM, and KC[].
>
> 13(a15):  I understand that I will not be in any contact with
> children **under the age of 18** years unless I have prior written
> approval from my parole officer.  I also understand this may
> include immediate and/or extended family members.

(Miller Decl. at ¶ 14; *see* Dkt. No. 1 a 7-8.)  Defendants argue Plaintiff has no constitutionally

protected interest in his relationship with BM or AM and, therefore, the special conditions

prohibiting contact with BM and AM do not violate the Plaintiff's rights under the First and

Fourteenth Amendments.  (Dkt. No. 38-14 at 6-7.)  The Court agrees with Defendants.

"It is well established that a parent's interest in maintaining a relationship with his or her

child is a fundamental liberty interest protected by substantive due process."  *Peoples*, 2021 WL

1582173, at *8.  Courts, however, have not extended the "same solicitude" to non-custodial

parents who did not play an active role in a child's life, prior to incarceration.  *Yunus*, 2009 WL

168544, at *34 (*citing Myers*, 426 F.3d at 128) (holding that the parolee must demonstrate some

"commitment to the responsibilities of parenthood").  As Defendants point out, Plaintiff has not

alleged either a custodial relationship with BM (born in 1989) or AM (born in 2006), or that he has some measure of responsibility for their care. (Dkt. No. 38-14 at 6.) Although Plaintiff has submitted evidence that BM and AM "recognize" Plaintiff as their father and grandfather, respectively, it is undisputed that BM is a victim of Plaintiff's crimes, Plaintiff is not the biological or adoptive father of BM, and that Plaintiff has no blood relationship to AM. (Dkt. No. 38-2 at ¶ 6; Dkt. No. 41 at ¶ 6.)

As set forth above, Miller reviewed Plaintiff's application and the associated documents and carefully considered the nature of the crimes that Plaintiff had committed (aggravated felonious sexual assault and endangering the welfare of a child), the age of his two victims, police and court records, statements made by Plaintiff, and statements made by his victims, and established the foregoing special conditions for Plaintiff's parole supervision in New York. (Miller Decl. at ¶ 10.) He further avers this condition was tailored to Plaintiff's circumstances and aimed toward his rehabilitation. *Id*. at ¶ 11. Miller states that at the time he established the special conditions, it was DOCCS' policy to impose special conditions to prohibit a sex offender from having contact with the victim(s) of his crime and with children under the age of 18 when the sex offender committed a felony offense, and the victim of the offense was a child. *Id*. at ¶ 12. SPO Snyder reviewed and approved the special conditions. *Id*. at ¶ 15. On August 26, 2019, Plaintiff signed the special conditions to certify that he read and understood them. (Dkt. No. 38-2 at ¶ 27.)

In May 2021, Maher established a special condition that allows Plaintiff to have contact with BM. (Maher Decl. at ¶ 16.) Maher established the special condition after BM contacted Maher by telephone and after BM provided written confirmation that she wanted to have contact

with Plaintiff. *Id.* at ¶ 17. Maher received the written confirmation from BM, who was no longer a minor, on or about November 24, 2020. *Id.* at ¶¶ 18, 19.

On the present record, the Court finds the special condition that prohibits Plaintiff from having contact with BM and AM is not arbitrary or capricious. *See, e.g.*, *Peoples*, 2021 WL 1582173, at *8 (finding convicted sex offender's condition restricting contact with minors, including members of his extended family and younger brother to be reasonable); *see also Maldonado*, 2019 WL 5784940, at *3, 10 (finding same condition restricting contact with minors to be reasonable); *Yunus*, 2009 WL 168544, at *34 (reasoning there is no authority for proposition that a parolee has a fundamental right to visit minor family members); *see also Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) ("Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves."); *Bostic v. Jackson*, No. 9:04-CV-676, 2008 WL 1882696, at *4-5 (N.D.N.Y. Apr. 24, 2008) (granting the defendants' motion for summary judgment as to plaintiff's challenge to a condition of parole which limited contact and prevented him from residing with his wife where she was the victim of the crime for which plaintiff was convicted).

To the extent Plaintiff challenges the foregoing condition on the grounds that it differs from the sentencing court's determination, (Dkt. No. 1 at 8), Plaintiff's argument is without merit. As discussed *supra*, Plaintiff's signed application to transfer his parole supervision from New Hampshire to New York, dated July 19, 2019, expressly provides:

> I FULLY UNDERSTAND AND ACKNOWLEDGE ALL OF
> THE ABOVE CONDITIONS AND FREELY AND
> KNOWINGLY WAIVE ANY CHALLENGE TO THESE
> REQUIREMENTS OF TRANSFER, INCLUDING THE

CONDITIONS OF SUPERVISION IN THE STATE TO WHICH
I REQUEST TRANSFER.

(Miller Decl., Exhibit A, Bates p. 001.)  "[U]nder New York law, the Board of Parole is entitled

to impose conditions on the conditional release of an inmate."  *Doe v. Simon*, 221 F.3d 137, 139

(2d Cir. 2000); N.Y. Exec. Law §§ 259-c, 259-g, 259-i(2); N.Y. Comp. Codes R. & Regs. tit. 9,

§ 8003.3 ("A special condition may be imposed upon a [parolee] either prior or subsequent to

release . . . each special condition may be imposed by a member of the Board of Parole, an

authorized representative of the division of parole, or a parole officer," memorialized by "a

written copy of each special condition imposed.").

Inasmuch as the Board of Parole and/or parole officer is charged with "the duty and

discretion of setting conditions for an inmate on parole release" *Doe*, 221 F.3d at 139; *Robinson*,

2010 WL 11507493, at *3, the Court finds Plaintiff's objection on this ground lacks merit.  *See*

*Peoples*, 2021 WL 1582173, at *8.  In a similar vein, "[e]very court to squarely address the issue

of whether the Full Faith and Credit Clause requires a state to give a convicted sex offender who

relocates to that state the same classification that he would have had in the state of conviction has

agreed that it does not."  *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *39 (E.D.N.Y.

Sept. 7, 2013) (collecting cases), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir.

2015).

Accordingly, because the record evidence demonstrates the foregoing conditions are

reasonably related to Plaintiff's criminal history and to the goals of protecting the public, the

Court recommends that Defendants' motion for summary judgment as to Plaintiff's second and

third causes of action be granted.  (Dkt. No. 38-14 at 6-7.)

### D.    Qualified Immunity

Defendants also move for summary judgment on all claims based on the doctrine of qualified immunity, which Plaintiff opposes.  (Dkt. No. 38-14 at 4-5;[10] Dkt. No. 40 at 2-6.)

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Beckles v. City of New York*, 492 F. App'x 181, 182 (2d Cir. 2012).

To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful."  *Phillips v. Wright*, 553 F. App'x 16, 17 (2d Cir. 2014).  "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context."  *Lima*, 270 F. Supp. 3d 684 at 710.

Here, as discussed *supra*, the record contains genuine issues of material fact as to Plaintiff's First Amendment claims regarding restrictions on attending church and accessing the

---

[10]  The Court only considers qualified immunity for claims that survived the above analysis.  *See Posr v. City of New York*, No. 10 CIV 2551, 2013 WL 2419142, *10 n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity"), *aff'd sub nom. Posr v. Ueberbacher*, 569 F. App'x 32 (2d Cir. 2014).

internet. As such, the first prong of the analysis has been met. With respect to the second prong, the Court notes Defendants' brief lacks any argument suggesting that Plaintiff's right to be free from these conditions was not clearly established. Rather, Defendants argue reasonable officials, similarly situated to Defendants, would not have understood that imposing the special conditions, in accordance with DOCCS' then-existing policies and with supervisory approval, violated any of Plaintiff's rights. (Dkt. No. 38-14 at 5.)

Upon review of the present record, the Court finds Defendants have failed to discharge their burden of showing that "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001); *see Maldonado*, 2019 WL 5784940, at *10 ("[S]ince *Salahuddin* [*v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993)], the right to participate in congregate religious services has been settled law, and a parole officer . . . is charged with knowledge thereof and cannot, therefore, reasonably believe that it was in his power to bar plaintiff from participating in communal worship altogether."); *United States v. Eaglin*, 913 F.3d 88, 95 (2d Cir. 2019) ("In our view, *Packingham* nevertheless establishes that, in modern society, citizens have a First Amendment right to access the Internet." ); *see, e.g.*, *Maldonado*, 2019 WL 5784940, at *10 (finding the defendant not entitled to qualified immunity with respect to plaintiff's claim that the conditions of parole prevented him from attending communal worship); *Ennis v. Annucci*, No. 5:18-CV-0501(GTS/TWD), 2019 WL 2743531, at *9 (N.D.N.Y. July 1, 2019) (denying motion to dismiss on qualified immunity grounds for internet related First Amendment deprivations that plaintiff allegedly suffered after *Packingham* was decided); *see also Maldonado*, 2019 WL 5784940, at *10 ("[A]t least prior to *Packingham*, the constitutional right of individuals on probation to

access social media or commercial internet sites was not clearly established."). Therefore, the

Court recommends denying Defendants' motion for summary judgment and dismissal based

upon qualified immunity. (Dkt. No. 38-14 at 4-5.)

## V.    CONCLUSION

After carefully considering the parties' submissions and the applicable law, and for the

reasons stated herein, it is hereby

**ORDERED** that Defendants' sealing request (Dkt. No. 37) is **DENIED**; and it is further

**ORDERED** that Defendants must file, within fourteen (14) days of the date of this

Report-Recommendation and Order, Exhibit B to Knapp Declaration and Exhibit A to the Miller

Declaration, in their **REDACTED** forms, which will replace Dkt. No. 38-5 and Dkt. No. 38-7;

and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 38) be

**GRANTED IN PART AND DENIED IN PART** as follows: (1) granted insofar as it seeks

dismissal of Plaintiff's claims for monetary damages against Defendants in their official

capacity; (2) granted insofar as it seeks dismissal of Plaintiff's second, third, and fourth causes of

action; (3) granted insofar as is seeks dismissal of Plaintiff's first cause of action relating to the

special condition of parole restricting access to parks; and (4) denied in all other respect; and it is

further

**RECOMMENDED** that, if the above recommendations are accepted, only Plaintiff's

first cause of action insofar as it challenges the special conditions of parole restricting Plaintiff's

access to church and the internet remains for trial; and it is further

**ORDERED** that the Clerk provide a copy of this Report-Recommendation and Order to

the parties in accordance with the Local Rules of Practice, along with copies of the unpublished

decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

  **ORDERED** that the Clerk is directed to amend the caption as set forth above.

  Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

  **IT IS SO ORDERED.**

Dated:  August 24, 2022
   Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2021 WL 4135007
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

CBF INDUSTRIA DE GUSA S/A, et al., Plaintiffs,

v.

AMCI HOLDINGS, INC., et al., Defendants.

13-CV-2581 (PKC) (JLC)
|
Signed 09/10/2021

**Attorneys and Law Firms**

Adam K. Grant, Elizabeth J. Sher, Gregory Robert Bruno, Pro Hac Vice, Day Pitney, L.L.P., New York, NY, Christopher A. Klimmek, Day Pitney LLP, Hartford, CT, Jonathan Seth Zelig, Day Pitney LLP, Boston, MA, Naju Lathia, Day Pitney, L.L.P., Parsippany, NJ, for Plaintiffs.

Stuart P. Slotnick, Buchanan Ingersoll & Rooney P.C., New York, NY, Alexandra West, Pro Hac Vice, Bruce Americus, Pro Hac Vice, Daniel C. Garfinkel, Jordan Webster, Kevin Patrick Lucas, Pro Hac Vice, Stanley Joel Parker, Buchanan Ingersoll & Rooney P.C., Pittsburgh, PA, Rishi Bhandari, New York, NY, Robert Allen Glunt, Mandel Bhandari LLP, New York, NY, for Defendants.

**MEMORANDUM ORDER**

JAMES L. COTT, United States Magistrate Judge

**\*1** Defendants have requested that portions of the Court's Opinion and Order dated August 18, 2021 be redacted. For the reasons explained below, the request is granted in part and denied in part.

**I. BACKGROUND**

On August 18, 2021, the Court issued its Opinion and Order on plaintiffs' motion for sanctions temporarily under seal and directed the parties to advise the Court of any proposed redactions for the Court's review. Dkt. No. 526 at 54. The Court reminded the parties to "be mindful of the presumption of public access to judicial documents in proposing any redactions." *Id.* (citing *Brown v. Maxwell*, 929 F.3d 41, 47–48 (2d Cir. 2019) and *Lugosch v. Pyramid Co. of Onondaga*,

435 F.3d 110, 119–20 (2d Cir. 2006)). On August 23, 2021, defendants filed a letter with their proposed redactions, which they claim "relate exclusively to [d]efendants' IT infrastructure." Dkt. No. 527 at 1. In their letter, defendants request that the Court redact "information regarding [their] server locations, vendors, data storage practices, and their use of specific hardware or software." *Id.* Plaintiffs have not responded to defendants' request.[1]

[1]    As defendants note in their letter, an unredacted copy of the Opinion and Order is available via a link contained in an August 19, 2021 article appearing on Law 360. Dkt. No. 527 at 1, n.1. While the Court understands that the Opinion was briefly filed on the public docket in the morning on August 19 due to human error in the docketing process, it has not been able to determine why the version that appeared in the Law 360 article was different from the one originally filed on ECF. In any event, the fact that the Opinion apparently remains publicly available would appear to render this application academic. Nevertheless, because defendants, while acknowledging this fact, have still requested that the Court approve their proposed redactions – and because the issues presented in this application are somewhat novel – the Court is issuing this Memorandum Order.

**II. DISCUSSION**

**A. Legal Standard**

"There is a long-established 'general presumption in favor of public access to judicial documents.' " *Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod.*, Inc., No. 19-CV-3766 (GHW), 2020 WL 7706741, at \*2 (S.D.N.Y. Dec. 29, 2020) (quoting *Collado v. City of New York*, 193 F. Supp. 3d 286, 288 (S.D.N.Y. 2016)). "The presumption of access is 'based on the need for federal courts ... to have a measure of accountability and for the public to have confidence in the administration of justice.' " *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Given this presumption, the Second Circuit has articulated a three-part test for evaluating whether documents (or certain information within those documents) may be sealed:

First, the court must determine whether the documents at issue are judicial documents. Second, it must assess the weight of the presumption of public access that attaches to

those documents. Third, the court must 'balance competing considerations against' the presumption of access, such as 'the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure.'

**\*2** *Sylvania v. Ledvance LLC*, No. 20-CV-9858 (RA), 2021 WL 412241, at \*1 (S.D.N.Y. Feb. 5, 2021) (internal citations omitted) (quoting *Lugosch*, 435 F.3d at 120).

"[T]he proponent of sealing must 'demonstrat[e] that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 144 (2d Cir. 2016) (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). " 'Broad and general findings' and 'conclusory assertion[s]' are insufficient to justify deprivation of public access to the record; 'specific, on-the-record findings' are required." *Id.* at 144–45 (internal citation omitted) (quoting *United States v. Erie Cnty.*, 763 F.3d 235, 243 (2d Cir. 2014)). Thus, "[t]o meet its heavy burden, the moving party 'must offer specific facts demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Beverly Hills Teddy Bear Co.*, 2020 WL 7706741, at \*2 (quoting *Wells Fargo Bank, N.A. v. Wales LLC*, 993 F. Supp. 2d 409, 413 (S.D.N.Y. 2014)). "[T]he decision as to access [to judicial records] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.* (quoting *Nixon v. Warner Commc'ns*, 435 U.S. 589, 599 (1978)).

## B. Application

### 1. Judicial Documents

"A 'judicial document' or 'judicial record' is a filed item that is 'relevant to the performance of the judicial function and useful in the judicial process.' " *Bernstein*, 814 F.3d at 139 (quoting *Lugosch*, 435 F.3d at 119). Because the information defendants wish to redact was submitted for the Court's consideration in response to plaintiffs' motion for sanctions and was related to the Court's decision, the information is plainly included as part of judicial documents. *See, e.g.,* *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2020 WL 2190708, at \*2 (S.D.N.Y. May 5, 2020) ("[A]ll the documents at issue were submitted to the Court in support of and so would reasonably have the tendency to influence the Court's decision on the outstanding motions ... for sanctions.... As such, all documents submitted in support

of these motions are judicial documents ...."); *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15-CV-2926 (DRH) (SIL), 2019 WL 5694256, at \*22 (E.D.N.Y. July 22, 2019) (documents in support of Rule 37(e) sanctions motion are judicial documents), *adopted by* 2020 WL 1242616 (Mar. 16, 2020).

### 2. Weight of Presumption of Public Access

"The weight of the presumption is a function of (1) 'the role of the material at issue in the exercise of Article III judicial power' and (2) 'the resultant value of such information to those monitoring the federal courts,' balanced against 'competing considerations' such as 'the privacy interests of those resisting disclosure.' " *Bernstein*, 814 F.3d at 142 (quoting *Lugosch*, 435 F.3d at 119–20). "The presumption attached to ... non-dispositive motions 'is generally somewhat lower than the presumption applied to material introduced at trial, or in connection with dispositive motions such as motions for dismissal or summary judgment." *Valassis Commc'ns, Inc.*, 2020 WL 2190708, at \*2 (quoting *Brown*, 929 F.3d at 50). Thus, the information defendants seek to redact is "subject to a lesser—but still substantial—presumption of public access.' " *Id.* (quoting *Brown*, 929 F.3d at 53).

**\*3** While the presumption of public access is lower given the non-dispositive nature of the motion at issue here, at least some of the information defendants seek to redact was used as part of the Court's analysis and "the public would likely need access to the information ... in order to understand the issues before the Court and evaluate the Court's reasoning." *Anderson v. New York City Health & Hosps. Corp.*, No. 16-CV-1051 (GBD) (KHP), 2020 WL 1047054, at \*3 (S.D.N.Y. Mar. 4, 2020) (citing *Bernstein*, 814 F.3d at 141). For example, as discussed in more detail below, defendants seek to redact details regarding the inconsistences in AMCI Holdings' document preservation practice on page 12 of the Court's Opinion and Order. However, this information was integral to the Court's analysis in determining the extent of defendants' dereliction of their duty to preserve ESI and whether email was actually lost. Accordingly, there is a strong presumption of public access to some of the information, at least to the extent the Court used it to shape and inform its analysis. *See, e.g.,* *In re SunEdison, Inc. Sec. Litig.*, No. 16-CV-7917 (PKC), 2019 WL 12043498, at \*2 (S.D.N.Y. Sept. 25, 2019) ("underlying materials [were] afforded a high presumption of public access" because they were "an

Case 5:20-cv-00535-BKS-TWD Document 45 Filed 08/24/22 Page 33 of 267
CBF Industria de Gusa S/A v. AMCI Holdings, Inc., Slip Copy (2021)

2021 WL 4135007

important part of defendants' opposition ... that was discussed in detail by the Court"); *Bernstein v. O'Reilly*, 307 F. Supp. 3d 161, 170 (S.D.N.Y. 2018) ("In order to evaluate that claim, the Court would need to review and analyze the [proposed redacted information]; thereafter, the public should be able to see what the Court relied on in issuing its Opinion. The public would have no way to make sense of the Court's analysis testing this claim with only partial or limited access to the [proposed redacted information].").

However, the inquiry does not end there. Rather, "[a]gainst the applicable presumption of public access," the Court must next "consider whether countervailing factors or higher values dictate" redacting the proposed information. *Valassis Commc'ns, Inc.*, 2020 WL 2190708, at *1.

### 3. Competing Considerations

"Although the term ['higher values'] has not been comprehensively defined, courts have identified particular examples of 'higher values.' " *E.E.O.C. v. Kelley Drye & Warren LLP*, No. 10-CV-655 (LTS) (MHD), 2012 WL 691545, at *2 (S.D.N.Y. Mar. 2, 2012) (collecting cases). "Established factors and values that can outweigh the presumption of public access include legal privilege, business secrecy, and privacy interests." *Echo Bay, LLC v. Torrent Pharma, Inc.*, No. 20-CV-6345 (PKC), 2020 WL 5543070, at *2 (S.D.N.Y. Sept. 16, 2020) (internal citations omitted).

Defendants argue that "information regarding server location, vendors, data storage practices, and use of specific hardware or software can be used to facilitate unauthorized access, particularly where such information is gathered in a single source," based on advice apparently provided to them from information security consultants, although they did not submit affidavits from their consultants detailing the extent of the harm or how the information could specifically be used by hackers.[2] They "further note that, '[c]ourts have concluded that concerns about hackers and a cyber attack justified sealing information about a company's IT systems.' " Dkt. No. 527 at 1 (quoting *OneAmerica Fin. Partners, Inc. v. T-Sys. N. Am., Inc.*, No. 15-CV-1534, 2016 WL 891349, at *4 (S.D. Ind. Mar. 9, 2016)). The one case they quote from, in turn, cites three cases from the Northern District of California and a case from the Eastern District of Wisconsin, all of which found that concerns regarding cyber attacks could justify the sealing of certain information. For example, in *Music Group Macao Commercial Offshore Limited v. Foote*, the court

described how certain categories of information can be used to "perpetuate a cyber attack including: (1) identification of a particular vulnerability in a company's systems or software; (2) knowledge of the software or vendor of security software used; and (3) 'social engineering'—*i.e.*, gaining the trust of a company insider to, in turn, gain access to the company's software." No. 14-CV-3078 (JSC), 2015 WL 3993147, at *5 (N.D. Cal. June 30, 2015). The court then reasoned that "[p]ublic release of this information could therefore cause [defendant] harm by contributing to [a] cyber attack." *Id.*

2   It would have been preferable for defendants to have submitted affidavits from their consultants in support of their application. In the normal course, the Court would expect such evidence in support of the redactions that are being sought here. However, plaintiffs do not oppose defendants' application, and the Court believes the record is sufficiently developed, especially given the expert reports submitted as part of the motion papers, to rule on defendants' requests without further submissions.

**\*4** Courts in the Second Circuit have not specifically addressed whether protecting a company from the threat of a "cyber attack" is a "higher value" or "countervailing factor" that can prevail over the presumption of public access.[3] However, protecting a company's IT information fits comfortably within other "higher values" consistently recognized by courts in this Circuit, such as the protection of "sensitive business information," *Hanks v. Voya Ret. Ins. & Annuity Co.*, No. 16-CV-6399 (PKC), 2020 WL 5813448, at *2 (S.D.N.Y. Sept. 30, 2020) (collecting cases); the protection of "proprietary business information, such as internal analyses, business strategies, or customer negotiations;" *Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, No. 19-CV-9439 (PKC), 2020 WL 3264264, at *3 (S.D.N.Y. June 17, 2020) (collecting cases); and "the prevention of potential fraud." *Dollar Phone Corp. v. Dun & Bradstreet Corp.*, No. 09-CV-3645 (ILG) (SMG), 2012 WL 13195012, at *2 (E.D.N.Y. May 10, 2012). *See also Kewazinga Corp. v. Microsoft Corp.*, No. 18-CV-4500 (GHW), 2021 WL 1222122, at *3 (S.D.N.Y. Mar. 31, 2021) ("Courts commonly find that documents that contain trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like satisfy the sealing standard." (quoting *Rensselaer Polytechnic Inst. v. Amazon.com, Inc.*, No. 18-CV-549 (BKS) (CFH), 2019 WL 2918026, at *2 (N.D.N.Y. June 18, 2019))); *In re Am. Realty*

*Cap. Properties, Inc. Litig.*, No. 15-CV-307 (AKH), 2019 WL 11863704, at *1 (S.D.N.Y. Mar. 25, 2019) ("Screenshots and any other information about ... software that could be used to copy the program's structure or functions are more deserving of protection ....").

3      The court in *Saint-Jean v. Emigrant Mortg. Co.* redacted information related to "cyber security and password setting," but did not provide its reasoning for doing so. No. 11-CV-2122 (SJ) (RLM), 2016 WL 11430775, at *5 n.11 (E.D.N.Y. May 24, 2016). However, releasing documents related to a company's "password setting," would seem to be inherently riskier than making public, for example, the type of email defendants use. Regardless, if "password setting" and the types of information defendants seek to redact produce similar cybersecurity risks, defendants have not met their burden through "a particular and specific demonstration of fact." *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, No. 13-CV-5356 (JMF), 2015 WL 394075, at *6 (S.D.N.Y. Jan. 29, 2015) ("[T]o justify sealing business information, a party must 'make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test.' ") (quoting *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 630 (S.D.N.Y. 2011)).

In this vein, at least one court has grouped "IT information," within the umbrella of "business information," warranting redactions. *See Ramirez v. Temin & Co., Inc.*, No. 20-CV-6258 (ER), 2020 WL 6781222, at *6 (S.D.N.Y. Nov. 18, 2020) ("The Document also has several sections that include the Firm's business information. Specifically, the categories of business information include: ... IT information. The Court has established that business information constitutes confidential information ... when it is 'sufficiently valuable and secret to afford an actual or potential economic advantage over others.' " (internal citations omitted) (quoting *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 245 (S.D.N.Y. 2009))). Accordingly, the need to protect a party from a cyber security attack may be a legitimate basis to rebut the public's presumption of access to judicial documents, where the threat of a cyber security attack outweighs the extent to which the particular information was used to inform the Court's opinion.

With these principles in mind, the Court will now turn to defendants' proposed redactions.

### 4. Categories of Redactions

Rather than going through each proposed redaction individually, the Court has grouped the redactions into the following eight categories: (1) the nature of defendant companies' IT infrastructure (Dkt. No. 526 at 7); (2) the names of the companies that handle their IT and the employees affiliated with those companies (*id.* at 7, 8, 11 n.6, 14, 17, 40, 50, 51); (3) the providers of certain services related to email and document retention (*id.* at 7, 17, 30); (4) the location of a physical server (*id.* at 9, 12, 15, 20, 29); (5) descriptions of forensic digital files (*id.* at 8 n.4, 14 n.8, 15–21, 25, 26, 29, 31, 41, 49, 50); (6) Hans Mende's, Fritz Kundrun's, and Hans Fleskes' specific preservation practices (*id.* at 9, 11, 18, 29, 30); (7) AMCI Holdings' document retention policies (*id.* at 12, 16, 17, 40); and (8) details regarding specific document retention (*id.* at 18, 37). The specific information redacted within the first four categories was not required to shape the Court's analysis and the public would not need access to this information to understand the Court's Opinion. *See, e.g., Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 707 (S.D.N.Y. 2017) ("The remaining categories of information [plaintiff] hopes to seal all carry a low presumption of access to public records because they are collateral to the Court's resolution of the parties' ... motions."). The Court therefore grants defendants' request to redact the information within those categories. The next four categories are more difficult to resolve. As such, the Court will discuss them in more detail.

**\*5** First, defendants seek to redact descriptions of forensic digital files, which includes much of the information the Court examined in determining whether emails were permanently destroyed. For example, defendants seek to redact significant portions of the Court's descriptions of the parties' expert reports (Dkt. No. 526 at 16–20). The descriptions, if unsealed, would reveal the type of software defendants use to keep and store emails because they relate to the programs that defendants use for emails, which they contend "can be used to facilitate unauthorized access." Dkt. No. 527 at 1. While defendants propose to redact much of the information in the description of the expert reports, they do not seek to redact similarly large portions of the Court's corresponding analysis. In particular, even with defendants' proposed redactions, the parts of the Court's Opinion and Order discussing whether the missing ESI could be restored through additional

discovery remains largely intact. Dkt. No. 526 at 41–42. The presumption of public access is weaker then because the public would still be able to understand the Court's rationale for its decision without the specific details of defendants' email infrastructure. The Court therefore grants the redactions related to the descriptions of forensic digital files at Dkt. No. 526 at 8 n.4, 14 n.8, 15–21, 25, 26, 29, 31, 41, 49, 50. [4]

[4]    The Court notes that on page 20, on the sixth line of the last paragraph, defendants did not redact a phrase that was otherwise redacted throughout. That phrase should also be redacted to be consistent with the other redactions.

Next, defendants seek to redact information related to Hans Mende's, Fritz Kundrun's, and Hans Fleskes' specific preservation practices. While the specific preservation practices of Mende and Kundrun are crucial to the Court's analysis on defendants' duty to preserve ESI (Dkt. No. 526 at 37–38), defendants only seek to redact specific references related to IT practices. [5] Defendants have thus narrowly tailored the proposed redactions without significantly affecting the public's access to understanding the Court's Opinion. The Court therefore grants the redactions related to Mende, Kundrun, and Fleskes' preservation practices at Dkt. No. 526 at 9, 11, 18, 29, 30.

[5]    Fleskes was not identified as a custodian in the case and the Court therefore did not discuss his ESI as part of its analysis on lost ESI when determining when defendants' duty to preserve ESI was triggered. Dkt. No. 526 at 10, 29.

Defendants also seek to redact information related to AMCI Holdings' document retention policies. Beginning at page 12 of the Court's Opinion and Order, defendants request that the specific references to the contradictions in AMCI Holdings' preservation practices and policies be redacted. On page 17, defendants similarly attempt to redact a comment that archiving at the AMCI Holdings office was done on an "ad hoc" basis. On pages 16 and 40, defendants wish to redact two sentences that refer to preservation practices and also detail how defendants' IT personnel archive information, both of which begin with the phrase "[defendants] archived emails 'at will.' " Many of these references lie at the heart of the Court's analysis in finding that sanctions were warranted because it was those inconsistencies that led the Court to its conclusions that AMCI Holdings failed to take reasonable steps to preserve ESI and that ESI was ultimately lost. *See,*

*e.g.*, Dkt. No. 526 at 40. Specifically, those references detail how defendants' counsel failed to "become fully familiar with [their] client's document retention policies, as well as the client[s'] data retention architecture." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004). The presumption of public access is thus higher, and the threat of a cyber attack must be greater to justify redacting the information. *See, e.g., Anderson*, 2020 WL 1047054, at *3 ("[T]he public would likely need access to the information ... in order to understand the issues before the Court and evaluate the Court's reasoning.").

Defendants have not met their burden to show that the threat of a cyber attack outweighs the public access to the following sentences on page 12: AMCI Holdings "does not have a written record retention policy;" it was AMCI Holdings' policy to "retain everything indefinitely;" it was "[t]he general practice of AMCI and AMCI Holdings ... to delete, maintain and/or archive emails and documents at their discretion;" and AMCI Holdings "had no standard practice of preserving employee's emails." [6] Defendants have not offered "a particular and specific demonstration of fact," *T-Jat Sys. 2006 Ltd.*, 2015 WL 394075, at *6 (quotation omitted), that this information can be used by hackers, nor is it apparent to the Court. The same applies to the Court's reference on page 17 that archiving at the AMCI Holdings office was done on an "ad hoc" basis. However, weighing the factors for the sentences on pages 16 and 40 produces a different conclusion. In particular, although the part of the sentences that mention that email archiving was done "at will" was important to the Court's analysis, the rest of each sentence offers details regarding defendants' IT practices, which are not as integral to the Court's analysis, and potentially offer details that could be used maliciously by hackers. Accordingly, the Court will permit redaction of the latter half of each sentence (following the phrase "at will") on pages 16 and 40.

[6]    References to the physical location of servers and employee names, as already discussed, can be redacted and were not included in the excerpts cited herein.

**\*6** Lastly, defendants seek to redact details regarding specific document retention at pages 18 and 37 of the Court's Opinion and Order and references to "Tata Emails" on pages 16, 18, 36, 41, and 49. Both sentences refer to the fact that part of the missing emails were "archived on Defendants' systems" that were recovered from a company called "Tata" in 2012. This fact was crucial to the Court's determination that emails

were lost after 2012, *i.e.*, after defendants' duty to preserve ESI was triggered. Dkt. No. 526 at 36–37. Consequently, these references ultimately led to the Court's conclusion that sanctions were warranted. Thus, there is far greater weight of a presumption of public access to these two sentences. Defendants have not provided "a particular and specific demonstration of fact," that a hacker could use knowledge that email was archived in 2012 to infiltrate defendants' current information systems. Defendants add that the threat of a cyber attack is greater where "information is gathered in a single source." Dkt. No. 527 at 1. However, because the Court has granted the majority of defendants' proposed redactions, the extent to which this particular information may be useful to a hacker, without the other information, is less likely. Accordingly, the Court denies the request to redact these two sentences as well as the Court's references to the "Tata Emails."

### III. CONCLUSION

For the foregoing reasons, the Court grants defendants' requests for redactions except those at pages 12, 16, 17, 18, 36, 37, 40, 41, and 49, as discussed in this Memorandum Order. By September 15, 2021, defendants are directed to submit to the Court, by email, a redacted version of the Opinion and Order consistent with this Memorandum Order. The Court will, in turn, docket that version, and then submit it to Westlaw and Lexis for publication.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4135007

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6586290
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John DOE, Plaintiff,
v.
RENSSELAER POLYTECHNIC
INSTITUTE, Defendant.

1:20-cv-01359 (BKS/CFH)
|
Signed 11/10/2020

**Attorneys and Law Firms**

For Plaintiff: Julie A. Nociolo, Benjamin F. Neidl, James C. Knox, E. Stewart Jones Hacker Murphy LLP, 28 Second Street, Troy, NY 12180.

For Defendant: Michael E. Ginsberg, Rhiannon I. Spencer, Pattison, Sampson, Ginsberg & Griffin, PLLC, 22 First Street —P.O. Box 208, Troy, NY 12181.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

*\*1* On November 3, 2020, Plaintiff John Doe filed a Complaint against Defendant Rensselaer Polytechnic Institute ("RPI"), alleging breach of contract and breach of the implied covenant of good faith and fair dealing. (Dkt. No. 1, at 16–21). Presently before the Court is Plaintiff's motion to proceed under a pseudonym pursuant to Fed. R. Civ. P. 10(a) and to seal the exhibits attached to the Complaint. (Dkt. No. 3). For the reasons that follow, Plaintiff's motion to seal is denied without prejudice, and the Court has set a due date for any response to the motion to proceed under a pseudonym.

**II. DISCUSSION**

**A. Legal Standard**

"The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." United States v. Erie County, 763 F.3d 235, 238–39 (2d Cir. 2014). "Indeed, the common law right of public access to judicial documents is said to predate even the Constitution itself." Id. at 239. The First Amendment to

the U.S. Constitution "also protects the public's right to have access to judicial documents." Id. A party seeking to seal documents submitted to a court bears the burden of showing that sealing is proper. See DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 826 (2d Cir. 1997).

**1. Common Law Right of Access**

The Second Circuit has articulated a three-step process for determining whether documents should be sealed in light of the common law right of access. "Before any such common law right can attach ... a court must first conclude that the documents at issue are indeed 'judicial documents.' " Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). To constitute a judicial document, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process." United States v. Amodeo (Amodeo I), 44 F.3d 141, 145 (2d Cir. 1995).

Second, after determining that the documents are judicial documents and that the "common law presumption of access attaches," the court must "determine the weight of that presumption." Lugosch, 435 F.3d at 119. According to the Second Circuit,

> the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

United States v. Amodeo (Amodeo II), 71 F.3d 1044, 1049 (2d Cir. 1995). When a document plays a role in a court's adjudication of litigants' substantive rights—a function that is "at the heart of Article III"—the presumption is strong, but "[a]s one moves along the continuum, the weight of the presumption declines." Id. When "documents are usually filed with the court and are generally available, the weight of

the presumption is stronger than where filing with the court is unusual or is generally under seal." *Id.* at 1050.

**\*2** Third, the court must balance any "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.' " *Id.* (quoting *Amodeo II*, 71 F.3d at 1050); *accord Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 143 (2d Cir. 2016). When weighing privacy interests, courts should consider "the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051. Courts should also assess the "nature and degree of injury," paying heed to "the sensitivity of the information and the subject" but also to "how the person seeking access intends to use the information." *Id.* at 1051 (explaining that "[c]ommercial competitors seeking an advantage over rivals need not be indulged in the name of monitoring the courts").

### 2. First Amendment Right of Access

The First Amendment right of access stems from the qualified right of the public and the press "to attend judicial proceedings and to access certain judicial documents." *Lugosch*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). Once a court concludes that there is a qualified First Amendment right of access to the judicial documents at issue, it may only seal the documents "if specific, on the record findings are made demonstrating that the closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). "Broad and general findings by the trial court ... are not sufficient to justify closure." *Id.* (quoting *In re N.Y. Times Co.*, 828 F.2d at 116). Examples of "higher values" may include law enforcement interests, the privacy of innocent third parties, *Amodeo II*, 71 F.3d at 1050, and the attorney-client privilege, *Lugosch*, 435 F.3d at 125.

### B. Analysis

The Exhibits at issue,[1] (Dkt. Nos. 1-1 to 1-6), are attached to the Complaint and Plaintiff relies on them in support of his motion for a temporary restraining order and preliminary injunction. (Dkt. No. 5; *see, e.g.*, Dkt. No. 5-2, at 7–8). They are, therefore, judicial documents. *See Doscher v.*

*Sobel & Co.*, LLC, No. 14-cv-646, 2014 WL 846773, at *2, 2014 U.S. Dist. LEXIS 29063, at *6 (S.D.N.Y. Mar. 3, 2014) ("The Complaint, and the exhibits attached thereto, are clearly 'judicial documents,' and are analyzed with 'strong presumption in favor of public access.' " (quoting *ING Global v. United Parcel Serv. Oasis Supply Corp.*, No. 11-cv-5697, 2012 WL 4840805, at *6, 2012 U.S. Dist. LEXIS 144923, at *19 (S.D.N.Y. Sep. 25, 2012))); *Utica Mut. Ins. Co. v. INA Reins. Co.*, No. 12-cv-194, 2012 WL 13028279, at *4, 2012 U.S. Dist. LEXIS 204381, at *11 (N.D.N.Y. June 12, 2012) ("The parties' filings on Utica's motion for a preliminary injunction clearly are judicial documents carrying a presumption of public access because they are intended to be taken into account in deciding the motion." (citing *Amodeo I*, 44 F.3d at 145)). As they are judicial documents "used to determine litigants' substantive legal rights" they are subject to the "highest" presumption of access, and "should, absent exceptional circumstances, be subject to public scrutiny." *Lugosch*, 435 F.3d at 121, 123, 124 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

[1]    Plaintiff seeks to seal "all attached documents" to the Complaint, (Dkt. No. 3), but in his proposed order seeks to seal only Exhibits B through E, and not Exhibit A. (Dkt. No. 3-2, at 3). In an excess of caution, the Court has considered Plaintiff's motion to seal with respect to all the Exhibits.

Plaintiff seeks to seal Exhibits A–F to the Complaint. Exhibit A is the Rensselaer Handbook of Student Rights and Responsibilities. (Dkt. No. 1-1). Exhibit B is a letter to Plaintiff from an RPI administrator dated October 12, 2020. (Dkt. No. 1-2). Exhibit C is a letter to Plaintiff from an RPI administrator dated October 14, 2020. (Dkt. No. 1-3). Exhibit D is an email from an RPI administrator to RPI students and families dated October 16, 2020. (Dkt. No. 1-4). Exhibit E is a letter to Plaintiff from an RPI administrator dated October 20, 2020. (Dkt. No. 1-5). Exhibit F is the RPI "Agreement to Comply with Health & Safety Requirements for Students Attending the Rensselaer Campus and Activities." (Dkt. No. 1-6). In support of his motion to seal these exhibits, Plaintiff argues that "[p]ublic disclosure of this confidential information contained in the exhibits, namely, the identity of plaintiff and his address, would subject plaintiff to unnecessary ridicule and attention without advancing any aspect of the litigation, chill litigation from future similarly situated students for fear that they need to reveal their identity in order to bring suit, and compromise the importance of safeguarding plaintiff's due process rights when he chose to vindicate those rights in court." (Dkt.

No. 3-2, at 3). However, as all identifying information has been redacted from these Exhibits, and Plaintiff has not provided a basis for wholesale sealing of these documents or attempted to narrowly tailor his request beyond the redactions already made, the Court finds that the presumption of access outweighs any privacy interests. Nothing in the Exhibits would enable a member of the public or anyone without knowledge of the gathering at issue in this case to discern Plaintiff's identity. Although Plaintiff represents that these "[e]xhibits were exchanged between the parties in a confidential student conduct proceeding ... and have been protected from public disclosure during RPI's investigation and determination," (*id.*), there is no indication that these documents are the subject of a protective order. And even if they were, the fact that documents are governed by a protective order in civil discovery does not satisfy a party's burden under *Lugosch. See In re SunEdison, Inc. v. Securities Litigation*, No. 16-cv-7917, 2019 WL 126069, at *1 (S.D.N.Y. Jan. 7, 2019). Any sealing must be narrowly tailored to serve the higher values that support limiting public access under the First Amendment and common law right of public access to court documents. *See Lugosch*, 435 F.3d at 119–20. Accordingly, Plaintiff has failed to show that his asserted privacy interests are sufficiently strong to overcome the presumption of access, and his motion to seal Exhibits A–F is denied without prejudice to renewal by letter motion.

### III. CONCLUSION

**\*3** For these reasons, it is

**ORDERED** that Plaintiff's motion to seal the Exhibits to the Complaint (Dkt. No. 3) is **DENIED** without prejudice to renew; and it is further

**ORDERED** that if Plaintiff does not renew his motion to seal by November 20, 2020, the Court Clerk is directed to unrestrict the Exhibits to the Complaint; and it is further

**ORDERED** that any response to Plaintiff's motion to proceed anonymously (Dkt. No. 3) is due by November 20, 2020.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2020 WL 6586290

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3540221
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SUSQUEHANNA INTERNATIONAL

GROUP LIMITED, Petitioner,

v.

HIBERNIA EXPRESS (IRELAND)
LIMITED, Respondent.

21 Civ. 207 (PGG)
|
Signed 08/11/2021

**Attorneys and Law Firms**

Marjorie Joan Peerce, Ballard Spahr LLP, New York, NY, for Petitioner.

Scott Livingston, Marcus & Shapira LLP, Pittsburgh, PA, for Respondent.

**ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

**\*1** In this action, Susquehanna International Group Limited ("Susquehanna") seeks to confirm an arbitration award. (Petition (Dkt. No. 1)) In a March 8, 2021 joint letter, Susquehanna and Respondent Hibernia Express (Ireland) Limited ("Hibernia") request that this Court (1) enter a consent judgment that will resolve and dispose of the action; and (2) permit Exhibits 1 through 3 to Susquehanna's petition to confirm the arbitration award to "be permanently sealed or, in the alternative, withdrawn from the ECF filing system and replaced with [the] redacted versions enclosed herewith." (See Mot. (Dkt. No. 4) at 1)

The Court will enter the proposed consent judgment submitted by the parties.

As to the sealing request, Exhibits 1, 2 and 3 are the Final Arbitration Award, the Partial Final Arbitration Award, and a Master Services Agreement ("MSA") between the parties (collectively, the "Exhibits"). The parties contend that sealing is appropriate because (1) the Exhibits are not "judicial documents" to which a presumption of public access applies, and even if they are "judicial documents," the presumption

of public access should be given little weight, because the presumption is outweighed by the parties' privacy interests; and (2) pursuant to the MSA and "a separate confidentiality agreement executed by the parties in connection with the underlying arbitration (and entered as an order by the arbitrator) ..., the parties agreed that certain information would be treated as confidential, including the terms of the MSA and the proceedings in the arbitration." (Id. at 1-3)

A presumption of public access applies to "judicial documents," which are documents " 'relevant to the performance of the judicial function and useful in the judicial process.' " Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006) (quoting United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I")). "A document is ... 'relevant to the performance of the judicial function' if it would reasonably have the tendency to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." Brown v. Maxwell, 929 F.3d 41, 49 (2d Cir. 2019) (citing Amodeo I, 44 F.3d at 145-46) (emphasis in original). "[I]f in applying these standards, a court determines that documents filed by a party are not relevant to the performance of a judicial function, no presumption of public access attaches." Id. (emphasis in original).

If, however, the court "determine[s] that the documents are judicial documents ... it must determine the weight of th[e] presumption [of judicial access].... [Then,] the court must 'balance competing considerations against [that presumption].' " Lugosch, 435 F.3d at 119-20 (quoting United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) ("Amodeo II")). " '[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.' " Id. at 119 (quoting Amodeo II, 71 F.3d at 1049).

**\*2** " '[D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to preserve that interest.... Broad and general findings by the trial court, however, are not sufficient to justify closure.' " Id. at 120

(quoting Matter of N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987)).

The parties argue that the Exhibits are not judicial documents because (1) "the Court was never presented with briefing or asked to rule on the Petition and thus had no need to consider the exhibits to the Petition in conducting its judicial function"; and (2) "the parties have agreed ... to the entry of the enclosed consent judgment prior to the Court needing to address the merits of the action," so the Exhibits are "not relevant to the performance of this Court's judicial function." (Mot. (Dkt. No. 4) at 2 (citing Brown, 929 F.3d at 51-52)) They further argue that, even if the Exhibits are judicial documents, "the presumption of access to them is entitled to very little weight[,]" because "here, where the Petition was never fully briefed and the Court was not asked to rule on the Petition, ... the role of Exhibits 1 through 3 is virtually non-existent." (Id. at 2-3 (citations omitted))

Because the parties settled this action before the Petition was briefed or decided, the Court need not rely on the Exhibits for the purpose of deciding the merits of the Petition. However, "[t]he fact that a suit is ultimately settled without a judgment on the merits does not impair the 'judicial record' status of pleadings.... [P]leadings are considered judicial records 'even when the case is pending before judgment or resolved by settlement.' " Bernstein v. Bernstein Litowitz Berger & Grossmann LLP, 814 F.3d 132, 140 (2d Cir. 2016) (quoting IDT Corp. v. eBay, 709 F.3d 1220, 1223 (8th Cir. 2013)). Indeed, the Second Circuit has "expressly rejected the proposition that 'different types of documents might receive different weights of presumption based on the extent to which they were relied upon in resolving [a] motion.' " Brown, 929 F.3d at 48 (quoting Lugosch, 435 F.3d at 123) (alterations omitted). In other words, "[o]nce [a document is] filed on the docket, the presumption of access attaches ... and does not disappear." Dawson v. Merck & Co., No. 1:12-CV-1876 (BMC)(PK), 2021 WL 242148, at *5 (E.D.N.Y. Jan. 24, 2021).

Moreover, "it is well settled in this District that 'the petition, memoranda, and other supporting documents filed in connection with a petition to confirm an arbitration award (including the Final Award itself) are judicial documents that directly affect the Court's adjudication of that petition.' " Clearwater Ins. Co. v. Granite State Ins. Co., No. 15-cv-165 (RJS), 2015 WL 500184, at *3 (S.D.N.Y. Feb. 5, 2015) (quoting Aloi Nissay Dowa Ins. Co. v. ProSight Specialty Mgmt. Co., No. 12 Civ. 3274(JPO), 2012 WL 3583176, at

*6 (S.D.N.Y. Aug. 21, 2012))) (collecting cases); see also Alexandria Real Estate Equities, Inc. v. Fair, No. 11 Civ. 3694(LTS), 2011 WL 6015646, at *2 (S.D.N.Y. Nov. 30, 2011) ("Petitions to confirm arbitration awards, and their attendant memoranda of law and supporting documents, are 'judicial documents that directly affect[ ] the Court's adjudication' of the confirmation petition." (quoting Church Ins. Co. v. Ace Prop. & Cas. Ins. Co., No. 10 Civ. 698(RJS), 2010 WL 3958791, at *1 (S.D.N.Y. Sept. 23, 2010))).

*3 Here, the Exhibits – the Final Arbitration Award, the Partial Final Arbitration Award, and the MSA between the parties – directly affect the adjudication of the Petition, and are therefore judicial documents. Clearwater Ins. Co., 2015 WL 500184, at *3. That the Court need not decide the merits of the Petition does not change the fact that the Exhibits are judicial documents. Moreover, because the information contained in the Exhibits directly affects the adjudication of the Petition, a strong presumption of public access applies. See Lugosch, 435 F.3d at 119; see also Eagle Star Ins. Co. v. Arrowood Indem. Co., No. 13 CV 3410 HB, 2013 WL 5322573, at *2 (S.D.N.Y. Sept. 23, 2013) ("[T]he sealed Arbitration Information ... constitute[s] 'the heart of what the Court is asked to act upon.' ... The weight of the presumption of access therefore is correspondingly high.... Whether the Court decided the petition or the motion to dismiss ... does not affect the weight of the presumption of access." (quoting Glob. Reins. Corp.-U.S. Branch v. Argonaut Ins. Co., Nos. 07 Civ. 8196(PKC), 07 Civ. 8350(PKC), 2008 WL 1805459, at *1 (S.D.N.Y. Apr. 21, 2008))).

Having concluded that a strong presumption of public access applies to the Exhibits, the Court must next " 'balance competing considerations against [that presumption].' " Lugosch, 435 F.3d at 119-20 (quoting Amodeo II, 71 F.3d at 1050). Competing considerations may include the parties' interests in confidentiality, particularly where "public disclosure of th[e] information " 'might harm a litigant's competitive standing.' " " Oliver Wyman, Inc. v. Eielson, 282 F. Supp. 3d 684, 706 (S.D.N.Y. 2017) (quoting In re Parmalat Sec. Litig., 258 F.R.D. 236, 244 (S.D.N.Y. 2009) (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978))).

Here, the parties assert that any presumption of public access is outweighed by (1) their agreement to keep the terms of the MSA and the arbitration proceedings confidential; and (2) potential competitive harm to Hibernia in the event that the Exhibits are not sealed. (Mot. (Dkt. No. 4) at 1-3)

2021 WL 3540221

Confidentiality agreements alone are not an adequate basis for sealing. See, e.g., Bernstein v. O'Reilly, 307 F. Supp. 3d 161, 168 (S.D.N.Y. 2018) ("Courts in this district have long held that bargained-for confidentiality does not overcome the presumption of access to judicial documents.") (collecting cases); First State Ins. Co. v. Nat'l Cas. Co., No. 13 Civ. 704(AJN), 2013 WL 8675930, at *1 (S.D.N.Y. Feb. 19, 2013) (denying motion to seal documents submitted in connection with a petition to confirm an arbitration award, because "[t]he assertion that disclosure violates a separate confidentiality order is insufficient"); Aioi Nissay, 2012 WL 3583176, at *6 ("Courts in this District have held that 'the mere existence of a confidentiality agreement covering judicial documents is insufficient to overcome the First Amendment presumption of access,' Alexandria Real Estate, 2011 WL 6015646, at *3, and have consistently refused to seal the record of a petition to confirm an arbitration award, notwithstanding the existence of such an agreement.") (citations omitted).

While a risk of competitive harm may serve as a basis for sealing judicial documents, the parties have not made a sufficient showing of competitive harm. They merely state that "the information redacted from Exhibits 1 through 3 includes commercial terms negotiated by the parties and information relating to Hibernia's business operations that Hibernia believes could, if revealed, provide a commercial advantage to Hibernia's competitors and to its customers in negotiating other contracts." (Mot. (Dkt. No. 4) at 3) But the parties have not identified with specificity what terms present such a risk to Hibernia, nor have they provided more than a conclusory assertion of potential harm resulting from disclosure.

 **\*4**  Moreover, the parties have made no effort to present a "narrowly tailored" sealing request, as Lugosch requires. See Lugosch, 435 F.3d at 120; cf. Cunningham v. Cornell Univ., No. 16-cv-6525 (PKC), 2019 WL 10892081, at *2 (S.D.N.Y. Sept. 27, 2019) (granting motions to seal where proposed redactions were "narrowly tailored and limited" to cover "pricing terms offered to [non-party] clients"). Their proposed redactions are extensive and include portions of the Exhibits with no apparent relation to the MSA's commercial terms or Hibernia's business operations. The parties' redactions include, inter alia: the portion of the Final Arbitration Award relating to Petitioner's claim for attorneys' fees and arbitration costs (see Ex. 1 (Dkt. No. 4-3) at 4-7); thirteen pages of the eighteen-page Partial Final Arbitration Award, including portions discussing the procedural history, facts, and analysis (see Ex. 2 (Dkt. No. 4-3) at 12-25); and all

but three of the MSA's 31 sections, as well as the entirety of the attached Service Level Agreement (see Ex. 3 (Dkt. No. 4-3) at 29-52, 56-61).

Absent a showing that sealing is " 'essential to preserve higher values' " and that such sealing is " 'narrowly tailored to serve that interest[,]' " Lugosch, 435 F.2d at 120 (quoting Matter of N.Y. Times Co., 828 F.2d at 116), a motion to seal cannot be granted. [1]

[1]
> The parties also argue that the presumption of public access is outweighed by the federal policy in favor of arbitration and interests of judicial efficiency. (Mot. (Dkt. No. 4) at 3-4) But these factors are not a sufficient basis for sealing here, where a strong presumption of public access applies to the Exhibits and the parties have not adequately demonstrated that Hibernia will suffer competitive harm absent sealing and have not narrowly tailored their sealing request. See Eagle Star Ins. Co., 2013 WL 5322573, at *2–3 (holding that confidentiality agreement was not an adequate basis for sealing petition to confirm arbitration award, exhibits attached to the petition, and motion to dismiss, despite "competing considerations includ[ing] 'the danger of impairing ... judicial efficiency' and 'the privacy interests of those resisting disclosure.' " (quoting Lugosch, 435 F.2d at 120)); Glob. Reins. Corp., 2008 WL 1805459, at *1 (holding that although "[t]he federal policy in favor of arbitration is promoted by permitting one of the principle advantages of arbitration – confidentiality – to be achieved[,]" the risk to Petitioner that unsealing arbitration award would "impair [its] negotiating position with other reinsurers" was not an adequate basis for sealing, because the award was "at the heart of what the Court is asked to act upon").

Accordingly, the motion to seal is denied without prejudice to a revised motion consistent with this Order. Any revised motion will (1) propose redactions that are narrowly tailored to cover only the commercially sensitive information contained in the Exhibits; and (2) include a detailed explanation – as to each proposed redaction – why the information at issue is commercially sensitive. Any revised motion will be filed by **August 17, 2021**. Absent such a filing, all material currently under seal will be unsealed.

2021 WL 3540221

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 3540221

---

**End of Document**                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 1512712
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gary KEMP, Petitioner,
v.
Joseph NOETH, Respondent.

20-CV-9121 (RA)(SN)
|
Signed 04/15/2021

**Attorneys and Law Firms**

Gary Kemp, Attica, NY, Pro Se.

Matthew B. Keller, Office of the Attorney General, New York, NY, for Respondent.

**ORDER**

SARAH NETBURN, United States Magistrate Judge:

**\*1**  On April 12, 2021, the Honorable Ronnie Abrams referred this matter to me for resolution of Respondent's motion to seal and for a report and recommendation on the petition for a writ of habeas corpus. See ECF No. 17.

On April 8, 2021, Respondent moved to seal the state records and transcripts relating to Petitioner's state court conviction. ECF No. 15. Respondent seeks to keep confidential the name of and other identifying information relating to Petitioner's rape victim, which can be found across the state record and transcripts. [1] See id. at 2. For the reasons stated below, Respondent's motion is GRANTED.

[1]     Respondent has not sought to seal any portion of his response to the petition. See ECF Nos. 18–19.

**BACKGROUND**

In 2017, Petitioner Gary Kemp was convicted of predatory sexual assault, aggravated criminal contempt, and four counts of criminal contempt in the first degree in New York County. See ECF No. 6 (Amended Petition); People v. Kemp, 112 N.Y.S.3d 92 (1st Dep't), lv. denied, 34 N.Y.3d 1079 (2019). When the matter was before the Appellate Division,

the State requested that the filings be kept confidential pursuant to New York Civil Rights Law § 50-b, which provides that the "identity of any victim of a sex offense ... shall be confidential," and that "[n]o report, paper, picture, photograph, *court file* or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection." (emphasis added).

On October 30, 2020, Petitioner filed his petition for writ of habeas corpus, challenging his judgment of conviction and raising four grounds for relief. See ECF Nos. 1, 6. On December 14, 2020, Judge Abrams ordered the State to respond to the petition and directed Respondent to file the records and transcripts relating to Petitioner's conviction. ECF No. 8.

On April 8, 2021, Petitioner filed a motion to seal those state records and transcripts, asserting that the victim's name appeared over 1,500 times across the state record and transcripts. ECF No. 15, at 5.

**DISCUSSION**

There is a presumption of public access to judicial documents. Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). A court should only limit access to judicial documents after balancing the competing privacy and public access interests. Id. at 119–20.

When a party has moved to seal documents, a Court must first determine whether those documents fall into the category of "judicial documents" to which the common law right of public access attaches. Id. at 115. In the second step of the analysis, once the Court has determined that the documents are "judicial documents," a Court must determine how much weight to afford the common law presumption of access and the public's First Amendment right of access. Id. at 119–20. At the third step, the Court must balance any countervailing factors to the presumption of public access. Id. at 120. Among those countervailing factors a court may consider are the "privacy interests of those resisting disclosure." Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995)).

**\*2**  The state court records and transcripts Respondent has filed would qualify as judicial documents as they are "relevant to the performance of the judicial function and useful in the judicial process." Id. (quoting United States v. Amodeo, 44

F.3d 141, 145 (2d Cir. 1995)); accord Murphy v. Warden of Attica Corr. Facility, No. 20-cv-03076 (PAE) (JLC), 2020 WL 6866403, at *2 (S.D.N.Y. Nov. 23, 2020); Scott v. Graham, No. 16-cv-02372 (KPF) (JLC), 2016 WL 6804999, at *1 (S.D.N.Y. Nov. 17, 2016). As judicial documents, then, the common law right of public access would attach. Lugosch, 435 F.3d at 119. Nevertheless, the privacy interest the Court must consider here—the identity of a sexual assault victim—is an important and recognized basis to limit public access to the documents in question. See, e.g., Murphy, 2020 WL 6866403, at *2 (sealing state records and transcript that included a sexual assault victim's identifying information); Scott, 2016 WL 6804999, at *1 (collecting cases); Williams v. Lempke, No. 11-cv-02504 (PGG), ECF. No. 7 (S.D.N.Y. June 20, 2011) (same); Archbold v. Hessel, No. 08-cv-03898 (SHS) (FM), 2011 WL 2671527, at *1 (S.D.N.Y. June 20, 2011).

The Court also concludes that filing these documents under seal—rather than redacting the necessary portions—is warranted in this case. See ECF No. 15 at 5. The impracticality of redacting the victim's name and the fallibility of the redacting software urge the conclusion that sealing is "narrowly tailored" in light of the "higher values" at issue. See United States v. Silver, No. 15-cr-0093 (VEC), 2016 WL 1572993, at *3 (S.D.N.Y. Apr. 14, 2016) (quoting United States v. Erie Cty., 763 F.3d 235, 241 (2d Cir. 2014)); accord Murphy, 2020 WL 6866403, at *2.

## CONCLUSION

Accordingly, in light of the significant weight affording a sexual assault victim's privacy interests, and in consideration of New York Civil Rights Law § 50-b, the Court concludes that the state court records and transcripts are to remain under seal.

Given that Respondent has now filed his response to the amended petition, Petitioner shall file his reply, if any, by Monday, May 17, 2021. Should Petitioner wish to oppose the sealing of the state records and transcripts, he shall so state in his reply brief.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1512712

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5991819
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jane DOE, Plaintiff,
v.
Cuba GOODING, Jr., Defendant.

20-cv-06569 (PAC)
|
Signed 07/29/2021

**Attorneys and Law Firms**

Mahir Sheikh Nisar, Nisar Law Group, P.C., Casimir Joseph Wolnowski, Law Office of Casey J. Wolnowski, New York, NY, for Plaintiff.

Edward Vincent Sapone, Sapone & Petrillo, LLP, New York, NY, for Defendant.

## ORDER & OPINION

PAUL A. CROTTY, United States District Judge

 *1 Plaintiff Jane Doe ("Plaintiff") sued Cuba Gooding, Jr. ("Defendant," "Gooding, Jr."), alleging that he forcibly raped her in 2013. Three motions from Plaintiff are before the Court: (1) a motion to proceed pseudonymously, or, in the alternative, to seal this case; (2) a motion to seal two declarations revealing the real names of Plaintiff and Jane Doe #2 [1] (the "True Identity Declarations"); and (3) a motion for default judgment. Defendant has completely failed to engage with this case. Accordingly, the Court (i) grants Plaintiff's motions to proceed pseudonymously and to seal the True Identity Declarations, without prejudice to a future challenge from Defendant if and when he responds to this order; (ii) grants Plaintiff's motion for default judgment as to Defendant's liability; and (iii) reserves judgment as to damages, attorneys' fees, and costs. Defendant is ordered to enter an appearance by September 7, 2021. After September 7, the Court will convene a conference to determine whether a hearing is necessary.

 [1]    Jane Doe #2 is not a plaintiff in this case. She is a third party who submitted a declaration in support of Plaintiff's motion for default judgment, which details the sexual assault Jane Doe #2 allegedly

suffered at Defendant's hands. *See* Decl. of Casey Wolnowski Supp. Default J. Ex. 6, Decl. of Jane Doe #2 ¶¶ 3–11, ECF No. 20–6.

## BACKGROUND

Plaintiff alleges that Gooding, Jr. forcibly raped her in 2013. *See* Compl. ¶¶ 8–23, ECF No. 1. On August 18, 2020, Plaintiff filed her complaint against Defendant, alleging that his rape was a crime of violence committed against her on the basis of, and with animus towards, her gender, in violation of New York City's Gender-Motivated Violence Protection Law, New York City Administrative Code § 10–1101, *et seq.* ("VGM"). Compl. ¶¶ 31–34; *see also* Pl.'s Mem. Supp. Mot. Default J. 8, ECF No. 21. Plaintiff simultaneously filed a motion to proceed pseudonymously or, alternatively, under seal. Mot. Seal Case and/or Proceed Pseudonymously, ECF No. 4. On August 20, 2020, the Court ordered Defendant to respond to the motion to proceed pseudonymously by September 10, 2020. Text Order dated Aug. 20, 2020. Defendant never responded, and no other activity occurred on the docket until March 2021.

On March 1, 2021, the Court dismissed the case without prejudice for failure to prosecute. Order of Dismissal, ECF No. 7. Plaintiff promptly moved to reopen the case. Mot. to Reopen Case, ECF No. 8. The Court granted Plaintiff's motion on March 16, 2021, and directed Plaintiff to serve Gooding, Jr. by April 30, 2021. Order Granting Mot. to Reopen Case, ECF No. 10. Plaintiff effected service on April 22, and Defendant failed to answer by the May 13 deadline. *See* Decl. of Casey Wolnowski Supp. Default J. ("Wolnowski Decl.") Ex. 1, Aff. of Service, ECF No. 20–1. On May 14, Plaintiff obtained a certificate of default from the Clerk of Court. Wolnowski Decl. Ex. 2, Clerk's Certificate of Default, ECF No. 20–2. Then, on My 26, 2021, Plaintiff moved for default judgment and to seal the True Identity Declarations. Pl.'s Mot. Default J., ECF No. 19; Pl.'s Mot. Seal True Identity Decls., ECF No. 16.

## DISCUSSION

### I. Plaintiff's Motion to Proceed Pseudonymously
 *2 Federal Rule of Civil Procedure 10(a) requires a complaint to name all parties. Fed. R. Civ. P. 10(a). "This Rule 'serves the vital purpose of facilitating public scrutiny of judicial proceedings,' " and it "cannot be set aside lightly." *Doe v. Weinstein*, 484 F. Supp. 3d 90, 93 (quoting *Sealed*

*Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188, 189 (2d Cir. 2008)). The district court may grant an exception to this disclosure rule if "the plaintiff has a 'substantial privacy' interest that 'outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings.' " *Id.* (quoting *Sealed Plaintiff*, 537 F.3d at 189). To that end, the Second Circuit has identified a non-exhaustive list of ten factors that a district court should consider in determining whether to permit a plaintiff to proceed under a pseudonym. *Sealed Plaintiff*, 537 F.3d at 190. [2]

[2]    "(1) whether the litigation involves matters that are highly sensitive and of a personal nature; (2) whether identification poses a risk of retaliatory physical or mental harm to the party seeking to proceed anonymously or even more critically, to innocent non-parties; (3) whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity; (4) whether the plaintiff is particularly vulnerable to the possible harms of disclosure, particularly in light of his age; (5) whether the suit is challenging the actions of the government or that of private parties; (6) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, whether the nature of that prejudice (if any) differs at any particular stage of the litigation, and whether any prejudice can be mitigated by the district court; (7) whether the plaintiff's identity has thus far been kept confidential; (8) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity; (9) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities; and (10) whether there are any alternative mechanisms for protecting the confidentiality of the plaintiff." *Sealed Plaintiff*, 537 F.3d 190 (internal citations, quotation marks, and alterations omitted).

Plaintiff has satisfied some, but not all, of the *Sealed Plaintiff* factors. The allegations in this case explicitly describe heinous sex acts perpetrated against Plaintiff (including vaginal and anal rape, without a condom, after luring Plaintiff into Defendant's hotel room on false pretenses). Compl. ¶¶ 14–22. Plaintiff has recounted her embarrassment,

depression, and suicidal ideation resulting from this episode with Defendant. Wolnowski Decl. Ex. 3, Decl. of Jane Doe ¶¶ 20–25, ECF No. 20–3. Plaintiff's allegations of sexual assault are unquestionably "highly sensitive and of a personal nature," but that alone does not carry her burden. Pl.'s Mem. Supp. Mot. Seal Case and/or Proceed Pseudonymously 3, ECF No. 5 ("Pl.'s Mem. Supp. Pseudonym"); *Weinstein*, 484 F. Supp. 3d at 94. However, Plaintiff also represents that (1) she "is likely to suffer social stigma as a victim of these crimes," (2) "permitting the details of these highly personal claims to be publicly associated with her may impact her family if her identity were revealed at this stage," and (3) "[t]he personal nature of the allegations informs other factors too, including whether identification poses a risk of retaliatory physical or mental harm to the plaintiff or to innocent non-parties (such as their families), and whether the identification presents other, severe harms." Pl.'s Mem. Supp. Pseudonym 4. While these claims would be stronger with more explanation of what those harms might be, where they might originate from, or the likelihood of their occurrence, the Court finds Plaintiff's representations sufficient to justify pseudonymity at this stage.

**\*3** Defendant's failure to appear precludes the Court from discerning whether he would suffer any prejudice from allowing Plaintiff to proceed as Jane Doe, especially since he already knows her identity, Pl.'s Mem. Supp. Pseudonym 4. And the use of a pseudonym is a narrowly-tailored solution for protecting Plaintiff's confidentiality while maximizing the amount of information about this case that the public may receive (as opposed to requiring Plaintiff to disclose her real name but filing the entire case under seal). *See Valassis Commc'ns, Inc. v. News Corp.*, No. 17-cv-7378, 2020 WL 2190708, at \*1 (S.D.N.Y. May 5, 2020) ("[R]edacting sensitive information is a preferable alternative to sealing an entire document.")'. *Doe v. Doe*, No. 20-CV-5329, 2020 WL 6900002, at \*4–5 (E.D.N.Y. Nov. 24, 2020). Accordingly, Plaintiff's motion to proceed pseudonymously is granted, without prejudice to future objection from Defendant.

## II. Plaintiff's Motion to Seal the True Identity Declarations

Plaintiff concedes that the True Identity Declarations, which she submitted in support of her motion for default judgment, are judicial documents. Pl.'s Mot. Seal True Identity Decls. 1–2; *see also United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (*Amodeo I*) (judicial documents are those "relevant to the performance of the judicial function and useful in the judicial process"). "Judicial documents are subject at

common law to a potent and fundamental presumptive right of public access that predates even the U.S. Constitution." *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020) (citations omitted). This common law presumptive right of access "requires a court to make specific, rigorous findings before sealing the [judicial] document or otherwise denying public access." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 141 (2d Cir. 2016) (citation omitted). Before sealing a document, the court must (1) determine whether the document is a judicial document; (2) if it is a judicial document, decide how much weight to give the presumption of access; and (3) determine whether the factors that weigh against public disclosure outweigh the presumption of access. *Mirlis*, 952 F.3d at 59. The presumption of access is heavy where the judicial document directly affects an adjudication, and light where the document's role in the court's performance of its Article III duties is negligible. *Bernstein*, 814 F.3d at 142.

The First Amendment independently safeguards the public's presumptive right to access certain judicial documents. *Bernstein*, 814 F.3d at 141. Where the First Amendment right of access applies, a court may seal judicial documents "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest," but "[b]road and general findings" are insufficient. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). The First Amendment presumptive right of access applies to judicial documents submitted in connection with a motion for default judgment, because it is a dispositive motion. *See Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 166 (S.D.N.Y. 2018); *City of Almaty, Kazakhstan v. Sater*, No. 19-CV-2645, 2019 WL 5963438, at *1–2 (S.D.N.Y. Nov. 13, 2019); *Lugosch*, 435 F.3d at 126. Thus, the [documents] at issue enjoy a qualified right of access under both the common law and the First Amendment," and the Court need only consider Plaintiff's sealing motion "under the 'stronger' First Amendment right." *United States v. Sater*, No. 98-CR-1101, 2019 WL 3288389, at *2 (E.D.N.Y. July 22, 2019) (quoting *United States v. Erie Cnty., N.Y.*, 763 F.3d 235, 239 (2d Cir. 2014)).

**\*4** Countervailing factors that weigh against public disclosure include "the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (*Amodeo II*)). Courts frequently recognize the privacy interest in protecting

"the identity of a sexual assault victim" as "an important and recognized basis to limit public access" to judicial documents. *See, e.g., Kemp v. North*, No. 20-CV-9121, 2021 WL 1512712, at *2 (S.D.N.Y. Apr. 15, 2021) (collecting cases). Courts assign especially heavy weight to innocent third parties' privacy interests. *Amodeo II*, 71 F.3d at 1050–51.

The Court has already explained the basis for redacting Plaintiff's name from the record. Jane Doe #2 also has a substantial privacy interest in maintaining her anonymity, for similar reasons. *See* Wolnowski Decl. Ex. 6, Decl. of Jane Doe #2 ¶¶ 3–11, ECF No. 20–6 (describing Defendant's attempt to digitally penetrate Jane Doe #2's anus, against her will, at a film festival). As a non-party sexual assault victim, Jane Doe #2's privacy interests receive heavy weight in the sealing analysis. Accordingly, the Court finds that (1) Plaintiff's and Jane Doe #2's substantial privacy interests outweigh the presumptive right of public access to the True Identity Declarations; and (2) sealing the True Identity Declarations is a narrowly-tailored means of protecting their privacy interests. *See Doe v. Doe*, 2020 WL 6900002, at *4–5; *Scott v. Graham*, No. 16-CV-2372, 2016 WL 6804999, at *2 (S.D.N.Y. Nov. 17, 2016) ("[R]edact[ing] the names of the victim and her mother (as opposed to requesting that the Court seal this entire proceeding) is 'narrowly-tailored' to serve the higher value of safeguarding the victim's identity."). Plaintiff's motion to seal the True Identity Declarations is granted, without prejudice to Defendant's right to object in the future.

### III. Plaintiff's Motion for Default Judgment

Federal Rule of Civil Procedure 55 "provides a 'two-step process' for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment." *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)). "[T]he entry of a default[] formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.* Then, "the entry of a default judgment[] converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c)." *Id.* Although the entry of default establishes liability, it does not constitute an admission of damages. *Id.* The court has the authority "to 'conduct hearings or make referrals' as may be necessary, *inter alia*, to determine the amount of damages

or establish the truth of the plaintiff's allegations." *Id.* at 129 (citing Fed. R. Civ. P. 55(b)(2)(B)–(C)).

"[T]he Clerk of the Court must enter the default if defendant fails to 'plead or otherwise defend' in response to a properly served and filed complaint." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 80 (E.D.N.Y. 2020) (quoting Fed. R. Civ. P. 55(a); *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011)). But a plaintiff is not entitled to a default judgment simply because she has obtained an entry of default; instead, the court will consider three factors in determining whether to grant a default judgment: "(1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Antoine*, 489 F. Supp. 3d at 80 (citation omitted); *Lent v. CCNH, Inc.*, No. 13-CV-942, 2015 WL 3463433, at *3 (N.D.N.Y. June 1, 2015) ("[S]imply because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right.").

**\*5** Here, all three factors tip in Plaintiff's favor. *First*, Defendant's failure to appear in this case or answer the complaint after being properly served indicates that his default was willful. *Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 291 n.2 (S.D.N.Y. 2016); *Antoine*, 489 F. Supp. 3d at 80; *see also* Order Granting Mot. to Reopen Case 2 (noting Defendant's evasion of service of process). *Second*, the Court has no way to determine whether Defendant has any meritorious defense, because the Defendant has not appeared and argued any. *Santana*, 198 F. Supp. 3d at 291 n.2; *Antoine*, 489 F. Supp. 3d at 82. *Third*, this case has been on the Court's docket for nearly a year, without any forward progress until now; Plaintiff would be prejudiced if the Court denied her motion and required her to continue waiting indefinitely for Defendant to engage with the judicial process. *Santana*, 198 F. Supp. 3d at 291 n.2; *Antoine*, 489 F. Supp. 3d at 90; Pl.'s Mem. Supp. Mot. Default J. 6.

Upon reviewing Plaintiff's submission, the VGM, and related caselaw, the Court determines that the facts Plaintiff alleges, which the Court accepts as true, are sufficient to support her claim under the VGM. *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 455 (S.D.N.Y. 2018) (setting forth the following elements a plaintiff must prove to establish a VGM claim: "(1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) presenting a serious risk of physical injury; (3) that was perpetrated

because of plaintiff's gender; (4) in part because of animus against plaintiff's gender; and [(5)] resulted in injury."); *Breest v. Haggis*, 115 N.Y.S.3d 322, 330 (N.Y. App. Div. 1st Dep't 2019) (holding that allegations of rape or sexual assault are, by themselves, sufficient to plead animus based on the victim's gender on a VGM claim); *see also id.* at 325–26 (describing defendant's concession that rape is a crime of violence committed "because of gender or on the basis of gender"). Accordingly, the Court grants Plaintiff's motion for default judgment as to Defendant's liability for the acts alleged in her complaint.

The Court reserves ruling on the issue of damages, however. Although an inquest on damages is not mandatory, the Court deems it useful here. *See Garcia v. Comprehensive Ctr., LLC*, No. 17-CV-8970, 2018 WL 3918180, at *2, *6 (S.D.N.Y. Aug. 16, 2018); *see also Doe v. Green*, No. 17-CV-1765, 2021 WL 2188148, at *1 (S.D.N.Y. May 28, 2021) (noting referral to magistrate judge "for an inquest into damages and attorney's fees" in Eighth Amendment sexual assault case).[3] Plaintiff seeks $2 million in compensatory damages and $4 million in punitive damages. Plaintiff's declaration (which discusses her mental and emotional problems following the Defendant's alleged attack) provides some basis for this request, but it is not enough for the Court to conclude, at this stage, that these amounts are warranted. *See Lent*, 2015 WL 3463433, at *11. "Damages, which are neither susceptible of mathematical computation nor liquidated as of the default, usually must be established by the plaintiff in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." *Henry v. Bristol Hosp., Inc.*, No. 13-cv-00826, 2020 WL 7773418, at *2 (D. Conn. Dec. 30, 2020) (quoting *Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). Thus, the Court will conduct an inquest into damages, as well as attorneys' fees and costs,[4] and give Defendant an opportunity to appear and argue for a lesser award.

[3]  Further, Federal Rule of Civil Procedure 54(c) requires that a default judgment not "exceed in amount[ ] what is demanded in the pleadings." Fed. R. Civ. P. 54(c). Plaintiff's complaint does not specify an amount of damages. *See* Compl. 6–7.

[4]  The Court reserves judgment on what is a reasonable award of attorneys' fees and costs because Plaintiff's counsel may need to do further

2021 WL 5991819

work in light of this order, and that further work might affect the amount Plaintiff seeks.

## **CONCLUSION**

**\*6** Plaintiff's motions to proceed pseudonymously and to seal the True Identity Declarations are granted. Plaintiff's motion for default judgment is granted as to Gooding, Jr.'s liability, but the Court reserves judgment as to damages, attorneys' fees, and costs. Gooding, Jr. is ordered to enter an appearance in this case by Tuesday, September 7, 2021.

After September 7, the Court will convene a conference to determine whether a hearing is necessary for the damages inquest.

The Clerk of Court is directed to close the motions at ECF numbers 4, 16, and 19.

**All Citations**

Slip Copy, 2021 WL 5991819

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 51 of 267

Scott v. Graham, Not Reported in Fed. Supp. (2016)

2016 WL 6804999

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   United States v. Nojay,   W.D.N.Y.,   December 19, 2016

2016 WL 6804999
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Andre SCOTT, Petitioner,
v.
Harold D. GRAHAM, et al., Respondents.

16-CV-2372 (KPF) (JLC)
|
Signed November 17, 2016

**Attorneys and Law Firms**

Andre Scott, Auburn, NY, pro se.

Margaret Ann Cieprisz, New York State Office of the Attorney General, New York, NY, for Respondents.

## **MEMORANDUM ORDER**

JAMES L. COTT, United States Magistrate Judge.

*\*1*  To protect the identity of a rape victim, respondents have submitted a letter requesting permission to redact the victim's name from state-court records that respondents plan to file with the Court in their response to this habeas corpus petition. *See* Respondents' letter, dated Nov. 15, 2016, Dkt. No. 28. Further, because the victim and her mother share the same last name, respondents also seek permission to redact the mother's name. For the reasons stated below, respondents' request is granted.

The petitioner, Andre Scott, was convicted of, among other things, first-degree rape. *See* Amended Petition, undated, Dkt. No. 8, at 1; *People v. Scott*, 126 A.D.3d 645, 645 (1st Dep't 2015), *leave denied*, 25 N.Y.3d 1171 (N.Y. 2015). Section 50-b of New York's Civil Rights Law requires that the identities of sexual-assault victims remain "confidential" and that no public employee make "available for public inspection" any document disclosing the victim's identity. To maintain the privacy of the victim, comply with the Civil Rights Law, and fully respond to the petition, respondents request permission to redact the name of the victim and the victim's mother from

copies of state-court records, including transcripts, that they plan to file with their response to Scott's petition. [1]

[1]     Respondents have properly redacted the name of the rape victim's minor child as required by Rule 5.2(a) of the Federal Rules of Civil Procedure.

There is a "common law right of public access to judicial documents," which is "firmly rooted in our nation's history" and which creates a rebuttable "presumption" in favor of public access to judicial documents. *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119 (2d Cir. 2006). Although not every document filed with a court constitutes a "judicial document," it appears that the state-court records at issue here would qualify as such given that they appear to be "relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995).

In determining what weight to afford the presumption in favor of public access to judicial documents, a court must first assess the "role of the material at issue in the exercise" of judicial power and the "value of such information to those monitoring the federal courts." *Lugosch*, 435 F.3d at 119 (citing *Amodeo*, 71 F.3d at 1050). Then, the court must weigh "competing interests," including, among other things, the "privacy interests of those resisting disclosure" and the "danger of impairing law enforcement or judicial efficiency." *Id.* A court may seal judicial documents "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and closure is narrowly tailored to serve that interest." *Id.* (citing *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

Here, there is a compelling reason to limit the general public's access to the documents filed in this case: safeguarding the identity of a rape victim. In habeas proceedings seeking relief from convictions for sex offenses, numerous courts in this District and elsewhere have entered sealing orders, or have excluded the rape victim's name from judicial documents, to protect the victim's identity. *See, e.g., Archbold v. Hessel*, No. 08-CV-3898 (SHS) (FM), 2011 WL 2671527, at *1 (S.D.N.Y. June 20, 2011), *adopted as modified*, 2011 WL 2946169 (S.D.N.Y. July 19, 2011) ("I have referred to the victim by her initials to protect her identity. *See* N.Y. Civil Rights Law § 50-b. For the same reason, I also granted the Respondent's motion to file the state court records under seal."); *Martich v. Smith*, No. 08-CV-6277 (SAS), 2009 WL 2043894, at *1 n.4 (S.D.N.Y. July 14, 2009) ("[T]his Court granted respondent ...

Scott v. Graham, Not Reported in Fed. Supp. (2016)

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 52 of 267

2016 WL 6804999

leave to place under seal the federal habeas corpus petition and copies of all state records, in order to protect the privacy of the sex offense victim pursuant to N.Y. Civ. Rights Law § 50-b."); *Hardison v. Artus*, No. 06-CV-322 (LTS) (AJP), 2006 WL 1330064, at *1 (S.D.N.Y. May 16, 2006), *adopted by*, 2006 WL 1763678 (S.D.N.Y. June 23, 2006) ("To protect the privacy of the sexual assault victim, as required by N.Y. Civil Rights Law § 50-b, she will be referred to by her initials instead of name. The state trial transcript has been filed under seal because it refers to the victim by name."); *Roe v. Senkowski*, No. 9:98-CV-656 (NAM) (GLS), 2001 WL 1860884, at *1 (N.D.N.Y. Feb. 20, 2001) (citing New York Civil Rights Law § 50-b and referring to sex-offense victim by initials only); *Brown v. Duncan*, No. 9:00-CV-242 (DNH) (GLS), 2003 WL 21294476, at *1 n.1 (N.D.N.Y. June 4, 2003) (citing New York Civil Rights Law § 50-b and noting that the "court will not refer to the victim by her name" and directing that the clerk "seal the file in this proceeding").

**\*2** The Court further concludes that respondents' request to redact the names of the victim and her mother (as opposed to requesting that the Court seal this entire proceeding) is "narrowly tailored" to serve the higher value of safeguarding the victim's identity. *See, e.g., United States v. Silver*, No. 15-CR-93 (VEC), 2016 WL 1572993, at *3 (S.D.N.Y. Apr. 14, 2016).

For the reasons stated above, respondents' request to file their response to the petition under seal is GRANTED. Respondents shall file copies of the state-court record and state-court transcripts with the Clerk of the Court on the docket with the names of the victim, the victim's mother, and the victim's child, redacted, and file unredacted copies of these same documents under seal.

**SO ORDERED.**

Dated: November 1, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6804999

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by  MALARCZYK v. LOVGREN,  2nd Cir.,  March 10,
2022

2022 WL 374271
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert MALARCZYK, Plaintiff,

v.

Trooper Eric P. LOVGREN, sued in both their
individual capacity and official capacity as a Trooper
with the New York State Police, Trooper Brian C.
DiPasquale, sued in both their individual capacity
and official capacity as a Trooper with the New York
State Police, and John Doe Officers 1-5, Their true
names and identities presently unknown, acting in both
their Official and Unofficial capacities, Defendants.

1:19-CV-42
|
Signed 02/08/2022

**Attorneys and Law Firms**

OF COUNSEL: THOMAS M. GAMBINO, ESQ., OFFICE
OF THOMAS M. GAMBINO & ASSOCIATES, P.C.,
Attorneys for Plaintiff, 222 Church Street, Poughkeepsie, NY
12601.

HON. LETITIA JAMES, New York State Attorney General,
OF COUNSEL: MARK G. MITCHELL, ESQ., Ass't
Attorney General, Attorneys for Defendants, The Capitol,
Albany, NY 12224.

**MEMORANDUM-DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 **\*1** On January 11, 2019, plaintiff Robert Malarczyk
("Malarczyk" or "plaintiff") filed this 42 U.S.C. § 1983
action against defendants New York State Police Trooper
Eric P. Lovgren ("Trooper Lovgren"), New York State
Police Trooper Brian C. DiPasquale ("Trooper DiPasquale"),
and John Doe Officers 1-5 (the "Does"). According to
the thirteen-count complaint, Trooper Lovgren and Trooper

DiPasquale (collectively "defendants") violated Malarczyk's
civil rights by, *inter alia*, conspiring to arrest him. Dkt. No. 1.

On May 20, 2021, defendants moved for summary judgment
under Federal Rule of Civil Procedure ("Rule") 56. Dkt.
No. 27. Plaintiff has opposed and cross-moved for summary
judgment in his own favor. Dkt. No. 29. The motions are fully
briefed and will be decided on the basis of the submissions
without oral argument.

**II. BACKGROUND**

On September 26, 2016, Trooper DiPasquale finished his shift
on duty as a New York State Trooper, clocked out, and left the
State Police barracks in his personal vehicle. *See* Defs.' Facts,
Dkt. No. 27-15 ¶ 1. As he drove westbound on State Route
299 in the Town of Lloyd, he saw a vehicle—a blue Mercury
Mountaineer—parked in a driveway close to the road. *Id.* ¶
2. According to Trooper DiPasquale, he saw the driver of
the blue Mercury make a gesture that "appeared to be him
possibly smoking a bowl" of marijuana. *Id.* ¶ 3.

Trooper DiPasquale pulled over to the side of the road to see
what the driver of the blue Mercury would do next. Defs.'
Facts ¶ 4. According to Trooper DiPasquale, the blue Mercury
pulled onto State Route 299, drove through "a steady red
light" without braking, and then turned abruptly onto New
Paltz Road "without signaling, crossing the center line[,] and
driving off the roadway onto a dirt patch before reentering the
roadway." *Id.* ¶¶ 5–6.

Although he was off duty, Trooper DiPasquale decided to
follow the blue Mercury because of its erratic behavior and
the possibility that the driver was intoxicated from recent drug
use. Defs.' Facts ¶ 7. Trooper DiPasquale also called 911 to
make a report. *Id.* According to Trooper DiPasquale, the blue
Mercury continued to drive in an erratic or dangerous manner
—he observed it cross over the center line multiple times. *Id.*
¶ 8. Eventually, after traveling some distance down the road,
the blue Mercury turned into a driveway on Tracy Road and
came to a stop. *Id.* ¶ 9.

Trooper DiPasquale parked his personal vehicle behind the
blue Mercury, got out, and approached on foot. Defs.' Facts
¶ 10. He observed a man—later identified as Malarczyk—
sitting in the driver's seat and a female in the front passenger
seat. *Id.* ¶ 11. Although Trooper DiPasquale did not recognize
plaintiff, he did know the passenger: Monika Giaculli. *Id.* ¶¶
12–13. As Trooper DiPasquale explains, he recognized Ms.
Giaculli because "he had responded to prior 911 calls at her

residence involving domestic disputes with her mother." *Id.* ¶ 13.

Trooper DiPasquale showed his State Police shield and ID card, identified himself as a police officer, and asked Malarczyk why he was driving erratically. Defs.' Facts ¶ 14. In response, plaintiff opened the driver's door and exited the blue Mercury. *Id.* ¶ 15. As plaintiff did so, "a beer can fell out of the driver's side door onto the ground." *Id.* "Beer spilled out of the can onto the driveway." *Id.* ¶ 16. "Plaintiff immediately picked up the can and threw it into the woods near a garbage can." *Id.* ¶ 17.

 **\*2** In the meantime, fellow New York State Trooper Lovgren had received a call through the 911 dispatcher about Trooper DiPasquale's report of an erratic vehicle. Defs.' Facts ¶ 18. Trooper Lovgren—who was on duty in full uniform and driving a marked police vehicle—responded to the call and arrived at the Tracy Road location at about 4:35 p.m. *Id.* ¶¶ 19–20.

Upon his arrival at the scene, Trooper Lovgren talked to Trooper DiPasquale. Defs.' Facts ¶ 21. Trooper DiPasquale described to Lovgren his observations, including the erratic behavior of the blue Mercury and that he saw a beer can fall out of the driver's door when Malarczyk exited the vehicle to speak with him. *Id.* Trooper DiPasquale also explained to Lovgren how plaintiff had tossed the beer can into the woods nearby. *Id.*

Next, Trooper Lovgren talked to Malarczyk. Defs.' Facts ¶ 22. Plaintiff identified himself and confirmed that he had just driven the blue Mercury from nearby New Paltz. *Id.* ¶ 23. According to Trooper Lovgren, plaintiff "had bloodshot, glassy eyes and the odor of alcohol on his breath." *Id.* ¶ 24. Trooper Lovgren also observed the beer can that plaintiff had thrown away nearby. *Id.* ¶ 27.

Based on the information he had received from Trooper DiPasquale and his own observations made at the scene, Trooper Lovgren asked Malarczyk to perform some field sobriety tests. Defs.' Facts ¶ 25. Plaintiff refused these requests. *Id.* ¶¶ 25–26. Trooper Lovgren handcuffed plaintiff and drove him to the police station. *Id.* ¶ 28.

At the police station, beginning at about 5:08 p.m., Trooper Lovgren asked Malarczyk on at least three occasions to submit to a chemical test to determine the alcohol and/or drug content of his blood and warned him that his refusal

to participate in the test would result in the immediate suspension of his driver's license. *See* Defs.' Facts ¶¶ 29–32. Plaintiff refused each of these requests. *Id.* ¶ 32.

Thereafter, Malarczyk was transported to the Town of Lloyd Court where he was arraigned on four traffic charges: (1) driving while intoxicated; (2) passing a red light; (3) consumption or possession of alcoholic beverages in a motor vehicle; and (4) moving from a lane unsafely. Defs.' Facts ¶ 34. After the arraignment, plaintiff was released. *Id.* ¶ 35. He did not spend time in jail and he was not required to post bond. *Id.* ¶ 36.

On October 24, 2016, the New York State Department of Motor Vehicles ("DMV") held an administrative hearing to determine whether Malarczyk's driving privileges should be revoked as a result of, *inter alia*, his refusal to submit to the chemical test in connection with his arrest on suspicion of driving while intoxicated. Defs.' Facts ¶ 37.

Malarczyk, represented by attorney Daniel Miller, appeared at the DMV hearing. Defs.' Facts ¶ 38. Plaintiff chose not to testify. *Id.* ¶ 41. However, the administrative law judge ("ALJ") did hear testimony from Trooper Lovgren and Trooper DiPasquale about the traffic stop. *Id.* ¶ 39. Plaintiff's attorney also cross-examined both officers while they were under oath. *Id.* After considering the officers' testimony and other evidence, the ALJ revoked plaintiff's driving privileges. *Id.* ¶ 43.

On August 8, 2018, the traffic charges that remained pending against Malarczyk proceeded to a jury trial in the Town of Lloyd Justice Court. Defs.' Facts ¶ 50. Plaintiff was acquitted. *Id.* ¶ 53. This action followed.

## III. LEGAL STANDARD

 **\*3** The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the

2022 WL 374271

nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up). "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*

## IV. DISCUSSION

Malarczyk's complaint enumerates thirteen different claims under federal and state law. Dkt. No. 1. Plaintiff asserts federal claims for conspiracy (Counts One and Seven), excessive force (Count Two), false arrest (Count Three), failure to intervene (Count Four), malicious prosecution (also Count Three), supervisory liability (also Count Four), violation of his right to free association (Counts Five and Six), and unlawful search of his person and property (also Counts Five and Six). *Id.* Plaintiff also asserts state law claims sounding in negligence (Count Eight), supervisory liability (Count Nine), assault and battery (Count Ten), false imprisonment (Count Eleven), a *prima facie* tort (Count Twelve), and defamation (Count Thirteen). Plaintiff demands $1 million in compensatory damages and more than $2 million in punitive damages. *Id.*

As an initial matter, however, there are four issues to be addressed.

### A. The Does

First, Malarczyk's claims against the Does must be dismissed. Although the complaint lists "John Doe Officers 1-5" as named defendants in this action, plaintiff "never identified or served" these Does before the close of discovery. Defs.' Mem., Dkt. No. 27-16 at 10 n.5. [1] Nor are these defendants mentioned in plaintiff's opposition and cross-motion. *See generally* Pl.'s Mem., Dkt. No. 29-1.

[1]    Pagination corresponds to CM/ECF.

"Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of N.Y.*, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010).

That is precisely the scenario presented in this action. Accordingly, the Does will be dismissed without prejudice. *Kenney v. Clay*, 172 F. Supp. 3d 628, 642 (N.D.N.Y. 2016) ("John Does 1–5 are dismissed from the case for failure to prosecute, as plaintiff did not identify the John Doe defendants by the end of discovery.").

### B. Official-Capacity Claims under § 1983

**\*4** Second, Malarczyk's § 1983 official-capacity claims against Trooper Lovgren and Trooper DiPasquale must be dismissed. Although the complaint asserts claims for money damages against these two defendants "in both their individual capacity and their official capacity," it is beyond cavil that an official-capacity claim for money damages under § 1983 is barred by the Eleventh Amendment.

The reason is simple: "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Thus, an official-capacity § 1983 claim against either Trooper-defendant is really a § 1983 claim against New York State, or perhaps the New York State Police. *See id.* In either case, the real party in interest—the State or the State Police—would be immune from § 1983 claims for money damages in federal court. *See, e.g., Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 300 (N.D.N.Y. 2019) (explaining that Eleventh Amendment immunity bars § 1983 money damages claims against New York State and its constituent agencies).

The typical way to evade this immunity bar is to pursue a claim under *Ex parte Young*, which "permits a suit to proceed against an otherwise immune entity if a plaintiff names a state official in his or her official capacity provided the plaintiff (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 360 n.6 (N.D.N.Y. 2017) (cleaned up).

Although Malarczyk tries to invoke this exception in his opposition and cross-motion, the *ad damnum* clause of his complaint seeks only money damages, not injunctive relief, and his claims allege only completed harms, not ongoing

ones. *Compare* Dkt. No. 1 at 16 (seeking money damages), *with* Pl.'s Mem. at 18–19 (citing *Ex parte Young*).

Malarczyk contends that defendants have waived their entitlement to this immunity defense by waiting until the close of discovery to raise it. Pl.'s Opp'n at 17–18. But as defendants correctly point out in reply, they pleaded sovereign immunity in their answer. Dkt. No. 7 ¶ 24. Nothing more is required. Besides, a party's entitlement to sovereign immunity goes to subject matter jurisdiction, which is not waivable and may be raised at any time by a party or even *sua sponte* by the Court. *Morris*, 268 F. Supp. 3d at 359. Accordingly, the official-capacity § 1983 claims will be dismissed.

### C. Plaintiff's Failure to Comply with Local Rule 56.1

Third, the properly supported material facts set forth in defendants' Local Rule 56.1 Statement will be deemed admitted for the purpose of assessing whether their motion for summary judgment should be granted or denied.

Under this District's Local Rules, the party opposing summary judgment is obligated to file a response to the movant's Statement of Material Facts that "mirror[s] the movant's Statement ... by admitting and/or denying each of the movant's assertions" and, in the case of a denial, setting forth "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b) (2021 ed.).

Malarczyk's counsel did not comply with this Local Rule. [2] *See* Dkt. Nos. 29, 30. This is so even though his other filings demonstrate that he is clearly aware of its importance on summary judgment. *See* Dkt. No. 30 (labeling responsive submission as a "Rule 56.1 Statement" and referring generally to a non-movant's obligation to provide the Court with a "counter-statement of facts to Defendants' motion").

[2]    This is not just a *pro forma* requirement. *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019). "A proper response to a movant's statement of material facts streamlines the summary judgment analysis by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 320 (N.D.N.Y. 2021) (cleaned up). For some reason, though, litigants routinely fail to get this right. *See, e.g., id.* at 321 (deeming certain facts admitted where non-movant failed to

comply with the Local Rule); *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 724–25 (same); *Frantti*, 414 F. Supp. 3d at 285 (same); *Carter v. Broome County*, 394 F. Supp. 3d 228, 238-39 (N.D.N.Y. 2019) (faulting both parties for injecting unnecessary confusion into the briefing).

**\*5** There is no excuse for this mistake. The party-driven procedure for identifying factual disputes that is memorialized in Local Rule 56.1 mirrors the summary judgment practice adopted by every single federal judicial district in the Second Circuit. *See Alke v. Adams*, 2018 WL 5297809, at \*2 (N.D.N.Y. Oct. 25, 2018) (collecting citations to local rules).

And even assuming this omission started out as an oversight, defendants promptly pointed out the error in their reply filing. Defs.' Reply, Dkt. No. 31 at 3–4. Plaintiff left it unremedied. Accordingly, the properly supported facts set forth in defendants' Rule 56.1 Statement shall be deemed admitted for the purpose of assessing their motion for summary judgment. N.D.N.Y. L.R. 56.1(b) (permitting Court to "deem admitted any properly supported facts ... that the opposing party does not specifically controvert"); *see also* FED. R. CIV. P. 56(e)(2) (permitting same).

### D. The Facts Set Forth in Plaintiff's Rule 56.1 Statement

As mentioned *supra*, Malarczyk's counsel did submit a document entitled "Rule 56.1 Statement" that purports to serve as a "counter-statement of facts" in response to defendants' motion. Dkt. No. 30. Although this filing makes reference to a supporting "affidavit," plaintiff's "Rule 56.1 Statement" does not actually include any citations to such a document. [3] *See id.* No such "affidavit" has been filed on the Court's electronic docket in connection with this motion practice. *See* Dkt. Nos. 29, 30. And there is no mention of such an "affidavit" in plaintiff's attorney declaration, which describes the exhibits actually being submitted to the Court as part of this motion practice. *See generally* Gambino Decl., Dkt. No. 29-2. Accordingly, the citation-less portions of this "Rule 56.1 Statement" offered by plaintiff will be disregarded for the purpose of resolving this motion practice.

[3]    Indeed, the entire first half of Malarczyk's "Rule 56.1 Statement" is devoid of *any* citations to record evidence. Pl.'s Facts ¶¶ 1–29.

The second half of this "Rule 56.1 Statement" does include some paragraphs that are supported with references to *other* documents that have actually been filed as exhibits with the Court. *See* Pl.'s Facts ¶¶ 33, 36–37, 39–40, 42–45, 47–48. Defendants, for their part, have properly responded to this document in accordance with the Local Rules by admitting or denying each fact offered by plaintiff and, in the case of a denial, citing to relevant portions of the record. Defs.' Resp. to Pl.'s Facts, Dkt. No. 31-1.

Upon review, however, the facts offered by Malarczyk (the ones with citations, at least) turn out to be duplicative of defendants' offering or irrelevant to the issues in this case. For instance, plaintiff makes repeated references to Trooper DiPasquale's 911 call in which he stated to the dispatcher that he had observed plaintiff "lighting a bowl of marijuana" in his vehicle. Pl.'s Facts ¶ 33; *see also id.* ¶ 40.

This appears to be an attempt by Malarczyk to accuse Trooper DiPasquale of overstating his observations to the 911 dispatcher; *i.e.*, did DiPasquale tell the dispatcher that he definitively saw the driver of the blue Mercury engaged in the consumption of illegal drugs? All he *really* could have seen for sure was physical behavior by the driver consistent with the possible or likely consumption of illegal drugs. *See id.* ¶ 43 (characterizing Trooper DiPasquale's subsequent testimony as "contradictory").

**\*6** But even assuming Malarczyk's encounter with law enforcement qualified as a *Terry* stop, that stop would not have begun until Trooper DiPasquale parked his personal vehicle behind the blue Mercury in the Tracy Road driveway. At that point, the combined force of the Trooper's own direct observations—which included the possibility of illegal drug consumption paired with erratic driving and serial violations of the Vehicle & Traffic Law—were already more than sufficient to render it lawful at its inception. *See, e.g.*, *United States v. Conley*, 342 F. Supp. 3d 247, 261 (D. Conn. 2018). ("[T]he standard for an investigatory stop of a vehicle requires reasonable suspicion, not probable cause or a preponderance of the evidence.").

Other facts offered by Malarczyk seem to contextualize the circumstances leading up to, and the ensuing consequences of, his arrest on September 26, 2016. However, these facts are also focused on matters that wind up being irrelevant to the issues in this case. For instance, plaintiff makes repeated references to defendants' interactions with Ms. Giaculli. Pl.'s Facts ¶¶ 37, 39.

But Ms. Giaculli is not a plaintiff in this action. And apart from his § 1983 conspiracy claim, Malarczyk has not articulated how defendants' conduct vis-a-vis Ms. Giaculli is at all relevant to any of his federal claims, which involve alleged infringements of his own constitutional rights.[4] In short, the smattering of non-duplicative, relevant, properly supported facts offered by plaintiff will be considered as part of this motion practice to the extent that they do not specifically controvert the facts deemed admitted for the reasons set forth *supra*.

[4]     To the extent that any of this information about Ms.
        Giaculli's involvement might relate to the § 1983
        conspiracy claim, that will be discussed *infra*.

### E. Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on all of Malarczyk's various claims. According to defendants, plaintiff's § 1983 claims "are either barred by collateral estoppel or fail to support a triable issue of fact." Defs.' Mem. at 4. As for the state law claims, defendants contend that they are time-barred and meritless and that the Court should decline to exercise supplemental jurisdiction over them. *Id.*

#### 1. <u>False Arrest</u> (Count Three)

Malarczyk's complaint asserts a § 1983 false arrest claim, which is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

"To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Jackson v. City of N.Y.*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (citation omitted).

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (quoting *Simpson v. City of N.Y.*, 793 F.3d 259, 2 65 (2d Cir. 2015)).

"A police officer has probable cause to arrest when he has knowledge or reasonably trustworthy information of facts

2022 WL 374271

and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hulett*, 253 F. Supp. 3d at 494 (cleaned up). "The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.' " *Id.* (quoting *Yorzinski v. City of N.Y.*, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016)).

**\*7** As an initial matter, defendants contend that Malarczyk's § 1983 false arrest claim is barred by collateral estoppel. Defs.' Mem. at 12–13. As defendants explain, at the October 2016 DMV hearing the ALJ concluded that plaintiff's driving privileges should be revoked because, *inter alia*, Trooper Lovgren had reasonable grounds to believe that plaintiff was driving while under the influence (and that therefore Trooper Lovgren made a lawful arrest on that basis). *Id.* at 12.

"Under either federal law or New York State law, collateral estoppel, or issue preclusion, bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." *Cayuga Nation v. Tanner*, 448 F. Supp. 3d 217, 234 (N.D.N.Y. 2020) (quoting *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003)), *aff'd*, 6 F.4th 361 (2d Cir. 2021), *cert. denied sub nom., Tanner v. Cayuga Nation*, 2022 WL 89378 (2022) (mem.).

Collateral estoppel "applies when (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir. 1999) (quoting *United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999)).

As relevant here, federal courts "give preclusive effect to a state agency's administrative findings if the state's courts would do the same." *Ferraro v. N.Y. City Dep't of Educ.*, 752 F. App'x 70, 73 (2d Cir. 2018) (summary order); *see also Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) (characterizing it as "sound policy to apple principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity"). "New York courts give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005).

Upon review, the October 2016 DMV hearing conducted by the ALJ in accordance with New York Vehicle & Traffic Law ("VTL") § 1194 meets this requirement. Malarczyk, represented by attorney Daniel Miller, appeared at the hearing. Defs.' Facts ¶ 38. Plaintiff did not testify. *Id.* ¶ 41. However, the ALJ did hear testimony from Trooper Lovgren and Trooper DiPasquale about the traffic stop. *Id.* ¶ 39. Ultimately, the ALJ found that defendants had "reasonable grounds" to believe that Malarczyk had been driving unlawfully and that Trooper Lovgren's arrest was "lawful." *Id.* ¶ 43.

In response, Malarczyk contends that the findings of the ALJ at the DMV hearing should not have preclusive effect. Pl.'s Mem. at 11. In plaintiff's view, his later acquittal by a jury on the traffic charges in the Town of Lloyd Justice Court should override the preclusive effect of any quasi-judicial administrative determination. *Id.* According to plaintiff, the proper application of estoppel actually warrants summary judgment in his favor. *Id.*

Upon review, this argument must be rejected because it confuses the relevant estoppel question. "The validity of an arrest does not depend on an ultimate finding of guilt or innocence." *Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 435 (S.D.N.Y. 2016); *see also Kandekore v. Comm'r of Motor Vehicles of State*, 1998 WL 150660, at *2 (S.D.N.Y. Mar. 31, 1998) ("[A] jury determination that an offense was not proven beyond a reasonable doubt does not, by itself, imply that an officer did not have a reasonable basis to believe that plaintiff committed the offense.").

**\*8** The relevant issue to be decided for purposes of collateral estoppel is whether probable cause existed for Trooper Lovgren to make an arrest, not whether Malarczyk was ultimately guilty of the one or more of the offenses for which he was charged and later tried. On that more limited issue, the Second Circuit has held that a hearing held pursuant to VTL § 1194 on the issue of probable cause "must be given preclusive effect" in a later § 1983 action. *Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 46 (2d Cir. 1985).

Even assuming otherwise, Malarczyk's § 1983 false arrest claim would still fail because the admitted facts establish probable cause.[5] Trooper DiPasquale directly observed plaintiff driving erratically; *i.e.*, he saw plaintiff drive through a "steady red light" without braking, turn abruptly "without signaling," "cross[ ] the center line" multiple times, and even

"driv[e] off the roadway onto a dirt patch." Defs.' Facts ¶¶ 5–6, 8. Trooper DiPasquale also directly observed behavior consistent with drug and/or alcohol consumption; *i.e.*, he saw plaintiff make a gesture that "appeared to be him possibly smoking a bowl" of marijuana" and later, saw an open can of beer spill out of the driver's door and onto the ground. *Id.* ¶¶ 3, 16.

5    Plaintiff does not directly challenge the initial stop in the Tracy Road driveway. But as noted *supra*, Trooper DiPasquale's own observations would have justified a *Terry* stop, regardless of whether or not he observed the driver of the blue Mercury smoking marijuana or just behavior consistent with the activity.

Trooper DiPasquale shared all of this information with Trooper Lovgren when he arrived on the scene. Defs.' Facts ¶ 21. Trooper Lovgren was entitled to rely on this information in assessing probable cause.[6] *See, e.g.*, *Cordero v. City of N.Y.*, 282 F. Supp. 3d 549, 561 (E.D.N.Y. 2017) ("The fellow officer rule, also known as the collective knowledge doctrine, allows one officer to make an arrest based on an instruction or information passed from one officer to another."). Trooper Lovgren was also entitled to rely on his own direct observations, which included the fact that plaintiff confirmed he had just driven the blue Mercury from nearby New Paltz and that he "had bloodshot, glassy eyes and the odor of alcohol on his breath." *Id.* ¶¶ 23–24.

6    Probable cause need not exist for the charge "actually invoked by the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004). Instead, an arrest is privileged "if there was probable cause to arrest ... for any single offense." *Marcavage v. City of N.Y.*, 689 F.3d 98, 109–10 (2d Cir. 2012).

In short, Trooper Lovgren had probable cause to arrest Malarczyk for driving while intoxicated in violation of VTL § 1192(3).[7] *Macshane v. City of N.Y.*, 2015 WL 1298423, at *23 (E.D.N.Y. Mar. 23, 2015) (concluding probable cause existed on charge of driving while intoxicated where arresting officer knew plaintiff had been driving that evening and "smelled alcohol" on his breath). Accordingly, plaintiff's § 1983 false arrest claim must be dismissed.

7    Under New York law, "intoxication" is a degree of impairment "which is reached when the driver has

voluntarily consumed alcohol to the extent that he is incapable of employing the physical and mental abilities which he is expected to possess in order to operate a vehicle as a reasonable and prudent driver." *People v. Cruz*, 48 N.Y.2d 419, 428 (1979).

**2. Excessive Force** (Count Two)

**\*9**  Malarczyk's complaint asserts a § 1983 excessive force claim. "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).

To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Id.*

This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy*, 634 F.3d at 96).

Thus, review of an excessive force claim is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).

"Importantly, a court must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up). "In so doing, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, or other exigent circumstances." *Id.*

Upon review, defendants are entitled to summary judgment on this claim. Malarczyk concedes that he was not "beaten" or otherwise injured by defendants. Pl.'s Mem. at 11. Instead, plaintiff argues that simply being "handcuffed, placed in a patrol vehicle and transported to a police barracks where he was chained to a bench" is sufficient to sustain this claim. *Id.* In plaintiff's view, the arrest itself was unlawful and therefore any use of force to effect it—no matter how slight—was also unlawful. *Id.*

As discussed *supra*, probable cause existed to arrest Malarczyk for driving while intoxicated. So while it is "impermissible to use significant force against a restrained arrestee who is not actively resisting," *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020), it is also true that "the right to make an arrest accompanies with it the right to use some degree of physical coercion," *Moore v. Keller*, 498 F. Supp. 3d 335, 356 (N.D.N.Y. 2020) (cleaned up). In short, no reasonable jury could find in Malarczyk's favor on this excessive force claim. Accordingly, plaintiff's § 1983 excessive force claim must be dismissed.

### 3. **Malicious Prosecution** (Count Three)

**\*10** Malarczyk's complaint asserts a § 1983 malicious prosecution claim. "The elements of a § 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Moore*, 498 F. Supp. 3d at 357 (cleaned up).

As with false arrest claims, probable cause is a complete defense to a claim of malicious prosecution. *See, e.g.*, *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 536 (S.D.N.Y. 2015). Unlike false arrest claims, however, probable cause must be assessed for each offense charged. *Id.* "Additionally, probable cause is measured at the time of the judicial proceeding, not the time of the arrest, though if it existed at the time of the arrest it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Id.* at 537 (cleaned up).

Upon review, defendants are entitled to summary judgment on this claim. The admitted facts establish that Trooper DiPasquale directly observed Malarczyk run a red light (in violation of VTL § 1111(d)(1)), cross the center line and drive

in an erratic manner (in violation of VTL § 1128(a)), and possess and/or consume an alcoholic beverage inside of his vehicle (in violation of VTL § 1127(1)).

Trooper DiPasquale shared all of this with Trooper Lovgren, who was entitled to rely on information he received from a fellow officer. Trooper Lovgren also independently observed that plaintiff "had bloodshot, glassy eyes and the odor of alcohol on his breath" and heard plaintiff admit to him that he had just been driving the vehicle (in violation of VTL § 1192(3)).

These facts—which are undisputed for the purpose of summary judgment—establish probable cause as to each charged offense at the time of arrest, which is presumed to continue to exist through the time of prosecution unless undermined by the discovery of some intervening fact. Although Malarczyk accuses defendants of giving false and/ or contradictory testimony that eventually led the jury to acquit him of these charges, Pl.'s Mem. 8–10, a favorable termination alone does not amount to the kind of "intervening fact" that defeats probable cause. Accordingly, plaintiff's § 1983 malicious prosecution claims will be dismissed.

### 4. **First, Fifth, & Fourteenth Amendments** (Counts Five and Six)

In Count Five, Malarczyk asserts a § 1983 claim alleging that defendants "deprived Plaintiff of his First and Fourteenth Amendment rights to freely associate with others and to be free from unlawful search and seizure of his personal property." Compl. ¶ 68. In Count Six, plaintiff substantially restates this claim, but with a reference to the Fifth Amendment. *Id.* ¶ 73.

#### i. **First Amendment**

"The right to free association is 'a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.' " *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir. 2013) (quoting *Shelton v. Tucker*, 364 U.S. 479, 485–86 (1960)).

"The Supreme Court has recognized that the freedom of association takes two forms—the right to engage in 'expressive association[s]' and the right to 'associate with others in intimate relationships." *Richardson-Holness v. Alexander*, 161 F. Supp. 3d 170, 175 (E.D.N.Y. 2015) (quoting *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999)).

**\*11** "The right of expressive association, while not explicitly set forth in the First Amendment, has been deemed essential to preserving First Amendment freedoms of speech, assembly, and petition." *Richardson-Holness*, 161 F. Supp. 3d at 176. The freedom of intimate association, on the other hand, aims to protect "certain kinds of highly personal relationships from unwanted state interference." *Id.* (cleaned up).

Broadly construed, Malarczyk has attempted to state the former species of First Amendment claim: a violation of his right to engage in some kind of "expressive association." As plaintiff tries to explain, he has "clearly been denied [the right] to freely associate" because defendants' arrest led to the loss of his ability to "freely travel, work or associate, and den[ied] him of his liberty interest in his driver's license." Pl.'s Mem. at 15.

At the outset, this argument sounds more like a due process challenge to the revocation of Malarczyk's driving privileges than any kind of First Amendment "freedom of association" claim. The viability of plaintiff's claim based on the loss of his driving privileges will be discussed *infra*. As for plaintiff's "freedom of association" claim, it is clear that he has not marshaled evidence from which a reasonable jury could find in his favor.

First, the admitted facts establish that defendants acted on the basis of probable cause. *Cf. Morgan v. Cty. of Nassau*, 720 F. Supp 2d 229, 238 (E.D.N.Y. 2010) (holding that probable cause is a complete defense to a First Amendment retaliation claim). Second, aside from Malarczyk's generalized complaints about the collateral consequences of his arrest, there is no indication that plaintiff suffered any particular chill in his speech or expressive activity. *Cf. Crown Heights Shomrim Volunteer Safety Patrol, Inc. v. City of N.Y.*, 2014 WL 4804869, at \*7 (E.D.N.Y. Sept. 25, 2014) (collecting cases dismissing First Amendment association claims where private plaintiffs failed to allege that their speech or association was chilled by defendants' conduct).

"It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall —but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Whatever kernel of expression might be found in the facts of this case, no reasonable jury could conclude that defendants violated a First Amendment right attached to it. Accordingly, this claim must be dismissed.

### ii. Fifth Amendment

As noted *supra*, Malarczyk has also invoked the Fifth Amendment in support of an alleged violation of his right to "be free from unlawful search and seizure of his personal property." Compl. ¶ 68. Defendants contend that this claim must be dismissed because the Fifth Amendment only applies to the federal government. Defs.' Mem. at 21. In opposition, plaintiff argues that this § 1983 claim is viable because defendants arrested and questioned plaintiff without a *Miranda* warning. Pl.'s Mem. at 15.

Upon review, this claim must be dismissed. As an initial matter, "[t]he Due Process Clause of the Fifth Amendment applies only to actions by the United States government and federal employees." *Solomon v. City of Rochester*, 449 F. Supp. 3d 104, 113 (W.D.N.Y. 2020) (cleaned up). Plaintiff has sued state actors, not federal ones, so any § 1983 claim against them would depend on whether the federal protection plaintiff identifies has been incorporated through the Fourteenth Amendment.

**\*12** Generally speaking, the Supreme Court has held that the Fourteenth Amendment "secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

And in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a person must be clearly informed of this right before a custodial interrogation. Indeed, *Miranda*'s so-called "exclusionary rule" is understood to "sweep[ ]more broadly" than the substantive protection afforded by the substantive Constitutional provision itself. *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985).

The problem for Malarczyk is that the Second Circuit has explicitly held that a plaintiff cannot sustain a § 1983 claim on this basis. "*Miranda* warnings are a procedural safeguard rather than a right explicitly stated in the Fifth Amendment." *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d Cir. 1995). "The remedy for a *Miranda* violation is the exclusion from evidence of any ensuing self-incriminating statements." *Id.* "The remedy is not a § 1983 action." *Id.* Accordingly, this claim must be dismissed.

### iii. Fourteenth Amendment

Broadly construed, Malarczyk's complaint asserts a due process challenge to the loss of his driving privileges. *See* Pl.'s Mem. at 15 (complaining about defendants' alleged misconduct at the administrative hearing).

The Due Process Clause of the Fourteenth Amendment protects procedural and substantive rights. [8] *Page v. Cuomo,* 478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020). "Procedural due process requires that 'a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " *Ceja v. Vacca,* 503 F. App'x 20, 22 (2d Cir. 2012) (summary order) (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985)).

[8] To the extent Malarczyk's complaint might be understood to raise a *substantive* due process claim arising out of his arrest, that claim must be dismissed. Substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir. 1999). The admitted facts fail to establish the kind of "outrageous" or "conscience-shocking" behavior necessary to sustain this claim. *See id.*

As relevant here, "[i]t is well established that a driver's license is a substantial property interest that may not be deprived without due process of law." *Forjone v. Dep't of Motor Vehicles,* 414 F. Supp. 3d 292, 303 (N.D.N.Y. 2019) (quoting *Pringle v. Wolfe,* 88 N.Y.2d 426 (1996)); *see also Gudema v. Nassau Cty.,* 163 F.3d 717, 724 (2d Cir. 1998) (holding that a driver's license is a state-created privilege that cannot be revoked without procedural due process).

Importantly, however, "Article 78 of the New York Civil Practice Law, an amalgam of the common law writs of certiorari to review, mandamus, and prohibition," *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.,* 101 F.3d 877, 881 (2d Cir. 1996), "provides the mechanism for challenging a specific decision of a state administrative agency," *Campo v. N.Y. City Emp. Ret. Sys.,* 843 F.2d 96, 101 (2d Cir. 1988).

**\*13** Thus, "courts have repeatedly held that the availability of an Article 78 proceeding to challenge the allegedly unlawful or improper revocation or suspension of a driver's license, with or without pre-deprivation notice or a hearing, typically constitutes an adequate procedural remedy." *Forjone,* 414 F. Supp. at 303–04.

There is no dispute that Malarczyk, represented by counsel, participated fully in the DMV's administrative hearing to determine whether or not his driving privileges should be revoked. To the extent plaintiff seeks to challenge the outcome of that proceeding, his remedy lies in state court. *See, e.g.,* *Rubin v. Swarts,* 2011 WL 1004838, at \*2 (E.D.N.Y. Mar. 18, 2011) (rejecting § 1983 procedural due process claim because "the proper forum for [plaintiff's] claim that Defendants unlawfully suspended his driver's license without notice is an Article 78 proceeding in New York State Supreme Court"). Accordingly, this claim must be dismissed.

### 5. Failure to Intervene (Count Four)

Malarczyk's complaint asserts a § 1983 failure-to-intervene claim. [9] "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Jackson v. Tellado,* 295 F. Supp. 3d 164, 173–74 (E.D.N.Y. 2018).

[9] Plaintiff styles it as a failure to "intercede."

However, "[a] plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying constitutional violation." *Kayo v. Mertz,* 531 F. Supp. 3d 774, 799 (S.D.N.Y. 2021). Because plaintiff's § 1983 claims for false arrest, excessive force, malicious prosecution, freedom of association, failure to give a *Miranda* warning, and procedural due process have been dismissed, plaintiff cannot sustain a claim under any "failure to intervene" theory. *Id.* Accordingly, this claim must be dismissed.

### 6. Supervisory Liability (Count Four)

Malarczyk's complaint asserts a § 1983 supervisory liability claim. "[A] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir. 2002). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann,* 983 F.3d 609, 618 (2d Cir. 2020) (cleaned up) (clarifying the "personal involvement" requirement that applies in the context of a § 1983 supervisory liability claim).

Upon review, this claim fails for the same reason set forth *supra*. Because Malarczyk's § 1983 claims for false arrest, excessive force, malicious prosecution, freedom of association, failure to give a *Miranda* warning, and procedural due process have been dismissed, he cannot sustain a claim for supervisory liability. *See, e.g.*, *Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016) (summary order) ("Because there is no underlying constitutional violation, [the] supervisory liability claim also fails."). Accordingly, this claim must be dismissed.

### 7. Conspiracy (Counts One and Seven)

Malarczyk's complaint asserts a § 1983 conspiracy claim.[10] According to plaintiff, this claim is viable because defendants "communicated with each other, formed a plan, [and] unlawfully arrested the Plaintiff and caused damages to him." Pl.'s Mem. at 13. In plaintiff's view, Trooper DiPasquale only followed plaintiff because he recognized Ms. Giaculli, who was dating one of DiPasquale's friends at the same time. *Id.*

[10]    Malarczyk's complaint also asserts a § 1985 conspiracy claim. In his opposition memorandum, plaintiff has agreed to withdraw this § 1985 claim. Pl.'s Mem. at 14. Accordingly, that claim will be dismissed.

**\*14**  "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

Upon review, defendants are entitled to summary judgment on this claim. As an initial matter, under the "intracorporate conspiracy doctrine" employees of a single corporate entity are legally incapable of conspiring together. *See, e.g.*, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013). This rule extends to § 1983 claims against police departments and law enforcement officers. *Towns v. Stannard*, 2017 WL 11476416, at \*4 (N.D.N.Y. Dec. 20, 2017) (Sannes, J.).

Malarczyk cannot reasonably dispute that it is within the scope of their employment for New York State Police troopers to apprehend motorists who violate the VTL. Nor has he attempted to do so. Instead, plaintiff argues that defendants were motivated by an improper purpose unrelated to their work with the State Police. According to plaintiff, Trooper DiPasquale only followed plaintiff because he recognized Ms.

Giaculli, who was dating one of Trooper DiPasquale's friends at the same time. Pl.'s Mem. at 13.

To be sure, there is an exception to the intracorporate conspiracy doctrine for cases in which "the alleged conspirators are motivated by an improper personal interest separate and apart from that of their principal." *Townes*, 2017 WL 11476416, at \*5. This exception applies "where law enforcement allegedly exercises their official duties in unconstitutional ways in order to secure personal benefit." *Chamberlain*, 986 F. Supp. 2d at 388 (cleaned up).

However, this narrow exception does not save Malarczyk's claim. This is because, as defendants point out, plaintiff has attempted to sustain this conspiracy claim with nothing more than speculation about Trooper DiPasquale's personal motives. *See, e.g.*, Malarczyk Dep., Dkt. No. 27-2 at 87 ("I don't have facts. It's speculation."). "To survive a motion for summary judgment, a plaintiff's evidence of a § 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Moroughan v. Cty. of Suffolk*, 514 F. Supp. 2d 479, 529 (E.D.N.Y. 2012) (citation omitted).

Even assuming otherwise, for reasons set forth *supra* Malarczyk has failed to establish an issue of fact as to any of his federal constitutional claims. In the absence of an underlying constitutional violation, plaintiff "cannot sustain a claim of conspiracy to violate those rights." *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000). Accordingly, this claim must be dismissed.

### 8. Supplemental Jurisdiction

Malarczyk's remaining claims arise under state law.[11] Federal courts "have supplemental jurisdiction over all other claims that are so related to claims [over which the court has] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In other words, "[t]he state and federal claims must derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 245 (2d Cir. 2011) (concluding same).

[11]    The basis for jurisdiction in this forum is federal-question, since the parties are non-diverse.

**\*15** As a general matter, "once it is determined that a supplemental claim is related to the claim within the court's original jurisdiction such that they form the same case or controversy, supplemental jurisdiction over the related claim is mandatory." *Catzin v. Thank You & Good Luck Corp.* 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).

However, a federal court may decline to exercise supplemental jurisdiction where "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." § 1367(c).

Importantly, though, even if one of the § 1367(c) categories apply, "a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values articulated [by the Supreme Court] in *Gibbs*: economy, convenience, fairness, and comity." *Catzin*, 899 F.3d at 85 (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)).

"Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016). There are no exceptional circumstances presented in this case. Accordingly, plaintiff's state law claims will be dismissed without prejudice.

## V. **CONCLUSION**

Malarczyk's § 1983 claims must be dismissed because he failed to controvert important facts about his encounter with law enforcement. Even viewing the additional evidence offered by plaintiff in the light most favorable to him, he has failed to create a jury question on any of his constitutional claims. Because those federal claims will be dismissed before trial, the Court declines to exercise supplemental jurisdiction over plaintiff's pendent state law claims.

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED in part;

2. Plaintiff's motion for summary judgment is DENIED;

3. John Doe Officers 1-5 are DISMISSED without prejudice as named defendants in this action;

4. Plaintiff's federal law claims (Counts One through Seven) against Trooper Eric P. Lovgren and Trooper Brian C. DiPasquale are DISMISSED WITH PREJUDICE; and

5. Plaintiff's state law claims (Counts Eight through Thirteen) against Trooper Eric P. Lovgren and Trooper Brian C. DiPasquale are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 374271

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 65 of 267

Gunn v. Bentivegna, Not Reported in Fed. Supp. (2020)

2020 WL 2571015

2020 WL 2571015
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darrell GUNN, Plaintiff,
v.
Dr. Robert V. BENTIVEGNA, F.H.S.D.; Ms.
Hennessy, MHU Unit Chief; Christine Raffaele,
Registered Nurse, New York State Department of
Corrections and Community Supervision, Defendants.

1:20-CV-2440 (LLS)
|
Signed 05/19/2020

**Attorneys and Law Firms**

Darrell Gunn, Ossining, NY, pro se.

ORDER OF DISMISSAL

LOUIS L. STANTON, United States District Judge:

 *1  Plaintiff, currently incarcerated in the Sing Sing Correctional Facility, brings this *pro se* action alleging that the defendants violated his federal constitutional rights. He asserts claims under 42 U.S.C. § 1983 and state law. He sues (1) Dr. Robert V. Bentivegna, the Facility Health Service Director of the Green Haven Correctional Facility, (2) Ms. Hennessy, the Mental Health Unit Chief at that facility, (3) Christine Raffaele, a nurse assigned to that facility, and (4) the New York State Department of Corrections and Community Supervision ("DOCCS"), which operates that facility. Plaintiff seeks damages and declaratory relief. He sues the individual defendants in their official and individual capacities.

By order dated May 8, 2020, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis.* [1] For the reasons discussed below, the Court dismisses this action, but grants Plaintiff leave to replead certain claims in an amended complaint to be filed within 30 days of the date of this order.

[1]    Prisoners are not exempt from paying the full filing fee, even when they have been granted permission

to proceed *in forma pauperis. See* 28 U.S.C. § 1915(b)(1).

**STANDARD OF REVIEW**

The Prison Litigation Reform Act requires that federal courts screen complaints brought by prisoners who seek relief against a governmental entity or an officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). The Court must dismiss a prisoner's *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a complaint if the Court lacks subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest,*" *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

The Supreme Court of the United States has held that under Rule 8, a complaint must include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Id.* But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Id.* (citing *Twombly,* 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.* at 678-79.

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 66 of 267

Gunn v. Bentivegna, Not Reported in Fed. Supp. (2020)
2020 WL 2571015

## BACKGROUND

**\*2** Plaintiff alleges the following facts: On July 28, 2017, while Plaintiff was incarcerated in the Green Haven Correctional Facility, he sought medical treatment from Raffaele, a nurse. But Raffaele "became repulsive, ... insensitive, [and] upset, and act[ed] irate towards [him, and gave him] a hard time...." (ECF 2, at 4.) She asked him, "why are you here at sickcall," and then told him, "I sent you a letter. You should not be coming to sickcall!" (*Id.*) Plaintiff told Raffaele that he was in pain, was losing his hearing, and needed pain medication. He also asked to speak to Hennessy, the Mental Health Unit Chief.

DOCCS officials, including Dr. Bentivegna, had previously referred Plaintiff to "sickcall," that is, they had told him to seek medical treatment. But Raffaele was frustrated that Plaintiff was seeking medical treatment. She stated that she was going to " ' steal someone's water.' " (*Id.*) Raffaele then gave Plaintiff a "Styrofoam cup with someone's water she stole[ ] from an abandon[ed] prison guard one gallon jug that she found sitting on [a] table." (*Id.*) She gave Plaintiff a "non-aspirin packet" and "the foul tasting unhygienic water [so that he could] swallow the two non-aspirins." (*Id.* at 5.) Raffaele did this to retaliate against Plaintiff for "coming to sickcall, and filing grievances[ ] and lawsuits. (*Id.*)

To protest Raffaele's actions, Plaintiff went on a hunger strike. The "unsafe water" and "needless medication" Raffaele gave him caused him "to have [an] upset stomach, loss of appetite, n[a]usea, fear, high levels of stress, worrying, depression, anxiety, [and] emotional and psychological injury." (*Id.* at 5-6.) When he began his hunger strike, Plaintiff was held in the Green Haven infirmary. But on August 7, 2017, he was released from the infirmary, and two days later, he was confined to his cell for a "72 hour cell confinement investigation." (*Id.* at 6.) On August 14, 22, and 24, 2017, while Plaintiff was still on his hunger strike, officials denied him medical treatment. On August 24, 2017, he was escorted to Green Haven's psychiatric satellite unit, but officials there "refused to help" him; Hennessy "laughed at [him] the whole time she responded to [his] problems [sic]." (*Id.* at 7.) One day later, he was allowed to go to sickcall, but was not allowed to be examined by a physician or speak to a mental-health professional.

During his hunger strike, Plaintiff was forced to wear "a sack as clothing in an isolation cell." (*Id.*) His hunger strike "was not being properly treated according to policy and procedure of DOCCS Departmental Directive #4309 by ... Bentivegna ... and ... Hennessy, ... dereliction of duty and negligence, who lacking integrity, accountability, no responsibility, and zero transparency, has no respect for the rule of law causing [P]laintiff's civil rights being infringed upon [sic]." (*Id.*)

## DISCUSSION

### A. DOCCS and official-capacity claims

Plaintiff's claims under 42 U.S.C. § 1983 against DOCCS are barred by the doctrine of Eleventh Amendment immunity. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity or unless Congress has abrogate[d] the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (internal quotation marks and citation omitted, second alteration in original). This immunity shields States from claims for money damages, injunctive relief, and retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 72-74 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F.3d at 366 (internal quotation marks and citation omitted). Thus, this immunity bars claims under § 1983 for damages against state officials in their official capacities. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993).

**\*3** Congress has not abrogated the States' immunity for claims under § 1983. *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). And the State of New York has not waived its immunity to suit in federal court. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). DOCCS, as an arm of the State of New York, enjoys Eleventh Amendment immunity from suit under § 1983. *See, e.g.*, *Madison v. New York State Dep't of Corr.* No. 19-CV-3401, 2019 WL 4933594, at *1-2 (S.D.N.Y. Oct. 4, 2019). And DOCCS officials enjoy Eleventh Amendment immunity from suit under § 1983 for damages in their official capacities. *See, e.g.*, *Marshall v. Lilley*, No. 19-CV-11829, 2020 WL 905989, *6 (S.D.N.Y. Feb. 21, 2020). Accordingly, the Court dismisses Plaintiff' claims under § 1983 against DOCCS, as well as his claims under § 1983 for damages against the individual defendants (who are all DOCCS employees)

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 67 of 267

Gunn v. Bentivegna, Not Reported in Fed. Supp. (2020)

2020 WL 2571015

in their official capacities, under the doctrine of Eleventh Amendment immunity. [2] *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

[2]    *See also Zuckerman v. Appellate Div., Second Dep't, Supreme Court*, 421 F.2d 625, 626 (2d Cir. 1970) (holding that a state court is not a "person" for the purpose of § 1983 liability); *see generally Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (holding that a state agency is not a "person" for the purpose of § 1983 liability).

**B. DOCCS Directive #4309**
Plaintiff alleges that the individual defendants violated his federal constitutional rights by not following DOCCS Directive #4309. But an official's failure to follow a prison directive does not constitute a violation of a prisoner's federal constitutional rights. *See Holcomb v. Lykens*, 337 F.3d 217, 224-25 (2d Cir. 2013) (holding that a state corrections directive did not create a liberty interest protected by the Due Process Clause); *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("[T]he law is settled that failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim."); *see also McDarby v. Dinkins*, 907 F.2d 1334, 1337 (2d Cir. 1990) (rejecting the plaintiff's claim that his right to due process was violated by a New York City agency's failure to follow the City's Administrative Code); *Morton v. Cnty. of Erie*, 335 F. Supp. 3d 449, 455 n.2 (W.D.N.Y. Sept. 26, 2018) ("Section 1983 provides a cause of action for deprivation of federal, and not state, rights."), *aff'd*, 796 F. App'x 40 (2d Cir. 2019) (unpublished opinion).

The Court therefore dismisses Plaintiff's claims under § 1983 that the individual defendants violated his federal constitutional rights by not following DOCCS Directive #4309 for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**C. State-law claims**
The Court must dismiss Plaintiff's claims under state law for damages. This Court lacks subject-matter jurisdiction to consider those types of claims against DOCCS, a state agency; they can only be brought in the New York Court of Claims against the State of New York. *See Gollomp*, 568 F.3d at 357 n.2 ("The New York Court of Claims is the exclusive forum among New York's state courts for litigating claims for money damages against New York State." (citing N.Y. Const. Art. VI, § 9, and N.Y. Court of Claims Act § 8)). The

Court therefore dismisses Plaintiff's claims under state law for damages against DOCCS. *See* Fed. R. Civ. P. 12(h)(3).

Under Section 24 of the New York Correction Law, "[a]ny claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [DOCCS] shall [also] be brought and maintained in the [New York] court of claims as a claim against the state." N.Y. Corr. § 24(2). Under this statute, DOCCS employees are immune from suit for claims under state law for damages arising from their actions or omissions that occurred within the scope of their DOCCS employment. *See* N.Y. Corr. § 24(1), (2); *Baker v. Coughlin*, 77 F.3d 12, 15-16 (2d Cir. 1996); *Parris v. New York State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 365-66 (S.D.N.Y. 2013) (dismissing such claims for lack of subject-matter jurisdiction).

 **\*4** In his complaint, Plaintiff asserts claims under state law for damages against individual DOCCS employees – the individual defendants. Those claims arise from the individual defendants' acts or omissions that occurred within the scope of their DOCCS employment. The Court therefore dismisses those claims. *See* § 1915(e)(2)(iii); Fed. R. Civ. 12(h)(3).

**D. Failure to provide adequate medical or mental-health treatment**
The Court understands Plaintiff's complaint as asserting that the individual defendants deprived Plaintiff of his Eighth Amendment right against cruel and unusual punishment by failing to provide him with adequate medical or mental-health treatment. A prisoner asserting this type of claim must allege facts showing that prison officials were deliberately indifferent to his serious medical or mental-health needs. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Darnell v. Pineiro*, 849 F.3d 17, 32-35 (2d Cir. 2017).

Deliberate indifference is evaluated under a two-pronged test comprised of both objective and "mental element" components. *See Darnell*, 849 F.3d at 30-33; *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). The objective component requires that the alleged medical or mental-health need be a sufficiently serious condition that " 'could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Darnell*, 849 F.3d at 30 ("[T]o establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination,

Gunn v. Bentivegna, Not Reported in Fed. Supp. (2020)

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 68 of 267

2020 WL 2571015

pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.' ") (citations omitted). The relevant inquiry is the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical [or mental-health] condition...." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702-03).

For the "mental element" component, a convicted prisoner must show that a prison official "kn[ew] of and disregard[ed] an excessive risk to [the prisoner's] health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must [have] also draw[n] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Allegations of malpractice or the negligent failure to provide adequate medical or mental-health care do not state a constitutional claim. *See Estelle*, 429 U.S. at 106; *Chance*, 143 F.3d at 703.

Plaintiff alleges that he was in pain and was losing his hearing, and in response to his complaints about those conditions and his request for mental-health treatment, Raffaele gave him some type of medication and "unsafe water." (ECF 2, at 4-5.) He also alleges that during his hunger strike, prison officials denied him medical and mental-health treatment, and that when he was brought to Green Haven's psychiatric satellite unit for mental-health treatment, Hennessy laughed at him "the whole time she responded to [his] problems." (*Id.* at 7.) But he fails to allege sufficient facts to suggest that any of the individual defendants were deliberately indifferent to his serious medical or mental-health needs. The Court therefore dismisses those claims for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii). But the Court grants Plaintiff leave to replead those claims in amended complaint to be filed within 30 days of the date of this order.

### E. Retaliation

 **\*5** By stating that Raffaele gave him "needless medication" and "unsafe water" in retaliation for his previous requests for medical or mental-health treatment, his previous grievances, or his previous lawsuits (ECF 2, at 5), Plaintiff may be attempting to assert a claim under § 1983 that Raffaele violated his rights under the First Amendment.

To state a First Amendment claim of retaliation under § 1983, a prisoner must allege facts showing that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was

a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted). An adverse action must be "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). A prisoner's claim of retaliation under § 1983 must be examined with skepticism because it is " 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citation omitted).

Plaintiff does not allege sufficient facts to state a claim under § 1983 that Raffaele retaliated against him. Even assuming that Plaintiff satisfies the first two pleading requirements, he has failed to allege any facts that suggest that there was a causal connection between his protected speech or conduct and Raffaele's purported adverse action against him (giving Plaintiff "needless medication" and "unsafe water" (ECF 2, at 5)), and that the adverse action was not *de minimis*. The Court therefore dismisses this claim of retaliation under § 1983 for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii). But the Court grants Plaintiff leave to replead this claim in an amended complaint to be filed within 30 days of the date of this order.

### CONCLUSION

Chambers will mail a copy of the order to Plaintiff. The Court dismisses this action.

The Court dismisses Plaintiff's claims under 42 U.S.C. § 1983 against DOCCS, as well as his claims under § 1983 for damages against the individual defendants, in their official capacities, under the doctrine of Eleventh Amendment immunity. 28 U.S.C. § 1915(e)(2)(B)(iii).

The Court also dismisses Plaintiff's claims under § 1983 arising from the individual defendants' failure to follow DOCCS Directive #4309 for failure to state a claim on which relief may be granted. § 1915(e)(2)(B)(ii).

The Court further dismisses Plaintiff's claims for damages under state law. § 1915(e)(2)(B)(iii); Fed. R. Civ. P. 12(h)(3).

2020 WL 2571015

In addition, the Court dismisses Plaintiff's claims under § 1983 in which he alleges that the individual defendants failed to provide him with adequate medical or mental-health treatment for failure to state a claim on which relief may be granted. § 1915(e)(2)(B)(ii). And the Court dismisses his claim under § 1983 that Raffaele retaliated against him for the same reason. *Id.* But the Court grants Plaintiff leave to replead these two types claims under § 1983 in an amended complaint to be filed within 30 days of the date of this order.

**\*6** If Plaintiff fails to file an amended complaint within the time allowed, the Court will enter a judgment in which the Court dismisses this action for the reasons discussed in this order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2571015

---

**End of Document** <span style="float:right">© 2022 Thomson Reuters. No claim to original U.S. Government Works.</span>

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 70 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

KeyCite Yellow Flag - Negative Treatment

Distinguished by Doe v. Sex Offender Registry Board, Mass., July 20, 2021

2019 WL 168544
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Equan YUNUS, Sr., Plaintiff,
v.
J. Lewis ROBINSON et al., Defendants.

17-cv-5839 (AJN)
|
Signed 01/11/2019

**Attorneys and Law Firms**

David Benjamin Berman, Emery Celli Brinckerhoff & Abady LLP, New York, NY, for Plaintiff.

Kacie Alina Lally, Amanda Shoffel, Daniel A. Schulze, NYS Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

ALISON J. NATHAN, United States District Judge

**\*1** Since 2016, Plaintiff has been required to register as a sex offender and has been subject to parole conditions designed to control the threat posed by sex offenders, including limitations on where he can live and travel, what websites he can access and what technology he can possess, and whether he can own a pet or rent a post office box. Plaintiff was even re-incarcerated for several months for possessing a smartphone and laptop. Report & Recommendation ("R & R"), Dkt. No. 79, at 61. Yet the record before the Court does not indicate that Plaintiff has ever committed any sexual misconduct. Instead, Plaintiff pled guilty to a crime—kidnapping of an unrelated minor under the age of 17—that automatically rendered him a sex offender under New York's Sex Offender Registration Act ("SORA"), N.Y. Correct. Law (CL) § 168-a. No evidence before the Court suggests that there was anything sexual about Plaintiff's crime, but rather that it was carried out to ransom the victim in exchange for money and drugs. At the state court hearing to determine his risk level classification as a sex offender, the judge found that

there was "virtually no likelihood that [Plaintiff] will commit a sex crime ever." R & R at 10. Indeed, for the purposes of these two motions, Defendants have conceded that there was no sexual element to Plaintiff's offense.

Plaintiff brought this action under 42 U.S.C. § 1983, alleging that this situation violates several of his constitutional rights. Plaintiff argues that being forced to register as a sex offender violates his substantive and procedural due process rights, while a number of his specific conditions of parole violate his rights under the Due Process Clause and the First Amendment. Plaintiff sought a preliminary injunction on some of his claims, while Defendants moved to dismiss his complaint in its entirety. These motions were referred to Magistrate Judge Moses for a Report and Recommendation. Judge Moses recommended that the Court grant a preliminary injunction on Plaintiff's claim that SORA, as applied to him, violates his right to substantive due process. Judge Moses also recommended granting Defendants' motion to dismiss in part and denying it in part.

For the reasons given below, the Court adopts Judge Moses' recommendation and grants Plaintiff a preliminary injunction on his substantive due process claim. The Court also grants Defendants' motion to dismiss as to several of Plaintiff's claims, including all of his claims for damages, while denying it as to his substantive due process claim, his challenges to his conditions of parole limiting where he can travel, his ability to seek alternate residences, his access to social media, what technology he can own and use, and his ability to interact with minor members of his family.

**I. Background**

The Court assumes the parties' familiarity with the facts of this case and will rely on Judge Moses's thorough discussion of the factual and procedural history of this case in her Report and Recommendation. See R & R at 8-18. In short, Plaintiff pleaded guilty in 2002 to two counts of kidnapping for ransom under New York law. R & R at 9. One of the victims was a boy under seventeen years old who was not Plaintiff's child. R & R at 9. Under SORA, a conviction for kidnapping a minor who is not the kidnapper's child is designated as a "sex offense." N.Y. Correct. Law § 168-a(2) (a)(i). Plaintiff was classified a level one sex offender—the lowest possible level—at a SORA hearing following his term of incarceration. R & R at 10-11. However, there was no allegation of a sexual component to Plaintiff's crime and he has never been accused of committing any form of sexual misconduct. R & R at 9. Furthermore, at his SORA hearing,

2019 WL 168544

the presiding judge—Justice Obus, who had also presided over Plaintiff's sentencing in his underlying criminal case—found that there was virtually no likelihood that Plaintiff would ever commit a sex crime. R & R at 10. Plaintiff was released to parole on July 14, 2016, and numerous parole conditions were imposed, some mandatory and some discretionary. *See* R & R at 11-18 (outlining relevant parole conditions and modifications that have been made over time to those conditions).

**\*2**  On August 1, 2017, Plaintiff commenced this action by filing a pro se complaint. Dkt. No. 2. Following the appearance of pro bono counsel for Plaintiff, he filed a motion for a preliminary injunction on March 26, 2018 and a Second Amended Complaint on March 29, 2018. *See* Mot. for PI, Dkt. No. 43; SAC, Dkt. No. 54. In his Second Amended Complaint, Plaintiff challenges his designation as a sex offender on procedural due process and substantive due process grounds. SAC ¶¶ 139-51. He also challenges numerous specific conditions of his parole, arguing that they are void for vagueness, SAC ¶¶ 152-58, violate his First Amendment rights, SAC ¶¶ 159-63, violate his due process right by interfering with his family relations, SAC ¶¶ 164-69, and impose conditions that are arbitrary and capricious, SAC ¶¶ 170-75. The Court referred the motion for a preliminary injunction to Magistrate Judge Barbara Moses for a Report and Recommendation. Dkt. No. 51.

On April 17, 2018, the Defendants in this action filed a motion to dismiss the Second Amended Complaint. Def. Mot. to Dismiss, Dkt. No. 59. The Court referred consideration of this motion to Judge Moses as well. Dkt. No. 62. On June 29, 2018, Judge Moses filed her Report recommending resolution of Plaintiff's motion for a preliminary injunction and Defendants' motion to dismiss. *See* R & R at 84-86. On July 20, 2018, both parties timely filed their objections to the Report, Pl. R & R Obj., Dkt. No. 85; Def. R & R Obj., Dkt. No. 86, and responded to one another's objections, Def. R & R Obj. Resp., Dkt. No. 93, Pl. R & R Obj. Resp., Dkt. No. 94. After having reviewed Judge Moses's Report and the parties' objections, the Court requested supplemental briefing on (1) whether preclusion doctrines barred some of Plaintiff's claims and (2) whether Defendants had waived any preclusion arguments by failing to raise them in the first instance before Judge Moses. Dkt. No. 98. The parties provided briefing, Def. Supp. Br., Dkt. No. 101; Pl. Supp. Br., Dkt. No. 102, and the Court held oral argument on October 3, 2018.

## II. Legal Standards

### A. Review of Objections to a Magistrate Judge's Report

A court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain motions, including motions for injunctive relief and motions to dismiss. *28 U.S.C. § 636(b)(1)(B)*. A party to the action may file objections to the proposed findings and recommendations. *Id.* *§ 636(b)(1)(C)*. Specific objections to a magistrate judge's recommendation are reviewed *de novo. See, e.g., Amadasu v. Ngai*, No. 05-CV-2585(RRM), 2012 WL 3930386, at *3 (E.D.N.Y. Sept. 9, 2012). Where a party does not object, or simply makes "conclusory or general objections," the district court will review for clear error. *Id.* (citing cases). Under this standard, portions of the report to which no objections were made will be accepted unless they are "facially erroneous." *Bryant v. New York State Dep't of Corr. Servs.*, 146 F.Supp.2d 422, 424–25 (S.D.N.Y. 2001); *see also DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339–40 (S.D.N.Y. 2009) ("A decision is 'clearly erroneous' when the Court is, 'upon review of the entire record, [ ] left with the definite and firm conviction that a mistake has been committed.' ") (alteration in original) (quoting *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) ).

### B. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Ordinarily, a party seeking a preliminary injunction must make one of two showings: First, he may "show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *ACLU v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015). Alternatively, he "may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.' " *Id.* (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) ). However, if "the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 72 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) ). When the moving party seeks a mandatory injunction, " '[t]he moving party must make a clear or substantial showing of a likelihood of success' on the merits, a standard especially appropriate when a preliminary injunction is sought against government." *D.D. ex rel. V.D. v. N.Y. Bd. Of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) (alteration in original) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) ).

### C. Motion to Dismiss

**\*3** A case is properly dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b) (1), a district court ... may refer to evidence outside the pleadings." *Id.* The party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Id.* Jurisdiction "must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

To survive a motion to dismiss for failure to state a claim under Rule 12(b) (6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). When considering a motion to dismiss under Rule 12(b)(6), "a court must accept as true all of the [factual] allegations contained in

[the] complaint." *Iqbal*, 556 U.S. at 678. However, the court should not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### D. Qualified Immunity

Several of Plaintiff's claims seek money damages, all of which Defendants contend should be dismissed on the grounds of qualified immunity. Def. Mot. to Dismiss, Dkt. No. 60, at 17-20. Because this issue arises at a number of points in the opinion, the Court provides a summary of the standard here.

Qualified immunity may be raised on a motion to dismiss under Rule 12(b)(6). However, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). In such cases, the facts supporting the immunity defense must be plain on the face of the complaint and "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

The defense of qualified immunity "protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ). The qualified immunity analysis asks whether (1) a plaintiff has sufficiently pled the violation of a constitutional or statutory right, (2) whether that right was "clearly established," and (3) whether it was "objectively reasonable" for the official to believe their conduct was lawful. *Id.* at 154-55 (citing *Taravella v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010) ). A right may be clearly established by either controlling authority or "a robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (internal quotation marks omitted) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999) ). The applicable legal rule at issue should not be defined "at a high level of generality," but rather must be "particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (internal quotation marks omitted). It is not necessary that "the very action in question" have been previously held unlawful, as "an officer might lose qualified immunity even if there is no reported case 'directly on point.' " *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017). On the other hand, "in the light of pre-

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 73 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

existing law, the unlawfulness of the officer's conduct must be apparent." *Id.* at 1867 (internal quotation marks omitted).

**\*4** As to the reasonableness inquiry, this turns on whether the official could have reasonably believed that their actions were legal given the law at the time of the actions in question. *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018). Objective reasonableness is a mixed question of law and fact, which "requires examination of the information possessed by the officials at that time (without consideration of subjective intent)." *Id.* at 109-10. The operative question is "whether a reasonable official would reasonably believe that his conduct did not violate a clearly established right[.]" *Id.*

### III. Judge Moses's Report and Recommendation

As a threshold matter, Judge Moses's Report addresses Defendants' arguments that Plaintiff's due process challenges are barred by the *Rooker-Feldman* doctrine, recommending that this case did not meet the narrow conditions for the doctrine to apply. Turning to the merits of the motion to dismiss, the Report recommends granting the motion to dismiss with respect to the following claims:

The First Claim, in its entirety;

The Third Claim, to the extent it alleges that Special Condition No. 24 (the "consenting adult" rule) is void for vagueness;

The Third Claim, to the extent it seeks damages against any of the Parole Officer Defendants [1] for their past enforcement of any of the parole conditions challenged as void for vagueness;

The Fourth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of the cellphone, computer, and social media restrictions contained in Special Conditions No. 12, 22, 35, 39, and 48;

The Fourth Claim, to the extent it seeks damages against PO Lewis-Robinson arising from her conduct prior to the decision in *Packingham*;

The Fifth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson for their past enforcement of Special Condition No. 15 (no contact with minors);

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past conduct in denying plaintiffs' requests to move in with his fiancée and his uncle;

The Sixth Claim, to the extent it seeks damages against the Parole Officer Defendants other than PO Lewis-Robinson in connection with the denial of Plaintiff's request to move in with Ms. Blake;

The Sixth Claim, to the extent it seeks damages against any of the Parole Officer Defendants for their past enforcement of Special Condition No. 24;

The Sixth Claim, to the extent it seeks either damages or injunctive relief in connection with Special Conditions No. 31 and 32 (motor vehicles), No. 14 (sexually explicit materials), No. 19 (pets) or No. 37 (Post Office boxes).

R & R at 84. The Report recommends denying Defendants' motion to dismiss as to the remaining claims. The Report also recommends that the Court grant Plaintiff's request for a preliminary injunction in part. R & R at 85. It concludes that Plaintiff's designation as a sex offender violates his substantive due process rights and therefore recommends that the Court enjoin Defendants from "enforcing, as against plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL §§ 259-c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required," and directing Defendants "to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10) except to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics." R & R at 85. Alternatively, Judge Moses recommends that if the Court does not grant a preliminary injunction on Plaintiff's substantive due process claim, it should grant a preliminary injunction as to several of his parole conditions. R & R at 85-86.

[1]     The Court adopts the term "Parole Officer Defendants" employed by Judge Moses' Report. R & R at 8.

### IV. Discussion

**\*5** The Court first addresses Defendants' claims that the *Rooker-Feldman* doctrine deprives it of subject-matter jurisdiction. The Court will then examine the issue of

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 74 of 267

2019 WL 168544

preclusion, which was only raised by Defendants after Judge Moses's Report, and the related question of waiver. The Court will then turn to the merits of Defendants' motion to dismiss and Plaintiff's motion for a preliminary injunction, addressing each in turn.

### A. Plaintiff's First and Second Claims Are Not Barred by the *Rooker-Feldman* Doctrine

Defendants argue that Plaintiff's first and second claims, which challenge his designation as a sex offender on procedural due process and substantive due process grounds, are barred by the *Rooker-Feldman* doctrine. The *Rooker-Feldman* doctrine bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). This doctrine deprives federal courts of subject-matter jurisdiction to hear cases "that are, in substance, appeals from state court judgments[.]" *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005). For the *Rooker-Feldman* doctrine to apply, four conditions must be met:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced" – i.e., *Rooker-Feldman* has no application to federal court suits proceeding in parallel with ongoing state-court litigation.

*Id.* at 85 (alterations in original) (footnote omitted) (quoting *Exxon-Mobil*, 544 U.S. at 284).

The Report recommends that the *Rooker-Feldman* doctrine does not deprive the Court of subject-matter jurisdiction here, both because Plaintiff did not lose in state court and because the injuries he complains of resulted from the SORA statute rather than a state court judgment. R & R at 22-25. Defendants raise several objections, which the Court reviews *de novo*.

First, Defendants object that Plaintiff's SORA hearing *did* address whether it was constitutional to require Plaintiff to register as a sex offender. Def. R & R Obj. at 6-7. Yet it is clear from the surrounding context that the section of the hearing transcript they cite to only addresses what level of classification should apply to Plaintiff and does not challenge that SORA as applied to him is unconstitutional. SORA Tr. 5:12-22. The Court agrees with the Report that SORA's constitutionality was neither challenged nor decided at the hearing.

Defendants next object that *Rooker-Feldman* bars any claim asserting injury based on a state judgment even if the injury was not actually contested in state-court proceedings. Def. R & R Obj. at 7-8. Yet the relevant inquiry for the purpose of *Rooker-Feldman* is whether the judicial decision at Plaintiff's SORA hearing itself *caused* Plaintiff's injury; if an injury was caused prior to the state judicial action, *Rooker-Feldman* is inapplicable. *See Sung Cho v. City of New York*, 910 F.3d 639, 649 (2d Cir. 2018). Indeed, it is settled law that *Rooker-Feldman* does not apply if the judicial determination in question "simply ratified, acquiesced in, or left unpunished" Plaintiff's injury. *McKithen v. Brown*, 481 F.3d 89, 97-98 (2d Cir. 2007) (quoting *Hoblock*, 422 F.3d at 88). Here, Plaintiff's injury did not result from his SORA hearing, but rather from the statute itself. *See Spiteri v. Russo*, No. 12-cv-2780 (MKB) (RLM), 2013 WL 4806960, at *13 (E.D.N.Y. Sept. 7, 2013) (holding *Rooker-Feldman* inapplicable to a claim challenging the plaintiff's designation as a sex offender because "[t]he issue before [the presiding judge] was Plaintiff's risk level classification, not whether he was required to register as a sex offender"). Defendants' argument that Plaintiff's injuries were caused by the hearing because SORA does not make a convicted individual's sex-offender status automatic is belied by the plain text of the statute. *See* N.Y. Correct. Law § 168-a(1) (defining "sex offender" as "any person who is convicted of any of the offenses" listed in the statute), *id.* § 168-d(1)(a) (requiring that "upon conviction of any of the offenses set forth" in SORA, "the court shall certify that the person is a sex offender" and failure to certify "shall not relieve a sex offender of the obligations imposed by this article"); *id.* § 168-l(8) ("A failure by a state or local agency or the board to act or by a court to render a determination within the time period specified in this article shall not affect the obligation of the sex offender to register ...."); *id.* § 168-n(2) (providing that the SORA hearing will determine the risk level of the offender); *see also* R & R at 4-5 & 5 n.5, 23 (discussing SORA's statutory requirements in greater depth). Defendants accuse Judge Moses of "misread[ing]" New York Corrections Law section 168-l(8). Def. R & R Obj. at 8. In their view, that section only "provides ... that a failure of the SORA hearing court to render a decision 'within the time periods specified in this article' does not preclude a later determination by the court that registration is required." Def. R & R Obj. at 8.

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 75 of 267
Yunus v. Robinson, Not Reported in Fed. Supp. (2019)
2019 WL 168544

Defendants have apparently overlooked that section 168-*l*(8) includes both the provision identified by Judge Moses and quoted by the Court above and a *separate* clause allowing a court to later impose a risk level to an offender outside of the prescribed time period. [2] The Court therefore concludes that Plaintiff's sex offender status was automatic under SORA as a function of his conviction.

[2]   Section 168-*l*(8) states in relevant part: "A failure by a state or local agency or the board to act or by a court to render a determination within the time period specified in this article shall not affect the obligation of the sex offender to register or verify under this article *nor shall such failure prevent a court from making a determination regarding the sex offender's level* of notification and whether such offender is required by law to be registered for a period of twenty years or for life." N.Y. Correct. Law § 168-*l*(8) (emphasis added).

**\*6**   Seeking to undermine this conclusion, Defendants also point to the fact that New York courts have been willing to entertain constitutional challenges to SORA that were initially raised in SORA hearings. Def. R & R Obj. at 8 (citing *People v. Knox*, 12 N.Y.3d 60, 65 (N.Y. 2009)). But this does not alter the *Rooker-Feldman* analysis. Even if a state court may have been willing to consider a constitutional challenge to Plaintiff's designation as a sex offender on appeal from his SORA hearing, it does not change the fact that Plaintiff's sex offender status was already imposed by statute. At most then, the judicial determination in his SORA hearing "simply ratified," *McKithen*, 481 F.3d at 97-98, what SORA dictated—that Plaintiff be designated a sex offender because of his conviction for kidnapping a minor not related to him. As a result, Plaintiff challenges New York's SORA legislation rather than an adjudication, and in such circumstances, *Rooker-Feldman* has no application. *Hachamovitch v. DeBuono*, 159 F.3d 687, 694 (2d Cir. 1998).

Finally, Defendants argue that if Plaintiff is not challenging injury caused by his SORA hearing, he must be challenging his underlying conviction, which would also be barred by the *Rooker-Feldman* doctrine. Def. R & R Obj. at 9. However, the Court agrees with the Report that Plaintiff is neither challenging his underlying conviction nor asking the Court to relieve him of it—he only seeks review of a statutorily-imposed collateral consequence that even Defendants do not contend could have been raised on direct appeal from that conviction. R & R at 25 n.19.

For the forgoing reasons, the Defendants' objections to the Report are denied as to subject-matter jurisdiction, and the Report is ADOPTED in full on this issue.

## B. Defendants Waived Their *Res Judicata* and Collateral Estoppel Arguments for the Purposes of These Motions

Moving from *Rooker-Feldman* to preclusion, Defendants argue that Plaintiff's first and second claims are precluded by the prior decision in the SORA hearing under theories of both collateral estoppel and *res judicata*. Defendants did not raise either argument in their briefings before Judge Moses. Judge Moses, in her Report, addressed the distinction between *Rooker-Feldman* and preclusion doctrine in a footnote, without making a recommendation either way as to the applicability of preclusion doctrine to Plaintiff's claims. R & R at 24 n. 18. Defendants, in their objections to the Report, mentioned *res judicata* only in passing, stating that Plaintiff's claims "should still be dismissed on the alternative grounds of res judicata suggested in the R & R." Def. R & R Obj. at 9. Subsequently, the Court requested supplemental briefing on preclusion and whether Defendants had waived these arguments by failing to raise them before Judge Moses.

Defendants do not dispute that they failed to raise their collateral estoppel or *res judicata* arguments before Judge Moses. Instead, they argue that despite this failure—and their conclusory treatment of preclusion in their objections to Judge Moses' Report—these arguments have not been waived. Plaintiff, on the other hand, argues that Defendants waived these arguments by not raising them earlier and failing to object to Judge Moses' mention of preclusion with sufficient particularity. For the purposes of the instant motions alone, the Court agrees with Plaintiff. However, this decision does not bar Defendants from raising preclusion in an answer.

Courts in this circuit have taken different positions as to whether failure to raise an argument before a magistrate judge waives those arguments. The Second Circuit has yet to decide this question. *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 433 (S.D.N.Y. 2015) ("The question 'whether a party may raise a new legal argument for the first time in objections to a magistrate judge's Report has not yet been decided in this Circuit.' ") (internal brackets and ellipses omitted) (quoting *Amadasu*, 2012 WL 3930386, at \*5).

**\*7**   For reasons it continues to find persuasive, this Court has previously found that, as a general matter, arguments made for

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

the first time in objection are waived. *See Tarafa v. Artus*, No. 10 CIV. 3870 (AJN), 2013 WL 3789089, at *2 (S.D.N.Y. July 18, 2013) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the R & R, and indeed may not be deemed objections at all." (citing cases) ); *Watson v. Geithner*, No. 11 CIV. 9527 (AJN), 2013 WL 5441748, at *2 (S.D.N.Y. Sept. 27, 2013) (noting that "a party waives any arguments not presented to the magistrate judge"). Other courts in this circuit have taken a similar approach, noting that "[i]f the Court were to consider formally these untimely contentions, it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments." *Abu-Nassar v. Elders Futures, Inc.*, No. 88 CIV. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994); *see also Smith v. Hulihan*, No. 11 CV 2948 (HB), 2012 WL 4928904, at *1 (S.D.N.Y. Oct. 17, 2012); *Rosello v. Barnhart*, No. 02 CIV. 4629 (RMB), 2004 WL 2366177, at *3 (S.D.N.Y. Oct. 20, 2004); *Lewyckyj v. Colvin*, No. 3:13-CV-126 (MAD), 2014 WL 3534551, at *2 (N.D.N.Y. July 17, 2014). This is consistent with the history and purposes of the Magistrate Act. *See Anna Ready Mix, Inc. v. N.E. Pierson Const. Co.*, 747 F. Supp. 1299, 1303 (S.D. Ill. 1990) (reviewing "the legislative history of the 1976 amendments to the United States Magistrate Act, applicable precedent, and the views of commentators" and concluding that "arguments raised for the first time in objections to a magistrate's report ought to be disregarded absent compelling reasons"). This position is also consistent with the majority of circuit courts to have examined this issue—though some have indicated that district courts have discretion in the matter.[3] In a case like this, it would undermine the efficiencies offered by the Magistrate Act to permit parties to raise arguments after a full briefing on both a motion for a preliminary injunction and a motion to dismiss, after which Judge Moses issued a detailed and thorough 86-page Report.

[3]   *See, e.g., Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."); *Cupit v. Whitley*, 28 F.3d 532, 535 & n. 5 (5th Cir. 1994) (holding that a party had waived arguments that were only raised after the magistrate judge had issued their Report); *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990–91 (1st Cir. 1988) ("[A]n unsuccessful party is not entitled as of right to *de novo* review by the judge of an argument never seasonably raised before the magistrate."); *Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638 (9th Cir. 1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act. We do not believe that the Magistrates Act was intended to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court."), *overruled on other grounds by United States v. Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc).

However, the Court need not rely on that reasoning to reach its conclusion since an application of the balancing test adopted by other courts in this circuit would result in the same outcome. *See Wells Fargo Bank N.A. v. Sinnot*, 2010 WL 297830, at *3-4 (D. Vt. Jan. 19, 2010); *Levy*, 103 F. Supp. 3d at 433-34. Defendants have not given any reason for their failure to raise these issues before Judge Moses and no intervening change in law has occurred. Unanswered questions remain that received little to no briefing. *See Wells Fargo*, 2010 WL 297830, at *4. Allowing Defendants to raise this new defense after several rounds of briefing in which they neglected to raise it except for a passing mention would, for the reasons given above, be an inefficient deviation from the purpose of the Magistrate Act. And given the ongoing harm to Plaintiff, fairness favors providing a prompt determination of his motion for a preliminary injunction without allowing Defendants to interpose new arguments that would result in further delay. Finally, no manifest injustice would result from deeming Defendants' arguments waived for the purposes of these motions. Considering and balancing these factors, the Court concludes that Defendants have waived preclusion. *See Amadasu*, 2012 WL 3930386, at *5-7. However, the Court only finds that Defendants have waived these arguments for the purposes of these motions and are free to raise them in an answer as affirmative defenses. *See Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 350 (1971) (*res judicata* and collateral estoppel are affirmative defenses) (citing Fed. Rules Civ. Pro. 8(c) ).

### C. Defendants' Motion to Dismiss is Granted in Part and Denied in Part

**\*8**  Having addressed these threshold matters, the Court turns first to Defendants' motion to dismiss.

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 77 of 267

### 1. Defendants' Motion to Dismiss is Granted as to Plaintiff's Procedural Due Process Claim (Claim 1)

Plaintiff alleges that he was deprived of constitutionally-required procedural due process because he had no opportunity to challenge his designation as a "sex offender" in an adversarial proceeding. SAC ¶¶ 139-45. Judge Moses agreed with Plaintiff that he had a cognizable liberty interest in not being labelled as a sex offender. R & R at 29-35. However, Judge Moses found that under governing Supreme Court and Second Circuit precedent, a person who has been convicted of an offense requiring registration under SORA is not entitled to any additional hearing, either *ex ante* or *ex post*, to adjudicate his obligation to register. R & R at 35-38 (citing *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) and *Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014) ). Plaintiff objects only to Judge Moses's recommendation on this claim as an "alternative basis for relief" and notes that if the Court agrees with the Report that SORA as applied to Plaintiff is a substantive due process violation, "no additional process or injunctive relief is necessary." Pl. R & R Op. at 3. Nonetheless, as Plaintiff does state various specific legal objections to Judge Moses's reasoning, the Court will review it *de novo*. Defendants, for their part, challenge Judge Moses' determination that Plaintiff had a procedural liberty interest in not being labeled a sex offender. Def. R & R Obj. at 9-10. However, since that issue is unnecessary to the Court's resolution of this claim, the Court neither adopts nor rejects Judge Moses' Report on that particular question.

The Court agrees with Judge Moses' reading of the governing precedent. Under *Connecticut v. Doe*, "[p]laintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant *under the statutory scheme*." 538 U.S. at 8 (emphasis added); *see also Doe v. Cuomo*, 755 F.3d at 112. Plaintiff sought to distinguish these two cases on the grounds that in both the plaintiffs had been convicted of *sexual* misconduct. Pl. R & R Op. at 7-8. However, as Judge Moses determined in her Report, this argument fails to go to the *procedural* sufficiency of process afforded, as that fact is not relevant under SORA. Instead, it implicates a *substantive* challenge to Plaintiff's designation under the law as a sex offender. R & R at 37-38. As a result, Plaintiff's claim "must ultimately be analyzed in terms of substantive, not procedural, due process." *Connecticut v. Doe*, 538 U.S. at 8 (internal quotation marks omitted). The Court therefore ADOPTS Judge Moses' Report as to the second prong of the procedural Due Process

analysis and GRANTS Defendants' motion to dismiss this claim. As it is unnecessary for resolution, the Court makes no finding with respect to the Report's analysis of Plaintiff's procedural liberty interest.

### 2. Defendants' Motion to Dismiss is Denied as to Plaintiff's Substantive Due Process Claim (Claim 2)

**\*9** Plaintiff's second claim asserts that requiring him to register as a sex offender is a violation of his right to substantive due process. "To establish a substantive due process violation, a plaintiff must show both (1) that she has an interest protected by the Fourteenth Amendment, and (2) that the statute, ordinance, or regulation in question is not rationally related to a legitimate government interest." *Winston v. City of Syracuse*, 887 F.3d 553, 566 (2d Cir. 2018). Rational basis review "is highly deferential," but "it is not meant to be toothless." *Id.* at 560 (quoting *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ). Even under the rational basis test, a state may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). [4] When considering whether a state had a rational basis to impose a statute, the reviewing court may properly consider the "countervailing costs" to the targets of the challenged statute. *Plyler v. Doe*, 457 U.S. 202, 223-24 (1982).

[4]     While *Cleburne* and *Plyler* involved Equal Protection Clause challenges, the Second Circuit has analogized between rational basis review in the equal protection and substantive due process contexts. *See Winston*, 887 F.3d at 562-67 (relying on its determination that a law lacked a rational basis in its analysis of an equal protection claim to find that the law also failed substantive due process review); *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (analyzing equal protection and substantive due process claims jointly under rational basis review).

In her Report, Judge Moses concludes that designating Plaintiff as a sex offender bears no rational relationship to the purposes of SORA. Reviewing the enabling legislation, Judge Moses identifies the purpose of SORA as "to combat 'the danger of recidivism posed by *sex offenders*, especially those *sexually violent* offenders who commit predatory acts

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

characterized by repetitive and compulsive behavior,' and to assist the criminal justice system 'to identify, investigate, apprehend and prosecute *sex offenders.*'" R & R at 40 (emphasis added in Report) (quoting 1995 N.Y. Sess. Laws ch. 192, § 1). As a result, Judge Moses concludes that applying the label of sex offender to the narrow class of individuals like Plaintiff who "has received a judicial finding that he never has and near certainly never will commit a sexual offense" bears no rational relationship to that purpose. R & R at 42-46.

Defendants object to the Report on several grounds. They argue that designating Plaintiff as a sex offender could be rationally based on: (i) preventing dangerous sex offenders from slipping through the cracks, (ii) avoiding administrative costs, and (iii) protecting minors from harm more generally, not just sexual abuse. None of these arguments are persuasive.

As an initial matter, Defendants do not argue in their objections that Plaintiff has no *substantive* liberty interest. Def. R & R Obj. at 10-12. To the contrary, Defendants emphasize that Judge Moses erred by finding a procedural liberty interest, rather than a substantive one. *Id.* at 10. The Court finds no clear error in the conclusion that Plaintiff has a substantive liberty interest in not being labeled a sex offender when he has committed no sexual offense. *See Vega v. Lantz,* 596 F.3d 77, 81–82 (2d Cir. 2010) ("[W]rongly classifying an inmate as a sex offender may have a stigmatizing effect which implicates a constitutional liberty interest.").

Defendants first object that the Legislature could have rationally concluded that the sex offender label should be applied in a blanket manner to various crimes involving minors, even when a sexual element is not evident, to avoid any dangerous sex offenders "slipping through the cracks." Def. R & R Obj. at 11-12; Def. Mot. to Dismiss at 9-10; *see also People v. Knox,* 12 N.Y.3d 60, 69 (2009) (finding that, along with administrative burden, "the risk that some dangerous sex offenders would escape registration" provided a rational basis for "a hard and fast rule, with no exceptions"). It is true that there may be cases, such as when the victim cannot or will not testify, when it will be administratively difficult in practice to prove that an offense was sexual in nature. As a result, it would not necessarily be irrational for the Legislature to conclude that for certain high-risk crimes toward minors, individuals should be designated as sex offenders even when it is ambiguous whether their specific offense was sexual.

**\*10** Yet even assuming it would be rational for the Legislature to designate individuals as sex offenders when there is uncertainty about whether their offense was sexual in nature, this does not satisfactorily answer Plaintiff's as-applied challenge. Plaintiff does not challenge that SORA is facially unconstitutional, nor even that it is unconstitutional as applied to all individuals who kidnapped unrelated minors. R & R at 42. Instead, the exceptionally narrow question before the Court for the purposes of these motions is whether there is a rational basis for designating someone as a sex offender solely in virtue of an offense that was undisputedly non-sexual. A case involving any suggestion or allegation of sexual misconduct—or even just ambiguity—would present a different question that need not be resolved here.

At this stage in the litigation, the lack of a sexual element to Plaintiff's offense can safely be termed conclusive. Based partly on the absence of any allegation of sexual abuse in this case, Justice Obus concluded at Plaintiff's SORA hearing that "I am satisfied that there is virtually no likelihood that [Plaintiff] will commit a sex crime ever." R & R at 10. Justice Obus' conclusion is particularly persuasive, as he was "very familiar" with Plaintiff, having conducted the trial of Plaintiff's co-defendant and accepted Plaintiff's plea in the underlying criminal case. SORA Tr., Dkt. No. 45-1, 20:8-12. Defendants do not contest Justice Obus' conclusion. Even more importantly, Defendants conceded for the purposes of these combined motions that there was no sexual component to Plaintiff's offenses. 10/03/18 Hearing Tr. 25:22-25, 26:1-18 (Plaintiff's counsel presenting as undisputed that Plaintiff's offenses had nothing to do with sex); 32:5-11, 14-17 (Defendants' counsel conceding this for the purposes of this motion). It is on the basis of this factual record and these representations that Plaintiff's claim must be evaluated. The Court is careful to note, however, that Defendants only conceded the absence of a sexual element for the purposes of these motions. Further argument, allegations, or evidence could present a meaningfully different issue. As a result, the risk that Plaintiff is a dangerous sex offender who might slip through the cracks is not just low, it is, at this stage, non-existent.

The slipping-through-the-cracks argument is therefore insufficient to provide a rational basis for imposing extensive civil and stigmatizing burdens on Plaintiff. R & R at 42-45. To reach this conclusion, the Court need not declare it irrational for the Legislature to weigh the harms and conclude that for individuals who committed high-risk crimes that *may* have had a sexual component, the public good is better served by

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

a blanket rule. But extending the sex offender designation to individuals for whom the absence of a sexual element is undisputed and who have been adjudicated by a state court to pose essentially no sexual risk cannot be justified as a means of protecting against *sex offenders* falling through the cracks. *See City of Cleburne*, 473 U.S. at 446 (even under rational basis review, a court will strike down "a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). Indeed, as various state courts have concluded when the lack of a sexual element to the underlying offense was stipulated, "[a]lthough the Legislature's concern for protecting our children from sexual predators may be reasonable ... the application of this statute to a defendant *whom the State concedes* did not commit a sexual offense is not." *State v. Robinson*, 873 So. 2d 1205, 1215 (Fla. 2004) (emphasis added); *see also State v. Reine*, 2003-Ohio-50, ¶ 28, *cause dismissed*, 795 N.E.2d 686 (designating an individual as a sex offender "in a case in which *it has been stipulated that* his offenses were committed without any sexual motivation or purpose" lacks rational basis (emphasis added) ). There is no more reason to classify Plaintiff as a *sex* offender at this stage than if he had been convicted of shoplifting, drug dealing, or any other crime that has no sexual element at all—indeed the label is less apt for Plaintiff, given Defendants' concession. Therefore, casting a wide net to include all grey area cases bears no rational relationship to this case, which, at this stage, presents no uncertainty at all.

**\*11**  Defendants further object that the Legislature could have rationally concluded that it needed to include *all* individuals who had committed certain high-risk crimes, to avoid the administrative costs of determining in each case whether someone's crime was sexual. *See Knox*, 12 N.Y.3d at 69. Even assuming this would be rational, in cases in which the absence of a sexual element is undisputed, no further administrative effort is required. This Court's opinion today reaches no further than the situation at hand, in which the non-sexual nature of Plaintiff's offense has been conceded. *See Robinson*, 873 So. 2d at 1215; *Reine*, 2003-Ohio-50, ¶ 28. An ambiguous case that would require the expenditure of administrative resources to decide could well present a distinct question. For example, if an individual contended that an evidentiary hearing was required to show that there was no sexual element to their offense, the issue of administrative resources might require a different analysis.

Defendants next argue that the Legislature "could have rationally determined that individuals convicted of

kidnapping a minor constitute a potential risk to other minors, whether that risk is characterized as sexual or not, and that this risk justifies all the restrictions set forth at length in the R & R." Def. R & R Obj. at 12. However, this argument ignores that both the stated purpose of SORA and the way it is designed are focused on preventing *sexual offenses* rather than all crimes that are dangerous to minors. *See* R & R at 40 (quoting from SORA's legislative history as to SORA's purpose). The list of offenses that require designation as a sex offender do not include all crimes that involve harm to a minor, even serious, violent crimes. *See* CL § 168-a(2)(a)(i); *People v. Bell*, 3 Misc. 3d 773, 788 (Sup. Ct. 2003) (noting that "the conviction of Bruno Hauptman for the Lindbergh infant's murder would *not* have subjected him to classification and registration under SORA" (emphasis in original) ). And even beyond the Legislature's own statements about its purpose and SORA's design, the Court finds that Defendants' proffered explanation is inconsistent with labeling Plaintiff (and requiring him to register) as specifically a *sex* offender. There is no rational reason for applying this intensely stigmatizing designation to an individual in Plaintiff's position. Nor do Defendants give any explanation for why the sexual element of the designation is related to protecting against non-sexual harms —indeed, nothing about the Court's decision would prevent Defendants from imposing a designation on Plaintiff that was rationally related to any non-sexual risk that he might pose to children. What it does prohibit is applying a specifically sexual stigmatizing designation and restrictions designed to prevent sexual abuse to an individual who has not committed any and who poses virtually no risk of doing so. Such an action cannot be viewed as rationally related to SORA's purpose.

Finally, the heavy costs imposed by Plaintiff's designation as a sex offender further support the conclusion that there is no rational basis for so classifying him. In conducting a rational basis analysis, a court may appropriately take into account the costs imposed by the law. *Plyler*, 457 U.S. at 223-24. SORA imposes significant civil burdens, as Plaintiff's case well illustrates. His life and liberty have been drastically limited in many ways, from where he can live to what speech he can engage in. SORA has also branded Plaintiff with one of the most stigmatizing labels that exists in our society, in this case doing so without a factual basis. *See, e.g., ACLU of NM v. City of Albuquerque*, 2006-NMCA-078, ¶ 25, 139 N.M. 761, 772 ("[T]he hardship imposed on an offender convicted of kidnaping or false imprisonment to be labeled a sex offender, absent any evidence of a sexual motivation for the crime, is

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 80 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)
2019 WL 168544

great."); *Vega,* 596 F.3d at 81-82. And labeling individuals as sex offenders when their crimes are not sexual actually risks undermining the usefulness of the registry created to effectuate SORA's purpose. *See People v. Diaz,* 150 A.D.3d 60, 66 (N.Y. App. Div.), *aff'd on other grounds,* No. 134, 2018 WL 6492716 (N.Y. Dec. 11, 2018). These significant harms to Plaintiff and the risk that labeling him as a sex offender actually undercuts public safety further support the conclusion that SORA as applied to Plaintiff lacks rational basis.

**\*12**  For all of the above stated reasons, the Court ADOPTS Judge Moses's recommendation—albeit on the additional grounds given above, which include Defendants' concession at oral argument—and Defendants' motion to dismiss this claim is DENIED.

### 3. Defendants' Motion to Dismiss is Granted in Part and Denied in Part as to Plaintiff's Vagueness Claims (Claim 3)

Plaintiff's third claim alleges that three of his parole conditions are unconstitutionally vague: Special Condition No. 4, "which excludes plaintiff from 'school grounds' – defined to include public areas within 1,000 feet of the school"; Special Condition No. 17, "which prohibits him from being 'within 300 yards of places where children congregate' "; and Special Condition No. 24, "which directs him to notify his parole officer and make certain disclosures when he 'establish[es] a relationship with a consenting adult.' " R & R at 46 (alteration in Report). Judge Moses recommends that the Court deny the motion to dismiss as to Conditions Nos. 4 and 7 and grant it as to Condition No. 24. Defendants object to the former, while Plaintiff does not object to the latter.

Under the Due Process Clause, "[a] statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales,* 527 U.S. 41, 56-57 (1999) ). And parole conditions are subject to review as void for vagueness. *LoFranco v. U.S. Parole Comm'n,* 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd,* 175 F.3d 1008 (2d Cir. 1999). Applying this standard, the Court will address each of the challenged conditions in turn.

### a. Defendants' Motion to Dismiss Plaintiff's Claim that Special Condition No. 4 is Unconstitutionally Vague is Denied in Part and Granted in Part

Plaintiff seeks injunctive relief, but not damages, on his vagueness challenge to Special Parole Condition No. 4. This condition, which is a statutorily mandated parole condition for parolees convicted of offenses that include Plaintiff's, R & R at 6, excludes Plaintiff from "school grounds," defined to include public areas within 1,000 feet of a school, while minors are present. EL § 259-c(14); PL § 220.00(14). Judge Moses recommended that: (i) Special Condition No. 4 is not unconstitutionally vague as applied to where Plaintiff may reside, since preclearance of residences by a parole office means there is no risk of an inadvertent violation; and (ii) this condition is unconstitutionally vague as to where Plaintiff is allowed to travel, both because it fails to provide sufficient notice *and* because it authorizes or encourages arbitrary enforcement. R & R at 49. Plaintiff did not object to the first part of Judge Moses' recommendation with sufficient specificity, Pl. R & R Obj. Resp. at 16, so it will be reviewed for clear error. *Kirk v. Burge,* 646 F. Supp. 2d 534, 537 (S.D.N.Y. 2009). Defendants raise two principal objections to the second part of Judge Moses' recommendation: first, because the condition has a knowledge requirement, there is no risk of an inadvertent violation; and second, Judge Moses improperly considered hypotheticals in an as-applied vagueness challenge, which must be confined to a plaintiff's actual conduct. These will be reviewed *de novo.*

**\*13**  The Court agrees with Judge Moses that because Special Condition No. 4 requires that a proposed residence be precleared by Plaintiff's parole officer, it is not void for vagueness. This is particularly true since both the applicable statute and New York state court decisions interpreting it provide precise definitions to determine how the 1,000 feet in question are calculated. R & R at 48. Finding no error, clear or otherwise, in this portion of Judge Moses' Report, the Court adopts it in full.

Defendants object that Condition No. 4 cannot be unconstitutionally vague, because its requirement that violations be knowing precludes inadvertent violations. Yet this does not address the separate conclusion that Condition No. 4, as applied to Plaintiff, is void on the separate and independent grounds that "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill,* 530 U.S. at 732. Indeed, the Supreme Court has indicated that "the

more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974) ). In the absence of such guidelines, a "criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Id.* (alteration in original) (quoting *Goguen*, 415 U.S. at 575). The 1,000-foot rule encompasses vast swaths of New York City. R & R at 50. It would also cover innocent conduct, since, as Judge Moses noted, this prohibition includes the courthouse where Plaintiff has been required to appear. R & R at 50. The knowledge requirement does not provide sufficient standards to govern the conduct that may be penalized as it is reasonable to presume that "the fact that there are schools and childcare facilities throughout New York City is something everyone ... knows." *State v. Floyd Y.*, 56 Misc. 3d 271, 273 (N.Y. Sup. Ct. N.Y. Co. 2017). Therefore, unless Plaintiff remains in his shelter for much if not all of the day, he will necessarily knowingly violate the law on countless occasions. While in practice, this condition may only be enforced as to residency, Def. R & R Obj. at 14, these informal enforcement practices cannot rescue the condition from vagueness where they "would not provide a defense" to Plaintiff if he were to be arrested. *See City of Chicago*, 527 U.S. at 63-64. Nor is a saving construction available, given the explicit language of the statute. R & R at 51-52 (citing EL § 259-c(14) ). This mandatory condition therefore places almost limitless discretion in the hands of Plaintiff's parole officers to arrest him for traveling almost anywhere in the city that he lives, raising precisely the concerns that void-for-vagueness doctrine seeks to prevent. *See Kolender*, 461 U.S. at 357-58.

As the Court finds that Plaintiff has sufficiently stated a claim that the condition is void for authorizing arbitrary enforcement, it need not reach whether it is void for lack of notice.

Defendants' other objection, that Plaintiff's claim is not a proper as-applied challenge, fares no better. Defendants contend that Judge Moses erred by permitting Plaintiff to challenge Condition No. 4 on vagueness grounds based on hypothetical future enforcement when, with the exception of residency requirements, it has not been enforced again him. Defendants cite *Copeland v. Vance* for the proposition that Plaintiff may not "seek to show that the ... law is vague by positing hypothetical unfair enforcement actions in which the statute could not be constitutionally applied."

*893 F.3d 101, 113 (2d Cir. 2018). Yet *Copeland* made clear that prospective, as-applied challenges are possible. *Id.* at 111-13 (noting also that "a party asserting a pre-enforcement challenge obviously cannot be required to show that a prior action was invalid"). What *Copeland* required is that: "A party asserting a prospective as-applied challenge must tailor the proof to the specific conduct that she would pursue but for fear of future enforcement" and show that enforcement as to this conduct would raise vagueness concerns. *Id.* at 112-13. In *Copeland*, Plaintiffs did not offer evidence of specific conduct they wished to engage in that would trigger vagueness concerns, instead positing hypothetical scenarios in an attempt to have the entire statute struck down. *Id.* at 113. Here, however, Plaintiff *himself* has sufficiently alleged that he would engage in specific conduct that would violate the 1,000-feet provision and in so doing raise vagueness concerns about arbitrary enforcement. SAC ¶ 61. Therefore, Plaintiff's challenge is properly framed as an as-applied challenge.

**\*14** In light of the analysis above, the Court ADOPTS Judge Moses' reasoning with respect to arbitrary enforcement, but not to lack of notice. Defendants' motion to dismiss this claim is hereby DENIED.

### b. Defendants' Motion to Dismiss Plaintiff's Claim that Special Condition No. 17 is Unconstitutionally Vague is Denied in Part and Granted in Part

Plaintiff seeks injunctive relief and damages on his vagueness challenge to Special Condition No. 17. This condition expressly prohibits Plaintiff from "enter[ing]" or "be[ing]" within 300 yards of "places where children congregate" without prior approval from his parole officer. R & R at 52-53 (alterations in Report). Judge Moses recommended that: (i) this condition is void for vagueness for both lack of notice and for allowing arbitrary enforcement; and (ii) because Plaintiff has not alleged this was enforced against him in the past, his claim for damages should be dismissed. R & R at 52-55. Defendants object on similar grounds as they did for the 1,000-foot rule: first, that there is no possibility of inadvertent violations because a knowledge requirement should be read into the condition and because the condition provides a list of examples illustrating the kinds of areas in question; and second, that Judge Moses improperly relied on hypotheticals in evaluating an as-applied challenge.

As with Condition No. 4, however, even aside from the question of whether a person of ordinary intelligence would

have a reasonable opportunity to determine what conduct Condition No. 17 prohibits, the condition would still be unconstitutionally vague because it "authorizes or even encourages discriminatory enforcement." *Hill*, 530 U.S. at 732. If anything, this provision applies to a broader swath of territory than Special Condition No. 4, as it not only includes schools but also a number of other places as well, such as parks, bike trails, and pool halls. SAC Ex. C ¶ 17. Nor does it actually require the presence of a minor. Judge Moses noted that, once again, the courthouse was within 300 yards of Columbus Park, R & R at 54 n.40, while Plaintiff noted that the Willow Avenue shelter, where he is currently housed, is directly across the street from a family shelter at which young children congregate. *See* SAC ¶ 80. Once again, this exceptionally broad scope places essentially total enforcement discretion in the hands of Plaintiff's parole officers, allowing them to arrest Plaintiff for a host of legitimate activity, such as stepping out of the shelter where his parole restrictions have effectively required him to remain. *See United States v. Malenya*, 736 F.3d 554, 561 (D.C. Cir. 2013) (noting how a similar restriction gave "the probation office the power to prevent [the registered sex offender] from living almost anywhere and going to almost any place"). As applied to Plaintiff, this provision is therefore unconstitutionally vague.

As above, since the Court finds that Plaintiff has sufficiently stated a claim that the condition is void for authorizing arbitrary enforcement, it need not reach whether it is void for lack of notice.

Turning to Plaintiff's claim for damages, the Court finds no error, clear or otherwise, in Judge Moses' recommendation that this claim should be dismissed because Plaintiff failed to allege that this condition had been enforced against him in the past.

**\*15** The Court ADOPTS the Report as to the finding that this condition authorizes arbitrary enforcement and as to damages, but not as to lack of notice. Defendants' motion to dismiss this claim is DENIED as to injunctive relief and GRANTED as to money damages.

### c. Defendants' Motion to Dismiss Plaintiff's Claim that Special Condition No. 24 is Unconstitutionally Vague is Granted

Plaintiff seeks both injunctive relief and damages on his claim that Special Condition No. 24 is void for vagueness. Condition No. 24 requires Plaintiff to notify his parole officer "when I establish a relationship with a consenting adult and then shall inform the party of my prior criminal history concerning sexual abuse, in the presence of my parole officer." SAC Ex. C ¶ 24 (emphasis in original). Judge Moses found that this was not void for vagueness and recommended dismissal. R & R at 55-56. Plaintiff did not object to this ruling and therefore the Court reviews it for clear error.

Judge Moses found that a reasonable individual in Plaintiff's position would understand that this condition referred not to all relationships, but only consensual sexual relationships. R & R at 55-56. Judge Moses also noted that since Plaintiff had already disclosed his relationship to his fiancée, he "clearly understood the type of relationship the special condition targeted." R & R at 56. The Court does not find the Report to be clearly erroneous. The Court ADOPTS the Report in full on this claim, and GRANTS Defendants' motion to dismiss.

### 4. Defendants' Motion to Dismiss is Denied as to Plaintiff's Claim that Special Parole Condition No. 48 and Other Technology Restrictions Violate His First Amendment Rights (Claim 4)

Plaintiff's parole conditions place a variety of de jure and de facto limitations on his ability to access the internet, particularly social media. Under Special Condition No. 12, Plaintiff cannot "engage or participate in any online computer service that involves the exchange of electronic messages"; No. 35 states that he may not "own or possess a beeper, scanner or cell phone without permission of [his] parole officer" and that if he is given permission to possess a cell phone, it cannot be video or photo-capable; No. 39 prevents him from possessing a computer or computer-related materials without approval by his parole officer; and No. 48 which, *inter alia*, prohibits him categorically from accessing "a commercial social networking website." SAC, Ex. C at 5-10. In addition to the specific restrictions on internet use itself, Plaintiff alleges that the limitations on his access to technology have the de facto effect of barring him from accessing the internet for nearly all purposes. SAC ¶ 81-92, 162. Plaintiff argues that these conditions violate his First Amendment rights and seeks injunctive relief and damages.

Judge Moses recommended that Condition No. 48, operating in conjunction with the limitations on Plaintiff's access to

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 83 of 267

2019 WL 168544

technological devices, violated Plaintiff's First Amendment rights under the Supreme Court's recent decision in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017). As to Plaintiff's request for damages, Judge Moses recommended dismissal on qualified immunity grounds except as to officer Lewis-Robinson for the period after the Supreme Court's decision in *Packingham*. R & R at 63-64. Defendants object to the Report's recommendation on the merits of Plaintiff's First Amendment claim and as to whether qualified immunity precludes money damages even post-*Packingham*. Plaintiff does not object to the recommended denial of damages pre-*Packingham*. The Court will address the merits of Plaintiff's claim and the question of qualified immunity in turn.

### a. The Motion to Dismiss is Denied as to Plaintiff's First Amendment Claim

**\*16** Defendants' primary objection is that *Packingham* does not apply to parole conditions and Judge Moses erred in imposing intermediate scrutiny. Def. R & R Obj. at 17-19. The Court disagrees.

Under *Packingham*, blanket limitations on an individual's ability to access social media will receive intermediate scrutiny, even when imposed as conditions of parole. There is no indication in *Packingham* that parolees are exempted from the Court's decision. The North Carolina law challenged in *Packingham* applied to registered sex offenders generally, without distinguishing between those who had finished any period of supervised release. *Packingham*, 137 S. Ct. at 1733-34; N.C. Gen. Stat. Ann. § 14-202.5(a) (applying the prohibition to registered sex offenders).[5] In fact, the Court was clear that the distinction between those who were presently under the supervision of the criminal justice system and those who no longer were was not a basis for its holding: "the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is also *not* an issue before the Court." *Id.* at 1737 (emphasis added); *see also United States v. Browder*, 866 F.3d 504, 511 n.26 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 693 (2018) (noting that the Court in *Packingham* did not seem to rely on the fact that the ban extended beyond the supervision of the criminal justice system). More generally, after describing the myriad ways in which the internet and social networks are part of an ongoing revolution in human communication, the Court cautioned that it would "exercise extreme caution

before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Packingham*, 137 S. Ct. at 1736. Indeed, the Supreme Court's decision to apply intermediate scrutiny was based on the sheer breadth of legitimate speech burdened, a concern that applies with equal force here. *Packingham*, 137 S. Ct. at 1735-37. While the Court stated that "it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor" it then made clear "[s]pecific laws of that type *must be* the State's first resort to ward off the serious harm that sexual crimes inflict." *Id.* at 1737 (emphasis added). Therefore, while in some contexts parolees receive a lesser degree of constitutional protection, it would be inconsistent with *Packingham* to categorically exempt parole conditions from its reach.

5        *See also* Brief for Amici Curiae the Cato Institute, the American Civil Liberties Union, and the American Civil Liberties Union of North Carolina in Support of Petitioner, *Packingham v. North Carolina*, 2016 WL 8136359 (U.S.), 7 (U.S., 2016) ("North Carolina's registry law in turn applies whether or not a former offender is on parole or probation.").

Nor is the Court persuaded by Defendants' objection that *Packingham* is distinguishable because Plaintiff's parole conditions are not absolute. Def. R & R Obj. at 18-19. Condition No. 48, prohibiting access to commercial social networking websites, is not written to allow parole officers to grant individualized exceptions. And Plaintiff alleges that in practice these conditions have functioned as an almost absolute bar, with the exception of using a school computer and "only for academic purposes and for purposes related to this lawsuit." SAC ¶¶ 81-92. These limited exceptions do not satisfy the concerns about access to the "vast democratic forums of the internet" for a multiplicity of purposes that was the basis for the Supreme Court's decision. *Packingham*, 137 S. Ct. at 1735-37 (internal quotation marks omitted). Furthermore, the possibility of certain case-by-case exceptions was insufficient to save other overly broad conditions of supervised release limiting internet or technology access, even when analyzed under a less demanding standard. *See United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson*, 248 F.3d 79, 81, 82-84 (2d Cir. 2001). Therefore, the possibility of case-by-case exceptions from some of these conditions does

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

not exempt them from *Packingham*, a conclusion reinforced by the nearly blanket manner they have allegedly been applied.

 **\*17** Defendants do not argue that these conditions can withstand intermediate scrutiny and the Court agrees with Judge Moses that they cannot. Under intermediate scrutiny, a law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 134 S.Ct. 2518, 2535 (2014) (internal quotation marks omitted). Plaintiff's crime did not involve the internet, social media, the exchange of electronic messages, cell phones, or computers. R & R at 62. As applied to Plaintiff, these restrictions therefore plainly burden substantially more speech than necessary and therefore fail intermediate scrutiny.

### b. Defendants Are Entitled to Qualified Immunity on Plaintiff's First Amendment Claims

While Plaintiff has sufficiently pled a First Amendment claim on the merits, the Court must still address whether the doctrine of qualified immunity warrants dismissing Plaintiff's claim for money damages. If a defendant can show that qualified immunity applies, a claim for money damages should be dismissed as a matter of law. *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Qualified immunity would not, however, bar Plaintiff's request for injunctive relief. *See, e.g.*, *Horne v. Coughlin*, 191 F.3d 244, 250 (2d Cir. 1999) (qualified immunity is not a defense to injunctive relief).

The Court finds that Plaintiff's rights were not clearly established under *Packingham* and that Defendants are therefore entitled to qualified immunity. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotes omitted). Though for the reasons above the Court ultimately agrees with Plaintiff's reading of *Packingham*, it has not been established in this jurisdiction that it applies to conditions of supervised release and a number of other federal courts have indicated that it might not. *See, e.g.*, *United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017). Therefore, the constitutional question of *Packingham*'s application in this context was not beyond debate.

As to the period before *Packingham*, Plaintiff did not object to Judge Moses's conclusion that his rights before the Supreme Court's decision were not clearly established. Reviewed

under the deferential clear error standard, it was not clearly erroneous for Judge Moses to conclude that—in part because Plaintiff had implicitly conceded this argument, R & R at 64 —the unlawfulness of Defendants' conduct under the First Amendment was not clearly established prior to *Packingham*. Therefore, qualified immunity bars Plaintiff's request for money damages on his First Amendment claim both before and after *Packingham*.

For these reasons, the Court ADOPTS the Report's reasoning as to the merits of Plaintiff's First Amendment claim but not as to damages. Defendants' motion to dismiss Plaintiff's First Amendment claim on the merits is DENIED, but Defendants' motion to dismiss Plaintiff's claim for money damages is GRANTED.

### 5. Defendants' Motion to Dismiss is Denied in Part as to Plaintiff's Claim of Interference with his Family Relationships (Claim 5)

Plaintiff contends that he has a fundamental right to contact with his extended family and that his parole conditions prohibiting contact with minors in his family violates his due process rights. Plaintiff seeks both injunctive relief and money damages on this claim. Under Special Condition No. 15, Plaintiff is prohibited from having any contact with children under the age of 18 without the prior approval of his parole officer. SAC, Ex. C at 6. Judge Moses agreed with Defendants that Plaintiff had no fundamental right to contact extended family members who are not his own children and with whom he never had a close or custodial relationship. R & R at 65-67. However, even though no fundamental right was at stake, Judge Moses found that the Due Process Clause still requires that parole conditions be "reasonably related to [the parolee's] prior conduct or the government's interest in his rehabilitation." R & R at 67 (alteration in Report) (quoting *Singleton v. Doe*, 210 F. Supp. 3d 359, 374 (E.D.N.Y. 2016) ). Judge Moses found that viewed on the motion to dismiss standard, Plaintiff had sufficiently alleged a claim for injunctive relief and damages as against Defendant Lewis-Robinson. Defendants object on several grounds, Plaintiff does not.

 **\*18** The Court does not find any error—clear or otherwise —in Judge Moses's conclusion that Plaintiff's fundamental rights were not implicated here and adopts this portion of the Report.

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 85 of 267

Defendants object that Plaintiff only pled a violation of his fundamental rights, and therefore Judge Moses erred by proceeding to apply the lower standard of review. Def. R & R Obj. at 19-21. It is true that Plaintiff did not include Special Condition No. 15 among the conditions that he challenged in a separate section as arbitrary and capricious. SAC ¶¶ 171-73. Nonetheless, Plaintiff did plead that the way the condition is applied to him violates the Due Process Clause, *id.* ¶¶ 93-105, 164-69, which provides the level of review that Judge Moses applied, *Singleton*, 210 F. Supp. 3d at 372-74. Therefore, the Court finds that Plaintiff stated a claim that the way Condition No. 15 is being applied to him violates his rights under the Due Process Clause.

As to the merits of Plaintiff's claim, Defendants object that because Plaintiff's crime involved harm to a minor, there is a rational relationship between this condition and the threat Plaintiff poses to children. Def. R & R Obj. at 19-20. Drawing all reasonable inferences in Plaintiff's favor, Plaintiff has alleged that Condition No. 15 is being applied as an absolute ban on his ever coming into contact with a minor member of his family. The Court agrees with Judge Moses that Plaintiff's kidnapping for ransom of an unrelated minor has no rational relationship to an absolute bar on his ever seeing minors to whom he is related, even in the presence of other adult family members. R & R at 68-69. Therefore, the Court rejects Defendants' objection.

Defendants also specifically object that neither form of relief sought by Plaintiff, injunctive relief and money damages, are available on this claim, warranting dismissal. Def. R & R Obj. at 20 n.3. The Court addresses each objection in turn.

Separate from their arguments about the preliminary injunction, Defendants object that Plaintiff's request for injunctive relief should be dismissed entirely, since the only relief he could ultimately receive would be an impermissibly vague injunction ordering Defendants to "follow the law." *Id.* at 20 n.3. Defendants are correct that "[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law." *S. C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ). Under this standard, "an injunction must 'be specific and definite enough to apprise those within its scope of the conduct that is being proscribed.' " *Id.* at 240-41 (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) ). The purpose of this rule is "to prevent uncertainty and confusion on the part of those to whom the injunction

is directed, and to be sure that the appellate court knows precisely what it is reviewing." *Id.* at 241 (internal quotation marks omitted) (quoting *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997) ). The Court does not find that, as a matter of law, it would be impossible to tailor sufficiently specific injunctive relief to this claim. For example, an injunction requiring Plaintiff's parole officers to consider his requests on a case-by-case basis and provide an explanation based on legitimate interests such as public safety and rehabilitation would provide sufficient notice to Defendants as to what is prohibited, and be definite enough in scope for further review.

**\*19** As to damages, the Court concludes that it was not clearly established that Defendant Lewis-Robinson's conduct was unlawful and she is therefore entitled to qualified immunity. While it is established that parole conditions may not be applied in an arbitrary and capricious manner, the qualified immunity analysis requires greater particularity. *See White v. Pauly*, 137 S. Ct. 548, 551-52 (2017). The only factually similar case to which Plaintiff points, *Doe v. Lima*, involved an individual's relationship with his son, and therefore implicated a fundamental liberty interest. 270 F. Supp. 3d 684, 704 (S.D.N.Y. 2017); *see also Doe v. Annucci*, No. 14 CIV. 2953 (PAE), 2015 WL 4393012, at *12-13 (S.D.N.Y. July 15, 2015) (same). Absent other authority, the Court agrees with *Singleton*, which found that qualified immunity applies to due process challenges to parole conditions as "[a]lthough parolees are entitled to certain limited due process rights in the conditions of their parole, those due process rights are not clearly defined." 210 F. Supp. 3d at 374. Therefore, the Court concludes that all Defendants are entitled to qualified immunity on this claim.

For the reasons given above, the Court ADOPTS the Report as to the merits of Plaintiff's claim, but not as to qualified immunity. Defendants' motion to dismiss is DENIED as to the merits of Plaintiff's claim, but GRANTED as to Plaintiff's claim for damages.

### 6. Defendants' Motion to Dismiss is Denied in Part on Plaintiff's Claim that Nine of His Parole Conditions Are Arbitrary and Capricious (Claim 6)

In Plaintiff's sixth and final claim, he alleges that a number of his parole conditions are arbitrary and capricious and that his parole officers acted arbitrarily and capriciously, in violation of the Due Process Clause. This includes officer Lewis-Robinson's alleged refusal to consider alternate proposed

Case 5:20-cv-00535-BKS-TWD Document 45 Filed 08/24/22 Page 86 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

residences besides the shelter to which he has been assigned, the restrictions on his internet and technology use, as well as "Special Condition No. 24, governing his relationships with consenting adults; Nos. 31 and 32, which prohibit him from owning, operating, or being a passenger in a motor vehicle without the permission of his PO; No. 14, which prohibits him from purchasing or possessing sexually explicit materials; No. 19, which prevents him from owning a pet; and No. 37, which prohibits him from renting a post office box without his PO's prior approval." R & R at 70. Plaintiff seeks injunctive relief and damages on these claims. The Court will address each of these restrictions in turn.

**\*20** As an initial matter, the parties and Judge Moses agree as to the legal standard for evaluating such claims. [6] "[P]arolees are entitled to some form of due process in the imposition of special conditions of parole." *Pollard v. United States Parole Comm'n*, No. 15-CV-9131 (KBF), 2016 WL 3167229, at \*4 (S.D.N.Y. June 6, 2016) (citing cases). "In the Second Circuit, special restrictions on a parolee's rights are upheld where they 'are reasonably and necessarily related to the interests that the Government retains after his conditional release.' " *Muhammad v. Evans*, No. 11 CV 2113 (CM), 2014 WL 4232496, at \*9 (S.D.N.Y. Aug. 15, 2014) (quoting *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972) ). Conditions will be upheld if there is a reasonable relationship to the parolee's prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. *Singleton*, 210 F. Supp. 3d at 372–74 (citing cases). On the other hand, if conditions are arbitrary and capricious, they will be invalidated. *See, e.g.*, *Boddie*, 2011 WL 1697965, at \*2 (citing cases). Defendants argue that there is effectively a heightened pleading standard for such claims, Def. Mot. to Dismiss, Dkt. No. 60, at 17, but the Court agrees with Judge Moses that the sole case on which Defendants purport to base this principle, *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 304 (E.D.N.Y. 2018), is properly understood as reflecting the unusual circumstances surrounding that case, not announcing a general heightened pleading standard. R & R at 76-77, 77 n.5. The Court will apply the standard pleading requirements and the arbitrary and capricious standard to Plaintiff's various challenges.

[6] Defendants had initially argued that state court was the only proper venue for such claims, but appear to no longer press that argument after Judge Moses correctly rejected it. R & R at 68 n.48.

### a. Defendants' Motion to Dismiss is Denied in Part as to Special Condition No. 4

Plaintiff challenges that Defendants are arbitrarily and capriciously requiring him to stay in the shelter to which he has been assigned. Judge Moses recommended that Defendants' motion to dismiss be denied as to the merits of Plaintiff's claim, but granted as to money damages except with respect to Defendant Lewis-Robinson. R & R at 70-71. Defendants object as to both.

Defendants object that Judge Moses erred by finding that Plaintiff has stated a claim on the basis of a single incident alone. Def. R & R Obj. at 21-22. The Court relies on Judge Moses's thorough description of Plaintiff's allegations surrounding his request to move out of the Willow Avenue Men's Shelter and in with his fiancée's sister, Ms. Blake. R & R 70-71. The Court agrees with Judge Moses that Plaintiff has alleged facts giving rise to a plausible claim on the merits that his residency requirements are being arbitrarily and capriciously applied in a manner that de facto confines him to the shelter for the convenience of his parole officer. R & R at 71. This objection is therefore rejected.

Here again, Defendants specifically object that neither injunctive relief nor money damages are available on this claim, warranting dismissal. The Court addresses each in turn.

Independently of their arguments about a preliminary injunction, Defendants object that any injunctive relief on this claim would be so vague as to be unenforceable and so the claim for injunctive relief should be dismissed entirely. Def. R & R Obj. at 22. As above, the Court cannot conclude that, as a matter of law, it would be impossible to tailor sufficiently specific injunctive relief on this claim. For example, Plaintiff offers that if he could establish in discovery "that Ms. Blake would be willing to house him and there is no non-arbitrary reason to deny his request to move" the Court could require Defendants to allow Plaintiff to live with Ms. Blake. Pl. R & R Obj. Resp. at 27. Therefore, the Court cannot conclude that, as a matter of law, no appropriate injunctive relief could be granted on this claim.

As to damages, the Court finds that while it is established that in general parole conditions cannot be arbitrary and capricious, neither Judge Moses nor Plaintiff identified any sufficiently similar cases to clearly establish that Defendant Lewis-Robinson's conduct with respect to

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 87 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

alternate residences was unconstitutionally arbitrary. *See Pauly*, 137 S. Ct. at 551-52; *Singleton*, 210 F. Supp. 3d at 374. Therefore, the parole officer defendants are entitled to qualified immunity on this claim.

**\*21** For the reasons above, the Court therefore ADOPTS the Report as to the merits of Plaintiff's claim, but not as to qualified immunity. Defendants' motion to dismiss Plaintiff's claim on the merits is DENIED, but Defendants' motion to dismiss Plaintiff's claim for money damages is GRANTED.

### b. Defendants' Motion to Dismiss is Granted as to Special Condition No. 24

Special Condition No. 24 requires Plaintiff to disclose his sexual relationships to his parole officer and disclose his supposed prior history of sexual abuse to his partners. SAC, Ex. C ¶ 24. Judge Moses recommended that since this was not "reasonably related to his prior conduct or to the government's interest in his rehabilitation[,]" the motion to dismiss should be denied as to the merits of Plaintiff's claim. R & R at 74-75. However, Judge Moses recommended granting the motion to dismiss with respect to money damages, as Plaintiff had failed to sufficiently allege harm and Defendants were entitled to qualified immunity. *Id.* at 75. For the reasons given below, the Courts finds it unnecessary to address the merits of this claim, as Plaintiff has failed to show standing on his claim for injunctive relief, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-06 (1983), and qualified immunity bars his claim for damages, *Mesa v. City of New York*, No. 09 CIV. 10464 JPO, 2013 WL 31002, at *7 (S.D.N.Y. Jan. 3, 2013) (a court is not required to address the merits of a claim before deciding that qualified immunity applies).

Though this was not raised as an objection, the Court finds that Plaintiff has failed to sufficiently allege a risk of future harm sufficient for standing to bring a claim for injunctive relief. A federal court has an obligation to confirm whether a plaintiff has standing, including raising the issue *sua sponte. Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). "[A] plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (emphasis in original) (citing *Lyons*, 461 U.S. at 105-06). To satisfy the first prong, a Plaintiff must establish that "he has sustained or is immediately in danger of sustaining some direct injury as the

result of the challenged official conduct." *Lyons*, 461 U.S. at 101-02 (internal quotation marks omitted). Past injury alone is insufficient to satisfy this requirement, unless it is causing continuing, present harm. See *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). In this case, Plaintiff has only alleged the past harm of being required to tell his fiancée about his status and that "he was forced to disclose the sexual nature of his relationship to PO Lewis-Robinson in detail." SAC ¶¶ 121-22. Plaintiff has not alleged that either of these requirements is ongoing, nor that he plans to enter into a new relationship such that this disclosure would be triggered again. Therefore, the Court will dismiss, without prejudice, Plaintiff's request for injunctive relief on this claim for lack of standing.[7]

> [7] See *Katz v. Donna Karan Co.*, L.L.C., 872 F.3d 114, 121 (2d Cir. 2017) ("[W]here a case is dismissed for lack of Article III standing, as here, that disposition cannot be entered with prejudice, and instead must be dismissed *without prejudice*.") (emphasis in original).

**\*22** As to damages, for similar reasons as those given in the qualified immunity analyses above, there are no sufficiently similar cases to establish with sufficient particularity that Defendant Lewis-Robinson's conduct with respect to this claim was unconstitutionally arbitrary. *See Pauly*, 137 S. Ct. at 551-52; *Singleton*, 210 F. Supp. 3d at 374. Defendant parole officers are therefore entitled to qualified immunity on this claim. For this reason, the Court does not reach the question of whether Plaintiff sufficiently alleged past harm.

For the forgoing reasons, neither injunctive relief nor money damages are available on this claim, which must therefore be dismissed. The Report is ADOPTED as to qualified immunity, but not as to the merits of Plaintiff's claim or whether Plaintiff sufficiently alleged harm. Defendants' motion to dismiss this claim is hereby GRANTED in full.

### c. Defendants' Motion to Dismiss is Granted as to Special Conditions Nos. 31 and 32

Plaintiff challenges Special Conditions Nos. 31 and 32, which *inter alia*, prohibit him from obtaining a driver's license, as well as from owning, operating, or being a passenger in a motor vehicle, without permission of his Parole Officer. SAC, Ex. C ¶¶ 31-32. Judge Moses found that because Plaintiff had used a car in the commission

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

of his crime and the conditions imposed on him were not absolute, these limitations were not arbitrary and capricious and recommended dismissal of these claims. R & R at 75-76. Plaintiff did not object to this recommendation, which will therefore be reviewed for clear error. The Court finds that Judge Moses' recommendation is not clearly erroneous. Where an individual used a vehicle in the commission of their crime, a parole condition limiting their access to such vehicles without approval is not unreasonable. *See Gerena v. Rodriguez,* 192 A.D.2d 606, 606-07 (1993). Therefore, the Court ADOPTS the Report in full as to this claim and Defendants' motion to dismiss this claim is hereby GRANTED.

### d. Defendants' Motion to Dismiss is Granted as to Special Conditions Nos. 14, 19, and 37

Plaintiff challenges that prohibitions on his viewing pornography (Special Condition No. 14), owning a pet (Special Condition No. 19), or owning a post office box (Special Condition No. 37), are arbitrary and capricious. R & R at 76-78. However, Judge Moses recommended that because Plaintiff had failed to allege that any of these prohibitions were having any impact on his life, his claims should be dismissed. R & R at 78. Plaintiff did not object to this recommendation, which will therefore be reviewed for clear error.

This Court finds no clear error in Judge Moses's recommendation. Plaintiff has not pled standing sufficient for either injunctive relief or money damages. As to injunctive relief, even drawing all reasonable inferences in his favor, Plaintiff has failed to allege "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Lyons,* 461 U.S. at 101-02. Nor has Plaintiff pled past harm that would warrant money damages. Indeed, Plaintiff has pled no injury at all resulting from these conditions, but rather simply lists them off in his complaint. SAC ¶¶ 128-29, 173. Because Plaintiff lacks standing, these claims must be dismissed. Therefore, the Court ADOPTS the Report on this claim and Defendants' motion to dismiss Plaintiff's claims with respect to Special Conditions Nos. 14, 19, and 37 is therefore GRANTED without prejudice.

### e. Defendants Are Entitled to Qualified Immunity on Plaintiff's Claim that the Internet and Technology Restrictions Are Arbitrary and Capricious

**\*23** In addition to his First Amendment challenge, Plaintiff also challenges that the parole conditions restricting his access to the internet and technology are arbitrary and capricious. SAC ¶ 173(i)-(ii). The Report does not address this claim separately, as it considered the same issues in its First Amendment analysis. R & R at 70 n.50. Neither party objected. The Court agrees that it is not necessary to determine the merits of this claim separately. However, whether Defendants are entitled to qualified immunity on Plaintiff's claim for damages under the Due Process Clause requires a separate analysis from the First Amendment claim.

The Court finds that Plaintiff's due process rights here were not clearly established for the purposes of qualified immunity. A right may be clearly established by either controlling authority or "a robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741–42 (2011) (internal quotation marks omitted). Here, neither condition is met. Second Circuit decisions interpreting the somewhat more stringent statutory standard imposed on federal conditions of supervised release under 18 U.S.C. § 3553(a) and § 3563(b) have invalidated conditions restricting internet or computer access if they were not reasonably related to the purposes of sentencing or inflicted a greater deprivation of liberty than necessary. *See United States v. Sofsky,* 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson,* 248 F.3d 79, 82-84 (2d Cir. 2001). Yet given the different legal standard, these are not controlling authority as to the constitutional analysis of state parole conditions. A recent case in the Eastern District of New York drew on these decisions—while noting the different standards—to sustain on summary judgment a challenge to a parole condition limiting a parolee's ability to own a phone with a camera where there was no evidence that it was related to prior conduct. *Singleton,* 210 F. Supp. 3d at 375-76. However, the court in that case also found that Defendants were entitled to qualified immunity given that due process rights in this context are "not clearly defined." *Id.* at 374. Therefore, while a consensus is emerging that it is arbitrary and capricious under the Due Process Clause to impose these kinds of technology and internet restrictions without an individualized link to prior conduct or another legitimate government interest, it has not yet been sufficiently clearly established for the purposes of the qualified immunity analysis. Defendants'

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 89 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)

2019 WL 168544

motion to dismiss Plaintiff's claim for damages on this claim is therefore GRANTED.

For the reasons given above, Defendants' motion to dismiss is hereby GRANTED in full as to Claim 1, Claim 3 as to residences and the consensual relationships rule, Claim 6 as to the consensual relationships rule, motor vehicles rule, pornography, pets, and P.O. boxes. Defendants' motion is also GRANTED as to money damages on all claims. Otherwise, Defendants' motion is hereby DENIED.

### D. Plaintiff is Entitled to a Preliminary Injunction on his Substantive Due Process Claim

The Court now turns to Plaintiff's motion for a preliminary injunction. Judge Moses's Report recommended that Plaintiff is entitled to a preliminary injunction on his substantive due process claim. Defendants object on several grounds, which the Court addresses in turn.

As an initial matter, Defendants argue that even if Plaintiff has sufficiently pled a claim to survive their motion to dismiss, Plaintiff has not demonstrated a substantial likelihood of success on the merits. Def. R & R Obj. at 12. For the reasons given above in the section denying Defendants' motion to dismiss this claim, the Court disagrees and concludes that Plaintiff has established a clear likelihood of success on the merits justifying the imposition of a preliminary injunction. Defendants do not object to Judge Moses' recommendation that Plaintiff has shown irreparable harm, and the Court finds no error—clear or otherwise—in Judge Moses' thorough discussion of the question. R & R at 79-82.

**\*24** Defendants object to the Report's recommendation that the preliminary injunction would be in the public interest. The Court disagrees. Judge Moses is correct that it is in the public interest to grant Plaintiff's motion for preliminary injunction because he presents no "*sexual* risks that sex offender registration, and the Sex Offender Conditions, are designed to combat." R & R at 82 (emphasis in original); Pl. R & R Obj. Resp. at 28. As a result, lifting Plaintiff's designation would not just ensure compliance with the Constitution, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing cases), it would remedy ongoing harm to Plaintiff and increase the accuracy of SORA's designation of individuals as sex offenders, *see People v. Diaz*, 150 A.D.3d 60, 66 (N.Y. App. Div.), *aff'd on other grounds*, No. 134, 2018 WL 6492716 (N.Y. Dec. 11, 2018). And even if remedying a constitutional violation were not, standing alone, always enough to outweigh countervailing public interests, Def. R

& R Obj. at 24, Defendants offer no concrete or persuasive examples of how the public interest would be harmed by the injunction. Defendants cursorily argue that the Report "(1) improperly placed the burden of proof on this issue upon defendants rather than plaintiff; (2) was not based on any evidence placed before the Court; (3) failed to offer sufficient deference to the state officials' determinations to the contrary; and (4) was factually incorrect given plaintiff's crimes of conviction." Def. R & R Obj. at 24. As noted above, Defendants at this stage have conceded that there was no sexual element to Plaintiff's offense. And the record offers no indication or allegation of a sexual element to Plaintiff's crime or of any risk of sexual misconduct, but rather a judicial determination by Justice Obus to the contrary. R & R at 10-11. Moreover, a significant number of parole conditions will remain even if Plaintiff is no longer designated as a sex offender, Pl. R & R Obj. Resp. at 28, and Defendants retain their discretion to impose conditions of parole that are reasonably related to a legitimate government interest and any non-sexual risk Plaintiff may pose. Therefore, the Court finds that Plaintiff has shown, based on the record, that it is in the public interest to grant a preliminary injunction.

Defendants also argue that the Court should only consider whether "the parole conditions imposed by the state officials ... were so arbitrary and irrational that they could not protect the public from Plaintiff in any manner, sexual or not." Def. R & R Obj. at 23. Even if this were true for Plaintiff's challenges to his specific conditions of parole, Plaintiff's Claim 2 objects to being designated as a "sex offender," and the question before the Court is thus whether that designation is rational and whether enjoining Defendants from labeling Plaintiff as such, and imposing parole conditions solely on that basis, would serve the public interest. Given that, as noted above, the injunction will allow Defendants to impose conditions based on any legitimate interests unrelated to Plaintiff's designation as a sex offender, this objection is unavailing.

Defendants also argue that the issue of parole conditions should be remanded to the Defendants to reconsider before any preliminary injunction issues. Def. R & R Obj. at 25-26. Specifically, the Defendants argue that they should have a chance to determine "whether any of the statutory parole conditions ... should still be imposed here to protect the public." *Id.* The Court concludes that no such remand is necessary. Defendants cite the Second Circuit's decision in *Schwartz v. Dolan*, 86 F.3d 315 (2d Cir. 1996), to support their

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 90 of 267

Yunus v. Robinson, Not Reported in Fed. Supp. (2019)
2019 WL 168544

argument, but that decision is importantly different from the instant case in two ways.

First, unlike in *Schwartz*, the preliminary injunction here would provide Defendants with significant flexibility to design and tailor the manner in which they will comply. In *Schwartz*, the district court "gave detailed instructions" on how a state agency was required to provide notice to public assistance recipients, which would have involved "extensive modifications to the computer systems that create the notices." *Schwartz*, 86 F.3d at 319. By mandating a specific restructuring of the agency's operations, the district court had foreclosed the remedy the agency would have selected. *Id.* The Second Circuit held that because there were "different possible ways to remedy the violation," the agency should have had an opportunity to present its own plan for remedying the constitutional deficiencies. *Id.* Here, however, the preliminary injunction language, as crafted by Judge Moses, provides Defendants with precisely the opportunity they seek to consider whether any parole conditions are still necessary to protect the public; Defendants have ample flexibility and discretion to impose parole conditions "to the extent they deem those conditions appropriate for plaintiff in light of his *non-sexual* criminal history and characteristics." R & R at 85. And, contrary to Defendants' contentions, they are not categorically prohibited from imposing discretionary conditions that may be similar in content to the mandatory conditions so long as they are not otherwise inconsistent with the injunction. Def. R & R Obj. at 25. As a result, this injunction does not involve the kind of systemic management by a federal court of the operation of state institutions that was problematic in *Schwartz*. Nor does it foreclose Defendants' ability to select the manner to remedy the violation identified. Since this injunction already provides Defendants with the flexibility they seek, remand is unnecessary to permit Defendants to choose how they wish to comply with the Court's ruling.

**\*25** Second, *Schwartz* involved a permanent injunction, rather than the preliminary injunctive relief sought here. As is true in this case, preliminary injunctive relief is time-sensitive, which weighs against adopting procedures that will entail delays resulting in further ongoing irreparable harm. This consideration is particularly weighty here, as Plaintiff first filed his motion for a preliminary injunction over nine months ago and represents that remanding to Defendants for subsequent approval by this Court might result in the mooting of several of his claims. Pl. R & R Obj. Resp. at 29 n.11. Furthermore, with a preliminary injunction, a party

will be given "an opportunity to present [their] own plan" for complying with a court's ruling, *Schwartz*, 86 F.3d at 319, before permanent injunctive relief, if any, is entered. Because Plaintiff is suffering ongoing, irreparable harm, the Court declines to require another series of submissions to the Court before entering preliminary relief.

For all of the above-stated reasons, the Court concludes that Plaintiff has satisfied his burden of demonstrating that a preliminary injunction is warranted. The Court will ADOPT Judge Moses' recommended preliminary injunction on Claim 2. In addition, the Court agrees with the Report —and Plaintiff, Pl. R & R Obj. at 3—that the injunction recommended by Judge Moses on Claim 2 is sufficient to address Plaintiff's request for injunctive relief. R & R at 2, 85-86. Therefore, the Court finds it unnecessary to address whether Plaintiff has made a sufficient showing to warrant injunctive relief on his other surviving claims.

## V. Conclusion

For the reasons given above, the Court GRANTS Defendants' motion to dismiss as to Claim 1 in full; Claim 3 in full as to the consensual relationships rule, the residency requirement of Condition No. 4, and all claims for damages; Claim 4 as to damages; Claim 5 as to damages; Claim 6 as to damages on all claims, and for both injunctive relief and damages as to the claims regarding conditions regulating consensual relationships, motor vehicles, pornography, pets, and P.O. boxes.

The Court DENIES the motion to dismiss as to all other claims. The Court also clarifies that Defendant Acting Commissioner Annucci remains in this case in his official capacity as the Defendant for the purposes of any injunctive relief on Claims 2, 3, and 4. Pl. R & R Obj. at 9.

Finally, the Court GRANTS Plaintiff's request for a preliminary injunction on Claim 2, and hereby ADOPTS Judge Moses's well-crafted language: Defendants, together with their agents, employees, and all persons acting in concert with them, are preliminarily enjoined, pending the final resolution of this action, from enforcing, as against Plaintiff, the registration and notification provisions made applicable to designated sex offenders by SORA (CL §§ 168a-168w), or the mandatory conditions prescribed by EL §§ 259-c(14) and (15) for parolees sentenced for an offense for which registration as a sex offender is required; and are directed to rescind the discretionary provisions of the Sex Offender Conditions (Yunus Decl. Ex. C, at ECF pages 4-10) except to the extent

2019 WL 168544

they deem those conditions appropriate for plaintiff in light of his non-sexual criminal history and characteristics.

This resolves docket numbers 43 and 59. As this matter has been referred to Magistrate Judge Moses for general pretrial, Dkt. 15, by separate order Judge Moses may schedule a case management conference.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 168544

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1582173
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leroy PEOPLES, Plaintiff,

v.

Gina R. LEON, Ellen E. Alexander, Jane Doe,
John Doe, and Tina M. Stanford, Defendants.

9:18-CV-1349 (LEK/ML)
|
Signed 01/04/2021

**Attorneys and Law Firms**

LEROY PEOPLES, Plaintiff, pro se, 05-A-2620, Great
Meadow Correctional Facility, Box 51, Comstock, NY
12821.

HON. LETITIA JAMES, Attorney General for the State of
New York, KEITH J. STARLIN, ESQ., Assistant Attorney
General, Attorney for Defendants, Gina R. Leon, Ellen E.
Alexander and Tina M. Stanford, The Capitol, Albany, New
York 12224-0341.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Plaintiff *pro se* Leroy Peoples ("Peoples" or "Plaintiff"),
an inmate in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS")
at Great Meadow Correctional Facility ("Great Meadow
C.F."), brings this action pursuant to 42 U.S.C. § 1983
against Defendants, in their official capacity, for violations
of his First and Fourteenth Amendment rights. Dkt. No.
1 ("Compl."). Presently before the Court is Defendants'
motion for summary judgment and dismissal of Peoples'
Complaint pursuant to Rule 56(b) of the Federal Rules of
Civil Procedure. Dkt. No. 71. For the following reasons,
it is recommended that Defendants' motion for summary
judgment be granted in part and denied in part.

**I. BACKGROUND** [2]

[2]

Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall
contain a Statement of Material Facts. The
Statement of Material Facts shall set forth,
in numbered paragraphs, each material fact
about which the moving party contends there
exists no genuine issue. Each fact listed shall
set forth a specific citation to the record
where the fact is established. The record for
purposes of the Statement of Material Facts
includes the pleadings, depositions, answers
to interrogatories, admissions and affidavits. It
does not, however, include attorneys' affidavits.
The opposing party shall file a response to the
Statement of Material Facts. The non-movant's
response shall mirror the movant's Statement
of Material Facts by admitting and/or denying
each of the movant's assertions in matching
numbered paragraphs. Each denial shall set
forth a specific citation to the record where
the factual issue arises. The Court shall deem
admitted any properly supported facts set forth
in the Statement of Material Facts that the
opposing party does not specifically controvert.
The non-movant's response may also set forth
any additional material facts that the non-movant
contends are in dispute. Any facts set forth in
the Statement of Material Facts shall be deemed
admitted unless specifically controverted by the
opposing party.
Local Rule 7.1(a)(3).
Defendants filed a Statement of Material Facts.
Dkt. No. 71-1. Plaintiff responded and admits
the facts contained in certain paragraphs of
Defendants' Statement of Material Facts. Dkt. No.
82.

**A. Facts** [3]

[3]

The parties annexed exhibits to their submissions.
without objection or challenge to the authenticity
of the documents. Dkt. Nos. 71-3 through 71-22;
71-26 through 71-28; 82-2 and 82-3. Therefore,

2021 WL 1582173

the Court will consider the exhibits in the context of the within motion. *See U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010) (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)). In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### 1. Plaintiff's Criminal History

**\*2** On May 22, 2000, Peoples was convicted of attempted Criminal Possession of a Controlled Substance in the 3rd Degree with Intent to Sell. Dkt. No. 71-6 at 6-7. When Peoples failed to return to court for his sentencing, a warrant was issued. Dkt. No. 71-4 at 3. On September 17, 2001, Peoples was sentenced to a prison term of eighteen to fifty-four months. *Id.*; Dkt. No. 71-6 at 7.

On July 1, 2002, Peoples was released on parole. Dkt. No. 71-4 at 3; Dkt. No. 71-6 at 3, 7. Peoples returned to prison in January 2003, after violating his conditions of parole. *Id.* On March 19, 2003, Peoples was re-released on parole. *Id.*

In June 2003, Peoples was arrested for two gunpoint abductions, rapes, and robberies. Dkt. No. 71-1 at ¶35; Dkt. No. 82 at p. 2, ¶14. Pursuant to Indictment No. 2103/03, Peoples was charged with two counts of rape, sodomy, kidnapping, robbery, and sexual abuse stemming from two different incidents on March 7, 1998 and April 7, 2003. Dkt. No. 71-4; Dkt. No. 82-2 at 11-18. The second incident occurred nineteen days after Peoples was released on parole. Dkt. Nos. 71-3, 71-4, 71-5, 71-26 at 40. In January 2005, Peoples pled guilty to two counts of rape in the first degree. *Id.* Peoples' guilty plea was precipitated by DNA evidence obtained by authorities. Dkt. No. 71-1 at ¶38; Dkt. No. 82-1 at ¶17. Peoples' conviction has not been overturned. Dkt. No. 71-26 at 47.

At the sentencing hearing, the victim of the March 1998 rape provided a statement to the court. Dkt. No. 71-5 at 3-6. In her statement, the woman described being attacked from behind by Peoples, who was masked and armed with a gun, while she was walking to a laundromat. *Id.* at 3-5. The woman claimed that Peoples put his gun to her head and walked her back to her home at gunpoint. *Id.* The woman stated that Peoples forced her into a stairway, pulled a hat over her face, told her to pull down her pants and "raped [her] from the back" while he held the gun to her head. *Id.* The woman told the court that Peoples told her to turn around and face him, stole her wallet, and fled. Dkt. No. 71-5 at 3-6.

On January 27, 2005, Peoples was sentenced to a term of 3 1/3 to 10 years for the first rape and to 16 years for the second rape, to run concurrently, and a five year period of post-release supervision ("PRS"). Dkt. No. 71-3. Because Peoples was fifteen at the time he committed the first rape, he was sentenced as a juvenile. Dkt. No. 71-1 at ¶41; Dkt. No. 82 at p. 2, ¶20, p. 6, ¶13. The sentencing court certified Peoples as a "Sex Offender" pursuant to New York Correction Law § 168-d. Dkt. No. 71-3. The court advised Peoples that he would be obligated to register as a sex offender in New York. Dkt. No. 71-5 at 9.

### 2. Parole Proceedings

In August 2018, defendant Offender Rehabilitation Counselor ("ORC") Gina R. Leon ("Leon") interviewed Peoples in preparation for an October 2018 hearing before the New York State Board of Parole (the "Board"). Compl. at 2; Dkt. No. 71-6 at 1. Peoples did not submit a parole packet for his October 2018 interview and asked Leon to forward his 2016 packet to the Board for consideration. Dkt. No. 71-2 at ¶ 15. Following the interview, Leon prepared a Parole Board Report and Confidential Report with thirty-six recommended special conditions of release, the Offender Case Plan, and assisted in the preparation of the COMPAS instrument [4]. Dkt. No. 71-6; Dkt. No. 71-10; Dkt. No. 71-23 at ¶ 5; Dkt. No. 71-11.

[4]    COMPAS is a risk-assessment instrument used to "inform decision-making throughout the various phases of incarceration and community supervision." *See* www.doccs.ny.gov (last visited Nov. 13, 2020).

**\*3** On October 16, 2018, defendants Board of Parole Commissioner Ellen Alexander ("Alexander"), John Doe, and Jane Doe conducted a parole release interview with Peoples to determine if he would be granted discretionary

early release to parole or held until his maximum expiration ("ME") date and released to PRS. Dkt. No. 71-2 at ¶¶ 12, 18. During the hearing, Peoples "accepted responsibility" for the "gunpoint rapes" and admitted to selling and possessing crack and/or cocaine. Dkt. No. 71-16 at 4, 5. Peoples stated that he was "unable to complete" the recommended Sex Offender Counseling and Treatment Program ("SOCTP") while in DOCCS' custody. *Id.* at 6.

On October 17, 2018, the Board denied Peoples discretionary release to parole, concluding that he should be held until June 7, 2019, his maximum expiration date. Dkt. No. 71-16 at 13. The Board explained:

> Based on your interview and overall record, after weighing the statutory factors, discretionary release is denied. Your instant offense involved your actions committing two gunpoint rape related offenses. This is a continuation of your criminal history and record on community supervision, which includes a previous prison term for a drug related offense.
>
> The panel notes your rehabilitation efforts, including your achievement of your G.E.D., the tailor shop and completion of ART and ASAT. You have not been able to complete the sex offender program. Your disciplinary record includes multiple disciplinary offenses, including infractions since your last interview. Also considered were your 2016 parole packet, a letter from the Appellate Advocates as well as official letters of opposition and support and your sentencing minutes.
>
> We have reviewed your case plan, your release plans and your risk and needs assessment which indicates your elevated risk of felony violence and need for reentry substance abuse services and treatment.

Dkt. No. 71-16 at 13.

The Board issued a Form 9026 Parol Board Decision Notice with thirty-six special conditions ("Special Conditions") of release.[5] Dkt. No. 1-2 at 3-11; Dkt. No. 71-2 at ¶ 19. Of these thirty-six conditions, Peoples objects to the following:

> 3. I will participate in a substance abuse treatment program as directed by the P.O.
>
> 4. I will participate in an alcohol abuse treatment program as directed by the P.O.

> 8. I will participate in anti-aggression/anti-violence counseling as directed by the P.O.
>
> 10. I will have no contact with any person under the age of eighteen without written permission of the P.O.
>
> 11. I will comply with all case specific sex offender conditions to be imposed by the P.O.
>
> 14. I will comply with geographical restrictions as directed by P.O.
>
> 15. I will abide by the mandatory condition imposed by the Sexual Assault Reform Act ("SARA").
>
> 16. I will not use or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor.
>
> 18. I will not use the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under eighteen, and communicate with a person under the age of eighteen unless I receive written permission from the Board of Parole to use the internet to communicate with a minor child under eighteen years of age who I am the parent of and who I am not otherwise prohibited from communicating with.
>
> 20. I will not own, use, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices and/or the internet unless I obtain prior written permission from my parole officer.
>
> **\*4** 21. If I am permitted by my parole officer to possess a computer at my residence, permission will be granted for only one computer.
>
> 22. I will provide all personal, business, phone, internet service provider, and/or cable records to my parole officer upon request.
>
> 23. I will provide copies of financial documents to my parole officer upon request. These documents may include, but are not limited to, all credit card bills, bank statements, and income tax returns.

24. I will provide all user IDs and passwords required to access the computer, my C.M.O.S., and Bios, internet service provider, and/all email accounts, instant messaging accounts, any removable electronic media, including but not limited to media such as smart cards, cell phones, thumb drives and web virtual storage.

25. I will provide my parole officer with my password and user ID for any approved device.

26. I acknowledge that individuals who have access to my computer system and/or other communication or electronic storage devices will also be subject to monitoring and/or search and seizure. I agree to be fully responsible for all material, data, images and information found on my computer and/or other communication or electronic storage devices at all times.

27. I will not create or assist directly or indirectly in the creation of any electronic bulletin board system, services that provide access to the internet, or any public or private computer network without prior written approval from my parole officer.

28. I will not use any form of encryption, cryptography, steganography, compression and/or other method that might limit access to, or change the appearance of, data and/or images without prior written approval from my parole officer.

29. I will not attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way.

30. I will cooperate with unannounced examinations directed by my parole officer of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on hard disk drives, floppy diskettes, CD roms, optical disks, magnetic tape, cell phones, and/or any other storage media whether installed within a device or removable.

31. I will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use.

32. I will submit to photo imaging every 90 days, or whenever directed by my parole officer or other representative of the N.Y.S. Department of Corrections and Community Supervision.

33. I understand that I shall not download, access, or otherwise engage in any internet enabled gaming activities to include Pokemon Go, I further understand that I shall not be in the company of any person who is engaged in any internet enabled gaming activities nor will I have any gaming software on any internet enabled device that I am permitted to access or otherwise possess.

**\*5** 34. I will propose a residence to be investigated by the Department of Corrections and Community Supervision and will assist the Department in any efforts it may make on my behalf to develop a residence.

35. If I am deemed a Level 3 risk pursuant to Article 6-c of the Correction Law - or - I am serving one or more sentences for committing or attempting to commit one or more offense(s) under Articles 130, 135 or 263 of the Penal Law or Sections 255.25, 255.26 or 255.27 of the Penal Law and the victim of such offense(s) was under 18 years of age at the time of the offense(s), and as such I must comply with section 259-c(14) of the Executive Law, I will not be released until a residence is developed and it is verified that such address is located outside the Penal Law definition of school grounds and is approved by the Department.

36. In pertinent part, Executive Law 259-c(14) provides: "The Board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the Penal Law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, ..." Penal Law 220.00(14)

"School grounds" means (A) in or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate,

junior high, vocational, or high school, or (B) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicles located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an "area accessible to the public" shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants.

Dkt. No. 1-2 at 5-11; Dkt. No. 71-1 at ¶ 20.

[5]    The conditions imposed by the Board are the same conditions previously recommended by Leon. *Compare* Dkt. No 71-6 at 26-28 *with* Dkt. No. 1-2 at 5-10.

In March 2019, pursuant to the Sex Offender Registration Act ("SORA") (Correction Law § 168), the Board of Examiners of Sex Offenders made a risk level and designation recommendation to Queens County Supreme Court, the sentencing court. Dkt. No. 82-3 at 7. In May 2019, the Honorable Ira H. Margulis determined that Peoples' risk level was 3 and designated him a "sexually violent offender" pursuant to Correction Law § 168-d.[6] *Id.*

[6]    On May 24, 2019, Peoples filed a Notice of Appeal of the order adjudicating him a Level 3 risk of re-offense and designating him a sexually violent offender. Dkt. No. 82-3 at 6. The record does not contain any evidence related to the outcome of the appeal.

On June 5, 2019, Peoples was released from DOCCS' custody and began serving his term of PRS subject to the Special Conditions. Dkt. No. 22; Dkt. No. 71-26 at 11. In August 2019, Plaintiff was arrested for violating the conditions of his parole and held at Broome County Jail ("Broome C.J."). Dkt. No 71-26 at 61. On May 20, 2020, a final revocation hearing was conducted. Dkt. No. 82-3 at 8-17. Peoples plead guilty to tampering with his GPS monitoring device and removing it from this ankle. Dkt. No. 82-3 at 16; Dkt. No. 71-26 at 65-66. The Administrative Law Judge ordered Peoples held for eighteen months, which began to run on August 6, 2019. *Id.* Peoples was transferred from Broome C.J. to Elmira Correctional Facility ("Elmira C.F."). Dkt. No. 74.

**\*6** In August 2020, Peoples was transferred from Elmira C.F. to Attica Correctional Facility ("Attica C.F.") and placed in protective custody due to his prior affiliation with the "Bloods-GKB" gang. Dkt. No. 76; Dkt. No. 71-4 at 3; Dkt. No. 82-2 at 40-42. Peoples is currently in DOCCS' custody. Dkt. No. 79.

### B. Procedural History

On November 16, 2018, the Court received the Complaint in the within action. Dkt. No. 1. Upon review of the Complaint, the Court directed defendants Leon, Alexander, Jane Doe, John Doe, and the Chairwoman of the New York State Board of Parole Tina Stanford ("Stanford") to respond to the § 1983 claims challenging the impositions of certain Special Conditions. *See generally,* Dkt. No. 8.

On May 3, 2019, Leon, Alexander, and Stanford filed an Answer to the Complaint. Dkt. No. 19. On February 27, 2020, Peoples was deposed. Dkt. No. 71-26. On July 17, 2020, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Peoples' claims. Dkt. No. 71.

### II. LEGAL STANDARD

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 248 (1986).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56; *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury,

2021 WL 1582173

and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

Peoples asks the Court to consider his Complaint as an affidavit in opposition to the motion for summary judgment. Dkt. No. 82-1 at 13. "Although 'a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment,' *Almonte v. Florio*, 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff 'verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true and to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes,' *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)." *King v. Puershner*, 17-CV-1373, 2019 WL 4519692, at *1 n.1 (S.D.N.Y. Sept. 19, 2019). Here, Plaintiff's complaint states, "I declare under penalty of perjury that the foregoing is true and correct." Compl. at 7. Therefore, the undersigned will accept Plaintiff's Complaint as an affidavit to the extent that the statements contained therein are based on Plaintiff's personal knowledge or are supported by the record. *See Berry v. Marchinkowski,* 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005).

**\*7** All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). Furthermore, where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191–92 (2d Cir. 2008). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION [7]

[7]   All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

Defendants move for summary judgment arguing that: (1) the claims for monetary damages are barred by the Eleventh Amendment; (2) the First and Fourteenth Amendment claims related to the Special Conditions must be dismissed because the conditions were reasonably related to Plaintiff's crimes and tailored to serve legitimate state interests; (3) judicial immunity bars Plaintiff's claims against Alexander; and (4) Stanford was not personally involved in the October 2018 determination. Defendants also argue that they are entitled to qualified immunity on the First and Fourteenth Amendment claims. Dkt. No. 71-29.

### A. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "New York State has not consented to suit in federal court." *Abrahams v. Appellate Div. of Supreme Court*, 473 F. Supp. 2d 550, 556 (S.D.N.Y. 2007) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d. Cir. 1977)).

Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979). "[C]laims against a government employee in his official capacity are treated as a claim against

the municipality," and, thus, cannot stand under the Eleventh Amendment. *Hines v. City of Albany*, 542 F. Supp. 2d 218, 227 (N.D.N.Y. 2008).

**\*8** However, "[u]nder the doctrine in *Ex Parte Young*, 'a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers ... in their official capacities, provided his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective.' " *Clark v. DiNapoli*, 510 Fed. App'x 49, 51 (2d Cir. 2013) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007)). "A plaintiff may not use this doctrine to adjudicate the legality of past conduct," meaning there must be some "plausible threat of future violations." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 277-78 (1986)); *see W. Mohegan Tribe and Nation*, 395 F.3d at 21 (noting that, "in determining whether the *Ex Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective' "); *see also New York State Corr. Officers & Police Benev. Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y. 2012) (D'Agostino, J.) ("[D]eclaratory relief is not permitted under *Ex Parte Young*, when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

Here, Plaintiff seeks both monetary and non-monetary relief. Dkt. No. 1-1 at 19-20. Plaintiff's claims against Defendants in their official capacities for monetary damages are barred by the Eleventh Amendment. Accordingly, I recommend that Defendants' motion for summary judgment and dismissal of all claims for monetary damages against Defendants in their official capacities be granted.

## B. Constitutional Claims Related to Special Conditions

Defendants move for summary judgment and dismissal of the section 1983 claims challenging the Special Conditions arguing that the conditions are reasonably related to Peoples' criminal history, past conduct, tailored to deter recidivism, and serve legitimate state interests in protecting the public. *See* Dkt. No. 71-29 at 4-19. Peoples asserts both general and specific challenges to the imposition of twenty-six of the thirty-six Special Conditions.

"[U]nder New York law, the Board of Parole is entitled to impose conditions on the conditional release of an inmate." *Doe v. Simon*, 221 F.3d 137, 139 (2d Cir. 2000); N.Y. Exec. Law §§ 259-c, 259-g, 259-i(2); N.Y. Comp. Codes R. & Regs. tit. 9, § 8003.3 ("A special condition may be imposed upon a [parolee] either prior or subsequent to release ... each special condition may be imposed by a member of the Board of Parole, an authorized representative of the division of parole, or a parole officer," memorialized by "a written copy of each special condition imposed.").

In its determinations, "the Parole Board may consider all of the circumstances surrounding the conviction - including conduct for which petitioner has not been convicted." *Robles v. Williams*, No. 02 CIV 6102, 2007 WL 2403154, at \*4 (S.D.N.Y. Aug. 22, 2007) (internal quotation marks omitted). Further, it is not "arbitrary nor capricious" for the Board to consider remorse when deciding whether to deny parole. *Matter of Simon v. Travis*, 95 N.Y.2d 470, 477 (2000); *see also M.G. v. Travis*, 236 A.D.2d 163, 169 (1997).

Parolees are entitled to some form of due process in the imposition of special conditions of parole. *Pollard v. U.S. Parole Comm'n*, No. 15-CV-9131, 2016 WL 3167229, at \*4 (S.D.N.Y. June 6, 2016) (citing *U.S. v. Green*, 618 F.3d 120, 122 (2d Cir. 2010)). This "limited due process right" entitles a parolee to conditions of parole that are reasonably related to his prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. *See Singleton v. Doe*, No. 14-CV-0303, 2014 WL 3110033 at \*3 (E.D.N.Y. July 7, 2014); *U.S. v. Myers*, 426 F.3d 117, 123-24 (2d Cir. 2005) (summary order); *Robinson v. Pagan*, No. 05-CV-1840, 2006 WL 3626930, at \*6 (S.D.N.Y. Dec. 12, 2006) (citation omitted); *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at \*20 (S.D.N.Y. Jan. 11, 2019) (internal citation omitted). "If a special condition implicates a fundamental liberty interest," the court "must carefully examine it to determine whether it is 'reasonably related' to the pertinent factors, and 'involves no greater deprivation of liberty than is reasonably necessary[.]' " *Myers*, 426 F.3d at 126. Courts "must use common sense to guide [their] interpretation of supervised release conditions." *U.S. v. Moritz*, 651 Fed. App'x 807, 810 (10th Cir. 2016) (citations omitted).

**\*9** In support of the motion, Leon provided a Declaration and swears that she reviewed the following documents in deciding what special conditions to recommend: sentence and commitment orders; pre-sentence investigation reports;

sentencing minutes; the parole board criminal history report; DOCCS program assignment history; disciplinary history; legal date computation; DOCCS' program refusal notification forms; letters from the District Attorney's office, the criminal defense attorney, and various individuals; release planning records; and the parole packet from Peoples' prior hearing in 2016. Dkt. No. 71-23 at ¶¶ 5, 7. Leon avers that her recommendations were reasonably related to Peoples' criminal history, his past conduct, and tailored to prevent recidivism, protect the public, and promote Peoples' rehabilitation. *Id.* at ¶ 9.

Alexander also provided a Declaration in support of the motion. Dkt. No. 71-2. Alexander stated that the Board's decision was guided by the factors set forth in N.Y. Executive Law § 259-1(2)(c)(A).[8] *Id.* at ¶ 13. Alexander avers that the Board reviewed the following records/documentation, in connection with the decision whether to grant Peoples early release to parole: sentence and commitment orders; pre-sentence investigation report; sentencing minutes (including a victim statement); criminal history; DOCCS institutional records; letters from the District Attorney and defense counsel; the COMPAS instrument; the Offender Case Plan; release planning records; letters from various individuals/entities; and Peoples' parole packet from his October 2016 interview. *Id.* at ¶¶ 14, 15. After the October 2018 interview, Alexander and the other Board members determined that Peoples would not be granted discretionary release and that he would remain incarcerated until his maximum expiration date. Dkt. No. 71-2 at ¶ 19. The Board imposed thirty-six special conditions of parole, which Alexander asserts are reasonably related to Peoples' criminal history, his past conduct, tailored to prevent recidivism, protect the public, and prevent future offenses. *Id.* at ¶¶ 20, 48. Alexander also opined that Peoples attempted to make excuses for his crimes and did not express remorse for his victims. *Id.* at ¶ 46.

[8]     Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision, the procedures adopted pursuant to subdivision four of section two hundred fifty-nine-

c of this article shall require that the following be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interactions with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department and any recommendation regarding deportation made by the commissioner of the department pursuant to section one hundred forty-seven of the correction law; (v) any current or prior statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated; (vi) the length of the determinate sentence to which the inmate would be subject had he or she received a sentence pursuant to section 70.70 or section 70.71 of the penal law for a felony defined in article two hundred twenty or article two hundred twenty-one of the penal law; (vii) the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest prior to confinement; and (viii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement. N.Y. Exec. Law § 259-i(2)(c)(A).

**\*10**  In the Parole Board Release Decision Notice, the Board explained that "[y]our instant offense involved your actions committing two gunpoint rape related offenses" was a reason for the decision to deny parole. Dkt. No. 1-2 at 4.

In opposition to the motion, Peoples presents three general challenges to the imposition of all twenty-six conditions.

### 1. General Objections

First, Peoples claims that the conditions were improperly imposed by the Board, rather than by the sentencing court. Dkt. No. 1-1 at 10; Dkt. No. 82-1 at 7. As discussed *supra*, the Board of Parole is charged with "the duty and discretion of setting conditions for an inmate on parole release." *Doe*, 221 F.3d at 139; *Robinson*, 2010 WL 11507493, at *3 (citing N.Y.C.R.R. §§ 8003.2 and 8003.3); N.Y. Penal Law § 70.40(1)(b). Accordingly, Peoples' objection, on this ground, lacks merit.

Peoples also challenges the special conditions claiming that Defendants improperly considered circumstances surrounding his convictions, including the use of a gun, and refused to consider certain "mitigating factors." Dkt. No. 82-1 at 3-6. In his opposition to the motion, Peoples presents those "mitigating factors", for the first time. To wit, Peoples asserts that he did not use a gun during the commission of the crimes and claims that an "inoperable b.b. gun was discovered in the second crime." Dkt. No. 82 at p.5-8, ¶¶ 2, 3, 7, 12, 14, 15. Additionally, Peoples claims that he knew one of the victims, that she was "not a stranger," and now contends that he did not "rob her, abduct her at gunpoint, or rape[ ] her by forcible compulsion[.]" Dkt. No. 82 at p. 6, ¶4; Dkt. No. 82-1 at 4-5. Peoples also insists that one of the assaults was a consensual sexual encounter in a pre-arranged meeting place as payment for drugs. *Id.* at p. 6, ¶¶ 4-6.

As discussed *supra*, "[t]he Board may consider all of the circumstances surrounding the conviction—including conduct for which petitioner has not been convicted—so long as some record evidence of such conduct exists in the record and it is not the sole basis for the Board's determination." *Williams v. Travis*, 783 N.Y.S.2d 413, 414 (2004). Here, the record contains extensive references to Peoples' use of a gun during the commission of the crimes and to the fact that the victims were strangers and that they were raped by forcible compulsion.

During the plea hearing, Peoples admitted to two counts of engaging in "sexual intercourse with a female to whom [he] [was] not married by means of forcible compulsion." Dkt. No. 82-2 at 28. Upon inquiry, Peoples admitted that the women were strangers and that he displayed "what appeared to be a handgun." *Id.* at 28-29. During the parole hearing, Peoples was asked the following question and gave the following answer:

> Q. Okay. So are you accepting responsibility for these gunpoint rapes?

> A. I have, I am and this is part of my past that I cannot take away.

Dkt. No. 71-16 at 4.

Peoples' new, self-serving statements, presented for the first time in his opposition to the motion for summary judgment, are unsupported by the record and do not create an issue of fact for a jury. Indeed, no reasonable jury could find the assertions credible and conclude, based upon the statements, that the Board's decision to consider all aspects of the seriousness of Peoples' offense was arbitrary or capricious. *See Stolow v. Greg Manning Auctions Inc.*, 80 Fed. App'x 722, 725 (2d Cir. 2003) (citing *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony.")); *Fox v. Harris*, No. 6:15-CV-0616 (LEK/ATB), 2017 WL 1319835, at *2 (N.D.N.Y. Apr. 7, 2017) (holding that the plaintiff "cannot escape summary judgment via 'self-serving statements ... made in his opposition that contradict his sworn deposition testimony.' ") (citation omitted).

**\*11** Finally, Peoples contends that Defendants failed to consider his plea transcript. Dkt. No. 82-1 at 3-6. Leon and Alexander do not state whether they considered Peoples' plea transcript during their reviews. However, as noted *supra*, the statements in the plea transcript do not offer any support for Peoples' objection. As noted *supra*, Plaintiff admitted raping two strangers with "forcible compulsion" using "what appeared to be a handgun." Dkt. No. 82-2 at 28-29.

Having determined that Peoples' general objections to the imposition of the Special Conditions lack merit, the Court will address Peoples' specific challenges to the Special Conditions, in turn. [9]

[9]   Plaintiff does not present any constitutional challenge to the following Special Conditions: 1, 2, 5, 6, 7, 9, 12, 13, 17, 19. Dkt. No. 1-1 at 10-14 and Dkt. No. 82-1.

### 2. Specific Objections

### a. Requirement to Participate in Programs

3. I will participate in a substance abuse treatment program as directed by the P.O.

4. I will participate in an alcohol abuse treatment program as directed by the P.O.

8. I will participate in anti-aggression/anti-violence counseling as directed by the P.O.

Peoples objects to these conditions as arbitrary and capricious because he satisfactorily completed Aggression Replacement Training ("ART") and Alcohol and Substance Abuse Treatment ("ASAT") while in DOCCS' custody and claims that he has "been clean and sober for quite some time." Dkt. No. 1-1 at 10; Dkt. No. 71-16 at 10. Alexander avers that the conditions were imposed due to Peoples' "lengthy, significant history of alcohol and substance abuse and history of selling controlled substances" and history of violent behavior and disciplinary violations while in custody, that continued even after Peoples completed ART. Dkt. No. 71-2 at ¶¶ 49(A) and (B). Alexander also explains that the conditions are reasonable because, although Peoples participated in ASAT ten years ago, he has not lived outside of prison at all since that time. *Id.*

According to the record before the Court, Peoples began using and abusing alcohol and marijuana at ages eleven and twelve. Dkt. No. 71-1 at ¶¶ 59-60; Dkt. No. 82 at p. 2, ¶ 25. Plaintiff also has a history of crack/cocaine and Ecstasy use. *Id.* Peoples was arrested, as a juvenile, in 1996 and 1998 and convicted of criminal possession of a controlled substance with intent to sell. Dkt. No. 71-6 at 7-8. Peoples admitted that he was smoking marijuana when he was arrested in March 2000 for possession of crack/cocaine with the intent to sell and stated that he was "on drugs" at the time he committed one of the rapes. Dkt. No. 71-1 at ¶¶ 60-61; Dkt. No. 82 at p. 2, ¶ 25.

During the parole hearing, Peoples admitted to selling drugs and stated that his "actions came about because [he] was growing up in an environment where [he] resorted to drugs and anger to address all of [his] problems." Dkt. No. 71-16 at 4, 5, 9. Peoples told the Board that he would participate in substance abuse services if it was a condition of parole. *Id.* at 10. Although Peoples claims that he has "been clean and sober for quite some time," during his deposition, he testified to testing positive for marijuana on June 13, 2020. Dkt. No. 71-26 at 86-87. The COMPAS instrument indicates that Peoples has a history of substance abuse including committing offenses while high/drunk, prior drug charges/

convictions, history of drug and alcohol problems, history of prior treatment, and history of failed drug tests. Dkt. No. 71-10 and 4, 10. As a result, Leon concluded that Peoples was at risk for substance abuse problems. *Id.* at 5, 10.

**\*12** The record is also replete with evidence suggesting that anti-aggression programming is reasonably related to Peoples' history. Due to the nature of Plaintiff's conviction, the sentencing court designated Peoples as a "sexually violent offender". Dkt. No. 82-3 at 7. During his pre-trial detainment and incarceration, Peoples incurred several disciplinary infractions and was found guilty of violating prison rules on twenty-three occasions and received violations for possessing unauthorized medications, smuggling, fighting, violent conduct, creating a disturbance, assaulting an inmate, harassment, and threats. Dkt. No. 71-1 at ¶¶ 69, 71; Dkt. No. 82 at p. 3, ¶30, at p. 8, ¶21. Peoples incurred thirty one months of recommended loss of good time as a result of disciplinary infractions. Dkt. No. 71-1 at ¶73; Dkt. No. 82 at p. 3, ¶30. Indeed, some of the infractions occurred after Peoples participated in ART. Dkt. No. 71-1 at ¶89; Dkt. No. 82 at p. 3, ¶41. Between his October 2016 parole interview and his October 2018 parole interview, Peoples was found guilty of three Tier II violations and two Tier III violations including one assault involving physical injuries to another inmate. Dkt. No. 71-1 at ¶73; Dkt. No. 82 at p. 3, ¶32. Peoples does not dispute his disciplinary history and admits that he refused to complete sex offender programming. Dkt. No. 71-1 at ¶¶68, 75-77; Dkt. No. 82 at p. 3 at ¶34, p. 8, ¶20; Dkt. No. 71-16 at 5, 9.

During the parole interview, when asked by Alexander, "what do you think about why you did [your crimes] and what impact you've had on your victims?" Dkt. No. 71-16 at 4. Peoples responded that he believed his "actions came about because I was growing up in an environment where I resorted to drugs and anger to address all of my problems." *Id.*

In light of Peoples' history of drug abuse, history of criminal conduct involving drugs, the forcible and violent circumstances surrounding his crimes, and disciplinary record in prison, the Special Conditions directing him to participate in alcohol, substance and anti-aggression programs are not arbitrary or capricious. *See Ahlers v. New York State Div. Of Parole*, 1 A.D.3d 849, 850 (2003). Indeed, Peoples' recent placement in DOCCS protective custody, due to his gang affiliations, further supports the need for Peoples to participate in anti-aggression programming. Dkt. No. 76. The Court finds the conditions to be "reasonably related to

legitimate penological objectives and rationally related to [plaintiff's] history and potential recidivism."

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to these conditions be granted.

### b. Minors

> 10. I will have no contact with any person under the age of eighteen without written permission of the P.O.

Peoples challenges this condition because his victims were not under eighteen. Dkt. No. 1-1 at 11. Peoples also claims that the condition precludes him from having contact with his younger brother and extended family members. *Id.* at 10-11.

"[I]t is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process." *Maldonado v. Mattingly*, No. 11-CV-1091, 2019 WL 5784940, at *10 (W.D.N.Y. Nov. 6, 2019) (citations omitted). Courts however, have not extended the "same solicitude" to non-custodial parents who did not play an active role in a child's life, prior to incarceration. *Yunus*, 2009 WL 168544, at *34 (citing *Meyers*, 426 F.3d at 128) (holding that the parolee must demonstrate some "commitment to the responsibilities of parenthood").

Here, Peoples does not have any children and does not claim to have a custodial relationship with any member of his extended family or his younger brother. Dkt. No. 71-1 at ¶81; Dkt. No. 82 at p. 3, ¶38. Moreover, in 2001, Peoples' mother obtained an Order of Protection against Peoples on her behalf and on behalf of Peoples' minor brother. Dkt. No. 71-1 at ¶82; Dkt. No. 71-6 at 3-4 [10]. Peoples testified that he has four nieces/nephews under the age of eighteen, however, the record lacks facts establishing that Peoples had a close relationship with any of them. Dkt. No. 71-26 at 107. The condition does not act as a total bar preventing Peoples from maintaining familial relationships with his nieces and nephews or ban him from all contact with any person under 18 years of age. Rather, Peoples is required to seek permission from his parole officer. To this end, Peoples testified that when he was on parole from June 2019 until August 2019, he never

requested, or was denied, permission to have contact with anyone under the age of eighteen. Dkt. No. 71-26 at 82.

[10]    Peoples does not dispute the truth of this assertion but objects to the fact because "defendants have not produced the actual Order of Protection[.]" Dkt. No. 82 at p. 9, ¶26.

**\*13**  Pursuant to the record before the Court, this condition is not arbitrary or capricious. *See Maldonado*, 2019 WL 5784940, at *3, 10 (finding same condition restricting contact with minors to be reasonable); *see also Yunus*, 2009 WL 168544, at *34 (reasoning that there is no authority for proposition that a parolee has a fundamental right to visit family members). Accordingly, the Court finds that this condition does not violate Peoples' due process rights and recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### c. Travel Restrictions

> 14. I will comply with geographical restrictions as directed by P.O.

Peoples contends that he should be permitted to travel within the state and argues that restricting his movement to his county of residence constitutes an "unconstitutional bill of attainder." Dkt. No. 1-1 at 11. Defendants argue that the condition is necessary as Peoples previously fled to Connecticut to avoid arrest. Dkt. No. 71-2 at ¶ 49(E).

Courts have held that limitations on the freedom of travel and association may be imposed without violating the parolee's constitutional rights. *See Bostic v. Jackson*, No. 9:04-CV-676 (NAM/GJD), 2008 WL 1882696, at *2 (N.D.N.Y. Apr. 24, 2008); *Cusamano v. Alexander*, 691 F.Supp.2d 312 (N.D.N.Y. 2009) (finding no due process violation where the parolee's special conditions included travel limitations). Moreover, travel restrictions may assist parole officers in monitoring a parolee's activities and thus, serve a valid penological interest. *Trivsan v. Annucci*, No. 14-CV-6016, 2019 WL 2304647, at *5 (E.D.N.Y. May 30, 2019).

Based upon the record and Peoples' prior conduct, the Court does not find the imposition of this condition to be arbitrary

or capricious. In 2000, a warrant was issued when Peoples failed to return to court for sentencing on his drug conviction. Dkt. No. 71-4 at 3. During his deposition, Peoples testified that while he was on parole in 2003, one of the conditions was that he not leave the state without prior permission from his parole officer. Dkt. No. 71-26 at 43-43. Despite that condition, Peoples traveled from Queens to Connecticut without permission from his Parole Officer. *Id.* Additionally, at his parole revocation hearing, Peoples plead guilty to tampering with his GPS monitoring device and removing it from his ankle. Dkt. No. 82-3 at 16.

Accordingly, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition to be granted.

### d. Sexual Assault Reform Act ("SARA") Conditions

15. I will abide by the mandatory condition imposed by the Sexual Assault Reform Act ("SARA").

34. I will propose a residence to be investigated by the Department of Corrections and Community Supervision and will assist the Department in any efforts it may make on my behalf to develop a residence.

35. If I am deemed a Level 3 risk pursuant to Article 6-c of the Correction Law - or - I am serving one or more sentences for committing or attempting to commit one or more offense(s) under Articles 130, 135 or 263 of the Penal Law or Sections 255.25, 255.26 or 255.27 of the Penal Law and the victim of such offense(s) was under 18 years of age at the time of the offense(s), and as such I must comply with section 259-c(14) of the Executive Law, I will not be released until a residence is developed and it is verified that such address is located outside the Penal Law definition of school grounds and is approved by the Department.

**\*14**  36. In pertinent part, Executive Law 259-c(14) provides: "The Board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the Penal Law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present, ..." Penal Law 220.00(14)

"School grounds" means (A) in or within any building, structure, athletic playing field, playground or land contained within the real property boundary line of a public or private elementary, parochial, intermediate, junior high, vocational, or high school, or (B) any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school or any parked automobile or other parked vehicles located within one thousand feet of the real property boundary line comprising any such school. For the purposes of this section an "area accessible to the public" shall mean sidewalks, streets, parking lots, parks, playgrounds, stores and restaurants.

Peoples does not dispute that he has been designated as a level three offender but objects to these conditions arguing his crimes did not involve minors, school grounds, or public parks. Dkt. No. 82-1 at 8; Dkt. No. 1-1 at 12.

In 2000, pursuant to SARA, the mandatory conditions set forth in N.Y. Executive Law § 259-c(14) applied only to sex offenders convicted of certain enumerated offenses and only if the victim had been under the age of eighteen. *Williams v. Dep't of Corr. & Cmty. Supervision*, 150, 24 N.Y.S.3d 18, 21 (2016). In 2005, SARA was amended to include level three sex offenders, regardless of the age of the victim. *Id.* Initially, courts in New York offered varying interpretations of the scope of the 2005 amendment. In November 2020, the New York Court of Appeals issued two decisions and addressed the scope of the 2005 amendments. *People ex rel. Negron v. Sup't Woodbourne Corr. Fac.*, 2020 WL 6828791, at *1 (N.Y. Nov. 23, 2020) and *People ex rel. Johnson v. Sup't Adirondack Corr. Fac.*, 2020 WL 6828834 (N.Y. Nov. 23, 2020). In both cases, the Court held that the 2005 amendments to SARA apply "to any defendant who is serving a sentence for various enumerated sex offenses, when the victim of the offense was under the age of 18 at the time of the offense or, [...] the defendant has been designated a level three sex offender." *Id.* The Southern District similarly interpreted the 2005 amendments to SORA. *Yunus*, 2018 WL 3455408, at *4. Peoples is a level three sex offender convicted of violating Penal Law § 130.35, one of the enumerated offenses. Dkt. No. 82-2 at 11. Therefore, pursuant to the controlling caselaw on this issue, Peoples is subject to the mandatory condition.

In a further attempt to invalidate the conditions, Peoples also argues that the 2005 amendments were enacted in August 2005 and September 2005, after his conviction and sentencing, and therefore, enforcing the conditions against him violates the Ex Post Facto Clause. Dkt. No. 82-1 at 8.

2021 WL 1582173

"Ex post facto" is a term of art applicable only to "punishment" - legislative action that retroactively "punishes as a crime an act previously committed, which was innocent when done," "makes more burdensome the punishment for a crime, after its commission," or "deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925). The Ex Post Facto Clause prohibits laws which "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). Courts in New York and in the Second Circuit have held that the 2005 SARA amendments are "non-punitive", do not violate the Ex Post Facto Clause and were enacted to protect the community, not punish offenders. *Smith v. Flynn*, No. 16-CV-9242, 2018 WL 3946453, at *7 (S.D.N.Y. Aug. 16, 2018) (citing *Wallace v. New York*, 40 F.Supp.3d 278, 314 (E.D.N.Y. 2014) and *Williams v. Dep't of Corr. and Cmty. Supervision*, 24 N.Y.S.3d 18, 23 (1st Dep't 2016)); *Devine v. Annucci*, 56 N.Y.S.3d 149 (2017) (holding that the retroactive application of SARA does not violate the Ex Post Facto Clause). Consequently, the Court is not persuaded by Peoples' arguments.

**\*15** Accordingly, the Court does not find the imposition of these conditions to be arbitrary or capricious and recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to these conditions be granted.

### e. Medications

16. I will not us or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor.

Peoples argues that this condition violates his right to privacy. Dkt. No. 1-1 at 12. Defendants have not responded to Peoples' arguments.

Based upon the facts surrounding Peoples' convictions, the condition does not involve a greater deprivation of liberty than is necessary as the condition is not a complete ban on taking medication for sexual enhancement. Additionally, Peoples does not allege that, during his time on parole, that he requested, and was unreasonably denied, permission to possess any medications intended to enhance his sexual performance. Accordingly, because the evidence suggests that the condition is reasonably related to Peoples' criminal history and to the goals of protecting the public, the Court recommends that Defendants' motion for summary judgment and dismissal of Plaintiff's constitutional challenge to this condition be granted.

### f. Computer and Internet Restrictions

18. I will not use the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under eighteen, and communicate with a person under the age of eighteen unless I receive written permission from the Board of Parole to use the internet to communicate with a minor child under eighteen years of age who I am the parent of and who I am not otherwise prohibited from communicating with.

20. I will not own, use, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices and/or the internet unless I obtain prior written permission from my parole officer.

21. If I am permitted by my parole officer to possess a computer at my residence, permission will be granted for only one computer.

22. I will provide all personal, business, phone, internet service provider, and/or cable records to my parole officer upon request.

24. I will provide all user IDs and passwords required to access the computer, my C.M.O.S., and Bios, internet service provider, and/all email accounts, instant messaging accounts, any removable electronic media, including but not limited to media such as smart cards, cell phones, thumb drives and web virtual storage.

25. I will provide my parole officer with my password and user ID for any approved device.

26. I acknowledge that individuals who have access to my computer system and/or other communication or electronic storage devices will also be subject to monitoring and/or search and seizure. I agree to be fully responsible for all material, data, images and information found on my computer and/or other communication or electronic storage devices at all times.

27. I will not create or assist directly or indirectly in the creation of any electronic bulletin board system, services that provide access to the internet, or any public or private computer network without prior written approval from my parole officer.

*16 28. I will not use any form of encryption, cryptography, steganography, compression and/or other method that might limit access to, or change the appearance of, data and/or images without prior written approval from my parole officer.

29. I will not attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way.

30. I will cooperate with unannounced examinations directed by my parole officer of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on hard disk drives, floppy diskettes, CD roms, optical disks, magnetic tape, cell phones, and/or any other storage media whether installed within a device or removable.

31. I will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use.

33. I understand that I shall not download, access, or otherwise engage in any internet enabled gaming activities to include Pokemon Go, I further understand that I shall not be in the company of any person who is engaged in any internet enabled gaming activities nor

will I have any gaming software on any internet enabled device that I am permitted to access or otherwise possess. Peoples' argument that these conditions were improperly imposed and unrelated to his criminal history because his crimes did not involve a minor or the internet, *see* Dkt. No. 82-1 at 8, lack merit.

Because Peoples is a level three sex offender, N.Y. Executive Law § 259-c(15) dictates that he is:

> ... prohibited from using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen, provided that the board may permit an offender to use the internet to communicate with a person under the age of eighteen when such offender is the parent of a minor child and is not otherwise prohibited from communicating with such child. [11]

N.Y. Exec. Law § 259-c(15) (the Electronic Security and Targeting of Online Predators Act ("e-STOP")); *M.F. v. New York Exec. Dep't Div. of Parole*, No. 08 CV 1504, 2010 WL 9461647, at *2 (S.D.N.Y. Mar. 24, 2010) (citing N.Y. Exec. § 259-c(15)). The aforementioned condition applies regardless of whether the internet played any role in the sex offender's crimes. *Yunus*, 2018 WL 3455408, at *4.

[11]    As used in this subdivision, a "commercial social networking website" shall mean any business, organization or other entity operating a website that permits persons under eighteen years of age to be registered users for the purpose of establishing personal relationships with other users, where such persons under eighteen years of age may: (i) create web pages or profiles that provide information about themselves where such web pages or profiles are available to the public or to other users;

(ii) engage in direct or real time communication with other users, such as a chat room or instant messenger; and (iii) communicate with persons over eighteen years of age; provided, however, that, for purposes of this subdivision, a commercial social networking website shall not include a website that permits users to engage in such other activities as are not enumerated herein.

N.Y. Exec. Law § 259-c.

**\*17** During Peoples' sentencing, he was "certified" as a sex offender and advised that he was obligated to register as a sex offender in New York. Dkt. No. 71-3. As a result of that designation and pursuant to DOCCS Directives 8304(III)(A) [12] and 9202 [13], Peoples is a mandatory sex offender subject to conditions of release referred to as "GES SC 40 A-F". Dkt. No. 71-22; Dkt. No. 71-2 at ¶ 49(J). Conditions GES SC 40 A-F were recommended by Leon and included in the Board's Decision and Notice as Special Conditions 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, and 31. Dkt. No. 1-1 at 7-9; Dkt. No. 71-6 at 27; Dkt. No. 71-2 at ¶¶ 49(J), (L)-(N).

[12]    DOCCS Directive 8304(III)(A) defines mandatory sex offenders as "[a]ll offenders subject to registration with the New York State Offender Registry." Dkt. No. 71-21.

[13]    DOCCS Directive 9202, entitled Management of Sex Offender Use of Computer Related Materials and Electronic Devices, provides, in pertinent part:
    B. Condition of Supervision: Condition(s) of release relating to use and access to computers, computer related material, electronic storage devices, communication devices, and the Internet on sex offenders will be imposed as follows:
    1. ORCs and SORCS are to identify mandatory sex offender cases on an ongoing basis and include the special condition (GES SC 40 A-F) on the Parole Board Report or other report prepared for the Parole Board.
    Dkt. No. 71-22.

Peoples also contends that the aforementioned "sweeping" conditions are overly-broad, prevent him from pursuing "entrepreneurial aspirations," and are not necessary or legitimate. Dkt. No. 82-1 at 10-14. Peoples seeks to invalidate these conditions relying upon the Supreme Court decision in *Packingham v. North Carolina*, 137 S.Ct. 1730

(2017). In *Packingham*, the Court held that a broad North Carolina criminal statute barring registered sex offenders from accessing commercial social networking websites was unconstitutional. *Id.*

Defendants argue that *Packingham* does not apply because the restrictions at issue were imposed as parole conditions. Dkt. No. 71-29 at 14-17. Upon review of recent caselaw, the Court does not agree with Defendants' restrictive interpretation of the holding in *Packingham*.

In *Yunus v. Robinson*, the Southern District considered, and rejected, a similar argument. The court noted "[e]ven before *Packingham*, courts in this Circuit looked with disfavor on broad cellphone, computer and internet restrictions for sex offenders on parole or supervised release, generally requiring an individualized showing that a particular restriction 'relates to [the offender's] prior conduct.' " *Yunus,* 2018 WL 3455408, at \*30 (citations omitted). The Court reasoned, "[t]here is no indication in *Packingham* that parolees are exempted from the Court's decision [...] "[i]n fact, the [Supreme] Court was clear that the distinction between those who were presently under the supervision of the criminal justice system and those who no longer were was not a basis for it's holding[.]" *Yunus,* 2019 WL 168544, at \*16.

This district court and others have rejected similar arguments. *See Lopez v. Stanford*, No. 18-CV-3493, 2020 WL 6900909, at \*8 (E.D.N.Y. Nov. 24, 2020) (rejecting the defendants' argument that *Packingham* is inapplicable to parole conditions); *Hartwick v. Annucci*, No. 5:20-CV-408 (DNH), 2020 WL 6781562, at \*9 (N.D.N.Y. Nov. 18, 2020) (citing to *Packingham* in context of the plaintiff's challenge to parole conditions); *Manning v. Powers*, 281 F.Supp.3d 953, 961 (C.D. Cal. 2017) (holding that the plaintiff's challenge to a social media parole condition "is controlled by the Supreme Court's recent decision in *Packingham*").

**\*18** In January 2019, the Second Circuit addressed a similar argument, in the context of a condition of supervised release imposed at sentencing. In *U.S. v. Eaglin*, 913 F.3d 88 (2d Cir. 2019), the Second Circuit was presented with a constitutional challenge to a condition that barred the plaintiff from "accessing the Internet from any computer or Internet-capable device in any location unless authorized by the [c]ourt or as directed by the U.S. Probation Office upon approval of the [c]ourt." *Id.* at 94. The condition was defined as a broad ban on social networking sites. *Id.* at 96. The court acknowledged the differences between the facts at hand and

*Packingham.* To wit, a criminal statute was not at issue and Eaglin's challenged condition of supervised release applied only to him and for a limited duration. Nevertheless, the Circuit concluded that *Packingham's* holding applied stating, "[i]n our view, *Packingham* [ ] establishes that, in modern society, citizens have a First Amendment right to access the internet" and "to access certain social networking websites[.]" *Eaglin,* 913 F.3d at 96-97. The court held that the ban was substantially unreasonable holding that, "[i]n light of our precedent, and as emphasized in *Packingham's* recognition of a First Amendment right to access certain social networking websites, the imposition of a total internet ban as a condition of supervised release inflicts a severe deprivation of liberty." *Id.* at *97. The Circuit further noted that Eaglin was not convicted of a crime involving the internet, that the ban would restrict his access to banking and employment, and that the condition was not necessary to protect the public. *Id.* at 97-98.

Defendants also argue that *Packingham* does not apply because Peoples may possess or purchase a computer, with permission from his parole officer. Dkt. No. 71-29 at 11-14. Once again, *Yunus v. Robinson* is instructive. In *Yunus,* the plaintiff, a parolee convicted of two counts of kidnapping, claimed that the following conditions violated his First Amendment rights:

> No. 12: Plaintiff cannot engage or participate in any online computer service that involves the exchange of electronic messages;
>
> No. 35: Plaintiff may not "own or possess a beeper, scanner or cell phone without permission of his parole officer";
>
> No. 39: Plaintiff may not possess a computer or computer-related materials without approval by his parole officer; and
>
> No. 48: Plaintiff is prohibited from accessing a commercial social networking website.

*Yunus*, 2019 WL 168544, at *15.

The court rejected the defendants' argument that the conditions were "not absolute" and concluded:

> These limited exceptions do not satisfy the concerns about access to the 'vast democratic forums of the internet' for a multiplicity of purposes that was the basis for the Supreme Court's decision. *Packingham*, 137 S. Ct. at 1735-37 (internal quotation marks omitted). Furthermore, the possibility of certain case-by-case exceptions was insufficient to save other overly broad conditions of

supervised release limiting internet or technology access, even when analyzed under a less demanding standard. *See United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002); *United States v. Peterson*, 248 F.3d 79, 81, 82-84 (2d Cir. 2001). Therefore, the possibility of case-by-case exceptions from some of these conditions does not exempt them from *Packingham*, a conclusion reinforced by the nearly blanket manner in which they have allegedly been applied.

*Yunus,* 2019 WL 168544, at *16.

Courts in this circuit and others have held a condition requiring prior written approval from a probation officer cannot salvage an otherwise overly broad restriction. *See U.S. v. Maxson*, 281 F.Supp.3d 594, 600 (D. Md. 2017) (citing *inter alia U.S. v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) ("If a total ban on Internet use is improper but a more narrowly tailored restriction would be justified, the solution is to have the district court itself fashion the terms of that narrower restriction. Imposing a total ban and transferring open-ended discretion to the probation officer to authorize needed exceptions is not a permissible alternative.")); *see also Scott v. Rosenberger*, No. 19-CV-1769, 2020 WL 4274226, at *9 (S.D.N.Y. July 24, 2020) ("... the possibility of case-by-case exceptions to a ban does not save an overly broad condition.").

In support of the contention that *Packingham* does not apply, Defendants cite to *U.S. v. Savastio*, 777 Fed. App'x 4 (2d Cir. 2019) and *U.S. v. Browder*, 866 F.3d 504 (2d Cir. 2017). Upon review, the Court finds Defendants' reliance upon the aforementioned cases is misplaced.

**19** In *Savastio*, the plaintiff was on supervised release. The court "reject[ed] Savastio's attempt to rely on the principles articulated in *Packingham*" noting that, "[t]he Supreme Court explicitly linked its holding to 'the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system.' " *Savastio*, 777 Fed. App'x at 4.

For several reasons, the Court is not persuaded that the holding in *Savastio* is controlling herein. First, *Savastio* is a summary order and thus, lacks precedential effect. *See* Local Rule of the Second Circuit 32.1.1. Second, the facts of *Savastio* are readily distinguishable. Savastio pled guilty to possession of child pornography. *Savastio*, 777. Fed. App'x at 5. The condition of release that Savastio challenged read as follows:

Your internet use will be limited and/or restricted under conditions to be set by the U.S. Probation Office in accordance with their Computer and Internet Monitoring Program. Such internet restriction may include a limitation of your daily internet use and/or the ban of certain websites, applications, chat rooms, or other internet activities as determined by the U.S. Probation Office. These determinations will be based upon an evaluation of your risk and needs, along with consideration of the factors outlined in 18 U.S.C. § 3553(a).

*Savastio*, 777 F. App'x at 5. The Circuit noted that given the plaintiff's history of accessing child pornography over the internet, the condition was reasonably related to his history. *Id.* Additionally, the court found *Packingham* "inapposite", because the condition allowed Savastio to receive permission from the probation office or district court and defined the condition as a monitoring requirement. *Id.* at 7-8. Here, Peoples has not been convicted of any crime involving pornography, minors, or the internet. Moreover, Peoples' condition is not a "monitoring condition" and does not contain similar qualifying language.

In *Browder*, the Circuit referred to *Packingham* only in dicta, noting the differences between *Packingham* and Browder's challenges. *Browder*, 866 F.3d 504, 511, n. 26. Notably, Browder's condition was a "computer monitoring" condition, not a complete internet ban. *Id.* Most "significantly" however, was the fact that Browder presented a Fourth Amendment challenge, while *Packingham* involved the First Amendment. *Id.* Here, Peoples' claims rest with the First Amendment and his condition cannot be described as a "monitoring" condition, but rather, a total internet ban. Therefore, for the same reasons, Peoples' challenge is distinguishable from *Browder*.

In opposition to Defendants' motion, Peoples references a case presently before the United States District Court for the Eastern District of New York, *Jones, et al. v. Stanford and Annucci*, No. 1:20-CV-1332 (E.D.N.Y. filed March 12, 2020), challenging the constitutionality of e-STOP. *See* Dkt. No. 82-1 at 8-9, 10. *Jones* presents a factual scenario strikingly similar to the facts presented herein. In *Jones*, the plaintiffs presented constitutional challenges to parole conditions imposed pursuant to e-Stop and DOCCS Directives 9201 and 9202. *Id.*, Dkt. No. 1. The plaintiffs were convicted of various sexual offenses including attempted rape, rape, sexual abuse, and sexual misconduct involving a minor. *Id.* at 11-18. The plaintiffs were designated at risk Levels One, Two, and Three, and as a condition of their release, an internet and social media ban was imposed. *Id.*

**\*20** In August 2020, the plaintiffs filed a motion for a preliminary injunction seeking to enjoin the defendants from enforcing e-Stop and the Directives. *Jones*, at Dkt. No. 28. In a Memorandum & Order issued on September 9, 2020, the court granted the plaintiff's application and preliminarily enjoined the defendants from applying e-Stop and Directive 9201 "wholesale to Registrants who have not used the internet to facilitate the commission of their underlying sex offense." *Id.*, Dkt. No. 37. The defendants argued that *Packingham* did not apply to "those on community supervision" and cited to *Savastio*. *Id.* at 9. Relying upon *Eaglin* and *Yunus*, the court rejected that argument. *Id.* The court distinguished the facts from those in the "non-precedential" case, noting that in *Savastio*, the condition was a "monitoring condition" that "did not amount to an outright ban on Savastio's access to all forms of social media." *Id.*

The court also noted that the ban was not narrowly tailored to the plaintiffs or in its application to social media. *Jones*, Dkt. No. 37 at 7-17. Addressing each plaintiff, the court noted that the underlying offenses did not involve improper internet use. *Id.* at 11-12. Under the circumstances, the court reasoned that, perhaps "less restrictive alternatives" to monitor the plaintiff's internet use was available and concluded that the imposition of a "blanket ban" was "incompatible with the First Amendment." *Id.* at 12-14. The *Jones* case is presently pending in the Eastern District.

The Court agrees with the reasoning set forth in *Eaglin, Yunus*, and *Jones* and finds that the Special Conditions related to social networking websites, the internet, and Peoples' ability to own or possess a computer are overlapping and may infringe upon Peoples' First Amendment rights. While the Court does not dispute that a legitimate penological interest exists in monitoring Peoples' activities, Defendants have not offered any evidence or explanation regarding why such restrictive conditions are necessary or whether any other less restrictive means of monitoring Peoples were considered. *See*

*U.S. v. Bolin*, 976 F.3d 202, 213-14 (2d Cir. 2020) (citing to *Packingham, Eaglin*, and *Savastio* and concluding that "[i]nternet monitoring, as opposed to a blanket ban, [...], remained to all outward appearances a viable option as it would adequately protect the public from [the releasee's] potential misuse of the Internet while imposing a more reasonable burden on [his] First Amendment interest in accessing the Internet."); *see Eaglin*, 913. F.3d at 98 (holding that an earlier Internet restriction under which his Internet use was monitored by the Probation Office, appeared to be a "viable option").

Most importantly, an issue that was somewhat ignored by Defendants on the motion, the record is devoid of any evidence establishing that the internet, social media, pornography, and children factored into any of Peoples' crimes or criminal history. Defendants have not proven, with competent admissible evidence, that the conditions are "narrowly tailored" so as not to burden Peoples' First Amendment rights more than necessary. *See Scott*, 2020 WL 4274226, at *9 (holding that because the plaintiff's underlying crime did not involve computers or the internet, the restrictions on all computer or internet use without permission were not reasonably related to the plaintiff's conduct); *Yunus*, 2018 WL 3455408 at *32 (holding that parole conditions restricting access to computers and social media were not "narrowly tailored" as required by the Constitution because the plaintiff had never been charged with any internet-related criminal conduct). To be entitled to summary judgment on the issue of the constitutionality of the social media, internet, and computer restrictions, Defendants must prove that the conditions do not violate Peoples' constitutional rights and, on the record, the Court finds that Defendants have not met that burden. Accordingly, it is for the factfinder to conclude whether the special conditions involving technology infringe upon Peoples' First Amendment rights and the Court recommends that this portion of Defendants' motion for summary judgment be denied.

### g. Financial Documentation

**\*21**  23. I will provide copies of financial documents to my parole officer upon request. These documents may include, but are not limited to, all credit card bills, bank statements, and income tax returns.

Peoples argues that this condition is over-broad and unconstitutional. [14] Dkt. No. 1-1 at 13. Defendants argue that this condition is reasonably related to Peoples' criminal history, past conduct, and to deter recidivism and protect the public. Dkt. No. 71-2 at ¶ 49(K); Dkt. No. 71-29 at 15.

[14]  Plaintiff also argues that the condition violates the settlement agreement in *Peoples v. Annucci*, No. 11-CV-2694 (S.D.N.Y. Mar. 16, 2016). Dkt. No. 82-1 at 11. The Court is familiar with the settlement agreement in *Peoples v. Annucci* and finds that it is not relevant or binding upon the Court as it relates to the issues presented herein.

"[F]inancial conditions may make it easier for the Probation Department to track [a parolee] in order to ensure his compliance with his registration obligation and with the conditions of his supervised release." *U.S. v. Bradshaw*, 653 Fed. App'x 325, 328 (5th Cir. 2016). However, where the conditions are "vague and overbroad" or imposed without context, the condition may impact liberties. *U.S. v. Sterling*, 959 F.3d 855, 863 (8th Cir. 2020) (reasoning that "broad financial disclosure conditions" are needed in cases involving convictions related to child support, debt, money, or greed).

Here, Peoples' conviction did not involve any monetary crimes and he is not required to make restitution payments. *Cf. U.S. v. Jeremiah*, 493 F.3d 1042, 1046 (9th Cir. 2007) (upholding restrictions on bank accounts, credit cards, and taxes because the conditions were reasonably related to supervising the defendant's ability to make restitution payments). While Peoples has a history of failing to comply with travel and geographical restrictions, the condition, as presently written, is overreaching as it does not include any language related to the purpose of the condition or language that would prevent the parole officer from demanding information arbitrarily. *But cf. U.S. v. Scaife*, No. 12 CR 519, 2015 WL 3775352, at *10 (N.D. Ill. May 20, 2015) (upholding condition that required the defendant to "provide the Probation Officer with access to requested financial information 'necessary to monitor compliance with the conditions of supervised release.' ").

Accordingly, the Court recommends that Defendants' motion for summary judgment be denied with respect to this special condition.

### h. Photo Imaging

32. I will submit to photo imaging every 90 days, or whenever directed by my parole officer or other representative of the N.Y.S. Department of Corrections and Community Supervision.

Peoples argues that there is no evidence that he has ever altered his image or attempted to alter his image and therefore, the condition is over broad and arbitrary. Dkt. No. 82-1 at 12; Dkt. No. 1-1 at 13. Defendants contend that the condition is mandated by statute and reasonably related to Peoples' criminal history, needed to protect the public, and necessary to prevent future offenses. Dkt. No. 71-29 at 18.

Pursuant to SORA and N.Y. Corr. Law § 168-f(3):

... [a] sex offender designated as a sexual predator or having been given a level three designation must personally verify his or her address with the local law enforcement agency every ninety calendar days after the date of release or commencement of parole or post-release supervision, or probation, or release on payment of a fine, conditional discharge or unconditional discharge. At such time the law enforcement agency having jurisdiction may take a new photograph of such sex offender if it appears that the offender has had a change in appearance since the most recent photograph taken pursuant to paragraph (b-2) of subdivision two of this section. If such photograph is taken, the law enforcement agency shall promptly forward a copy of such photograph to the division. The duty to personally verify shall be temporarily suspended during any period in which the sex offender is confined to any state

or local correctional facility, hospital or institution and shall immediately recommence on the date of the sex offender's release.

**\*22** A Level Three sex offender must register in person with the local police department every ninety (90) days and their registration obligations continue annually for life. *Rodriguez v. Attorney Gen.*, No. 10 CIV. 3868, 2011 WL 519591, at *5 (S.D.N.Y. Feb. 15, 2011); *People v. Barber*, 27 Misc. 3d 1234(A), 911 N.Y.S.2d 694 (Sup. Ct. 2010) (citations omitted).

As discussed *supra*, Peoples was designated a Level Three sex offender. Peoples has not stated how this condition deprives him of a fundamental liberty interest in violation of the Constitution. Moreover, the government has a legitimate interest in SORA and protecting the community from sex offenders. *People v. Knox*, 12 N.Y.3d 60, 68 (2009).

Accordingly, the Court recommends that Defendants' motion for summary judgment, with respect to this condition, be granted.

### i. Requirement to Comply with Conditions Imposed by Parole Officer

11. I will comply with all case specific sex offender conditions to be imposed by the P.O.

Peoples argues that this condition is "overly-broad and unconstitutional" as it constitutes a "blanket-condition meant to whimsically abuse discretion by overreaching and infringing on constitutional rights." Dkt. No. 1-1 at 11.

"A special condition of parole that is so vague that a person of common knowledge must guess at its meaning will be struck down as void for vagueness." *Yunus*, 2018 WL 3455408, at *25 (quoting *LoFranco v. U.S. Parole Comm'n*, 986 F. Supp. 796, 808 (S.D.N.Y. 1997), *aff'd*, 175 F.3d 1008 (2d Cir. 1999)). While Alexander claims that the condition is "specifically tailored" and "enables the calibration of his conditions according to his particular risk factors and criminogenic needs," *see* Dkt. No. 71-2, Defendants did not

present any legal argument or caselaw in support of the motion for summary judgment with respect to this condition. As presently constituted, the condition does not "sufficiently inform" defendant of "what conduct will result in his being returned to prison. *See Yunus*, 2018 WL 3455408, at *25. As to this condition, there are genuine issues of material fact for a factfinder to resolve. Therefore, the Court recommends that Defendants' motion for summary judgment be denied with respect to this special condition.

### C. Personal Involvement

Defendants move for summary judgment and dismissal of all claims against Stanford, the Chairwoman of the Board, arguing that Stanford was not personally involved in the October 2018 determination imposing the Special Conditions at issue herein. *See* Dkt. No. 71-29 at 21-25. Peoples argues that Stanford was personally involved in the constitutional violations because she permitted a policy or custom to continue to deny registered sex offenders access to the internet and social media in violation of *Packingham*. *Id.* at 14-15.

As discussed *supra*, Peoples sued Defendants for declaratory relief, injunctive relief, and compensatory damages. Although Peoples does not specifically state that he is suing Defendants in their individual capacity, *see* Compl. at 1; Dkt. No. 1-1 at 1, 9-20, courts in this district assume that pro se prisoners intend to sue pursuant to § 1983 in both capacities. *See Zaire v. Doe*, No. 9:03-CV-629 (FJS/RFT), 2006 WL 1994848, at *10 (N.D.N.Y. July 13, 2006). The arguments presented by Defendants in support of dismissal of the claims against Stanford, and Plaintiff's opposition, implies that the parties believe that the defendants have been sued in their individual capacities. *See Davis v. Cty. of Nassau*, 355 F.Supp.2d 668, 675-76 (E.D.N.Y. 2005) (citing *Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988)) (reasoning that the plaintiff's for damages, "coupled with the defendants' summary judgment motion [...], suggests that the parties believed that this action is a personal capacity suit.").

### 1. Claims Against Stanford in her Individual Capacity

**\*23** "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

In a recent case, *Tangreti v. Bachmann*, the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *Id.*, 2020 WL 7687688 (2d Cir. 2020). In *Tangreti*, the plaintiff was sexually abused by correctional officers at York Correctional Institute in 2014 and argued that the defendant, a counselor supervisor, violated the Eighth Amendment by exhibiting deliberate indifference to the risk of sexual abuse by the officers. *Id.* at * 2, 3. Consistent with other circuits, the court concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Id.* at *6. Therefore, to avoid summary judgment, the plaintiff had to establish that the defendant violated the Eighth Amendment by her "own conduct, not by reason of [her] supervision of others who committed the violation" and could

not "rely on a separate test of liability specific to supervisors." *Id.*

In support of the motion, Stanford provided a Declaration and avers that she does not have authority to unilaterally establish a process for administratively appealing the imposition of special conditions by a Parole Board panel. Dkt. No. 71-24 at ¶ 7. Stanford was not present at Peoples' parole interview, she did not review the Board's conclusions and, in fact, was not aware of the Board's decision until she was served with the summons and Complaint in this lawsuit. *Id.* at ¶ 13. Stanford had no contact with Peoples, prior to being served with the Complaint. *Id.* at ¶ 15.

**\*24** Based upon the holding in *Tangreti*, summary judgment should be entered in favor of Stanford. The record lacks any evidence that Stanford violated Plaintiff's First and/or Fourteenth Amendment rights through her own individual actions or conduct.

Even if the Court considers the *Colon* factors, summary judgment is still warranted. The third *Colon* category provides for personal involvement where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873. "A policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the 'violative practice is persistent and widespread,' and if the acts of subordinate employees 'imply the constructive acquiescence of senior policy-making officials.' " *Lipton v. Cty. of Orange*, 315 F.Supp.2d 434, 453 (S.D.N.Y. 2004). To establish personal involvement pursuant to the third *Colon* factor, a plaintiff must produce evidence that the defendant had policymaking responsibility and that, after notice of an unconstitutional practice, the defendant created the improper policy or allowed it to continue, causing the harm. *See Pusepa v. Annucci*, No. 17-CV-7954, 2019 WL 720699, at \*4 (S.D.N.Y. Feb. 19, 2019) (citation omitted).

Even assuming that Stanford was responsible for creating policy, Peoples has not presented evidence establishing that Stanford was on notice that an unconstitutional policy existed and failed to take action. The record lacks facts related to other instances of similar unconstitutional practices involving registered sex offenders and their access to the internet and social media in violation of *Packingham*, or evidence of Stanford's knowledge of the instances to permit a jury to find that Stanford was personally involved pursuant to the third *Colon* factor. *See Pusepa*, 2019 WL 720699, at \*7 (accepting

allegations of frequent sexual abuse at facility to suggest that the supervisory defendants were aware that their policies permitted the abuse to continue); *see also Casey v. Brockley*, No. 9:13-CV-01271 (DNH/TWD), 2018 WL 1399244, at \*9 (N.D.N.Y. Feb. 16, 2018) (awarding summary judgment in favor of the superintendent because the plaintiff failed to provide evidence of similar events and "sheds no light on [the Superintendent's] actions or conduct in creating or permitting a policy or custom"). [15]

[15]  With respect to the remaining *Colon* factors, the record evidence does not suggest that Stanford was aware of Peoples' claims or that she acted, or failed to act, once placed on notice of the allegations.

Thus, the Court recommends granting Defendants' motion summary judgment and dismissing Peoples' claims against Stanford, in her individual capacity.

### 2. Claims Against Stanford in her Official Capacity

Although it is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983 for monetary damages, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation, *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013), "district courts in this Circuit have held 'that the personal involvement requirement does not apply to bar actions ... pursuant to § 1983 for injunctive relief against a state official.' " *Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*, 336 F.Supp.3d 50, 68 (E.D.N.Y. 2018) (quoting *Marinaccio v. Boardman*, No. 1:02-CV-00831, 2005 WL 928631, at \*9 (N.D.N.Y. Apr. 19, 2005)); *McLaurin v. Paterson*, No. 07 CIV 3482, 2008 WL 3402304, at \*11 (S.D.N.Y. Aug. 11, 2008) (denying motion to dismiss the claims against the Governor and the Chairman of the Division of Parole in their official capacities based upon the lack of personal involvement in parole hearings). However, "[u]nder *Ex parte Young*, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of federal law." *Daily Mart Convenience Stores, Inc. v. Nickel (In re Dairy Mart Convenience Stores, Inc.)*, 411 F.3d 367, 372–73 (2d Cir. 2005) (quoting *Ex Parte Young*, 209 U.S. at 154, 157). "So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act." *Id.*; *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F.Supp.2d 78, 102–03 (N.D.N.Y. 2013) (reasoning that "[a]ll that a Plaintiff

must show is that the official had: (1) 'a direct connection to, or responsibility for, the alleged illegal action[s]'; and (2) 'the authority to perform the required act.' ") (citation omitted).

**\*25** Defendants' arguments in support of summary judgment are limited to an analysis of the *Colon* factors and personal involvement as it relates to claims for damages against Stanford, in her individual capacity. Defendants offer no argument or evidence establishing that Stanford is not "connected" with the decisions to impose special conditions of parole.

The evidence before the Court does not demonstrate an absence of an issue of fact regarding whether Peoples is prevented from asserting a claim for injunctive relief against Stanford. Thus, the Court recommends denying Defendants' motion summary judgment and dismissal of Peoples' claims against Stanford, in her official capacity.

### D. Judicial Immunity

Defendants argue that Peoples' claims against Alexander are barred by absolute immunity. Dkt. No. 71-29 at 19-20. Peoples did not respond to this argument.

It is well established that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) (citation omitted). This immunity extends to claims for injunctive relief unless a declaratory decree was violated or declaratory relief is unavailable. *Id.* at 761; *Davis v. Travis*, No. 07 CIV. 3047, 2008 WL 5191074, at \*3 (S.D.N.Y. Dec. 3, 2008) (holding that absolute immunity barred claims for damages and injunctive relief against parole board officials). "[A]bsolute immunity protects officials in their adjudicative or prosecutorial functions[,]" but "does not extend to the performance of administrative or investigative functions." *Farrell v. Burke*, No. 97 Civ. 5708, 1998 WL 751695, at \*4 (S.D.N.Y. Oct. 28, 1998) (citing *Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998)).

"[P]arole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole" because these tasks are "functionally comparable to that of a judge." *Montero,* 171 F.3d at 761; *Scotto,* 143 F.3d at 111. While some courts have held that the

imposition of special parole conditions can be an adjudicative act that merits absolute immunity, courts in this circuit have also recognized that the decision to impose special conditions may be administrative in nature and "void of any discretion on the parole official's part." *Hartwick*, 2020 WL 6781562, at \*8 (citations omitted); *Doe v. Annucci*, No. 14 CIV. 2953, 2015 WL 4393012, at \*8 (S.D.N.Y. July 15, 2015); *Farrell*, 1998 WL 751695, at \*4 (citing *inter alia, Morrissey v. Brewer*, 408 U.S. 471, 478 (1972) (stating that parole officers perform largely administrative functions)). To resolve the issue of whether the imposition of special conditions of parole is an adjudicative or administrative act, a factual inquiry is necessary. *Farrell*, 1998 WL 751695, at \*4.

Although Defendants move for summary judgment on this issue, the motion lacks any argument or analysis of Alexander's role or facts establishing that she performed solely adjudicative functions, rather than administrative or investigative. Conversely, the record before the Court indicates that some of the special conditions imposed were the "product of an adjudicative process" while others were administered pursuant to statutory authority; "as administrative." *See Hartwick,* 2020 WL 6781562, at \*8 (declining to apply absolute immunity where the Board allegedly imposed statutory unconstitutional parole conditions related to the internet).

**\*26** Based upon the record, the Court finds issues of fact for a jury to resolve related to the issue of immunity. Accordingly, the undersigned recommends denying the Defendants' motion for summary judgment on this ground. *See Farrell*, 1998 WL 751695, at \*4 (refusing to dismiss on the grounds of absolute immunity where the facts did not permit the Court to determine whether the parole officers acted adjudicatively or administratively in imposing special conditions). [16]

[16]     Defendants cite to *Stewart v. Smallwood*, No. 92 Civ. 4043, 1993 WL 77381 (S.D.N.Y. Mar. 15, 1993), in support of the argument that officials who imposed parole conditions are absolutely immune from civil damages. In *Hartwick,* Judge Hurd deviates from the decision in *Stewart* noting that the court found "parole board officials absolutely immune without further inquiry." *Hartwick*, 2020 WL 6781562, at \*8.

### E. Qualified Immunity

In the alternative, Defendants argue that they are shielded from liability based on the doctrine of qualified immunity because Peoples had no clearly established right to be free from the special conditions he challenges. [17] Dkt. No. 71-29 at 26-27.

[17]
> To the extent that Defendants move for summary judgment and dismissal of all claims based on the doctrine of qualified immunity, I do not consider these arguments in the context of claims for which I have already recommend dismissal in this Report-Recommendation. *See Armand v. Simonson*, 12-CV-7709, 2016 WL 1257972, at *15 (S.D.N.Y. Mar. 30, 2016)* ("[b]ecause the Court dismisses Plaintiff's claim against Peterson, there is no need to consider whether she may also be entitled to qualified immunity."); *see also Posr v. City of New York*, 10-CV-2551, 2013 WL 2419142, at *10, n.8 (S.D.N.Y. June 4, 2013)* ("Because [the defendant] did not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v. Ueberbacher*, 569 Fed. App'x 32 (2d Cir. 2014).

Qualified immunity shields federal and state officials from suit " 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 Fed. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: " '(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful.' " *Phillips v. Wright*, 553 Fed. App'x 16, 17 (2d Cir. 2014) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)). "Even

if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Doe v. Lima*, 270 F.Supp.3d 684, 710 (S.D.N.Y. 2017) (citations omitted), *aff'd sub nom. Doe v. Cappiello*, 758 Fed. App'x 181 (2d Cir. 2019).

**\*27** Qualified immunity only bars monetary damages - it does not bar declaratory and injunctive relief. *Robinson v. New York*, 486 Fed. App'x 905, 907 (2d Cir. 2012); *Singleton v. Doe*, 210 F.Supp.3d 359, 371 (E.D.N.Y. 2016) (citing *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995)). Thus, Defendants' motion for summary judgment and dismissal of the claims for declaratory relief and injunctive relief prohibiting the enforcement of the special conditions of parole is denied.

With respect to Peoples' claim for monetary damages, the record contains genuine issues of material fact as to the constitutionality of certain Special Conditions of parole. As such, the first prong of the qualified immunity analysis has been met.

With respect to the second prong, in support of the motion for summary judgment, Defendants summarize the legal standards related to qualified immunity and state, in a cursory manner, that Peoples had no clearly established right to be free from any of the special conditions of confinement. Dkt. No. 71-29 at 27. While Defendants are correct, it is also well established that parole conditions may not be applied in an arbitrary and capricious manner and must be reasonably related to the parolee's underlying offense. *Yunus*, 2019 WL 168544, at *19 (S.D.N.Y. Jan. 11, 2019) (citation omitted); *Scott*, 2020 WL 4274226, at *13. As discussed *supra*, there are genuine issues of material fact as to whether Defendants acted arbitrarily and capriciously in imposing Special Conditions 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33. Further, as previously noted, cases in this Circuit have held that special conditions on internet and computer access may infringe upon a parolee's First Amendment rights if the restrictions are overly-broad and not reasonably related to a parolee's past conduct. Defendants' brief lacks any argument suggesting that Peoples' right to be free from some or all of these conditions was not clearly established. On the basis of the record before it, the Court cannot find that Defendants are entitled to the protections of qualified immunity.

Therefore, the Court recommends denying Defendants' motion for summary judgment and dismissal based upon qualified immunity.

### F. Declaratory and Injunctive Relief Against Leon

Leon avers, and Peoples does not dispute, that she retired from DOCCS in January 2020 and is no longer employed by DOCCS. Dkt. No. 71-23 at ¶1. Therefore, because Leon does not have the authority to remedy any ongoing constitutional violations, Peoples cannot seek injunctive or declaratory relief against her. *Marshall v. Annucci*, No. 16-CV-8622, 2018 WL 1449522, at *8 (S.D.N.Y. Mar. 22, 2018). Accordingly, Peoples' claims for injunctive and declaratory relief against Leon are dismissed, sua sponte, as moot. *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 CIV. 3826, 2012 WL 2367033, at *2 (S.D.N.Y. June 21, 2012) (finding that retiree has no ability to provide injunctive relief) (citing *Corr. Officers Benevolent Assoc. v. Kralik*, No. 04–CV–2199, 2009 WL 856395, at *8 (S.D.N.Y. Mar. 26, 2009)) ("[B]ecause a defendant no longer occupied the position which he occupied at the time of the underlying events, and therefore did 'not have the official capacity necessary to enable him to comply with the injunctive relief sought,' he had to be dismissed from the case").

### G. Doe Defendants

**\*28** As discussed *supra*, Peoples asserted claims against two unnamed defendants identified as Commissioner Jane Doe and Commissioner John Doe. Compl. at 1, 2. In a Memorandum-Decision and Order issued on February 19, 2019 (the "February Order"), the Court directed Plaintiff to "take reasonable steps to ascertain their identities through discovery[.]" Dkt. No. 8 at 10. Peoples was advised to amend the operative pleading to properly name the individuals as parties and was advised that if he failed to ascertain the identify of the Doe defendants to permit timely service of process, all claims against the individuals were subject to dismissal. *Id.*

Peoples did not comply with the February Order and, further, his opposition to Defendants' motion is devoid of any reference to the Doe Defendants. Therefore, as to the still unidentified John Doe and Jane Doe Defendants, I recommend these Defendants be dismissed based upon: (1) Fed. R. Civ. P. 16(f) for failure to comply with a court

order pursuant to; (2) Fed. R. Civ. P. 41(b) and N.D.N.Y.L.R. 41.2(a) for failure to prosecute under; and (3) Fed. R. Civ. P. 4(m) for failure to serve within 90 days.

### IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment and dismissal (Dkt. No. 71) be **GRANTED** as to:

a. Plaintiff's claims for monetary damages against Defendants in their official capacities;

b. Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 3, 4, 8, 10, 14, 15, 16, 32, 34, 35, and 36;

c. Plaintiff's claims for monetary damages against Stanford in her individual capacity; and it is further

**RECOMMENDED**, that Defendants' motion (Dkt. No. 71) be **DENIED** as to:

> a. Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33; and
>
> b. Plaintiff's claims for injunctive relief against Stanford in her official capacity; and
>
> c. the issue of judicial immunity; and
>
> d. the issue of qualified immunity; and it is further

**RECOMMENDED**, that Plaintiff's claims against Jane Doe and John Doe be **DISMISSED**, *sua sponte;* and it is further

**RECOMMENDED**, that Plaintiff's claims for injunctive and declaratory relief against Leon be **DISMISSED**, sua sponte; and it is further

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules; and it is further

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [18] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk

of the Court**. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

18    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(c).

**All Citations**

Slip Copy, 2021 WL 1582173

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 977222
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leroy PEOPLES, Plaintiff,
v.
Gina R. LEON, et al., Defendants.

9:18-CV-1349 (LEK/ML)
|
Signed 03/16/2021

**Attorneys and Law Firms**

Leroy Peoples, Binghamton, NY, pro se.

Keith J. Starlin, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

**\*1** Pro se plaintiff Leroy Peoples, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great Meadow C.F."), brings this action against Defendants Offender Rehabilitation Coordinator ("ORC") Gina R. Leon, New York State Board of Parole ("Board") Commissioner Ellen E. Alexander, Board Chairwoman Tina M. Stanford, Board Commissioner Jane Doe, and Board Commissioner John Doe, in their individual and official capacities, asserting claims pursuant to 42 U.S.C. § 1983 for violations of his First and Fourteenth Amendment rights in connection with the imposition of certain special conditions of parole (the "Special Conditions"). Dkt. Nos. 1 ("Complaint"); 1-1 ("Peoples' Memorandum of Law"). On July 17, 2020, Defendants filed a motion for summary judgment. Dkt. Nos. 71 ("Motion"); 71-29 ("Defendants' Memorandum of Law"). In a Report-Recommendation issued on January 4, 2021, the Honorable Miroslav Lovric, United States Magistrate Judge, granted Defendants' Motion in part and denied it in part. Dkt. No. 89 ("Report-Recommendation"). For the reasons that follow, the Court adopts the Report-Recommendation in its entirety.

**II. BACKGROUND**

The facts are detailed in the Report-Recommendation, familiarity with which is assumed. For convenience, the Court outlines the facts here and discusses other factual details as necessary throughout this Memorandum-Decision and Order.

Peoples was sentenced in 2005 to a term of imprisonment based on convictions for two instances of rape. See R. & R. at 4. The sentences were to run concurrently, with the longer being sixteen years. See id. The sentencing court certified Peoples as a "Sex Offender" pursuant to New York Correction Law § 168-d (the "Sex Offender Registration Act" or "SORA") and advised him that he would be obligated to register as a sex offender in New York. See id.

At an October 17, 2018 hearing, the Board denied Peoples discretionary release to parole and mandated that he be held until June 7, 2019, his maximum expiration date. See id. at 5. The Board also imposed thirty-six Special Conditions. See id. at 6. In May 2019, pursuant to a recommendation by the Board of Examiners of Sex Offenders, the Honorable Ira H. Margulis of the Queens County Supreme Court determined that Peoples' risk level under SORA was three and designated him a "sexually violent offender." See id. at 10. Peoples was released in June 2019. See id. at 10. In August 2019, he was arrested for violating the conditions of his parole. See id. He ultimately pled guilty to tampering with his global positioning system monitoring device and removing it from his ankle and was ordered held for eighteen months. See id.

Peoples challenges twenty-six of his Special Conditions on constitutional grounds. See id. at 6–10. In their Motion, Defendants argued that: (1) Peoples' claims for monetary damages are barred by the Eleventh Amendment; (2) the First and Fourteenth Amendment claims related to the Special Conditions must be dismissed, because the conditions were reasonably related to Peoples' crimes and tailored to serve legitimate state interests; (3) judicial immunity bars Plaintiff's claims against Alexander; (4) Stanford was not liable in her individual capacity, because she was not personally involved in the October 2018 determination; and (5) all Defendants are entitled to qualified immunity with respect to Peoples' First and Fourteenth Amendment claims. See id. at 14.

**\*2** Magistrate Judge Lovric granted the Motion to the following extent: Peoples' claims for monetary damages against Defendants in their official capacities were dismissed; Peoples' constitutional claims were dismissed with respect to eleven of the challenged Special Conditions; and his claims for monetary damages against Stanford in her individual

capacity were dismissed. Magistrate Judge Lovric also dismissed Peoples' claims against Jane Doe and John Doe, and Peoples' claims for injunctive and declaratory relief against Leon, sua sponte. See id. at 58.

The magistrate judge permitted Peoples' First and Fourteenth Amendment claims related to the fifteen remaining Special Conditions to proceed, as well as his claims for injunctive relief against Stanford in her official capacity. Further, Magistrate Judge Lovric denied Defendants' Motion with respect to the issues of judicial immunity and qualified immunity. See id. at 58–59.

Peoples and Defendants have each objected to portions of the Report-Recommendation. Dkt Nos. 90 ("Peoples' Objections"); 95 ("Defendants' Objections").

### III. STANDARDS OF REVIEW

#### A. Report-Recommendation
Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

#### B. Summary Judgment
Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. 2548.

### IV. DISCUSSION

**\*3** The Court addresses each side's objections, in turn. For the reasons that follow, the Report-Recommendation withstands all objections.

#### A. Constitutional Claims Related to Special Conditions
Parolees are entitled to some form of due process in the imposition of special conditions of parole. Pollard v. U.S. Parole Comm'n, No. 15-CV-9131, 2016 WL 3167229, at *4 (S.D.N.Y. June 6, 2016) (citing U.S. v. Green, 618 F.3d 120, 122 (2d Cir. 2010)). This "limited due process right" entitles a parolee to conditions of parole that are reasonably related to his prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public. See Singleton v. Doe, No. 14-CV-0303, 2014 WL 3110033 at *3 (E.D.N.Y. July 7, 2014); U.S. v Myers, 426 F.3d 117, 123–24 (2d Cir. 2005) (summary order); Robinson v. Pagan, No. 05-CV-1840, 2006 WL 3626930, at *6 (S.D.N.Y. Dec. 12, 2006); Yunus v. Robinson, No. 17-CV-5839, 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11, 2019). "If a special condition implicates a fundamental liberty interest," the court "must carefully examine it to determine whether it is reasonably related to the pertinent factors, and involves no greater deprivation of liberty than is reasonably necessary[.]" Myers, 426 F.3d at 126 (internal quotation marks omitted). Courts "must use

common sense to guide [their] interpretation of supervised release conditions." U.S. v. Moritz, 651 Fed. App'x 807, 810 (10th Cir. 2016) (citations omitted).

**B. Peoples' Objections**

Plaintiff's Objections pertain to three Special Conditions of parole that Magistrate Judge Lovric held were constitutional.

Special Condition 14 provides, "I will comply with geographical restrictions as directed by [the Parole Officer]." See R. & R. at 26. Peoples alleged in his Complaint that he had a constitutional right to travel within the state. See R. & R. at 27 (citing Peoples' Mem. of Law at 11). The magistrate judge noted that parole limitations on travel and association are generally constitutional, and that Special Condition 14 was justified under the circumstances, based on evidence that Peoples had a history of leaving the state without permission, failing to appear for court appearances, and tampering with his GPS monitoring device. See id.

Peoples objects that he is not an "offender subject to civil-management ... making the imposition of a 'GPS' ankle-monitor [as] a special condition of parole unconstitutional." Peoples' Objs. at 2. This argument is improperly raised for the first time in objections. See Ross v. Koenigsmann, No. 14-CV-1321, 2016 WL 5408163, at *2 (N.D.N.Y. Sept. 28, 2016) ("[A] district court will ordinarily refuse to consider an argument that could have been, but was not, presented to the magistrate judge in the first instance."). In any case, the argument lacks merit: regardless of whether Peoples is subject to civil management, see N.Y. Mental Hygiene Law Article 10, the Board can require GPS monitoring if the restriction is reasonably related to Peoples' prior conduct. Cf. Lando v. Annucci, No. 18-CV-1472, 2021 U.S. Dist. LEXIS 41935, at *15, 2021 WL 1131475 (N.D.N.Y. Mar. 4, 2021) (report-recommendation) (denying motion to dismiss due process challenge to GPS monitoring condition when the condition had no basis in past conduct).

**\*4** Special Condition 16 provides, "I will not us[e] or possess any medications or supplements designed or intended for the purpose of enhancing sexual performance or treating erectile dysfunction without the written permission of my parole officer and the approval of his or her area supervisor." See R. & R. at 31. Peoples argued that this condition violated his right to privacy by interfering with his marital relationship, and that the condition was analogous to "penile plethysmography testing." See id.; Peoples's Mem. of Law at 12–13. The magistrate judge found that this condition

was reasonably related to Peoples' criminal history as a sex offender and to the goal of ensuring public safety. See R. & R. at 31. In his objections, Peoples repeats the argument that Special Condition 16 is analogous to penile plethysmography testing and is thus unconstitutional. See Peoples' Objs. at 2; see also United States v. McLaurin, 731 F.3d 258 (2d Cir. 2013) (invalidating a special condition mandating penile plethysmography). Since the magistrate judge did not address this argument, the Court reviews it de novo. Having done so, the Court rejects Peoples' contention that restricting the use of drugs for improving sexual performance is analogous to requiring the invasive penile plethysmography procedure. [1]

[1]    "This examination involves the use of a device known as a plethysmograph which is attached to the subject's penis. In some situations, the subject apparently may be required, prior to the start of the test, to masturbate so that the machine can be 'properly' calibrated. The subject is then required to view pornographic images or videos while the device monitors blood flow to the penis and measures the extent of any erection that the subject has. The size of the erection is, we are told, of interest to government officials because it ostensibly correlates with the extent to which the subject continues to be aroused by the pornographic images." McLaurin, 731 F.3d at 259.

Special conditions 3, 4, and 8 require Peoples to participate in a substance abuse treatment program, an alcohol abuse treatment program, and "anti-aggression/anti-violence counseling," respectively. See R. & R. at 22 (citing Peoples' Mem. of Law at 10). Peoples argued that the imposition of these conditions was arbitrary and capricious, because he had satisfactorily completed "Aggression Replacement Training" and "Alcohol and Substance Abuse Treatment" while in prison and has since been sober. See id. The magistrate judge found that these Special Conditions were reasonably related to legitimate penological objectives and to Peoples' history of violence and drug use. See id. at 22–25. In his objections, Peoples improperly raises new arguments. See Peoples' Objs. at 3; see Ross, 2016 WL 5408163, at *2. The Court finds no clear error in the magistrate judge's analysis.

Accordingly, having reviewed the portions of the magistrate judge's Report-Recommendation to which Peoples objected, the Court adopts them.

**C. Defendants' Objections**

Defendants object to the magistrate judge's findings with respect to the constitutionality of certain special conditions, his conclusion that Alexander is not entitled to judicial immunity, his conclusion that a claim for injunctive relief should proceed against Stanford, and his conclusion that Defendants are not entitled to qualified immunity. See generally Defs.' Objs.

Defendants dispute the magistrate judge's findings regarding Special Conditions 11, 18, 20–31, and 33. See Defs.' Obj. at 4–7. With respect to all but Special Condition 11, Defendants offer only a general objection that the Report-Recommendation is incorrect. Defendants ask this Court to review Alexander's declaration and Defendants' summary judgment brief in full, and assert that once the Court does so, it will realize the wisdom of Defendants' arguments:

> Due to the length of the analysis in question, and with the knowledge that this Court will be reviewing Defendants' motion papers in their entirety, for the sake of brevity, Defendants respectfully refer the Court to that extensive discussion for a more detailed discussion and analysis of special conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33, and the rationale for applying them to this particular Plaintiff in light of the relevant facts and circumstances, and incorporate that discussion herein.

*5 Defs.' Objs. at 6. The Court reviews this objection under the same standard of review that would apply if Defendants had made no objection at all. See Barnes, 2013 WL 1121353, at *1. Having reviewed the relevant portions of the magistrate judge's detailed and thoughtful opinion, the Court finds no clear error.

With respect to Special Condition 11, Defendants offer a marginally more specific objection. Special Condition 11 provides, "I will comply with all case specific sex offender conditions to be imposed by the P.O." See R. & R. at 46. The magistrate judge found that this condition was unconstitutionally vague, as it does not provide Peoples with notice of what conduct will result in his being returned to prison. See id. at 46. Defendants direct the Court's

attention to Alexander's statement in her declaration that the condition "simply 'authorizes Plaintiff's parole officer to impose "case specific" sex offender conditions of release based on Plaintiff's individual case and circumstances,' and is thus, 'specifically tailored to Plaintiff as he is indeed a sex offender and it simply enables the calibration of his conditions according to his particular risk factors and criminogenic needs.' " See Defs.' Objs. at 7 (quoting Dkt. 71-2 ¶ 49 (D)). The magistrate judge already addressed this evidence. See R. & R. at 46. But as the Report-Recommendation notes, Defendants failed to offer any legal argument or case law in support of their Motion with respect to Special Condition 11. See id. They still do not. Defendants' mere reiteration of an initially perfunctory argument merits review for clear error. See Barnes, 2013 WL 1121353, at *1. The Court finds none.

Next, Defendants object to the magistrate judge's finding that Alexander is not entitled to judicial immunity. In their Motion, Defendants argued that Alexander was entitled to absolute immunity, because the Board, in imposing the Special Conditions, was serving a quasi-judicial function, and a parole board official is entitled to absolute immunity when she performs a quasi-adjudicative role. See Defs.' Mem. of Law at 17–18. The magistrate judge denied the Motion with respect to judicial immunity based on Defendants' failure to address nuances in the doctrine of judicial immunity as applied to parole board officials. See R. & R. at 53. Namely, while certain functions of a parole board, such as granting, denying, and revoking parole, are generally quasi-judicial, the imposition of special conditions is under some circumstances a merely administrative function. See id. (collecting cases). Defendants did not address the question of why the imposition of special conditions was in this case judicial. In other words, in neglecting to argue a complex, fact-intensive question by identifying the relevant legal principles and applying them to the evidence, Defendants failed to meet their burden of persuasion. See 11 MOORE'S FEDERAL PRACTICE - Civil § 56.40 (2021) ("[T]he moving party bears an ultimate burden of persuading the court that a trial is unnecessary."); id. at § 56.20 ("[T]he movant must identify and establish the legal principles that entitle it to judgment as a matter of law[.]"); Celotex Corp. v. Catrett, 477 U.S. 317, 330–331 & n.2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The burden of persuasion imposed on a moving party by Rule 56 is a stringent one. Summary judgment should not be granted unless it is clear that a trial is unnecessary.") (citations omitted). They now present five pages of new arguments and factual analysis in an attempt to meet this burden after the fact. See Defs.' Objs. at 9–13. The Court cannot

2021 WL 977222

consider these arguments. See Ross, 2016 WL 5408163, at *2. Having otherwise reviewed this portion of the Report-Recommendation for clear error, the Court finds none.

**\*6** Further, Defendants object to the magistrate judge's denial of their Motion with respect to Peoples' claim for injunctive relief against Stanford. See Defs.' Objs. at 13–15. The magistrate judge correctly found that Defendants failed to address whether Stanford was properly named for purposes of injunctive relief, instead focusing exclusively on her personal involvement for purposes of monetary relief. See R. & R. at 52; Defs. Mem. of Law 18–23. A defendant need not have been personally involved in a constitutional violation to be properly named in her official capacity for purposes of injunctive relief. See Smith v. Perez, No. 19-CV-1758, 2020 WL 2307643, at *6 (D. Conn. May 8, 2020) (noting that a claim for injunctive relief can only proceed against defendants who "plausibly have the authority to grant the prospective relief"); Vaughan v. Aldi, No. 19-CV-107, 2019 WL 1922295, at *2 (D. Conn. Apr. 29, 2019) (prison warden was proper defendant for official capacity claim seeking injunctive relief even though he lacked personal involvement in alleged constitutional violation). In their objections, Defendants reiterate their initial irrelevant argument that Stanford was not personally involved in any alleged constitutional violation. See Defs.' Objs. at 13–15. This reiteration warrants review for clear error. See Barnes, 2013 WL 1121353, at *1. There is none.

Defendants additionally object to the magistrate's finding that they are not entitled to qualified immunity. In this portion of their objections, Defendants recount the nature of Peoples' crimes, and then appear to assert that due to the serious nature of his offenses, he does not have *any* "clearly established" constitutional rights pertaining to the imposition of special conditions. See Defs.' Objs. at 17. This perfunctory, legally unsupported argument merits clear error review. See Barnes, 2013 WL 1121353, at *1. Aside from this objection, Defendants argue in general terms that the Special Conditions were sufficiently tailored. This also warrants clear error review. See id. The Court finds no clear error.

Finally, Defendants assert that they are entitled to Eleventh Amendment immunity, see Defs.' Objs. at 25, even though there are no remaining damages claims against Defendants in

their official capacities, see R. & R. at 58. Under any standard of review, the magistrate judge did not err.

Having reviewed the remaining portion of the Report-Recommendation, to which the parties have not objected, the Court finds no clear error.

## V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 89) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 71) is **GRANTED in part and DENIED in part.** The motion is **DENIED** as to Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 11, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 33; Plaintiff's claims for injunctive relief against Stanford in her official capacity; the issue of judicial immunity; and the issue of qualified immunity. Plaintiff's claims against Jane Doe and John Doe, and Plaintiff's claims for injunctive and declaratory relief against Leon are **DISMISSED** sua sponte. Defendant's motion is **GRANTED** as to Plaintiff's claims for monetary damages against Defendants in their official capacities; Plaintiff's First and Fourteenth Amendment claims related to Special Conditions 3, 4, 8, 10, 14, 15, 16, 32, 34, 35, and 36; and Plaintiff's claims for monetary damages against Stanford in her individual capacity; and it is further

**ORDERED**, that the Clerk **TERMINATE** John Doe and Jan Doe from the docket; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 977222

---

**End of Document**                                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4274226
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eugene SCOTT, Plaintiff,

v.

Robert ROSENBERGER, Parole Officer; and Gary
Morgiewicz, Senior Parole Officer, Defendants.

No. 19-CV-1769 (CS)
|
Signed 07/24/2020

**Attorneys and Law Firms**

Eugene Scott, Scranton, Pennsylvania, Pro Se Plaintiff

Brendan M. Horan, Assistant New York Attorney General,
New York, New York, Counsel for Defendants

**OPINION & ORDER**

Seibel, J.

**\*1** Before the Court is the motion to dismiss of Defendants
Robert Rosenberger and Gary Morgiewicz (collectively,
"Defendants"). (Doc. 23.) For the reasons set forth below,
Defendants' motion is GRANTED IN PART and DENIED IN
PART.

**I. BACKGROUND**
I accept as true the facts, but not the conclusions, set forth in
Plaintiff Eugene Scott's Complaint. (Doc. 2 ("Compl.").)

**A. Facts**
On April 10, 2012, Plaintiff was sentenced to a term of ten
years' probation after pleading guilty to a "Criminal Sexual
Act involving his six year old cousin at his residence." (*Id.*
¶ 6.)[1] Plaintiff alleges he was sentenced as a "youthful
offender." (*Id.*)

[1]   It is unclear from the face of the Complaint whether
the second "his" in that quotation refers to Plaintiff
or Plaintiff's cousin.

On an unspecified date, Plaintiff violated his probation in
an unspecified manner, and on December 9, 2015, he was

sentenced to one and one-third to four years' imprisonment
(*Id.* ¶ 7.)

On January 10, 2019, Plaintiff was released from prison
and placed under the care of Defendant Rosenberger, a
parole officer with the New York State Department of
Corrections and Community Supervision ("DOCCS"). (*Id.*
¶ 8.) Rosenberger's supervisor was Defendant Morgiewicz.
(*Id.* ¶ 4.) Plaintiff alleges that Rosenberger and Morgiewicz
"decided to supervise Plaintiff as a discretionary sex
offender." (*Id.* ¶ 18.)

Rosenberger gave Plaintiff a list of several special conditions
of parole that were to be imposed. (*Id.* ¶ 9.)

> The conditions read: I will not be in
> contact with children under the age
> of 18 unless I have permission[;] I
> will not purchase or possess a camera
> or related photography equipment,
> or a video camera or related
> equipment without permission[;] if
> given permission to obtain a driver's
> license I will drive only to and
> from work[;] I will not rent, own,
> use, posses, purchase, or have control
> of any computer, computer-related
> material, and/or internet unless I obtain
> written permission[;] I will not rent,
> operate, or be a passenger in any
> vehicle without permission.

(*Id.*) Rosenberger also told Plaintiff that Plaintiff had
to "inform" Rosenberger "of all relationships formed by
Plaintiff sexual or not." (*Id.* ¶ 21.) Plaintiff asked Rosenberger
why "so many special conditions were being re-imposed
when they were already removed when his parole conditions
were amended by a parole commissioner the previous
June." (*Id.* ¶ 10.) Plaintiff also told Rosenberger that the
conditions restricting his access to vehicles, computers, the
internet, and camera phones had nothing to do with his
offense. (*Id.*) Rosenberg responded, " '[B]ecause you're a sex
offender and all sex offenders get the same conditions that's
why they are being imposed.' " (*Id.*) Plaintiff asked if he
could speak with Rosenberger's supervisor before signing an
acknowledgment of his conditions of parole, but Rosenberger
said that his "senior and bureau chief" already approved of the

conditions, so Plaintiff signed the document listing the special conditions. (*Id.*)

Rosenberger took Plaintiff to meet with a caseworker at the Department of Social Services ("DSS"), and to "the only Sexual Assault Reform Act ("SARA") [public] housing in Orange County," where Plaintiff would stay while on parole. (*Id.* ¶ 8.) Plaintiff's caseworker told Plaintiff that he had to seek employment and keep all employment-related appointments to remain on public assistance, and Rosenberger stated that if Plaintiff lost his public assistance, he would have to go back to prison for not having access to SARA-compliant housing. (*Id.* ¶ 11.)

**\*2** On or about January 21, 2019, Plaintiff requested permission from Rosenberger to take classes to renew his Emergency Medical Technician ("EMT") certificate. (*Id.* ¶ 12.) Rosenberger told Plaintiff that the request was under review. (*Id.*)

On January 22, Plaintiff went to the Department of Labor, where he was reminded that he had to search for employment while on parole. (*Id.* ¶ 13.) He was "introduced" to the resource room there, where he used a computer to update his resume and apply for jobs. (*Id.*) That same day, one of the employers to which he applied agreed to interview him for a position on January 24. (*Id.*)

On January 23, Plaintiff registered for anger management classes, which he was required to do under his parole conditions. (*Id.* ¶ 14.) Plaintiff told Rosenberger that the anger management class times would "conflict[ ] with the potential employment opportunity" for which he had scheduled an interview. (*Id.*) Rosenberger responded that Plaintiff would not be permitted to take that job because of the conflict, so Plaintiff canceled the interview. (*Id.*)

On January 24, Rosenberger told Plaintiff that his request to renew his EMT certificate was denied because there was a chance that both the classes and a job as an EMT would bring Plaintiff into contact with minors. (*Id.* ¶ 15.) Rosenberger stated that his supervisor, Defendant Morgiewicz, made the decision to deny Plaintiff's request. Plaintiff explained that he had previously been an EMT while on probation, EMTs must be at least eighteen years old so there would be no minors in the certification classes, and Plaintiff would always be under the supervision of his EMT or paramedic partner if he obtained his certificate and got a job as an EMT. (*Id.*) Plaintiff then asked if he could take EMT certification classes

at a local college, to which Rosenberger replied that Plaintiff would have to disclose his youthful offender adjudication to any college in which he enrolled. (*Id.*)

On January 24, Plaintiff went back to the Department of Labor and applied for more jobs. (*Id.*)

On January 28, Plaintiff met with Rosenberger and said that he had two upcoming interviews. (*Id.* ¶ 16.) Plaintiff also requested a copy of the reasons his request to take EMT classes was denied. (*Id.*)

On January 30, Rosenberg took Plaintiff into custody for violating his parole conditions by using a computer without permission while at the Department of Labor. (*Id.* ¶ 17.)

### B. **Procedural History**

Plaintiff's Complaint, dated February 14, 2019, brought the following claims under 42 U.S.C. § 1983 against Defendants in both their individual and official capacities: (1) procedural and substantive due process violations against both Defendants for designating Plaintiff as a "discretionary sex offender," (2) First Amendment and due process violations against both Defendants for the "40 special conditions" of parole imposed on Plaintiff, (3) First Amendment and due process violations against Morgiewicz for denying Plaintiff's request to take EMT classes, and (4) First Amendment and due process violations against Rosenberger for requiring Plaintiff to disclose to colleges that he was a sex offender and disclose to Rosenberger whenever Plaintiff entered into any relationship. (*Id.* ¶¶ 5, 18-21.) Plaintiff sought declaratory relief and money damages. (*Id.* at 8.)

**\*3** On October 11, 2019, Defendants filed a pre-motion letter, (Doc. 20), and the Court set a date for a pre-motion conference and ordered Plaintiff to respond to Defendants' letter by November 12, 2019, (Doc. 21). Plaintiff did not do so, but at the pre-motion conference on November 18, 2019, Plaintiff provided Defendants and the Court with his responsive letter, which was dated November 2. (Doc. 24 ¶ 2; *id.* Ex. A.) In Plaintiff's letter, he acknowledged that he was no longer on parole or under the supervision of DOCCS, and thus his claim for declaratory relief was moot. (*Id.* Ex. A at 1.)

At the pre-motion conference, the Court discussed Defendants' letter and Plaintiff's response and set a schedule for Plaintiff to amend his Complaint and for Defendants to move to dismiss. (Minute Entry dated Nov. 18, 2019.)

Plaintiff did not amend his Complaint by the deadline set by the Court.

On February 21, 2020, Defendants moved to dismiss, (Doc. 23), and filed a memorandum of law in support of their motion, (Doc. 25 ("Ds' Mem.")). Plaintiff to date has not opposed Defendants' motion. The Court thus considers the motion fully briefed.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

Complaints by *pro se* plaintiffs shall be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475

F. App'x 807, 808 (2d Cir. 2012) (summary order) (internal quotation marks and emphasis omitted), [2] and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (internal quotation marks omitted). Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations that [the plaintiff] has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

[2]     The Court will send Plaintiff copies of all unreported cases cited in this Opinion and Order.

**\*4** A plaintiff's failure to oppose a motion to dismiss "does not, without more, justify dismissal," *James v. John Jay Coll. of Criminal Justice*, 776 F. App'x 723, 724 (2d Cir. 2019) (summary order), especially where the plaintiff is *pro se*, *see Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 536 (S.D.N.Y. 2015). That is because "the sufficiency of a complaint is a matter of law that the district court is capable of determining based on its own reading of the pleading and knowledge of the law." *Goldberg v. Danaher*, 599 F.3d 181, 184 (2d Cir. 2010) (internal quotation marks and alteration omitted).

## III. DISCUSSION

### A. Declaratory Relief

Plaintiff's Complaint seeks a declaration vacating his special conditions of parole, (Compl. at 8), but as Plaintiff acknowledges, the Court cannot provide that form of relief because Plaintiff has reached the maximum expiration date of his sentence and is no longer subject to any parole conditions. (Doc. 24 Ex. A at 1.) Accordingly, to the extent Plaintiff's claims seek declaratory relief, they are dismissed as moot. *See Krull v. Oey*, 805 F. App'x 73, 74 (2d Cir. 2020) (summary order) (dismissing equitable claim as moot where the court "can no longer provide that form of injunctive relief"); *Maldonado v. Fischer*, No. 11-CV-1091, 2013 WL 5487429, at \*4 (W.D.N.Y. Sept. 30, 2013) ("As plaintiff is no longer subject to special conditions of parole, his request for injunctive relief is moot.").

### B. Claims Against Defendants in Their Official Capacities

Plaintiff states his claims are brought against Defendants "in their official and individual capacities." (Compl. ¶ 5.) But "DOCCS officials enjoy Eleventh Amendment immunity

from suit under § 1983 for damages in their official capacities." *Gunn v. Bentivegna*, No. 20-CV-2440, 2020 WL 2571015, at *3 (S.D.N.Y. May 19, 2020); *see Ortiz v. Russo*, No. 13-CV-5317, 2015 WL 1427247, at *5 (S.D.N.Y. Mar. 27, 2015) ("[E]ach of the Defendants are employees of DOCCS, a state entity, and are therefore entitled to Eleventh Amendment immunity from claims against them in their official capacity."). Accordingly, Plaintiff's claims against Defendants in their official capacities are dismissed.

### C. Plaintiff's Designation as a Discretionary Sex Offender

Plaintiff alleges he was denied procedural and substantive due process when Defendants designated him "as a discretionary sex offender while being fully aware of the liberty restrictions that would be placed on the Plaintiff as a result of that designation." (Compl. ¶ 18.)

### 1. Procedural Due Process

Plaintiff alleges that he "was not given the opportunity to attend any hearing or given a choice to dispute th[e] designation," nor was he "given any form of individualized assessment clinical or otherwise to defend himself against th[e] designation" in violation of his procedural due process rights secured by the Fourteenth Amendment. *Id.*

When faced with a procedural due process claim under the Fourteenth Amendment, courts must proceed with the following two-step inquiry: first, inquire " 'whether there exists a liberty or property interest which has been interfered with,' " and second, inquire " 'whether the procedures attendant upon that deprivation were constitutionally sufficient.' " *Francis v. Fiacco*, 942 F.3d 126, 141 (2d Cir. 2019) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)); *see Singleton v. Doe*, 210 F. Supp. 3d 359, 366 (E.D.N.Y 2016) ("A court first asks whether there exists a liberty or property interest of which a person has been deprived, and if so, whether the procedures followed by the State were constitutionally sufficient.") (internal quotation marks omitted). In other words, if a plaintiff is not deprived of a constitutionally protected liberty interest, the Court need not reach the issue of whether the attendant procedures were constitutionally sufficient.

**\*5** "[I]t is an unsettled question in this Circuit as to whether a prisoner holds a liberty interest in being designated as a

[discretionary sex offender]." *Webster v. Himmelbach*, 271 F. Supp. 3d 458, 464 (W.D.N.Y. 2017); *see Singleton*, 210 F. Supp. 3d at 367 (court "unaware of any Second Circuit federal court determination that addresses a parolee's liberty interest in being free from a discretionary sex offender designation") (emphasis omitted). That said, the only cases that have considered a constitutionally protected liberty interest in not being designated as a discretionary sex offender have done so using the "stigma-plus" theory. *See Singleton*, 210 F. Supp. 3d at 367-71 (plaintiff established genuine issue of fact regarding whether designation as discretionary sex offender violated his due process rights under stigma-plus test); *see also Maldonado v. Mattingly*, No. 11-CV-1091, 2019 WL 5784940, at *8 (W.D.N.Y. Nov. 6, 2019) (granting summary judgment in favor of defendant, but analyzing plaintiff's claim under stigma-plus theory). The stigma-plus theory acknowledges that a liberty interest may be implicated "when a person's good name and reputation are at stake." *Singleton*, 210 F. Supp. 3d at 367.

"To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal quotation marks omitted). "Thus, even where a plaintiff's allegations would be sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." *Id.* (internal quotation marks omitted).

Here, Plaintiff alleges that he pled guilty to a "Criminal Sexual Act involving his six year old cousin," after which he was placed on probation, which he violated. (Compl. ¶¶ 6-7.) After serving a term of incarceration, he was released on parole, and Defendants designated him as a "discretionary sex offender." (*Id.* ¶ 18.) Plaintiff has conceded that he was found guilty of engaging in criminal misconduct with his six-year-old cousin and that his conduct was sexual in nature. In other words, Plaintiff's Complaint leaves undisputed that he committed a sexual offense and that he is a sex offender. Thus, Plaintiff has failed to plausibly allege that his designation as a sex offender was false or is capable of being proved false, and he therefore cannot establish that he had a constitutionally protected liberty interest in maintaining his good name and reputation under the stigma-plus theory. *See Vega*, 596 F.3d at 82 (where plaintiff did not dispute committing sexual offense, he "has not established a threshold

requirement" for a stigma-plus claim: "the existence of a reputation-tarnishing statement that is *false*") (emphasis in original). Accordingly, Plaintiff has failed to plausibly allege a constitutional violation under the stigma-plus theory. And because Plaintiff does not otherwise posit a theory under which he would have a constitutionally protected liberty interest in not being designated a discretionary sex offender, his procedural due process claim is dismissed.

### 2. Substantive Due Process

"To plead a substantive due process claim, a plaintiff must assert that: (1) a constitutionally cognizable property or liberty interest is at stake, and (2) defendants' alleged acts were arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised." *McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 3 (2d Cir. 2013) (summary order) (internal quotation marks and alterations omitted). Thus, like Plaintiff's procedural due process claim, the threshold inquiry is whether Plaintiff has plausibly pleaded that he has a constitutional liberty interest in being free from a discretionary sex offender designation. For essentially the same reasons discussed in the procedural due process section above, Plaintiff has not.

**\*6** As noted, Plaintiff does not dispute that he engaged in a criminal sexual act with his six-year-old cousin. While a plaintiff may have "a substantive liberty interest in not being labeled a sex offender *when he has committed no sexual offense*," *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at \*9 (S.D.N.Y. Jan. 11, 2019) (emphasis added), *appeal withdrawn sub nom. Yunus v. Lewis-Robinson*, No. 19-382, 2019 WL 3814554 (2d Cir. May 15, 2019), Plaintiff here has not plausibly alleged that he did not commit a sexual offense. In fact, he pleaded that he did commit a sexual offense. (Compl. ¶ 6.) Accordingly, Defendants' decision to designate Plaintiff as a discretionary sex offender did not implicate any constitutionally protected liberty interests, and Plaintiff's substantive due process claim regarding the designation is dismissed.

### D. Plaintiff's Special Parole Conditions

Plaintiff alleges that Defendants "imposed and enforced over 40 special conditions upon the Plaintiff while being aware that those conditions had nothing to do with his crime," thereby violating his substantive due process rights. (Compl. ¶ 19.) He also alleges that some of the forty conditions violated his First

Amendment rights. (*See id.* ¶¶ 19-21.) But Plaintiff did not allege each of the forty conditions; rather he pleaded only the following special conditions: (1) prohibition on contact with minors without permission; (2) prohibition on possession of cameras or related equipment without permission; (3) prohibition on obtaining a driver's license without permission; (4) if Plaintiff got a driver's license, he was allowed to drive only to and from work; (5) prohibition on computer and internet use without permission, (6) prohibition on operating or being a passenger in a vehicle without permission; (7) denial of request to take EMT classes and receive EMT certification; (8) mandatory disclosure to any college in which he enrolled of his youthful-offender status; and (9) mandatory disclosure to Rosenberger of any "relationships ... sexual or not" into which Plaintiff entered. (*Id.* ¶¶ 9, 15, 19-21.) Defendants argue that the special conditions did not violate Plaintiff's constitutional rights because they are rational in light of his crime and previous probation violation and are not arbitrary and capricious. (Ds' Mem. at 15-19.)

"Parolees are entitled to some form of due process in the imposition of special conditions of parole." *Yunus*, 2019 WL 168544, at \*20 (S.D.N.Y. Jan. 11, 2019) (internal quotation marks and alteration omitted). "Generally, the imposition of conditions ... must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses." *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 298-99 (E.D.N.Y. 2018) (internal quotation marks omitted); *see Muhammad v. Evans*, No. 11-CV-2113, 2014 WL 4232496, at \*9 (S.D.N.Y. Aug. 15, 2014) ("In the Second Circuit, special restrictions on a parolee's rights are upheld where they 'are reasonably and necessarily related to the interests that the Government retains after his conditional release.' ") (quoting *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972)); *see also United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (in federal supervised release context, conditions "must involve no greater deprivation of liberty than is reasonably necessary for the purposes of sentencing") (internal quotation marks and alteration omitted); *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017) (applying *Myers* to state parole context), *aff'd sub nom. Doe v. Cappiello*, 758 F. App'x 181 (2d Cir. 2019) (summary order); *Doe v. Annucci*, No. 14-CV-2953, 2015 WL 4393012, at \*13 (S.D.N.Y. July 15, 2015) (applying *Myers* in addressing qualified immunity in state parole context). "However, where the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation." *Robinson v. New York*, No. 09-CV-455, 2010

WL 11507493, at *6 (N.D.N.Y. Mar. 26, 2010) (collecting cases in which parole conditions were not reasonably related to offense). And where the condition deprives the parolee of a liberty interest that "is fundamental" under the Constitution, "a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest." *Myers*, 426 F.3d at 126; *see Lima*, 270 F. Supp. 3d at 702 ("The Second Circuit has applied strict scrutiny to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system).").

*7 "[W]hile a plaintiff who claims that his parole conditions are arbitrary and capricious must provide enough information concerning his underlying crimes to plausibly allege that those conditions are not reasonably related to his prior conduct," the plaintiff need not "establish the lack of a rational relationship between these parole conditions and his criminal history by describing in detail the facts underlying his crime of conviction as found at trial and explaining why the parole conditions are unreasonable or unnecessary despite the actions for which he was convicted." *Yunus v. Robinson*, No. 17-CV-5839, 2018 WL 3455408, at *39 (S.D.N.Y. June 29, 2018) (internal quotation marks, emphasis, and alterations omitted), *report and recommendation adopted*, 2019 WL 168544.

### 1. Prohibition on Contact with Minors

Plaintiff's second claim is dismissed to the extent it is challenging the condition that he could not have contact with minors without permission from his parole officer. Plaintiff acknowledged engaging in a "Criminal Sex Act with a six year old." (Compl. ¶ 6.) Restricting his access to minors is thus reasonably related to Plaintiff's past conduct and is designed to prevent Plaintiff from committing further offenses, and Plaintiff has not plausibly alleged that the condition is arbitrary and capricious. *See Trisvan*, 284 F. Supp. 3d at 298-99. Accordingly, the condition did not violation Plaintiff's substantive due process rights.[3]

[3]  In his Complaint, Plaintiff states that he has a "son who lives states away." (Compl. ¶ 19.) If Plaintiff alleged that the restriction on contact with minors without permission prevented him from maintaining a relationship with his son,

heightened scrutiny might apply to that claim, which would require a different analysis than the one in which Court the engaged above. *See Lima*, 270 F. Supp. 3d at 702 ("It is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process.... Restrictions on such protected liberty interests are subject to strict scrutiny."). *See generally* Max B. Bernstein, *Supervised Release, Sex-Offender Treatment Programs, and Substantive Due Process*, 85 Fordham L. Rev. 261, 283-86 (discussing heightened scrutiny applied to conditions of supervised release infringing on fundamental liberty interests). But Plaintiff did not allege that the restriction on contact with minors had any effect on his relationship with his son or even that he had the ability or right to visit his son. (Indeed, it would be unusual if a parolee could visit with relatives "states away.") Plaintiff was fully capable of alleging such interference if it existed, as he pleaded that the condition prohibiting camera phone possession "made it extremely difficult to establish and maintain a relationship with his son." (Compl. ¶ 19.) Accordingly, Plaintiff's condition of release restricting his contact with minors does not trigger any heightened scrutiny, and his claim stemming from that condition is dismissed for the reasons discussed above.

### 2. Prohibition on Cameras and Related Equipment

Plaintiff alleges that the special condition prohibiting possession or use of a camera or any related equipment violates (1) his Fourteenth Amendment rights because the condition is not related to his underlying offenses and (2) his First Amendment rights because he cannot possess a camera phone, which interferes with his ability to maintain a relationship with his son. (Compl. ¶ 19; *see id.* ¶ 9.)

As noted, special restrictions on a parolee's rights must be reasonably related to Plaintiff's past conduct. And if a restriction violates a parolee's fundamental liberty interests – like a parent's interest in maintaining a relationship with his child – that restriction must be narrowly tailored to serve a compelling state interest. *See Lima*, 270 F. Supp. 3d at 702. On the record before me, restricting Plaintiff's access to cameras or related equipment, including camera phones, has nothing to do with Plaintiff's past conduct. There is no indication in

the Complaint that Plaintiff's Criminal Sex Act or subsequent probation violation involved cameras, videos, cellphones or any related equipment. And to the contrary, Plaintiff alleges that the condition "had nothing to do with his crime." (Compl. ¶ 19.) Perhaps in discovery it will come to light that Plaintiff's criminal conduct included taking pictures or videos, or possessing the same, but on the face of the Complaint, I cannot make that determination. Thus, because there is no indication that Plaintiff's crimes involved cameras, Plaintiff has plausibly alleged that this special condition violated his due process rights. *See Singleton*, 210 F. Supp. 3d at 376 (denying defendants' motion for summary judgment where "Defendants have not provided the Court with evidence that the cellular telephone restriction was related to Plaintiff's prior conduct").[4]

[4]  Defendants have not argued that Plaintiff has failed to plausibly allege how the restriction on having a camera, whether in a phone or otherwise, interfered with his relationship with his son. It seems to the Court that there are still phones available that do not have cameras and do not connect to the internet, and that Plaintiff could have communicated with his son using such a device. But whether the camera restriction in fact interfered with that relationship may be taken up at a later stage.

**\*8** Defendants do not even attempt to explain why this condition was reasonably related to his offense. Rather, they argue, as they do for all of the special conditions, that as a sex offender, Plaintiff is subject to "more intensive supervision," justifying all of the special conditions imposed on him. (Ds' Mem. at 16 (citing *Maldonado*, 2019 WL 5784940, at \*5 (noting that the discretionary sex offender designation is applied where "[i]t appears that the offender and/or community would benefit from intensive supervision practices that incorporate specialized sex offender 'containment' strategies.")) (alteration in original).) If the Court were to follow Defendants' logic here, essentially any condition could be imposed on a sex offender. But the law is clear that special conditions, whether imposed on sex offenders or any other offenders, must be reasonably related to the offender's past conduct. *See Singleton*, 210 F. Supp. 3d at 376 (genuine issue of fact existed whether cellphone prohibition on plaintiff sex offender was unconstitutional). In fact, even in *Maldonado* (the case that Defendants cite to support this argument), the court engaged in a condition-by-condition analysis, determining that some were appropriate and some were not. *Maldonado*,

2019 WL 5784940, at \*10-11 (condition preventing plaintiff from "communal worship" survived motion, while condition limiting access to "premium cable channels" did not).

Next, Defendants argue that because Plaintiff had violated his probation in the past, more restrictive conditions were appropriate for him on parole. (Ds' Mem. at 16.) But the Court does not know what Plaintiff did to violate his probation, and there is no indication that it had anything to do with the possession of a camera or related equipment. Thus, I cannot say that a condition restricting his access to cameras is reasonably related to his previous probation violation. And Defendants have provided no authority to suggest that a parolee who has violated conditions of supervision in the past may subsequently be subject to any special condition, no matter how restrictive or unrelated to his previous offense. Finding none myself, I reject Defendants' argument.

Finally, Defendants argue that the ban on cameras – and all of the other special conditions – "were the initial conditions imposed upon [Plaintiff's] release, which Plaintiff subsequently violated within less than three weeks," meaning that "Defendants had almost no time to adjust the conditions after assessing Plaintiff's adjustment to his release and gauging his efforts to reintegrate following his incarceration for a violation of probation." (*Id.* at 17-18.) But conditions of parole must be reasonably related to Plaintiff's past conduct and cannot be arbitrary and capricious "whether imposed prior to or subsequent to release." *Trisvan*, 284 F. Supp. 3d at 298-99 (internal quotation marks omitted). Defendants (or any parole officers, for that matter) are not permitted to impose unconstitutional conditions of parole merely because they are the "initial conditions" and Defendants may reel them back later so long as they deem Plaintiff to have sufficiently reintegrated. Accordingly, Defendants' argument that this special condition is valid, despite the fact that it is not reasonably related to Plaintiff's past conduct, is without merit.[5]

[5]  Defendants' arguments described in this section are raised with respect to all of the special conditions they imposed on Plaintiff. For the same reasons, those arguments are rejected as applied to all of the special conditions discussed below.

### 3. Vehicle Restrictions

Plaintiff alleges that Defendants violated his constitutional rights by restricting his ability to get a driver's license or ride in vehicles. (Compl. ¶¶ 9, 19.) Defendants argue that the vehicle restrictions were legitimate because they were not absolute bans but rather required Plaintiff to seek permission before getting in a car or obtaining a driver's license. (Ds' Mem. at 17.) Defendants further assert that "Courts have routinely upheld restrictions on parolees' movements and associations." (*Id.* (citing *Trisvan, 284 F. Supp. 3d at 299 & n.7* ("Traveling and access to vehicles, including a driver's license, may also be curtailed given Plaintiff's exhibited willingness to flee authorities.... The restriction on possessing a driver's license and operating a vehicle, in conjunction with the travel condition, may assist parole officers in monitoring Plaintiff's activities, a 'clearly legitimate penological objective.' ") (quoting *Muhammad v. Jenkins*, No. 12-CV-8525, 2014 U.S. Dist. LEXIS 158481, *18 (S.D.N.Y. Nov. 4, 2014)), and *Morrissey v. Brewer, 408 U.S. 471, 478 (1972)* ("Typically, [parolees] must seek permission from their parole officers before engaging in specified activities, such as ... acquiring or operating a motor vehicle ....")).) But these cases do not help Defendants, as Plaintiff has plausibly alleged that the vehicle restrictions were not reasonably related to the crimes he committed, at least on the record before me where there is no indication that his crimes involved vehicles or that he posed a flight risk.

**\*9** The cases on which Defendants rely do not change the Court's analysis. In *Trisvan*, the court asked whether the vehicle restrictions were "reasonably related to a parolee's past conduct," and it found that they were "given Plaintiff's exhibited willingness to flee authorities." *Trisvan, 284 F. Supp. 3d at 299*. Here, in contrast, there is nothing in the Complaint to suggest that Plaintiff had shown a willingness to flee authorities or was otherwise a flight risk. Nor can I determine at this stage that a ban on being in a car would be of any use in monitoring Plaintiff's activities or whereabouts. Thus, *Trisvan* does not help Defendants here.

The *Muhammed* opinion Defendants cited was a denial of a request for a preliminary injunction, and the Court merely noted that Plaintiff had a "checkered history as a parolee, replete with violations of parole conditions," which made it unlikely that he would succeed on the merits of a claim that an imposed curfew was unconstitutional. 2014 U.S. Dist. LEXIS 158481, *17-18 (internal quotation marks omitted). That case is not factually analogous to the case at hand.

Finally, while *Morrissey* explained that parolees typically (at least as of 1972) had to seek permission from their parole officers before acquiring or operating a motor vehicle, the conditions here are far more restrictive, as Plaintiff must seek permission to even be a passenger in one. (Compl. ¶ 19.) Further, *Morrisey* – which held that due process requires a hearing in connection with revocation of parole, *see 408 U.S. at 485-89* – did not address whether conditions of parole must be reasonably related to the parolee's past conduct, and does not contradict the law in this Circuit that they must. On the record before me now, there is nothing to suggest that Plaintiff's past conduct had anything to do with vehicles. And the possibility of case-by-case exceptions to a ban does not save an overly broad condition. *Yunus, 2019 WL 168544, at *16*. Accordingly, Plaintiff's claim that his special condition of parole restricting vehicle access violated his due process rights may proceed.

### 4. Computer and Internet Restrictions

Plaintiff alleges that conditions restricting his access to computers and the internet violated his First and Fourteenth Amendment rights. Defendants argue that the computer and internet restrictions are valid because they merely obligated Plaintiff "to seek and obtain permission from parole officials before using a computer or the internet, allowing close monitoring of his technology usage." (Ds' Mem. at 17 (citing *United States v. Browder, 866 F.3d 504, 511, n.26 (2d Cir. 2017)* (upholding supervised release condition allowing monitoring of plaintiff's computer usage)).) But again, Defendants' argument misses the mark. In *Browder*, the defendant "was convicted of possessing over 462 digital images of child pornography that he received (and shared) on internet exchanges, so computer monitoring is 'reasonably related' to the nature and circumstances of the offense and Browder's history and characteristics." *866 F.3d at 512*. Here, there is nothing to suggest that Plaintiff's underlying crime or probation violation involved computers or the internet, so there is no indication that imposing restrictions on all computer or internet use without permission is reasonably related to Plaintiff's conduct. In other words, Plaintiff has plausibly alleged that the restriction was not reasonably related to his past conduct.

Further, such restrictions may infringe on Plaintiff's First Amendment rights. *See United States v. Eaglin, 913 F.3d 88, 95 (2d Cir. 2019)* (parolees have constitutional right to internet access and restrictions on that right presented

heightened constitutional concerns, requiring more searching inquiry); *Browder*, 866 F.3d at 511 (even conditions imposing computer monitoring as opposed to a total ban have "a constitutional gloss"); *see also Lima*, 270 F. Supp. 3d at 702 ("[T]o satisfy substantive due process, such a restriction on a releasee's liberty 'must reflect the heightened constitutional concerns' of strict scrutiny, meaning that the deprivation must be 'narrowly tailored to serve a compelling government interest.' ") (quoting *Myers*, 426 F.3d at 126). At this stage, Plaintiff has alleged that the condition is not even reasonably related to his past conduct, so by definition he has also alleged that the condition would not survive a more searching inquiry. Accordingly, Plaintiff has sufficiently alleged that the computer and internet restrictions violated his rights guaranteed under the First Amendment as well as the Fourteenth, and Plaintiff's claim regarding this special condition may proceed.

**5. EMT Certification Restriction**

**\*10** Plaintiff claims that Morgiewicz's refusal to allow Plaintiff to obtain his EMT certification violated his First and Fourteenth Amendment rights. (Compl. ¶¶ 15, 20.) Defendants argue that that decision was not arbitrary and capricious and was reasonably related to Plaintiff's past conduct, and thus not unconstitutional, because "as an EMT, Plaintiff would come into contact with, and be obligated to treat, vulnerable persons, including minors." (Ds' Mem. at 18.) The problem with Defendants' argument, however, is that Plaintiff's claim relates only to his request to take classes to get his EMT certification. (Compl. ¶ 20.) As Plaintiff alleged, all EMTs must be at least eighteen years old, so Plaintiff has plausibly stated that he would not come into contact with minors – or at least not young minors near the age of the victim of his offense – by merely taking the certification classes. (Compl. ¶ 15.) Accordingly, this restriction is plausibly arbitrary and capricious, as it would deprive Plaintiff of the opportunity to pursue his desired occupation in the future, without achieving any desired goal of parole.[6]

[6] While Defendants suggest that Plaintiff could properly be prohibited from working as an EMT while on parole, the training would not necessarily be superfluous, as the record at this stage does not contain reference to any legal impediment

to Plaintiff obtaining such employment once his parole term concluded.

Further, Plaintiff has adequately alleged that the restriction violated his First Amendment right to pursue his desired occupation. While not entirely on point, there is well-established law in this Circuit that conditions of federal supervised release may not impose "an occupational restriction" on a releasee unless

> (1) a reasonably direct relationship exist[s] between the defendant's occupation and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted.

*United States v. Lombardi*, 727 F. App'x 18, 20 (2d Cir. 2018) (summary order) (internal quotation marks omitted). While the federal supervised release statute is different from New York's parole statute, the logic underlying the federal rule on occupational restrictions is persuasive in this context as well.

Defendants argue that there is a reasonable relationship between Plaintiff's conduct – a criminal sexual act with a six-year-old – and the occupational restriction: preventing potential access to minors. That might justify preventing Plaintiff from doing the job of an EMT while on parole, but it bears a more tenuous relationship to taking the classes for potential employment later on. Further, at this stage, Plaintiff has plausibly alleged that serving as an EMT would not create the risk that he would continue to engage in criminal misconduct similar to that for which he was convicted, because Plaintiff alleges that EMTs are always observed by their partners.[7] (Compl. ¶ 15.) Accordingly, he has plausibly stated that there is no risk that he would continue to engage in criminal sexual acts with minors if he served as an EMT,[8] and his claim regarding restrictions on EMT classes may proceed.

[7] Plaintiff also alleges that he would present no risk because EMTs cannot treat a minor without parental consent. (Compl. ¶ 15.) I do not find that

allegation plausible. It seems plain that parental consent cannot always be obtained in emergency situations, and even if it could, such consent would do little to mitigate the risk if the parent were not informed of Plaintiff's criminal history.

8    The Court is not convinced that an EMT is so closely supervised at all times that he could not endanger a child, but at this stage I must accept Plaintiff's allegations as true.

### 6. Requirement to Disclose Youthful-Offender Status to Colleges

Plaintiff next alleges that Rosenberger's condition that Plaintiff could attend college classes only if he disclosed his criminal history to the college violated his rights under the First and Fourteenth Amendments. (*Id.* ¶ 21.) Defendants argue that because "Plaintiff pleaded guilty to a sexual offense involving a minor, the condition is rationally related to his past conduct" because it "would permit school officials to be informed and take reasonably necessary measures to protect their students, some of whom may be minors." (Ds' Mem. at 18.) I disagree, at least at this stage.

*\*11  First, Defendants provide no authority suggesting that disclosure of sex-offender status to colleges is a reasonable condition of release. Second, colleges typically serve adult-aged students, and that some students may be minors – when Plaintiff's offense involved a minor so young that the chances of there being a college student of approximately that age are virtually nil – does not establish at this stage that a condition requiring disclosure before Plaintiff can access college is reasonably related to Plaintiff's criminal conduct. *Cf United States v. Peterson*, 248 F.3d 79, 86 (2d Cir. 2001) ("In view of the defendant's prior child sex abuse, the court had justification to impose a condition of probation that prohibits the defendant from being at educational and recreational facilities where children congregate.... [H]owever, there would be no justification to forbid the defendant from being at parks and educational or recreational facilities where children do not congregate."). Defendants' conclusory assertion that some minors may enroll in college is insufficient at this stage to defeat Plaintiff's claim. Accordingly, Plaintiff's claim regarding this special condition may proceed.

### 7. Requirement to Notify Defendants of Any Relationship

Plaintiff claims that Rosenberger imposed a condition under which Plaintiff had to "inform ... Rosenberger of all relationships formed by Plaintiff sexual or not," which violated his constitutional rights (Compl. ¶ 21.) Defendants argue that "a condition obligating Plaintiff to disclose his relationships to parole officials is rational to ensur[e] Plaintiff's continued rehabilitation, assisting parole officials in monitoring Plaintiff's compliance with conditions, and protecting members of the public." (Ds' Mem. at 18-19 (citing *Birzon*, 469 F.2d at 1243).) I find that Plaintiff has plausibly alleged that this condition was both unconstitutionally vague and violated his substantive due process rights.

"A condition is unconstitutional if it is so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Reeves*, 591 F.3d 77, 81 (2d Cir. 2010) (internal quotation marks omitted). Here, it is unclear to this Court what a "relationship ... sexual or not" would encompass. Would Plaintiff be at risk of re-incarceration if he waved to his neighbor but did not report that contact to his parole officer? What if he had a conversation with that neighbor in his elevator? Or what if he made a friend at his anger management classes and they had a conversation on their way home? Based on the inclusion of the term "sexual or not," Rosenberger may have been referring to any romantic relationship, but even that term has been found to be unconstitutionally vague in the post-release supervision context. *See Reeves*, 591 F.3d at 81. In any event, at this stage, I find Plaintiff has plausibly alleged that "people of common intelligence ... would find it impossible to agree on the proper application of a release condition triggered by entry into a ['relationship']." *Id.*

Further, Plaintiff has plausibly alleged that this restriction was not reasonably related to his past conduct. Regardless of what meaning one attributes to "relationship ... sexual or not," it is unclear how that relates to Plaintiff's criminal act involving his six-year-old cousin. There is nothing in the Complaint to suggest that Plaintiff ever engaged in any criminal act with a romantic partner or anyone else with whom he was in a relationship. (While the term "relationship" is undefined, the Court doubts Rosenberger was referring to the relationship Plaintiff had with his six-year-old cousin.) And the prohibition was not limited to relationships with children or with people who have children. A condition

this broad and restrictive, without any relation to Plaintiff's underlying offense, is plausibly arbitrary and capricious. Accordingly, Plaintiff may proceed on his claim regarding this special condition.

**E. Qualified Immunity**

Defendants argue that even if Plaintiff plausibly alleged that the special conditions of his parole were unconstitutional, Defendants are entitled to dismissal on qualified immunity grounds. (Ds' Mem. at 19-25.)

 **\*12**  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (internal quotation marks omitted), or insofar as it was objectively reasonable for the official to believe that his or her conduct did not violate such rights, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). A governmental official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see Creighton*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

As the Second Circuit recently explained:

> To be sure, qualified immunity should be resolved at the earliest possible stage in litigation. But there is an obvious, if rarely expressed, corollary to that principle: The immunity question cannot be resolved before the earliest possible stage, *i.e.*, prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised. And since qualified immunity is an affirmative defense that is typically asserted in an answer, as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion.

*Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (internal quotation marks, citations, emphasis, and alteration omitted). In other words, the Second Circuit has cautioned district courts against granting motions to dismiss on qualified immunity grounds. *See id.*; *see also Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order) ("[A] defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful.") (internal quotation marks and alteration omitted).

Here, Plaintiff has plausibly alleged that eight of the special conditions of his parole were not reasonably related to his past conduct, and thus those conditions violated his due process rights (as well as his First Amendment rights in some cases). As discussed at length in this opinion, it is well settled that conditions of release must be reasonably related to the parolee's underlying offense, and all parole officers should be aware of this fundamental legal principle setting the parameters of the conditions they may or may not impose. On one hand, once the facts are developed in discovery, it may come to light that Plaintiff's right to be free from all or some of his special conditions, given the facts and circumstances of his case, was not clearly established. On the other hand, it may become clear that no reasonable parole officer in the position of Defendants could have thought the restrictions to be constitutional. At this early stage, I cannot make that

determination. For that reason, Defendants' motion to dismiss on qualified immunity grounds is rejected.

## IV. CONCLUSION

**\*13** For the foregoing reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Plaintiff's Complaint is dismissed to the extent it seeks declaratory relief and brings claims against Defendants in their official capacities. Plaintiff's first claim – alleging procedural and substantive due process violations due to Defendants designating him as a discretionary sex offender – is also dismissed. Plaintiff's second claim is dismissed to the extent it is premised on the special condition that he was prohibited from having contact with minors without permission. Defendants' motion is denied in all other respects, and Plaintiff may proceed on claims regarding the following conditions: camera restrictions, vehicle restrictions, computer and internet restrictions, prohibition of obtaining his EMT

certification, required disclosure of youthful offender status to colleges, and required notice to Rosenberger of any relationships. The Clerk of Court is respectfully directed to terminate the pending motion. (Doc. 23.)

The parties shall attend a scheduling conference by telephone on August 6, 2020, at 4:15 p.m. Because Plaintiff did not amend his Complaint or oppose Defendants' motion, he may no longer intend to pursue this case. He is advised that if he fails to attend the conference as directed, this case may be dismissed under Federal Rule of Civil Procedure 41 for failure to prosecute, without further order. The Clerk of Court shall send Plaintiff a copy of this Opinion and Order.

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 4274226

---

**End of Document**　　　　　© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3818857

2018 WL 3818857
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Eugene LEWANDOWSKI

v.

UNITED STATES of America

Civil Action No. DKC 16-3421
|
Criminal No. DKC 14-0082
|
Filed 08/10/2018

**Attorneys and Law Firms**

Byron Brandon Warnken, Warnken, LLC, Pikesville, MD, for
Eugene Lewandowski.

John Michael Pelletieri, US Attorney's Office, Greenbelt,
MD, for United States of America.

**MEMORANDUM OPINION**

DEBORAH K. CHASANOW, United States District Judge

 **\*1** Presently pending and ready for resolution are the motion
to vacate sentence filed by Petitioner Eugene Lewandowski
("Petitioner") (ECF No. 43) and the government's motion
to seal its response in opposition (ECF No. 48). The issues
have been briefed, and the court now rules, no hearing
being deemed necessary. Local Rule 105.6. For the following
reasons, the motion to vacate sentence will be denied and the
motion to seal will be denied in part.

**I. Background**

On July 15, 2014, pursuant to a plea agreement, Petitioner
pled guilty to the charges of sexual exploitation of a minor
for the purpose of child pornography ("Count 1") and
transportation of child pornography ("Count 5"). Petitioner
was sentenced to 360 months on Count 1 and a concurrent
term of 240 months on Count 5. Petitioner appealed to the
United States Court of Appeals for the Fourth Circuit, which
dismissed the appeal on July 16, 2015, because Petitioner
"knowingly and voluntarily waived his right to appeal and ...
the issues [Petitioner sought] to raise on appeal f[e]ll squarely
within the compass of his waiver of appellate rights." (ECF
No. 39). Petitioner did not file a petition for writ of certiorari

with the Supreme Court of the United States. Accordingly,
Petitioner's convictions became final on October 14, 2015.
See *United States v. Sosa*, 364 F.3d 507, 509 (4th Cir.
2004) (stating that because the petitioner did not file a
petition for writ of certiorari in the Supreme Court, his
conviction became "final" for the purpose of § 2255's one year
statute of limitations ninety days after the court dismissed
his direct appeal (citing *Clay v. United States*, 537 U.S.
522, 525 (2003) ) (holding that "a judgment of conviction
becomes final when the time expires for filing a petition for
certiorari contesting the appellate court's affirmation of the
conviction") ).

On October 12, 2016, Petitioner filed the pending motion
to vacate sentence pursuant to 28 U.S.C. § 2255. (ECF No.
43). [1] The government was directed to respond and did so on
January 12, 2017. (ECF No. 49). The government also filed a
motion to seal its response. (ECF No. 48).

[1]     Petitioner also submitted a copy of the results of his
        Static-99 psychosexual evaluation, an evaluation
        used to assess a sex offender's risk of reoffending,
        performed on August 19, 2016. (*See* ECF No.
        43-1).

**II. Government's Motion to Seal**

**A. Standard of Review**

A motion to seal must comply with Local Rule 105.11 (D.
Md.2016), which provides that "[a]ny motion seeking the
sealing of pleadings, motions, exhibits or other papers to be
filed in the Court record shall include (a) proposed reasons
supported by specific factual representations to justify the
sealing and (b) an explanation why alternatives to sealing
would not provide sufficient protections." This rule endeavors
to protect the common law right to inspect and copy judicial
records and documents, *Nixon v. Warner Commc'ns, Inc.*,
435 U.S. 589, 597 (1978), while recognizing that competing
interests sometimes outweigh the public's right of access, *In
re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).
Before sealing any documents, the court must provide the
non-moving party with notice of the request to seal and an
opportunity to object. *Id.* at 234. This notice requirement
may be satisfied by docketing the motion "reasonably in
advance of deciding the issue." *Id.* at 235. Finally, the court
should consider less drastic alternatives to sealing, such as
filing redacted versions of the documents. If the court decides
that sealing is appropriate, it should also provide reasons,

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 135 of 267
Lewandowski v. United States, Not Reported in Fed. Supp. (2018)
2018 WL 3818857

### B. Analysis

**\*2** The government filed a motion to seal its response in opposition to Petitioner's motion to vacate sentence. (ECF No. 48). The government states that because it cites to its sentencing memorandum which was filed under seal and 18 U.S.C. § 3509(d)(2) provides that it must file any papers that disclose the name or other information concerning a child under seal, the response in opposition should remain under seal. The government does not explain why redactions or other less restrictive alternatives to sealing would not protect the sensitive information, as required by Local Rule 105.11. Additionally, § 3509(d)(2) provides that any person who files a paper that discloses the name of or any information concerning a child must "submit to the clerk of the court— (A) the complete paper to be kept under seal; *and (B) the paper with the portions of it that disclose the name of or other information concerning a child redacted, to be placed in the public record.*" (emphasis added). Accordingly, the government will be ordered to redact appropriate information from its response and file the redacted document within fourteen days. The original document will remain under seal.

### III. Motion to Vacate Sentence

#### A. Standard of Review

To be eligible for relief under § 2255, a petitioner must show, by a preponderance of the evidence, that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). If the § 2255 motion, along with the files and records of the case, conclusively shows that Petitioner is not entitled to relief, a hearing on the motion is unnecessary and the claims raised in the motion may be dismissed summarily. § 2255(b). If Petitioner makes this showing, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.*

#### B. Ineffective Assistance of Counsel

Petitioner argues that his defense counsel was ineffective at sentencing because counsel failed to (1) defend against the government's argument that Petitioner poses a significant risk for recidivism and (2) object to various "unconstitutional and unreasonable" probation terms.

In a motion to vacate pursuant to 28 U.S.C. § 2255 based on ineffective assistance of counsel, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984) ). When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland*, 466 U.S. at 690. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* at 105 (quoting *Strickland*, 466 U.S. at 190). In other words, "[f]or counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999). Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice could have resulted from some performance deficiency. To demonstrate prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694.

"Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because 'any amount of [additional] jail time has Sixth Amendment significance.' " *Lafler v. Cooper*, 566 U.S. 156, 165 (2012) (quoting *Glover v. United States*, 531 U.S. 198, 203 (2001) ).

#### 1. Recidivism

**\*3** Petitioner argues that counsel was ineffective because counsel failed to have him undergo a psychosexual evaluation prior to his sentencing hearing and failed to mitigate the government's argument that Petitioner was a significant risk for recidivism.[2] (ECF No. 43, at 8).

2      Petitioner argues that "Defense counsel knew, via the Government's sentencing memo[randum]" that the government would argue at sentencing that Petitioner had a high likelihood of recidivism. (ECF No. 43, at 9). The government argued that Petitioner was a significant risk for recidivism in its

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 136 of 267

Lewandowski v. United States, Not Reported in Fed. Supp. (2018)

2018 WL 3818857

sealed sentencing memorandum filed eleven days before the sentencing hearing.

Evaluating counsel's decision at the time it was made, "[t]he court doubts that the decision not to submit a medical evaluation 'amount[s] to incompetence under "prevailing professional norms." ' " *Brown v. United States*, No. CCB-09-1677, 2012 WL 1969677, at *2 (D. Md. May 31, 2012) (citations omitted). "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland*." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland*, 466 U.S. at 689).

As the Government points out, at sentencing it did not focus on Petitioner's potential recidivism, but rather on the nature and circumstances of Petitioner's offense. (*See* ECF No. 33, at 6-13). The government emphasized Petitioner's abuse of trust of the victim and victim's father as well as the breadth of Petitioner's child pornography collection and distribution. In response, defense counsel reasonably focused on Petitioner's remorse and willingness to change, indirectly addressing recidivism. At sentencing, counsel highlighted that while incarcerated Petitioner completed a program on getting motivated to change and served as a teaching assistant in an adult basic education class. (*Id.* at 16, 18). Counsel read Petitioner's letter to the court which reflected Petitioner's remorse and desire to seek counseling and change his ways. (*Id.* at 18-19). Counsel further argued that Petitioner "desperately wants" and "desperately needs treatment[,]" and specifically requested that the court impose treatment as a condition of his sentence and recommended one of two sex offender treatment programs available at a specific prison. (*Id.* at 20). In addition, counsel argued that Petitioner's criminal history under the Guidelines was overstated and that Petitioner's criminal history category should be I rather than II. (*Id.* at 15). Therefore, counsel presented mitigating evidence at sentencing and performed adequately.

Moreover, no prejudice resulted because Petitioner has not shown that the psychosexual evaluation would have changed his sentence.[3] As the court emphasized at Petitioner's sentencing hearing, Petitioner's conduct alone as to Count 1 "is deserving of an extremely harsh punishment[,]" as it is "unthinkable that someone in a parental role could do what [Petitioner did] to a child." (ECF No. 33, at 25). As

to Count 5, the court pointed out that the Guidelines were calculated on 600 or more images and that Petitioner had 14,000 images, the distribution of which was "ongoing and escalating." (*Id.* at 26). Thus, the Guidelines "capture only a part of the reprehensible conduct" that Petitioner engaged in. (*Id.*).

[3] This court may consider evidence about the actual process of decision to the extent such evidence is part of the sentencing record. *See Strickland*, 466 U.S. at 695.

**\*4** Petitioner points out that the psychosexual evaluation concludes that Petitioner "is at a moderate risk for reoffending upon his release into the community[.]" (ECF No. 43-1, at 3). However, Petitioner's emphasis on the distinction between moderate and significant risk for reoffending is of no moment.[4] Defense counsel performed adequately at sentencing and counsel's failure to have a psychosexual evaluation prepared did not result in any prejudice to Petitioner.[5] Therefore, his ineffective assistance claim fails on this basis.

[4] As the Government points out, Petitioner's score of 4 points on the Static-99 actually equates to a "moderate-high" risk for recidivism. *See Static-99—Tally Sheet*, http://www.static99.org/pdfdocs/static-99-coding-rules_e71.pdf.

[5] Petitioner argues that under American Bar Association standards, counsel's performance was deficient and objectively unreasonable. (ECF No. 43, at 8-9). However, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable, *but they are only guides*." *Strickland*, 466 U.S. at 688 (emphasis added).

## 2. Supervised Release Conditions

Petitioner also argues that counsel was ineffective for failing to object to the language and constitutionality of several supervised release conditions that were imposed at sentencing. (ECF No. 43, at 13, 19).

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 137 of 267

Lewandowski v. United States, Not Reported in Fed. Supp. (2018)

2018 WL 3818857

Petitioner was, of course, facing a lengthy sentence of imprisonment. Counsel necessarily focused on minimizing the term of incarceration. Supervised release would not begin for many years and conditions of supervision may always be modified during supervision. *United States v. Johnson,* 529 U.S. 53, 60 (2000); 18 U.S.C. § 3583(e)(2). Thus, counsel's decision not to challenge the proposed conditions must be viewed through that lens. Moreover, none of the now challenged conditions were inappropriate under the circumstances.

District courts have "broad latitude" to impose appropriate conditions of supervised release. *United States v. Armel,* 585 F.3d 182, 186 (4th Cir. 2009). However, any condition must satisfy two fundamental prerequisites. First, the condition must be " 'reasonably related' to the factors referred to in 18 U.S.C. § 3583(d)(1), which include 'the nature and circumstances of the offense and the history and characteristics of the defendant,' *id.* § 3553(a)(1); 'protect[ing] the public from further crimes,' *id.* § 3553(a)(2)(C); and 'provid[ing] the defendant with needed ... medical care[ ] or other correctional treatment,' *id.* § 3553(a)(2)(D)." *Armel,* 585 F.3d at 186 (alterations in original). Second, the condition must " 'involve[ ] no greater deprivation of liberty than is reasonably necessary' to achieve the goals enumerated in § 3553(a)." *Id.* (quoting 18 U.S.C. § 3583(d)(2) ) (alteration in original). Additionally, the sentencing court must provide "the rationale for the special conditions it imposes." *Id.*; *see, e.g.*, *United States v. Shannon,* 743 F.3d 496, 502 (7th Cir. 2014) ("Adequate findings are especially important when the subject matter of the ban is a lifetime ban on otherwise-legal material."); *United States v. Warren,* 186 F.3d 358, 366 (3d Cir. 1999) ("[C]ourts of appeals have consistently required district courts to set forth factual findings to justify special ... conditions.").

**\*5** *United States v. Maxson,* 281 F.Supp.3d 594, 596 (D. Md. 2017).

### a. Restricted Contact with Minors

Petitioner first challenges the supervised release condition that, unless approved by a probation officer, he will "have no contact with people under the age of 18" and "will not congregate or loiter near any school, park, playground, arcade, or other places frequented by children under the age of 18[.]" (ECF No. 33, at 27). Petitioner argues that prohibiting him from having contact with anyone under the age of eighteen is a greater deprivation of liberty than necessary

under § 3583(d)(2) because "the sexual contact involved in this case involved a child much more younger than 18" and "[r]estrictions against interacting with teenagers who are just shy of adult age has no relationship to [his] case." (ECF No. 43, at 15). Petitioner further argues that this restriction "could include a server in a restaurant, a clerk at a store, a minor on a bus, or numerous other examples." (*Id.*). Lastly, on this point, Petitioner argues that nothing in the record suggests that his conduct has anything to do with his activities in public places.

Contrary to Petitioner's contention, the condition does not prohibit him from having contact with anyone under the age of eighteen without prior approval. After imposing the condition, the court explicitly stated, "This provision does not apply to people under the age of 18 with whom you must deal in order to obtain ordinary and usual commercial services[,]" and provided a clear example—"That is, if they're working at a place you are frequenting." (ECF No. 33, at 28). Thus, this condition does not "swe[ep] so broadly that it would effectively prevent him from going to the grocery store unaccompanied." (ECF No. 43, at 15). Petitioner could do just that.

The government cites to several cases where other courts have upheld conditions of supervised release that restrict a defendant's contact with minors and prohibit the defendant from congregating or loitering at locations frequented by minors when the offense shows that the defendant poses a risk to children. *See* *United States v. Shultz,* 733 F.3d 616, 619-20 (6th Cir. 2013); *United States v. Ellis,* 720 F.3d 220, 225-226 (5th Cir. 2013); *United States v. Smith,* 606 F.3d 1270, 1282-83 (10th Cir. 2010); *United States v. Moran,* 573 F.3d 1132, 1140 (11th Cir. 2009); *United States v. Stoterau,* 524 F.3d 988, 1008 (9th Cir. 2008); *United States v. Johnson,* 446 F.3d 272, 280-81 (2d Cir. 2006); *United States v. Ristine,* 335 F.3d 692, 696-97 (8th Cir. 2003). In the Fourth Circuit, a particular restriction does not require an "offense-specific nexus." *United States v. Worley,* 685 F.3d 404, 407 (4th Cir. 2012) (quoting *United States v. Perazza-Mercado,* 553 F.3d 65, 70 (1st Cir. 2009) ). The court may impose any condition that is "reasonably related" to the relevant statutory sentencing factors. *Id.*

**\*6** Petitioner's offense shows that he is a risk to minor children and the condition is not overly broad or vague. Petitioner sexually abused a minor child, recorded it, and had over 14,000 images of child pornography on his computer. The condition imposed serves the statutory sentencing purposes of public protection and rehabilitation under 18

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 138 of 267

Lewandowski v. United States, Not Reported in Fed. Supp. (2018)

2018 WL 3818857

U.S.C. §§ 3553(a)(2)(C) and (D) and does not impose a deprivation greater than necessary in the case of Petitioner.

**b. Restrictions on Viewing Sexually Explicit Material**
Petitioner also challenges the constitutionality of the condition that he "not own, use, possess, view, or ready any material, including pictures, photographs, books, writings, drawings, videos or video games depicting and/or describing sexually explicit conduct or frequent any place that is involved with pornography as defined in [18 U.S.C. § 2256(2) ]" (ECF No. 33, at 28). Petitioner argues that this condition is exceedingly broad and is a greater deprivation of liberty than necessary under § 3583(d). (ECF No. 43, at 17).

Petitioner cites to cases where probation conditions prohibiting the possession of any "pornography" were struck down on appeal because the conditions were unconstitutionally vague. (*Id.* at 16) (citing *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002); *United States v. Loy*, 237 F.3d 251, 254 (3d Cir. 2001) ).

In *Guagliardo*, the condition that the petitioner not possess "any pornography" was deemed unconstitutionally vague because it did not inform the petitioner of what is encompassed by "pornography" and thus what conduct could result in his being returned to prison. In *Loy*, the defendant challenged his probation condition that prohibited him from possession "all forms of pornography, including legal adult pornography." The court held that the prohibition on pornography was "unconstitutionally vague because it fail[ed] to provide any method for Loy or his probation officer to distinguish between those items that are merely titillating and those items that are 'pornographic' "; nor did the prohibition "provide any guidance as to whether the restriction extend[ed] only to visual materials, or whether purely textual works and sound recording f[e]ll within its scope." *Id.* at 254. In *Loy*, the court grappled with dictionary definitions of "pornography" and found that the various definitions "clearly lack[ed]" precision. *Id.* at 263-64.

Here, the court specified that the restriction includes "any material" that "depict[s] and/or describe[s] sexually explicit conduct or frequent any place that is involved with pornography as defined in 18 [U.S.C. § 2256(2) ]." (ECF No. 33, at 28). The condition is not merely a blanket prohibition on "pornography." 18 U.S.C. § 2256(2)(A) defines "sexually explicit conduct" as "actual or simulated (i) sexual intercourse ...; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition

of the genitals or pubic area of any person[.]" Although Petitioner argues that this condition would prohibit him from reading classic novels and visiting Barnes & Nobles bookstores, the restriction on sexually explicit materials and sexually oriented establishments should be read in a "commonsense way" and does not include such material and establishments. *See Ellis*, 720 F.3d at 226-27 (citations omitted).

**\*7** Petitioner also does not cite to any binding authority that would suggest that the condition is a greater deprivation of liberty than necessary in his case. This circuit has upheld terms of supervised release that restrict possessing or viewing any sexually explicit material even when the defendant's offense involves a minor only. *United States v. Lord*, 393 Fed.Appx. 60, 63 (4th Cir. 2010) ("[T]he condition is reasonable, given Lord's background and the need for the district court to protect the public."); *United States v. Henson*, 22 Fed.Appx. 107, 112 (4th Cir. 2001) ("In light of defendant's conviction for receiving more than 100 images of child pornography and his prior conviction for taking indecent liberties with a minor, the special condition of supervised release restricting his possession of any sexually explicit material was not overly broad and was sufficiently related to the goals of rehabilitating defendant and protecting the public[.]"). The government cites to numerous cases where courts have upheld conditions of supervised release that prohibit a defendant from possessing sexually explicit materials or from frequenting places where sexually explicit materials are available. *See United States v. Carpenter*, 803 F.3d 1224, 1240 (11th Cir. 2015); *Ellis*, 720 F.3d at 226-27; *United States v. Zobel*, 696 F.3d 558, 576-77 (6th Cir. 2012); *United States v. Thompson*, 653 F.3d 688, 694-96 (8th Cir. 2011); *United States v. Thielemann*, 575 F.3d 265, 273 (3d Cir. 2009); *United States v. Daniels*, 541 F.3d 915, 927-28 (9th Cir. 2008).

As the government points out, Petitioner's own submitted psychosexual evaluation provides that Petitioner's "prolific use of pornography ... featured both child and adult subjects engaged in a range of sexual activity and behaviors" and that "even with healthy outlets for his sexual urges, [Petitioner] remained strongly compelled to view pornography and engage in masturbatory activity." (ECF No. 43-1, at 3). During this evaluation, Petitioner "admitted to an interest in pornography that dated back to young adolescence and that grew to include images of child pornography when he himself was still a child." (*Id.*). Petitioner has not shown that the condition was a greater deprivation of liberty than necessary.

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 139 of 267
Lewandowski v. United States, Not Reported in Fed. Supp. (2018)
2018 WL 3818857

The condition is reasonably related to the sentencing purposes of public protection and Petitioner's rehabilitation.

### c. Computer and Internet Restrictions

Lastly, Petitioner challenges the constitutionality of the condition that he "not use any computer system, internet-capable device and/or similar electronic device at any location ... without the prior approval of the probation office." [6] (ECF No. 33, at 28-29). Petitioner argues that restricting his internet access will deprive him of "today's preeminent means of communication" and that internet use "had little to do" with his offense, rendering "the wholesale ban on Internet access a greater deprivation of liberty than necessary to promote adequate deterrence." (ECF No. 43, at 18). Petitioner cites to no binding authority to support his position, and the court does not agree that Petitioner's collection and distribution of child pornography using an internet-based file sharing program has "little to do" with his offense. Petitioner distributed child pornography to countless individuals using file sharing programs, including undercover officers. At the time of his arrest, Petitioner had at least 14,000 images and videos of child pornography on his computers and other digital media. Petitioner's submitted psychosexual evaluation provides that Petitioner "manifests many aspects of an addictive behavior in regards to his use of the Internet. His excessive use of the Internet, his repeated attempts to quit, his compulsion to return to it, and his attempts to hide the behavior are all consistent with a model of addictive behaviors." (ECF No. 43-1, at 3). Notwithstanding Petitioner's conduct in his offense, Petitioner may seek prior approval by a probation officer to use the internet, and thus the condition is not a "wholesale ban" on his internet use. "[R]estrictions on internet and computer use are often imposed in cases involving child pornography," *Ellis*, 720 F.3d at 225, and "[a] condition limiting the use of a computer or an interactive computer service [is recommended] in cases in which the defendant used such items[,]" U.S.S.G. § 5D1.3(d)(7)(B). This condition is reasonably related to the sentencing factors and is not a greater deprivation of liberty than necessary. [7]

[6]    Petitioner incorrectly recites this condition as one prohibiting his computer use unless approved by a probation officer for legitimate work. (ECF No. 43, at 18). After imposing the condition the court provided an example of when a probation officer might provide prior approval—"[t]hat is, they can

approve if it becomes necessary for you to have access for legitimate work." (ECF No. 33, at 29).

[7]    Petitioner also argues that "any computer system" could reasonably be read to include an ATM, a self-checkout machine at a grocery store, or a navigation system. (ECF No. 43, at 19). However, the "categorical term 'computers' is subject to a 'commonsense understanding of what activities the category[y] encompass[es]'" and would not include such systems. *Ellis*, 720 F.3d at 225 (citing *United States v. Paul*, 274 F.3d 155, 167 (5th Cir. 2001) ).

**\*8** Petitioner has not shown that the terms of supervised release are unconstitutional, and thus that Counsel's performance was deficient in failing to object to them. Counsel performed adequately and, after invitation by the court, raised reasonable objections to the conditions regarding contact with minors (that Petitioner should not be prohibited from having contact with his minor son) and computer use (that a complete restriction is unreasonable but monitoring is appropriate). (*See* ECF No. 33, at 21-23).

Additionally, Petitioner was not prejudiced by counsel's alleged errors. Petitioner is currently serving a 30-year sentence of imprisonment at the conclusion of which his supervised release will commence. After his release from imprisonment, Petitioner will complete a sex offender risk assessment and psychosexual evaluation where the court can better assess at that time which conditions should remain or should be modified. Petitioner has suffered no prejudice by the alleged errors in counsel's performance, and thus his ineffective assistance of counsel claim fails.

### IV. Conclusion

For the foregoing reasons, the motion to vacate sentence filed by Petitioner Eugene Lewandowski will be denied. The government's motion to seal will be denied in part.

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. §§ 2254 or 2255, the court is also required to issue or deny a certificate of appealability when it enters a final order adverse to the petitioner. A certificate of appealability is a "jurisdictional prerequisite" to an appeal from the court's order. *United States v. Hadden,* 475 F.3d 652, 659 (4th Cir. 2007). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where the court denies the petitioner's motion on its

2018 WL 3818857

merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller–El v. Cockrell*, 537 U.S. 322, 336–38 (2003). Upon its review of the record, the court finds that Petitioner does not satisfy the above standard. Accordingly, it declines to issue a certificate of appealability. A separate order will follow.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3818857

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 730608
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dominic CENTONZE, Plaintiff,

v.

Otsego County Deputy Sheriff and Investigator
Jason MUNSON, in his Individual Capacity, Otsego
County Probations Officer and Supervisor Timothy
E. DeForest, in his Individual Capacity, Defendants.

1:19-CV-1017 (MAD/ATB)
|
Signed 02/13/2020

**Attorneys and Law Firms**

DOMINIC CENTONZE, 18-B-2867, Greene Correctional
Facility, Post Office Box 975, Coxsackie, New York 12051,
Plaintiff pro se.

OF COUNSEL: COREY A. RUGGIERO, ESQ., LORAINE
CLARE JELINEK, ESQ., JOHNSON & LAWS, LLC, 648
Plank Road, Suite 204, Clifton Park, New York 12020,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

 **\*1**  On August 19, 2019, Plaintiff *pro se* Dominic Centonze
("Plaintiff"), an inmate currently in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), commenced this action under 42
U.S.C. § 1983 alleging that Defendants violated his federal
constitutional rights under the First, Eighth, and Fourteenth
Amendments, as well as alleging state law claims including
negligent inflection of emotional distress and negligence. *See*
Dkt. No. 1 at 6–11.

On October 25, 2019, Defendants filed a motion to
dismiss the complaint, arguing that the complaint must be
dismissed based on applicable immunity doctrines, applicable
conditions precedent, and the lack of a plausible claim against
Defendants. *See* Dkt. No. 5-1 at 1. Thereafter, on November
1, 2019, Plaintiff filed a letter motion for an extension of time
to file a response to Defendants' motion to dismiss. *See* Dkt.
No. 6. The Court granted this request, extending Plaintiff's
response date to December 23, 2019. *See* Dkt. No. 7. Plaintiff
filed a response with the Court on January 9, 2020, *see* Dkt.
No. 9, which the Court accepted. *See* Dkt. No. 12.

**II. BACKGROUND**

Plaintiff's claims arise from a series of events stemming from
his November 3, 2017 guilty plea to unlawful surveillance
in the second degree. *See* Dkt. No. 1 at ¶¶ 7–8. Plaintiff
was sentenced to six months in the Otsego County Jail and
received a ten-year term of supervised probation. *See id.* at
¶ 9. Plaintiff was sentenced in accordance with the terms
of the original plea agreement on March 30, 2018, which
was later modified on April 6 of the same year to vacate
the portion of his sentence that required him to register as
a sex offender. *See id.* at ¶¶ 10–12. Plaintiff was released
from custody on April 9, 2018. *See id.* at ¶ 13. At this
time, Plaintiff's computer, which had previously been seized
from him in connection with his underlying conviction, was
returned to him by Defendant Jason Munson, Otsego County
Deputy Sheriff and Investigator. *See* Dkt. No. 5-1 at 2.

On April 12, 2018, Defendant Timothy E. DeForest, an
Otsego County Probation Officer and Supervisor, visited
Plaintiff's home. *See* Dkt. No. 5-1 at 2. During the course
of that visit, Defendant DeForest discovered illicit materials
contained on the computer owned and possessed by Plaintiff.
*See id.* Plaintiff alleges that this was the same computer "that
had been returned to him two days earlier" by Defendant
Munson. *See* Dkt. No. 1 at ¶ 15. Plaintiff further alleges
that Defendant DeForest located material that he believes
should have been removed by Defendant Munson before
releasing the computer back to Plaintiff, but was not. *See
id.* at ¶ 16. Plaintiff indicates that he had explained this
to Defendant DeForest during the home visit, but that
Defendant DeForest "failed to verify Plaintiff's statement with
Defendant Munson, or Defendant's attorney Randal Scharf,
which Plaintiff immediately informed of the contents of the
computer as soon as he became aware of it's [sic] existence."
*See id.* at ¶ 23.

 **\*2**  On April 24, 2018, a violation report was filed
with the Otsego County Court, whereupon the terms of
Plaintiff's probation were modified, including a requirement
that Plaintiff needed to wear a tracking device. *See id.* at
¶ 18. "[B]ased upon information gleaned from the tracking

2020 WL 730608

device," Defendant DeForest filed a Violation of Probation Petition with the Otsego County Court on May 7, 2018. *Id.* at ¶ 19. On July 13, 2018, the Court held a hearing based upon Defendant DeForest's report, whereupon Plaintiff testified that the computer given to Plaintiff contained "pre-trial arrest material which the Plaintiff was convicted for." *Id.* at ¶¶ 21–22.

After the hearing on July 13, 2018, Plaintiff alleges that he suffered severe depression and requested that Defendant DeForest permit him to see his psychotherapist, Charlotte Black. *See id.* at ¶ 24. Plaintiff alleges that, despite his insistence that he felt suicidal, Defendant DeForest continually denied this request, ultimately leading to Plaintiff's attempted suicide by carbon monoxide poisoning. *See id.* at ¶ 24. Plaintiff also alleges that Defendant DeForest retained medical records from a neurologist after a visit with this doctor, which prevented Plaintiff from being able to receive additional medical testing at Bassett Hospital. *See id.* at ¶¶ 26–27. Plaintiff further alleges that Defendant DeForest refused to allow Plaintiff to attend church services at a particular church in Cooperstown, New York, "without cause, or a probation stipulation which ... required Plaintiff to refrain from religious services." *Id.* at ¶ 28. Plaintiff contends that these events occurred as a result of Defendant Munson's returning a computer to Plaintiff with illicit material on it from Plaintiff's underlying offense, and Defendant DeForest's refusal to include information relating to the same in his violation report. *See generally* Dkt. No. 1.

Although it is not entirely clear, the Court has construed Plaintiff's complaint as raising the following claims: (1) a substantive due process claim under the Fourteenth Amendment relating to the return of Plaintiff's computer with illicit material and subsequent probation violation; (2) denial of medical care in violation of the Eighth and Fourteenth Amendments; (3) denial of the right to attend religious services in violation of the First Amendment; (4) conspiracy to violate Plaintiff's civil rights; and (5) selective enforcement and treatment in violation of the Fourteenth Amendment.

## III. DISCUSSION

### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111–12 (2d Cir. 2007). In

considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *Twombly*, 550 U.S. at 558, 570.

**\*3** Despite this recent tightening of the standard for pleading a claim, complaints by *pro se* parties continue to be accorded more deference than those filed by attorneys. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation omitted). As such, *Twombly* and *Iqbal* notwithstanding, this Court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 146 (2d Cir. 2002) (quotation omitted).

### B. Consideration of the Otsego County Probation Department Order and Conditions of Probation and Updated Pre-Sentence Investigation Report

In both Defendants' motion to dismiss and Plaintiff's response to the motion to dismiss, additional documents were filed by the parties. Both Defendants and Plaintiff submitted a copy of the Otsego County Probation Department Order and Conditions of Probation in the matter of *The People of the State of New York vs. Dominic J. Centonze, Probationer*, Otsego County Court of the State of New York, Docket #: 2017-052. *See* Dkt. No. 5-2; Dkt. No. 9 at 21–26. Plaintiff additionally submitted an Updated Pre-Sentence Investigation Report dated October 22, 2018, signed by Defendant DeForest. *See* Dkt. No. 9 at 12–17.

The Court is normally confined to consider only the complaint and "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits" on a Rule 12(b)(6) motion to dismiss. *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effects, which renders the document integral to the complaint." *Chambers*, 282 F.3d at 153.

In the present matter, the Court finds that it is appropriate to consider both the Otsego County Probation Department Order and Conditions of Probation as well as the Updated Pre-Sentence Investigation Report. This is because "the harm to [a party] when a court considers material extraneous to a complaint is the lack of notice that the material may be considered." *Id.* (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)). These documents were also "in [the other party's] possession or of which [the other party] had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.3d 142, 150 (2d Cir. 1993). Because Plaintiff and Defendants attached the same document, the Otsego County Probation Department Order and Conditions of Probation, it is clear that there was notice of the material being considered. Additionally, both documents were heavily incorporated by reference in the complaint. As such, the Court will consider both documents when determining the merits of Defendants' motion.

## C. Defendant DeForest's Entitlement to Absolute Immunity

Initially, Defendant DeForest moves to dismiss Plaintiff's complaint on the ground that, when filing a Violation of Probation Petition, probation officers are entitled to absolute

immunity inasmuch as they are acting as an arm of the judiciary. *See* Dkt. No. 5-1 at 4–7.

"As a general matter, probation officers are entitled to immunity in the performance of their duties, but the type of immunity afforded depends on whether 'the duties of the defendants were judicial or prosecutorial, which entitles them to absolute immunity, or administrative, which may entitle them to qualified immunity.' " *Dettelis v. Sharbaugh*, 919 F.3d 161, 164 (2d Cir. 2019) (quoting *King v. Simpson*, 189 F.3d 284, 288 (2d Cir. 1999)). Probation officers are entitled to absolute immunity in "initiating parole revocation proceedings and in presenting the case for revocation to hearing officers." *Dettelis*, 919 F.3d at 164 (quoting *Scotto v. Almenas*, 143 F.3d 105, 112 (2d Cir. 1998)). "By contrast, in performing investigatory duties, for example, the filing of a violation report or recommending the issuance of an arrest warrant, a parole officer is entitled only to qualified immunity." *Dettelis*, 919 F.3d at 164; *see also Scotto*, 143 F.3d at 111; *Roberts ex rel. Estate of Roberts v. Lapp*, 297 Fed. Appx. 67, 69 (2d Cir 2008) (holding state parole officer entitled to qualified immunity in recommending issuance of a parole warrant); *Malik v. Mackey*, 268 Fed. Appx. 83, 84 (2d Cir 2008) (holding state parole officer entitled to qualified immunity when filing parole violation charges).

**\*4** In the context "of the issuance of a Violation of Probation, ... it is the judge who actually signs the Violation of Probation and makes the determination to issue the arrest warrant[,]" not the probation officer in question. *Gelatt v. Cnty. of Broome*, 811 F. Supp. 61, 68 (N.D.N.Y. 1993); N.Y. Crim. Proc. Law § 410.40(2) ("Where the probation officer has requested that a probation warrant be issued, the court shall ... issue or deny the warrant....").

"The cases regarding the preparation and filing of probation- and parole-violation reports ... explain that such supervisory conduct is investigatory in nature, and, therefore, comparable to the role of a police officer rather than that of a judge or prosecutor." *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 382 (E.D.N.Y. 2009); *see also Gelatt*, 811 F. Supp. at 69 (holding that "absolute immunity is not available 'for one whose complaint causes a warrant to issue' ") (quoting *Malley v. Briggs*, 475 U.S. 335, 340 (1986)).

Defendant DeForest argues that the filing of a violation report and/or a violation of Probation Petition initiated the prosecution of Plaintiff's probation violation, that he therefore engaged in a prosecutorial function, and is subsequently

entitled to absolute immunity. *See* Dkt. No. 5-1 at 6–7. However, based upon the Court's review of Second Circuit precedent, the issuance of a Violation of Probation or a probation violation report is more often considered to be engaging in investigatory conduct, which is not entitled to absolute immunity. As such, the Court is not inclined to afford Defendant DeForest absolute immunity at this time.

**D. Plaintiff's Failure to Satisfy Conditions Precedent**
To the extent that Plaintiff's complaint alleges state tort claims for negligent infliction of emotional distress and negligence, Defendants contend that Plaintiff's claims should be dismissed due to failure to satisfy conditions precedent. *See* Dkt. No. 5-1 at 7–11.

As a general rule, "state notice-of-claim statutes apply to state-law claims" asserted as pendant claims in a federal action. *Hardy v. NYC Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988); *Fincher v. Cnty. of Westchester*, 879 F. Supp. 989, 1002 (S.D.N.Y. 1997) (noting that New York's 90-day notice-of-claim requirement applies to state tort claims brought as pendent claims in a federal action)). "Pursuant to New York General Municipal Law § 50-e, a plaintiff who asserts a state law tort claim against a municipal entity or its employees for acts that occurred within the scope of their employment must file a notice of claim within ninety days after the incident giving rise to the claim." *Maier v. New York City Police Dep't*, No. 08-CV-5104, 2009 WL 2915211, *3 (E.D.N.Y. Sept. 1, 2009). "Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94.

In order to survive a motion to dismiss, a plaintiff "must plead that: (1) a notice of claim was served; (2) at least thirty days elapsed since the notice of claim was filed and before the complaint was filed; and (3) in that time, the defendant neglected to or refused to adjust or satisfy the claim." *Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 251 (E.D.N.Y. 2013). "The plaintiff bears the burden of demonstrating compliance with the notice of claim requirement." *Chabot v. Cnty. of Rockland, New York*, No. 18-CV-4109, 2019 WL 3338319, *9 (S.D.N.Y. July 25, 2019).

 **\*5** Here, Plaintiff has failed to allege that he met the notice of claim requirements to pursue negligent infliction of emotional distress and negligence claims against both Defendants for alleged acts committed within the scope of their employment

as an Otsego County Deputy Sheriff and Investigator and an Otsego County Probations Officer and Supervisor. Plaintiff has also submitted no justification for the failure to file a notice of claim. Accordingly Plaintiff's seventh, eighth, ninth, and tenth causes of action must be dismissed. *See Lopez v. City of New York*, No. 15-CV-7292, 2018 WL 2744705, *14 (E.D.N.Y. June 7, 2018) (dismissing the plaintiffs' state claims because they "did not allege in their complaint that at least thirty days elapsed between when the notice of claim was served and when they filed suit.... While dismissal might seem like a harsh sanction for such a pleading omission, the statutory text is clear").

**E. Defendants' Personal Involvement in Injurious "State Action"**
It is well established that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct under the doctrine of *respondeat superior* is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325–26 (1981); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). The personal involvement of a supervisory official may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly

negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).

In *Ashcroft v. Iqbal*, the Supreme Court held that, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. The Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," because that "conception of 'supervisory liability' is inconsistent with [the principle that supervisors] may not be held accountable for the misdeeds of their agents." *Id.* at 677. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

A plaintiff may establish that a defendant was personally involved in the underlying alleged conduct by showing that the defendant "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (citing *Colon*, 58 F.3d at 873).

**\*6** At this time, the Court finds that the complaint sufficiently alleges the personal involvement of Defendant DeForest. The complaint alleges that Defendant DeForest examined Plaintiff's computer during a visit to Plaintiff's residence on April 12, 2018, located illicit material on Plaintiff's computer that allegedly was not removed by Defendant Munson, and filed a violation report on April 24, 2018. *See* Dkt. No. 1 at ¶¶ 15–17. The complaint further alleges that "Plaintiff had informed Defendant Deforest at the home visit on April 12th, 2018, that the computer was given to him by Defendant Jason Munson with the illicit

material still contained on it ... and failed to verify Plaintiff's statement with Defendant Munson, or Defendant's attorney Randal Scharf....." *Id.* at ¶ 23. In light of the allegations in the complaint and Plaintiff's *pro se* status, the Court finds that Plaintiff has alleged sufficient facts to survive this argument with respect to Defendant DeForest.

Defendants assert that Plaintiff conceded that Defendant Munson should be dismissed because he is not mentioned in Plaintiff's opposition memorandum. *See* Dkt. No. 15 at 2. In his complaint, Plaintiff only alleges that he "was provided with computer equipment by Defendant Otsego County Deputy Sheriff Munson that was seized from Plaintiff's home ... [and that the computer] continued to possess images and recordings that were the basis of the Plaintiff's conviction for Unlawful Surveillance in the Second Degree." Dkt. No. 1 at ¶ 14. Plaintiff's claims ultimately relate to events taking place after Defendant Munson allegedly returned a computer to Plaintiff. There are no facts alleging that Defendant Munson was the individual responsible for the removal of any materials from Plaintiff's computer. As such, the Court finds that Plaintiff has not alleged sufficient facts to survive this argument with respect to Defendant Munson.

**F. Eighth Amendment**

The Eighth Amendment forbids the imposition of punishment that is "cruel and unusual." U.S. Const. amend. VIII. Plaintiff claims that his rights under the Eighth Amendment were violated by Defendants because they denied him access to medical care, including "failed[ure] to promptly allow Plaintiff to see his psychotherapist, despite the fact defendant was aware of Plaintiff's mental health status." Dkt. No. 1 at ¶¶ 38, 43.

"[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). At the time that the alleged Eighth Amendment violations occurred in this case, Plaintiff was not incarcerated or institutionalized, having been released from custody on April 9, 2018. *See* Dkt. No. 1 at ¶ 13. Plaintiff's claims that Defendants were deliberately indifferent are thus appropriately analyzed under the Fourteenth Amendment, not the Eighth. *See, e.g., McGhie v. Main*, No. 11–CV–3110, 2011 WL 4852268, \*5 (E.D.N.Y. Oct. 12, 2011) (denying deliberate indifference claim where plaintiff, who was on supervised released, "was not incarcerated or institutionalized when, as he alleges, he was deprived of necessary psychiatric

care.... The fact that such psychiatric care was a condition of [Plaintiff]'s supervised release does not alter the analysis").

As such, Plaintiff's deliberate indifference claims under the Eighth Amendment are dismissed against both Defendants.

### G. Fourteenth Amendment

Although Plaintiff generally raised a claim under the Fourteenth Amendment, *see* Dkt. No. 1 at ¶ 34, he asserted a substantive due process theory for the first time with regards to his deliberate indifference claim in his response to the pending motion. *See* Dkt. No. 9 at 6. While Defendants argue that the Court should not recognize this claim as opposition papers are generally an inappropriate channel by which to advance new claims, *see R.S. v. Bd. of Educ. Shenendehowa Cent. Sch. Dist.*, No. 1:17-CV-0501, 2017 WL 6389710, *6 (N.D.N.Y. Dec. 13, 2017), as Plaintiff generally addressed the Fourteenth Amendment in his *pro se* complaint, the Court will address this argument briefly.

**\*7** Generally, to establish a substantive due process violation, a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the government's action were conscience-shocking or arbitrary in the constitutional sense. *See Little v. City of New York*, 487 F. Supp. 2d 426, 443 (S.D.N.Y. 2007) (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)). The "shock the conscience" standard is not easily met; the plaintiff must show that the government's conduct was " 'egregious' " and " 'outrageous,' " "not merely incorrect or ill-advised." *Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006) (quotation omitted).

To satisfy his or her burden, a plaintiff must demonstrate that the defendant's actions were "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Matican v. City of New York*, 524 F.3d 151, 158 (2d Cir. 2008). Official conduct "must be truly brutal and offensive to human dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (internal quotation marks and citation omitted). In *Lewis*, the Supreme Court noted that intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. On the other end of the spectrum, the Supreme Court has emphasized that "negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.*; *see also Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (distinguishing between intentionally inflicted harms, which are likely to rise to

conscience shocking level, and negligently inflicted harms, which cannot constitute conscience-shocking behavior).

To the extent that Plaintiff's complaint can be read to assert a claim against Defendant DeForest for a violation of his substantive due process rights, the Court finds that the claim must be dismissed. Plaintiff has failed to plead any facts plausibly suggesting conduct so egregious as to constitute a violation of substantive due process. In his complaint and opposition papers, Plaintiff acknowledges that he was provided with regular and continuing medical treatment during the course of his probation. *See* Dkt. No. 15 at 6 n.6. Plaintiff also had the opportunity to petition the Otsego County Court to seek the ability to travel to different doctors' offices or religious services. *See* Dkt. No. 5-2 at ¶ 21. While Plaintiff criticizes the decisions of Defendant DeForest, he fails to allege conduct that transgressed the "outer limit" of legitimate governmental action or that is fairly viewed as so "brutal" and "offensive to human dignity" that it shocks the conscience. *See Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421, 434 (N.D.N.Y. 2005) (citations omitted).

The only conduct that Defendant Munson could potentially be personally involved in relates to returning the computer to Plaintiff without first ensuring that the illicit material was removed from it. Plaintiff's complaint makes clear, however, that Defendant Munson acted negligently when he returned the computer to Plaintiff. Since Plaintiff is not alleging that Defendant Munson placed this evidence on the computer himself, Plaintiff is not bringing a more common fabrication of evidence claim. Rather, the Court can also construe Plaintiff's claim with regards to Defendant Munson as a general substantive due process claim. "[N]egligently inflicted harm is categorically beneath the threshold" for a substantive due process claim and even conduct exhibiting "deliberate indifference ... demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking," *Lombardi*, 485 F.3d at 82 (quotation omitted). Because Plaintiff has failed to plead any facts which could merit such condemnation, his substantive due process claim against Defendant Munson must be dismissed.

**\*8** As such, Plaintiff's deliberate indifference claims under the Fourteenth Amendment are dismissed against both Defendants.

### H. First Amendment

Plaintiff alleges that Defendant DeForest "refused to allow Plaintiff to attend church service for the pastor Dane Boston,

at the Episcapal [sic] church in Cooperstown, NY. Plaintiff requested as soon as he was released to start attending church, however, Defendant Deforest denied him without cause, or a probation stipulation which would require Plaintiff to refrain from religious services." Dkt. No. 1 at ¶ 28. Defendants allege that Defendants' ability to attend church services was curtailed at the time Plaintiff was convicted of a felony offense, that he gave up his rights to attend church services of his choosing, and that Plaintiff possessed the ability to petition the Otsego County Court to attend the services of his choice. *See* Dkt. No. 15 at 6–7.

"First Amendment rights may be curtailed only by the least drastic means." *United States v. Kahane*, 396 F. Supp. 687, 699 (E.D.N.Y. 1975) (citations omitted). "Any limitation on exercise of religious freedom rights must be as narrow as practicable and clearly related to an appropriate governmental need. Limitations must affect prisoners and parolees with 'the least denigration of the human spirit and mind consistent with the needs of a structured correctional society.' " *United States v. Hernandez*, 209 F. Supp. 3d 542, 546 (E.D.N.Y. 2016) (quoting *Kahane*, 396 F. Supp. at 702) (failing to provide Jewish prisoner with kosher meals deprived him of his First Amendment right). "A condition that prevents defendant from attending his place of worship because minors attend the same services is not the least drastic means of ensuring the public's safety. It violates defendant's right to religious observance." *Hernandez*, 209 F. Supp. 3d at 546.

Presently, it does not appear that there is a condition of Plaintiff's probation that relates specifically to church services; rather, Plaintiff must "stay away from places where children under 17 years of age are known to congregate, including but not limited to parks, schools playgrounds, arcades, or any other area deemed inappropriate...." Dkt. No. 5-2 at ¶ 42. Defendants similarly allege that "Plaintiff's rights to travel to ... church services (let alone a particular church that was in the town where Plaintiff's victim, an infant male, was a resident and may have attended the same church) of his choosing and on Plaintiff's own schedule were undisputedly curtailed at the time that Plaintiff was convicted...." Dkt. No. 15 at 6–7 (original emphasis removed).

Plaintiff "has a right to attend church services. Preventing him from going to his place of worship because the services are also attended by minors unnecessarily burdens that right." *Hernandez*, 209 F. Supp. 3d at 547. Defendants have provided no legal justification for this limitation beyond speculation that Plaintiff's victim "may have attended the same church,"

which is not sufficient to survive a motion to dismiss. Dkt. No. 15 at 6. Additionally, this information is not properly before the Court on a motion to dismiss. At this stage, in light of Plaintiff's *pro se* status and the facts alleged in Plaintiff's complaint, the Court is inclined to allow Plaintiff's claim under the First Amendment to proceed against Defendant DeForest.

## I. The Merits of Plaintiff's Conspiracy Claim

**\*9** Plaintiff alleges that Defendants "conspired to violate Plaintiff's statutory civil rights in violation of 42 U.S.C.A. § 1983...." Dkt. No. 1 at ¶ 47. " 'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' " *Benitez v. Ham*, No. 9:04-CV-1159, 2009 WL 3486379, \*18 (N.D.N.Y. Oct. 21, 2009) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right. *See Malsh v. Austin*, 901 F. Supp. 757, 763–64 (S.D.N.Y. 1995) (citation omitted). Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights. *See id.*; *see also Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted).

To withstand a motion to dismiss, the conspiracy claim must contain more than " 'conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights[.]' " *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quotation omitted); *Shabazz v. Pico*, 994 F. Supp. 460, 467 (S.D.N.Y. 1998) (holding that a mere allegation of conspiracy with no facts to support it cannot withstand a motion to dismiss). Specifically, the plaintiff must provide some factual basis supporting a "meeting of the minds," such as that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999). "Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977).

Plaintiff's conspiracy claim is supported by only conclusory and vague allegations of a conspiracy, which is insufficient to state a plausible claim. *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) (citing cases). Plaintiff merely alleges

that Defendants "conspired to violate Plaintiff's statutory civil rights." Dkt. No. 1 at ¶ 47. Such conclusory assertions are clearly insufficient to state a plausible conspiracy claim. Based on the foregoing, the Court grants Defendants' motion as to Plaintiff's conspiracy claim against both Defendants.

**J. Selective Enforcement**

Although Plaintiff's claim of selective enforcement is far from clear, it appears that Plaintiff is attempting to allege that Defendant DeForest violated his rights under the Fourteenth Amendment by unfairly enforcing his conditions of supervised release.

To establish a selective enforcement claim against a state actor, plaintiffs must show

> (1) that they were treated differently from other similarly situated individuals, and

> (2) that such differential treatment was based on " 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' "

*Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (quotations omitted); *accord Posr v. Pascale*, No. 15 Civ. 584, 2017 WL 1366004, *5 (E.D.N.Y. Apr. 12, 2017).

In the present matter, Plaintiff has failed to plausibly allege facts supporting either element of this claim. Specifically, as to the second element, nothing in the complaint supports the inference that Defendants' actions were based on impermissible considerations or that they were undertaken in a bad faith effort with the intent to injure Plaintiff. Simply put, Plaintiff's conclusory allegations fall far short of asserting a selective enforcement claim. [1]

---

[1]    Although not raised in Defendants' motion to dismiss, under 28 U.S.C. § 1915(e)(2), a court "may *sua sponte* dismiss a claim if it is frivolous, malicious, or fails to state a claim." *Hartnett v. Tetreault*, No. 9:07-cv-952, 2009 WL 2971576, *3 (N.D.N.Y. Sept. 11, 2009); *see also Rodriguez v. Goord*, No. 9:06-CV-1288, 2009 WL 3122951, *2 (Sept. 28, 2009).

**K. Defendants' Entitlement to Qualified Immunity**

**\*10** Qualified immunity " 'protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known.' " *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). A public official is entitled to qualified immunity where his or her conduct does not implicate a constitutional right or where the conduct at issue does not violate a clearly established constitutional right. *See Lore*, 670 F.3d at at 166 (citing *Harlow*, 457 U.S. at 818).

For a constitutional right to be clearly established, its "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citations omitted). Qualified immunity provides protection "to all but the plainly incompetent or *those who knowingly violate the law.*" *Vincent*, 718 F.3d at 166 (internal quotation marks and citations omitted). An official's actions are not protected by qualified immunity by virtue of the fact that his or her action in question has not previously been held unlawful. *See Hope*, 536 U.S. at 739; *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). "[I]f decisions from this or other circuits clearly foreshadow a particular ruling on the issue," the Court may treat the law as clearly established. *Terebesi*, 764 F.3d at 231 (internal quotation marks omitted).

Qualified immunity is an affirmative defense and, as such, Defendants bear the burden of proving that the privilege of qualified immunity applies. *See Vincent*, 718 F.3d at 166; *Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). The Second Circuit has made clear that it disfavors granting qualified immunity at the motion to dismiss stage. *See McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (citing *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)) (noting that generally "the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted"). Notably, a defendant asserting a qualified immunity defense on a motion to dismiss "faces a formidable hurdle ... and is usually not successful." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006). In this regard, the defense will succeed only where entitlement to qualified immunity can be established "based [solely] on the facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness.... That is, '[e]ven if the right at issue was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.' " *Id.* (quotations omitted).

In their motion, Defendants generally contend that "both Defendants are entitled to qualified immunity as a matter of law since there was no 'clearly established law' on April 10, 2018, which imposed an affirmative obligation upon Munson to become the *de facto* information technology consultant for Plaintiff and to remove illicit materials from Plaintiff's computer prior to returning it to him." Dkt. No. 5-1 at 22. Similarly, Defendants argue that "there was no clearly established law in April 2018 which compelled DeForest to include in his report information which was extraneous to the actual stated grounds for the revocation of Plaintiff's probation." *Id.*

 **\*11** Having already dismissed the stated claims against Defendant Munson, the Court declines to address the qualified immunity issue as to him. As to Defendant DeForest, the only remaining claim is that Defendant DeForest denied Plaintiff the right to attend religious services in violation of the First Amendment. Since the application of qualified immunity was not addressed in the pending motion as to this claim, Defendants' motion to dismiss on this ground is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss is **GRANTED** in part and **DENIED** in part as set forth above; [2] and the Court further

[2]    Based on the foregoing, the only claim that survives at this stage is Plaintiff's claim of denial of religious services under the First Amendment against Defendant DeForest.

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 730608

2020 WL 6900909

2020 WL 6900909
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Ramon LOPEZ, Plaintiff,

v.

Tina M. STANFORD, et al., Defendants.

18-CV-3493 (RRM) (LB)
|
Filed 11/24/2020

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, Chief United States District Judge

**\*1** *Pro se* plaintiff Ramon Lopez ("Lopez") brings this civil rights action against the chairwoman and various employees of the New York State Board of Parole, the Director of Operations and two other employees of RevCore Recovery Center, a Nassau County Family Court judge, and his ex-wife, Mayra L. Lopez, principally challenging the restrictions imposed on him as conditions of his release to parole supervision alleging that the conditions violate the federal and New York State Constitutions. (Second Amended Complaint ("SAC") (Doc. No. 65).) Presently before the Court are his Mayra Lopez's motion for judgment on the pleadings, and the remaining defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated below, Myra Lopez's motion is granted, and the remaining defendants' motions are granted in part and denied in part.

**BACKGROUND**

On August 19, 2016, Lopez was released from custody after serving a five-year sentence for sex offenses. (SAC ¶ 14.) Shortly after his release from custody, in September 2016, Lopez was served with an order of protection issued by Nassau County Family Court Judge Felice J. Muraca restraining him from contact with his ex-wife, Mayra I. Lopez, an Assistant District Attorney in Nassau County. (SAC ¶ 19.)

On June 13, 2018, Lopez filed a *pro se* civil rights complaint against Tina M. Stanford, the Chairwoman of the New York State Board of Parole ("BOP"); Mayra Lopez; Judge Muraca; and three other parole officials – primarily challenging certain conditions of his parole as violative of the federal and New York State Constitutions. (Compl. (Doc. No. 1).) The complaint sought declaratory and injunctive relief, as well as damages.

On July 3, 2018, Lopez filed an amended complaint in which he added Audra Grant and Rayna Ramirez as defendants. Grant and Ramirez are named in this action by virtue of their employment at RevCore Recovery Center LLC ("RevCore"), where Lopez was ordered to participate in alcohol and substance abuse treatment as a mandatory condition of his parole.

Lopez also filed his first TRO motion in July. He alleged that specific parole conditions including requiring that he attend domestic violence and alcohol and substance abuse treatment programs were unrelated to his criminal conduct. That motion was denied because he did not provide any factual allegations about his crime of conviction, leaving the Court no basis to conclude that the conditions were not reasonably and necessarily related to the state's interests in light of the conduct for which he was convicted. (Mem. & Order (Doc. No. 12).)

On August 17, 2018, Lopez filed a motion for reconsideration, acknowledging that he "inadvertently did not include" the "pertinent factual evidence pertaining to his crime of conviction" in his original motion for an injunction and TRO. (Pl.'s Mem. of Law (Doc. No. 15-2) at 2.) [1] On October 1, 2018, Lopez withdrew that motion and replaced it with a second TRO motion, seeking a TRO, preliminary injunction, and appointment of *pro bono* counsel. (Second TRO Mot. at 2.) Unlike the first motion for a TRO, the second TRO motion provided the Court with documents describing his offense. (Exs. 13–14 to Second TRO Mot. (Doc. No. 30-2) at 28–39.) On four distinct occasions, Lopez sexually abused women, ranging in age from 25 to 31. (Order of 3/22/2019 (Doc. No. 44) (citing Pre-Sentence Report, Ex. 14 to Second TRO Mot. (Doc. No. 30-2) at 38).) After representing that he was a taxi driver, Lopez would offer to drive the victim home. (Pre-Sentence Report at 38.) Once the victim was in the back of his car, he would pull over his car, climb in the back seat, and get on top of the victim. While holding the victim down, he would rub his penis against the victim and with his final victim, he removed his penis from his pants and

rubbed it on the victim's vagina and forced her to touch his penis. (*Id.*) Lopez pleaded guilty to sexual abuse, unlawful imprisonment, forcible touching, and harassment in violation of several provisions of New York Penal Law. (*Id.*) Lopez was sentenced to five years in custody, followed by ten years of supervised release. (*Id.*)

1        The Court uses the page numbers assigned by ECF.

**\*2**  The Court denied Lopez's second TRO motion, except with respect to limitations on communication for which the Court ordered additional factual development. (Mem. & Order (Doc. No. 44).) On May 31, 2019, the BOP ordered that the special condition concerning Lopez's access to the internet and use of a smartphone with a camera be removed effective immediately, mooting additional factual development. (Letter from Parole Board (Doc. No. 52).)

On July 12, 2019, Lopez filed his SAC, the operative pleading in this action. All of his claims stem directly from his conviction, possibly with the exception of his ninth cause of action challenging the lawfulness of the order or protection that defendant Mayra Lopez obtained against him. Lopez names additional RevCore employees as defendants, Tabitha Forte, Marta Hendozka, and Justyna Rzewinki, each of whom are alleged to have been RevCore employees at the time that Lopez received treatment from RevCore. (SAC ¶¶ 10–13.) Apart from Lopez's state law claims against RevCore employees, all of Lopez's claims for constitutional violations are brought pursuant to 42 U.S.C. § 1983. (SAC ¶ 1.) The SAC does not name Rayna Ramirez as a defendant.

Lopez's first three causes of action all relate to parole conditions restricting his internet access. Lopez's first cause of action alleges that Stanford, Senior Parole Officer Tina Shaw, and Parole Officer Lisa Duquesnay violated his First Amendment right by setting a parole condition restricting his internet and social media. (SAC ¶¶ 60–64.) Lopez's second cause of action alleges that Shaw and Duquesnay violated his First Amendment right to free exercise of religion by restricting his internet and social media access, thereby preventing him from using a smartphone to access religious texts. (SAC ¶¶ 65–69.) His third cause of action alleges that the BOP and the New York State Department of Corrections and Community Supervision ("DOCCS") violated his First Amendment right by preventing him from using a computer as a condition of his parole. (SAC ¶¶ 70–73.)

Lopez's fourth cause of action alleges that Stanford, Shaw, and Duquesnay violated his First, Eighth, and Fourteenth

Amendment rights by instituting various conditions of parole including internet-access restrictions pursuant to the Electronic Security and Targeting of Online Predators Act ("e-STOP") and requirements that he enroll in RevCore's substance and alcohol abuse program and register with the Domestic Violation alert system. (SAC ¶¶ 74–79.) Lopez contends that none of these conditions are related to his crime and are therefore arbitrary and capricious.

Pursuant to the conditions of his release, Lopez's residence must be approved by parole. Lopez, apparently having remarried, sought to live with his new wife and her daughter, but that request was denied and Lopez moved into a shelter. (SAC ¶ 81.) In his fifth cause of action, Lopez alleges that DOCCS, Stanford, Shaw, and Duquesnay violated his Fifth, Eighth, and Fourteenth Amendment rights by not permitting him to live with his wife and stepdaughter. (SAC ¶¶ 80–83.) Lopez claims that shelter housing impedes his ability to successfully complete parole and that he was only denied his choice of home because it was easier for parole to supervise him at a shelter, where his parole officer supervised other parolees. (SAC ¶ 82.)

Lopez's sixth cause of action alleges that DOCCS violated his Fifth, Eighth, and Fourteenth Amendment rights by forcing him to attend domestic violence and substance/alcohol abuse treatment program. (SAC ¶¶ 84–86.) Lopez contends that his crime did not relate to domestic violence and he does not suffer from substance or alcohol abuse and therefore imposition of these programs was unconstitutional. (SAC ¶¶ 84–86.) Lopez's seventh cause of action alleges that DOCCS violated his constitutional rights by mandating that Lopez attend sex offender treatment until his parole ends on March 19, 2027. (SAC ¶¶ 87–90.) His eighth cause of action alleges that eight different conditions of his parole violate his constitutional rights and he holds BOP and DOCCS liable for these violations. (SAC ¶¶ 91–99.)

**\*3**  Lopez's ninth cause of action alleges that Mayra Lopez and Judge Muraca acted together to violate his constitutional rights by issuing an order of protection against Lopez. (SAC ¶¶ 100–03.) He claims that Mayra Lopez and Judge Muraca were colleagues by virtue of Mayra Lopez's employment as a Nassau County Assistant District Attorney and therefore the order of protection issued by Judge Muraca was unethical and violated his due process rights. (SAC ¶¶ 13, 20, 100–03.)

Lopez's final cause of action alleges that RevCore and Grant violated his due process right and state laws by terminating

him from his treatment program prior to completion based upon a false drug test. (SAC ¶¶ 104–10.) RevCore, though mentioned in the tenth cause of action, has not been named as a defendant in this action. Lopez also alleges that his termination was retaliatory and therefore violated his First Amendment rights. He claims he was only terminated after filing a grievance about his treatment at RevCore with the New York State Office of Addiction Services and Supports ("OASAS"), the state agency that oversees the state's addiction services. (SAC ¶¶ 52–54.) Lopez seeks declaratory and injunctive relief as well as damages.

On August 16, 2019, the BOP, DOCCS, Stanford, Shaw, Duquesnay, and Judge Muraca (collectively the "State Defendants"), filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). (State Defendants' Mot.) The State Defendants move, among other things, to dismiss the SAC for failing to state a claim because the SAC does not describe the facts underlying Lopez's crime of conviction, which forecloses the Court's ability to evaluate the lawfulness of Lopez's conditions of release. (State Defendants' Mot. at 14.) The State Defendants also argue that they are entitled to dismissal because Lopez's parole conditions are constitutional. (State Defendants' Mot.) Finally, the State Defendants argue that Judge Muraca is entitled to absolute judicial immunity and that the Eleventh Amendment bars Lopez's claims against the BOP and DOCCS, as well as his claims for monetary damages against the State Defendants sued in their official capacity. (State Defendants' Mot.)

Mayra Lopez filed a motion for judgment on the pleadings primarily arguing that Lopez cannot sustain a § 1983 claim against her because the SAC fails to allege any state action by Mayra Lopez when she obtained an order of protection against him. (Mayra Lopez Mot. (Doc. No. 90).)

On November 4, 2019, Marta Hendozka, Justyna Rzewinski, Tabitha Forte, and Grant (collectively, the "RevCore Defendants") also filed a motion to dismiss pursuant to Rule 12(b)(6). (RevCore Defendants' Mot. (Doc. No. 109).) The RevCore Defendants assert that they are entitled to dismissal because Lopez has not stated a claim for a violation of the New York Criminal Code, and because a § 1983 claim for First Amendment retaliation and denial of due process cannot be asserted against the RevCore Defendants because they are not state actors and their conduct was not under the color of state law. (Id.) Lopez opposes the motions. (Lopez Opp. to Mayra Lopez Mot. (Doc. No. 91); Lopez Opp. to State Defendants' Mot. (Doc. Nos. 99 and 106);

Lopez Opp. to RevCore Defendants' Mot. (Doc. No. 121-1).) In response to the State Defendants' argument that they are entitled to dismissal because Lopez does not describe the facts underlying his conviction, Lopez points to a December 2012 Pre-Sentence Investigation Report, which provides a brief summary of his crime. (Exhibit 2 to Lopez Opp. to Mayra Lopez Mot. (Doc. No. 91-2).)

## STANDARDS OF REVIEW

### I. Rule 12(b)(1)

**\*4** Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for dismissal of an action where the court lacks subject matter jurisdiction – that is, "when the district court lacks the statutory or constitutional power to adjudicate" the case. *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam)); FED. R. CIV. P. 12(b)(1). Plaintiffs bear the burden of showing that subject matter jurisdiction exists. *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir. 2011). On a motion to dismiss pursuant to Rule 12(b)(1), "a court accepts as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003). Nevertheless, the district court may refer to evidence outside the pleadings, such as documents or affidavits, without converting the motion to one for summary judgment. *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.8 (2d Cir. 2006).

### II. Rule 12(b)(6) and 12(c)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "detailed factual allegations," but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). That is, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). The determination of whether "a complaint

states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)). "In a judgment on the pleadings under Rule 12(c) we apply the same standard as that applicable to a motion under Rule 12(b)(6)." *Faconti v. Potter*, 242 F. App'x 775, 777 (2d Cir. 2007) (summary order).

Generally, the Court's review is limited to facts alleged in the complaint, documents attached to the complaint or incorporated by reference in the complaint, documents integral to the complaint, and matters of which the Court may take judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

When a plaintiff proceeds pro se, however, the Court "may consider materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (citation and quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[ ] either possessed or knew about and upon which [the plaintiff] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

**\*5** *Cianfano v. Vill. of Tuckahoe*, No. 18-CV-7882 (KMK), 2019 WL 3456887, at *3 (S.D.N.Y. July 31, 2019). The Court finds that the Pre-Sentence Report, attached to Lopez's Second TRO Motion is consistent with the allegations in the complaint and therefore considers it. The Pre-Sentence Report, which Lopez has previously filed in this case, provides additional details regarding Lopez's crime of conviction. The Court also considers the conditions of Lopez's release, Exhibit A to his Amended Complaint, on this motion as it is within the "four corners of the complaint," despite Lopez's failure to attach it to his SAC. (DOCCS Special Conditions of Release ("Conditions"), Ex. A to Am. Compl. (Doc. No. 9-1).) The "four corners of the complaint" include "any documents attached to that pleading or incorporated into it by reference, any documents that are 'integral' to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice." *BLT Rest. Grp. LLC v. Tourondel*, 855 F.Supp.2d 4, 15 (S.D.N.Y. 2012); *see DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

## III. Standards Applied to *Pro Se* Litigants

The Court holds *pro se* complaints to a less exacting standard than those drafted by attorneys. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Boykin v. KeyCorp*, 521 F.3d 202, 213–14 (2d Cir. 2008). The Court reads *pro se* pleadings to "raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal citations omitted). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the Court must grant leave to amend the complaint. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Ashmore v. Prus*, 510 F. App'x. 47, 48 (2d Cir. 2013) (summary order) ("District courts should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend.").

## DISCUSSION

## I. Claim Against Mayra Lopez

A § 1983 claim "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Therefore, private parties are not proper defendants in a § 1983 action unless the private parties were acting under color of state law. *Jae Soog Lee v. Law Off. of Kim & Bae, PC*, 530 F. App'x 9, 9 (2d Cir. 2013) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)). "[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Id.* (internal quotation marks omitted). A "conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). Rather, to demonstrate a § 1983 conspiracy between a private party and a state authority sufficient to survive a motion to dismiss, plaintiff must show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Id.* at 324–25. "[C]omplaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977). Moreover, "assertions

[that] lack any factual foundation ... are merely conclusory allegations 'masquerading as factual conclusions' [and] are insufficient to defeat a motion to dismiss." *Jackson v. Cnty. of Rockland*, 450 Fed. App'x 15, 19 (2d Cir. 2011) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006)).

In his SAC, Lopez asserts a § 1983 claim against Mayra Lopez but fails to plausibly allege that she was acting under the color of state law. Lopez alleges in conclusory fashion that Mayra Lopez used her status as an Assistant District Attorney to conspire with Judge Muraca to obtain an order of protection against Lopez. (SAC ¶¶ 100–03.) However, absent from the SAC are any allegations that plausibly allege that Mayra Lopez was acting under the color of state law when she sought an order of protection against her ex-husband. Mayra Lopez's employment as an Assistant District Attorney does not mean that her every action can be characterized as state action. *See Patterson v. Cty. of Oneida*, N.Y., 375 F.3d 206, 230 (2d Cir. 2004). Lopez also wholly fails to allege specific facts that would plausibly show the existence of any agreement or concerted action between Mayra Lopez and Judge Muraca. Accordingly, Lopez's claim against Mayra Lopez is dismissed with prejudice.

## II. Claim Against Judge Muraca

**\*6** It is well settled that judges have absolute immunity for their judicial acts performed in their judicial capacities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991); *Stump v. Sparkman*, 435 U.S. 349, 356 (1978); *Dupree v. Bivona*, No. 07-CV-4599, 2009 WL 82717, at \*1–2 (2d Cir. Jan. 14, 2009) (summary order); *Colson v. New York Police Dept.*, No. 13-CV-5394 (JG) (CLP), 2015 WL 64688, at \*6 (E.D.N.Y. Jan. 5, 2015). This absolute "judicial immunity is not overcome by allegations of bad faith or malice," nor can a judge "be deprived of immunity because the action [she] took was in error ... or was in excess of [her] authority." *Mireles*, 502 U.S. at 11 (quotation omitted); *see also Horton v. City of New York*, No. 14-CV-4279 (KAM), 2014 WL 3644711, at \*1 (E.D.N.Y. July 22, 2014); *Edo v. Queens Cty. Criminal Court*, No. 13-CV-7089 (JBW), 2013 WL 6732811, at \*1 (E.D.N.Y. Dec. 19, 2013); *Gamez v. U.S. Dist. Court E. & S. Dist. of Tyranny, N.Y.*, No. 11-CV-4068 (KAM), 2011 WL 3949807, at \*1 (E.D.N.Y. Sept. 6, 2011).

Judge Muraca is entitled to absolute judicial immunity for his issuance of an order of protection against Lopez and therefore Lopez's claim against him must be dismissed. Lopez fails to allege any facts to suggest that Judge Muraca was

without jurisdiction or acted outside of his judicial capacity in issuing the order of protection against Lopez. Accordingly, Lopez's claim against Judge Muraca is foreclosed by judicial immunity. In light of the dismissal of the claim against Mayra Lopez and Judge Muraca, Lopez's ninth cause of action, alleged against only these two defendants, is dismissed.

## III. Claims Against the State and Its Officers In Their Official Capacity

States enjoy sovereign immunity from suit in federal court pursuant to the Eleventh Amendment of the United States Constitution. *See Harrison v. New York*, 95 F. Supp. 3d 293, 314 (E.D.N.Y. 2015). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Woods v. Roundout Valley cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (internal quotation marks omitted) (citation omitted). State agencies or employees cannot be sued in federal court in their official capacities, absent the state's consent or an express statutory waiver of immunity by Congress. *See Gollomp v. Spitzer*, 568 F.3d 355, 365–66 (2d Cir. 2009); *Holmes v. Caliber Home Loans, Inc.*, No. 16-CV-3344 (KMK), 2017 WL 3267766, at \*5 (S.D.N.Y. July 31, 2017).

The State Defendants contend that all claims against BOP, DOCCS, and individual State Defendants sued in their official capacity should be dismissed under Rule 12(b)(1) as barred by the Eleventh Amendment. (State Defendants' Mot. at 28.) New York State has not waived its Eleventh Amendment immunity and consented to suit in federal court. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38–40 (2d Cir. 1977). BOP and DOCCS are arms of the state and are therefore entitled to Eleventh Amendment immunity. As such, the Eleventh Amendment precludes Lopez's request for monetary damages against the BOP, DOCCS, and the State Defendants in their official capacities. *See Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (dismissing claims against DOCCS and individual defendants sued in their official capacities on Eleventh Amendment grounds); *Ford v. Miller*, No. 18-CV-1815 (PAE) (BCM), 2019 WL 6831640, at \*13 (S.D.N.Y. Aug. 23, 2019), *report and recommendation adopted*, No. 18-CV-1815 (PAE), 2019 WL 4673445 (S.D.N.Y. Sept. 25, 2019) (same). The Court notes that the *Ex parte Young* exception to Eleventh Amendment immunity would apply to Lopez's claims against the individual State Defendants because Lopez seeks prospective injunctive relief, however this is inconsequential because, as discussed below, all claims

against the State Defendants are dismissed on the merits. *See Ex parte Young*, 209 U.S. 123 (1908).

## IV. Claims Against Stanford and Shaw

**\*7**  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation and internal quotation marks omitted). "Personal involvement can be shown by evidence that the defendant 'participated directly in the alleged constitutional violation'; or that the defendant acted in a supervisory capacity by creating a policy or custom under which violations occurred, by negligently supervising subordinates, or by failing to act or remedy wrongs after being aware of them." *Anderson v. City of New York*, 817 F. Supp. 2d 77, 93 (E.D.N.Y. 2011) (quoting *Colon*, 58 F.3d at 873). "[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Put differently, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.

State Defendants argue that Stanford and Shaw are entitled to dismissal because Lopez has failed to plausibly allege their personal involvement in the violations of his constitutional rights. (State Defendants' Mot. at 25–27.)

### a. Stanford

Lopez alleges that Stanford, who is the Chairwomen of the New York State Division of Parole and oversees the BOP, is responsible for the broad duties of the BOP, including "mandating the conditions of release of any person who may be presumptively released or conditionally released ...." (SAC ¶ 5.) Lopez also alleges that Stanford violated his First Amendment right by restricting his internet and social media access, and that "[n]ot amending [this] Condition for all parolees ... will continue to jeopardize 'Modern Free Speech' in the technological era we live in today." (SAC ¶ 61.) These statements are nothing more than a bare assertion that Stanford is a supervisor, which is insufficient to state a § 1983 claim. Lopez has failed to allege any factual basis upon which a fact finder could reasonably conclude personal involvement by Stanford. Thus, the claims against her are dismissed.

### b. Shaw

Lopez alleges that Shaw, a senior parole officer, directly supervises Duquesnay. (SAC ¶ 8.) Lopez alleges that Shaw was present on September 13, 2016, when he was asked to remove the camera from his smartphone as a condition of his parole. (SAC ¶ 21.) Lopez asked Shaw and Duquesnay multiple questions about why this condition was imposed and they refused to answer. (*Id.*) Lopez further alleges that after Duquesnay told him he could not work as paralegal, he asked to speak with Shaw, but Shaw refused to answer his questions "and instead directed advised [sic] not to work as a Paralegal or be subjected to a violation of parole ..." (SAC ¶¶ 23–24.) Lopez further alleges that "Duquesnay spoke to Shaw and unlawfully refused to honor" his request to live with his wife and Duquesnay and Shaw denied his request to have internet access in June 2018. (SAC ¶¶ 34, 42.)

In light of Lopez's *pro se* status, the Court finds that Lopez has sufficiently alleged Shaw's personal involvement in the alleged constitutional violations. Unlike Stanford, Shaw's role in supervising Lopez's parole extends beyond that of an uninvolved supervisor. Shaw was present for at least one meeting with Lopez where Shaw and Duquesnay enforced a condition of his parole and Shaw cautioned Lopez against accepting employment that would violate his parole. Viewed liberally, Lopez has sufficiently alleged that Shaw actually enforced certain conditions of his parole, which is sufficient to constitute her personal involvement. Accordingly, the State Defendants' motion to dismiss the claims against Shaw on account of her lack of personal involvement is denied.

## V. Challenges to Parole Conditions

**\*8**  Challenges to parole conditions are cognizable under Section 1983. *See, e.g., Singleton v. Doe*, No. 14-CV-0303 (MKB), 2014 WL 3110033, at \*3 (E.D.N.Y. July 7, 2014); *Trisvan v. Annucci*, 284 F. Supp. 3d 288, 296 (E.D.N.Y. 2018). "Section 1983 provides a civil cause of action for damages and injunctive relief against any person who acts under color of state law to deprive another of a constitutional right." *Bailey v. N.Y.C. Police Dep't*, No. 93-CV-1281 (CPS), 1993 WL 416544, at \*1 (E.D.N.Y. Sept. 28, 1993).

While parolees are not without constitutional rights, they are subject to "restrictions not applicable to other citizens" and enjoy only "the conditional liberty properly dependent on observance of special parole restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480, 482 (1972). "Although a parolee should enjoy greater freedom in many respects than a prisoner, we see no reason why the Government may not impose restrictions on the rights of the parolee that are

reasonably and necessarily related to the interests that the Government retains after his conditional release." *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972).

Government interests are considered "in light of the crime and circumstances related to [the parolee's] conviction." *Trisvan*, 284 F. Supp. 3d at 296. Generally, "the imposition of conditions—whether imposed prior to or subsequent to release, by the parole board or a field parole officer— must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses." *Singleton*, 2014 WL 3110033, at *3 (quoting *Robinson v. New York*, No. 09-CV-0455, 2010 WL 11507493, at *3 (N.D.N.Y. Mar. 26, 2010)); *see also Robinson*, 2010 WL 11507493, at *6 ("[W]here the condition is not related to the parolee's criminal history or to the State's interests, it may be prone to tailoring or invalidation.").

### a. First Cause of Action
Pursuant to his conditions of release, Lopez had to obtain permission before using services that provide access to the internet, and he was prohibited from using online services involving "the exchange of electronic messages." (Conditions at 5, 10.) Lopez also was restricted from using the internet to access social networking websites, among other restrictions. (*Id.* at 9.) These restrictions were removed in May 2019. (Letter from Parole Board (Doc. No. 52).) Lopez's first cause of action alleges that Shaw and Duquesnay violated his First Amendment right by unconstitutionally restricting his internet and social media in light of the Supreme Court decision in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017). (SAC ¶¶ 60–64.)[2] The State Defendants argue that they are entitled to dismissal of this claim because *Packingham* is inapplicable to parole conditions. (State Defendants' Mot. at 16.) The Court disagrees.

2  As the Court has already dismissed Lopez's claims against Stanford, the Court omits her as a defendant in its discussion of Lopez's claims.

"Under *Packingham*, blanket limitations on an individual's ability to access social media will receive intermediate scrutiny, even when imposed as conditions of parole. There is no indication in *Packingham* that parolees are exempted from the Court's decision." *Yunus v. Robinson*, No. 17-CV-5839 (AJN), 2019 WL 168544, at *16 (S.D.N.Y. Jan. 11, 2019), *appeal withdrawn sub nom. Yunus v. Lewis-Robinson*, No. 19-382, 2019 WL 3814554 (2d Cir. May 15, 2019). The Court

has already addressed the applicability of *Packingham* to Lopez's First Amendment claim regarding the restrictions of his social media use in its Memorandum and Order on Lopez's Second TRO Motion (Doc. No. 44) at 10–12; familiarity with that prior Order is assumed. Accordingly, the Court will not repeat its prior analysis except to note that in its prior Order, the Court found that the State Defendants "have not described the relationship, if any, between the limitations imposed and Lopez's actual crime of conviction or other past conduct." (*Id.* at 12.) The same is true here and the State Defendants do not argue that these conditions can withstand intermediate scrutiny. As such, the State Defendants are not entitled to dismissal on this ground.

### i. Qualified Immunity
**\*9**  Even if Lopez has stated a § 1983 claim for a violation of his First Amendment rights, the State Defendants argue that the doctrine of qualified immunity warrants dismissal of Lopez's claim for money damages in his first cause of action. (State Defendants' Mot. at 18–19.) Qualified immunity is only a bar to a request for monetary relief, and not injunctive relief.[3] *See Horne v. Coughlin*, 191 F.3d 244, 250 (2d Cir. 1999). While the defense of qualified immunity may be asserted on a Rule 12(b)(6) motion, "the complaint itself [must] establish[ ] the circumstances required as a predicate to a finding of qualified immunity." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004). "Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). A right is "clearly established" when "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (alterations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

3  The State Defendants correctly note that Lopez's claim for injunctive relief on his first cause of action was mooted by the removal of the conditions

his parole restricting his access to the internet and to a cell phone capable of taking photos. (State Defendants' Mot. at 15.)

The State Defendants argue that Supreme Court's decision in *Packingham* did not clearly establish that the internet access parole conditions imposed on Lopez could violate his First Amendment rights. (State Defendants' Mot. at 19.) The Court agrees. Judge Nathan's opinion in *Yunus* is instructive on whether a parolee's First Amendment rights under *Packingham* are clearly established.

> The Court finds that Plaintiff's rights were not clearly established under *Packingham* and that Defendants are therefore entitled to qualified immunity. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotes omitted). Though for the reasons above the Court ultimately agrees with Plaintiff's reading of *Packingham*, it has not been established in this jurisdiction that it applies to conditions of supervised release and a number of other federal courts have indicated that it might not. *See, e.g.*, *United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017). Therefore, the constitutional question of *Packingham*'s application in this context was not beyond debate.

*Yunus*, 2019 WL 168544, at *17. As a result, Judge Nathan granted defendants' qualified immunity defense raised in a motion to dismiss a parolee's First Amendment claim challenging a parole condition prohibiting access to social networking websites. Because Lopez's rights under *Packingham* were not clearly established, and prior to *Packingham* it was not clearly established that a social media ban would violate a parolee's constitutional right, Shaw and Duquesnay are entitled to qualified immunity on this claim.

### b. Second Cause of Action

**\*10** Lopez's second cause of action challenges the parole condition denying him access to a smartphone as infringing on his First Amendment right to free exercise of religion. (SAC ¶¶ 65–69.) The State Defendants argue that they are entitled to dismissal on this claim because Lopez has failed to allege a prima facie First Amendment Free Exercise claim and Lopez has failed to allege that Shaw and Duquesnay's conduct was not reasonably related to some legitimate penological interest. (State Defendants' Mot. at 17; State Defendants' Reply (Doc. No. 100) at 9.)

As discussed above, a parole condition must be upheld as long as it is "reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses." *Singleton*, 2014 WL 3110033, at *3. Lopez alleges that by denying him access to a smartphone he is unable to access the Church of Jesus Christ of Latter Day Saints' app, which "allows constituents to access the gospel library (24/7), which includes the Bible, Teachings, General Conferences, Videos, and Music etc." (SAC ¶ 67.) This in turn hinders his ability to practice his religion. (*Id.*) Lopez also states that possession of smartphone has "no nexus to Mr. Lopez['s] crime of conviction." (SAC ¶ 69.) Apart from this wholly conclusory statement, the SAC contains no factual allegations regarding the relatedness between the denial of access to smartphone and his crime of conviction. Setting aside this defect in Lopez's claim, it is unclear how denying access to a smartphone, when he is permitted to access a computer with internet as long as he obtains approval from his probation officer, (Conditions at 5), denies Lopez access to online religious materials. Further, there is no allegation in the SAC that Lopez requested approval from Shaw or Duquesnay to access these materials and was denied. *See Trisvan*, 284 F. Supp. 3d at 301 ("the Court finds it likely relevant whether there were any requested and available accommodations"). Accordingly, this claim is dismissed.

### c. Third Cause of Action

Lopez's third cause of action alleges that the BOP and DOCCS violated his First Amendment right by imposing a condition of release that prevents him from using a computer without authorization. (SAC ¶¶ 70–73.) Because the Court has already granted dismissal of these defendants, this cause of action is dismissed.

### d. Fourth and Sixth Causes of Action [4]

[4] Because of overlap between Lopez's fourth and sixth causes of action, the Court will address them together.

### i. e-STOP

Lopez challenges the imposition of e-STOP, which requires certain sex offenders to register their internet accounts and screen names with probation and restricts offenders from using the internet to access pornographic material and other materials without permission from a parole officer. Lopez

argues that this condition violates his constitutional rights because e-STOP is applied to sex offenders with a risk level of three, offenders who used the internet to commit the offense, or offenders who had a child victim, none of which apply to Lopez. (SAC ¶ 76.) Even though the e-STOP condition has been removed, Lopez argues that he is entitled relief because this condition does not "squarely fit with Mr. Lopez['s] crime of conviction" and was "erroneously applied" to him. (SAC ¶¶ 75–76.) State Defendants do not address Lopez's allegation that the e-STOP condition should not have been applied to him. Instead, they argue that the restrictions placed on Lopez did not violate his rights and even if they did, they are entitled to qualified immunity. (State Defendants' Mot. at 20.)

**\*11** To the extent Lopez's SAC can be liberally construed to be asserting a First Amendment claim with respect to the imposition of the e-STOP condition, the State Defendants are entitled to qualified immunity for the same reasons as discussed in Lopez's first cause of action.

Lopez's contention that e-STOP is inapplicable to him also fails. Under the New York State e-STOP law, the BOP is required to prohibit certain parolees "from using the internet to access pornographic material, access a commercial social networking website, communicate with other individuals or groups for the purpose of promoting sexual relations with persons under the age of eighteen, and communicate with a person under the age of eighteen when such offender is over the age of eighteen." N.Y. Exec. § 259–c(15). Lopez correctly identifies the categories of parolees who are required to comply with this condition: sex offenders whose victim was under the age of eighteen, level three sex offenders, or where the internet was used to facilitate the commission of the crime. See id. However, the mandatory language of § 259–c(15) does not limit the BOP's ability to apply these conditions to other parolees like Lopez. Accordingly, Lopez's challenge to the e-STOP conditions of his parole fails.

### ii. Substance Abuse Treatment Program, Domestic Violence Treatment Program, and Registration with Domestic Violence Alert

Lopez alleges that he does not have substance or alcohol abuse history or domestic violence abuse history and therefore he should not have been forced as a condition of his release to enroll in a substance and alcohol treatment program, domestic violence treatment program, and should not have had a domestic violence alert imposed on him. (SAC ¶¶ 74–

79, 84–86.) Regarding the domestic violence alert, Lopez concedes that the purpose of the alert "is simply to alert staff that the individualized case plan for the parolee must include assessing and monitoring a parolee's behavior to ensure that no further victimization occurs." (SAC ¶ 31.)

This Court has previously discussed Lopez's claim that he should not have been subjected to a substance abuse program or registered with a domestic violence alert because these conditions are not related to his offense:

> Lopez's case summary indicates "he had been drinking and flirting with the victims" prior to his offenses, which were committed by "forcible compulsion." The case summary also identifies Lopez as a "Sexually Violent Offender," and while it does indeed note that he "did not score in the problem or treatment need areas regarding alcohol or substance abuse when administered the MAST or SSI," it also indicates that he was nonetheless "referred to the Alcohol and Substance Abuse Treatment (ASAT) program while incarcerated and is on the wait list to attend." In addition, he has been considered a "Violent Felony Offender" and was referred to an aggression therapy program.

> Because his criminal conduct did involve alcohol use and forcible compulsion, Lopez has not clearly shown that the imposition of mandatory attendance to alcohol, substance abuse, and domestic violence treatment is not reasonably related to his past conduct, or is arbitrary and capricious. See Birzon v. King, 469 F.2d 1241, 1243 (2d Cir. 1972); Trisvan, 284 F. Supp. 3d at 296 (E.D.N.Y. 2018).

**\*12** (Order of 3/22/19 at 5–6 (internal citations omitted).) The Court has also previously analyzed Lopez's claim that he should not have been subject to a domestic violence alert and explained that the alert "does not impose any condition to which Lopez is subject." (Id. at 7.) While this Court's prior discussion was in the context of denying Lopez's request for injunctive relief, the relation of these conditions to Lopez's past conduct is unchanged. Accordingly, the State Defendants' motion to dismiss these claims is granted.

### e. Fifth Cause of Action

In his fifth cause of action, Lopez alleges that Shaw and Duquesnay violated his Fifth, Eighth, and Fourteenth Amendment rights by refusing to approve Lopez's request to live with his wife and now 15-year old stepdaughter and instead forcing him to live at a shelter until he completes

a domestic violence treatment program. (SAC ¶¶ 80–83.) Lopez alleges that it was easier for his parole officer to supervise parolees because multiple parolees were housed at the same shelter. (SAC ¶ 82.) The State Defendants argue that Lopez was only denied approval to live with his wife and stepdaughter until he completed his domestic violence treatment program, which is reasonably related to his crime. (State Defendants' Mot. at 22.) The State Defendants also argue that Lopez's history of sexual assault coupled with the issuance of an order of protection against him, entitled Shaw and Duquesnay to qualified immunity on this claim. (*Id.*) Pursuant to the terms of Lopez's parole, his residence must be approved by DOCCS. (Conditions at 12).

Here, at the very least, the State Defendants are entitled to qualified immunity on Lopez's fifth cause of action. As discussed above, "a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell*, 316 F.3d at 385. For a right to be "clearly established ... existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft*, 563 U.S. at 741). Lopez alleges that his request to live with his wife and stepdaughter was denied pretextually because of a de facto parole condition requiring him to remain in a shelter for the convenience of his parole officer. Accepting these facts as true, even if Lopez has plausibly alleged a cognizable damages claim, the State Defendants are entitled to qualified immunity because in August 2016, it was not at all clear that this sort of condition violated a parolee's constitutional rights. *See Yunus v. Robinson*, No. 17-CV-5839 (AJN), 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11, 2019), *appeal withdrawn sub nom. Yunus v. Lewis-Robinson*, No. 19-382, 2019 WL 3814554 (2d Cir. May 15, 2019) (citing *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017); *Singleton v. Doe*, 210 F. Supp. 3d 359, 374 *(E.D.N.Y. 2016) (defendants were entitled to qualified immunity because "neither Judge Moses nor Plaintiff identified any sufficiently similar cases to clearly establish that Defendant [parole officer's] conduct with respect to alternate residences was unconstitutionally arbitrary.")).

### f. Seventh Cause of Action

Lopez's seventh cause of action challenges the condition of his release that he remain in sex offender treatment for ten years, through the end of his parole. Lopez contests how his

risk of recidivism category, which Lopez says is critical to how restrictive his parole is, was calculated, despite admitting the sex offense he committed "automatically put him at default of category 1 (high risk)." (SAC ¶ 88.) Lopez also admits that he failed to complete his sex offender treatment program at RevCore but alleges that he was discharged from the program as retaliation for filing a complaint. (*Id.*) Lopez alleges that the imposition of ten years of sex offender treatment is arbitrary. The State Defendants argue that the imposition of ten years of sex offender treatment is reasonably related to his crime of conviction. (State Defendants' Mot. at 23.)

**\*13** Accepting Lopez's allegations as true and drawing all reasonable inferences for Lopez, Lopez has failed to state a plausible claim that impositions of ten years of sex offender treatment violated his constitutional rights. Lopez pleaded guilty to sexual abuse, unlawful imprisonment, forcible touching, and harassment. Four separate times, Lopez represented to a woman that he was a taxi driver and offered to drive her home. Each time, once the woman was in his car, he pulled the car over, jumped in the back seat, and got on top of the woman while holding her arms down. He then rubbed his penis against the woman and in the last offense, he removed his penis from his pants and forced the woman to touch his penis. The condition of his parole requiring Lopez, a convicted sex offender, to remain in sex offender treatment for ten years is plainly reasonably related to his crime and is neither arbitrary nor capricious. *See Maldonado v. Mattingly*, No. 11-CV-1091 (SR), 2019 WL 5784940, at *9 (W.D.N.Y. Nov. 6, 2019) ("Mandatory sex offender programming for an individual convicted of a sex offense does not rise to the level of a substantive due process violation.") (collecting cases). Lopez's seventh cause of action is dismissed. [5]

[5]    Lopez submitted a motion for emergency relief seeking to be relieved of the condition of parole prohibiting him from possessing a driver's license. (Motion for Emergency Relief (Doc. No. 117).) The State Defendants oppose the request. (State Defendants Letter (Doc. No. 119).) While Lopez's request is not properly before this Court as it is not contained in his SAC, the request to be relieved of the condition of his parole prohibiting him from possessing a driver's license is denied because this condition is reasonably related to Lopez's past conduct—posing as taxi driver, offering women a

ride home, and then sexually abusing the women in his car.

**g. Eighth Cause of Action**

Lopez's eighth cause of action challenges various conditions of his parole as violative of his constitutional rights and he holds the BOP and the DOCCS liable for these violations. As discussed above, the BOP and DOCCS are immune from suit.

**h. Ninth Cause of Action**

Lopez's ninth cause of action is alleged only against defendants Judge Muraca and Mayra Lopez. As discussed above, in light of dismissal of Lopez's claim against Mayra Lopez and Judge Muraca, Lopez's ninth cause of action is dismissed.

**i. Tenth Cause of Action**

Lopez's tenth cause of action relates to the treatment he received at RevCore and his discharge from the program prior to completion. His federal cause of action alleges that the RevCore Defendants "infringed upon Mr. Lopez [sic] liberty interest which prompted Mr. Lopez [sic] grievance to OASAS against Revcore defendants." (SAC ¶ 107.) Lopez alleges that immediately following his complaint to OASAS, RevCore retaliated against him by creating a false positive toxicology report and then discharging him from the program prior to completion. (SAC ¶¶ 108–109.) The Court construes these as alleging a due process and First Amendment retaliation § 1983 claim against the RevCore Defendants.

**i. State Actor**

Section 1983 creates a civil cause of action against a party "who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. There are two essential elements of a § 1983 claim: "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994) (citations omitted).

The actions of nominally private entities are attributable to the state when those actions meet one of three tests: 1. The compulsion test: the entity acts pursuant to the coercive power of the state or is controlled by the state, 2. The public function test: the entity has been delegated a public function by the state, or, 3. The joint action test or close nexus test: the state provides *significant encouragement* to the entity, the entity is a willful participant in *joint activity* with the state, or the entity's functions are *entwined* with state policies.

**\*14** Hollander v. Copacabana Nightclub, 624 F.3d 30, 34 (2d Cir. 2010) (citation omitted), *cert. denied*, 131 S.Ct. 914 (2011). Courts have refused to dismiss private organizations that provide treatment to parolees as a condition of their parole from § 1983 claims on the basis that the private organization is not a state actor. Ford, 2019 WL 6831640, at *12 n.10 (finding a "close nexus" or "joint action" between provider of services to "parole detainees" and state); Johnson v. White, No. 06-CV-2540, 2010 WL 3958842, at *4 n.5 (S.D.N.Y. Sept. 9, 2010) (finding private rehabilitation center subject to § 1983 suit because "plaintiff was referred to [rehabilitation center] by the Criminal Justice System. He was required to undergo treatment as an alternative to incarceration."); Wilson v. Phoenix House, No. 10-CV-7364 (DLC), 2011 WL 3273179, at *3 (S.D.N.Y. Aug. 1, 2011).

The RevCore Defendants argue that they are entitled to dismissal because RevCore is a private organization and not a state actor. (RevCore Defendants' Mot. at 21–27.) The Court disagrees. The complaint alleges that RevCore provides outpatient drug, domestic violence, anger management, and sex offender treatment. (SAC ¶ 10.) As a condition of his parole, Lopez was obligated to receive treatment and was referred to RevCore by DOCCS. (SAC ¶ 13.) Lopez alleges that he did not meet the requirements for enrollment in substance and alcohol abuse treatment at RevCore but "DOCCS bullied the program and enforced their clinical decision by directing Revcore to enroll Mr. Lopez or he would go to jail." (SAC ¶ 105.) Lopez alleges that he filed two grievances with OASAS concerning RevCore, both of

which seem to relate to the positive toxicology report that he received at RevCore, which Lopez claims was false. (SAC ¶¶ 51–55.) Based on these allegations of close cooperation between DOCCS and RevCore, RevCore is not entitled to dismissal on the ground that it cannot be held liable under § 1983.

### ii. Due Process Claim

Lopez alleges that the RevCore Defendants violated his due process rights when they discharged him from his treatment program. (SAC ¶¶ 109–10.) While the RevCore Defendants generally argue that Lopez has failed to state a claim they do not address the merits of his due process claim. Nevertheless, the district court retains the authority to *sua sponte* review the sufficiency of the pleadings.

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). "In evaluating due process claims, '[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution.' " *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001) (quoting *Narumanchi v. Board of Trs. of the Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988)). "[A] number of cases within our Circuit have held that a parolee does not have a protectable liberty interest in his or her discharge from a drug treatment program ... even where that discharge may result in parole revocation proceedings." *Ford*, 2019 WL 6831640, at *14 (citing *Moore v. Peters*, 92 F. Supp. 3d 109 (W.D.N.Y. 2015); *Roundtree v. Bartlett*, No. 10-CV-0828-A-F, 2011 WL 666173 (W.D.N.Y. Feb. 11, 2011); *Marsh v. Bellinger*, No. 06-CV-464, 2009 WL 3429775 (W.D.N.Y. Oct. 19, 2009)).

Quite simply, Lopez cannot state a claim for a violation of his due process rights because he does not have liberty interest in his discharge from RevCore. Accordingly, this claim is dismissed.

### iii. New York Mental Hygiene Law

**\*15** Finally, Lopez alleges that the RevCore Defendants violated 14 N.Y.C.R.R. §§ 815.5 and 815.7, which prescribes regulatory guidelines for OASAS-certified/authorized providers. Even if Lopez had cited to the New York Mental Hygiene Law, rather than the state regulations, these claims would be dismissed because there is no private right of action under the Mental Hygiene Law. *See Lombardo v. Holanchock*, No. 07-CV-8674 (DLC), 2008 WL 2543573, at *10 (S.D.N.Y. June 25, 2008) (quoting *McWilliams v. Catholic Diocese of Rochester*, 536 N.Y.S.2d 285, 286 (4th Dep't 1988)) ("The Mental Hygiene Law is a regulatory statute ... No private cause of action is authorized for violations of the Mental Hygiene Law")).

### CONCLUSION

For the reasons set forth above, Lopez's complaint is dismissed with the exception of the First Amendment retaliation claim against the RevCore Defendants. This action is re-committed to the assigned magistrate judge for all remaining pretrial proceedings, including settlement discussions as appropriate.

The Clerk of Court is respectfully directed to mail a copy of this Order to the *pro se* plaintiff at the address listed on the docket, and to note the mailing on the docket.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

### All Citations

Slip Copy, 2020 WL 6900909

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6781562
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason HARTWICK, Plaintiff,

v.

Anthony ANNUCCI; Steven Claudio; Ana Enright;
Tina Stanford; Walter William Smith; Joseph P.
Crangle; Ellen Evans Alexander; Marc Coppola;
Otis Cruse; Tana Agostini; Erik Berliner; Tyece
Drake; Caryne Demosthenes; Charles Davis; Carol
Shapiro; Robert Hodson; Tammy Gronau; Regina
Orsaio; Kenneth Palmer; Michael Wright; Spo Green;
Paul Rigby; and Jason W. Gavras, Defendants.

5:20-CV-408
|
Signed 11/18/2020

**Attorneys and Law Firms**

LAW OFFICE OF JOSHUA PEPPER, PLLC, Attorneys for
Plaintiff, 30 Wall Street-8th Floor, New York, New York
10005, OF COUNSEL: JOSHUA PEPPER, ESQ.

HON. LETITIA JAMES, New York State Attorney General,
Attorneys for Defendants, The Capitol, Albany, New York
12224, OF COUNSEL: BRIAN W. MATULA, ESQ.,
Assistant Attorney General

**MEMORANDUM–DECISION and ORDER**

DAVID N. HURD United States District Judge

**I. INTRODUCTION**

 **\*1**  On April 7, 2020, plaintiff Jason Hartwick ("Hartwick"
or "plaintiff") brought the present complaint alleging
violations of rights protected by the constitutions of both
the United States and the State of New York. Plaintiff, a
convicted sex offender, alleges that his conditions of parole,
which previously included stark restrictions of his rights to
access the internet, violated his First Amendment rights. By
extension, he argues that New York State's enforcement of
those measures against him was unconstitutional.

The defendants saddled with Hartwick's allegations are
disparate, but can be grouped into a few distinct categories.
First, there are three defendants among positions of

authority at New York State's Department of Corrections
and Community Supervision ("DOCCS"), including DOCCS
Commissioner Anthony Annucci ("Annucci"), former
Deputy Commissioner for Community Supervision Steven
Claudio ("Claudio"), and Ana Enright ("Enright") who
currently occupies Claudio's former role. Second, several
defendants are members of the New York State Parole
Board (the "Board"): defendant Tina Stanford is the Parole
Board's chair, while defendants Walter William Smith, Joseph
P. Crangle, Ellen Evans Alexander, Marc Coppola, Otis
Cruse, Tana Agostini, Erik Berliner, Tyece Drake, Caryne
Demosthenes, Charles Davis, and Carol Shapiro were all
Board members tasked with considering plaintiff for parole
(together "the Board defendants").

The third group of Hartwick's defendants are parole officers,
including Robert Hodson ("Hodson"), Tammy Gronau
("Gronau"), Regina Orsaio ("Orsaio"), and Michael Wright
("Wright"), in addition to Supervising Parole Officers
Kenneth Palmer ("Palmer") and SPO Green. The fourth and
final grouping of defendants includes defendants Paul Rigby
("Rigby") and Jason W. Gavras ("Gavras"), who serve and
served, respectively, as Bureau Chief for the Syracuse Belt
Area Office of DOCCS (together "defendants").

Hartwick's complaint brings six causes of action:[1] (1) a
Fourth Amendment violation under 42 U.S.C. § 1983 ("§
1983")[2] against Gronau, Hodson, Orsaio, and Palmer; (2)
an illegal search in violation of N.Y. CONST. art. 1 § 12
against the same defendants; (3) a First Amendment § 1983
claim against defendants Annucci, Claudio, Gronau, Hodson,
Orsaio, Palmer, and Gavras; (4) a Fourth Amendment § 1983
claim against the same defendants; (5) a First Amendment
§ 1983 claim against the Board defendants; and (6) a First
Amendment § 1983 claim against defendants Wright, Green,
Rigby, Annucci, and Enright. Defendants have moved to
dismiss the complaint in its entirety and against all defendants
for lack of subject matter jurisdiction and failure to state a
claim under Federal Rule of Civil Procedure ("Rule") 12(b)
(1) and 12(b)(6). That motion having been fully briefed, it
will now be decided on the basis of the parties' submissions
without oral argument.

[1]     Plaintiff also brings a seventh cause of action for
        punitive damages, but that is not a freestanding
        claim absent a valid claim for compensatory
        damages. *Excelsior Cap. LLC v. Allen*, 536 F. App'x
        58, 60 (2d Cir. 2013) (summary order) (citing

*Hubbell v. Trans World Life Ins. Co. of N.Y.*, 408 N.E.2d 918, 919 (1980)).

2    Section 1983 allows a plaintiff to bring civil rights claims against state actors in their individual capacity. 42 U.S.C. § 1983. However, two elements must be present for all § 1983 claims: "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).

## II. BACKGROUND

**\*2**  On October 13, 2009, Hartwick was convicted of First Degree Attempted Rape in New York. [3]  *See* Dkt. 1 ("Compl."), ¶ 30. For that crime, he was sentenced to seven years' imprisonment with an additional ten years of post-release supervision ("PRS") to follow his release. *Id.* On June 8, 2015, plaintiff was granted parole, subject to several conditions imposed by the Board. *Id.* ¶ 31.

3    The facts are taken from the amended complaint and any and all documents attached to it, because for the purposes of a Rule 12(b)(6) motion, this Court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff[.]" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Accordingly, the Court will not rely on any exhibits attached to the parties' briefs except as otherwise noted.

Among Hartwick's PRS conditions was a prohibition against plaintiff's owning, purchasing, possessing, or controlling "any computer, computer-related material, electronic storage devices, communications, and/or the internet without prior written permission from his parole officer ...." Compl. ¶ 31. State law mandates this restriction for all level 3 sex offenders. *Id.*

Apparently, after Hartwick's release from prison, he achieved employment and quickly rose up the ranks at his new vocation. Compl. ¶ 33. In April of 2016, plaintiff alleges that his rise through the company rewarded him with another promotional opportunity into a supervisory role. *Id.* ¶ 34. But the job came with a catch: should plaintiff accept it, he would

need to own a cell phone equipped with internet access and a camera. *Id.* Plaintiff claims that he spoke to Thomas Distefano ("Distefano"), his parole officer at the time (who is not a defendant in this case) to request permission to purchase a phone meeting the requirements of his potential new role. *Id.* Plaintiff alleges that Distefano consulted with his Supervising Parole Officer, defendant Palmer, who approved plaintiff to purchase the phone. *Id.*

Upon allegedly getting his parole officer's permission, Hartwick purchased a smartphone and accepted the promotion. Compl. ¶ 35. According to plaintiff, Distefano verbally informed him that he had permission to purchase the phone, and at that point it was Distefano's obligation to record that approval in DOCCS's computer system. *Id.* ¶ 36. But plaintiff alleges that he failed to ever make a record of approving plaintiff's owning the phone. *Id.*

In October of 2016, Hartwick took a polygraph test administered by defendant parole officer Orsaio. Compl. ¶ 37. Plaintiff alleges that Orsaio told him that he had passed the test. *Id.* Nearly a year later, on September 8, 2017, defendant parole officers Hodson, Orsaio and Gronau arrived unexpectedly at plaintiff's home to conduct a search. *Id.* ¶ 38. Plaintiff alleges that Palmer sent the parole officers under his supervision to search plaintiff's home based on his failing the same prior polygraph test Orsaio had told him that he had passed. *Id.*

Hartwick neither resisted nor consented to the search. Compl. ¶ 41. Despite plaintiff's lack of resistance, he claims that Hodson handcuffed him while the parole officers searched his home and car. *Id.* ¶ 42. Predictably, the parole officers found plaintiff's phone in his vehicle. *Id.*

**\*3**  When asked about the phone, Hartwick told Hodson that Distefano had given him permission to purchase the phone. Compl. ¶ 43. Nevertheless, the parole officers promptly arrested him for possessing a cell phone in violation of his PRS conditions and took him to county jail, where he would remain until October 30, 2017. *Id.* ¶ 44

In the written report describing the search, Hodson and Palmer accused Hartwick of claiming falsely that Gronau had been the one to grant him permission to have the phone. Compl. ¶ 43. Using that allegation, Palmer and his supervisor, then-DOCCS Syracuse Belt Area Office Bureau Chief Gavras, recommended that plaintiff return to DOCCS custody. *Id.* Plaintiff claims that Palmer knew that plaintiff

had been given permission to purchase the phone at the time of his arrest. *Id.* ¶ 44.

On October 16, 2017, Hartwick's parole violation hearing took place. Compl. ¶ 46. Fearing the potential penalty of three years' imprisonment for his violation of possessing a phone with access to the internet, plaintiff pled guilty. *Id.* In return, he received a sentence of eighteen months' imprisonment. *Id.*

Concurrently, 2017 saw two substantial changes to Hartwick's situation that he believes opened the door to easing his onerous internet restrictions. First, plaintiff successfully appealed his designation as a level 3 sex offender, and his designation was reduced to level 2 in April of 2017. Compl. ¶ 32. Second, the Supreme Court decided *Packingham v. North Carolina* in June of that year. 137 S. Ct. 1730, (2017). In that case, the Supreme Court held that a blanket denial of access to social media for convicted sex offenders violates the First Amendment rights of those convicted. *Id.* at 1736-37.

Hartwick alleges that although he did not know about *Packingham* at the time of his guilty plea, defendants should have. Compl. ¶ 47. Nevertheless, he alleges that DOCCS Commissioner defendant Annucci and his Deputy Commissioner of Community Supervision, defendant Claudio, created a policy and instructed their subordinates to continue to enforce the parole conditions that plaintiff believes *Packingham* outlawed. *Id.* ¶ 48. He also alleges that defendants Rigby and Enright, as Claudio's successor, carried this policy forward. *Id.* ¶ 57.

Unsatisfied with his sentence, Hartwick filed an Article 78 proceeding [4] challenging the validity of his imprisonment, which ultimately proved to be unsuccessful. Compl. ¶ 49. However, his challenge did not address the constitutionality of the condition that he allegedly violated. *Id.*

[4]     An Article 78 proceeding is a special proceeding under New York law which allows a petitioner to challenge the legality of state actions. N.Y. CPLR § 7803.

On March 7, 2019, Hartwick was released from prison with new PRS conditions. Compl. ¶ 54. Despite plaintiff's reduction to a level 2 sex offender, the Board defendants nevertheless again restricted plaintiff from owning or possessing internet-capable devices. *Id.* ¶ 55. After plaintiff's release, defendant Wright has served as plaintiff's parole officer, with defendant Green working as Wright's

Supervising Parole Officer and defendant Rigby working as the new Syracuse Bureau Chief. *Id.* ¶ 56.

At last, on January 12, 2019, having received advance notice of his parole conditions, Hartwick filed a second Article 78 proceeding challenging the constitutionality of the technological restrictions he faced. Compl. ¶ 59. On July 19, 2019, plaintiff alleges that condition was overruled as unconstitutional. *Id.* ¶ 60. Nevertheless, plaintiff alleged that his parole officers all the way up the ladder to Rigby continued to tell plaintiff that he was not to have a device with the capability of accessing the internet in the absence of express permission. *Id.* ¶ 61. It was only on August 27, 2019, when plaintiff filed his third Article 78 petition, that defendants removed the condition precluding him from owning a cell phone. *Id.* ¶ 63.

**\*4** On February 13, 2020, Hartwick's Article 78 proceeding was dismissed as lacking subject-matter jurisdiction to award damages. Compl. ¶ 64. This Court of course has no such limitation, and plaintiff filed the present complaint on April 7, 2020. Dkt. 1. On August 17, 2020, defendants moved to dismiss the complaint in its entirety. Dkt. 35.

## III. LEGAL STANDARD

### A. Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

"In determining the existence of subject matter jurisdiction, a district court may consider evidence outside the pleadings." *Saleh v. Holder*, 84 F. Supp. 3d 135, 137-38 (E.D.N.Y. 2014) (citing *Makarova*, 201 F.3d at 113). "Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." *Id.* at 138 (citations omitted).

### B. Failure to State a Claim

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above

the speculative level.' " *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, the complaint must contain sufficient factual matter that it presents a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In assessing the plausibility of the plaintiff's complaint, "the complaint is to be construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor." *Ginsburg*, 839 F. Supp. 2d at 540. The complaint may be supported by "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

## IV. DISCUSSION

Defendants raise eight objections to Hartwick's claims: (1) plaintiff's challenges to the search and his arrest for parole violations run afoul of the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) plaintiff's claim under the New York constitution is foreclosed by N.Y. CORR. LAW § 24; (3) plaintiff has failed to allege the personal involvement of the Board, Annucci, Enright, Wright, Green and Rigby; (4) plaintiff has failed to state a claim as to counts five and six because he has not alleged any enforcement actions; (5) absolute immunity protects all defendants; (6) plaintiff's guilty plea to his charged parole violations establishes probable cause, barring his Fourth Amendment claims; (7) plaintiff has failed to state a claim for his alleged Fourth Amendment violations in any case; and (8) plaintiff is collaterally estopped from challenging his special condition.

### A. New York Corrections Law § 24.

Defendants argue that N.Y. CORR. LAW § 24 precludes this Court from considering Hartwick's Count (2) claim for an illegal search in violation of Article 1, § 12 of New York's constitution.[5] Nowhere in his response does Hartwick dispute that "N.Y. CORR. LAW § 24 exclusively vests jurisdiction of state law claims against DOCCS employees in the New York Court of Claims." *Fontaine v. Cornwall*, 2019 WL 4257136, at *4 (N.D.N.Y. Sept. 9, 2019).

[5]    Although defendants lead their memorandum of law by arguing *Heck v. Humphrey*, 512 U.S. 477

(1994), precludes plaintiff's claim, the Court will nevertheless begin, as it must, by assessing its jurisdiction to consider plaintiff's Count 2 claim. *See Saleh*, 84 F. Supp. 3d at 138 (noting that subject matter jurisdiction is threshold issue that must be considered before argument of failure to state claim).

**\*5** Because Hartwick has thus failed to carry his burden of establishing this Court's jurisdiction, his Count 2 claim for illegal search must be dismissed. *Aurecchione*, 426 F.3d at 638. Moreover, because plaintiff cannot cure an obvious jurisdictional defect through repleading, any attempt for plaintiff to amend his Count Two claim would be futile, and that dismissal must be with prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (noting that dismissal with prejudice in the absence of opportunity to amend is proper if amendment would be futile).

### B. *Heck v. Humphrey*.

In *Heck v. Humphrey*, the Supreme Court ruled that a plaintiff hoping to recover damages under § 1983 for an unconstitutional conviction or imprisonment "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ..., or called into question by a federal court's issuance of a writ of habeas corpus[.]" 512 U.S. 477, 486-87 (1994). In so doing, the *Heck* Court carved out "an implicit exception from § 1983's otherwise broad scope for actions that lie within the core of habeas corpus" relief. *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (internal citations and quotation marks omitted). Functionally, *Heck* cashes out to precluding § 1983 plaintiffs from using that statute to collaterally attack a criminal conviction. *Waller v. Smith*, 403 F. Supp. 3d 164, 169 (W.D.N.Y. 2019).

Of course, as is often the case with exceptions to rules intended toward breadth, courts have since developed limitations to *Heck*'s scope. One crucial limitation is that *Heck* only bars a plaintiff if success on his § 1983 claim "would *necessarily* result in the nullification of his conviction or the shortening of his confinement." *McKithen v. Brown*, 481 F.3d 89, 101 (2d Cir. 2007). For example, a § 1983 claim challenging a search that would, if invalidated, merely increase the likelihood that a plaintiff would be able to overturn a conviction will still be possible notwithstanding *Heck* so long as the overturn of the conviction is not a necessary consequence. *Id.* at 102.

Additionally, this Circuit recognizes a second exception that *Heck* cannot bar a claim if habeas corpus remedies are not available. *See Jenkins v. Haubert*, 179 F.3d 19, 27 (2d Cir. 1999) (holding that some federal remedy "must be available" and if habeas corpus is not, it must be § 1983); *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999) (same). Typically, habeas corpus will not be available to challenge a parole revocation after the would-be petitioner's term of imprisonment resulting from the revocation has ended. *Spencer v. Kemna*, 523 U.S. 1, 8, 18 (1998) (ruling that habeas corpus petition challenging parole revocation after conclusion of imprisonment was moot).

But despite those few exceptions, "[n]o court has recognized an exception as to *Heck*'s bar" when a plaintiff could have filed a habeas corpus petition while incarcerated, yet "waited more than a year" until his incarceration concluded and only then brought a claim for damages. *Teichmann v. New York*, 769 F.3d 821, 828 (2d Cir. 2014) (Livingston, J., concurring).

Defendants argue that Hartwick's claims under Counts One, Three, and Four are all *Heck*-barred.[6] Of course, to determine whether that is the case involves pulling apart the factual predicate for each of plaintiff's claims in turn. Plaintiff's Count 1 claim alleges that Gronau, Hodson, Orsaio, and Palmer "conduct[ed] an arbitrary and capricious search" based only on a polygraph test which they falsely claimed that he failed. Compl. ¶ 66.

[6]   Defendants argue the same for Count 2, but because the Court lacks jurisdiction over that claim in any case, that argument is moot.

**\*6** Because Hartwick's claim involves a search, the central question as to this claim's vitality in light of *Heck* is whether a finding for plaintiff would necessarily result in the nullification of his parole revocation. *McKithen*, 481 F.3d at 101. But courts in this Circuit have consistently held that a § 1983 claim is *Heck*-barred if it challenges the sole search that provided the entirety of the evidence supporting a criminal charge. *See, e.g., Waller*, 403 F. Supp. 3d at 170 (collecting cases for proposition that "[§] 1983 actions targeting a single episode involving a single search, if successful, would necessarily demonstrate the invalidity of a conviction based on that search").

The cell phone Hartwick's parole officers discovered upon searching his home formed the entire basis of his parole revocation. If there were no phone, there would be no parole

revocation. If there were no search, there would be no phone. Accordingly, a holding that the September 8, 2017 search violated plaintiff's rights would, by necessity, undermine his parole revocation. Accordingly, unless it fits within another exception, plaintiff's Count One claim for an illegal search in violation of the Fourth Amendment is barred by *Heck*. *Waller*, 403 F. Supp. 3d at 170.

Hartwick's third count charges the same defendants with violating his first amendment rights by enforcing the unlawful special condition prohibiting him from using an internet-capable device. Compl. ¶¶ 31, 74. It goes without saying that any eventual outcome holding that defendants violated plaintiff's constitutional rights by even bringing his parole revocation charges in the first place would by necessity invalidate his eventual conviction. Accordingly, plaintiff's claim under Count Three is similarly within *Heck*'s ambit.

However, the analysis for Hartwick's Count Four tells a different tale. At first blush, plaintiff is asserting a Fourth Amendment claim arising from his being arrested for the same parole revocation that sounds the root note for his other claims. But unlike those other claims, plaintiff does not appear to be disputing the authority of his parole officers to arrest him under the internet condition. If he were, that claim would be *Heck*-barred much like the rest. Instead, he is claiming that he did not "present a flight risk" or "any other exigent circumstance" that required him to be arrested and placed in jail, and apparently it is not the justifiability of the arrest but its necessity that plaintiff is challenging. Compl. ¶ 78. Count Four of plaintiff's complaint is thus entirely independent from his contentions concerning the validity of his parole revocation and is not barred by *Heck*.

Of course, simply because Counts One and Three are of the sort that *Heck* typically precludes does not mean that it does in this case. In particular, Hartwick argues that his claims are excepted from *Heck* because he cannot challenge a parole revocation through habeas corpus after being released from prison absent a showing of collateral consequences. Particularly, he argues that the eighteen months that he spent in prison for his violation of the internet condition was too short a time for him to avail himself of habeas corpus.

The caselaw of this Circuit does not support Hartwick's position. Several courts nationwide have rejected the ability of a plaintiff to endure his prison term, never pursue a meaningful challenge to his conviction, and then seek monetary damages after being released. *See, e.g., Opperisano*

*v. P.O. Jones*, 286 F. Supp. 3d 450, 461-63 (E.D.N.Y. 2018) (collecting cases to support dismissing claim as *Heck*-barred because plaintiff had full year to bring habeas corpus petition and failed to do so). Moreover, his delay cannot be excused because he lacked the time to make a challenge given that all would-be habeas corpus petitioners are tasked with exhausting their administrative remedies and filing a habeas corpus petition within one year of their parole revocation becoming final. *See Cook v. N.Y. State Div. of Parole*, 321 F.3d 274, 280-81 (2d Cir. 2003). Accordingly, plaintiff cannot use the exception of habeas corpus's unavailability to skirt past *Heck*'s holding when his term of imprisonment outlasted the timeframe in which he even could have brought a habeas corpus petition by six months.

**\*7** *Heck*'s applicability to Hartwick's case is nevertheless complicated by the fact that he alleges that his underlying PRS condition has since been found unconstitutional through an Article 78 hearing. Compl. ¶ 60. Though he did not make this argument in defense of his motion, plaintiff could have argued that because his underlying condition has been "declared invalid by a state tribunal", he is thus sheltered from *Heck*. 512 U.S. 487. However, even had he made that argument, it would not have succeeded. After all, whether the conditions were legal or not, they were still in effect at the time that he pled guilty to violating them. That he alleges they are now invalid does not change that he violated them back when they remained in force.

In other words, Hartwick's Article 78 proceeding did not challenge his conviction itself, it challenged the special condition's continuing application to him. Accordingly, his conviction still has not been declared invalid by a state tribunal. His conviction itself remains unchallenged because plaintiff failed to use any of the tools—such as habeas corpus —available to him to challenge it prior to his release.

Accordingly, because Hartwick has not demonstrated that his conviction for violating his conditions has been expunged or otherwise invalidated, his claims under Counts: (1) Fourth Amendment claim against Gronau, Hodson, Orsaio, and Palmer; and (3) First Amendment claim against defendants Annucci, Claudio, Gronau, Hodson, Orsaio, Palmer, and Gavras; must be dismissed as precluded by *Heck. See, e.g.*, *Opperisano*, 286 F. Supp. 3d at 461-63.

### C. **Sufficiency of Plaintiff's Count IV § 1983 Claim Under the Fourth Amendment.**

Defendants also argue that Hartwick's Count Four failed to state a claim for which relief may be granted. Defendants are correct, though not for the reasons they advance. Again, defendants approach Count Four as if it were attacking their authority to arrest him. That does not seem to be plaintiff's contention. Instead, he seems to be arguing not that defendants were not lacking in authority to make the arrest, but that arresting him was unnecessary. Nevertheless, the Second Circuit has made it clear that "the Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine." *United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (internal citations and quotation marks omitted).

Accordingly, "probable cause regarding a [New York State parole] violation that, if proven, could result in the loss of liberty provides sufficient grounds for a constitutional warrantless arrest." *Bernacet*, 724 F.3d at 279. Hartwick has by extension failed to establish any Fourth Amendment claim stemming from his arrest for his parole violation, and that claim must also be dismissed. [7]

[7]    Once again, assuming that plaintiff actually intended to challenge the legitimacy of defendants' power to arrest him for violating an unlawful condition, that claim would be subject to dismissal under *Heck* for the same reasons as discussed concerning Counts One and Three.

### D. **Absolute Immunity for Parole Decisions.**

Defendants next argue that the Board defendants are protected by absolute immunity from Hartwick's Count Five claim that they violated his First Amendment rights by imposing the special condition prohibiting him from owning an internet-capable device. To defendants' point, "[a] limited number of officials are entitled to absolute immunity from § 1983 damages liability for their official acts." *Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998). However, because qualified immunity is generally preferred to absolute immunity because of the latter's capacity to undermine § 1983's constitutional protections, "[a]bsolute immunity is proper only in those rare circumstances where the official is able to demonstrate that the application of absolute immunity to the circumstances presented is required by public policy." *Id.*

**\*8** Absolute immunity thus comes to bear only after a district court weighs two factors: (1) "the need for absolute immunity ... to permit the effective performance of the

[official's] function"; and (2) "the existence of safeguards against improper performance." *Dorman v. Higgins*, 821 F.2d 133, 136 (2d Cir. 1987). "Functions most apt to be accorded absolute, rather than qualified, immunity are those integrally related to the judicial process." *Id.* By extension, "the level of immunity flows not from rank or title or location within the Government, but from the nature of the [official's] responsibilities." *Scotto*, 143 F.3d at 110 (internal citations and quotation marks omitted).

Guided by these immunity principles, the Second Circuit has held that "a parole board official is absolutely immune from liability for damages when he decides to grant, deny, or revoke parole, because this task is functionally comparable to that of a judge." *Scotto*, 143 F.3d at 110 (internal citations and quotation marks omitted). For similar reasons, "[a]bsolute immunity has also been extended to parole officials for the imposition of parole conditions and the execution of parole revocation procedures[.]" *Swift v. California*, 384 F.3d 1184, 1189 (9th Cir. 2004).

However, courts in this Circuit have typically recognized that although a parole board's decision to impose special conditions may be an adjudicative exercise, it may also be an administrative one, and thus void of any discretion on the parole official's part. *See, e.g.*, *Farrell v. Burke*, 1998 WL 751695, at *4 (S.D.N.Y. Oct. 28, 1998) (declining to dismiss claim on basis of absolute immunity in absence of evidence demonstrating whether special condition was quasi-judicial or administrative function); *but see Stewart v. Smallwood*, 1993 WL 77381, at *1 (S.D.N.Y. Mar. 15, 1993) (Sotomayor, J.) (finding parole board officials absolutely immune without further inquiry).

On that last point, Hartwick argues that the Board defendants did not exercise any discretion and its members were statutorily obligated to impose the allegedly unconstitutional parole condition. Though plaintiff attached an exhibit to his opposition in support of his argument, delving into the factual realities of the board's determination would push review beyond the confines of deciding defendants' Rule 12(b)(6) motion. Instead, it is enough to say that the complaint can fairly be read to allege that the Board defendants did not exercise discretion in imposing the challenged condition on plaintiff, and any ruling to the contrary would require a factual inquiry beyond the scope of this motion. Accordingly, the Court cannot apply absolute immunity to the Board defendants at this juncture.

Defendants also argue that the non-board defendants should be entitled to absolute immunity for charging plaintiff with a parole violation. For that point, defendants again rely on *Scotto*, which held that "[p]arole officers also receive absolute immunity for their actions in initiating parole revocation proceedings and in presenting the case for revocation to hearing officers, because such acts are prosecutorial in nature." 143 F.3d at 112. However, once again the parole officer must have discretion in initiating that parole revocation proceeding. *Id.*

To the extent defendants argue that Count Three alleges a claim against defendants for prosecuting a parole violation, that argument is moot because Count Three has already been dismissed. But to the extent that defendants argue that absolute immunity protects Wright, Green, Rigby, Annucci, and Enright from Count Six, absolute immunity cannot attach, at least at the motion to dismiss stage.

**\*9** Defendants want to paint Hartwick's Count Six as a claim against Wright, Green, Rigby, Annucci, and Enright based on their capacity to have brought a parole revocation proceeding. But defendants misread this claim. Plaintiff is not objecting to the potential legal consequences of the condition. Plaintiff is objecting to the restriction on his First Amendment freedoms that accompanied his need to comply with a parole condition that he believed was unconstitutional but that these defendants nevertheless would have enforced.

That enforcement includes, according to the complaint, continuing to tell Hartwick that he would not be permitted to have a phone even after the Article 78 court ruled that condition to be unconstitutional. Compl. ¶ 61. Informing plaintiff that he will not be permitted to exercise a right to which he appears to be entitled does not qualify as a prosecutorial act in the vein of filing parole revocation charges, and thus at least a portion of plaintiff's claim against these defendants is not barred by absolute immunity at this time.

### E. Sufficiency of Plaintiff's First Amendment Claims Under Counts V and VI.

Defendants next argue that Hartwick's First Amendment claims under Counts Five and Six are insufficiently pled, because he has failed to identify an enforcement action deriving from the PRS prohibiting internet usage before that condition was repealed by the Article 78 court on July 19, 2019. However, as was just discussed, plaintiff alleges that defendants continued to tell him that he would not be

permitted to own an internet device until August 27, 2019. Compl. ¶¶ 61, 63. Although defendants are correct that plaintiff faced no formal discipline, that is not the right for which he seeks redress.

Rather, Hartwick alleges that defendants deprived him of his First Amendment right to access the internet while continuing to impose an unlawful condition. Because defendants allegedly told plaintiff he would not be able to purchase a phone, he has plausibly alleged that defendants deprived him of his First Amendment rights to access the internet. *See Packingham*, 137 S. Ct. at 1736-37 (ruling that depriving plaintiff of right to access social media violated First Amendment).

### F. **Personal Involvement.**

Next, defendants argue that Hartwick has failed to allege that the Board defendants, as well as Annucci, Enright, Wright, Green, and Rigby, were personally involved in any deprivation of his constitutional rights. "[I]t is well[-]settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (internal citations and quotation marks omitted).

Moreover, individual liability under § 1983 may not be based on vicarious liability, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989), but must instead flow from a supervisor's personal involvement in the alleged constitutional deprivation, *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). A supervisor may nevertheless be personally involved in a constitutional violation if he created a policy or custom—or allowed the continuance of such a policy or custom—under which unconstitutional practices occurred. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Defendants first argue that Hartwick has not adequately alleged that any one particular Board defendant imposed the allegedly violative PRS condition on him. In support of that argument, defendants note that New York's regulations for setting special conditions provide that "[e]ach special condition may be imposed by a member or members of the Board of Parole," and thus it is possible that only one of the Board defendants actually decided to impose the allegedly unlawful condition. 9 N.Y.C.R.R. § 8003.3.

**\*10** The problem with defendants' argument in the motion to dismiss context is that Hartwick need only plausibly allege personal involvement against each of the Board defendants. By necessary operation of New York's regulations, at least one of the Board defendants imposed the challenged special condition on him, and perhaps all of them did. It is therefore plausible that any or all of the Board defendants imposed the condition and may ultimately be found liable. If, at the close of discovery, plaintiff has still failed to determine which member of the Board imposed the condition, then defendants may point to that failure, but for now plaintiff has adequately alleged personal involvement by the Board defendants. *Iqbal*, 556 U.S. at 678 (requiring plaintiffs to state claims that are plausible on their face).

To the extent that defendants argue that the Board itself would have been the proper defendant, its own cited regulation belies that argument. It is the "member or members" of the Board that are tasked with imposing special conditions, not the Board itself. 9 N.Y.C.R.R. § 8003.3. Thus, Hartwick properly named the Board defendants, and his claims against them cannot be dismissed for a lack of personal involvement.

Defendants also argue, however, that Hartwick has failed to allege personal involvement on the part of defendants Wright, Green, Rigby, Annucci, and Enright as well. As for defendants Wright, Rigby, Annucci, and Enright, that argument is similarly unavailing. Plaintiff alleges that Rigby told plaintiff that defendants would continue to enforce the internet device condition, regardless of the Article 78 court's determination. Compl. ¶ 61. Moreover, plaintiff has alleged that Annucci, Enright, and Rigby instituted a policy requiring that all probation officers would continue to enforce conditions such as the one that plaintiff was subjected to. *Id.* ¶ 57. Although perhaps not the gold standard of pleading personal involvement, plaintiff's allegations against Annucci, Enright, and Rigby are as close as he could be expected to come to pleading an infringing custom or policy in the absence of discovery. Accordingly, plaintiff's claims against those defendants must survive.

As for defendant Wright, defendants have once again failed to demonstrate that Hartwick's claims against him cannot survive. Plaintiff has alleged that Wright is his current parole officer, and thus it can be reasonably inferred that Wright in particular was among the officers to inform plaintiff that he continued to be incapable of owning a phone after his release from confinement for his parole violation. Compl. ¶ 56. Because "all reasonable inferences" must be made in

plaintiff's favor, plaintiff's Count Six claim against Wright cannot be dismissed for a lack of personal involvement. *Ginsburg*, 839 F. Supp. 2d at 540.

However, Hartwick's claim against Green is not so vital. Plaintiff's only allegation against Green is that he "personally enforced" plaintiff's allegedly unconstitutional PRS condition as Wright's supervisor. Compl. ¶ 56. That lone allegation cannot be enough. Plaintiff has at least alleged a direct connection between himself and Wright and Rigby, but has not alleged that Green so much as knows his name, let alone took an active role in infringing his constitutional rights. Accordingly, plaintiff's claims against Green must be dismissed for failure to adequately plead personal involvement.

### G. Collateral Estoppel.

Defendants' final remaining argument is that Hartwick is collaterally estopped under the principles of *res judicata* from asserting any challenge to his parole conditions because he already unsuccessfully appealed those conditions. Compl. ¶ 49. "Under both New York and federal law, the doctrine of ... claim preclusion[ ] provides that a final judgment on the merit of an action precludes the parties from relitigating issues that were or could have been raised in that action." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) (cleaned up and internal citations and quotation marks omitted). Ultimately, "[i]f a valid and final judgment has been entered on the merits of a case, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* at 196 (internal citations and quotation marks omitted).

 **\*11** Claim preclusion only comes into play where "the parties [are] the same as those in the first action or persons in privity with them." *See Pricaspian Dev. Corp. (Texas) v. Royal Dutch Shell, PLC*, 382 F. App'x 100, 104 (2d Cir. 2010) (summary order). But still, "the same parties, similar legal issues, similar facts, or essentially the same type of wrongful conduct is not dispositive." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997).

It is unclear, at this juncture, who would have been a party to Hartwick's appeal of his conviction. For that reason alone, defendants have not proven that claim preclusion compels this Court to dismiss plaintiff's claims. Moreover, because plaintiff's appeal only concerned his conviction for a parole

violation, the Court is similarly in the dark as to what issues would have been even capable of consideration, let alone which issues were actually actively raised, at that appeal. The Court therefore cannot determine that claim preclusion blocks plaintiff's claim at the Rule 12(b)(6) stage.

Alternatively, even if a claim is not precluded in its entirety, a specific issue may nevertheless be subject to collateral estoppel, or issue preclusion. The Second Circuit requires four elements for issue preclusion: (1) the issues in the prior and present action must be identical; (2) the issue in the prior proceeding must be actually litigated and decided; (3) the party against whom preclusion is sought must have had a full and fair opportunity for litigation in the prior proceeding; and (4) the issue litigated must have been necessary to the final judgment on the merits of the prior proceeding. *See Faulkner v. Nat'l Geographic Enters.*, 409 F.3d 26, 37 (2d Cir. 2005).

As for issue preclusion, defendants' argument fares no better. Issue preclusion requires an identity of issues that is lacking in this case, because plaintiff specifically states that his appeals "did not address the constitutionality of [his PRS] condition." Compl. ¶ 49. Accordingly, plaintiff's claims under Counts Five and Six are not barred by either variety of *res judicata*, and plaintiff's remaining claims must survive.

### V. CONCLUSION

Hartwick's complaint lives in the interstice between the civil and the criminal realms. As might be expected from its abiding in such embattled territory, its ability to state a valid civil claim despite the pressing need to maintain the finality of criminal proceedings is uneven. Nevertheless, plaintiff has successfully stated a plausible First Amendment claim against the Board defendants, as well as defendants Wright, Rigby, Annucci, and Enright. The complaint must therefore proceed to discovery on Counts Five and Six as to those defendants. Similarly, plaintiff's Count Seven claim for punitive damages must still survive.

Therefore, it is

ORDERED THAT

1. Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART;

2. Counts One, Two, Three, and Four are DISMISSED;

2020 WL 6781562

3. Count Six is DISMISSED as to defendant SPO Green;

4. All claims against Defendants Robert Hodson, Tammy Gronau, Regina Orsaio, Kenneth Palmer, Jason W. Gavras, Steven Claudio, and SPO Green are DISMISSED;

5. Count Five for a First Amendment violation against defendants Tina Stanford, Walter William Smith, Joseph P. Crangle, Ellen Evans Alexander, Marc Coppola, Otis Cruse, Tana Agostini, Erik Berliner, Tyece Drake, Caryne Demosthenes, Charles Davis, and Carol Shapiro remains.

**\*12** 6. Count Six for a First Amendment violation against defendants Michael Wright, Paul Rigby, Anthony Annucci, and Ana Enright remains; and

7. Defendants Tina Stanford, Walter William Smith, Joseph P. Crangle, Ellen Evans Alexander, Marc Coppola, Otis Cruse, Tana Agostini, Erik Berliner, Tyece Drake, Caryne Demosthenes, Charles Davis, Carol Shapiro, Michael Wright, Paul Rigby, Anthony Annucci, and Ana Enright are directed to respond to Counts Five, Six, and Seven of the complaint no later than Wednesday, December 2, 2020.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 6781562

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 1882696
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nathaniel E. BOSTIC, Plaintiff,
v.
Barry JACKSON, Defendant.

No. 9:04-CV-676 (NAM/GJD).
|
April 24, 2008.

**Attorneys and Law Firms**

Nathaniel E. Bostic, Brooklyn, NY, pro se.

Office of the New York State Attorney General, Senta B. Siuda, Esq., Asst. Attorney General, Syracuse, NY, for Defendant.

*MEMORANDUM DECISION and ORDER*

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** In plaintiff's second amended complaint in this action, pursuant to 42 U.S.C. § 1983, he named various defendants, claiming that they violated plaintiff's constitutional and statutory rights in imposing conditions of parole and in postponing plaintiff's final parole revocation hearing. (Dkt. No. 8) (AC). Plaintiff also claimed that defendants retaliated against him for the exercise of his constitutional right to access to courts. AC ¶ 9. Plaintiff also appeared to challenge the constitutionality of a section of the New York State Executive Law governing parole revocation, together with the regulations pertaining to the statute. AC ¶¶ 12-14. Plaintiff sought declaratory, injunctive, and substantial monetary relief.

Defendants moved to dismiss the action for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 28). On September 22, 2006, Magistrate Judge Gustave J. Di Bianco recommended that the motion to dismiss be denied as against defendant Jackson regarding the conditions of plaintiff's parole. (Dkt. No. 30). Magistrate Judge Di Bianco recommended that the motion to dismiss be granted as to all other claims as against all other defendants. *Id.* On November 1, 2006, this court approved Magistrate Judge Di Bianco's

recommendation. (Dkt. No. 32). As a result of this court's order, the *only* remaining claim is against defendant Barry Jackson regarding the conditions of plaintiff's parole.

Presently before this court is defendant Jackson's motion for summary judgment pursuant to FED.R.CIV.P. 56. [1] (Dkt. No. 35). Plaintiff has responded in opposition to the motion. (Dkt. No. 38). For the following reasons, this court agrees with defendant and will dismiss this action in its entirety.

[1]  The parties are advised that the referral to the Magistrate Judge as provided for under Local Rule NDNY 72.3 has been rescinded. Therefore, any appeal taken from this Order will be taken to the Court of Appeals for the Second Circuit.

**DISCUSSION**

**1.** *Summary Judgment*
Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2.** *Procedural History*
The second amended complaint contained very few facts regarding the reason for the conditions imposed upon plaintiff's parole release. Thus, when defendants made their motion to dismiss, the only facts before Magistrate Judge Di Bianco were those in the amended complaint and the materials attached to the complaint. *See Dangler v. New York City Off-Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1998) (when considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference).

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   1

2008 WL 1882696

**\*2** The Exhibits that were attached to the amended complaint showed that plaintiff was paroled on September 10, 2001. Plaintiff's Ex. A. On September 24, 2001, plaintiff received a copy of various "special conditions" of his release. *Id.* Defendant Jackson witnessed plaintiff's receipt of the conditions. *Id.* Included in those "special conditions" was a requirement that plaintiff not reside with Donna Capani without his parole officer's permission. *Id.* ¶ 13D. Another "special condition" was that plaintiff could "only visit 20 Jefferson Avenue, Binghamton, N.Y. on Saturdays, 12 noon to 6 p.m. for the purpose of visiting [his] wife and children." *Id.* ¶ 13E.

In Magistrate Judge Di Bianco's analysis of the conditions of parole issue, he found that it was **"impossible"** based on the amended complaint alone to determine the purpose for the restrictions imposed and whether the restrictions were reasonable. (Dkt. No. 30 at 13). Magistrate Judge Di Bianco, thus, recommended denying the motion to dismiss on this issue because he could not find that plaintiff could prove "no set of facts that would entitle him to relief." *Id.* at 14. This court approved Magistrate Judge Di Bianco's recommendation. (Dkt. No. 32).

Defendant Jackson has now moved for summary judgment and has included his own affidavit in support of the motion, together with exhibits establishing the facts surrounding the "special conditions" of release. (Dkt. No. 35) (Jackson Aff.). This court has had the opportunity to consider these additional facts in deciding this motion.

### 3. *Conditions of Parole*

A parolee does not enjoy the "absolute liberty" of a free citizen, rather, he is considered a prisoner who has been allowed to serve a portion of his sentence outside the prison. *See Baker v. Welch,* 03 Civ. 2267, 2003 U.S. Dist. LEXIS 22059, \*36-38 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.), *adopted,* (S.D.N.Y. Jan. 26, 2004) (Rakoff, J.). Parolees have no liberty interest in being free from "special conditions" of parole. *Id. See also Pena v. Travis,* 01 Civ. 8534, 2002 U.S. Dist. LEXIS 24709, \*35 n. 5 (S.D.N.Y. Dec. 27, 2002) (citing *Morrissey v. Brewer,* 408 U.S. 471, 480 (1972)). Constitutional rights such as freedom of travel and association may be limited without violating the parolee's constitutional rights. *Id.*

Restrictions upon the First Amendment rights of parolees are valid as long as "the restrictions are reasonably and necessarily related to the advancement of some justifiable purpose of imprisonment." *Birzon v. King,* 469 F.2d 1241, 1243 (2d Cir.1972), *cited in Farrell v. Burke,* 449 F.3d 470, 497 (2d Cir.2006). In *Birzon,* the court was considering a restriction on the petitioner's right to freedom of association. 469 F.2d at 1243. In *Farell,* the Second Circuit was considering the reasonableness of a restriction, prohibiting a paroled sex offender from possessing pornographic material. 449 F.3d at 476. The court stated that because Farrell was a convicted sex offender, the restriction was "reasonably and necessarily related to the Government's legitimate interests in the parolee's activities." *Id.* (internal quotation marks omitted).

**\*3** In *Yaweh v. United States Parole Comm'n,* 158 F.Supp.2d 1332 (S.D.Fla.2001), a federal parolee was challenging a special condition that restricted the parolee's right to associate with members of his religious group. *Id.* at 1335. The court upheld the restrictions, finding that the restrictions were "reasonably related" to legitimate parole purposes, notwithstanding their burden on a fundamental constitutional right. *Id.* at 1351. In *United States v. Schiff,* 876 F.2d 272, 273-74 (2d Cir.1989), the court upheld a probation restriction that prevented a convicted "tax resister" from associating with any anti-tax group or participating in promotion of the group's meetings. This restriction was upheld, notwithstanding the burden on Schiff's First Amendment rights. *Id.* at 276.

In *Tremper v. Ulster County Dep't of Probation,* 160 F.Supp.2d 352 (N.D.N.Y.2001), District Judge David N. Hurd granted a preliminary injunction to plaintiff, Julie Tremper, who was challenging the enforcement of a condition of probation, preventing her from having contact with co-plaintiff DaShawn Johnson. Tremper and Johnson had a child together, and they claimed that the probation restriction violated their constitutional rights to participate in the care, custody, and management of that child, as well as their right to live together as a family. *Id.* at 356.

Judge Hurd found that the challenged condition burdened a fundamental right, and that a heightened level of scrutiny must be applied, even if the parents are not married. *Id.* at 357 (citing *Zablocki v. Redhail,* 434 U.S. 374, 386-87 (1978)). Although the state had a legitimate interest in promoting the rehabilitation of probationers, Judge Hurd found that "something more than a reasonable relationship to rehabilitation must be shown to justify such a complete impediment to plaintiffs' fundamental right to family life." *Id.* (citing *Zablocki,* 434 U.S. at 388-90) Judge Hurd did include some case law in his decision, cited by the defendants,

2008 WL 1882696

in which the restrictions on family association were upheld based upon the specific facts. 160 F.Supp.2d at 358-59 (citing *People v. Myatt,* 248 A.D.2d 68, 681 N.Y.S.2d 114 (3d Dep't 1998); *People v. Howland,* 145 A.D.2d 866, 536 N.Y.S.2d 191 (3d Dep't 1988)).

Judge Hurd distinguished those cases from the facts found in *Tremper* by stating that in Ms. Tremper's case, there was no showing of "undue influence, initiation of criminal conduct; need to protect the public safety; or reasonable alternative to incarcerating Tremper." 160 F.Supp.2d at 359. In finding that the plaintiffs had shown a likelihood of success on the merits for purposes of a preliminary injunction, Judge Hurd stated that defendants made an insufficient showing "that there is a rehabilitative purpose that would outweigh plaintiffs' liberty interest." *Id.* In this case, based upon *Tremper,* and the fact that the court was unaware of the reasons for the special conditions, Judge Di Bianco recommended, and this court approved, denial of the defendant's motion to dismiss. At that time, there was no way to determine the reasonableness of the restrictions imposed upon plaintiff.

**\*4** Defendant has now moved for summary judgment and has included the documents relevant to his decision to impose the particular conditions challenged by plaintiff. A review of defendant Jackson's affidavit, together with the exhibits attached shows that the conditions imposed upon this plaintiff were *completely* justified and *more than* reasonably related to the state's legitimate interest in the parolee's activities and the safety of the community. Defendant Jackson states that the Division of Parole (DOP) records indicate that on February 4, 1999, plaintiff was sentenced in Broome County Court to concurrent indeterminate terms of imprisonment of 3½ to 7 years for Robbery, Third Degree and 2 to 4 years for Criminal Contempt, First Degree. Jackson Aff. ¶ 2.

The important fact regarding these convictions is that Donna Capani, plaintiff's wife, was *the victim of the crime for which plaintiff was convicted.* Plaintiff broke into Ms. Capani's house, vandalized it, and stole property from her. In doing so, plaintiff also disobeyed an order of protection that directed plaintiff to stay away from Ms. Capani. *Id.* On January 5, 1999, Ms. Capani signed a "Victim Impact Statement" in which she stated that she was granted an order of protection on October 16, 1998, and that plaintiff became "angry," resulting in his burglarizing and vandalizing her home. Jackson Aff. Ex. B. Plaintiff's actions included instances of physical abuse. *Id.* Ms. Capani stated that "clearly this is a person who believes that laws ... do not apply to him-then has the audacity

to blame me for the consequences." *Id.* She stated that this attitude is *"one* of the things that makes him dangerous." *Id.* (emphasis added). Ms. Capani also stated that the "emotional agony and turmoil" was "immeasurable", and that her eleven-year-old daughter was afraid to enter her home and had to be placed on anti-depressant medication because of this incident. *Id.* at 2.

Defendant Jackson was assigned to supervise plaintiff when he was released on September 10, 2001. Jackson Aff. ¶ 3-4. Defendant Jackson states that he prepared the "special conditions" based on the above statement by Ms. Capani, and based upon a review of the plaintiff's background and criminal history. Jackson Aff. ¶ 4. The court would point out that unlike the condition imposed in *Tremper,* defendant Jackson in this case did not deny plaintiff total contact with his wife and child. The special conditions stated that plaintiff could not reside with Ms. Capani without his parole officer's permission. Jackson Aff. Ex. C ¶ 13D. Plaintiff was also allowed to visit his wife and children [2] on Saturdays from noon until 6 p.m. *Id.* ¶ 13E. Defendant Jackson states that these conditions were imposed for the safety of Ms. Capani and the children. Jackson Aff. ¶ 5. Defendant Jackson states that he believed it would be necessary to observe plaintiff for a period of time to ensure that he demonstrated a positive change in his behavior before the couple could actually live together. *Id.* Defendant Jackson states that on September 24, 2001, he met with plaintiff and reviewed the special conditions. Plaintiff signed the conditions and was provided a copy. *Id.* ¶ 7. Plaintiff's supervision was transferred to another officer on November 26, 2001, and defendant Jackson states that he had no further contact with plaintiff after that time. *Id.* ¶ 8.

[2]     It is unclear how many children there were. In her Victim Impact Statement, Ms. Capani mentions only an elevenyear-old daughter, but the special conditions refer to "children." Whether there was only one child or more children is not relevant to this decision.

**\*5** It is very clear from the evidence submitted that the special conditions, as well as defendant Jackson's reasons for imposing those conditions, were more than reasonable. Because the crime for which plaintiff was being paroled involved violence toward Ms. Capani and her belongings, together with the violation of an order of protection that had been filed against him on Ms. Capani's behalf, there was good reason to limit plaintiff's contact with her and her daughter

2008 WL 1882696

until plaintiff could show that his behavior could be trusted. This reason was certainly related to the crime committed, the objectives of parole, and the safety of the community. Based on the facts of this case, it is clear that *Tremper* is distinguishable, and that defendant Jackson had ample basis for his decision, regardless of its possible impact on plaintiff's First Amendment rights.

Subsequent events further support defendant Jackson's decision. Unfortunately, Ms. Capani later expressed a desire to have plaintiff live with her. [3] On May 29, 2002, Ms. Capani signed a document, stating that she wished to have plaintiff return to her home. Jackson Aff. ¶ 9, Ex. D. In this document, she acknowledged that she had been the victim of domestic abuse by plaintiff and that she had complained about the system's "inability to protect her from her husband." *Id.* Ex. D. She also stated that she was acting against DOP's advice. *Id.* Based on this document, plaintiff was allowed to return to live with Ms. Capani. Jackson Aff. ¶ 9.

[3]   This happened after defendant Jackson was no longer assigned as plaintiff's parole officer, but is relevant to the basis for this court's findings.

Defendant Jackson states that according to DOP records, plaintiff was arrested on November 12, 2003 for Assault, Third Degree. Jackson Aff. ¶ 10. Plaintiff assaulted Ms. Capani by striking her in the face and kicking her hand. *Id.* Ex. E. This assault was the subject of plaintiff's parole violation charge. *Id.* ¶ 10, Exs. E-F. Clearly, the limitations that had been previously imposed on plaintiff were more than reasonable, and unfortunately, the victim herself chose to request that the restrictions be changed to her detriment. Defendant Jackson did ***not*** violate any of plaintiff's constitutional rights by issuing the special conditions of release.

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that defendant Jackson's motion for summary judgment (Dkt. No. 35) is **GRANTED,** and plaintiff's amended complaint (Dkt. No. 8) is **DISMISSED IN ITS ENTIRETY.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1882696

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sethi v. Narod, E.D.N.Y., September 30, 2013

2013 WL 4806960
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Carmel SPITERI, Plaintiff,

v.

John Leo RUSSO, Arthur George Trakas, Supreme
Court Judge Fernando Camacho, in his official capacity,
New York State Governor Andrew M. Cuomo, in his
official capacity, New York State Sex Offender Board
of Examiners Commissioner Michelle Harrington, in
her official capacity, the New York State Sex Offender
Registry Director Michelle Mulligan, in his official
capacity, New York State, New York City Police
Department Offender Unit, and Does 1–10, Defendants.

No. 12–CV–2780 (MKB)(RLM).
|
Sept. 7, 2013.

**Attorneys and Law Firms**

Carmel Spiteri, Las Vegas, NV, pro se.

Maria Barous Hartofilis, Office of NYS Atty. General, New
York, NY, John L. Russo, Law Offices of John L. Russo,
Arthur Trakas, Astoria, NY, for Defendants.

### MEMORANDUM & ORDER

MARGO K. BRODIE, District Judge.

**\*1** Plaintiff Carmel Spiteri brings the above-captioned
action *pro se* seeking a writ of mandamus, declaratory

relief and injunctive relief against Defendants John Leo
Russo and Arthur George Trakas, attorneys practicing in
New York, (collectively the "Attorney Defendants"), the
Governor of New York, Andrew Cuomo, New York State
Court Judge, Fernando Camacho, Michelle Harrington as
Commissioner of New York State Sex Offender Board of
Examiners (the "Board"), Michelle Mulligan as Director
of the New York State Division of Criminal Justice
Services [1] (the "Division"), New York State, (collectively the
"State Defendants"), the New York City Police Department
("NYPD") Sex Offender Unit and Does 1–10. Plaintiff
asserts various federal constitutional claims against the
State Defendants and federal and state law claims against
the Attorney Defendants. On September 3, 2012, Plaintiff
moved for injunctive relief to, among other things, enjoin
the State Defendants from "imposing sanctions, or taking
any action" with respect to Plaintiff's registration as a
sex offender. On February 15, 2013, the State Defendants
and the Attorney Defendants filed separate motions to
dismiss the complaint and in opposition to Plaintiff's motion
for injunctive relief. The Court heard oral argument on
June 14, 2012. For the reasons set forth below, the State
Defendants' motion to dismiss the complaint is granted and
the complaint is dismissed with prejudice in its entirety as
to the State Defendants. Accordingly, Plaintiff's request for
injunctive relief as to the State Defendants is denied. The
Attorney Defendants' motions to dismiss the complaint as
to Plaintiff's federal claims are granted and these claims are
dismissed with prejudice. The Court declines to exercise
supplemental jurisdiction over Plaintiff's state law claims
and dismisses those claims against the Attorney Defendants
without prejudice.

[1]    Plaintiff incorrectly named "New York State
Division of Criminal Justice System" instead of
"New York State Division of Criminal Justice
Services."

## Table of Contents

| | | |
|---|---|---|
| I. | Procedural Background ................... | 3 |
| II. | Factual Background ................... | 6 |
| | a. Plaintiff's California Conviction ................... | ...................6 |
| | b. Plaintiff Living and Working in New York ................. | ...................8 |
| | c. Plaintiff's New York State SORA Proceedings .............. | ................10 |
| III. | Discussion ................... | 16 |

a.  Standard of Review ................... .................16

    i.          Rule 12(b)(1)......................................    16

    ii.         Rule 12(b)(6)......................................    16

b.  SORA Legislative Scheme ................... .................18

    i.          General Provisions...............................    18

    ii.         Nonresident Worker Provisions...................    21

    iii.        Level III Sex Offender Requirements.............    22

c.  State Defendants' Motion to Dismiss the Complaint ............. .................24

    i.          *Rooker–Feldman* Doctrine.......................    24

    ii.         Absolute Immunity—Judge Camacho..............    29

    iii.        Sovereign Immunity...............................    32

d.  Plaintiff's Substantive Claims Against the State Defendants ......... .................42

    i.          Procedural Due Process—Generally...........    42

    ii.         Due Process—Vagueness........................    50

    iii.        Substantive Due Process.........................    55

    iv.         Equal Protection..................................    65

    v.          Privileges and Immunities.......................    74

    vi.         Right to Travel....................................    77

    vii.        *Ex Post Facto*...................................    79

    viii.       Cruel and Unusual Punishment.................    80

    ix.         Full Faith and Credit.............................    81

    x.          Premption.........................................    84

    xi.         Commerce Clause and Dormant Commerce Clause............    90

e.  Plaintiff's Substantive Claims Against the Attorney Defendants ......... .................92

    i.          RICO Claim.......................................    93

    ii.         RICO Conspiracy.................................    111

    iii.        FLSA...............................................    112

    iv.         State Law Claims.................................    125

f.  Motions to Strike ................... .................129

2013 WL 4806960

g.    Motions to Take Judicial Notice ...............    .................132

IV.    Conclusion ...................    134

### I. Procedural Background

**\*2**  Plaintiff commenced this action on May 31, 2012 by filing a complaint seeking, among other things, damages, declaratory and injunctive relief against several individuals including Governor Cuomo, the Attorney Defendants, Judge Camacho, [2] the Queens District Attorney, Richard Brown, and several agencies including the Sex Offender Monitoring Unit of the NYPD's Special Victims Division, the Division, the Board, and others. Plaintiff served only the Attorney Defendants with the initial complaint.

[2]    Plaintiff incorrectly named Judge Ricardo Camacho instead of Fernando Camacho.

On August 24, 2012, Plaintiff filed the amended complaint (the "Complaint") seeking a writ of mandamus, declaratory relief and injunctive relief against the Attorney Defendants, Governor Cuomo, Judge Camacho, Harrington, [3] Mulligan, the NYPD Sex Offender Unit and Does 1–10. [4] In the Complaint, Plaintiff asserts several constitutional claims against the State Defendants including violations of the Due Process, Equal Protection, *Ex Post Facto* and Full Faith and Credit Clauses. In his opposition to the State Defendants' motion to dismiss the Complaint, Plaintiff asserts additional constitutional claims for cruel and unusual punishment and violations of the Privileges and Immunities Clause, Commerce Clause, Dormant Commerce Clause and Supremacy Clause, as well as a right of access to the courts and right to travel claims. As to the Attorney Defendants, Plaintiff asserts several federal claims, including Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise, RICO conspiracy and Fair Labor Standard Act ("FLSA") unpaid overtime along with a Thirteenth Amendment constitutional claim. In addition, Plaintiff asserts state law claims against the Attorney Defendants for unjust enrichment, fraud, deceit and misrepresentation, fraudulent concealment, legal malpractice, unpaid wages, unpaid overtime wages and unpaid spread-of-hours wages.

[3]    Plaintiff incorrectly named Michael Green instead of Michelle Harrington as the Commissioner of the Board.

[4]    Plaintiff did not properly serve the NYPD Sex Offender Unit and, in any event, cannot sue the NYPD Sex Offender Unit. Section 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Admin. Code & Charter Ch. 16 § 396. This provision has been construed to mean that the NYPD, as an agency of New York City, is not a suable entity. *See, e.g., Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007) ("The district court correctly noted that the NYPD is a non-suable agency of the City."); *Thomas v. N.Y.C. Police Dep't,* No. 12–CV–5082, 2013 WL 431335, at \*1 (E.D.N.Y. Feb.4, 2013) (finding that "[t]he complaint cannot proceed against the NYPD" because of NY.C. Admin Code & Charter Ch. 16 § 396); *Richardson v. N.Y.C. Police Dep't,* No. 12–CV–5753, 2013 WL 101403, at \*2 (E.D.N.Y. Jan. 7, 2013) ("The NYPD and its divisions, including the Transit Police, may not be sued directly; instead, any suit against a City agency must be brought against the City of New York."); *Johnson v. N.Y.C. Police Dep't,* No. 12–CV–5423, 2012 WL 5607505, at \*3 (E.D.N.Y. Nov. 15, 2012) ("New York City departments and agencies, as distinct from the City itself, lack the capacity to be sued. Therefore, any claims against the NYPD are dismissed." (citations omitted)). The Complaint is therefore dismissed against the NYPD Sex Offender Unit. *See, e.g., Thomas,* 2013 WL 431335, at \*1 (dismissing claims against the NYPD); *Richardson,* 2013 WL 101403, at \*2 (same); *Johnson,* 2012 WL 5607505, at \*3 (same). Suits against the NYPD must be brought against the City of New York.

By letter dated September 3, 2012, Plaintiff sought to file a motion to seek a temporary restraining order to, among other things, "declare that Plaintiff [was] not subject" to New York State Sex Offender Registration Act ("SORA") requirements, enjoin the State Defendants from imposing sanctions or taking any other action against Plaintiff,

and enjoin the Attorney Defendants from "[m]entioning, discussing, annotating and/or documenting in any of their pleadings, motions and/or legal papers" that Plaintiff has or continues to violate New York State or federal sex offender registration requirements. (Docket Entry No. 52, Sep. 3, 2012 Letter.) On September 28, 2012, the Court converted Plaintiff's request for a temporary restraining order to a request for a preliminary injunction.[5] On October 12, 2012, Plaintiff filed a motion for "Permanent Injunction" which the Court has construed as a motion for preliminary injunction. Plaintiff requests relief from New York SORA registration requirements, including relief from having to return to New York State every 90 days, relief from being on the New York State SORA website, and injunctive relief to prevent any arrests of Plaintiff for his failure to register. Plaintiff also seeks several declarations regarding the constitutionality of SORA.

[5]      Plaintiff subsequently withdrew his request for injunctive relief against the Attorney Defendants. The Court issued a decision on October 19, 2012, denying a subsequent application by Plaintiff for a temporary restraining order. (*See* Docket Entry No. 79.)

 **\*3** On February 15, 2013, the State Defendants and the Attorney Defendants filed separate motions to dismiss the Complaint and in opposition to Plaintiff's motion for a preliminary injunction. The Attorney Defendants and Plaintiff moved for sanctions against each other, which were denied at oral argument. In addition to the motions to dismiss and the motion for preliminary injunction, Plaintiff filed several other motions including: (1) motions to strike various portions of documents filled by the Attorney Defendants; and (2) several motions for the Court to take judicial notice of many items including cases and court filings.

The Court heard oral argument on June 14, 2013. At oral argument, the Court (1) dismissed Judge Camacho and New York State as defendants, (2) dismissed the claims for damages against the individual State Defendants, (3) dismissed Plaintiff's Thirteenth Amendment claim against the Attorney Defendants, (4) denied the Attorney Defendants' and Plaintiff's motions for sanctions, and (5) denied Plaintiff's motions to strike, except as to Plaintiff's motion to strike statements that he forged signatures.

## II. Factual Background

### a. Plaintiff's California Conviction

In 1998, Plaintiff pled guilty to unlawful sex acts on a minor and was sentenced to sixteen months in prison and three years' probation, (State Def. Mem. 3), an offense that required registration on California's sex offender registry.[6] (Compl.¶¶ 23, 44.) At the time Plaintiff pled guilty he was required to register as a sex offender for life.[7]

[6]      The facts alleged in the Complaint are assumed to be true for the purposes of deciding the motions to dismiss, except where Plaintiff's pleadings in the Complaint are inconsistent. *U.S. Bank Nat. Ass'n v. Bank of Am., N.A.,* No. 12–CV–4873, 2012 WL 6136017, at \*7 (S.D.N.Y. Dec. 11, 2012). In view of Plaintiff's *pro se* status and because of the Court's responsibility to construe *pro se* pleadings liberally, the Court will consider all the facts submitted in Plaintiff's submissions and presented at oral argument, in addition to the facts in the Complaint. *See Pietri v. N.Y. Office of Court Admin.,* No. 11–CV–3205, 2013 WL 1312002, at \* 1 n. 2 (E.D.N.Y. Mar.28, 2013) ("The facts alleged in the Complaint are assumed to be true for the purposes of this motion. Since Plaintiff is *pro se,* the Court will also consider facts contained in Plaintiff's opposition papers."); *Small v. Ortlieb,* No. 10–CV–1616, 2012 WL 3229298, at \*1 (E.D.N.Y. Aug. 6, 2012) ("[A]s part of this Court's duty to construe *pro se* pleadings liberally, the Court will take account of all the facts contained in both [plaintiff's] amended complaint and his opposition papers."); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 461 (N.D.N.Y.2009) ("[T]he mandate to read the papers of pro se litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint.").

[7]      At the time Plaintiff pled guilty, he signed a form which stated that his offense required a lifetime registration. (*See* Hartfolis Decl. Ex. B.) Plaintiff has cited case law to the Court and argues that the law in California has changed and he is no longer required to register. (Pl. Opp'n to State Defs. 89–91.) Whether or not Plaintiff was required to register as a sex offender for this offense in California is not determinative of whether Plaintiff was required to register in New York. Under New York Corrections Law Section 168–a (2)(d), a sex offender is required

2013 WL 4806960

to register in New York if the crime would require registration in New York pursuant to SORA or the federal Sex Offender Registration and Notification Act ("SORNA"), even if the crime does not require registration in the state where the sex offender was convicted. *See* N.Y. Correct. Law § 168–a (2)(d); *Kasckarow v. Bd. of Examiners of Sex Offenders of State,* 106 A.D.3d 915, 964 N.Y.S.2d 650, 651 (App.Div.2013) ("The definition of a 'sex offense' with respect to an offense committed in another jurisdiction is 'a conviction of [i] an offense in any other jurisdiction which includes all of the essential elements of any such crime' that constitutes a 'sex offense' under SORA." (quoting N.Y. Correct. Law § 168–a(2)(d) (i))); *Smith v. Devane,* 73 A.D.3d 179, 898 N.Y.S.2d 702, 704 (App.Div.2010) ( "[E]ntry of a guilty plea constitutes a 'conviction' under New York law, the Board correctly determined that petitioner was required to register as a sex offender under Correction Law § 168–a(2)(d)(ii), notwithstanding that he received a discretionary deferred adjudication under Texas criminal procedure upon that guilty plea" which petitioner argued was not a conviction under Texas law); *see also People v. Mann,* 52 A.D.3d 884, 859 N.Y.S.2d 278, 280 (App.Div.2008) (noting that the plaintiff's two "misdemeanor counts" that "arose from defendant touching the breasts of females ages 13 and younger ... would constitute the crime of sexual abuse in the second degree if committed in New York, and is a registrable offense under SORA" (citations omitted)); *People v. Whibby,* 50 A.D.3d 873, 855 N.Y.S.2d 250, 251 (App.Div.2008) (holding that since the defendant was "convicted of the crime of rape in the Commonwealth of Pennsylvania in 1987 ... [which] includes all the essential elements of rape in the first degree as defined in New York State Penal Law § 130.35(1)" that he committed a registrable offense in New York and he was properly classified as a sex offender in New York). The Court will not opine on whether or not Plaintiff is currently required to register in California as this issue is not before the Court. The Court notes that the form signed by Plaintiff and referred to by the Court was not attached to the Complaint and is therefore not considered by the Court in deciding the pending motions. The document is relied on simply to give context to the facts since Plaintiff asserts in the Complaint that "in his home State of California, Plaintiff was similar to a Level I" and he is no longer required to register in California. (Compl. ¶¶ 268, 291–92; *see also id.* ¶¶ 151, 178, 261–62, 279.)

**b. Plaintiff Living and Working in New York**

Plaintiff asserts that in "early 2009," he began to "lend[ ] emotional and moral support to his cousin, who resided in Borough of Queens, City of Astoria, State of New York, through a divorce proceeding." (Compl.¶ 41.) "It was then when Plaintiff was introduced to attorney/defendant Trakas, who was, at that time, representing Plaintiff's cousin in said divorce proceedings." (*Id.*) According to Plaintiff, he helped Trakas in a case before the New York Board of Prisons and Trakas asked Plaintiff if he was interested in working for him as "a civil rights and constitutional consultant, temporary legal assistant, researcher, investigator and process server." (*Id.* ¶¶ 42, 43.) Plaintiff agreed that he would travel back and forth between California and New York until the Attorney Defendants had an opportunity to research sex offender registration in New York "to make sure that Plaintiff [did] not suffer any collateral consequence which could potentially expose him to more severe restrict [sic] and public notification then [sic] he had been exposed [to] in his state of conviction." (*Id.* ¶ 47.)

The Attorney Defendants told Plaintiff that in their professional opinion, he would not be subject to registration in New York that would require him to be on the public website or have a classification level but he would be required to notify the Division of his presence in New York. (*Id.* ¶ 49.) Plaintiff asserts that he was "induced" to live in New York by the Attorney Defendants who told Plaintiff he could work for them as a "non-New York citizen and nonresident worker." (*Id.* ¶ 187.) Plaintiff does not allege when in 2009 he met the Attorney Defendants nor does he allege when he began to have discussions with them regarding working for them in New York.

**\*4** Plaintiff began working and living in New York in November 2009. (*Id.* ¶ 52.) He first lived in Flushing, Queens and then in Astoria, Queens. (*Id.*) His apartment in Astoria was "only one block away from Bryant High School, and two blocks away from other public schools." (*Id.*) According to Plaintiff, the Attorney Defendants paid for his first month's rent and Trakas purchased Plaintiff's bed and other furniture. (*Id.*) The Attorney Defendants agreed to pay Plaintiff his

customary rate of $75.00 an hour. (*Id.* ¶ 55.) They also agreed that Plaintiff would receive ten percent commission for cases he brought to the Attorney Defendants and ten percent of any judgment or settlement. (*Id.*)

Plaintiff alleges that the Attorney Defendants "together agreed to manipulate the Plaintiff to induce him, through the use of the United States Postal Service, internet, and the telecommunications system, an [sic] other interstate communications means, to accept a position within their respective law office, in order to enrich themselves from his knowledge of civil rights, criminal, and other fields of litigation...." (*Id.* ¶ 56.) Plaintiff claims that the Attorney Defendants enriched themselves by "using Plaintiff's experience in civil rights, I.D.E.A., ADA and the Rehabilitation Act of 1974, including his knowledge of constitutional issues arising from criminal cases." (*Id.* ¶ 158.) Plaintiff maintains that he "had been trained and taught by deceased renowned New York Civil Rights attorney Mel Sachs, and that Plaintiff was working on Mel Sachs [sic] cases when he passed." (*Id.*)

### c. Plaintiff's New York State SORA Proceedings

Plaintiff asserts that within 10 days of arriving in Queens in November 2009, he went with the Attorney Defendants and Trakas's paralegal to the Division's offices in Manhattan. (Compl. ¶¶ 50, 54.) [8] Plaintiff alleges that he notified California "that he was temporarily working in the State of New York and would have a secondary address, and that he would continue to have is [sic] primary residence in City of Palm Springs, State of California." (*Id.* ¶ 51.) However, Plaintiff told officials in both New York and California that he was planning to reside in New York. By letter dated December 22, 2009, Plaintiff wrote to the New York State Sex Offender Registry, stating:

[8]     In another part of the 149–page Complaint, Plaintiff asserts that "on or about January 11th, 2010[sic], upon being temporary [sic] hired by attorneys/defendants Russo and Trakas, Plaintiff went with attorney/defendant Trakas' paralegal to the Division located in New York City to register in accordance with Correction Law 168–f(6) ." (Compl. ¶ 283.)

I would like to inform you that I would like to reside in New York. I am subject to sex registration in California and I am told I would have to register in New York. Can you please send me the required form to complete my registration. I have been in New York for less than ten (10) days from the signing of this letter.

I have also notified Sonoma County, California, my place of residence of this action and am providing you a copy of said letter as attached.

(Hartfolis Decl. Ex. D.) [9] The letter to Sonoma County that Plaintiff refers to is also dated December 22, 2009 and states:

[9]     Generally, a court may only consider materials encompassed in the "four corners" of a complaint when deciding a motion to dismiss. *See Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000) (holding that "a district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants, or relies on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss" (citations omitted)). All documents that are "attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" are considered part of the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citations omitted). A court may also consider "a document [that] is not incorporated by reference ... where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* at 153 (citations omitted). The Complaint relies on the terms and effect of the letter since the Complaint relies on Plaintiff's discussions and correspondences with New York State and California State authorities regarding his work in New York and his registration requirements. (*See* Compl. ¶¶ 51, 54.)

**\*5** While visiting New York, I decided to relocate to the State of New York. I do not have a permanent address as of yet, and I am informed by my California lawyers that once I get a permanent address I have to immediately notify you. I have notified New York of my presence in accordance with their [sic] statutes. A copy of the notification is hereto attached. By the time I receive the N.Y. Board's form for registration I would have a permanent address and I will send you that information contained in said form.

(Hartfolis Decl. Ex. D.) Plaintiff asserts that he amended his original letter. (Pl. Opp'n to State Defs. 58.) The

amended letter Plaintiff refers to is a letter dated June 10, 2010, six months after he notified New York that he was moving to New York and requested the relevant registration forms from New York State. (*Id.* Ex. 3.) Plaintiff's June 10, 2010 letter written to Judith Condo "Member, Board of Examiners," responds to the Board notification to Plaintiff that he is required to register as a sex offender and that his case had been referred to the court for a SORA risk level classification proceeding. (*Id.*) In the June 10, 2010 letter Plaintiff wrote:

> 1. I am in receipt of your determination and purported evaluation where you have referred this matter for a SORA hearing for a Level Classification and Designation.
>
> 2. Madam, you nor any Court have jurisdiction on this matter to institute or prosecute a SORA proceeding.
>
> 3. I am a non-resident worker and as such pursuant to New York Corrections Law § 168(f)(6) my only obligation is to notify the Division, which I did, and the Division is required to notify the local law enforcement of my resident address and employment address. The statute does not authorize you nor the Court to take any further action nor does it confer on the Court, in personam jurisdiction or subject matter jurisdiction.

> (*Id.*)

Despite his letter to the Board, Plaintiff did litigate the SORA proceeding. According to Plaintiff, he appeared at some of the hearings before Judge Camacho, (Compl.¶ 166.), and he relied on Trakas's legal advice and agreed to have Russo represent him at his SORA proceeding. (*Id.* ¶ 66.) Plaintiff claims that "[i]t was clear to Plaintiff that attorney/defendant Russo had not studied nor reviewed any of the legal briefs, evidences and facts that he had prepared for attorney/defendant Russo, and appeared so incompetent at the hearings, that attorney/defendant would ask for a continuance." (*Id.* ¶ 166.) Plaintiff asserts that "it was for [sic] Attorney/defendant Russo' [sic] failure to file the aforementioned Petition and seeking a stay of the S.O.R.A. Level III Classification hearing before Judge Camacho, Plaintiff would not have been subjected to such a process, but would have immediately returned to his home State of California." (*Id.* ¶ 167.)

Plaintiff does not state when, but asserts generally that sometime prior to his final risk level determination by Judge Camacho, he "discovered that Queens Supreme Court had

posted on its New York State Criminal Website (N.Y.S Crimweb) that Plaintiff had been charged with a Felony in regards to the New York registrations." (*Id.* ¶ 68 (emphasis omitted).) Plaintiff asserts that the registration information listed him as having committed an E Felony, which was false. (*Id.*) Plaintiff told the Attorney Defendants about this information, and they agreed to raise the issue at the next hearing with Judge Camacho. (*Id.* ¶ 69.) The Attorney Defendants also asked Plaintiff to draft an Article 78 petition and an order to show cause. (*Id.*)

**\*6** According to Plaintiff, prior to the final hearing before Judge Camacho, he had a meeting with the Attorney Defendants. (*Id.* ¶ 83.) They informed Plaintiff that if he returned to California, Judge Camacho would have no jurisdiction over him. (*Id.*) The Attorney Defendants and Plaintiff agreed that Plaintiff should return to California and that the Attorney Defendants would assist Plaintiff with shipping his belongings to California. [10] (*Id.*) Plaintiff was to appear before Judge Camacho during the last week of May 2011 for his registration determination hearing. (*Id.* ¶ 74.) Plaintiff suffered a seizure that week and was hospitalized. (*Id.*) While at the hospital, he received a call from Russo that Judge Camacho wanted to see Plaintiff the next day. (*Id.* ¶ 75.) Russo told Plaintiff that he was not under any obligation to appear at the hearing since Russo had given Judge Camacho sufficient notice that Plaintiff was returning to California. (*Id.* ¶ 76.) Russo also told Plaintiff that the hearing would be canceled because Judge Camacho would no longer have jurisdiction over Plaintiff. (*Id.*) On May 25, 2011, Judge Camacho determined that Plaintiff was a risk level III sex offender. (Hartofilis Decl. Ex. C.)

[10]  Plaintiff claims he lost $100,000 in personal property when the Attorney Defendants failed to ship Plaintiff his belongings, including "computer, air-conditioner, furniture, expensive cowboy designer cloths [sic] and cowboy hats, wheelchair, Canadian walking cains [sic], etc." (Compl.¶ 83.)

While Plaintiff was at Newark Airport on his way to California, he received a call from Russo. (Compl.¶ 77.) Russo told Plaintiff that Judge Camacho issued an order classifying Plaintiff a Level III sex offender. (*Id.*) Plaintiff asked Russo if he should return to New York and was told by Russo that he did not have to return because Russo was going to file a motion for reconsideration, an Article 78 petition, and a notice of appeal. (*Id.*)

Plaintiff asserts that "[u]pon arriving in the City of Palm Springs, County of Riverside, State of California, Plaintiff with his lawyer, David L. Wright, went to the Police Department and registered." (*Id.* ¶ 78.) Plaintiff "made copies of the registration business card provided by the registry officer, scanned it and sent it to the New York Sex Offender's Registry in Albany and to attorney/defendant Russo to file before Judge Camacho and provide a[sic] to the Assistant District Attorney" who was the attorney in the SORA proceeding. (*Id.*)

Plaintiff subsequently tried to find out the status of the SORA proceeding. (*Id.* ¶ 80.) He emailed Russo on June 29, 2011, to inquire whether the order had been withdrawn and was told by Russo that "Camacho is out until after the fourth [sic] of July. The ADA will get 20 days to respond and the matter will be decided." (*Id.*) Plaintiff understood the email to mean that Russo had filed the motions. (*Id.*) At some point, Plaintiff began to suspect that the Attorney Defendants had not acted in his best interest and he contacted the Clerk of the Supreme Court and was told that no motions or notice of appeal had been filed on his behalf.[11] (*Id.* ¶ 88.) Plaintiff immediately contacted the Attorney Defendants and "requested an explanation." (*Id.* ¶ 89.) Plaintiff received a series of offensive emails. (*Id.*) Plaintiff was told in those emails that the time to appeal had lapsed and this lawsuit followed. (*Id.* ¶¶ 90–91.) Plaintiff alleges in the Complaint that "[u]ntil the time to file (a) Motion for Reconsideration, (b) Article 78 Petition and (c) a Notice of Appeal had elapsed, [the Attorney Defendants] kept leading on the Plaintiff to believe that they had performed the above obligations, duties and responsibilities owed to Plaintiff as their client." (*Id.* ¶ 82.)

[11]    Plaintiff does not state in the Complaint when he contacted the Clerk of the Supreme Court. (Compl.¶ 88.)

**\*7**  In his papers submitted in opposition to the State Defendants' motion to dismiss the Complaint, Plaintiff, for the first time, asserts that he tried to file a timely Article 78 petition and appeal but was "obstructed, prevented, interfered with and denied by officers or agents of the [S]tate [D]efendants." [12] (Pl. Opp'n. to State Defs. 24.) Email "excerpts" inserted into Plaintiff's submissions in opposition to the State Defendants' motions to dismiss, appear to show that Plaintiff may have attempted to file an Article 78 petition and an appeal in the appellate court. [13]  (*Id.*) Plaintiff was initially informed (1) that the papers had to be filed in

Supreme Court, (2) that the Appellate Clerk would be unable to file his papers for him sent via email, and (3) that Plaintiff should have an attorney file the papers. (*Id.* at 24–25.) Plaintiff then had Dr. Busuttil file the papers in the Appellate Division because he thought it was the right court. (*Id* .)

[12]    It is not plausible that Plaintiff did not know that the Attorney Defendants did not timely appeal or file the Article 78 petition until the time to do so had expired and, at the same time, that Plaintiff tried to file a timely appeal but was thwarted in his attempts to do so. Clearly, both of these things cannot be true. In Plaintiff's motion for preliminary injunction, he admits that when he first attempted to submit his Article 78 petition and appeal that the time to do so had expired. (Pl.Prelim.Inj.Mem.43.)

[13]    No actual emails were provided as attachments to Plaintiff's Complaint or to his submissions in opposition to the motions to dismiss. However, as discussed *supra* in footnote 6, in view of Plaintiff's *pro se* status and because of the Court's responsibility to construe *pro se* pleadings liberally, the Court will consider these factual allegations.

There are many email excerpts between Plaintiff and several individuals in the New York State Court system beginning in December 2011, discussing whether documents Plaintiff mailed to the court were received. (*Id.* at 26–31.) Plaintiff was emailed the appropriate forms to file his petition and to file an application to receive "poor person" status in the New York State court and was told that the forms had to be notarized in order to be accepted by the court. (*Id.* at 28–31.) Plaintiff objected to the requirement that the documents had to be notarized. (*Id.* at 29.) Plaintiff requested that the notary requirement be waived because he was outside the United States and it was too costly to notarize the documents. (*Id.*) Plaintiff was advised that there was a free notary at the court but he would have to be physically present to use the services of the free notary public. (*Id.*) Plaintiff was informed that "[r]equiring that an affidavit be signed and properly notarized is not a mere administrative rule, but a required legal procedure to safeguard against fraud. In any event, the county clerk is not 'the court' as you put it, and we cannot 'waive' the law." (*Id.*) Plaintiff argues that his application should have been accepted as a declaration signed under the penalty of perjury pursuant to Title 28 U.S.C. Section 1746. (*Id.*)

### III. Discussion

### a. Standard of Review

#### i. Rule 12(b)(1)

"[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Shabaj v. Holder,* 704 F.3d 234, 237 (2d Cir.2013) (alteration in original) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005)). " '[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " *Morrison v. Nat'l Austl. Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) (alterations in original) (citations omitted), *aff'd,*561 U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists. *M.E.S., Inc. v. Snell,* 712 F.3d 666, 671 (2d Cir.2013); *Romano v. Kazacos,* 609 F.3d 512, 520 (2d Cir.2010); *Morrison,* 547 F.3d at 170.

#### ii. Rule 12(b)(6)

**\*8** In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir.2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *see also Matson v. Bd. of Educ.,* 631 F.3d 57, 63 (2d Cir.2011) (quoting *Connecticut v. Am. Elec. Power Co.,* 582 F.3d 309, 320 (2d Cir.2009)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson,* 631 F.3d at 63 (quoting *Iqbal,* 556 U.S. at 678);*see also Pension Ben. Guar. Corp.,* 712 F.3d at 717–18. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Pension Ben. Guar. Corp.,* 712 F.3d at 718 (alteration in original) (quoting *Iqbal,* 556 U.S. at 679). "Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss ." *U.S. Bank Nat. Ass'n v. Bank of Am., N.A.,* No. 12–CV–4873, 2012 WL 6136017, at \*7 (S.D.N.Y. Dec. 11, 2012) (quoting *Nationwide Mut. Ins. Co. v. Morning Sun Bus. Co.,* No. 10–CV–1777, 2011 WL 381612, at \*6 (E.D.N.Y. Feb. 2, 2011)); *see also Vaughn v. Strickland,* No. 12–CV–2696, 2013 WL 3481413, at \*6 (S.D.N.Y. July 11, 2013) (noting that a court is not required "to accept as true allegations that conflict with a plaintiff's" other allegations (internal quotation marks omitted) (quoting *Green v. Niles,* No. 11–CV–1349, 2012 WL 987473, at \*5 (S.D.N.Y. Mar. 23, 2012)); *Ferguson v. Cai,* No. 11–CV–6181, 2012 WL 2865474, at \*4 n. 3 (S.D.N.Y. July 12, 2012) (same); *In re Int'l Tobacco Partners, Ltd.,* 462 B.R. 378, 385 (Bankr.E.D.N.Y.2011) ("Where an allegation in the complaint conflicts with other allegations, or where the plaintiff's own pleadings are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, the court is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the pleadings as true in deciding a motion to dismiss." (quoting *In re Vanarthos,* 445 B.R. 257, 261 (Bankr.S.D.N.Y.2011)).

### b. SORA Legislative Scheme

#### i. General Provisions

SORA, codified at N.Y. Correction Law § 168 *et seq.,* became effective January 21, 1996. *Doe v. Pataki,* 120 F.3d 1263, 1266 (2d Cir.1997); *Moore v. County of Suffolk,* 851 F.Supp.2d 447, 453 (E.D.N.Y.2012); *State v. Rashid,* 16 N.Y.3d 1, 17, 917 N.Y.S.2d 16, 942 N.E.2d 225 (2010). It requires that sex offenders register with the Division. *Pataki,* 120 F.3d at 1266. The registration provisions apply not only to sex offenders who were convicted at trial of a registrable crime but also those sex offenders who plead guilty and enter nolo contendere pleas. *See, e.g., Kasckarow v. Bd. of Examiners of Sex Offenders of State,* 106 A.D.3d 915, 964 N.Y.S.2d 650, 650 (App.Div.2013) (holding that "outof-state nolo contendere pleas" are convictions under SORA); *Smith v. Devane,* 73 A.D.3d 179, 898 N.Y.S.2d 702, 704 (App.Div.2010) (holding that the "petitioner's Texas guilty plea and deferred adjudication [w]as a conviction requiring registration as a sex offender in" in New York).

**\*9** The statute also applies to sex offenders convicted in other states who move to New York. "The procedure for registration of sex offenders who move to New York from other states is set out in Correction Law § 168–k." *People v. Liden,* 19 N.Y.3d 271, 275, 946 N.Y.S.2d 533, 969 N.E.2d

2013 WL 4806960

751 (2012). According to this provision, a sex offender shall notify the Division of his or her address "no later than ten calendar days after such sex offender establishes residence in this state." N.Y. Correct. Law § 168–k(1). The Division is required to notify the Board that an out-of-state convicted sex offender has notified the Division of his or her presence in New York State, and the Board is responsible for making a determination as to whether the offender is required to register, and, if so, makes a recommendation to the county court or supreme court as to the risk level classification for the out-of-town convicted sex offender.

The statute provides in pertinent part:

> The division shall advise the board that the sex offender has established residence in this state. The board shall determine whether the sex offender is required to register with the division. If it is determined that the sex offender is required to register, the division shall notify the sex offender of his or her duty to register under this article and shall require the sex offender to sign a form as may be required by the division acknowledging that the duty to register and the procedure for registration has been explained to the sex offender. No later than thirty days prior to the board making a recommendation, the sex offender shall be notified that his or her case is under review and that he or she is permitted to submit to the board any information relevant to the review. After reviewing any information obtained, .... the board shall within sixty calendar days make a recommendation regarding the level of notification ... and whether such sex offender shall be designated a sexual predator, sexually violent offender, or predicate sex offender....

N.Y. Correct. Law § 168–k(2). While the Board makes a recommendation as to the classification level of the offender, the county court or supreme court determines the level of classification after a hearing. Id.; see also Liden, 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751 ("Thus the statute assigns the registrability determination to the Board, and the risk level ('level of notification') determination to the court.").

The statute further provides:

> At least thirty days prior to the determination proceeding, such court shall notify the district attorney and the sex offender, in writing, of the date of the determination proceeding and the court shall also provide the district attorney and sex offender with a copy of the recommendation received from the board and any statement of the reasons for the recommendation received from the board. This notice shall include the following statement or a substantially similar statement ... This proceeding ... will determine how long you must register as a sex offender and how much information can be provided to the public concerning your registration. *If you fail to appear at this proceeding, without sufficient excuse, it shall be held in your absence. Failure to appear may result in a longer period of registration or a higher level of community notification because you are not present to offer evidence or contest evidence offered by the district attorney.* The court shall also advise the sex offender that he or she has a right to a hearing prior to the court's determination, that he or she has the right to be represented by counsel at the hearing and that counsel will be appointed if he or she is financially unable to retain counsel.

**\*10** *Id.* (emphasis added). "If a sex offender, having been given notice, including the time and place of the determination proceeding in accordance with this section, fails to appear at this proceeding, without sufficient

excuse, the court shall conduct the hearing and make [a] determination[ ]." N.Y. Correct. Law § 168–k(4). At the hearing, the sex offender can also obtain counsel appointed by the court if the sex offender applies for counsel and the court finds that the sex offender cannot afford to retain counsel. N.Y. Correct. Law § 168–k(2).

If the parties dispute issues, including whether the sex offender is required to register, the court may also consider that dispute. *Id.* "Where there is a dispute between the parties concerning the determinations, the court shall adjourn the hearing as necessary to permit the sex offender or the district attorney to obtain materials relevant to the determinations from the state board of examiners of sex offenders or any state or local facility, hospital, institution, office, agency, department or division. Such materials may be obtained by subpoena if not voluntarily provided to the requesting party." *Id.* The New York Court of Appeals has held that the court may consider not only the level of classification but also whether a sex offender is under any obligation to register if there is a dispute among the parties. [14] *Liden,* 19 N.Y.3d at 276, 946 N.Y.S.2d 533, 969 N.E.2d 751 ("Where the initial determination that the person must register is disputed, ... that registrability can be considered in the risk level proceeding."). "The state has the burden of establishing by clear and convincing evidence the risk level assessment." *People v. Arotin,* 19 A.D.3d 845, 796 N.Y.S.2d 743, 745–46 (App.Div.2005). "Case summaries often satisfy this burden." *Id.*

[14]    At the time of Plaintiff's classification hearing, Plaintiff could only challenge his risk level and not the determination that he was required to register at the classification hearing. *See In re Mandel,* 293 A.D.2d 750, 742 N.Y.S.2d 321, 322 (App.Div.2002) ("SORA limits the court's function to determining the duration of registration and the level of notification. Since the court's function in a proceeding pursuant to Correction Law article 6–C is limited, in the absence of a proceeding pursuant to CPLR article 78, the court may not review the Board's registration determination."), *abrogated by People v. Liden,* 19 N.Y.3d 271, 946 N.Y.S.2d 533, 969 N.E.2d 751 (2012); *see also Liden,* 19 N.Y.3d at 274, 946 N.Y.S.2d 533, 969 N.E.2d 751 (noting that "several Appellate Division decisions h[eld] that a determination of registrability may be challenged only in an article 78 proceeding" and making it

clear that a plaintiff could challenge the Board's determination at the classification hearing); *People v. Teagle,* 64 A.D.3d 549, 884 N.Y.S.2d 80, 81 (App.Div.2009) ("The defendant's argument that he is not properly subject to SORA at all is not properly before this Court since a CPLR article 78 proceeding is the only proper vehicle in which to raise a challenge to an agency determination that an out-of-state conviction subjects a defendant to SORA."). Plaintiff could have brought a separate Article 78 proceeding to challenge the Board's determination that he was required to register as a sex offender.

The court is ultimately required to provide an order with findings of fact and law, which order can be appealed by either party. [15] N.Y. Correct. Law § 168–k(2). "Where counsel has been assigned to represent the sex offender upon the ground that the sex offender is financially unable to retain counsel, that assignment shall be continued throughout the pendency of the appeal, and the person may appeal as a poor person pursuant to article eighteen-B of the county law." *Id.*

[15]    "Upon application of either party, the court shall seal any portion of the court file or record which contains material that is confidential under any state or federal statute." N.Y. Correct. Law § 168–k(2).

### ii. Nonresident Worker Provisions

Under SORA, a "nonresident worker" is defined as "any person required to register as a sex offender in another jurisdiction who is employed or carries on a vocation in New York State, on either a full-time or a part-time basis, with or without compensation, for more than fourteen consecutive days, or for an aggregate period exceeding thirty days in a calendar year." N.Y. Correct. Law § 168–a(15). Section 168–f(6) of SORA provides in pertinent part that:

> Any nonresident worker or nonresident student, as defined in subdivisions fourteen and fifteen of section one hundred sixty-eight-a of this article, shall register his or her current address and the address of his or her place of employment or educational institution attended

with the division within ten calendar days after such nonresident worker or nonresident student commences employment or attendance at an educational institution in the state. Any nonresident worker or nonresident student shall notify the [D]ivision of any change of residence, employment or educational institution address no later than ten days after such change. The [D]ivision shall notify the law enforcement agency where the nonresident worker is employed or the educational institution is located that a nonresident worker or nonresident student is present in that agency's jurisdiction. [16]

[16]   Plaintiff asserts that according to this provision, he was required only to notify the Division that he was present in New York and would not appear on the public registry if he complied with this provision. (Pl. Opp'n to State Defs. 65, 70.) Contrary to Plaintiff's claims, this is a first step rather than the only step with which a nonresident worker is required to comply. Whether a sex offender will ultimately be subject to registration in New York State and the level of classification is governed by the procedures set forth in New York Corrections Law Section 168–k.

**\*11** N.Y. Correct. Law § 168–f(6). New York Court of Appeals has held that any sex offender, as defined by New York Corrections Law Section 168–a (2)(d), may be required to appear on the registry and whether or not a sex offender is required to register is a determination made pursuant to N.Y. Corrections Law Section 168–k. *See Liden,* 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751 ("The procedure for registration of sex offenders who move to New York from other states is set out in Correction Law § 168–k."). Under N.Y. Corrections Law Section 168–k, the determination as to whether a sex offender has to register is made by the Board, but the risk level classification determination is made by a judge of the county court or supreme court. *Id.*

### iii. Level III Sex Offender Requirements

A sex offender is given a Level III classification when "risk of repeat offense is high and there exists a threat to the public safety." N.Y. Correct. Law § 168–l(6)(c); *see also* N.Y. Correct. Law § 168–d(2) (discussing notification given to individuals about risk levels); N.Y. Correct. Law § 168–k(2) (same); N.Y. Correct. Law § 168–n(3) (same). Level III sex offenders are required to register and "shall personally appear at the law enforcement agency having jurisdiction within twenty days of the first anniversary of the sex offender's initial registration and every year thereafter during the period of registration for the purpose of providing a current photograph of such offender. The law enforcement agency having jurisdiction shall photograph the sex offender and shall promptly forward a copy of such photograph to the [D]ivision." N.Y. Correct. Law § 168–f(2)(b–2). Additionally, a Level III sex offender "shall also personally verify his or her address every ninety calendar days with the local law enforcement agency having jurisdiction where the offender resides." N.Y. Correct. Law § 168–h(3).

As a Level III sex offender, pursuant to New York Correction law, Plaintiff has a lifetime registration requirement. N.Y. Correct. Law § 168–h(2). Once it has been determined that a sex offender is under a life-time registration, he may be removed from the registry only if he or she has his or her conviction overturned or is pardoned. *See* N.Y. Correct. Law § 168–f(5); *Doe v. O'Donnell,* 86 A.D.3d 238, 924 N.Y.S.2d 684, 686 (App.Div.2011) ("[W]hile SORA expressly addresses an offender's relocation to another state, it does not provide for his or her removal from the sex offender registry under such circumstances. Had the Legislature intended to require the Division to remove a sex offender from New York's registry upon his or her relocation from this state, it would have so provided."). SORA also requires that all sex offenders register any change of address with the Division "no later than ten calendar days after any change of address." N.Y. Correct. Law § 168–f(4). SORA makes clear that both nonresident workers and nonresident students are to inform the Division within ten days of their relocation to a new address. N.Y. Correct. Law § 168–f(6). The Division will inform law enforcement officials in the new place of residence of the individual's relocation. N.Y. Correct. Law § 168–f(6); N.Y. Correct. Law § 168–j(4). [17]

[17]   The State Defendants argue that if Plaintiff had properly notified the appropriate New York agency of his change of address, while he would still be on the registry, he would no longer be under an obligation to report every 90 days to his local law

enforcement agency, since New York Correction Law Section 168–h(3) only requires a sex offender to report to the local law enforcement where the offender "resides." (*See* State Def. Reply 17.)

### c. State Defendants' Motion to Dismiss the Complaint

 **\*12**  The State Defendants assert that the Court lacks jurisdiction over Plaintiff's claims against them for several reasons: (1) the *Rooker–Feldman* doctrine bars the suit, (2) Judge Camacho is immune because of the absolute immunity doctrine, (3) the State Defendants are immune because of sovereign immunity, and (4) the State Defendants have no personal involvement and therefore they are not proper parties. For the reasons set forth below, the Court finds that the *Rooker–Feldman* doctrine does not bar the bulk of Plaintiff's suit, only a small portion of it, Judge Camacho is immune from prosecution for all claims because of judicial immunity and sovereign immunity, New York State is also immune from all claims because of sovereign immunity, the Individual State Defendants are immune from all claims for money damages, the Governor is not a proper party, and Plaintiff's claims against Harrington and Mulligan have no merit. Therefore, Plaintiff's preliminary injunction request is denied, and the State Defendants' motion to dismiss is granted.

### i. *Rooker–Feldman* Doctrine

Plaintiff is not barred from bringing the bulk of this action against the State Defendants by the *Rooker–Feldman* doctrine. Under the *Rooker–Feldman* doctrine, federal district and circuit courts lack subject-matter jurisdiction in cases that are essentially "appeals from state-court judgments." *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 84 (2d Cir.2005); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (holding that *Rooker–Feldman* bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"); *McKithen v. Brown,* 626 F.3d 143, 154 (2d Cir.2010) ("[T]he *Rooker–Feldman* doctrine deprives a federal court of jurisdiction to consider a plaintiff's claim" which applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review of those judgments." (citations and internal quotation marks omitted)); *Galtieri v. Kelly,* 441 F.Supp.2d 447, 453 (E.D.N.Y.2006) ( "[F]ederal district courts lack jurisdiction over suits that are,

in substance, appeals from state-court judgments." (quoting *Hoblock,* 422 F.3d at 84)). "Underlying the Rooker–Feldman doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." *Hoblock,* 422 F.3d at 85; *see also Williams v. 2720 Realty Co.,* No. 12–CV–6408, 2013 WL 55685, at \*2 (E.D.N.Y. Jan. 3, 2013) ("[O]nly the United States Supreme Court is vested with jurisdiction over appeals from final state court judgments.").

In order for *Rooker–Feldman* to apply, a four-part test must be satisfied: "First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must 'complain of injuries caused by a state-court judgment.' Third, the plaintiff must 'invite district court review and rejection of that judgment.' Fourth, the state-court judgment must have been 'rendered before the district court proceedings commenced....' " *Green v. Mattingly,* 585 F.3d 97, 101 (2d Cir.2009) (alteration and citations omitted); *see also McKithen,* 626 F.3d at 154 (outlining the *Rooker–Feldman* test); *Jelks v. Menorah Home & Hosp. for the Aged & Infirm.,* No. 13–CV–2995, 2013 WL 4008734, at \*2 (E.D.N.Y. Aug.5, 2013) (same); *Baumgarten v. Suffolk County,* No. 12–CV–0171, 2013 WL 3973089, at \*6 (E.D.N.Y. July 31, 2013)) (same). As discussed below, only two of the four requirements have been met by the State Defendants.

 **\*13**  The State Defendants argue that Judge Camacho's May 25, 2011 determination of Plaintiff's risk level assessment (1) is a loss in state court, (2) is a state court judgment that has caused the injuries Plaintiff complains of in this action, (3) that Plaintiff seeks review and rejection of Judge Camacho's decision, and (4) that the decision was rendered before Plaintiff commenced this action. (*See generally* State Defs. Mem.) The State Defendants are correct only as to the first and fourth elements—Plaintiff did commence this proceeding on May 31, 2012, a year after Judge Camacho's May 25, 2011 decision and Judge Camacho's decision was a loss for Plaintiff in state court. [18]

[18]      Plaintiff argues that there is no final state court decision because he can appeal Judge Camacho's decision. (Pl. Opp'n to State Def. 25–39.) It is unclear why Plaintiff believes he can timely appeal a May 2011 court decision, but, in any event, even assuming that Plaintiff could timely appeal Judge Camacho's decision, the ability to do so does not bar the application of the *Rooker–Feldman* doctrine since the doctrine applies not only to

2013 WL 4806960

final orders but also to interlocutory decisions. *Green v. Mattingly,* 585 F.3d 97, 101 (2d Cir.2009) (noting that the "doctrine applied both to final state court judgments and to interlocutory state court orders"); *Shelley v. Brandveen,* No. 06–CV–1289, 2012 WL 3903472, at *3 (E.D.N.Y. Sept. 6, 2012) (*"Rooker–Feldman* doctrine, applies not only to final judgments, but also to interlocutory orders." (citing *Campbell v. Greisberger,* 80 F.3d 703, 707 (2d Cir.1996))); *see also Citibank, N.A. v. Swiatkowski,* No. 12–CV–0196, 2012 WL 542681, at *4 n. 7 (E.D.N.Y. Feb. 21, 2012); ("The fact that [the plaintiff] had an appeal pending before the Appellate Division at the time of removal does not affect the Rooker–Feldman analysis."); *Bobrowsky v. Yonkers Courthouse,* 777 F.Supp.2d 692, 706 (S.D.N.Y.2011) (holding that the initial criminal conviction and civil protective order were both final decisions prior to any 440 motions seeking to overturn the conviction).

As to the other two *Rooker–Feldman* elements, the State Defendants are wrong. The issue before Judge Camacho was Plaintiff's risk level classification, not whether he was required to register as a sex offender. Indeed, at the time of the risk level classification proceeding before Judge Camacho, Plaintiff could *not* challenge the Board's determination that he was required to register as a sex offender during the proceeding before Judge Camacho. *See In re Mandel,* 293 A.D.2d 750, 742 N.Y.S.2d 321, 322 (App.Div.2002) ("SORA limits the court's function to determining the duration of registration and the level of notification. Since the court's function in a proceeding pursuant to Correction Law article 6–C is limited, in the absence of a proceeding pursuant to CPLR article 78, the court may not review the Board's registration determination."), *abrogated by Liden,* 19 N.Y.3d 271, 946 N.Y.S.2d 533, 969 N.E.2d 751;*see also People v. Teagle,* 64 A.D.3d 549, 884 N.Y.S.2d 80, 81 (App.Div.2009) ("The defendant's argument that he is not properly subject to SORA at all is not properly before this Court since a CPLR article 78 proceeding is the only proper vehicle in which to raise a challenge to an agency determination that an out-of-state conviction subjects a defendant to SORA."). Plaintiff's primary challenge in the proceeding before this Court is to the requirement that, as an alleged nonresident worker, he is required to register as a sex offender in New York.[19] This determination was made by the Board, and while Plaintiff could have brought an Article 78 proceeding to challenge the Board's determination, Plaintiff did not challenge the determination in court. Thus, as to the Board's

determination that Plaintiff was required to register, there is no court proceeding that Plaintiff is challenging in this action. Judge Camacho's decision did nothing more than determine Plaintiff's risk level classification. It had no effect on whether Plaintiff was *required to register.* Therefore, as to the determination that Plaintiff had to register, Plaintiff is not complaining of any injuries caused by Judge Camacho's decision, nor is he seeking a review or rejection of Judge Camacho's decision. Plaintiff is therefore not barred from bringing this action by the *Rooker–Fedlman* doctrine.[20]

19    To the extent Plaintiff is challenging his risk level determination that was decided by Judge Camacho on May 25, 2011, such a challenge is barred by the *Rooker–Feldman* doctrine. *See Burfeindt v. Postupack,* 509 F. App'x 65, 66 (2d Cir.2013) (upholding district court's dismissal which rested partially on *Rooker–Feldman* grounds); *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 83 (2d Cir.2005) (finding suit barred by *Rooker–Feldman* doctrine); *Zuneska v. Cuomo,* No. 12–CV–0949, (E.D.N.Y. Feb.1, 2013) (finding that the supreme court's determination that a level one registered sex offender could not be declassified was barred from review by the federal court because of the *Rooker–Feldman* doctrine); *Anderson v. UMG Recordings Inc.,* No. 12–CV–25826, 2012 WL 6093776, at *2 (E.D.N.Y. Dec.7, 2012) ("[A]lthough plaintiff's complaint does not detail the specific injuries that the rulings in the State Court Action cause him, a fair reading of the complaint is that plaintiff seeks to continue pressing the claims underlying the State Court Action...."); *White v. White,* No. 12–CV–200, 2012 WL 3041660, at * 13–14 (S.D.N.Y. July 20, 2012) (finding that the state court decision was the real cause of the plaintiff's injury and therefore the federal district court lacked jurisdiction over the matter); *Munsch v. Evans,* No. 11–CV–2271, 2012 WL 528135, at *6 (E.D.N.Y. Feb. 17, 2012) (barring a plaintiff from bringing a case in which the plaintiff sought to have supervision for life by the parole board found unconstitutional because it would require the court to overturn the state court decision).

20    Plaintiff also asserts a denial of access to the courts claim. (Pl. Opp'n to State Def. 25–39.) Plaintiff claims that the State Defendants should be barred from asserting that the *Rooker–Feldman* doctrine

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 190 of 267
Spiteri v. Russo, Not Reported in F.Supp.2d (2013)
2013 WL 4806960

bars his claims because they prevented him from filing his Article 78 petition and his appeal. (*Id.*) The Court denied this claim at oral argument, (Oral Arg. Tr. 18:15–22:22), but explains the basis for the dismissal here. "To sustain a cause of action for denial of access to the courts, a plaintiff must show that '(1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury.' " *DeMeo v. Kean,* 754 F.Supp.2d 435, 445 (N.D.N.Y.2010); *see also Dawes v. VanBenschoten,* 21 F. App'x 29, 31 (2d Cir.2001) ("To find an unconstitutional denial of access to the courts, a plaintiff must demonstrate that the defendant acted deliberately and maliciously."); *Hendricks v. Boltja,* 20 F. App'x 34, 37 (2d Cir.2001) ("[D]enial of access to the courts ... requires a showing of actual injury."). "A plaintiff must assert more than mere allegations that the 'false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.' " *DeMeo,* 754 F.Supp.2d at 445 (quoting *Christopher v. Harbury,* 536 U.S. 403, 418, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)). Plaintiff argues that several individuals employed in the court system prevented him from filing his appeal. (Pl. Opp'n to State Def. 25–39.) According to Plaintiff, these individuals refused to accept Plaintiff's appeal papers without having them notarized and Plaintiff felt notary fees were too expensive in Europe and therefore he should have been allowed to submit non-notarized documents. (*Id.*) Accepting the facts alleged by Plaintiff as true for the purposes of deciding the motions, they do not support a denial of access claim, since enforcing procedural rules of the court does not deny access to the court. *See Yadav v. Brookhaven Nat. Lab.,* 487 F. App'x 671, 672 (2d Cir.2012) ("Although *pro se* litigants must be afforded a certain amount of latitude, they are still required to attempt to comply with procedural rules, especially when they can be understood without legal training and experience."); *Caidor v. Onondaga County,* 517 F.3d 601, 605 (2d Cir.2008) ("*[P]ro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them ." (citations omitted)). Plaintiff, although *pro se* and litigating this case from Malta, is required to comply with all procedural rules. Courts have found that requiring plaintiff to pay fees related to filing papers in court does

not amount to a denial of access to court claim. *See, e.g., Moncla v. Kelley,* 430 F. App'x 714, 717–18 (10th Cir.2011); *In re Diet Drugs,* 325 F.Supp.2d 540, 541–43 (E.D.Pa.2004). Plaintiffs do not have a right to file papers any way they want. *See, e.g., Wells v. Welborn,* 165 F. App'x 318, 322 (5th Cir.2006) (holding that the plaintiff had no right to file his papers by facsimile); *see also Wolfe v. George,* 486 F.3d 1120, 1126 (9th Cir.2007) ("A state may set the terms on which it will permit litigations in its courts."). Moreover, according to Plaintiff's own submission, he did not learn that the Attorney Defendants had failed to file his Article 78 proceeding or appeal Judge Camacho's determination until *after* the time to do so had expired. (*See, e.g.,* Compl. ¶ 164 ("Attorney/defendant Russo told Plaintiff to prepare a different Article 78 Petition, addressing the jurisdiction of the court to adjudicate a Level III Classification upon a non-New York citizen and non-resident worker in violation of Correction Law § 168–f(6), and that attorney/defendant Russo would file it. However, once again after the time to so do had elapsed Plaintiff learned that attorney/ defendant Russo did not file the aforementioned Petition." (emphasis omitted)); Pl. Prelim. Inj. Mot. 43 (admitting that he was told that he was outside of the time to file a timely appeal).) Plaintiff also asserted at oral argument that he was unable to perfect his appeal because Russo never returned his case file to him. (Oral Arg. 86:8–20.) Therefore, Plaintiff has failed to sufficiently allege a claim for denial of access to the courts.

### ii. Absolute Immunity—Judge Camacho

*\*14* On December 28, 2012, Plaintiff requested that all claims against Judge Camacho be dismissed. (Docket Entry No. 113, Dec. 28, 2012 Letter.) However, in his opposition to the State Defendants' motion to dismiss the Complaint filed on February 16, 2013, Plaintiff asserts that Judge Camacho is not entitled to judicial immunity because he was performing ministerial and administrative duties on May 25, 2011 when he determined Plaintiff's risk level III classification. (Pl. Opp'n to State Def. 81.) The Court dismissed all claims against Judge Camacho at oral argument. The Court sets forth its legal basis for the dismissal in this decision.

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial

2013 WL 4806960

actions and even allegations of bad faith or malice cannot overcome judicial immunity ." *Basile v. Connolly,* 513 F. App'x 92, 93–94 (2d Cir.2013) (internal quotation marks omitted) (quoting *Bliven v. Hunt,* 579 F.3d 204, 209 (2d Cir.2009)); *Pietri v. N.Y. Office of Court Admin.,* No. 11–CV–3205, 2013 WL 1312002, at *6 (E.D.N.Y. Mar.28, 2013) (discussing judicial immunity). Judges are afforded absolute immunity "in order to insure that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bliven,* 579 F.3d at 209 (internal quotation marks omitted) (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1871)). A judge is immune "even if [the judge's] exercise of authority is flawed by the commission of grave procedural errors," *Basile,* 513 F. App'x at 94 (alteration in original) (quoting *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)), or if the "judge acted 'in excess of his or her jurisdiction' or authority," *id.* (quoting *Maestri v. Jutkofsky,* 860 F.2d 50, 52 (2d Cir.1988)). *See also Pietri,* 2013 WL 1312002, at *6 (finding that absolute immunity is not affected by procedural errors or a judge acting in excess of authority); *Collins v. Miller,* No. 06–CV–5179, 2007 WL 2891414, at *2 (E.D.N.Y. Sept. 28, 2007) ("[A]bsolute judicial immunity 'is not overcome by allegations of bad faith or malice,' nor can a judge 'be deprived of immunity because the action he took was in error ... or was in excess of his authority.' " (quoting *Mireles,* 502 U.S. at 11)), *aff'd,* 338 F. App'x 34 (2d Cir.2009).

Plaintiff asserts that Judge Camacho's actions were ministerial and administrative. "In determining whether an act by a judge is 'judicial,' thereby warranting absolute immunity, we are to take a functional approach, for such 'immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.' " *Bliven,* 579 F.3d at 209–10 (emphasis in original) (quoting *Forrester v. White,* 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)). "In employing this functional analysis, the Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven,* 579 F.3d at 210; *see also Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,* 812 F.Supp.2d 357, 365 (S.D.N.Y.2011) (holding that judicial immunity is applied when a government official performs "the function of resolving disputes between parties, or of authoritatively adjudicating private rights." (quoting *Antoine v. Byers & Anderson,* 508 U.S. 429, 435–36, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993))). Judicial immunity will not apply only if "an individual's duties do not require him to exercise

discretionary judgment but rather are 'purely ministerial and administrative' in nature." *Tomlins,* 812 F.Supp.2d at 365 (citations omitted); *see also Quitoriano v. Raff & Becker, LLP,* 675 F.Supp.2d 444, 450 (S.D.N.Y.2009) (finding that judicial immunity applies when the function involves "exercise[ing] discretionary judgment"). "Even 'informal and *ex parte*' proceedings that are 'otherwise within a judge's lawful jurisdiction' are considered judicial." *Zeigler v. New York,* No. 11–CV–037, 2013 WL 2461453, at *6 (N.D.N.Y. June 7, 2013) (quoting *Forrester,* 484 U.S. at 227). As pled in the Complaint, the only act Judge Camacho engaged in was judicially designating Plaintiff a risk level III sex offender, which was clearly an act that required his "discretionary judgment." [21] (Compl.¶¶ 29, 64, 69–71, 74–88, 120, 161, 166–167, 172, 252, 258, 285, 287, 296–298.) Judge Camacho is therefore entitled to the absolute immunity. [22] *See, e.g., Myers v. Sperazza,* No. 11–CV–292, 2012 WL 6690303, at *2 (W.D.N.Y. Dec. 21, 2012) (finding the judge who determined the plaintiff a level III sex offender to be absolutely immune under judicial immunity).

[21]   The Second Circuit has provided a list of examples of administrative functions performed by judges—none of which are similar to the actions engaged in by Judge Camacho. The list includes administrative actions like "demoting or dismissing a court employee; and compiling general jury lists to affect all future trials." *Bliven v. Hunt,* 579 F.3d 204, 210 (2d Cir.2009) (citations omitted). The list also includes "promulgating a code of conduct for attorneys," although the court stated that the judge performing such a task would be "entitled to legislative immunity." *Id.*

[22]   In addition, all actions against Judge Camacho are barred by sovereign immunity. Plaintiff sued Judge Camacho for actions he took in his official capacity as a judge of Queens County Supreme Court—determining that Plaintiff was a risk level III sex offender. The Eleventh Amendment bars all suits against states, state agencies and individuals in their official capacity, including judges. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (internal quotation marks omitted) (quoting

*Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)); *Zahl v. Kosovsky,* No. 08–CV–8308, 2011 WL 779784, at *7 (S.D.N.Y. Mar.3, 2011) ("Official-capacity sovereign immunity extends to a state judge sued in her official capacity."), *aff'd,*471 F. App'x 34 (2d Cir.2012), *cert. denied,*568 U.S. ——, 133 S.Ct. 1460, 185 L.Ed.2d 363 (2013). Furthermore, as discussed *supra* in the *Rooker–Feldman* section, this Court is barred from direct review of any judicial determination made by Judge Camacho.

**iii. Sovereign Immunity**

**\*15** "As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law."*KM Enterprises, Inc. v. McDonald,* 518 F. App'x 12, ——, 2013 WL 1799866, at *1 (2d Cir. Apr.30, 2013). States may only be sued in federal court when they have waived their sovereign immunity, Congress has acted to abrogate state sovereign immunity pursuant to Section 5 of the Fourteenth Amendment, or the plaintiff is suing a state official in his or her official capacity for prospective injunctive relief from an ongoing constitutional violation. U.S. Const. amend. XI; *Va. Office for Prot. & Advocacy v. Stewart,* 564 U.S. ——, ——, 131 S.Ct. 1632, 1638, 179 L.Ed.2d 675 (2011); *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 152 (2d Cir.2013), *cert. dismissed,*569 U.S. ——, ——, 133 S.Ct. 2823, —— L.Ed.2d ——, —— (2013); *KM Enterprises,* 518 F. App'x at ——, 2013 WL 1799866, at *1;*Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Mary Jo C.,* 707 F.3d at 152 (quoting *Woods,* 466 F.3d at 236) (alterations omitted). In addition, "[t]he Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354–55 (2d Cir.2003); *see also Woods,* 466 F.3d at 236 (holding that officials in their official capacities cannot be sued for money damages). "[T]he Supreme Court has frequently instructed that a state will not be deemed to have waived its sovereign immunity unless the waiver is 'express' and 'unequivocal.' " *Doe v. Pataki,* 481 F.3d 69, 78 (2d Cir.2007).

**1. Claims for Money Damages**

In order to sue a state for a constitutional violation under the Fourteenth Amendment, a party must rely on an act of Congress which explicitly allows suit and abrogates sovereign immunity. *See Coleman v. Court of Appeals of Md.,* 566 U.S. ——, ——, 132 S.Ct. 1327, 1338, 182 L.Ed.2d 296 (2012) ("To abrogate the States' immunity from suits for damages under § 5 [of the Fourteenth Amendment], Congress must identify a pattern of constitutional violations and tailor a remedy congruent and proportional to the documented violations."); *see also United States v. Georgia,* 546 U.S. 151, 158, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) ("Section 5 authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amendment rights." (citations omitted)). If a plaintiff wants to sue someone acting under the color of state law for money damages because of a constitutional violation, the relief comes from § 1983. *Zigmund v. Foster,* 205 F.3d 1327 (2d Cir.2000) ("42 U.S.C. § 1983, ... makes a Fourteenth Amendment due process violation actionable."); *Sank v. City Univ. of N.Y.,* No. 10–CV–4975, 2011 WL 5120668, at *6 (S.D.N.Y. Oct.28, 2011) ("Because [ ] Section 1983[ ] provides a remedy for alleged constitutional violations, [plaintiff] cannot base claims directly on the First, Fourth and Fourteenth Amendments."); *see also Wimmer v. Suffolk Cnty. Police Dep't,* 176 F.3d 125, 136 (2d Cir.1999) ("Section 1983 permits an individual deprived of a federal right by a person acting under color of state law to seek compensation in federal court."). However, under § 1983 statutory scheme, § 1983 only applies to states if they consent to its application and waive their immunity. *Gross v. New York,* 428 F. App'x 52, 53 (2d Cir.2011) ("The Eleventh Amendment bars § 1983 claims against states, absent their consent."); *Mamot v. Bd. of Regents,* 367 F. App'x 191, 192 (2d Cir.2010) ("It is well-established that ... § 1983 was not intended to override a state's sovereign immunity." (citations omitted)); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) ("[T]he Supreme Court has ruled that Congress did not intend § 1983 to abrogate immunities well-grounded in history and reason." (alterations omitted) (citing *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)).

**\*16** New York State has not waived its sovereign immunity in § 1983 suits, and Congress has not abrogated its immunity. *See Vincent v. Yelich,* 718 F.3d 157, 177 (2d Cir.2013) (holding that "suits against [New York] State under § 1983 are barred by sovereign immunity"); *McCluskey v. N.Y. Unified Court Sys.,* 442 F. App'x 586, 588 (2d Cir.2011) (dismissing § 1983 claims because "there is no evidence suggesting any waiver of sovereign immunity" by New York State), *cert.*

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 193 of 267
Spiteri v. Russo, Not Reported in F.Supp.2d (2013)
2013 WL 4806960

*denied,* 568 U.S. ——, 132 S.Ct. 1553, 182 L.Ed.2d 183 (2012); *Gross,* 428 F. App'x at 53 ("Because New York [State] has waived its immunity from liability and consented to be sued only to the extent that claims are brought in the New York Court of Claims, as opposed to federal court, the district court correctly dismissed Gross's complaint for lack of subject matter jurisdiction."); *Mamot,* 367 F. App'x at 192 ("It is well-established that New York has not consented to § 1983 suits in federal court ...." (citations omitted)); *see also Jones v. N.Y. Div. of Military & Naval Affairs,* 166 F.3d 45, 49 (2d Cir.1999) (finding that New York State has not waived it sovereign immunity and Congress has not abrogated its sovereign immunity in a § 1983 action); *Keitt v. New York City,* No. 09–CV–8508, 2011 WL 4526147, at *3 (S.D.N.Y. Sept.29, 2011) ("[T]here has been no waiver of immunity by the state or abrogation of immunity by Congress" in § 1983 claims.). [23] Since New York State has not waived its sovereign immunity in § 1983 claims and § 1983 has not abrogated state's immunity, all claims for money damages where New York State is the real party in interest are barred by sovereign immunity. *See, e.g., Nolan v. Cuomo,* No. 11–CV–5827, 2013 WL 168674, at *7 (E.D.N.Y. Jan. 16, 2013).

[23]    Furthermore, "neither a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] § 1983[;]" and therefore, they cannot be sued under § 1983. *Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir.2004) (alteration omitted) (quoting *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)); *see also Cowder v. Dep't for Children & Families,* No. 09–CV–0628, 2010 WL 3834008, at *2 (E.D.N.Y. Sept. 27, 2010) ("§ 1983 only applies to 'persons' acting under the color of state law. 'Government entities that are considered arms of the State for Eleventh Amendment purposes,' ... are not persons under § 1983." (quoting *Will v. Mich. Dept of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989))).

Moreover, as discussed above, sovereign immunity applies not only to the State but to " 'state agents and state instrumentalities' when 'the state is the real, substantial party in interest.' " *Henny v. New York,* 842 F.Supp.2d 530, 544 (S.D.N.Y.2012) (citing *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)); *see also Mary Jo C.,* 707 F.3d at 151–52 ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents

and state instrumentalities' that are, effectively, arms of a state." (alteration omitted) (quoting *Woods,* 466 F.3d at 236)). Where a claim is brought against an official in their official capacity, the state is considered the real party in interest and therefore the same sovereign immunity principles apply as if the claim was brought directly against the state. [24] *KM Enterprises,* 518 F. App'x at ——, 2013 WL 1799866, at *1 (finding that a suit against a government official in her "official capacity as Commissioner of the New York State Department of Transportation ('DOT')" was "effectively ... a suit against the State of New York" and covered by sovereign immunity); *Gollomp v. Spitzer,* 568 F.3d 355, 369 (2d Cir.2009) ("Eleventh Amendment sovereign immunity 'is not a mercurial area of law, but has been definitively settled by the Supreme Court since 1890 with respect to actions against the state itself, and 1945 with respect to actions against state agencies or state officials named in their official capacity.' " (citations omitted)); *Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir.2004) ("[S]tate officials cannot be sued in their official capacities for retrospective relief under section 1983."); *Anghel v. N.Y. Dep't of Health,* No. 12–CV–03484, 2013 WL 2338153, at *9 (E.D.N.Y. May 29, 2013) ("A suit for damages against a state official in his or her official capacity 'is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.' " (quoting *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993))); *Pietri,* 2013 WL 1312002, at *4 ("The Eleventh Amendment also bars suits against state officials in their official capacities for money damages."). Here, Plaintiff specified in the Complaint that he is only suing the individually named State Defendants in their "official capacity." (Comp.¶¶ 29–32.) Therefore, Plaintiff is barred from bringing this action against all the State Defendants for money damages pursuant to § 1983, since the Individual State Defendants are sued in their official capacities and the suit is therefore considered a suit against the state. All of Plaintiff's claims seeking money damages are therefore dismissed as to all of the State Defendants. [25]

[24]    State officials may only be liable under § 1983, when officials are sued in their individual capacity and are "individual[ly] and personal[ly] liabl[e]." *Hafer v. Melo,* 502 U.S. 21, 30, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

§ 1983.' "); *Fowlkes v. Rodriguez,* 584 F.Supp.2d 561, 572 (E.D.N.Y.2008) (personal involvement is necessary for damages against state officials). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

25   Furthermore, the Court has no authority to grant a writ of mandamus. Mandamus is a writ that has been codified in 28 U.S.C. § 1361. *See Moore v. N.Y. Appellate Div. Fourth Dep't,* No. 10–CV–5952, 2011 WL 703711, at *3 (E.D.N.Y. Feb.17, 2011) (discussing mandamus). Pursuant to the statute, a plaintiff may seek mandamus in federal court "to compel an officer or employee *of the United States* or any agency thereof to perform a duty owed to the plaintiff." *Binder & Binder PC v. Barnhart,* 399 F.3d 128, 133 (2d Cir.2005) (quoting 28 U.S.C. § 1361) (emphasis added); *Lutheran Med. Ctr. v. Thompson,* 520 F.Supp.2d 414, 419 (E.D.N.Y.2007) (quoting 28 U.S.C. § 1361); *see also Jones v. Astrue,* 526 F.Supp.2d 455, 459 (S.D.N.Y.2007) (same). Federal courts have jurisdiction over claims against federal officers under the statute but do not have jurisdiction over mandamus actions brought against state officers. *See Davis v. Lansing,* 851 F.2d 72, 74 (2d Cir.1988) (holding that the federal courts have no jurisdiction over mandamus actions brought against state officials because "[t]he federal courts have no general power to compel action by state officials"); *Chinn v. Bradt,* No. 11–CV–0376, 2012 WL 2325850, at *6 (N.D.N.Y. June 19, 2012) (dismissing the petitioner's mandamus claim because "[d]istrict courts are not authorized ... to compel a state or state officials to perform a particular duty" (alteration in original) (quoting *Reyes v. New York,* No. 08–CV–1679, 2008 WL 2120783, at *1 (E.D.N.Y. May 19, 2008))); *Moore,* 2011 WL 703711, at *3 (holding that the federal court had no jurisdiction to compel a state official); *Main v. Vt. Supreme Court,* No. 09–CV–157, 2009 WL 1940876, at *1 (D.Vt. June 30, 2009) (noting that federal courts have "no jurisdiction to compel action by state officials via a writ of mandamus"); *Lebron v. Armstrong,* 289 F.Supp.2d 56, 58 (D.Conn.2003) ("By its terms, the federal mandamus statute does not apply to an action to compel a state or state officials to perform a particular duty."). Therefore, Plaintiff's mandamus request is denied.

### 2. Injunctive and Declaratory Claims

*17  Under *Ex Parte Young* and its progeny, a person may sue a state for prospective injunctive and declaratory relief under the Fourteenth Amendment of the Constitution. *See Mary Jo C.,* 707 F.3d at 166 ("Under the well-known exception to [the Eleventh Amendment's grant of sovereign immunity from suit] first set forth in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), ... 'a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.' " (alterations in original) (quoting *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 95 (2d Cir.2007))); *see also McKeown v. N.Y. State Comm'n on Judicial Conduct,* 377 F. App'x 121, 123 (2d Cir.2010) ("[A] state official acting in his or her official capacity may be sued only for prospective injunctive relief from ongoing violations of federal law....").

The *Ex parte Young* jurisprudence "rests on the premise—less delicately called a 'fiction,'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes," and therefore sovereign immunity does not apply. *Stewart,* 564 U .S. at ——, 131 S.Ct. at 1638. The *Ex parte Young* doctrine is limited to the situation where an official is acting individually to violate federal constitutional rights and "does not apply when the state is the real, substantial party in interest." *Id.* (citations and internal quotation marks omitted). "In defining whether a state official is a proper party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional statute, the Supreme Court has held: '[I]t is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state [a] party.' " *Nolan,* 2013 WL 168674, at *9 (quoting *Ex parte Young,* 209 U.S. at 157). Thus, to obtain injunctive and declaratory relief against an official, the official must have a direct connection to the illegal action. *See Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001) ("Actions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." (citations and alterations omitted));

*see also Coleman,* 566 U.S. at ——, 132 S.Ct. at 1350 (finding that a plaintiff may "seek injunctive relief against the responsible state official" under *Ex parte Young* ).

### A. Relief Sought by Plaintiff

Plaintiff's injunctive claims are not entirely clear. Plaintiff appears to seek his removal from the New York State sex offender registry because he asserts his placement on the registry is unconstitutional. Plaintiff states in his Preliminary Injunction Memorandum that:

> **\*18** Petitioner brings this proceeding for preliminary injunction to enjoin the State Defendants and the co-defendant New York City Police Department Sex Offender Unit (N.Y.CPDSOU) [26] from continuing to engage in discriminatory, deceptive, fraudulent and illegal practices in connection with providing alleged public safety notification of Petitioner, who does not reside, nor was he ever a resident at anytime as stated in the [Complaint].

26     As discussed *supra* in footnote 4, the NYPD is not a suable entity and is not a party to this action.

(Pl.Prelim.Inj.Mem.30.) Plaintiff also appears to seek relief from what he believes is the requirement that he return to New York every ninety days to register. (*Id.* at 44.) In addition, Plaintiff seeks "[a]n [o]rder commanding the State Defendants and the NYPDSOU Defendants that any application seeking the arrest of the Petitioner to be sole [sic] brought before this Honourable [sic] Court and no other jurist and/or court of competent jurisdiction." (*Id.* at 45.) Plaintiff further seeks an order that he "will no longer be required to register nor update his registration, as long as he continues to be a nonresident of the State of New York, and/or does not visit New York more than 10 days and not more that [sic] 30 days in one year." (*Id.*) Lastly, Plaintiff seeks declarations of SORA's unconstitutionality, including (1) "the application, implementation and enforcement of SORA has [sic] it is being applied to the Petitioner is unconstitutional;" (2) "the application, implementation and enforcement of SORA has [sic] it is being applied to the Petitioner is cruel and unusual punishment;" (3) "the application, implementation

and enforcement of SORA has [sic] it is being applied to the Petitioner has no relationship to a State protected interest;" (4) "the application, implementation and enforcement of SORA in regards to nonresident workers as prescribed in Correction Law § 168–f(6) does not provide nor assign the State Defendants with discretion and/or authority to refer such nonresident worker for a Level Classification determination;" and (5) "the Order by Defendant Camacho is declared null and void and unenforceable." [27] (*Id.*)

27     As discussed *supra* in footnote 19, any challenge to Judge Camacho's decision is barred by the *Rooker–Feldman* Doctrine.

### B. State Defendants' Alleged Involvement

Plaintiff alleges that the Governor had direct involvement to establish § 1983 liability, since Governor Cuomo would be responsible for recommending Plaintiff's extradition from Malta to the United States. (Pl. Opp'n to State Def. 82–84.) Plaintiff has presented no evidence that there is an extradition request for Plaintiff or that such an extradition request will be made, nor has Plaintiff shown that the Governor would be involved in making such an extradition request. *Cf. Nolan,* 2013 WL 168674, at \*10 (finding in a case challenging a denial of the plaintiff's request for a reclassification of his risk assessment level as a sex offender "that Cuomo is not a proper party to the extent that plaintiff has asserted Section 1983 claims for injunctive relief against him in his official capacity" and dismissing the claims against Governor Cuomo). The fact that the Governor is charged generally with executing the laws of New York is insufficient to allege that the Governor is involved in (a) having Plaintiff extradited from Malta and (b) removing Plaintiff from the New York's sex offender registry. *See Nolan,* 2013 WL 168674, at \*9 (holding that the governor's duty to take care that the law is enforced is not sufficient to make the governor a proper party); *Wang v. Pataki,* 164 F.Supp.2d 406, 410 (S.D.N.Y.2001) ("[S]tate official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." (quoting *Warden v. Pataki,* 35 F.Supp.2d 354, 359 (S.D.N.Y.1999), *aff'd, Chan v. Pataki,* 201 F.3d 430 (2d Cir.1999), *cert. denied,* 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000))). Given that Plaintiff has failed to plead that Governor Cuomo had direct involvement with Plaintiff's classification as a sex offender and has not plausibly alleged that Governor Cuomo is seeking to extradite him, the Complaint is dismissed with prejudice as to Governor Cuomo. The Court finds that, as a matter of law, Plaintiff cannot seek injunctive relief against Governor Cuomo.

**\*19** For the reasons set forth below, the Court also finds that, assuming, without deciding, Plaintiff can seek injunctive relief against Harrington and Mulligan, [28] Plaintiff is not entitled to any injunctive relief against Harrington or Mulligan because Plaintiff has not stated and cannot state a claim upon which relief can be granted. The Court, therefore, denies Plaintiff's motion for injunctive [29] and declaratory relief [30] and grants the State Defendants' motion to dismiss all of Plaintiff's claims.

[28]     The Court notes that based on the language of SORA, Harrington and Mulligan appear not to be proper parties since neither Harrington nor Mulligan can grant Plaintiff the relief that he seeks. The only manner in which an individual can be removed from the registry is by being pardoned by the governor of the state of conviction or if his conviction is overturned. *See* N.Y. Correct. Law § 168–f(5); *O'Donnell,* 924 N.Y.S.2d at 686 (discussing the two limited manners in which a lifetime registrant can be removed from the registry); *see also Nolan v. Cuomo,* No. 11–CV– 5827, 2013 WL 168674, at \* 10 (E.D.N.Y. Jan. 16, 2013) (dismissing the head of the Division because the statute does not provide for the Division to enforce the statute or change someone's registration).

[29]     In order to prevail on his claim for a preliminary injunction, Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 209, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *see also Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 215 (2d Cir.2012). As discussed *infra,* Plaintiff's numerous claims of constitutional violations fail on the merits, and therefore, his motion for injunctive relief is denied. *See Monserrate v. N.Y. Senate,* 599 F.3d 148, 154 (2d Cir.2010) (finding that a failure "to establish a likelihood of success on the merits of any claim ... is fatal" to a claim for preliminary injunction).

[30]     A plaintiff cannot maintain a claim for a declaratory judgment where the underlying substantive claim has been dismissed since the Declaratory Judgment Act ("DJA") only created a procedural mechanism and not an independent cause of action. *Chevron Corp. v. Naranjo,* 667 F.3d 232, 244 (2d Cir.2012) ("The DJA gives a district court the discretion to 'declare the legal rights and other legal relations of any interested party seeking such declaration.' But that discretion does not extend to the declaration of rights that do not exist under law. Like a preliminary injunction, a declaratory judgment relies on a valid legal predicate. The DJA is 'procedural only,' and 'does not create an independent cause of action.' "), *cert. denied,* 568 U.S. ——, ——, 133 S.Ct. 423, 184 L.Ed.2d 288 (2012); *Crewe v. Rich Dad Educ., LLC,* 884 F.Supp.2d 60, 80 (S.D.N.Y.2012) ("But the Declaratory Judgment Act is not a source of federal substantive rights, because it does not 'provide an independent cause of action. Its operation is procedural—to provide a form of relief previously unavailable.' "); *Chiste v. Hotels.com L.P.,* 756 F.Supp.2d 382, 406–07 (S.D.N.Y.2010) ("Declaratory judgments and injunctions are remedies, not causes of action."); *Propst v. Ass'n of Flight Attendants,* 546 F.Supp.2d 14, 22–23 (E.D.N.Y.2008) ("The Declaratory Judgment Act, 28 U.S .C. §§ 2201 *et seq.,* does not provide 'an independent cause of action' but rather its 'operation is procedural only—to provide a form of relief previously unavailable.' The court may 'only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief.' (quoting *In re Joint Eastern & Southern District Asbestos Litig.,* 14 F.3d 726, 731 (2d Cir.1993)), *aff'd,* 330 F. App'x 304 (2d Cir.2009).

**d. Plaintiff's Substantive Claims Against the State Defendants**

Plaintiff is not entitled to injunctive relief against the State Defendants because Plaintiff's numerous claims fail to state any constitutional violations. In the Complaint, motion for preliminary injunction and opposition to the State Defendants' motion to dismiss, Plaintiff asserts that requiring him to register under SORA violates his rights under the Constitution, including procedural due process, substantive due process, equal protection, privileges and immunities, right to travel and his right to be free from cruel and unusual

2013 WL 4806960

punishment; Plaintiff also argues that SORA violates many provisions of the Constitution including the Due Process Clause because it is vague, the *Ex Post Facto* Clause, the Full Faith and Credit Clause, the Supremacy Clause, Commerce Clause and Dormant Commerce Clause. For the reasons set forth below, the Court finds that none of Plaintiff's constitutional claims have merit.

### i. Procedural Due Process—Generally

"To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre-or post-deprivation process." *J.S. v. T'Kach,* 714 F.3d 99, 105 (2d Cir.2013). "In order to do this, a plaintiff must 'first identify a property right, second show that the [government] has deprived him of that right, and third show that that the deprivation was effected without due process.' " *J.S.,* 714 F.3d at 105 (alteration in original) (citations omitted); *see also Palacio v. Pagan,* 345 F. App'x 668, 669 (2d Cir.2009) (discussing the elements of procedural due process); *Looney v. Black,* 702 F.3d 701, 706–07 (2d Cir.2012) (same); *Schweitzer v. Crofton,* —— F.Supp.2d ——, ——, 2013 WL 1208999, at *10 (E.D.N.Y. Mar.25, 2013) (same).

Plaintiff alleges that the State Defendants infringed upon his due process rights by their "(1) failure to grant Plaintiff a continuance to seek and obtain exculpatory evidence to rebut the prosecution case [at his risk assessment classification hearing]; (2) stating on the record that Judge Camacho would only consider prosecution' [sic] evidence to make his determination; (3) refusing to order the prosecution to turn over its' [sic] entire evidentiary/investigatory file for Plaintiff's review and rebuttal; [ (4) ] conducting the S.O.R.A. hearings and proceedings in an oppressive and criminal mode of operation rather affording [sic] Plaintiff equal protection of the law, otherwise afforded to civil litigants in cases; [and (5) ] issuing an [sic] Level Classification judgment without complying with the statutory mandate of provided [sic] reason, facts and detailed analysis on what basis and admissible evidence he reached his conclusions." (Compl.¶ 252.)

**\*20** Plaintiff is barred by the *Rooker–Feldman* doctrine from pursuing this claim. In any event, Plaintiff was not deprived of any property interest without due process and this claim is without merit.

### 1. *Rooker–Feldman* Doctrine

Plaintiff is clearly challenging the proceedings before Judge Camacho which resulted in the May 25, 2011 decision classifying Plaintiff as a level III sex offender. Because each of the four elements of the *Rooker–Feldman* doctrine is satisfied—Plaintiff lost in the state court proceeding, is complaining of the injury caused by the state court judgment, is asking this Court to review the proceedings that led to the state court judgment and therefore the judgment itself, and the judgment was rendered almost a year before this action was commenced—Plaintiff is barred from bringing this challenge. *See Burfeindt v. Postupack,* 509 F. App'x 65, 66 (2d Cir.2013) (upholding district court's dismissal which rested partially on *Rooker–Feldman* grounds); *Hoblock,* 422 F.3d at 83 (finding suit barred by *Rooker–Feldman* doctrine since it was an appeal of a state court determination); *Zuneska v. Cuomo,* No. 12–CV–0949, 2013 WL 431826, at *3–5 (E.D.N.Y. Feb. 1, 2013) (finding that the supreme court's determination that a level one registered sex offender could not be declassified was barred from review by the federal court because of the *Rooker–Feldman* doctrine); *Anderson v. UMG Recordings Inc.,* No. 12–CV25826, 2012 WL 6093776, at *2 (E.D.N.Y. Dec.7, 2012) ("[A]lthough plaintiff's complaint does not detail the specific injuries that the rulings in the State Court Action cause him, a fair reading of the complaint is that plaintiff seeks to continue pressing the claims underlying the State Court Action ...."); *Munsch v. Evans,* No. 11–CV–2271, 2012 WL 528135, at *6 (E.D.N.Y. Feb. 17, 2012) (barring a plaintiff from bringing a case in which the plaintiff sought to have supervision for life by the parole board found unconstitutional because it would require the court to overturn the state court decision). Moreover, even if Plaintiff were not barred by the *Rooker–Feldman* doctrine, his claim would fail on the merits.

### 2. Liberty Interest

Plaintiff does not articulate in the Complaint or any of his submissions any protected liberty interest, but the Complaint can be read as articulating that requiring Plaintiff to register as a level III sex offender, and therefore publishing Plaintiff's name on the New York State website for registered sex offenders, resulted in "stigma plus." Under stigma plus analysis a plaintiff may bring a due process claim if he can show that he suffered a " 'stigma resulting from the defamatory character of [a government statement] combined with some other state-imposed alteration in [the plaintiff's] legal status.' " *McCaul v. Ardsley Union Free Sch. Dist.,* 514 F. App'x 1, 3–4 (2d Cir.2013) (citations omitted); *Carter v. Inc. Vill. of Ocean Beach,* 415 F. App'x 290, 293 (2d Cir.2011) (" 'Stigma plus' refers to a claim brought for injury

to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." (quoting *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003)); *Balentine v. Tremblay,* No. 11–CV–196, 2012 WL 1999819, at *5 (D. Vt. June 4, 2012) ("The Second Circuit has recognized a constitutional right to be free from a false stigmatizing statement that alters a person's legal status or rights ."); *see also Hefferan v. Corda,* 498 F. App'x 86, 89 (2d Cir.2012) ("A defamation action can be grounded in 42 U.S.C. § 1983 when th[e] plaintiff can demonstrate a stigmatizing statement plus a deprivation of a tangible interest." (citations and internal quotations mark omitted)); *Woe v. Spitzer,* 571 F.Supp.2d 382, 387 (E.D.N.Y.2008) ("Thus, to show a liberty interest, Plaintiff must show more than the stigma attached to his inclusion on the sex offender registry. Specifically, he must show what has been referred to as 'stigma plus,' i.e., stigma accompanied by the potential loss of rights under law."). "Damage to someone's reputation alone is insufficient 'to invoke the procedural protection of the Due Process Clause'...." *McCaul,* 514 F. App'x at 3–4 (quoting *Valmonte v. Bane,* 18 F.3d 992, 999, 1000–02 (2d Cir.1994))); *see also Balentine,* 2012 WL 1999859, at *5 ("The protected interest is a narrow one and requires more than a derogatory public statement by a government official."); *Woe,* 571 F.Supp.2d at 387 ("The Supreme Court has held clearly that injury to reputation alone is insufficient to implicate a liberty right under the due process clause."). "In order to state a claim for deprivation of an intangible legal right to one's reputation, commonly known as a 'stigma plus', a plaintiff must allege facts showing both '(1) the utterance of a statement about her that is injurious to her reputation, that is capable of being proved false, and that ... she claims is false, and (2) some tangible and material state-imposed burden ... in addition to the stigmatizing statement.' " *Kalderon v. Finkelstein,* 495 F. App'x 103, 107 (2d Cir.2012) (alterations in original) (quoting *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir.2005)); *see also Lawson v. Rochester City Sch. Dist.,* 446 F. App'x 327, 329 (2d Cir.2011) (discussing the two part test). "In addition, the 'defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest.' " *Kalderon,* 495 F. App'x at 107 (quoting *Velez,* 401 F.3d at 87).

**\*21** Courts in this Circuit have not conclusively determined whether requiring a plaintiff to register as a sex offender implicates a liberty interest, even under a stigma plus analysis.[31] *See Singleton v. Lee,* No. 09–CV–6654, 2012 WL 864801, at *9 (W.D.N.Y. Mar. 13, 2012) ("It is not

altogether clear that the determination of risk-level under the SORA implicates a cognizable liberty interest for purposes of the Due Process Clause of the Fourteenth Amendment."); *Fowlkes v. Parker,* No. 08–CV–1198, 2010 WL 5490739, at *7 (N.D.N.Y. Dec. 9, 2010) ("[T]here is not unanimity on the question of whether the requirement to register as a sex offender in and of itself implicates such a liberty interest."), *report and recommendation adopted,* No. 08–CV–1198, 2011 WL 13726 (N.D.N.Y. Jan. 4, 2011). However, two courts in this Circuit have found that a stigma plus liberty interest is implicated when an individual is required to register under SORA, since the stigma attached to registration may affect the registered person in other areas such as employment. *See Woe,* 571 F.Supp.2d at 387 (holding that SORA implicates a protected liberty interest under SORA); *Doe v. Pataki,* 3 F.Supp.2d 456, 466 (S.D.N.Y.1998) (finding the two prongs of the stigma plus analysis met).[32]

| 31 | Some courts in other circuits have found that a stigma plus claim can be implicated by requiring a person to register as a sex offender, but other courts have found that there is not sufficient stigma to meet the test. *Compare Brown v. Montoya,* 662 F.3d 1152, 1168 (10th Cir.2011) (finding that "requiring a person to register as a sex offender triggers the protections of procedural due process" under a stigma plus theory); *Gwinn v. Awmiller,* 354 F.3d 1211, 1224 (10th Cir.2004) (same); *Lemay v. N.H. State Police Dep't of Sex Offender Registration,* No. 11–CV–185, 2011 WL 6983993 (D.N.H. Dec.20, 2011) (finding stigma plus implicated by registry as a sex offender), *report and recommendation approved sub nom. Lemay v. NH Dep't of Safety,* No. 11–CV–185, 2012 WL 83736, at *3 (D.N.H. Jan.10, 2012); *Fortner v. United States,* No. 06–CV–02148, 2008 WL 410396, at *7 (D.Colo. Feb. 12, 2008) (same); *Gwinn v. Awmiller,* No. 99–CV–00308, 2005 WL 2450154, at *3 (D.Colo. Sept.8, 2005) (same), *report accepted,* No. 99–CV–308, 2005 WL 2450153 (D.Colo. Sept. 30, 2005); *with Doe v. Mich. Dep't of State Police,* 490 F.3d 491, 502 (6th Cir.2007) (holding that due process was not implicated under stigma plus theory because of sex registration); *John Does IVIII v. Munoz,* 462 F.Supp.2d 787, 794 (E.D.Mich.2006) (same), *aff'd sub nom. Does v. Munoz,* 507 F.3d 961 (6th Cir.2007). |
|----|---|

32    The *Doe v. Pataki* district court decision analyzed SORA prior to its amendment pursuant to the settlement that was reached in 2004, discussed *infra. See Doe v. Pataki,* 481 F.3d 69, 73–74 (2d Cir.2007) (discussing the settlement).

### 3. Deprivation of Liberty Interest Without Process

Assuming, without deciding, that Plaintiff has a liberty interest that was implicated by his registration, the Court must determine whether there was a deprivation of Plaintiff's liberty interest without sufficient process. *See Woe,* 571 F.Supp.2d at 387 ("To state a claim under the due process clause, a plaintiff must first show the existence of a constitutionally protected right. Second, plaintiff must show the deprivation of that right without due process of law."); *Doe,* 3 F.Supp.2d at 466 ("The Supreme Court has stated that procedural due process claims are to be examined 'in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " (citing *Ky. Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989))).

The right to have a hearing to determine risk level, prior notice of the hearing, the right to appeal any determination, the right to an attorney during the proceedings and the right to the discovery of evidence were established as a result of a litigation agreement between New York State and a class of sex offenders. *See Doe,* 481 F.3d at 77–79 (finding that all the procedural safeguards suggested by the district judge were implemented in the settlement and subsequent amendment to SORA, and finding the settlement to be binding and valid); *United States v. Kimble,* 905 F.Supp.2d 465, 475 (W.D.N.Y.2012) (finding that the settlement put in procedural safeguards of notice and an opportunity to be heard to bring SORA in compliance with due process demands); *Singleton v. Lee,* No. 09–CV–6654, 2011 WL 2421226, at *2 (W.D.N.Y. June 13, 2011) ("Extensive litigation regarding the constitutionality of the SORA was resolved in a 2004 consent decree providing that all level two and three sex offenders who were required to register under the SORA were afforded the right to a new hearing to redetermine their sex offender level."); *Woe,* 571 F.Supp.2d at 389 (holding that SORA post-settlement did not violate procedural due process).

 **\*22**  Plaintiff was notified of the SORA hearing in advance and appeared personally and through the Attorney Defendants at multiple hearings before Judge Camacho. (*See* Compl.

¶¶ 62–64, 66, 74–76, 166.) Plaintiff could have appealed Judge Camacho's classification determination—as Plaintiff claims the Attorney Defendants told him they did and as he attempted to do himself. (*Id.* ¶ 77.) Plaintiff also could have challenged the Board's determination that he was required to register as a sex offender by bringing an Article 78 proceeding as Plaintiff claimed he asked the Attorney Defendants to do on his behalf. (*See id.* ¶¶ 23, 77, 79, 80, 82, 86, 88, 172, 295.) Even assuming that there were procedural irregularities throughout the proceeding before Judge Camacho as Plaintiff alleges, because Plaintiff was given notice, an opportunity to be heard and legally had the ability to appeal Judge Camacho's decision and to challenge the Board's determination that he was required to register as a sex offender, Plaintiff's due process rights were not violated. *See, e.g., Kimble,* 905 F.Supp.2d at 475 (finding that the plaintiff's "due process rights were not violated" by his SORA risk level redetermination hearing where he received notice and had an opportunity for redetermination and was represented by counsel); *Singleton,* 2012 WL 864801, at *9 (holding that the fact that the sex offender received "notice and an opportunity to be heard before a neutral decision-maker" is sufficient to find that procedural due process has been met); *Fowlkes,* 2010 WL 5490739, at *8 (holding that "the availability of these procedural safeguards [in SORA] satisfies the Fourteenth Amendment's procedural due process requirements and demonstrates that plaintiff's due process claim lacks merit"); *People v. Montanez,* 88 A.D.3d 1278, 930 N.Y.S.2d 380, 382 (App.Div.2011) (holding that the defendant's due process rights were not violated during his SORA proceeding where the plaintiff was notified about the hearing and appeared with counsel who was able to respond to the allegations that plaintiff should register at a certain risk level).

The fact that Plaintiff alleges that his lawyers failed to perform to his satisfaction at his classification hearing, failed to file his appeal, failed to commence an Article 78 proceeding or that he was unaware that his presence was required at his classification hearing, is insufficient to state a procedural due process claim. Plaintiff had all of these various procedural processes available to him. In addition, Plaintiff could have addressed his claims that he was not granted sufficient continuances, that Judge Camacho only considered prosecution evidence, that he was not given all of the prosecution's evidence, the manner in which his hearing was conducted, and the written order of Judge Camacho in an appeal of Judge Camacho's decision. Since an appeal was available to Plaintiff, Plaintiff cannot maintain a due

process claim against the State Defendants. *See Hefferan v. Corda,* 498 F. App'x 86, 88 (2d Cir.2012) (holding that since "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies," the plaintiff could not maintain a due process claim where he "either knew or should have known of the complained of irregularities prior to the grievance deadline and chose not to take advantage of available process" (quoting *N.Y. Nat'l Org. for Women v. Pataki,* 261 F.3d 156, 169 (2d Cir.2001), *cert. denied,* 534 U.S. 1128, 122 S.Ct. 1066, 151 L.Ed.2d 969 (2002))); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.,* 620 F.3d 146, 152–53 (2d Cir.2010) ("The fact that a state proceeding is required by due process does not mean that Section 1983 provides a remedy for every error committed in the state proceeding. So long as state appellate remedies are available, a Section 1983 action is not an available vehicle for relief."); *De Asis v. N.Y.C. Police Dep't,* 352 F. App'x 517, 518 (2d Cir.2009) (holding that a plaintiff could not maintain a due process claim where "a post-deprivation remedy was available, in the form of an Article 78" proceeding). Plaintiff has not and cannot establish a due process violation and this claim is dismissed with prejudice.

### ii. Due Process—Vagueness

**\*23** In his submission in opposition to the State Defendants' motion to dismiss, Plaintiff articulates a due process challenge to SORA based on a void for vagueness theory. This was the first time that Plaintiff has asserted that the SORA statute is unclear. "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that enforcing the law do not act in an arbitrary or discriminatory way."[33] *F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. ——, ——, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012); *see also Hayes v. N.Y. Attorney Grievance Comm. of the Eight Judicial Dist.,* 672 F.3d 158, 168–69 (2d Cir.2012) (discussing the void for vagueness test); *see also Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.,* 660 F.3d 612, 621 (2d Cir.2011) (same). "Although a law has to provide 'minimal guidelines' in the form of 'explicit standards' regarding what conduct is unlawful, 'it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth.' " *United States v. Rosen,* 716 F.3d 691, 699 (2d Cir.2013) (quoting *Mannix v. Phillips,* 619 F.3d 187, 197 (2d Cir.2010)); *see also Cunney,* 660 F.3d at 621 ("[R]egulations may embody 'flexibility

and reasonable depth,' and 'satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require.' " (citations omitted)). "The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *Commack Self–Serv. Kosher Meats, Inc. v. Hooker,* 680 F.3d 194, 213 (2d Cir.2012) (alteration in original) (citations omitted); *see also Advance Pharm., Inc. v. United States,* 391 F.3d 377, 396 (2d Cir.2004) (describing the various vagueness tests).

33    The Second Circuit has established that, when determining whether or not a statute has sufficient procedures in order to guide enforcers of the statute, courts should consider "whether: (1) ...'[the ordinance] as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement'; or (2) 'even in the absence of such standards, the conduct at issue falls within the core of the [ordinance's] prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the [ordinance].' " *Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.,* 660 F.3d 612, 621–22 (2d Cir.2011) (citations omitted).

Plaintiff argues that it is unclear under the SORA statute that a nonresident worker would be subject to a risk level classification and placement on the public registry. (Pl. Opp'n to State Defs. 8; *see also id.* at 1, 52.) According to Plaintiff:

> *Correction Law § 168–f(6)* is constitutionally and structurally vague and ambaigous [sic] as to failing to alter [sic] a nonresident worker, such as Plaintiff that the Division, the Board of Examiners and the Supreme Court could subject him to a SORA proceedings, posting on the internet, and ultimately retain him on the internet and cause such nonresident, such as the Plaintiff, to continue [to] physically appear

2013 WL 4806960

before the local law enforcement to register in accordance to his/her level classification, whether or not such nonresident worker continue to reside or lives outside the border of the State of New York, or in this case, overseas, nowhere close to the 50 states, the District of Columbia, and the principal U.S. territories, to include also federally recognized Indian tribes.

**\*24** (Pl. Opp'n to State Defs. 8; *see also id.* at 1, 52.) Plaintiff does state in the Complaint that the statute is clear and only requires him to report his name and address to the Division. (Compl.¶ 63.)

Contrary to Plaintiff's current argument that he was a nonresident worker, it is clear from the allegations in the Complaint that Plaintiff was living in New York and therefore required to register in New York. According to the Complaint, Plaintiff moved to New York and was living in an apartment in Queens, New York with furniture and significant clothing for a period of at least two years. (Compl.¶¶ 12, 41, 52, 93, 136.) Plaintiff notified New York State that he was moving to New York and requested the necessary forms to register. (Harfolis Decl. Ex. B.) However, even accepting Plaintiff's additional, unsupported and contradictory claim that he was a nonresident worker, the plain language of the SORA statute clearly informed Plaintiff that even as a nonresident worker, he was subject to the registration process of New York Corrections Law Section 168–k. *Liden,* 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751 ("The procedure for registration of sex offenders who move to New York from other states is set out in Correction Law § 168–k.").

The Second Circuit has instructed district courts to look at statutory provisions in context. *See Commack Self–Serv. Kosher Meats,* 680 F.3d at 213 ("[T]he court does not look at the statutory language in isolation; rather, the court considers the language in context, with the benefit of the canons of statutory construction and legislative history."); *JWJ Indus., Inc. v. Oswego County,* No. 09–CV–740, 2012 WL 5830708, at \*3 (N.D.N.Y. Nov. 16, 2012) (stating that a court must look at a statute in context); *Vt. Right to Life Comm., Inc. v. Sorrell,* 875 F.Supp.2d 376, 390 (D.Vt.2012) (same). Plaintiff incorrectly focusses only on a specific subsection of the statute, namely, Section 168–f(6) of New York Corrections Law. New York Corrections Law makes clear that sex

offenders convicted in other jurisdictions may be required to register in New York if their crime is a registrable offense in the state of conviction or if it shares the same elements of a crime that would require registration in New York. *See Kasckarow,* 964 N.Y.S.2d at 650 (finding that an out of offense will be registrable in New York if it shares the same elements as a registrable state offense in New York); *Smith,* 898 N.Y.S.2d at 704 (same); *People v. Whibby,* 50 A.D.3d 873, 855 N.Y.S.2d 250, 251 (App.Div.2008) (same); *People v. Mann,* 52 A.D.3d 884, 859 N.Y.S.2d 278, 280 (App.Div.2008) (same).

New York Corrections Law Section 168–k sets out the procedure for determining registration and risk level classification for offenders who were convicted in other jurisdictions. *See Liden,* 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751 (discussing the procedures). As discussed in part III.b in the SORA Legislative Scheme section, a sex offender is required to notify the Division of his or her address "no later than ten calendar days after such sex offender establishes residence in this state." N.Y. Correct. Law § 168–k (1); *People v. Melzer,* 89 A.D.3d 1000, 933 N.Y.S.2d 705, 706 (App.Div.2011) (finding that people with offenses from other jurisdictions are required to register in New York). The very next subsection of the law requires the Division to advise the Board of the sex offender's presence in the state and the Board is responsible under the statute for determining whether the sex offender must register. N.Y. Correct. Law § 168–k (2); *see Liden,* 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751 (discussing the fact that it is the Board that makes the initial determination whether a person should register); *People v. Wyatt,* 89 A.D.3d 112, 931 N.Y.S.2d 85, 89–90 (N.Y.App.Div.2011) (stating that "the procedure for determining the risk level of out-of-state sex offenders who relocate to New York" is in § 168–k(2)). The same provision provides that if required to register, the sex offender is notified within thirty days of a determination that he must register and is permitted to submit information to the Board. N.Y. Correct. Law § 168–k (2). The Board is responsible for making a recommendation of the level of registration required by the offender to the county court or supreme court and the offender is given at least 30 days notice of the Board's risk assessment recommendation and the reason for the recommendation. *Id.; see Liden,* 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751 (stating that the Board only makes a recommendation of the risk level to the court). The offender is entitled to a court hearing by a county or supreme court judge to determine his or her classification level as well as whether the sex offender must register. N.Y. Correct. Law § 168–k (2); *see Melzer,*

2013 WL 4806960

933 N.Y.S.2d at 706 ("[T]he Supreme Court was statutorily required to hold a risk level assessment hearing after receiving the recommendation of the Board of Examiners regarding the defendant's level of notification."). The sex offender may appeal the decision of the hearing judge. N.Y. Correct. Law § 168–k (2); *see Liden*, 19 N.Y.3d at 276, 946 N.Y.S.2d 533, 969 N.E.2d 751 (finding that persons required to register have the right to appeal). In addition, New York Correction Law Section 168–j specifies what a sex offender is required to do when he or she leaves the state. N.Y. Correct. Law § 168–j. If a sex offender leaves the State, he or she is required to notify the Division and provide his or her new address. *Id.* The sex offender is only required to register every 90 days in the jurisdiction in which he resides. N.Y. Correct. Law § 168–h(3).

**\*25** This statutory scheme clearly sets forth all the necessary steps that must be complied with, even for a nonresident worker, and there is nothing vague about the requirements. It informs a nonresident worker, such as Plaintiff claims he was, what he or she is required to do. Plaintiff was aware of the relevant provisions and he even alleged in the Complaint that he complied with SORA. (Compl.¶¶ 68, 172, 288, 300.) Plaintiff did comply with the first step of the process—he registered with the Division. (*Id.* ¶ 283, 946 N.Y.S.2d 533, 969 N.E.2d 751.) The fact that Plaintiff believes that only one provision of the statute applied to him does not make the other applicable provisions vague. Plaintiff simply had to read the subsection after the one he complied with to recognize that it was applicable to him, and, in any event, he was notified by the Board that he had to register. (*Id.* ¶ 62, 946 N.Y.S.2d 533, 969 N.E.2d 751.) Plaintiff's vagueness challenge to SORA is without merit and his vagueness claim is dismissed with prejudice. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 99–100 (2d Cir.2010) (holding in a bankruptcy case that the "Plaintiffs' vagueness argument is patently meritless [since] [t]he provisions provide explicit notice of the disclosures required, and, to the extent the statute affords some flexibility, it imposes no greater burden on attorneys' exercise of professional judgment than plaintiffs already carry"); *Advance Pharm.*, 391 F.3d at 397 (holding that the statute at issue was not vague both because "the common sense meaning" of the words in the statute were clear and plaintiffs had been directly advised that they were in violation of the statute multiple times before any action was taken).

### iii. Substantive Due Process

Plaintiff's substantive due process claim is not entirely clear but appears to encompass many different arguments. In general, Plaintiff appears to claim that requiring him to register when he is a nonresident worker was a violation of his substantive due process rights. (*See* Pl. Opp'n to State Defs. 16–26, 37, 47.) Plaintiff also appears to argue that his substantive rights were violated because he was no longer in New York at the time Judge Camacho adjudicated his risk level assessment, therefore, requiring him to be present at the final adjudication of his risk level determination was a violation of his substantive due process rights.[34] (*Id.* at 60.) Plaintiff also appears to argue that his substantive due process rights, as well as his equal protection and procedural due process rights, were violated because New York State failed to consider new data which shows that first time sex offenders like Plaintiff need not register as sex offenders, and New York State failed to modify its registration requirements in accordance with these new studies.[35] (*Id.* at 19–22.)

[34] Plaintiff also appears to argue that his substantive due process rights were violated because he was not assigned a lawyer to file his appeal of Judge Camacho's determination and his Article 78 petition, even though Plaintiff had private counsel, the Attorney Defendants, representing him before Judge Camacho. Plaintiff's claim is without merit. The statute requires assigned representation on appeal if a plaintiff had demonstrated that he was financially unable to retain counsel at the hearing and had assigned counsel at the hearing. N.Y. Correct. Law § 168–k (2). Plaintiff does not even claim that he sought counsel on appeal and was denied. Plaintiff additionally appears to argue that his substantive rights were violated when the clerk refused to accept his appeal documents without notarization. (Pl. Opp'n. to State Def. at 33, 37–39.) As discussed *supra* in footnote 20, Plaintiff's claim of denial of access to the court based on the requirement that Plaintiff submit notarized documents to the court is without merit.

[35] Plaintiff argues "that in ignoring the new data that proves that first time offenders whose conviction arose from factors of a willing participant, where no violence, no coercion, no threats of physical violence, no unlawful imprisonment, no kidnaping, etc .... such as Plaintiff's situation, only supports that the State Defendants have twisted the New York State Legislature intent from purely

administration and ministerial to punitive ....“ (Pl. Opp'n to State Defs. 17.)

"[I]t is well established that any substantive component to the Due Process Clause protects only those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, as well as implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *United States v. Windsor,* 570 U.S. ——, ——, 133 S.Ct. 2675, 2714, 186 L.Ed.2d 808 (2013) (Roberts, Chief J. dissenting) (citations and internal quotation marks omitted). Depending on the interest at stake, a court may review a claim that a statute is unconstitutional pursuant to substantive due process either under a rational basis test, intermediate scrutiny or a strict scrutiny test. *See Windsor v. United States,* 699 F.3d 169, 196 (2d Cir.2012) (discussing the three levels of scrutiny), *aff'd,* 570 U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013); *see also F.C.C. v. Beach Commc'ns., Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("[A] statutory classification that *neither* proceeds along suspect lines *nor* infringes fundamental constitutional rights must be upheld ... if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. (emphasis added)); *Bryant v. N.Y. Educ. Dep't,* 692 F.3d 202, 217 (2d Cir.2012), (discussing the various tests for substantive due process), *cert. denied,* 569 U.S. ——, 133 S.Ct. 2022, 185 L.Ed.2d 885 (2013). Given that Plaintiff does not claim his rights were infringed because he is a member of one of the suspect classes, the first step is to determine whether the right at issue is fundamental. [36] *Bryant,* 692 F.3d at 217 ("In examining whether a government rule or regulation infringes a substantive due process right, the first step is to determine whether the asserted right is fundamental,—i.e., implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." (citations and internal quotation marks omitted)); *Alleyne v. N.Y. Educ. Dep't,* 691 F.Supp.2d 322, 336 (N.D.N.Y.2010) ("In assessing whether a government regulation impinges on a substantive due process right, the first step is to determine whether the asserted right is 'fundamental.' " (quoting *Leebaert v. Harrington,* 332 F.3d 134, 140 (2d Cir.2003))). If "the right infringed is fundamental," the case must be analyzed under strict scrutiny and "the regulation must be narrowly tailored to serve a compelling government interest." *Bryant,* 692 F.3d at 217; *see also Windsor,* 1570 U.S. at ——, 133 S.Ct. at 2717 (discussing strict scrutiny). However, "[w]here the right infringed is not fundamental," the regulation is analyzed under a rational basis test and "the governmental regulation need only be

reasonably related to a legitimate state objective." *Bryant,* 692 F.3d at 217 (citations omitted).

[36]    There are two methods of determining which test should be used to determine if substantive due process has been violated—one method is dependent on whether the right at stake is fundamental and the other depends on whether the law affects or is applied based on a suspect classification. *See United States v. Windsor,* 570 U.S. ——, ——, 133 S.Ct. 2675, 2714, 186 L.Ed.2d 808 (2013) (Roberts, Chief J. dissenting). Under the suspect classification analysis, laws and government actions that affect suspect classes such as race and religion are subject to strict scrutiny, those that affect quasi-suspect classes such as gender are subject to intermediate scrutiny and all others are subject to a rational basis test. *Id.*

**\*26** An individual may also allege a substantive due process claim, if the individual can demonstrate that the government took an "action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ...." " *Cunney,* 660 F.3d at 626 (citations omitted). "It is not enough that the government act be 'incorrect or ill-advised;' it must be 'conscience-shocking.' " *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 275 (2d Cir.2011) (citations omitted); *see also Cunney,* 660 F.3d at 626 (substantive due process does not apply to "government action that is incorrect or ill advised"); *Phillips v. County of Orange,* 894 F.Supp.2d 345, 379 (S.D.N.Y.2012) ("Conduct that is merely 'incorrect or ill-advised' is insufficient to state a claim." (quoting *Cox,* 654 F.3d at 275)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Cox,* 654 F.3d at 275. In order to demonstrate that a government's individual action violated substantive due process under this theory, a plaintiff must meet a two prong test: (1) the plaintiff had an actual interest protected by the Fifth Amendment—life, liberty or property —at stake, and (2) Defendants infringed on that interest in a manner that was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Southerland v. City of New York,* 680 F.3d 127, 142 (2d Cir.2012); *see also McCaul,* 514 F. App'x at 3 (discussing the two part test); *Schweitzer v. Crofton,* —— F.Supp.2d at ——, 2013 WL 1208999, at * 13 (same); *RI, Inc. v. Gardner,* 889 F.Supp.2d 408, 413 (E.D.N.Y.2012) (same), *aff'd,* —— F. App'x ——, 2013 WL 3185437 (2d Cir. June 25, 2013); *Sutera v. Transp. Sec. Admin.,* 708 F.Supp.2d 304, 313 (E.D.N.Y.2010) ("To prevail on either a procedural or

2013 WL 4806960

a substantive due process claim, a claimant must establish that he possessed a liberty or property interest of which the defendants deprived him."). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Schweitzer,* 2013 WL 1208999, at * 13 (quoting *Rosa R. v. Connelly,* 889 F.2d 435, 439 (2d Cir.1989)).

SORA's registration provision is rationally related to a legitimate government interest and none of the actions taken by the State concerning Plaintiff violate Plaintiff's substantive due process rights.

**1. SORA's Registration Requirement Does Not Violate Substantive Due Process**

SORA requires all sex offenders in New York State who meet the requirement of the statute to register as a sex offender, including Plaintiff, accepting his claim that he is a nonresident worker. Plaintiff claims that as a nonresident worker, he should only be required to notify the Division that he is in New York, and should not be required to register. (Pl. Opp'n 47.) Plaintiff claims that as a nonresident worker, being required to register is a violation of his substantive due process rights. (*Id.*) This claim is an attack on the constitutionality of SORA. As discussed below, since SORA does not implicate a fundamental right, it is analyzed under a rational basis test and survives this test. Plaintiff cannot sustain a claim under a theory that SORA's registration requirement violates his substantive due process rights.

*\*27* The New York Court of Appeals has considered the issue of whether a rational basis test or strict scrutiny test should apply to a challenge to a SORA registration requirement. [37] The New York Court of Appeals found that "while defendants may be asserting a liberty interest, we conclude that they are not asserting a 'fundamental right,' as due process cases use that term" in their SORA registration claim. *People v. Knox,* 12 N.Y.3d 60, 67, 875 N.Y.S.2d 828, 903 N.E.2d 1149 (2009) (citing *Immediato v. Rye Neck School Dist.,* 73 F.3d 454, 463 (2d Cir.1996)). Similarly, the appellate courts in New York State that have considered the issue have also found that a rational basis test applies to a SORA registration claim. *People v. Liden,* 79 A.D.3d 598, 913 N.Y.S.2d 200, 201–02 (App.Div.2010), (applying rational basis test to the plaintiff's claim that his SORA classification violated substantive due process), *reversed on other grounds by Liden,* 19 N.Y.3d at 275, 946 N.Y.S.2d 533, 969 N.E.2d 751; *People v. Taylor,* 42 A.D.3d 13, 835 N.Y.S.2d 241, 244

(App.Div.2007) (same); *People v. Hood,* 16 A.D.3d 778, 790 N.Y.S.2d 757, 758 (App.Div.2005) (same).

37    The Court is not aware of any courts that have considered whether intermediate scrutiny applies to SORA.

Federal courts in this Circuit and across the country have ruled, similarly to the courts in New York, that a rational basis test is the correct level of scrutiny to be applied where there is a challenge to a sex offender registration requirement. [38] *See Balentine v. Tremblay,* No. 11–CV–196, 2012 WL 1999859, at *3 (D. Vt. June 4, 2012) ("[P]lacement on a sex offender registry, regardless of how the right has been characterized, courts have concluded that it is not a fundamental one."); *Travis v. N.Y. Div. of Parole,* No. 96–CV–759, 1998 WL 34002605, at *4 (N.D.N.Y. Aug.26, 1998) ("[T]he placement of residential conditions on sex offenders, or holding them beyond their conditional release dates if the conditions are not met, [does not] deprive these inmates of a fundamental right." (citing *Greenholtz v. Inmates of the Neb. Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979))); *see also Doe v. Mich. Dep't of State Police,* 490 F.3d 491, 500 (6th Cir.2007) (stating that freedom from appearing on a sex offender registry "is not a fundamental right deeply rooted in our Nation's history"); *Doe v. Moore,* 410 F.3d 1337, 1345 (11th Cir.2005) (finding that sex offender registration is not "a fundamental right classification" and therefore strict scrutiny does not apply); *Doe v. Tandeske,* 361 F.3d 594, 597 (9th Cir.2004) (per curiam) ("[P]ersons who have been convicted of serious sex offenses do not have a fundamental right to be free from the registration and notification requirements ...."); *Gunderson v. Hvass,* 339 F.3d 639, 643 (8th Cir.2003) ("[A] fundamental right is not implicated" in state's sex registration requirement.); *cf. Paul P. v. Verniero,* 170 F.3d 396, 404 (3d Cir.1999) ("[T]he state interest [in registering sex offenders], which we characterized as compelling, 'would suffice to justify the deprivation even if a fundamental right of the registrant's were implicated.' ").

38    "The law in this Circuit is clear that [w]here, as here, a statute neither interferes with a fundamental right nor singles out a suspect classification, we will invalidate [that statute] on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Molinari v. Bloomberg,* 564 F.3d 587,

606 (2d Cir.2009) (alteration in original) (citations and internal quotation marks omitted).

**\*28** Under the rational basis test, "courts look to any 'conceivable basis' for the challenged law, not limited to those articulated by or even consistent with the rationales offered by the legislature."*Windsor,* 699 F.3d at 196 (quoting *Beach Commc'ns,* 508 U.S. at 312);*see also Beatie v. City of New York,* 123 F.3d 707, 712 (2d Cir.1997) (finding that under the rational basis test, "[t]o uphold the legislative choice, a court need only find some 'reasonably conceivable state of facts that could provide a rational basis' for the legislative action" (citing *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993))). "Those attacking the rationality of a legislative classification have the burden 'to negative every conceivable basis which might support it.' " *Windsor,* 699 F.3d at 196 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)); *Beatie,* 123 F.3d at 712 ("To succeed on a claim such as this, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " (citing *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979))).

New York courts have found that the legislature's intent in enacting SORA was to " 'protect[ ] vulnerable populations[,] and in some instances the public, from potential harm' posed by sex offenders." *People v. Alemany,* 13 N.Y.3d 424, 430, 893 N.Y.S.2d 448, 921 N.E.2d 140 (2009) (citations omitted); *see also North v. Bd. of Exam'rs of Sex Offenders of N.Y.,* 8 N.Y.3d 745, 752, 840 N.Y.S.2d 307, 871 N.E.2d 1133 (2007) ("SORA is a remedial statute intended to prevent future crime; its aim is to 'protect communities by notifying them of the presence of individuals who may present a danger and enhancing law enforcement authorities' ability to fight sex crimes' " (citing *Pataki,* 120 F.3d at 1276)); *Melzer,* 933 N.Y.S.2d at 706 ("[T]he dual purposes of [SORA] ... are to monitor sex offenders' whereabouts and to aid law enforcement in prosecuting recidivist offenders...."); *O'Donnell,* 924 N.Y.S.2d at 686–87 (describing SORA's "dual purposes of monitoring sex offenders' whereabouts and aiding law enforcement in prosecuting recidivist offenders"). This interest is rationally related to requiring sex offenders to register and allowing for community notification, even for nonresident worker sex offenders as Plaintiff claims he was, since under the statute, these nonresident workers would have spent 14 continuous days or 30 non-continuous days in the state, and could be a danger to the state's population.

*See, e.g., People v. Knox,* 12 N.Y.3d 60, 69, 875 N.Y.S.2d 828, 903 N.E.2d 1149 (2009) (finding that SORA does not violate substantive due process because "[c]onsidering that no fundamental right is at stake—defendants are suffering no worse injustice than being called 'sex offenders' " and that the legislature had a rational reason for the classification); *People v. Belter,* 84 A.D.3d 905, 921 N.Y.S.2d 885, 885 (App.Div.2011) ("Equally without merit is the defendant's contention that his adjudication as a sexually violent offender based on his having been convicted of attempted rape in the first degree constituted a denial of his substantive due process rights."); *Taylor,* 835 N.Y.S.2d at 246 ("Whether in common parlance the defendant is a sex offender, or his offense is a sex offense, is of no legal significance where, as here, the Legislature has rationally chosen to categorize him or his offense as such. We are not at liberty to depart from that determination."); *Hood,* 790 N.Y.S.2d at 758 ("Despite defendant's contention that the recidivism rate among sex offenders is not higher than the rate for other criminal defendants, we will not dispute the Legislature's wisdom in concluding to the contrary. As SORA's registration requirement is rationally related to the legitimate government purpose of protecting the public, we reject defendant's equal protection challenge." (citations omitted)); *see also Mich. Dep't of State Police,* 490 F.3d at 501 (finding that the plaintiff's claim for substantive due process violation should be dismissed and that "[a]lthough we believe that the State's justification sweeps too broadly, especially with reference to the plaintiffs in the present case, we are constrained to conclude that the rationale articulated in the statute itself satisfies the rational-basis standard"); *Moore,* 410 F.3d at 1345–46 (finding the state's sex registration law was not a violation of substantive due process under the rational basis test); *Tandeske,* 361 F.3d at 597 (same); *Gunderson,* 339 F.3d at 643–45 (holding that the statute did not violate substantive due process despite the fact that it might at times "perhaps [be] unfair" given the breath of convictions that require registration); *Paul P.,* 170 F.3d at 404 (finding that the state's sex registration law was not a violation of substantive due process); *Balentine,* 2012 WL 1999859, at \*3 (same). This interest also persists even if a plaintiff leaves the state, since the State's interest in "monitor[ing] sex offenders' whereabouts and ... aid[ing] law enforcement in prosecuting recidivist offenders, would be frustrated if they were to cease when a registered sex offender moves out of the state." *Melzer,* 933 N.Y.S.2d at 706. Therefore, Plaintiff's challenge to the constitutionality of the registration provision of SORA is without merit as it is rationally related to New York State's interest in among other things, protecting its

2013 WL 4806960

vulnerable population, being able to monitor the whereabouts of sex offenders and aiding law enforcement.

**\*29** Plaintiff's claim that his risk level assessment hearing should not have been concluded in his absence similarly fails the rational basis test. Pursuant to the text of Section 168–n, the State is required to hold a risk level determination once the Board has recommended that an individual is required to register. *See Melzer,* 933 N.Y.S.2d at 706 (finding that "[c]ontrary to the defendant's contention, the Supreme Court was statutorily required to hold a risk level assessment hearing after receiving the recommendation of the Board of Examiners regarding the defendant's level of notification" even though the defendant claimed he had relocated by the time the hearing occurred). Since as discussed *supra,* the State has a legitimate reason in tracking sex offenders who once lived in the state and have since departed the state, this provision also passes the rational basis test. [39] *See id.*

[39]   Moreover, Plaintiff was represented by counsel who attended the hearing before Judge Camacho on Plaintiff's behalf. (Compl.¶¶ 66, 69–71, 75–77.)

### 2. Plaintiff's Substantive Due Process Rights Were Not Violated

None of the alleged State actions Plaintiff complains about shock the conscience. The State's failure to consider new data that allegedly shows that first time sex offenders need not register, adjudication of Plaintiff's risk level while he was at the airport leaving New York State to return to California, and New York State's failure to accept Plaintiff's appeal because his documents were not properly notarized do not amount to outrageous government action that shocks the conscience. None of the State's actions are even "incorrect or ill-advised," which would be insufficient to sustain a substantive due process claim. *See Cox,* 654 F.3d at 275 (discussing the standard for substantive due process). Plaintiff cannot state a substantive due process claim and this claim is dismissed with prejudice. *See Kuck v. Danaher,* 600 F.3d 159, 167 (2d Cir.2010) (upholding the dismissal of a complaint on motion to dismiss because "the fact that state officials required [the plaintiff] to produce proof of citizenship or legal residency in connection with his permit renewal application is hardly outrageous or shocking [and] [e]ven more, substantive due process does not entitle federal courts to examine every alleged violation of state law, especially ones that, while perhaps vexatious, are more routine than egregious"); *Thomas v. N.Y.C. Dep't of Educ.,* No. 10–CV–464, 2013 WL 1346258, at \* 17 (E.D.N.Y. Mar.

29, 2013) (holding that even if the government's actions may have been discriminatory that "these alleged actions do not shock the conscience or interfere with rights implicit in the concept of ordered liberty" and therefore do not implicate substantive due process); *Phillips,* 894 F.Supp.2d at 381 ("At most, Plaintiffs have claimed that Defendants were negligent in their handling of the abuse investigation, but they have not alleged sufficient facts to support an inference that Defendants' acts were malicious, such that their actions could 'shock the conscience.' " (quoting *Cox,* 654 F.3d at 276)).

#### iv. Equal Protection

**\*30** Plaintiff alleges that requiring him to register under SORA violates his equal protection rights. (Pl. Opp'n to State Defs. 56–71.) "The Equal Protection Clause has traditionally been applied to governmental classifications that treat certain groups of citizens differently than others." *Fortress Bible Church v. Feiner,* 694 F.3d 208, 221 (2d Cir.2012). According to the Second Circuit, there are "three common methods" "to plead intentional discrimination in violation of the Equal Protection Clause:" (1) "by pointing to a law that expressly classifies on the basis of race," (2) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (3) "a facially neutral [law or] policy that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo,* 567 F.3d 74, 76 (2d Cir.2009) (per curiam); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona,* 915 F.Supp.2d 574, 615–16 (S.D.N.Y.2013) (quoting *Pyke* ). When a suspect classification is not at issue, the Equal Protection Clause requires that individuals are treated the same as "similarly situated individuals." *Fortress Bible Church v. Feiner,* 694 F.3d 208, 222 (2d Cir.2012) (holding that equal protection applies "where the plaintiff alleges that [ ]he has been intentionally treated differently from others similarly situated" (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000))); *Vaher v. Town of Orangetown, N.Y.,* 916 F.Supp.2d 404, 433–34 (S.D.N.Y.2013) (finding that the plaintiff's equal protection claim failed because the plaintiff failed to "allege differential treatment from 'similarly situated' individuals").

#### 1. Suspect Class Claim

Plaintiff's primary equal protection claim, as far as can be ascertained by the Court, is that he is part of a suspect class of "non-resident workers," which class has been treated differently from "non-resident students" and "non-resident visitors." [40] (Pl. Opp'n to State Defs. 67.) Plaintiff appears to

argue that while nonresident visitors and students simply have to notify the Division that they are in New York State and that the information will be passed along to law enforcement, Plaintiff, as a nonresident worker, is treated differently in that he is required to do much more. (*Id.* at 65–71.) Plaintiff cites no support for this argument. (*Id.*) At oral argument, Plaintiff asserted that in looking at websites for various universities, they appear to require less of their students who are sex offenders. (Oral Arg. Tr. 32:17–33:7.) Plaintiff claims that under the statute, a nonresident student would not be required to register or obtain a risk level classification. (Pl. Opp'n to State Defs. 56–67.) The language of the statute applies to both nonresident workers and nonresident students. N.Y. Correct. Law § 168–k (1)-(2). All of the provisions discussed above which are applicable to a nonresident worker are also applicable to a nonresident student. The text of § 168–k makes clear that every sex offender is required to notify the Division of their presence in the State and that person is then referred to the Board for a determination of whether the person is required to register. *Id.* Plaintiff's claim that students are treated differently from nonresident workers is simply not supported by the language of the statute. *Id.*

[40]   SORA does not have a defined term labeled "nonresident visitor," (*see* N.Y. Correct. Law § 168–a (defining terms)), this is a term created by Plaintiff. (See Pl. Opp'n to State Defs. 67.) SORA does define "nonresident worker" as "any person required to register as a sex offender in another jurisdiction who is employed or carries on a vocation in this state, on either a full-time or a part-time basis, with or without compensation, for more than fourteen consecutive days, or for an aggregate period exceeding thirty days in a calendar year." *See* N.Y. Correct. Law § 168–a.

**\*31** Moreover, Plaintiff's equal protection challenge to the nonresident worker provision fails the rational basis test. A classification that is not a suspect class or a quasi-suspect class is analyzed under a rational basis test. *See Windsor,* 699 F.3d at 192 (discussing Supreme Court jurisprudence on the rational basis test under both equal protection and substantive due process); *Beach Commc'ns,* 508 U.S. at 313 ("[A] statutory classification that *neither* proceeds along suspect lines *nor* infringes fundamental constitutional rights must be upheld ... if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (emphasis added)). The Second Circuit and district courts in this Circuit have made clear that "[s]ex offenders do not comprise a suspect or quasi-suspect class for Equal Protection purposes."

*Travis,* 1998 WL 34002605, at \*4; *see also Mich. Dep't of State Police,* 490 F.3d at 503 (holding that sex offenders and sub-groups of sex offenders are not a suspect class; and therefore, the rational basis test applies); *Moore,* 410 F.3d at 1346–47 (same); *Selah v. N.Y. Docs Comm'r,* No. 04–CV–3273, 2006 WL 2051402, at \*6 (S.D.N.Y. July 25, 2006) ("Neither sex offenders nor the mentally ill are a suspect class warranting heightened equal protection scrutiny.").

As the Supreme Court has stated, "[o]n rational-basis review, a classification in a statute ... comes to us bearing a strong presumption of validity." *Beach Commc'ns,* 508 U.S. at 314. To the extent Plaintiff believes he is treated different than the class of individuals Plaintiff refers to as "non-resident visitors," the State of New York has a rational basis for being more concerned about "nonresident workers" who are defined by the statute as sex offenders who have spent significant time in New York—14 continuous days or an aggregate of 30 days, *see* N.Y. Correct. Law 168–a—as opposed to sex offenders who have spent less time in the state. As discussed *supra,* in the Substantive Due Process section, New York has a legitimate interest in protecting its vulnerable populations from the potential harm posed by sex offenders.

Furthermore, New York State is not treating Plaintiff any differently than it treats other sex offenders who work in the state for a period longer than 14 consecutive days or 30 nonconsecutive days in a calendar year. New York courts that have considered the issue of whether out-of-state convicted sex offenders have been treated differently from other sex offenders under New York's statutory scheme have found that both in-state convicted sex offenders and out-of state convicted sex offenders are treated similarly in that the Board determines whether both classes of sex offenders are required to register, and if they are required to register, their level of classification is determined by a court. *See People v. McGarghan,* 83 A.D.3d 422, 920 N.Y.S.2d 329, 331 (App.Div.2011) ("New York is treating defendant exactly the same way it would treat a lifelong New York resident who committed the same sex crime while visiting [another state]."); *Dewine v. N.Y. Bd. of Examiners of Sex Offenders,* 89 A.D.3d 88, 930 N.Y.S.2d 332, 336 (App.Div.2011) ("[C]ontrary to petitioner's contention, requiring him to register as a sex offender pursuant to Correction Law § 168–k would not result in disparate treatment on the basis of residency. Rather, such an interpretation would subject petitioner to the same registration and notification requirements applicable to a similarly situated individual who was on probation in New York at the time of SORA's

2013 WL 4806960

implementation."). SORA does not intentionally discriminate against nonresident workers and passes the rational basis test.

### 2. Class–of–One Claim

**\*32** Plaintiff makes several arguments that he was personally treated in a way that violated his equal protection rights. Although "[t]he Equal Protection Clause has traditionally been applied to governmental classifications that treat certain groups of citizens differently than others .... the Supreme Court affirmed the existence of a class-of-one theory for equal protection claims...." *Fortress Bible Church,* 694 F.3d at 221 (citations omitted); *see also RI, Inc.,* 889 F.Supp.2d at 414–15 ("Because plaintiffs do not claim discrimination on the basis of membership in a particular group, they may proceed on an equal protection claim under a 'class of one' theory, as recognized by the Supreme Court ...."). [41] "[T]o succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Aliberti v. Town of Brookhaven,* 876 F.Supp.2d 153, 163 (E.D.N.Y.2012) (quoting *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006)); *see also Fortress Bible Church,* 694 F.3d at 222–23 ("The Supreme Court recognized an Equal Protection claim 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)); *Jones v. Bay Shore Union Free Sch. Dist.,* No. 12–CV–4051, 2013 WL 2316643, at \*8 (E.D.N.Y. May 28, 2013) (discussing the two-part test). "To prevail, the 'class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.' " *RI,* 889 F.Supp.2d at 415 (quoting *Clubside,* 468 F.3d at 159);*see also Fortress Bible Church,* 694 F.3d at 222–23 (upholding dismissal because the comparators were not sufficiently similar); *Aliberti,* 876 F.Supp.2d at 163–64 ("[A] plaintiff must show more than a general similarity between her and the comparator ... as in cases where discrimination based on membership in a protected class is claimed." (citations omitted)).

[41] In addition to "class-of-one" claims, there are also selective enforcement claims that could be brought under certain circumstances, which are not present in the case before the Court. "In order to adequately allege a selective enforcement claim, a plaintiff must allege: '(1) [he was] treated differently from other similarly situated individuals and (2) this differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Jones v. Bay Shore Union Free Sch. Dist.,* No. 12–CV–4051, 2013 WL 2316643, at \*8 (E.D.N.Y. May 28, 2013); *see also Viteritti v. Inc. Vill. of Bayville,* 918 F.Supp.2d 126, 134–35 (E.D.N.Y.2013) (utilizing the same test); *Vaher v. Town of Orangetown, N.Y.,* 916 F.Supp.2d 404, 433 (S.D.N.Y.2013) (same). A selective enforcement claim is inapplicable since Plaintiff does not allege he was treated differently than other individuals because of "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Nor could Plaintiff make out a selective enforcement theory, since, as discussed *infra,* he has not been treated differently than other similarly situated individuals. *See Jones,* 2013 WL 2316643, at \*8 (holding that a person must allege they were treated differently than similarly situated individuals to prevail on a selective enforcement claim); *see also Viteritti,* 918 F.Supp.2d at 134–35 (same); *Vaher,* 916 F.Supp.2d at 433 (same).

Plaintiff appears to argue that he was discriminated against on an individual level and is being treated differently than other nonresident workers because he is being required to register in New York, despite the fact that he no longer lives in New York but currently lives in Malta and should therefore not be subject to New York reporting requirements. [42] (Pl. Opp'n to State Def. 52.) This claim lacks merit. Plaintiff is not required to do anything more than any similarly situated individual. All sex offenders classified as risk level III are required to register for life and all sex offenders, regardless of risk level, must use the proper procedure to notify New York of their new address if they relocate out of New York State. N.Y. Correct. Law §§ 168–f (4)-(5), 168 j(4) (requiring a life time registration for all individuals listed as level three sex offenders and requiring all individuals required to register to inform the Division of a

2013 WL 4806960

change in address). Once notified of Plaintiff's new address, if that address is outside of New York State, Plaintiff is no longer required to verify his address in person every 90 days. *See* N.Y. Correct § 168–h (stating that a risk level III sex offender is required to verify in person "where the offender resides"). This allegation does not state an equal protection claim based on a class-of-one theory.

[42]    Plaintiff also argues that other California convicted sex offenders similar to him would no longer be required to register in California and the fact that he is required to register in New York is a violation of his equal protection rights. (Pl. Opp'n State Defs. 57, 86, 89–91.) However, this is not a cognizable Equal Protection claim since Plaintiff neither claims that he is being required to register in New York because he is part of a protected class or that Plaintiff is being treated differently than similarly situated individuals and thus the statute is being selectively enforced against him or that he is a class-of-one. *RI, Inc. v. Gardner,* 889 F.Supp.2d 408, 414–15 (E.D.N.Y.2012) (discussing intentional discrimination based on suspect classification and class-of-one cases), *aff'd,* —— F. App'x ——, ——, 2013 WL 3185437 (2d Cir. June 25, 2013); *DeFalco v. Dechance,* No. 11–CV–05502, 2013 WL 2658641, at *9 (E.D.N.Y. June 13, 2013) (same).

**\*33** Plaintiff also argues that not allowing him to file his appeal of Judge Camacho's decision and his Article 78 petition without having the documents notarized was a violation of his equal protection rights, since in-state sex offenders could travel to the county clerk's office and have their documents notarized for free. (*Id.* at 33, 35, 38.) Plaintiff does not allege that other similarly situated individuals, i.e., individuals outside of New York State who could not travel to the County Clerk's office, were not required to have their documents notarized. Rather, Plaintiff claims that *an exception* should have been made for him from the State's procedural rules. (*Id.*) These facts do not and cannot state a claim for a violation of Plaintiff's equal protection rights based on a class-of-one theory.

Plaintiff also claims that since he was no longer physically present in New York at the time of the final adjudication of his risk level, requiring him to attend the final adjudication of this risk level was a violation of his equal protection rights. [43]

(*Id.* at 60.) First Plaintiff's assertion is inaccurate. Pursuant to the law, where, as here, Plaintiff was given notice of the risk level classification hearing, but chooses not to attend or to give sufficient excuse, the determination will be held in his absence. N.Y. Correct. Law § 168–k. Plaintiff cannot simply avoid a risk level determination by leaving New York State prior to the hearing. *See Melzer,* 933 N.Y.S.2d at 706 (finding that "the dual purposes of the Sex Offender Registration Act ... are to monitor sex offenders' whereabouts and to aid law enforcement in prosecuting recidivist offenders" and that those would be frustrated if the sex offender could just move to avoid registration). SORA requires that the risk level determination be held once the Board has recommended that a sex offender should register. *Id.* Thus, Plaintiff cannot state an equal protection claim based on a class-of-one theory since all similarly situated sex offenders who receive notice of a hearing, decide not to participate in the classification hearing and do not give a sufficient excuse for their absence would also be subject to a risk level classification hearing and determination in their absence.

[43]    Plaintiff also claims that, as with his substantive due process claim, not having a lawyer assigned to him for his appeal was a violation of his equal protection rights. (Pl. Opp'n to State Defs. 38.) According to Plaintiff, he was assigned a lawyer at the hearing before Judge Camacho. (*Id.* at 37.) While Plaintiff may have initially been appointed counsel by the court, Plaintiff subsequently declined the services of the court-appointed counsel and retained the services of the Attorney Defendants. (Compl.¶ 64.) Nothing in the statute requires that Plaintiff be appointed counsel for appeal under these circumstances. *See* N.Y. Correct. Law § 168–k (2).

Lastly, Plaintiff asserts that his equal protection rights were violated because civil litigants are required to be personally served and he was never personally served "with Judge Camacho's May 25th, 2011 Order or any type of formal notice of his [sic] requirements pursuant to Judge Camacho aforementioned Order." (*Id.* at 58, 933 N.Y.S.2d 705.) Plaintiff provides no legal support for the assertion that he must be personally served, rather than by service on his attorney who was present at the hearing. (*Id.*) Furthermore, the text of 168–k does not require personal service of the order. *See* N.Y. Correct. Law § 168–k(2) (discussing the requirements for the order relating to the sex offender's risk level).

**\*34** Plaintiff has failed to plausibly allege that he was treated differently because he was part of a suspect class or that he had been treated different from similarly situated individuals and his equal protection claim is without merit and is therefore dismissed with prejudice. *See, e.g., Scott v. Woodworth,* No. 12–CV–0020, 2013 WL 3338574, at \*4–5 (N.D.N.Y. July 2, 2013) (holding that the plaintiff's suspect class claim and class-of-one claim were both not adequately pled because he was not part of a suspect class and he had failed to plead that he was treated differently than similarly situated individuals); *Bowens v. Fed. Bureau of Prisons,* No. 12–CV5591, 2013 WL 3038439, at \*8 (S.D.N.Y. June 18, 2013) (same); *DeFalco v. Dechance,* No. 11–CV–05502, 2013 WL 2658641, at \*10 (E.D.N.Y. June 13, 2013) (dismissing the complaint for failure to plausibly allege that the plaintiff was treated differently than similarly situated individuals); *Vaher,* 916 F.Supp.2d at 433–35 (dismissing the complaint because the plaintiff both failed to plead he was "a member of a constitutionally protected class" and that he was treated differently from similarly situated individuals).

### v. Privileges and Immunities

"Under the Privileges and Immunities Clause, '[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States.' "[44] *McBurney v. Young,* 569 U.S. ——, ——, 133 S.Ct. 1709, 1714, 185 L.Ed.2d 758 (2013) (quoting *U.S. Const., art. IV, § 2, cl. 1*). The goal of the Privileges and Immunities Clause is to ensure that states give out-of-state residents substantially similar rights as the states give to their own residents. *Id.* ("We have said that [t]he object of the Privileges and Immunities Clause is to strongly ... constitute the citizens of the United States [as] one people, by plac[ing] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." (alterations in original) (citations and internal quotation marks omitted)). As the Supreme Court has made clear, "[t]his does not mean, we have cautioned, that 'state citizenship or residency may never be used by a State to distinguish among persons.' " *Id.* "Nor must a State always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do." *Id.* (citations omitted). "Rather, we have long held that the Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.' " *Id.; see also McDonald v. Chicago,* 561 U.S. ——, ——, 130 S.Ct. 3020, 3028, 177 L.Ed.2d 894 (2010) (holding that privileges and immunities applies only to "fundamental rights"); *Joseph v. Hyman,* 659 F.3d 215, 219 (2d Cir.2011) (holding that the

right to park where one wants without incurring a ticket was not "sufficiently fundamental to trigger protection under the Privileges and Immunities Clause").

44      In addition to "the Privileges and Immunities Clause in the Fourth Amendment" there is the "Privileges or Immunities Clause in the Fourteenth Amendment." *Selevan v. N.Y. Thruway Auth.,* 711 F.3d 253, 255 n. 2 (2d Cir.2013). Plaintiff only pled Privileges and Immunities in the Complaint. (See Compl. ¶ 263.) However, in his opposition to the State Defendants' motion to dismiss, Plaintiff pleads that his right to travel has been violated pursuant to the "Privileges or Immunities Clause" in the Fourteenth Amendment. (Pl. Opp'n to State Defs. 50.) The Court will discuss his right to travel claim in a separate section.

**\*35** Plaintiff alleges that New York State's classification of Plaintiff as a risk level III sex offender when Plaintiff was subject to no risk level assessment in California and is no longer required to register in California is a violation of the Privileges and Immunities Clause. (Pl. Opp'n to State Defs. 40–50.) Plaintiff alleges that he is subject to more severe registration requirements in New York than he would have been in California: He is not required to register in California and he is required to register in New York; the California registry only publishes photographs, the conviction, and the zip code, but the SORA website publishes photographs, details about the conviction, and home addresses; in California, registration would have only been once a year, while in New York he is required to register every 90 days; California mandates that law enforcement update their website when he leaves the state, but New York has refused to update its website; California does not require Plaintiff to pay each time he has his photograph taken for the website, but he had to pay each time his photograph was taken for the SORA website; Plaintiff did not have to pay to have his fingerprints taken in California but does have to pay to have his finger prints taken in New York; California does not have community notification but, according to Plaintiff, law enforcement in New York personally notified his neighbors of his presence, and, in addition, the Malta police and the German police were notified of his conviction; California allows Plaintiff to have a United States passport but New York prohibits him from having a passport; and California allows him to travel internationally and New York prohibits him from traveling internationally. (*Id.* at 41–42.) Plaintiff also alleges that New York failed to update his information on the SORA website although he informed New York of his move from

2013 WL 4806960

New York to California. (*Id.* at 41.) Plaintiff further alleges that he believes he was given a level III classification because he was a nonresident worker and New York wanted to punish him for working within the state.[45] (*Id.* at 45.)

[45] In addition, Plaintiff asserts that his privileges and immunities were violated when he was prevented from filing his appeal of Judge Camacho's decision and Article 78 petition. (Pl Opp'n to State Defs. 47.) As discussed *supra,* Plaintiff admits that it was beyond the appeal period when he attempted to file his appeal and, in any event, he was not prevented from filing an appeal but rather told to comply with procedural rules.

The fact that Plaintiff may not have been required to register in California or required to register with less community notification, less restrictions, less frequency than he was required to do by New York does not give rise to a privileges and immunities claim, since the Privileges and Immunities Clause only requires that a state treat a non-citizen the same as it treats the citizens *of its own state. See McBurney,* 569 U.S. at ——, 133 S.Ct. at 1714 (discussing the Privileges and Immunities Clause). Thus, under the Privileges and Immunities Clause, New York State was required to treat Plaintiff the same as it treats New York citizens, which it did. The Court need not reach the question of whether Plaintiff is asserting a fundamental right under the Privileges and Immunities Clause because, even assuming Plaintiff is asserting a fundamental right, as a nonresident worker, Plaintiff was required to register and have his classification level determined by a judge, the same as residents of New York State. Thus, Plaintiff cannot claim that the registration requirement or risk level classification determination violated the Privileges and Immunities Clause because he was treated the same as any citizen of New York State would have been treated who had committed a similar crime. *See, e.g., McGarghan,* 920 N.Y.S.2d at 331 (holding that the defendant's claim that requiring him to register in New York State based on his Vermont conviction was a violation of his privileges and immunities was without merit); *Dewine,* 930 N.Y.S.2d at 336 (holding that the defendant's claim that requiring him to register in New York State based on his Wyoming conviction was a violation of his privileges and immunities was without merit). Plaintiff's claim pursuant to the Privileges and Immunities Clause is therefore dismissed with prejudice.

**vi. Right to Travel**

**\*36** Plaintiff asserts that his right to travel has been harmed because under SORA he must register in person in New York every 90 days. (Pl. Opp'n to State Defs. at 76–80.) Plaintiff argues that the cost of travel from Malta to New York is expensive but if he fails to return to New York to register, he will be subject to severe criminal penalties. (*Id.*) Plaintiff therefore argues that essentially, he cannot travel outside of the State of New York. (*Id.*)

" 'A state law implicates the right to travel'—thereby triggering strict scrutiny—'when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right.' " *Selevan v. N.Y. Thruway Auth.,* No. 06–CV–291, 2011 WL 5974988, at \*6 (N.D.N.Y. Nov. 28, 2011), (quoting *Attorney Gen. of N.Y. v. Soto–Lopez,* 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986), *aff'd,*711 F.3d 253 (2d Cir.2013)). Minor restrictions on travel are not sufficient to state a constitutional claim. *See Selevan v. N.Y. Thruway Auth.,* 711 F.3d 253, 258 (2d Cir.2013) ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right."); *Joseph v. Hyman,* 659 F.3d 215, 219 (2d Cir.2011) (same).

Although the Court has only found limited case law challenging SORA as impacting the right to travel, many courts have considered the issue as applied to the Sex Offender Registration and Notification Act[46] ("SORNA") and have determined that SORNA does not implicate the right to travel. SORNA requires registration not only in the jurisdiction where an individual resides, but also the jurisdiction in which an individual works and studies. *See*42 U.S.C. § 16913(a) ("A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence ."). Despite requiring an individual to register in multiple states, SORNA does not violate the right to travel, since it does not prevent an individual from moving to a new state. *See United States v. Byrd,* 419 F. App'x 485, 491–92 (5th Cir.2011) ("SORNA's registration requirements do not implicate the fundamental right to travel [by] convicted sex offenders because nothing in the statute precludes an offender from entering or leaving another state ...." (citations and internal quotation marks omitted)); *United States v. Shenandoah,* 595 F.3d 151, 162 (3d Cir.2010) ("[The defendant] may travel interstate, but when

2013 WL 4806960

he does, must register in the new state, while a convicted sex offender who remains within a state need only remain properly registered therein. There is simply no Constitutional violation. Moreover, moving from one jurisdiction to another entails many registration requirements required by law which may cause some inconvenience, but which do not unduly infringe upon anyone's right to travel. The essential part of the charged crime in this matter is the failure to register; [the defendant's] right to travel is incidental to this obligation, and not constitutionally offended."), *abrogated on other grounds by Reynolds,* 565 U.S. ——, 132 S.Ct. 975, 181 L.Ed.2d 935;*United States v. Ambert,* 561 F.3d 1202, 1210 (11th Cir.2009) ("The requirement to update a registration under SORNA is undoubtedly burdensome; however, the government's interest in protecting others from future sexual offenses and preventing sex offenders from subverting the purpose of the statute is sufficiently weighty to overcome the burden. This statute does not violate [the defendant's] right to travel."); *United States v. Stacey,* No. 12–CR–15, 2013 WL 1891342, at *4 (W.D.Pa. May 6, 2013) (SORNA does not "unconstitutionally infringe[ ] on ... [the] right to travel"); *McCarty v. Roos,* No. 11–CV–1538, 2012 WL 6138313, at *7 (D.Nev. Dec.7, 2012) (same); *United States v. Lesure,* No. 11–CR30227, 2012 WL 2979033, at *4 (S.D.Ill. July 19, 2012) (same) (collecting cases).

46    SORNA "requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries." *Reynolds v. United States,* 565 U.S. ——, ——, 132 S.Ct. 975, 978, 181 L.Ed.2d 935 (2012).

**\*37** SORA only requires registration in New York when the individual has been present in New York fourteen continuous days or thirty cumulative days. *See*Correct. Law § 168–a; Correct. Law § 168–f. As discussed *supra,* Plaintiff is only required to inform New York State that he has relocated and provide the address of his new location. *See*N.Y. Correct. Law § 168–j(4). At least one New York State appellate division court has held that SORA does not violate the right to travel. *See McGarghan,* 920 N.Y.S.2d at 330 (holding that SORA registration requirements did not violate the plaintiff's right to travel). The Court finds that because Plaintiff is only required to provide New York with his new address when he has relocated to another state, at most, SORA implicates a negligible impact on travel. Plaintiff cannot sustain his right to travel claim and this claim is dismissed with prejudice.

### vii. *Ex Post Facto*

Plaintiff claims that requiring him to register as a sex offender in New York State was a violation of the *Ex Post Facto* Clause. (Compl.¶ 303.) The basis for this claim is unclear since Plaintiff only argues that he should not have been required to register as a sex offender in New York State and classified as a level III risk offender. (*Id.*) The Second Circuit has made clear that registration and notification requirements under SORA do not implicate the *Ex Post Facto* Clause—"Because we have previously concluded that the legislature's intent in enacting these provisions was nonpunitive and that the text and structure of the Act bear out its prospective, regulatory goals, we hold that the notification requirements of the SORA do not constitute punishment for purposes of the Ex Post Facto Clause." *Doe,* 120 F.3d at 1284;*see also United States v. Kebodeaux,* 570 U.S. ——, ——, 133 S.Ct. 2496, 2516, 186 L.Ed.2d 540 (2013) (holding that SORNA does not violate *ex post factor* "because SORNA's registration requirements are civil"); *United States v. Brunner,* ——F.3d ——, ——, 2013 WL 4033847, at *4 (2d Cir. Aug.9, 2013) (holding that where a person is indicted for failing to register after the enactment of SORNA that the *ex post facto* clause is not violated); *Singleton,* 2012 WL 864801, at *8 (holding that SORA registration does not implicate the Ex Post Facto Clause); *Manzullo v. People,* No. 07–CV–744, 2010 WL 1292302, at *8 (E.D.N.Y. Mar. 29, 2010) (" '[B]oth the registration and notification provisions of [SORA] [do] not constitute punishment for the purposes of the Ex Post Facto clause,' and therefore, Petitioner's claim has no merit." (citations omitted)); *see also Smith v. Doe,* 538 U.S. 84, 105–06, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (holding that Alaska's sex registration act was "nonpunitive, and its retroactive application does not violate the Ex Post Facto Clause"). Plaintiff cannot sustain a claim pursuant to the *Ex Post Facto* Clause and this claim is dismissed with prejudice.

### viii. Cruel and Unusual Punishment

**\*38** Plaintiff argues that since nonresident workers and students are forced to register and are given the highest level of classification, that the classification itself should be considered cruel and unusual punishment. [47] (Pl. Opp'n to State Defs. at 64–65.) For the same reasons that Plaintiff's claim pursuant to the *Ex Post Facto* Clause cannot be sustained, Plaintiff's cruel and unusual punishment claim also fails—the registration requirement is not punitive. *See, e.g., United States v. Crews,* 496 F. App'x 896, 901 (11th Cir.2012), *cert. denied,*568 U.S. ——, 133 S.Ct. 1301, 185 L.Ed.2d 227 (2013) (holding that sex registration does not violate the *Ex

*Post Facto* Clause nor is it cruel and unusual punishment because it does not "impose additional punishment for past sex offenses"); *see also United States v. Under Seal,* 709 F.3d 257, 265 (4th Cir.2013) (holding that sex registration is not cruel and unusual punishment because "[a]lthough Appellant is required under SORNA to appear periodically in person to verify his information and submit to a photograph, this is not an affirmative disability or restraint [and] '[a]ppearing in person may be more inconvenient, but requiring it is not punitive' " (quoting *United States v. W.B.H.,* 664 F.3d 848, 857 (11th Cir.2001); *Crosby v. Schwartz,* 678 F.3d 784, 791–92 (9th Cir.2012) (imposing a criminal sentence for the plaintiff's failure to follow registration requirements did not constitute cruel and unusual punishment); *United States v. Davis,* 352 F. App'x 270, 272 (10th Cir.2009) (holding that registration of convicted sex offenders under SORNA does not violate "the Eighth Amendment's prohibition on cruel and unusual punishment" since it is civil and not punitive). Since registration has been found not to be punitive, even if Plaintiff was targeted with the highest level of registration, it is not cruel and unusual punishment. Plaintiff has not, and cannot, state a claim for cruel and unusual punishment and this claim is dismissed with prejudice.

47   Risk level classification, while recommended by the Board, is determined by a judge after a hearing where the sex offender can provide evidence and argument to rebut the Board's recommendation and is guaranteed counsel at the hearing, if the sex offender is unable to afford counsel. Correct. Law. 168–k. Plaintiff had a hearing and was represented by counsel at his hearing. (Compl.¶¶ 66, 83, 166, 167.)

### ix. Full Faith and Credit

Plaintiff argues that because his "out-of-state California conviction with a willing participant is no longer registerable [sic]" that New York is violating the Full Faith and Credit Clause by requiring Plaintiff to register in New York. (Pl. Opp'n. to State Defs. 86, 88–91.) According to the Full Faith and Credit Clause, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. Const. art. IV, § 1. "The purpose of the Full Faith and Credit Clause 'was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial

proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin." *Rosin v. Monken,* 599 F.3d 574, 576 (7th Cir.2010) (quoting *Baker v. General Motors Corp.,* 522 U.S. 222, 232, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998)). "By virtue of its 'exacting' operation with respect to judgments, the Full Faith and Credit Clause results in 'the judgment of the rendering State [gaining] nationwide force.' The primary operational effect of the Clause's application is 'for claim and issue preclusion (res judicata) purposes." *Rosin,* 599 F.3d at 576 (alteration in original) (quoting *Baker,* 522 U.S. at 233).

**\*39** Every court to squarely address the issue of whether the Full Faith and Credit Clause requires a state to give a convicted sex offender who relocates to that state the same classification that he would have had in the state of conviction has agreed that it does not. *See, e.g., Daniels v. Arapahoe Cnty. Dist. Court,* 376 F. App'x 851, 854 (10th Cir.2010) (holding that Colorado was not bound by the Full Faith and Credit Clause, to give the plaintiff the same sex offender classification status for his California guilty plea as he would have received in California); *Rosin,* 599 F.3d at 577 (holding that the Full Faith and Credit Clause did not prevent Illinois from requiring a plaintiff to register even though registration was not required in the state where he pled guilty); *McGuire v. City of Montgomery,* No. 11–CV–1027, 2013 WL 1336882, at \*12 (M.D.Ala. Mar. 29, 2013) (plaintiff failed to state a Full Faith and Credit claim because "the judgment of the Colorado court—which is silent on registration in Colorado or any other state—does not preclude Alabama from requiring Plaintiff to register"); *O'Donnell,* 924 N.Y.S.2d at 687–88 (holding that New York could impose a different registration requirement than Virginia where the plaintiff was convicted); *McGarghan,* 920 N.Y.S.2d at 331 (the requirement that plaintiff register for 20 years in New York when he would only have to register for 10 years in Vermont where his conviction occurred was not a violation of Full Faith and Credit Clause); *Smith,* 898 N.Y.S.2d at 704–05 (holding that New York did not have to give full faith and credit to the plaintiff's registration requirement in Texas, the state where the plaintiff pled guilty); *People v. Arotin,* 19 A.D.3d 845, 796 N.Y.S.2d 743, 745 (App.Div.2005) (finding that the Full Faith and Credit Clause "is not violated by requiring a convicted sex offender moving into New York to be governed by [New York's] registration requirements").

The rationale used by most of these courts in reaching their decision is that the exercise of the police power of each

2013 WL 4806960

state over its citizens gives states the power to independently determine sex registration for sex offenders located in its borders. For example, in *Rosin,* the Seventh Circuit found that "Illinois, as a state of the Union, has police power over the health and welfare of its citizens." *Rosin,* 599 F.3d at 577. The Seventh Circuit went on to state that "New York has no authority to dictate to Illinois the manner in which it can best protect its citizenry from those convicted of sex offenses." *Rosin,* 599 F.3d at 577. The Seventh Circuit concluded that "there is no tension between Illinois's police power and the Full Faith and Credit Clause here. As a result, New York could promise Rosin only that he would never have to register as a sex offender within its own jurisdiction. Rosin could not bargain for a promise from New York as to what other states would do based on his guilty plea to sexual abuse in the third degree, for New York had no power to make such a promise." *Rosin,* 599 F.3d at 577.

**\*40** In New York, two courts have similarly found that requiring a plaintiff to comply with a different registration requirement than the state of conviction was not a violation of the Full Faith and Credit Clause. In *O'Donnell,* the Appellate Division, Third Department found that:

> New York and Virginia have each separately adjudicated the risk posed by petitioner to their respective citizens and imposed registration requirements upon petitioner pursuant to each state's sex offender registration law. As neither state has attempted to adjudicate the same matter, the Full Faith and Credit Clause has not been violated.

*O'Donnell,* 924 N.Y.S.2d at 687–88. In *McGarghan,* the Appellate Division, First Department, found that "[t]he administrative manner in which a state chooses to exercise the registration requirements for a sex offender who moves into its jurisdiction falls squarely within the power of that state and is not governed by the procedures in effect in the state where the offender previously resided." *McGarghan,* 920 N.Y.S.2d at 330–31 (2011) (quoting *Arotin,* 19 A.D.3d 845, 796 N.Y.S.2d 743). The Appellate Division reasoned that "[t]he purpose of the Full Faith and Credit Clause is to avoid conflicts between States in adjudicating the same matters" and that "a different state's registration requirement is not the

same matter," and therefore not a violation of the Full Faith and Credit Clause. *Id.* In *Smith,* the Third Department, used the same reasoning as *Rosin* and held that the registration of sex offenders was pursuant to New York State's police powers and "New York is not required under full faith and credit principles to assign an offender the same risk level classification as that designated by the jurisdiction where the registerable conviction occurred...." Plaintiff has not, and cannot, state a claim under the Full Faith and Credit Clause of the Constitution and this claim is dismissed with prejudice.

### x. Premption

In his opposition to the State Defendants' motion to dismiss, Plaintiff asserts for the first time that requiring him to remain registered in New York State even though he no longer lives in New York, is a violation of the Supremacy Clause of the Constitution because SORA is preempted by SORNA. (*See, e.g.,* Pl. Opp'n to State Defs. 1, 44, 46, 52–53, 59, 75.) "The Supremacy Clause establishes that federal law 'shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." *Hillman v. Maretta,* 569 U.S. ——, ——, 133 S.Ct. 1943, 1955, 186 L.Ed.2d 43 (2013) (Thomas, J., concurring) (quoting U.S. Const. art. VI, cl. 2). Under the doctrine of federal preemption, when a federal law preempts a state or local law, the preempted law ceases to be in effect and is considered void. *See Mary Jo C.,* 707 F.3d at 161 ("Under the doctrine of federal preemption, 'state laws that conflict with federal law are without effect." (citations omitted)). "[A]s the Supreme Court has repeatedly instructed, 'in all pre-emption cases ... we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,* —— F.3d ——, 2013 WL 3863890, at \*19 (2d Cir. July 26, 2013) (quoting *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)); *see also Mary Jo C.,* 707 F.3d at 161 ("Absent clear congressional intent to the contrary, federal preemption of state law is not favored ...." (alteration in original) (citations omitted)). "That rule of construction rests on an assumption about congressional intent: that 'Congress does not exercise lightly' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States.' " *Arizona v. Inter Tribal Council of Ariz., Inc.,* 570 U.S. ——, ——, 133 S.Ct. 2247, 2256, 186 L.Ed.2d 239 (2013) (citations omitted). "In light of this assumption, the party asserting that federal law preempts state law bears the burden of establishing preemption." *In MTBE,* —— F.3d at ——, 2013 WL 3863890, at \*19.

**\*41** There are three different types of preemption: express, field and conflict preemption. Under express preemption Congress directly states in the statute that it is Congress's intent to preempt all state law on the issue. *See Hillman,* 569 U.S. at ——, 133 S.Ct. at 1949 ("Under the Supremacy Clause, Congress has the power to pre-empt state law expressly."); *In re MTBE,* —— F.3d at ——, 2013 WL 3863890, at \*19 ("First, when Congress expressly provides that a federal statute overrides state law, courts will find state law preempted if, applying standard tools of statutory construction, the challenged state law falls within the scope of Congress's intent to preempt."). Field preemption applies "when Congress legislates so comprehensively in one area as to 'occupy the field,' " and thus courts "may infer from the federal legislation that Congress intended to preempt state law in that entire subject area." *In re MTBE,* —— F.3d at ——, 2013 WL 3863890, at \*19 (citing *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)); *see also Mary Jo C.,* 707 F.3d at 161–62 (finding that field preemption applies "where Congress has manifested an intent to 'occupy the field' in a certain area" (citations omitted)). Conflict preemption applies "where state law 'actually conflicts with federal law' " even though the statute does not expressly state that state law is preempted. *Id.* (citations omitted); *see also Hillman,* 569 U.S. at ——, 133 S.Ct. at 1949–50 (noting that conflict preemption occurs "when compliance with both federal and state regulations is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " (citation omitted)); *In re MTBE,* —— F.3d at ——, 2013 WL 3863890, at \*19 (finding that when "state law directly conflicts with the structure and purpose of a federal statute, we may conclude that Congress intended to preempt the state law"). "Such a conflict occurs when compliance with both federal and state regulations is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Hillman,* 569 U.S. at ——, 133 S.Ct. at 1950 (citations omitted); *see also In re MTBE,* —— F.3d at ——, 2013 WL 3863890, at \*19 ("[W]e will find a conflict with preemptive effect only in two circumstances: first, when 'compliance with both federal and state regulations is a physical impossibility,' and second, when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (quoting *Arizona v. United States,* 567 U.S. ——, ——, 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012))).

According to Plaintiff:

> State Defendants's [sic] malicious attempts to enforce an administrative and ministerial SORA policy upon a foreign nation and international commerce violates the Supremacy Clause were [sic], as stated above and more specifically below, the U.S. Congress excluded foregin [sic] nations from the Megan Law registration requirements and controls.

**\*42** (Pl. Opp'n to State Defs. 44.) Plaintiff argues that since SORNA specifically states that it does not apply to foreign nations that SORA cannot require those residing abroad to register. (*Id.*) According to Plaintiff, SORNA preempts any attempts by New York State to regulate sex offenders living in other jurisdictions—states and foreign countries. (*Id.* at 52–53, 59, 75.)

As discussed in Part III.d.ix addressing Plaintiff's claim pursuant to the Full Faith and Credit Clause, the registration of sex offenders is part of the police powers of a state. A state's police powers to protect the health and safety of its citizens are traditional areas of state authority. *See Steel Inst. of N.Y. v. City of New York,* 716 F.3d 31, 36 (2d Cir.2013) ("Protection of the safety of persons is one of the traditional uses of the police power," which is "one of the least limitable of governmental powers." (quoting *Queenside Hills Realty Co. v. Saxl,* 328 U.S. 80, 82–83, 66 S.Ct. 850, 90 L.Ed. 1096 (1946))). Therefore, "[t]here is a strong presumption against preemption when states and localities 'exercise[ ] their police powers to protect the health and safety of their citizens.' " *Steel Inst. of N.Y.,* 716 F.3d at 36 (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 484–85, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996))). Thus, courts generally require a "clear and manifest" intent by Congress to preempt statutes that concern the state's police powers. *Id.* ("Because of the role of States as separate sovereigns in our federal system, we have long presumed that state laws ... that are within the scope of the States' historic police powers ... are not to be pre-empted by a federal statute unless it is the clear and manifest purpose of Congress to do so." (quoting *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 894, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (Stevens, J., dissenting))).

Case 5:20-cv-00535-BKS-TWD Document 45 Filed 08/24/22 Page 216 of 267
Spiteri v. Russo, Not Reported in F.Supp.2d (2013)
2013 WL 4806960

None of the three types of preemption apply here. SORNA does not contain an explicit preemption provision. *See* 42 U.S.C. § 16901 *et seq.* This Court has not located a single case to even consider SORNA an implied preemption, or to rule that it has preempted any state law. In addition, since SORNA is opt-in legislation for the states, [48] it suggests that Congress did not intend to fully occupy the field, a field traditionally left to states. Moreover, SORA is not in conflict with SORNA. SORNA, like SORA, would have required Plaintiff to register in New York State, had it applied in New York, since according to Plaintiff, he was a nonresident worker and SORNA requires sex offenders to register where they live, work and study. *See* 42 U.S.C. § 16913(a) (requiring sex offenders to register where they live, work or study in every jurisdiction); *see also* 42 U.S.C. § 16912 (requiring states to maintain registries of sex offenders); N.Y. Correct. Law §§ 168–a, 168–f, 168–k (listing the registration requirements once someone is present in the state after 14 days); *Reynolds,* 565 U.S. at ——, 132 S.Ct. at 978 ("[SORNA], requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries.").

[48]  *See* *United States v. Guzman,* 591 F.3d 83, 93–94 (2d Cir.2010) (noting that New York, Massachusetts and Virginia have not implemented SORNA and have not opted into the statute).

 **\*43**  Courts have held that SORNA contemplates by its provisions that a sex offender will be registered in more than one state. *See* *United States v. Begay,* 622 F.3d 1187, 1196 (9th Cir.2010) ("SORNA clearly contemplates that certain sex offenders might have to register and keep their registration current in multiple jurisdictions. And nothing in the text of the statute limits its application to only one jurisdiction in each of the three categories mentioned in § 16913(a); rather, the most logical reading of the statute is that it applies to every jurisdiction falling within one of the three categories."); *United States v. Gundy,* No. 13–CR–8, 2013 WL 2247147, at \*10 (S.D.N.Y. May 22, 2013) ("Section 16913 requires offenders to register in each jurisdiction in which they reside, work, or study—requirements that all envision individuals outside of prison, free to go about their lives in multiple jurisdictions."). Moreover, SORNA requires sex offenders to register in states when they move from one state to another state. *See* *United States v. Robbins,* —— F.3d ——, 2013 WL 4711394, at \*5 (2d Cir. Sept.3, 2013) (finding that a sex

offender is required to register when he moves to a new state pursuant to SORNA and holding that SORNA's provision that a sex offender register when he or she moves is valid); *United States v. Guzman,* 591 F.3d 83, 93–94 (2d Cir.2010) (noting that SORNA requires a sex offender to register with a state when he or she moves to the state). Furthermore, SORNA has no provision requiring removal from a state's registry once a sex offender moves out of that state. *See* 42 U.S.C. § 16901 *et seq.* Contrary to Plaintiff's claim, SORA is not in conflict with SORNA since SORA only requires that registered sex offenders register their new address when they leave New York State; it does not require that Plaintiff travel back and forth to New York State to re-register every 90 days, as Plaintiff claims. *See* N.Y. Correct. Law § 168–f(4)–(5). SORA is not preempted by SORNA and Plaintiff's Supremacy Clause claim is without merit and is dismissed with prejudice. [49]

[49]  Plaintiff's extraterritoriality argument is without merit as it is not a cognizable Supremacy Clause claim. The Supremacy Clause only makes a law void when it is in conflict with federal law, as discussed above. Nothing in SORNA prevents states from keeping individuals on the registry even if they no longer reside in the United States. SORNA states that the federal government shall initially register qualified foreign nationals when they first enter the United States. *See* 42 U.S.C. § 16928. However, Plaintiff is a United States citizen, in addition to being a citizen of Malta, and he was required to register in New York *not* because he relocated to New York from outside of the United States but because he relocated to New York from California. Thus, under the terms of SORNA, Plaintiff was required to register in New York. *See* 42 U.S.C. § 16912 (requiring states to maintain registries); 42 U.S.C. § 16913(a) (requiring sex offenders to register where they live, work or study in every jurisdiction).

 **xi. Commerce Clause and Dormant Commerce Clause**
Plaintiff alleges that attempting to exercise jurisdiction over Plaintiff by requiring him to register in New York as a sex offender, despite the fact that he lives oversees, is a violation of the "international commerce and dormant commerce clause." (Pl. Opp'n to State Defs. at 35; *see also id.* at 42, 52.) Plaintiff refers to dormant Commerce Clause and Commerce Clause as two separate claims. However, when applied to states, the proper analysis is the Dormant

2013 WL 4806960

Commerce Clause analysis. *See Steel Inst. of N.Y. v. City of New York,* 832 F.Supp.2d 310, 333 (S.D.N.Y.2011), *aff'd,*716 F.3d 31 (2d Cir.2013) ( "Although the Constitution does not expressly limit the power of States to regulate commerce, the Supreme Court has 'long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute.' This implicit restraint is referred to as the 'Dormant' Commerce Clause." (quoting *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007))). A violation of the "dormant Commerce Clause," or the Commerce Clause in its dormant state, occurs when a state "interfere[s] with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *McBurney,* 569 U.S. at ——, 133 S.Ct. at 1720. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Francarl Realty Corp. v. Town of E. Hampton,* 400 F. App'x 605, 607 (2d Cir.2010) (citations omitted). "Courts have consistently recognized that '[t]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids.' " *Freedom Holdings, Inc. v. Cuomo,* 624 F.3d 38, 67–68 (2d Cir.2010) (citations omitted).

**\*44** Plaintiff argues that the implementation of SORA violates the Commerce Clause because only Congress can implement legislation that affects interstate and international commerce. (Pl. Opp'n to State Defs. 40–41, 75–76.) According to Plaintiff, Congress enacted SORNA pursuant to its powers under the Commerce Clause and therefore states may not operate in the same area. (*Id.* at 43, 71.) He argues that New York's registration requirement implicates commerce because it hinders the ability for nonresidents to move in and out of New York State as part of interstate and international commerce.[50] (*Id.* at 44.)

[50]    Plaintiff also argues that the State Defendants violated the Commerce Clause and the Dormant Commerce Clause by not allowing Plaintiff to file his appeal. (*Id.* at 46.) As discussed *supra,* Plaintiff admits that it was beyond the appeal period when he attempted to file his appeal and, in any event, he was not prevented from filing an appeal but rather told to comply with all procedural rules.

Plaintiff's Commerce Clause and Dormant Commerce Clause claim is without merit. First, SORNA explicitly requires states to act in the area of registration of sex offenders. Under the terms of SORNA, all states are to register convicted sex offenders who live, work and study in the state. *See*42 U.S.C. § 16912 (requiring states to maintain registries); 42 U.S.C. § 16913(a) (requiring sex offenders to register when they live, work or study in a jurisdiction). Second, as discussed *supra,* states have a legitimate interest in protecting the health and safety of their citizens and can do so pursuant to their state powers. Third, New York's law governing sex offenders residing in New York does not impede or interfere with the interstate market. *See, e.g., McBurney,* 569 U.S.at ——, 133 S.Ct. at 1720 ("Because [the regulation in question] [did] not ... interfere[ ] with an interstate market through prohibition or burdensome regulations, this case is not governed by the dormant Commerce Clause."). Plaintiff's Commerce Clause claim is without merit and is therefore dismissed.

The Court finds that none of Plaintiff's constitutional claims have merit and all claims against the State Defendants are dismissed. Because none of Plaintiff's claims have merit, Plaintiff's applications for injunctive and declaratory relief are denied. *See O'Leary v. Town of Huntington,* No. 11–CV–3754, 2012 WL 3842567, at \*16 (E.D.N.Y. Sept.5, 2012) (holding that the plaintiff had failed to plead any constitutional violation and "[granting] defendants' motion to dismiss plaintiff's federal claims in their entirety" including requests for declaratory and injunctive relief); *Wilson v. Emond,* No. 10–CV–659, 2011 WL 494777, at \* 10 (D.Conn. Feb.5, 2011) (same); *Chiste v. Hotels.com L.P.,* 756 F.Supp.2d 382, 406–07 (S.D.N.Y.2010) (dismissing requests for declaratory and injunctive relief because "[d]eclaratory judgments and injunctions are remedies, not causes of action" and the plaintiff's underlying claims have no merit and therefore declaratory and injunctive relief cannot be granted).

### e. Plaintiff's Substantive Claims Against the Attorney Defendants

Plaintiff brings several federal claims—RICO, RICO conspiracy, FLSA and Thirteenth Amendment—and multiple state law claims—fraudulent misrepresentation, fraudulent concealment, unjust enrichment, legal malpractice, violation of New York Judiciary Law § 487, unpaid wages, unpaid overtime and unpaid spread-of-hours wages against the Attorney Defendants. The Court dismissed the Thirteenth Amendment claim at oral argument.[51] (Oral Arg. Tr. 71:15–72:2.) For the reasons set forth below, the Court finds that

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 218 of 267
Spiteri v. Russo, Not Reported in F.Supp.2d (2013)
2013 WL 4806960

Plaintiff's federal claims are without merit and therefore grants the Attorney Defendants' motions to dismiss as to these claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

<sup>51</sup> The Court dismissed Plaintiff's Thirteenth Amendment claim at oral argument because the Complaint failed to allege involuntary servitude. (Oral Arg. Tr. 71:15–72:2.) Plaintiff admitted that he voluntarily agreed to travel from California to New York to work for the Attorney Defendants. (Compl.¶¶ 27, 48, 50, 52.) Plaintiff has not plausibly alleged that he was coerced through *physical or legal threats* to work for the Attorney Defendants. (*See generally id.*) Plaintiff must allege that his work constituted "involuntary servitude." *McGarry v. Pallito,* 687 F.3d 505, 510–11 (2d Cir.2012). Involuntary servitude has been defined as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* (quoting *United States v. Kozminski,* 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988)). Plaintiff's allegations in the Complaint simply do not meet this standard. "The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion." *Kozminski,* 487 U.S. at 944.

**i. RICO Claim**

**\*45** "RICO provides a private right of action for '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter.' " *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 283 (2d Cir.2006) (quoting 18 U.S.C. § 1964(c)). In order to establish a RICO claim, a Plaintiff must plead " '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.' " *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 119 (2d Cir.2013) (citations omitted); *see also Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir.2008) ("To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.' " (citations

omitted)). The RICO conduct must be both the proximate and but for cause of the plaintiff's injury. *Lerner,* 459 F.3d at 283.

Plaintiff's burden is high when pleading RICO allegations. First, where the "conduct" or predicate acts sound in fraud, as they do here, they must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *See Curtis v. Law Offices of David M. Bushman, Esq.,* 443 F. App'x 582, 584 (2d Cir.2011) ("[A]ll allegations of fraudulent predicate acts[ ] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). In addition to alleging the particular details of a fraud, 'the plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.' " (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 178–79 (2d Cir.2004))); *see also Spool,* 520 F.3d at 185 (holding that RICO allegations that sound in fraud should be pled with particularity); *Lerner,* 459 F.3d at 290–91 (same). Second, a pattern of racketeering "must be adequately alleged in the complaint." *Spool,* 520 F.3d at 183 (alteration omitted) (citations and internal quotation marks omitted). Courts look with particular scrutiny at claims for a civil RICO, given RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies. *See Curtis & Assocs. ., P.C. v. Law Offices of David M. Bushman, Esq.,* 758 F.Supp.2d 153, 166–67 (E.D.N.Y.2010) ("Because of this likely powerful effect on potentially innocent defendants who face the threat of treble damages, and the concomitant potential for abuse of RICO's potent provisions, the court is aware of a particular imperative in cases such as the one at bar, to flush out frivolous [civil] RICO allegations at an early stage of the litigation."), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq.,* 443 F. App'x 582 (2d Cir.2011); *Purchase Real Estate Grp. Inc. v. Jones,* No. 05–CV–10859, 2010 WL 3377504, at \*6 (S.D.N.Y. Aug.24, 2010) (" 'In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants.' Accordingly, courts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress." (citations omitted)).

**\*46** Courts are "to ensure that 'RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering ... courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.' " *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.,* 303 F.Supp.2d 432, 443 (S.D.N.Y.2004) (alteration in original) (citations omitted); *see*

2013 WL 4806960

*also Spool,* 520 F.3d at 184 ("Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1)."); *Purchase Real Estate Grp.,* 2010 WL 3377504, at *6 ("[C]ourts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress."); *DLJ Mortgage Capital,* 726 F.Supp.2d at 237 ("[I]f an alternate route to recovery is available, a putative RICO plaintiff must pursue it first."); *Curtis,* 758 F.Supp.2d at 172–73 (holding that "plaintiffs' claims must be rejected because finding otherwise—and allowing malicious prosecution claims such as those attempted to be alleged here to suffice as RICO predicate acts—would lead to absurd results").

There are four different ways in which a plaintiff can plead that a defendant violated RICO:

A showing ... [of] the defendant's violation of 18 U.S.C. § 1962, may be made in any one of four ways. Specifically, "any person" may be liable for violating 18 U.S.C. § 1962 who: (i) uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); (ii) "acquire[s] or maintain[s], directly or indirectly, any interest in or control of" such an enterprise "through a pattern of racketeering activity," § 1962(b); (iii) by being "employed by or associated with" such an enterprise, "conduct[s] or participate[s], directly or [in]directly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," § 1962(c); or (iv) conspires to violate the substantive provisions of § 1962(a), (b), or (c), § 1962(d).

*Curtis,* 758 F.Supp.2d at 167. Plaintiff alleges that the Attorney Defendants engaged in violations of § 1962(c) and § 1962(d) .[52] (Compl.¶ 219.) Plaintiff alleges that the Attorney Defendants lied to Plaintiff and told him he would not be subject to SORA registration in order to induce him to travel from California to New York to work for them. (*Id.* ¶ 192.) According to Plaintiff, he was induced to work by a promise that he would be paid $75 an hour wage and a ten percent referral fee for all out-of-state clients that Plaintiff referred to the Attorney Defendants and for any judgments or settlements in cases Plaintiff worked on. (*Id.*) According to Plaintiff, the Attorney Defendants and their respective legal practices formed a RICO enterprise, with a purpose to "use ... their license to practice law in the State of New York, to secure out-of-state clients, obtain a monetary retainers [sic] into the thousands of dollars." (*Id.*) Plaintiff alleges

that as result of the RICO activity, the Attorney Defendants "secur[ed] the thousands of dollars from out-state-clients, and refus[ed] to pay Plaintiff for services and out-of-pocket expenses for the sole purpose to enrich themselves, without actually, properly or effectively representing the out-of-state clients, by abandoning them, and enriching themselves by keeping their retainers ." (*Id.*) For the reasons discussed below, the Court finds that the Complaint fails to adequately allege predicate acts and a pattern of racketeering activity, and, therefore, dismisses Plaintiff's RICO claims.[53]

[52]    The full text of the RICO statute provides:

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.

53 Since as discussed *infra,* Plaintiff's RICO claim fails to sufficiently allege predicate acts and Plaintiff cannot adequately plead a pattern of racketeering, the Court does not decide whether the Complaint has met the other elements necessary to establish a RICO claim.

### 1. Predicate Acts

**\*47** Plaintiff states that the Attorney Defendants engaged in the predicate acts of extortion, mail fraud and wire fraud.[54] Plaintiff has failed to sufficiently allege these claims.

54 In Plaintiff's opposition to the Attorney Defendants' motions to dismiss, he cites the forced labor statute, 18 U.S.C. § 1589, as a RICO predicate act. (Pl. Opp'n to Att'y Defs. 34.) For the same reasons Plaintiff's Thirteenth Amendment claim fails, Plaintiff's claim that he was forced to work in violation of 18 U.S.C. § 1589 fails. As the Court explained at oral argument, Plaintiff has failed to plausibly allege that he was forced to continue to work for the Attorney Defendants given Plaintiff's allegations in the Complaint, his assertions in his opposition to the Attorney Defendants' motions to dismiss, and his representations at oral argument, including his assertions that (1) he traveled freely while working for the Attorney Defendants, (2) he continued to work for other attorneys in California while working for the Attorney Defendants, (3) he worked with a great deal of autonomy, and (4) he freely discontinued working for the Attorney Defendants to relocate to California using a ticket purchased by Russo. (Compl. ¶¶ 76–77, 83, 99; Pl. Opp'n to Att'y Defs. 30–32; Oral Arg. Tr. 71:15–72:2.) Thus, Plaintiff's claim that he was subjected to forced labor is not plausible.

### A. Extortion

The Supreme Court, citing the Hobbs Act, 18 U.S.C. § 1951(a), has defined federal extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Sekhar v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2720, 2723, 186 L.Ed.2d 794 (2013). "The elements of a claim for extortion under the Hobbs Act are that the defendant (1) induced [the victim], with [the victim's] consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce." *Ascentive, LLC v. Opinion Corp.,* 842 F.Supp.2d 450, 478 (E.D.N.Y.2011) (citations and internal quotation marks omitted); *see also Flores v. Osaka Health Spa, Inc. .,* 474 F.Supp.2d 523, 529 (S.D.N.Y.2007) ( "A private individual commits extortion under the Hobbs Act by obtaining or attempting to obtain property from another party by the use or threatened use of force, violence or fear." (citing *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 404–09, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003))). "To establish extortion, a plaintiff must demonstrate that the person committing the act either pursued or received 'something of value that [he] could exercise, transfer, or sell.' " *Flores,* 474 F.Supp.2d at 529 (citing *Scheidler,* 537 U.S. at 405);*see also Sekhar,* 570 U.S. at ——, 133 S.Ct. at 2724 ("Extortion required the obtaining of items of value, typically cash, from the victim."); *United States v. Cain,* 671 F.3d 271, 282 (2d Cir.2012), *cert. denied,*566 U.S. ——, 132 S.Ct. 1872, 182 L.Ed.2d 655 (2012) ("[I]n each Hobbs Act case we must now consider ... whether the property that is the subject of the extortion is valuable in the hands of the defendant.").

Plaintiff appears to allege that he was both extorted while he worked for the Attorney Defendants and is being extorted now to discontinue this action. (Compl. ¶ 201.) Plaintiff alleges that he suffered from "public attacks based on false and misleading statements, threat[s] to trump up criminal charges, threat [s][of] fraudulent civil judgments, investigations by government agencies, and ongoing harassment and disruptions of Plaintiff's peace, tranquility and enjoyment of his constitutionally protected right," while he worked for the Attorney Defendants which kept him working for them. (*Id.* ¶¶ 201, 204.) Plaintiff asserts that the Attorney Defendants "[c]ontinue to pursue a scheme of misrepresentation to the great harm and public denigration of Plaintiff, unless and until Plaintiff relinquishes his claims against the RICO Attorneys/defendants Russo, Jl [sic] Russo P.C.; Trakas and the Law Office of Arthur G. Trakas, including unfounded attempts in seeking injunction

2013 WL 4806960

and restraining orders preventing Plaintiff [from] assert[ing] and invok[ing] his First Amendment of the United States Constitution access to courts." (*Id.* ¶ 203 (emphasis omitted).) Under the section of the Complaint titled extortion, Plaintiff alleges that:

> **\*48** By and through their own admission in the aforementioned Motion to Dismiss (ref: FAC fn 12), attorneys/defendants Russo and Trakas, unquestionable [sic] admit that they possessed this information, prior to inducing Plaintiff to work for them as a 'nonNew York citizen and non-resident worker,' by using that specific phrase to induce, con and entrap Plaintiff to work for them to enrich themselves and then use the language in their Motion to Dismiss as stated in the above Fn 12, to avoid liability.

(*Id.* ¶¶ 205.) It appears that Plaintiff is alleging he was extorted since Plaintiff was told by the Attorney Defendants that he did not have to register while the Attorney Defendants were aware that he would have to register. (*Id.*)

Plaintiff's claim fails for several reasons. Plaintiff's argument that he continued to work for the Attorney Defendants because they extorted him is not plausible. Plaintiff admits that he freely discontinued working for the Attorney Defendants, with their consent, not because he was able to finally break free of their control but because he chose to leave because he did not want to be registered in New York as a sex offender. (*Id.* ¶¶ 77, 83 (discussing his meeting with the Attorney Defendants where they agreed he would return to California).) His claim that he is being extorted during the litigation also fails because a plaintiff can only allege extortion for " 'something of value that [the defendant] could exercise, transfer, or sell.' " *Flores,* 474 F.Supp.2d at 529 (citing *Scheidler,* 537 U.S. at 405);*see also Sekhar v. United States,* 570 U.S. at ——, 133 S.Ct. at 2725 ("Obtaining property requires 'not only the deprivation but also the acquisition of property.' That is, it requires that the victim 'part with' his property and that the extortionist 'gain possession' of it." (citations omitted)); *Cintas Corp. v. Unite Here,* 601 F.Supp.2d 571, 577 (S.D.N.Y.2009) ("A Hobbs Act violation arises ... when a defendant exploits a plaintiff's fear of economic loss and receives property to which it has no lawful claim."), *aff'd,*355 F. App'x 508 (2d Cir.2009). "The property extorted must therefore be *transferable*—that is, capable of passing from one person to another." *Sekhar,* 570 U.S. ——, 133 S.Ct. at 2725, 186 L.Ed.2d 794 (emphasis in original). There is no allegation in the Complaint that the Attorney Defendants received or attempted to receive

something tangible from Plaintiff and therefore his extortion claim fails. [55] *See, e.g., Scheidler,* 537 U.S. at 410 ("Because petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed.").

[55]   Rather than plead that the Attorney Defendants received something tangible from Plaintiff, he alleges that they received his services and prevented him from leaving their employment. (Compl.¶ 205.) As the Supreme Court has explained, extortion is distinct from coercion: "[w]hereas [extortion] require[s] ... the criminal acquisition of ... property, [coercion] require[s] merely the use of threats to compel another person to do or to abstain from doing an act which such other such person has a legal right to do or to abstain from doing." *Sekhar v. United States,* 570 U.S. ——, ——, 133 S.Ct. 2720, 2723, 186 L.Ed.2d 794 (2013) (citations and internal quotation marks omitted). As the Supreme Court has explained, coercion is "a separate, and lesser, offense than extortion." *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 394, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003); *Sekhar,* 570 U.S. at ——, 133 S.Ct. at 2725 (citing *Scheidler* for the proposition that extortion and coercion are distinct). The Supreme Court has found that coercion without the transfer of property or an attempt to obtain property is not extortion and not a RICO predicate act. *Scheidler,* 537 U.S. at 406–08 (holding that coercion is not a RICO predicate act). As explained *supra,* Plaintiff has failed to plausibly allege that he continued to work for the Attorney Defendants because he was threatened. Thus, Plaintiff has failed to plausibly allege that the Attorney Defendants coerced him, let alone any facts to plausibly allege extortion.

### B. Mail and Wire Fraud

Because allegations of mail and wire fraud are governed by Rule 9(b) of the Federal Rules of Civil Procedure, they must be pled with particularity. *See Curtis,* 443 F. App'x at 584 (discussing pleading requirements under RICO for fraud claims); *Spool,* 520 F.3d at 185 (same); *Lerner,* 459 F.3d at 290–91 (same); *Curtis,* 758 F.Supp.2d at 167 (same). "Allegations of predicate mail and wire fraud acts 'should state the contents of the communications, who was involved,

[and] where and when they took place, and [should] explain why they were fraudulent.' " *Spool,* 520 F.3d at 185 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993)); *see also Purchase Real Estate Grp.,* 2010 WL 3377504, at *8 ("Under Rule 9(b), allegations of fraud in the RICO context must be made with particularity and must 'specify the statements [plaintiffs] claim [ ] were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' " (alteration in original) (quoting *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172–73 (2d Cir.1999)); *Am. Fed'n of State, Cnty. & Mun. Emps. Dist. Council 37 Health & Sec. Plan v. Bristol–Myers Squibb Co.,* No. 12–CV–2238, 2013 WL 2391999, at *4 (S.D.N.Y. June 3, 2013) ("[T]o comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " (quoting *Lerner,* 459 F.3d at 290)). "[W]here multiple defendants are accused of mail or wire fraud, plaintiffs must plead with particularity as to each defendant ...." *U.S. Fire Ins.,* 303 F.Supp.2d at 443–44 (citations omitted).

**\*49** Plaintiff has failed to sufficiently plead mail and wire fraud RICO predicate acts. The acts alleged by Plaintiff that could possibly be predicate mail and wire fraud acts are (1) the alleged fraudulent interstate communications sent by the Attorney Defendants to Plaintiff to induce Plaintiff to work for them and (2) the fraudulent interstate communications sent by Plaintiff on the Attorney Defendants' behalf to recruit and communicate with out of state "victims." (*See* Compl. ¶¶ 60, 192.) However, while these communications are discussed generally, Plaintiff does not provide sufficient details, such as the specific content of the communications, when they were sent, to whom they were sent and which Attorney Defendant sent them. (*See id.*) Among the communications quoted in detail in the Complaint are a series of emails between Plaintiff and various entities involved with Plaintiff's SORA registration and emails between Plaintiff and the Attorney Defendants. (*See id.* ¶ 59.) These emails are dated and identify the speaker and sender, and although Plaintiff contends that these emails are "offensive, humiliating, oppressive, foul and malicious," they do not meet the pleading requirements because Plaintiff has not pled why they are fraudulent or how they were in furtherance of the alleged RICO scheme. (*Id.*) The failure of Plaintiff to sufficiently plead mail and wire fraud predicate acts warrants dismissal of Plaintiff's RICO

claims. *See, e.g., Dulsky v. Worthy,* No. 11–CV–4925, 2013 WL 4038604, at *5 (S.D.N.Y. July 30, 2013) (dismissing the plaintiff's RICO claim because "the only allegations in the [second amended complaint] that come close to alleging acts of mail or wire fraud with the particularity required by Rule 9(b) fail to delineate which defendant committed, or conspired to commit, which predicate act"); *Newby v. Bank of Am. Corp.,* No. 12–CV–614, 2013 WL 940943, at *8 (E.D.N.Y. Mar. 8, 2013) (dismissing RICO claim for failure to plead with particularity mail and wire fraud); *United States v. Int'l Longshoremen's Ass'n,* 518 F.Supp.2d 422, 479 (E.D.N.Y.2007) (holding that allegations "which simply state the dates and the identities of the participants or addressees in various alleged telephone conversations or mailings without identifying what specific statements were made or explaining how those statements furthered the allegedly fraudulent scheme or artifice, fall far short of Rule 9(b)'s pleading standard"); *see also Lundy,* 711 F.3d at 119 ("Barebones allegations do not satisfy Rule 9(b)."). There is only one communication provided by Plaintiff that arguably meets the 9(b) pleading requirements. It is a letter dated August 6, 2012 from Russo to Patricia and Maurcio Cerda. (Pl. Opp'n to Att'y Defs. Ex. 2a.) However, one predicate act is insufficient to demonstrate that the RICO enterprise engaged in racketeering activity—a plaintiff must plead at a minimum two predicate acts. *Vaughn v. Air Line Pilots Ass'n,* 377 F. App'x 88, 90 (2d Cir.2010) (finding that RICO requires at "least two predicate acts of racketeering activity").

**\*50** Furthermore, as courts in this Circuit have cautioned, a plaintiff cannot turn a state law tort, fraud or contract claim into a RICO claim by merely labeling it RICO. *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.,* No. 12–CV–8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013) ("[T]he allegations in the Complaint that purport to plead predicate criminal acts sufficient to establish a cause of action under RICO 'amount merely to a breach of contract claim [and common business torts], which cannot be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent, indeed criminal.' " (quoting *Carr v. Tillery,* 591 F.3d 909, 918 (7th Cir.2010))); *U.S. Fire Ins.,* 303 F.Supp.2d at 443 (encouraging courts to review the allegations to ensure that more than "ordinary fraud" is alleged). Plaintiff alleges that the Attorney Defendants:

> engaged in a wide-ranging scheme or
> artifice to defraud Plaintiff, various
> courts of law, and the greater out-of-

state clients/victims and the public by inducing Plaintiff to work long hours without compensation, inducing out-of states [sic] clients/victims, where the RICO Attorneys/defendants Russo, Jl [sic] Russo P.C.; Trakas and the Law Office of Arthur G. Trakas to retain them to represent their interest in States where the RICO Attorneys/defendants Russo, Jl [sic] Russo P.C.; Trakas and the Law Office of Arthur G. Trakas knew that they were not licensed to practice law and/or petitioned the respective jurisdictional Court through Pro Hac Vice process; manufacturing evidence, and defrauding said clients/victims, including the Plaintiff by refusing to "do the right thing" and paid them back and/or reimburse them to adequately represent various clients in legal matters, including Plaintiff, and failed to pay Plaintiff pursuant to an agreement he had with Attorney Defendants.

(Compl. ¶ 208; *see also id.* ¶ 192.) Plaintiff's allegations appear to be simple contract, general fraud and legal malpractice allegations rather than allegations of an extensive racketeering fraudulent scheme. The Court finds that Plaintiff has failed to adequately allege mail and wire fraud RICO predicate acts. *Helios Int'l,* 2013 WL 3943267, at *6–9 (dismissing a complaint that alleged RICO based on the transportation of stolen goods, sale of stolen goods, money laundering and mail and wire fraud, among others, because the dispute was actually a contract dispute between a supplier and a buyer over unpaid fees); *Curtis,* 758 F.Supp.2d at 174–75 (holding that the plaintiff's claim that defendants began legal actions "with malice [and] ... prosecut[ed] ... such actions by 'acts of champerty,' 'corruption' and 'deceitful' schemes employing 'suborned perjury and deceit of the court' " were not proper claims for RICO violations but rather malicious prosecution claims); *Wright v. Brae Burn Country Club, Inc.,* No. 08–CV–3172, 2009 WL 725012, at *6 (S.D.N.Y. Mar.20, 2009) (holding that the plaintiff clearly had an employment claim and not a RICO claim).

### 2. Pattern of Racketeering Activity

**\*51** Even if Plaintiff had properly alleged predicate extortion, mail and wire fraud RICO acts, his RICO claim would nevertheless fail because Plaintiff has not sufficiently alleged a pattern of racketeering activity. "The requisite 'pattern ... of racketeering activity' required by 18 U.S.C. § 1961(5) must consist of two or more predicate acts of 'racketeering,' as enumerated in 18 U.S.C. § 1961(1)." *Terrell v. Eisner,* 104 F. App'x 210, 212 (2d Cir.2004) (alteration in original); *see also Moore v. Guesno,* 301 F. App'x 17, 18–19 (2d Cir.2008); *Newby,* 2013 WL 940943, at *8. "The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.' " *Spool,* 520 F.3d at 183–84 (alteration in original) (citations omitted); *see also W & D Imports, Inc. v. Lia,* No. 11–CV–4144, 2013 WL 1750892, at *6 (E.D.N.Y. Apr. 22, 2013) (citing *Spool* ). "Predicate acts are related if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *In re LIBOR–Based Fin. Instruments Antitrust Litig.,* No. 11–MD–2262, 2013 WL 1285338, at *48 (S.D.N.Y. Mar. 29, 2013) (quoting *Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp.,* 327 F.Supp.2d 159, 164 (E.D.N.Y.2004)). The Second Circuit has held that in order to survive a motion to dismiss, a plaintiff alleging a RICO violation must sufficiently plead a pattern of racketeering. *Spool,* 520 F.3d at 183 ("To survive a motion to dismiss, this pattern must be adequately alleged in the complaint."). There are two ways a plaintiff can demonstrate a pattern of racketeering activity: a closed-ended pattern or an open-ended pattern. *Spool,* 520 F.3d at 183–84.

### A. Close–Ended Pattern

A close ended pattern involves "a series of related predicate acts extending over a substantial period of time." *Spool,* 520 F.3d at 183–84. "The law is clear that 'the duration of a pattern of racketeering activity is measured by the RICO predicate acts' that the defendants are alleged to have committed." *Id.* The Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.' " *Id.; see also Kalimantano GmbH v. Motion in Time, Inc.,* No. 12–CV–6969, 2013 WL 1499408, at *14 (S.D.N.Y. Apr.12, 2013) ("[T]he Second Circuit has never held a period of racketeering activity lasting less than two years to be substantial enough to qualify as closed-ended continuity ."); *U1IT4less, Inc. v. FedEx Corp.,* 896 F.Supp.2d

2013 WL 4806960

275, 288–89 (S.D.N.Y.2012) (discussing substantial time); *Grimes v. Fremont Gen. Corp.,* 785 F.Supp.2d 269, 300 (S.D.N.Y.2011) (same); *Purchase Real Estate Grp.,* 2010 WL 3377504, at *9 (same). Although the Second Circuit has found that two years is not "a brightline requirement," it has emphasized that "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where ... [t]he activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy." *Spool,* 520 F.3d at 184; *see also U1IT4Ies,* 896 F.Supp.2d at 288–89 (discussing requirements for close-ended conspiracy). However, "while two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern.' " *First Capital Asset Mgmt.,* 385 F.3d at 181 (emphasis in original); *see also Kalimantano GmbH,* 2013 WL 1499408, at * 14 (quoting *First Capital Asset Mgmt.*). In addition to considering the length of time over which the pattern is alleged to have occurred, a court also weighs " 'a variety of non-dispositive factors,' including 'the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes.' " *Dolan v. Fairbanks Capital Corp.,* No. 03–CV–3285, 2013 WL 991002, at *8 (E.D.N.Y. Mar. 13, 2013) (alteration in original) (quoting *GICC Capital Corp. v. Tech. Fin. Grp., Inc.,* 67 F.3d 463, 467 (2d Cir.1995)); *see also Marini v. Adamo,* 812 F.Supp.2d 243, 262 (E.D.N.Y.2011) ("Furthermore '[w]hile closed ended continuity is primarily concerned with the time period of the activities, the court also considers factors such as the 'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes' as relevant when determining whether closed ended continuity exists.' " (citations omitted)).

 **\*52** It appears that Plaintiff is attempting to allege a close-ended pattern of racketeering activity. According to the Complaint, the crux of the scheme involved recruiting Plaintiff to use Plaintiff's expertise in civil rights and constitutional law and to obtain out-of-state referrals. (*See* Compl. ¶ 60.) In Plaintiff's opposition papers he states that the Attorney Defendants "entered into an agreement with one another, in manipulating and conning Plaintiff to believe that they could handle[ ] out-of-state cases, and that since Plaintiff had several of his friends in need of legal representation, the [Attorney Defendants] conned Plaintiff to refer them said cases." (Pl. Opp'n to Att'y Defs. 33.) The Attorney Defendants then "enriched themselves in collectively obtaining huge amount[s] of thousands of dollars from said out-of-state

victim-clients, the [Attorney Defendants] abandoned said out-of-state victim-clients, by either withdrawing from the case, or not filing the required federal court order pleadings and legal documents, thereby causing the out-of-state victim-clients cases to be dismissed." (*Id.*)

Plaintiff generally alleges that he first came to New York in early 2009 to comfort his cousin. (*Id.* ¶ 41.) Plaintiff further alleges that sometime after that he met the Attorney Defendants and they began to use the mail and wires to induce him to relocate from California to New York State to work for them. (*Id.* ¶ 187.) Plaintiff began to work for the Attorney Defendants in November 2009 and stopped working for them in May 2011 .[56] Thus, based on the dates in the Complaint —November 2009 when Plaintiff began working for the Attorney Defendants and May 2011 when Plaintiff returned to California to live—Plaintiff has alleged an eighteen month period during which the fraudulent scheme occurred. Courts have held that *any* period shorter than two years is too short to establish a close-ended pattern of racketeering activity. *Spool,* 520 F.3d at 184; *see also Grimes v. Fremont Gen. Corp.,* 785 F.Supp.2d 269, 301 (S.D.N.Y.2011) ("Plaintiffs have not sufficiently alleged close-ended continuity, because they have not adequately pled predicate acts over a period of at least two years, the amount of time the Second Circuit has generally found necessary to establish close-ended continuity."); *Kalimantano GmbH,* 2013 WL 1499408, at * 15 (finding that the scheme is alleged to "span from any date after October 4, 2010, until the October 4, 2012 phone call from an anonymous caller to Davidoff [and] would fall just below the two-year minimum time frame that the case law demands [and] ... [the] [p]laintiffs therefore are unlikely to satisfy the duration requirement of a pattern of racketeering activity"); *Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C.,* 713 F.Supp.2d 96, 110–11 (N.D.N.Y.2010) (dismissing a close-ended RICO claim which, as originally pled, alleged a series of acts "approximately five months shy of two years"). Based on the allegations in the Complaint, Plaintiff has not alleged that the scheme lasted a sufficient length of time to allege a close ended conspiracy.

56      Plaintiff also alleges that emails were sent to Plaintiff in 2012 from the Attorney Defendants. (*See* Compl. ¶ 201.) However, these emails do not appear to be related to the overarching goal of the alleged RICO scheme as described by Plaintiff, which was to induce Plaintiff to work without compensation and to obtain legal fees

2013 WL 4806960

from multiple clients recruited by Plaintiff without performing the required legal work. (*Id.* ¶ 59.)

**\*53** Even if the Court were to assume that Plaintiff could allege acts that would take his allegations beyond the two years, Plaintiff still could not prove a pattern of racketeering activity because "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims, ... is insufficient to establish closed-ended continuity." *Purchase Real Estate,* 2010 WL 3377504, at \* 13 (finding that, despite the fact that the plaintiff had alleged a set of actions beyond two years, the allegations were not sufficient to establish a closed-ended pattern (quoting *Spool,* 520 F.3d at 186)); *Kalimantano GmbH,* 2013 WL 1499408, at \*15 (holding that even if the court construed the complaint to allege a pattern which was "three days longer than the twoyear minimum requirement— it would still fall short of adequately alleging closed-ended continuity" because it was a discrete scheme with a limited number of victims); *Dolan,* 2013 WL 991002, at \* 10–11 (holding that the plaintiffs had failed to allege a close ended scheme because there were too few victims and perpetrators and the enterprise had "a single and finite goal").

**B. Open–Ended Pattern**
An open-ended pattern of racketeering activity "poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool,* 520 F.3d at 183–84. "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful." *Spool,* 520 F.3d at 185;*see also W & D Imports,* 2013 WL 1750892, at \*7 (quoting *Spool* ); *Dolan,* 2013 WL 991002, at \*8 (same). "When 'the enterprise primarily conducts a legitimate business,' however, no presumption of a continued threat arises." *Spool,* 520 F.3d at 185;*see also W & D Imports,* 2013 WL 1750892, at \*7 (discussing legitimate businesses). "In such cases, 'there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.' " *Spool,* 520 F.3d at 185;*Dolan,* 2013 WL 991002, at \*8. In *Spool,* a joint venture between an American adoption company and an international company fell apart and, as a result, employees of the American company took possession of documents, sent fraudulent faxes, and opened up their own branch office of the international company. 520 F.3d at 181. The Second Circuit found that because the joint venture was a legitimate business and the time period for setting up the new branch of the international company was short, that plaintiff had failed to allege an open-

ended pattern and was unsuccessful in its attempts to allege a close-ended pattern. *Spool,* 520 F.3d at 185 ("At most, the amended complaint states that [the international adoption company's] branch office fraudulently continued to process client cases over a period of several months following the fallout between [the members of the joint venture] and the defection of [the American adoption company's employees]. A scheme of this sort is 'inherently terminable' because once the defendants conclude the fraudulent 'processing,' they have no more CFA-related files with which to work."). Similarly in *W & D Imports,* the Honorable Sandra Feuerstein found that a scheme to establish a rival car dealership through multiple fraudulent letters failed to establish an open-ended pattern, despite the fact that the plaintiff had alleged that the dealership could only be maintained through continued fraudulent filings. *W & D Imports,* 2013 WL 1750892, at \*7. In *Dolan,* the Honorable Denis Hurley found that a plaintiff's allegation that his mortgage servicer "operated a RICO enterprise to extract money and property" from him was not an openended pattern. *Dolan,* 2013 WL 991002, at \*8.

**\*54** Here, according to the Complaint, the Attorney Defendants were attorneys primarily engaged in the practice of law. (Compl.¶¶ 18, 20.) There is no indication from the Complaint that inducing individuals to work for them without pay and having these individuals then recruit out-of-state clients was the way in which the Attorney Defendants normally conducted business. In fact, according to the allegations in the Complaint, the alleged scheme was conducted because of Plaintiff's specific past legal experience and thus, the scheme was based on Plaintiff as an individual rather than a mode of operation that could be easily duplicated by employing someone else. (*Id.* ¶ 19 ("Plaintiff alleges that attorney/defendant Russo associated with attorney/defendant Arthur G. Trakas, and together agreed to manipulate the Plaintiff to induce him, through the use of the United States Postal Service, internet, and the telecommunications system, an [sic] other interstate communication means, to accept a temporary position within their respective law offices, in order to enrich themselves from his knowledge of civil rights, criminal, and other fields of litigation ....").) Plaintiff cannot sustain a claim under a theory of open-ended pattern of racketeering activity.

Plaintiff cannot maintain a claim for extortion and has not sufficiently alleged predicate claims for mail or wire fraud. Moreover, even if Plaintiff could allege mail and wire fraud claims, Plaintiff cannot sustain a claim under a theory of

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 226 of 267
Spiteri v. Russo, Not Reported in F.Supp.2d (2013)
2013 WL 4806960

a closed-ended pattern of racketeering activity or a theory of an open-ended pattern of racketeering activity. Therefore, Plaintiff cannot sustain a claim for RICO violation and this claim is dismissed with prejudice.

### ii. RICO Conspiracy

A "RICO conspiracy requires evidence that [a defendant] participated in the enterprise through a pattern of racketeering activity, or agreed to do so." *W & D Imports,* 2013 WL 1750892, at \*8 (quoting *United States v. Tellier,* 83 F.3d 578, 581 (2d Cir.1996)); *see also United States v. Praddy,* ––– F.3d ––––, ––––, 2013 WL 3884712, at \*5 (2d Cir. July 30, 2013) ("RICO's conspiracy provision [§ 1962(d) ] proscribes an agreement to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." (citations and internal quotation marks omitted)); *Dulsky v. Worthy,* No. 11–CV–4925, 2013 WL 4038604, at \*5 (S.D.N.Y. July 30, 2013) ("The core of a RICO conspiracy is an agreement to commit predicate acts, and a RICO civil conspiracy complaint must specifically allege such an agreement."). Furthermore, "a substantive RICO violation is a prerequisite to a RICO conspiracy claim." *Amiron Dev. Corp. v. Sytner,* No. 12–CV–3036, 2013 WL 1332725, at \*8 (E.D.N.Y. Mar. 29, 2013); *see also First Capital Asset Mgmt.,* 385 F.3d at 168 (holding that "[b]ecause [the p]laintiffs' substantive RICO claims [were] infirm, there [was] no basis for a claim of [RICO] conspiracy"); *N.Y. Dist. Council of Carpenters Pension Fund v. Forde,* No. 11–CV–5474, 2013 WL 1454954, at \*10 n. 3 (S.D.N.Y. Mar. 26, 2013) ("Proper pleading of a substantive RICO violation is required to sustain a RICO conspiracy claim."); *Allstate Ins. Co. v. Tanella,* No. 11–CV–6364, 2012 WL 7188685, at \*2 n. 7 (E.D.N.Y. Aug.28, 2012) ("Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.' " (quoting *Spool,* 520 F.3d at 183)), *report and recommendation adopted,*No. 11–CV06364, 2013 WL 663924 (E.D.N.Y. Feb. 22, 2013). Since Plaintiff failed to properly plead an underlying substantive RICO claim by failing to plead a pattern of racketeering activity, he has also failed to plead a RICO conspiracy claim. *See, e.g., First Capital Asset Mgmt.,* 385 F.3d at 168 (upholding the district court's dismissal of the RICO conspiracy claim because the plaintiffs' "substantive RICO claims [were] infirm, [thus] there [was] no basis for a claim of [RICO] conspiracy"); *W & D Imports,* 2013 WL 1750892, at \*8 ("Since plaintiffs have failed to adequately allege a pattern of racketeering activity, their RICO conspiracy claim must also be dismissed."); *Dolan,* 2013 WL 991002, at \*12 ("Because, as discussed above, plaintiff has failed to come

forward with evidence sufficient to raise a question of fact as to whether a pattern of racketeering activity existed, his RICO conspiracy claim also must be dismissed."); *Petrosurance,* 888 F.Supp.2d at 507 ("A failure to adequately allege a substantive violation of RICO necessitates that allegations of conspiracy to violate RICO also fail."). Plaintiff's RICO conspiracy claim is dismissed with prejudice.

### iii. FLSA

**\*55** FLSA provides a remedy for employees both for their employer's failure to pay the minimum wage and failure to pay overtime wages. *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.,* ––– F.3d ––––, ––––, 2013 WL 3743152, at \*5 (2d Cir. July 11, 2013). An employer is required under FLSA to pay an employee a legally mandated minimum wage. *Zheng v. Liberty Apparel Co.,* 355 F.3d 61, 65 (2d Cir.2003); *see also* 29 U.S.C. § 206(a)(1); N.Y. Labor Law § 652(1); *Irizarry v. Catsimatidis,* 722 F.3d 99, ––––, 2013 WL 3388443, at \*2 (2d Cir. July 9, 2013). FLSA also requires "that covered employees shall be paid at a rate of one-and-one-half times their regular rate for every hour they work in excess of forty in a given week." *McCluskey v. J.P. McHale Pest Mgmt., Inc.,* 147 F. App'x 203, 204 (2d Cir.2005). Plaintiff alleges in the Complaint that he worked for the Attorney Defendants "as a civil rights and constitutional consultant, temporary legal assistant, researcher, investigator and process server." (Compl.¶ 43.) As set forth below, Plaintiff's allegations are insufficient to state a claim for failure to pay overtime wage, [57] and, in any event, clearly demonstrate that Plaintiff is an independent contractor and therefore cannot sustain a claim under FLSA.

[57]   Plaintiff has not alleged a minimum wage claim and cannot do so. Based on the allegations in the Complaint, Plaintiff agreed with the Attorney Defendants that he would be paid $75 per hour for his work, well over the minimum wage. *See* Compl. ¶¶ 130, 138; *see also*N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 12, § 146–1.2 (stating that the current "minimum hourly rate[is] $7.25 per hour"); *Angamarca v. Pita Grill 7 Inc.,* No. 11–CV–7777, 2012 WL 3578781 (S.D.N.Y. Aug. 2, 2012) (citing 12 NYCRR § 146–1.2 for the minimum wage in New York); *cf. Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.,* ––– F.3d ––––, ––––, 2013 WL 3743152, at \*5 (2d Cir. July 11, 2013) ("The FLSA statute requires payment of minimum wages and overtime wages only;

therefore, the FLSA is unavailing where wages do not fall below the statutory minimum and hours do not rise above the overtime threshold ."); *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 115 (2d Cir.2013) ("An employee who has not worked overtime has no claim under FLSA for hours worked below the 40–hour overtime threshold, unless the average hourly wage falls below the federal minimum wage.").

**1. Plaintiff Failed to Plead An Overtime Wage Claim**
While Plaintiff pleads some facts indicating that he worked for the Attorney Defendants, Plaintiff has failed to plausibly allege the elements of a FLSA claims for unpaid overtime wage. [58] Plaintiff alleges:

[58]
> Plaintiff's allegations as to his employment with both the Attorney Defendants are deficient, but the allegations are woefully deficient as to Russo. Plaintiff pleads almost no facts to support his employment claims against Russo other than conclusory statements that Plaintiff in fact worked for Russo. For example, as discussed *infra,* Plaintiff pleads that his work with Trakas meets the "economic reality test," but makes no such claim as to Russo. (Compl.¶ 183.)

he was subjected to work in excess of sixty to seventy hours per week, as their civil rights and constitutional consultant, legal assistant, legal messenger, legal researcher, etc. Plaintiff alleges that attorneys/defendants JOHN L. RUSSO and ARTHUR G. TRAKAS had him travel back and forth on cases they undertook to represent out-of-state clients/victims in California, Montana, New Jersey and Pennsylvania with no monetary compensation for said services.
(Compl.¶ 14.) In other sections of the Complaint, Plaintiff alleges he "worked approximately fifty (50) to (60) hours per week." (*Id.* ¶¶ 61, 98, 141.) Plaintiff alleges that while he worked for the Attorney Defendants he referred a number of cases to them, and he generally alleges the hours he worked on the cases. (*Id.* ¶ 60, 140.) Plaintiff alleges the aggregate number of hours worked on all cases he referred to the Attorney Defendants without specifying when those hours were worked. (*Id.*) Plaintiff also alleges that each Attorney Defendant agreed to pay him $75 an hour and 10 percent commission on referrals and judgments and settlements. (*Id.* ¶¶ 130, 138.)

In order to plead a FLSA overtime claim the Second Circuit has held that a plaintiff must plead more "than the number of hours worked in a typical week and the alleged time worked without pay." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.,* ——— F.3d ———, ———, 2013 WL 3743152, at *5 (2d Cir. July 11, 2013). "[P]laintiffs must allege overtime without compensation in a 'given' workweek ...." *Dejesus v. HF Mgmt. Servs., LLC,* ——— F.3d ———, ———, 2013 WL 3970049, at *4 (2d Cir. Aug.5, 2013); *James v. Countrywide Fin. Corp.,* No. 10–CV–4953, 2012 WL 359922, at *20 (E.D.N.Y. Feb. 2, 2012) (holding that a plaintiff must plead sufficient facts detailing the type of work performed and the extent of overtime hours to sustain a claim.); *DeSilva v. North Shore–Long Island Jewish Health System, Inc.,* 770 F.Supp.2d 497, 509 (E.D.N.Y.2011) ("[I]t is not enough 'to merely allege[ ] that Plaintiffs worked beyond forty hours per week.' Instead, plaintiffs must provide at least some approximation of the overtime hours that defendants required them to work and a time frame for when those hours were worked." (citations omitted)).

**\*56** Plaintiff has only generally alleged that "[d]uring the time relevant herein, Plaintiff worked approximately fifty (50) to (60) hours per week" and then alleged an aggregate number of hours worked on each case. (*See* Compl. ¶¶ 61, 97–98, 140–41.) Plaintiff concedes that he was paid some money for the time he worked (Compl. ¶ 131; Oral Arg. 62:20–63:2), and given that Plaintiff only pleads hours in the aggregate, the Court cannot determine which hours were not paid and whether any unpaid hours qualify for overtime payment. Nowhere in the Complaint does Plaintiff plead the hours he worked with the specificity required by the Second Circuit. Therefore, Plaintiff has failed to plausibly allege that he was not paid for overtime hours worked. *See Dejesus,* ——— F.3d at ———, 2013 WL 3970049, at *4 (affirming the district court's dismissal of the plaintiff's FLSA claim for overtime for only alleging that " 'some or all weeks' [the plaintiff] worked more than 'forty hours' a week without being paid '1.5' times her rate of compensation"); *Nakahata,* 723 F.3d 192, 2013 WL 3743152, at *5 (upholding dismissal of complaint where the plaintiff had "merely alleged that they were not paid for overtime hours worked"); *James v. Countrywide Fin. Corp.,* 849 F.Supp.2d 296, 321 (E.D.N.Y.2012) (holding that "[a]lthough plaintiff has identified a fourteen-month time period during which he was allegedly not properly paid overtime compensation .... [h]e has not specified the 'various' positions he was working in at the time he was allegedly denied overtime compensation, explained whether those positions were, in fact, exempt, or set forth the number

of hours he allegedly worked without overtime compensation. Plaintiff has done little more than assert, in vague and conclusory manner, his entitlement to overtime compensation under the FLSA and NYLL, and this is insufficient to withstand a motion to dismiss"); *Wolman v. Catholic Health System of Long Island,* No. 10–CV1326, 2012 WL 5491182, at *2–3 (E.D.N.Y. Dec. 30, 2010) (holding that recitation of facts that are "consistent" with a FLSA claim is not sufficient under *Iqbal* to plead a plausible claim, additional facts were needed to better detail the specific facts giving rise to the claim of unpaid overtime, for example "describing [Plaintiff's] typical or periodic work and missed break schedule, or by identifying 'examples' of when they exceeded the overtime threshold").

### 2. Independent Contractor Exception

Even if Plaintiff could plead specific facts as required by the Second Circuit, Plaintiff cannot sustain a claim under FLSA because based on the allegations in the Complaint, his opposition to the Attorney Defendants' motions to dismiss and Plaintiff's additional factual representations at oral argument, the Court concludes that Plaintiff was an independent contractor. Since independent contractors are not governed by FLSA's wage and overtime provisions, Plaintiff's FLSA claim must be dismissed. *See Norwest Fin., Inc. v. Fernandez,* 225 F.3d 646 (2d Cir.2000) (finding that independent contractors are not employed within the meaning of FLSA and therefore are not covered by its provisions).

**\*57** Courts look to the economic reality of the work relationship to determine whether a person was acting as an employee or an independent contractor. *See Rui Xiang Huang v. J & A Entm't Inc.,* No. 09–CV–5587, 2012 WL 6863918, at *8 (E.D.N.Y. Dec. 3, 2012) ("In order to determine whether a person is an employee or an independent contractor, however, the 'ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves.' " (quoting *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988)), *report and recommendation adopted,*No. 09–CV–5587, 2013 WL 173738 (E.D.N.Y. Jan. 16, 2013); *see also Irizarry,* 722 F.3d at ——, 2013 WL 3388443, at *3 ("Accordingly, the Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.' " (citations omitted)); *Browning v. Ceva Freight, LLC,* 885 F.Supp.2d 590, 598 (E.D.N.Y.2012) (discussing the economic reality test); *Velu v. Velocity Exp., Inc .,* 666 F.Supp.2d

300, 305–06 (E.D.N.Y.2009) (same). The Second Circuit has developed a five factor economic reality test to determine if someone is an independent contractor. The factors include: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Barfield v. N.Y.C. Health & Hospitals Corp.,* 537 F.3d 132, 142–43 (2d Cir.2008) (citing *Brock,* 840 F.2d at 1058–1059);*see also Velez v. Sanchez,* 693 F.3d 308, 327 (2d Cir.2012) (stating that the *Brock* test is "relevant for distinguishing between independent contractors and employees"); *Arena v. Delux Transp. Servs., Inc.,* No. 12–CV–1718, 2013 WL 654418, at *2 (E.D.N.Y. Feb. 15, 2013) (utilizing the same test); *Browning,* 885 F.Supp.2d at 599 (same). "The ultimate question of whether a plaintiff is an employee of the defendant, or an independent contractor, is a question of law." *Evans v. MassMutual Fin. Grp.,* 856 F.Supp.2d 606, 610 (W.D.N.Y.2012); *see also Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 115 (2d Cir.2000) ("The District Court's 'ultimate determination' as to whether a worker is an employee or an independent contractor —that is, the District Court's balancing of the Reid factors- is a question of law ...." (citations omitted)); *Browning,* 885 F.Supp.2d at 599 ("[W]hether one qualifies as an employee or independent contractor can be a question of law."); *Solis v. Gen. Interior Sys., Inc.,* No. 08–CV–0823, 2012 WL 1987139, at *4 (N.D.N.Y. June 1, 2012) ("The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." (alteration omitted) (quoting *Norwest Fin., Inc.,* 225 F.3d at 646).

**\*58** Plaintiff alleges that he meets the economic reality test and was not an independent contractor as to Trakas because: (1) he engaged in various work tasks for Trakas, including interviewing prospective clients, making appearances at court and administrative hearings on their behalf, (2) Trakas had the ability to fire Plaintiff and other employees, (3) Trakas paid him, (4) Trakas counseled Plaintiff on job performance, (5) Trakas gave Plaintiff office space, a desk, a computer, and a telephone to do his work, and (6) Trakas agreed to pay him a $75.00 per hour rate.[59] (Compl.¶ 131.) However, given the allegations in the Complaint and Plaintiff's assertions at oral argument, the Court finds that Plaintiff has failed to allege that he was an employee and not an independent contractor.

2013 WL 4806960

59    Plaintiff only specifically applies "the economic reality test" with respect to Trakas, but Plaintiff does allege that he also worked for Russo. (*See generally* Compl. ¶¶ 14, 27, 52; 55; Oral Arg. Tr. 78:1–4.) Thus, the Court will consider whether Plaintiff has sufficiently alleged a FLSA claim against both the Attorney Defendants. The Court notes that Plaintiff uses the incorrect economic reality test. Plaintiff uses the economic reality test that is used to determine whether two employers are joint employers rather than the test utilized by courts to determine whether someone is an employee or an independent contractor. *See Velez v. Sanchez,* 693 F.3d 308, 327 (2d Cir.2012) (discussing the differences between the various economic reality tests).

**A. Degree of Control**

The first factor the Court must consider is the degree of control the Attorney Defendants exercised over Plaintiff's work. *Barfield,* 537 F.3d at 142–43. When deciding whether a defendant exercised control over the plaintiff, a court considers "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Campos v. Zopounidis,* No. 09–CV–1138, 2011 WL 2971298, at *4 (D.Conn. July 20, 2011) (quoting *Carter v. Dutchess Cmty. College,* 735 F.2d 8, 12 (2d Cir.1984)). Plaintiff has alleged that two of the factors applied as to his relationship with Trakas—the first factor, that Trakas had the ability to fire Plaintiff, and the third factor, that Trakas determined Plaintiff's rate of pay. 60 (Compl. ¶ 131.) However, the second factor supports the contention that Plaintiff was an independent contractor. In his Complaint, Opposition to the Attorney Defendants' motions to dismiss and at oral argument, Plaintiff represented that he had a high degree of autonomy in the work he did for the Attorney Defendants, even for the work done on the cases he did not refer to the Attorney Defendants. (*Id.* ¶¶ 14, 15, 28, 60; Pl. Opp'n to Att'y Defs. 30–32; Oral Arg. Tr. 71:15–72:3.) At oral argument Plaintiff stated that in addition to working in the office, he also worked from home, including from his home in California, and gave the *Garcia* case as an example of a case where Plaintiff flew to California alone to work on the case. (*See* Oral Arg. Tr. 71:15–72:3.) In the Complaint, Plaintiff alleges that much of the work he did was done on his own without the Attorney Defendants' supervision and further

represented that the Attorney Defendants would simply sign documents prepared by Plaintiff. (Compl. ¶ 60.) Plaintiff also represented that he attended court appearances alone. (Pl. Opp'n to Att'y Defs. 30–32.) There are no allegations as to the fourth factor—whether the Attorney Defendants maintained employment records. Balancing the factors, the Court finds that, while Trakas arguably exercised some control over Plaintiff, Plaintiff primarily acted independently and this factor weighs in favor of Plaintiff being an independent contactor. 61 *Browning,* 885 F.Supp.2d at 608 ("As set forth above, the [d]efendants certainly had some degree of control over [the plaintiffs].... However, the degree of control is not so great as to weigh in favor of finding the [p]laintiffs to be employees as opposed to independent contractors."); *Velu,* 666 F.Supp.2d at 307 (finding on summary judgment that the plaintiff was an independent contractor and that neither the defendant "nor its agents supervise [the plaintiff's] work, except to account for payments it owed to [the plaintiff]" and that neither the plaintiff had "a great deal of control over his own work and work schedule, subject to the demands of clients").

60    The Court notes that Plaintiff's claim that Trakas determined his rate of pay is contradicted by Plaintiff's allegations in other parts of the Complaint that he reached an agreement with the Attorney Defendants prior to working for them that he would be paid $75 an hour and ten percent commission on referrals and settlements and judgments. (Compl. ¶¶ 55, 95.)

61    At oral argument, Plaintiff, for the first time, stated that he engaged in both independent contractor work on cases he referred to the Attorney Defendants and employee work in the office for cases he did not refer to the Attorney Defendants. (Oral Arg. Tr. 77:7–18 .) This allegation fails for several reasons. First, it appears from Plaintiff's representations both in his submissions and at oral argument, that even as to the work he performed in the office on cases he did not refer to the Attorney Defendants, Plaintiff still exercised a great deal of control. (*Id.*) Second, in the Complaint, Plaintiff alleges he worked 50 to 60 hours each week. (Compl. ¶¶ 61, 97–98, 140–41.) The Complaint also identified the aggregate number of hours worked on several cases without specifying when those hours were worked. (*Id.* ¶¶ 60, 140.) At oral argument, Plaintiff identified the list of cases in the

2013 WL 4806960

Complaint as cases he worked on as an independent contractor. (Oral Arg. Tr. 77:7–18.) Thus, the Complaint woefully fails to allege that Plaintiff worked unpaid overtime hours as an *employee.*

**B. Employee's Profit or Loss**

**\*59** The next factor is the worker's opportunity for profit or loss and his or her investment in the business. *Barfield,* 537 F.3d at 142–43. From the allegations in the Complaint, at least a portion of Plaintiff's compensation was contingent on his investment in the business, since according to Plaintiff, the Attorney Defendants agreed to pay him a ten percent commission for referrals and judgments or settlements on cases referred to the Attorney Defendants. (Compl.¶¶ 55, 95.) The balance of Plaintiff's earnings were hourly wages at $75 per hour. (*Id.*) Plaintiff has not pled that he was required to work a set number of hours. (*Id.*) Since Plaintiff could earn more money working for the Attorney Defendants if he invested more into the business by referring more cases and getting more cases to go to judgment, this factor weighs in favor of finding that Plaintiff was an independent contractor. *See Dubois v. Sec'y of Def.,* 161 F.3d 2 (4th Cir.1998) (per curiam) (upholding the district court's determination at summary judgment that while the plaintiff's "investment in the[ ] business was not 'great,' their opportunity for profit or loss was found to be 'entirely dependent on the [plaintiff's] themselves' " (citations omitted)); *Browning,* 885 F.Supp.2d at 608 (finding on summary judgment that this factor weighed in favor of finding that the plaintiff was an independent contractor where there was no set amount of work and the plaintiff could make more if the plaintiff invested more in the business); *Evans v. MassMutual Fin. Grp.,* 856 F.Supp.2d 606, 610 (W.D.N.Y.2012) ("The fact that plaintiff received commissions rather than a salary, for example, tends to indicate that he may have been an independent contractor ...."); *Schwind v. EW & Assocs., Inc.,* 357 F.Supp.2d 691, 701 (S.D.N.Y.2005) (noting that "plaintiff had an opportunity for profit because he worked on commission").

**C. Degree of Skill and Independent Initiative**

The next factor is the degree of skill and independent initiative required to perform the work. *Barfield,* 537 F.3d at 142–43. Crediting the Complaint's description of the work performed by Plaintiff for the Attorney Defendants, this factor weighs in favor of finding that Plaintiff was an independent contractor. Plaintiff alleges that the Attorney Defendants wanted to use "Plaintiff's experience in civil rights, I.D.E.A., ADA and

the Rehabilitation Act of 1974, including his knowledge of constitutional issues arising from criminal cases [and his] train[ing] [from] renowned New York Civil Rights attorney Mel Sachs." (Compl.¶ 99.) According to the Complaint, Plaintiff acted "as a civil rights and constitutional consultant, temporary legal assistant, researcher, investigator and process server." (*Id.* ¶ 43.) At oral argument Plaintiff stated that he also engaged in office work, (Oral Arg. Tr. 77:7–18), however, office work may be skilled, i.e. legal researcher, and the fact that Plaintiff may have done some administrative tasks does not negate the fact that, according to the Complaint, the majority of his work was highly skilled labor. *See Browning,* 885 F.Supp.2d at 608–09 ("As for the next relevant factor, the Court finds that the tasks completed by the [p]laintiffs did require a significant degree of skill, although the Plaintiff[']s attempt to minimize this as merely the ability to be a 'people person.' "). As discussed above, Plaintiff's work also required initiative, since he was required to refer new clients to the Attorney Defendants and according to the Complaint, did in fact refer numerous individuals to them. (*See* Compl. ¶ 96.) Thus, this factor weighs in favor of finding Plaintiff to be an independent contractor. *See Browning,* 885 F.Supp.2d at 608–09 (finding on summary judgment that both the skill and initiative needed to perform the job weighed in favor of finding the plaintiff to be an independent contractor); *Velu,* 666 F.Supp.2d at 307 (finding on summary judgment that the plaintiff was an independent contractor where there were factors that showed independent initiative such as "a great deal of control over his own work and work schedule"); *see also Gayle v. Harry's Nurses Registry, Inc.,* No. 07–CV–4672, 2009 WL 605790, at *8 (E.D.N.Y. Mar. 9, 2009) (distinguishing between skilled employees who "exercise significant initiative in locating work opportunities" and are more likely to be independent contractors and those who do not).

**D. Duration of Relationship**

**\*60** Next, courts look to the permanence or duration of the working relationship. *Barfield,* 537 F.3d at 142–43. According to Plaintiff, he conducted "temporary work" for the Attorney Defendants. (Compl. ¶ 95, *see also id.* ¶¶ 14, 19, 43, 55.) He left New York and stopped working for the Attorney Defendants after 18 months, when he had completed his cases for the Attorney Defendants. (*Id.* ¶¶ 76–77; Oral Arg. Tr. 71:16.) When asked by the Court about the nature of his working relationship with the Attorney Defendants and whether he was hired per case, Plaintiff answered in the affirmative and represented that he had specific cases that he worked on with each Attorney Defendant. (Oral Arg.

2013 WL 4806960

Tr. 73:10–15.) In addition, according to Plaintiff, he flew back and forth between New York and California during his time with the Attorney Defendants and continued to work for lawyers in California, while at the same time working for the Attorney Defendants. (Compl.¶ 99.) Therefore, this factor supports a finding that Plaintiff was an independent contractor. *See Talbert v. Am. Risk Ins. Co.,* 405 F. App'x 848, 856 (5th Cir.2010) (finding as a matter of law that the plaintiff was an independent contractor and crediting as a factor in favor of the plaintiff being an independent contractor the fact that she "was aware that her position was expressly temporary"); *Thibault v. Bellsouth Telecomm., Inc.,* 612 F.3d 843, 849 (5th Cir.2010) (noting that whether the job is "temporary, project-by-project, on-again-off-again relationship" will be important to determining whether a plaintiff is an independent contractor); *Estate of Suskovich v. Anthem Health Plans Of Va., Inc.,* 553 F.3d 559, 568 (7th Cir.2009) (finding on summary judgment that the plaintiff "never enjoyed any guarantees that his work would extend beyond this limited duration, and accordingly, as this court has held before, this factor favors independent contractor status"); *Imars v. Contractors Mfg. Servs., Inc.,* 165 F.3d 27 (6th Cir.1998) (noting that in a prior decision the Sixth Circuit "found that the migrant workers were independent contractors" where "[t]he relationship between pickers and growers was a temporary one, potentially renegotiated every year"); *Baker v. Flint Eng'g & Const. Co.,* 137 F.3d 1436, 1442 (10th Cir.1998) ("Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." (citations and internal quotation marks omitted)); *Gate Guard Servs. L.P. v. Solis,* No. 10–CV–91, 2013 WL 593418, at *12 (S.D.Tex. Feb. 13, 2013) (finding that the "temporary, job-by-job basis [of the work] is ... relevant and supports a finding [the plaintiffs] are independent contractors"); *Mack v. Talasek,* No. 09–CV–53, 2012 WL 1067398, at *8 (S.D.Tex. Mar. 28, 2012) (same); *cf. Campos v. Zopounidis,* No. 09–CV–1138, 2011 WL 2971298, at *9 (D.Conn. July 20, 2011) (finding on summary judgment that the plaintiff was an employee when he worked "on a permanent rather than a temporary basis and did so over a substantial period of time").

### E. Work's Importance to Employer's Business

**\*61** The last factor the Court must consider is whether the work is an integral part of the employer's business. This is the only factor which weighs in favor of finding

that Plaintiff was an employee of the Attorney Defendants. According to the Complaint, the Attorney Defendants relied on Plaintiff's referrals, legal research and appearances at various proceedings. (Compl.¶ 99.) These are all integral functions of a law office.

Accepting Plaintiff's factual allegations as true, the Court finds that Plaintiff has not plausibly alleged and cannot plausibly allege that he was an employee of the Attorney Defendants, since based on the allegations in the Complaint, his allegations in his opposition to the Attorney Defendants' motions to dismiss and his representations at oral argument, the Court finds that Plaintiff was an independent contractor. Even if Plaintiff spent part of his time working in the office of the Attorney Defendants, it is clear that based on Plaintiff's allegations in the Complaint and his other submissions to the Court, as well as his assertions at oral argument, (1) he primarily worked independently with little supervision from the Attorney Defendants, (2) his compensation was greatly influenced by his investment in the Attorney Defendants' business by the commissions he received from referrals of new clients and judgments and settlements he helped to achieve, (3) Plaintiff was highly skilled and worked on his own initiative, and (4) his work was intended to only last a temporary period and Plaintiff primarily worked on a case by case basis. Therefore, the Court dismisses Plaintiff's FLSA claim with prejudice. *See, e.g., Torres v. Ridgewood Bushwick Senior Citizens Homecare Council Inc.,* No. 08–CV–3678, 2009 WL 1086935, at *3 (E.D.N.Y. April 22, 2009) (dismissing the complaint on motion to dismiss for failure to plausibly allege that the plaintiff worked as an employee covered by FLSA's provisions and not as an exempt person); *Human Services Home Care Services Corp.,* No. 05–CV–10734, 2008 WL 4104025, at *2 (S.D.N.Y. Aug. 8, 2008) (same).

### iv. State Law Claims

#### 1. Diversity Jurisdiction

Plaintiff commenced this action asserting jurisdiction pursuant to, among other provisions, 28 U.S.C. § 1332(a) and § 1332(b). (Comp.¶¶ 1–2.) Plaintiff asserts that he is "a citizen of the State of California, the United States and a citizen of the European Union .... a citizen of the Republic of Malta," (*id.* ¶¶ 1, 11), and that the amount in controversy exceeds $75,000, (*id.* ¶ 1).

"A party seeking diversity jurisdiction bears the burden of establishing that diversity exists." *Braten v. Kaplan,* 406 F.

App'x 516, 517 (2d Cir.2011). When a person is a dual citizen, it is the American citizenship that governs the issue of diversity jurisdiction. *See Action S.A. v. Marc Rich & Co., Inc.,* 951 F.2d 504, 507 (2d Cir.1991) ("In matters of diversity jurisdiction American citizenship will determine diversity. As the Seventh Circuit found in *Sadat v. Mertes,* 615 F.2d 1176 (7th Cir.1980), 'only the American nationality of the dual citizen should be recognized under 28 U.S.C. § 1332(a).' "); *see also Molinos Valle Del Cibao, C. por A. v. Lama,* 633 F.3d 1330, 1341 (11th Cir.2011) ("[A]n individual who is a dual citizen of the United States and another nation is only a citizen of the United States for the purposes of diversity jurisdiction under § 1332(a)."); *Frett–Smith v. Vanterpool,* 511 F.3d 396, 400 (3d Cir.2008) ("A number of our sister Courts of Appeals have already held that for a dual national citizen, only the American nationality is relevant for purposes of diversity under 28 U.S.C. § 1332."); *Fuerst v. Fuerst,* 832 F.Supp.2d 210, 217 (E.D.N.Y.2011) ("Although Wolfgang is a citizen of both Germany and the United States, it is the general consensus among the courts—including the Second Circuit—that, where a party has dual citizenship, '[i]n matters of diversity jurisdiction American citizenship will determine diversity .' " (quoting *Action S.A,* 951 F.2d at 508)); *El–Jurdi v. El–Balah,* No. 11–CV–00520, 2011 WL 2433501, at *3 (N.D. Ohio June 14, 2011) (holding that only American citizenship is considered for diversity jurisdiction where plaintiff is a dual national); *Falken Indus., Ltd. v. Johansen,* 360 F.Supp.2d 208, 210 (D.Mass.2005) ("Courts have increasingly held that 'for a dual national citizen, only the American citizenship is relevant for purposes of diversity under 28 U.S.C. § 1332.' " (quoting *Coury v. Prot,* 85 F.3d 244, 250 (5th Cir.1996)); *Brooks v. Girois,* No. 03–CV–3260, 2003 WL 21949702, at *1 (E.D.Pa. Aug.11, 2003) (holding that "for a dual national citizen, only the American citizenship is relevant for purposes of diversity under 28 U.S.C. § 1332[ (a)(2) ]" (alterations in original) (citations omitted) (collecting cases)); *Lemos v. Pateras,* 5 F.Supp.2d 164, 165 (S.D.N.Y.1998) (" '[T]here is an emerging consensus among courts that, for a dual national citizen, only the American citizenship is relevant for purposes of diversity jurisdiction under 28 U.S.C. § 1332.' " Courts in this Circuit have accepted this view. For the purpose of diversity jurisdiction, the plaintiff, therefore, is not "a citizen or subject of a foreign state." (citations omitted)).

**\*62** In order for an American citizen to sue pursuant to diversity jurisdiction, the person must be both a citizen and domiciliary of a state in the United States. *See H & R Convention & Catering Corp. v. Somerstein,* No. 12–CV–

1425, 2013 WL 1911335, at *14 (E.D.N.Y. May 8, 2013) (holding that a United States citizen must be domiciled in the United States for diversity jurisdiction to apply); *Fuerst,* 832 F.Supp.2d at 217–18 (holding that the dual German-American national had to be domiciled in a state in the United States in order for diversity jurisdiction to apply); *Lemos,* 5 F.Supp.2d at 165 ("For purposes of diversity jurisdiction, one is a citizen of the state where one is domiciled."). If an American citizen is not domiciled in a state in the United States, the federal court is divested of diversity jurisdiction. *See Frett–Smith,* 511 F.3d at 400 ("The only way that an American national, living abroad, can sue under § 1332 is under § 1332(a)(1) if that national is a citizen, i.e., domiciled, in one of the fifty U.S. states."); *Herrick Co. v. SCS Commc'ns, Inc.,* 251 F.3d 315, 322 (2d Cir.2001) ("United States citizens 'domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state,' so that ' § 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties.' " (quoting *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 68 (2d Cir.1990)); *H & R Convention,* 2013 WL 1911335, at *14 ("It is undisputed that the Somersteins are domiciliaries of Costa Rica but have not renounced their United States citizenship. They are, for purposes of diversity jurisdiction, 'neither citizens of any state of the United States nor citizens or subjects of a foreign state.' Their status as United States citizens domiciled outside of the country deprives the court of diversity jurisdiction pursuant to 28 U.S.C. § 1332." (citations omitted)); *Fuerst,* 832 F.Supp.2d at 217–18 (holding that the dual German-American national was domiciled in Germany and not an American state thus the federal court lacked diversity jurisdiction); *Lemos,* 5 F.Supp.2d at 165 (holding that because the plaintiff, who was a dual citizen of Greece and the United States, was not domiciled in the United States, "she [was] a citizen of no state for the purposes of diversity jurisdiction" and therefore the court lacked subject matter jurisdiction pursuant to diversity jurisdiction).

Here, Plaintiff asserts that he is a dual citizen of the United States, specifically of California, and the Republic of Malta. However, Plaintiff asserts that he has his "permanent domicile and residence in the Republic of Malta" and no longer resides in California. (Pl. Opp'n to State Defs. 77; *see also id.* at 56, 62, 82; Pl. Opp'n to Att'y Defs. 20; Oral Arg. Tr. 26:4–27:1.) Therefore, the Court lacks diversity jurisdiction over Plaintiff's claims. *See, e.g., Frett–Smith,* 511 F.3d at 402 (upholding the district court's dismissal for lack of diversity jurisdiction since the plaintiff was a dual citizen who was not domiciled in the United States when she filed the action);

*Fuerst,* 832 F.Supp.2d at 217–18 (dismissing the complaint for lack of jurisdiction because the dual German–American national was domiciled in Germany and not an American state); *Lemos,* 5 F.Supp.2d at 165 (dismissing the complaint because the court lacked jurisdiction over the dual United States and Greek national who was not domiciled in the United States).

**2. Supplemental Jurisdiction**

**\*63** As discussed above, the Court dismisses all of Plaintiff's federal claims and the Court lacks diversity jurisdiction over Plaintiff's state law claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp.,* 712 F.3d at 727 (citations and internal quotation marks omitted); *see also Oneida Indian Nation of N.Y. v. Madison County,* 665 F.3d 408, 437 (2d Cir.2011) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." (alteration in original) (citations omitted)).

Courts routinely decline to exercise supplemental jurisdiction where the only remaining claims are state law claims, including fraud-based, unjust enrichment, New York Judiciary Law § 487, unpaid wages, unpaid overtime and unpaid spread-of-hours wages claims. *See, e.g., Petroleos Mexicanos v. SK Eng'g & Const. Co. Ltd.,* No. 12–CV–9070, 2013 WL 3936191, at \*4 (S.D.N.Y. July 30, 2013) ("The Court declines to exercise supplemental jurisdiction over plaintiffs' remaining claim for common-law fraud."); *Nabatkhorian v. County of Nassau,* No. 12–CV–1118, 2013 WL 1233247, at \*11 (E.D.N.Y. Mar. 27, 2013) (declining to exercise supplemental jurisdiction over the plaintiff's state law claims for fraud); *Sampson v. MediSys Health Network, Inc.,* No. 10–CV–1342, 2013 WL 1212655, at \*6 (E.D.N.Y. Mar. 18, 2013) (dismissing the remaining New York Labor Law claims after the federal claims had been dismissed); *2022 Fulton St. LLC v. Akande,* No. 11–CV–3993, 2012 WL 3637458, at \*4 (E.D.N.Y. Aug. 22, 2012) (declining to

exercise jurisdiction over the plaintiff's New York Judiciary Law § 487 and fraud claims); *Edmonds v. Seavey,* No. 08–CV–5646, 2009 WL 2949757, at \*7 (S.D.N.Y. Sept. 15, 2009) (declining to exercise jurisdiction over state law claims including claims for unjust enrichment), *aff'd,* 379 F. App'x 62 (2d Cir.2010). Plaintiff's state law claims are therefore dismissed without prejudice.

**f. Motions to Strike**

At oral argument the Court denied motions for sanctions made by the Attorney Defendants and Plaintiff, and motions to strike made by Plaintiff, except that the Court reserved judgment on Plaintiff's motion to strike as to the specific statements in the Attorney Defendants' motions to dismiss that Plaintiff forged the signature of an individual on an affidavit filed with the Court. (Oral Arg. Tr. 88:23–90:24; 91:8–21, 97:5–21.) Specifically, Plaintiff moves pursuant to Rule 12(f) of Federal Rules of Civil Procedure to strike the following statements in both the Attorney Defendants' motions to dismiss:

> **\*64** Nevertheless, we would be remiss if we left unaddressed the fact that virtually all of Mr. Spiteri's 'factual' submission to this Court is irrelevant, false or fabricated and, in most instances, actionable at law. Indeed, his endless spitting of insults, lies and character assassinations against members of this Court's bar are despicable and we pray that appropriate sanctions be imposed.

(Docket Entry No. 112, Request for a Telecom Re: Plaintiffs Request to Strike Re: Defendant/Attorneys Russo & Trakas Memorandum of Law in Support of Defendants' Motion for Judgment and Dismissal of the Complaint Pursuant to Rule 12 of the Federal Rules of Civil Procedure ("Pl. Request to Strike"); Russo Mem. 8–9 n. 2; Trakas Mem. 4–5 n. 2.) For the reasons set forth below, the Court denies Plaintiff's motion to strike the above statements.

Rule 12(f) of the Federal Rules of Civil Procedure provides in pertinent part:

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 234 of 267
Spiteri v. Russo, Not Reported in F.Supp.2d (2013)
2013 WL 4806960

The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

**(1)** on its own; or

**(2)** on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed.R.Civ.P. 12.[62] Pleadings are defined by Rule 7 of the Federal Rules of Civil Procedure as "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a thirdparty complaint; and (7) if the court orders one, a reply to an answer." Fed.R.Civ.P. 7(a). The Attorney Defendants' motions to dismiss are not pleadings, and therefore, Plaintiff cannot properly strike portions of the Attorney Defendants' motions to dismiss. *See Dekom v. New York,* No. 12–CV–1318, 2013 WL 3095010, at *6 (E.D.N.Y. June 18, 2013) (denying motion to strike because a party can strike only pleadings pursuant to Rule 12, not legal briefs); *Bridgeforth v. Popovics,* No. 09–CV–0545, 2011 WL 2133661, at *1 n. 2 (N.D.N.Y. May 25, 2011) (finding that the plaintiff cannot move to strike a motion to dismiss pursuant to Rule 12(f)); *Huelbig v. Aurora Loan Servs., LLC,* No. 10–CV–6215, 2011 WL 4348281, at *2 (S.D.N.Y. May 18, 2011) (dismissing motion to strike portions of the defendant's motion to dismiss because motions to dismiss cannot be struck pursuant to Rule 12(f)), *report and recommendation adopted,* No. 10–CV–6215, 2011 WL 4348275 (S.D.N.Y. Sept. 16, 2011); *Gaymon v. Tarscio,* No. 10–CV–653, 2010 WL 4340689, at *2 (D.Conn. Oct. 26, 2010) (holding that the plaintiff could not move to strike the defendant's motion to dismiss because a motion to dismiss is not a pleading); *cf. Marshall v. Webster Bank, N.A.,* No. 10–CV–908, 2011 WL 219693, at *12 (D.Conn. Jan. 21, 2011) (finding that a "reply memorandum is not a 'pleading' " and therefore not subject to be struck pursuant to Rule 12).

[62] The Court notes that generally motions to strike pursuant to Rule 12 "are disfavored and granted only if there is a strong reason to do so." *Anderson News, L.L.C. v. Am. Media, Inc.,* No. 09–CV–2227, 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013); *see also G.L.M. Sec. & Sound, Inc. v. LoJack Corp.,* No. 10–CV–4701, 2012 WL 4512499, at *7 (E.D.N.Y. Sept. 28, 2012) ("While Courts 'possess considerable discretion in weighing 12(f) motions,' 'motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation.' "); *Greenwald v. City of New York,* No. 06–CV–2864, 2012 WL 6962297, at *1 (E.D.N.Y. July 19, 2012) ("[A] motion to strike an affirmative defense pursuant to Rule 12(f) for legal insufficiency 'is not favored and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.' " (quoting *Salcer v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir.1984)), *report and recommendation adopted,* No. 06–CV–2864, 2013 WL 354169 (E.D.N.Y. Jan. 29, 2013). "As the Second Circuit has instructed, 'courts should not tamper with the pleadings unless there is a strong reason for so doing.' " *Low v. Robb,* No. 11–CV–2321, 2012 WL 173472, at *8 (S.D.N.Y. Jan. 20, 2012) (quoting *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir.1976)).

**g. Motions to Take Judicial Notice**

**\*65** At oral argument, the Court also instructed Plaintiff that his motions for the Court to take judicial notice of various cases were unnecessary because the Court may consider any relevant case law that Plaintiff would like the Court to consider. (Oral Arg. Tr. 87:10–88:21.) The Court denies Plaintiff's remaining requests for the Court to take judicial notice of various documents, filings, etc .[63] Rule 201 of the Federal Rules of Evidence allows courts to take judicial notice of: (1) a fact that "is generally known within the trial court's territorial jurisdiction"; or (2) a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201; *see Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.,* 696 F.3d 206, 227 (2d Cir.2012) (noting that the court "take[s] judicial notice, pursuant to Federal Rule of Evidence 201"). Plaintiff has made voluminous requests for the Court to take judicial notice of matters including, but not limited to, California cases, documents filed in California cases, documents filed in the case before the Court, documents in other cases, letters sent to Plaintiff by California officials, sex registration data of other individuals required to register and statements from the Attorney Defendants which Plaintiff asserts are inappropriate. (*See* Docket Nos. 46, 63, 65, 66, 112, 140, 146, 149, 165, 183.)

63    The Court notes that Docket Entry Number 149 is titled "MOTION for Leave to Appeal in forma pauperis, MOTION for Reconsideration;" however, in substance it is a motion for the Court to reconsider an order denying Plaintiff's request for the Court to take judicial notice.

As the Court explained at oral argument, Plaintiff need only cite to any relevant case or statute that he would like to bring to the Court's attention. (Oral Arg. Tr. 87:10–23.). For court documents filed in other proceedings that Plaintiff would like the Court to take judicial notice of to support Plaintiff's assertion that he is no longer required to register in California, the Court notes that even if it took judicial notice of these documents, the Court could only take judicial notice of the fact that these documents exist. The Court would not be able to take judicial notice of these documents for the truth of the matter asserted in the documents by Plaintiff, i.e., that Plaintiff is not required to register in California, which appears to be the reason Plaintiff seeks their acceptance by the Court. 64 *See In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 355 n. 5 (2d Cir.2010) (taking judicial notice of SEC filings not "for their truth, but 'rather to establish the fact of such litigation and related filings' "); *Global Network Commc'n, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir.2006) ("[A] court may take judicial notice [of public records], 'it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.' "); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *Landow v. Wachovia Sec., LLC,* No. 12–CV–3277, 2013 WL 4432383, at *10 (E.D.N .Y. Aug. 12, 2013) ("The Court takes judicial notice of the following media report and court filings, not for the truth of the matters asserted therein, but rather to establish the fact that the information in those materials was publicly available ...." (citation omitted)); *Porrazzo v. Bumble Bee Foods, LLC,* 822 F.Supp.2d 406, 412 (S.D.N.Y.2011) ("In the motion to dismiss context, ... a court should generally take judicial notice 'to determine what statements [the documents] contain [ ] ... not for the truth of the matters asserted.' " (alteration in original) (citations omitted)).

64    As discussed *supra,* while Plaintiff would like the Court to review California cases and filings to determine whether Plaintiff was under an obligation to register in California, the Court will not opine on whether Plaintiff is or is not required to register in California. As explained *supra,* whether or not Plaintiff must register in California is immaterial to whether or not he must register in New York.

 **\*66**  The Court may not take judicial notice of several of the documents which Plaintiff seeks to have the Court take judicial notice of because the facts are not generally known within the Court's jurisdiction and they do not contain facts which can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201.

### IV. Conclusion

For the reasons discussed above, the State Defendants' motion to dismiss the Complaint is granted and the Complaint is dismissed with prejudice in its entirety as to all the State Defendants—Governor Andrew Cuomo, Judge Fernando Camacho, Michelle Harrington, Michelle Mulligan and New York State. In addition, Plaintiff's application for injunctive and declaratory relief as to the State Defendants is denied. The Attorney Defendants' motions to dismiss as to Plaintiff's federal claims—RICO, RICO conspiracy and FLSA—is granted and these claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for unjust enrichment, fraud, deceit and misrepresentation, fraudulent concealment, legal malpractice, unpaid wages, unpaid overtime and spread of hours and these claims are dismissed without prejudice. Plaintiff's remaining motion to strike is denied and his motion for the court to take judicial notice of various documents is denied.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 4806960

---

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 236 of 267

Ennis v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2743531

2019 WL 2743531
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie D. ENNIS, Plaintiff,

v.

Anthony J. ANNUCCI; B. White; Timothy Pettit; R.
Kellar; David Knapp; and Maryann Delaney, Defendants.

5:18-CV-0501 (GTS/TWD)
|
Signed 07/01/2019

**Attorneys and Law Firms**

EDDIE D. ENNIS, Plaintiff, Pro Se, 114 Franklin Street, Apt.
208, Watertown, New York 13601.

LETITIA A. JAMES, Assistant Attorney General, Attorney
General for the State of New York, OF COUNSEL: DAVID
A. ROSENBERG, ESQ., The Capitol, Albany, New York
12224, Counsel for Defendants.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently pending before the Court, in this *pro se* civil
rights action filed by Eddie D. Ennis ("Plaintiff") against
Anthony J. Annucci, B. White, Timothy Pettit, R. Kellar,
David Knapp, and Maryann Delaney ("Defendants"), is
Defendants' motion to dismiss Plaintiff's Amended Complaint
pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 21.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Amended
Complaint alleges that Defendants violated his right to due
process under the Fourteenth Amendment, and his right to
free speech under the First Amendment. (*See generally* Dkt.
No. 6 [Pl.'s Compl.].) More specifically, Plaintiff alleges that
Defendants imposed specific conditions on his parole that
improperly prohibit him from (1) engaging in any contact
with any children under eighteen years of age, including his
twelve-year-old son, unless he obtains prior approval from his

parole officer and the contact is supervised by a responsible
adult who is twenty-one years of age or older (the "Family
Contact Condition"), and (2) owning or using a computer or
other electronic device with the ability to access the internet
without obtaining prior permission from his parole officer (the
"Computer Condition"). (*Id.*)

Based on these factual allegations, Plaintiff's Amended
Complaint asserts the following two claims: (1) a claim
that Defendants violated his right to due process under
the Fourteenth Amendment and 42 U.S.C. § 1983, by
imposing and enforcing the Family Contact Condition,
which improperly interfered with his right to maintain a
relationship with his child ("First Claim"); and (2) a claim
that Defendants violated his right to free speech under
the First Amendment and 42 U.S.C. § 1983, by imposing
and enforcing the Computer Condition ("Second Claim").
(*Id.*) As relief, the Amended Complaint requests monetary
damages and a permanent injunction. (*Id.*) Familiarity with
the remaining factual allegations supporting these two claims
in the Amended Complaint is assumed in this Decision and
Order, which is intended primarily for the review of the
parties.

### B. Parties' Briefing on Defendants' Motion to Dismiss

Generally, in support of their motion to dismiss, Defendants
assert the following three arguments: (1) the Amended
Complaint fails to allege facts plausibly suggesting that (a)
Defendants Kellar and White were personally involved in the
imposition or enforcement of the Family Contact Condition
or the Computer Condition, and (b) Defendant Knapp was
personally involved in the imposition or enforcement of the
Family Contact Condition; (2) to the extent that Plaintiff
seeks monetary damages, Defendants are entitled to qualified
immunity as a matter of law based on Plaintiff's own factual
allegations because the due process rights of a discretionary
sex offender on parole are not clearly defined; and (3)
Plaintiff's request for injunctive relief should be dismissed
because (a) there is an adequate remedy to challenge the
conditions of his parole through a N.Y. C.P.L.R. Article
78 proceeding, and, (b) in any event, such claims are
inappropriate against Defendants Pettit, Kellar, and White
because there are no factual allegations plausibly suggesting
that those Defendants will have any role in the future
enforcement of Plaintiff's parole. (Dkt. No. 21, Attach. 1
[Defs.' Mem. of Law].)

**\*2** Generally, in opposition to Defendants' motion to
dismiss, Plaintiff asserts the following three arguments: (1)

Ennis v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 2743531
Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 237 of 267

the Amended Complaint alleges facts plausibly suggesting (a) the personal involvement of Defendants Kellar and White in the imposition or enforcement of the conditions of Plaintiff's parole because both Defendants required Plaintiff to accept the Family Contact Condition and Computer Condition or risk violating his parole, and (b) the personal involvement of Defendant Knapp in the imposition or enforcement of the Family Contact Condition because Defendant Knapp provided a form to Plaintiff to request to reside with his family and Plaintiff was informed that his request to reside with his wife and children would be discussed with Defendant Knapp; (2) the doctrine of qualified immunity is inapplicable here because Defendants were personally involved in imposing and/or enforcing the Family Contact Condition and Computer Condition; (3) there is no adequate remedy under New York law for Defendants' violations of Plaintiff's rights because Plaintiff's claims are constitutional in nature and thus raise a "Federal question." (Dkt. No. 24 [Pl.'s Opp'n Mem. of Law].) [1]

[1] Plaintiff concedes that injunctive relief is not an appropriate remedy as to Defendants Pettit, Kellar, and White. (Dkt. No. 24, at 10.)

Generally, in their reply letter, [2] Defendants assert three arguments: (1) the Amended Complaint does not allege any facts that plausibly suggest that (a) Defendants Kellar or White were personally involved in the imposition or enforcement of the Family Contact Condition or Computer Condition merely by meeting with him to sign documents accepting the terms of his parole, and (b) Defendant Knapp was personally involved in the imposition or enforcement of the Family Contact Condition because (i) there is no allegation that Plaintiff discussed his request to reside with his wife and children with Defendant Knapp, (ii) there is no allegation that this request was actually brought to Defendant Knapp's attention, and (iii) there is no supervisory liability based merely on the fact that Defendant Knapp is a "Senior Parole Officer"; (2) Plaintiff did not address Defendants' argument that they are immune from liability for monetary damages because the process due to a discretionary sex offender before he is subject to special conditions of parole is not clearly established; and (3) Plaintiff does not dispute that he could have filed an Article 78 proceeding in New York State courts to remedy the allegedly unconstitutional terms of his parole. (Dkt. No. 25 [Defs.' Reply Letter].)

[2] In the future, counsel is cautioned to comply with Local Rule 7.1(a)(1), which provides that "[a]ll memoranda of law shall contain a table of contents."

## II. GOVERNING LEGAL STANDARD FOR MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on de novo review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." Jackson, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Jackson, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [3]

[3] Accord, Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); Hudson v. Artuz, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); Powell v. Marine Midland Bank, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

**\*3** The Supreme Court has explained that such fair notice has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper

Ennis v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2743531

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 238 of 267

decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*,

it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

**\*4** However, complaints by *pro se* parties are accorded more deference than those filed by attorneys. *See Erickson v. Pardus*, 551 U.S. 89, 127 (2007). As such, *Twombly* and *Iqbal* notwithstanding, this Court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

## III. ANALYSIS

### A. Plaintiff's First Claim

#### 1. Whether the Amended Complaint Alleges Facts Plausibly Suggesting the Personal Involvement of Defendants Kellar, White, and Knapp

After carefully considering the matter, the Court grants Defendants' motion to dismiss the First Claim against Defendants Kellar, White, and Knapp because the Amended Complaint has failed to allege facts that plausibly suggest these Defendants' personal involvement in the imposition or enforcement of the Family Contact Condition for the reasons stated in Defendants' memoranda of law. (Dkt. No. 21, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 25 [Defs.' Reply Letter].) To those reasons, the Court adds the following analysis, which is intended to supplement but not supplant Defendants' reasons.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790

F.2d 260, 263 [2d Cir. 1986]). " 'Direct participation' means 'personal participation by one who has knowledge of the facts that rendered the conduct illegal.' " *Doe v. Annucci*, 14-CV-2953, 2015 WL 4393012, at *19 (S.D.N.Y. July 15, 2015) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 [2d Cir. 2001]). For example, the personal involvement requirement is satisfied where a parole officer is alleged to have "actually enforced" a parole condition by arresting the parolee for a violation. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). However, continuing special conditions already in place without altering the rules or conditions of parole, does not satisfy the personal involvement requirement. *Farrell*, 449 F.3d at 484.

### a. Defendant Kellar

The Amended Complaint alleges that, prior to his release from prison, Plaintiff met with Defendant Kellar "on May 14, 2017, who told me that if i [sic] did not sign my conditions of release ... that I would receive a 12-18 page parole violation charge. Needless to say, I signed the paper." (Dkt. No. 6, at 4.)

There is no allegation that Defendant Kellar made any recommendations about the terms of Plaintiff's special conditions, participated in a meeting during which the decision about Plaintiff's special conditions was made, enforced the special conditions, or otherwise contributed to the alleged constitutional violations. *See Annucci*, 2015 WL 4393012, at *20. Instead, the Amended Complaint merely alleges that Defendant Kellar met with Plaintiff to obtain his signature on the parole conditions. (Dkt. No. 6, at 4.) The Amended Complaint alleges no facts plausibly suggesting that Defendant Kellar had any involvement or input regarding the terms and conditions of Plaintiff's parole. (*See generally id.*) In addition, the Amended Complaint does not allege any facts plausibly suggesting that Defendant Kellar enforced the Family Contact Condition. (*Id.* at 28.)

**\*5** Therefore, the Amended Complaint does not sufficiently allege that Defendant Kellar was personally involved in the alleged constitutional violations. *Compare Barnes v. Ross*, 926 F. Supp. 2d 499, 508 (S.D.N.Y. 2013) (finding personal involvement where defendant "was aware of, and contributed to" the allegedly unconstitutional treatment) *and Pugh v. Goord*, 571 F. Supp. 2d 477, 514-15 (S.D.N.Y. 2008) (finding personal involvement where defendant "was consulted" and "espoused views" that led to the creation of the allegedly unconstitutional policy), *with Vogelfang v. Capra*, 889 F.

Supp. 2d 489, 503 (S.D.N.Y. 2012) (finding no personal involvement where defendants were not "involve[d] in any event which constituted a violation of [plaintiff's] rights") *and Odom v. Calero*, 06-CV-15527, 2008 WL 2735868, at *6-7 (S.D.N.Y. July 10, 2008) (finding no personal involvement where defendant reviewed an administrative determination).

As a result, Plaintiff's First Claim against is dismissed as against Defendant Kellar.

### b. Defendant White

The Amended Complaint alleges that on March 16, 2017, Plaintiff "reported to my parole office at 317 Washington Street in Watertown, NY where I met with Parole Officer B. White (my then parole officer, Timothy Pettit, wasn't there) who required me to agree and sign Special Conditions of Release to my Parole Supervision ... as part of my parole." (Dkt. No. 6, at 4.)

Similarly to Defendant Kellar, there is no allegation that Defendant White made any recommendations about the terms of Plaintiff's special conditions, participated in a meeting during which the decision about Plaintiff's special conditions was made, enforced the special conditions, or otherwise contributed to the alleged constitutional violations. *See Annucci*, 2015 WL 4393012, at *20. Instead, the Amended Complaint merely alleges that Defendant White met with Plaintiff in the absence of Plaintiff's assigned parole officer. (Dkt. No. 6, at 4.) The Amended Complaint alleges no facts plausibly suggesting that Defendant White had any involvement or input regarding the terms and conditions of Plaintiff's parole. (*See generally id.*) In addition, the Amended Complaint does not allege any facts plausibly suggesting that Defendant White enforced the Family Contact Condition. (*Id.*)

Therefore, the Amended Complaint does not sufficiently allege that Defendant White was personally involved in the alleged constitutional violations. *Compare Barnes*, 926 F. Supp. 2d at 508 (finding personal involvement where defendant "was aware of, and contributed to" the allegedly unconstitutional treatment) *and Pugh*, 571 F. Supp. 2d at 514-15 (finding personal involvement where defendant "was consulted" and "espoused views" that led to the creation of the allegedly unconstitutional policy) *with Vogelfang*, 889 F. Supp. 2d at 503 (finding no personal involvement where defendants were not "involve[d] in any event which

Ennis v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2743531

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 240 of 267

constituted a violation of [plaintiff's] rights"), *and Odom,* 2008 WL 2735868, at *6-7 (finding no personal involvement where defendant reviewed an administrative determination).

As a result, Plaintiff's First Claim is dismissed as against Defendant White.

### c. Defendant Knapp

Generally, the fact that a defendant supervised or managed officials who may have violated the plaintiff's rights does not establish he or she was personally involved in the violation. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987).

Here, the Amended Complaint does not allege any facts that plausibly suggest Defendant Knapp was personally involved in imposing or enforcing the Family Contact Condition. (*See generally* Dkt. No. 6.) The only factual allegation regarding Defendant Knapp is that Plaintiff spoke with Defendant Knapp "about having a laptop in my apartment (with internet) for the purposes of continuing education, business, and other legal activity (legal research) that parole could monitor through the use of special software. They were unwilling to agree to even this." (Dkt. No. 6, at 6.) [4] While relevant for the Second Claim, this allegation does not relate to the imposition or enforcement of the Family Contact Condition.

[4]    In his opposition memorandum of law, Plaintiff asserts additional allegations regarding Defendant Knapp's involvement in enforcing the Family Contact Condition. (Dkt. No. 24, at 7.) More specifically, Plaintiff asserts that he "was informed that his request [to reside with his wife and children] would be discussed with Defendant Knapp. Defendant Delaney and Defendant Knapp even presented me with parole documentation to request to reside with family." (Dkt. No. 24, at 7.) In addition, Plaintiff asserts that his wife provided letters "expressing her strong desire to have me home. It was 'misplaced' by parole she was told, so she sent Defendant Pettit another that should still be in my file. To require a third letter from my wife, as Defendant Delaney and Knapp are currently, is frustrating to say the least." (*Id.*) However, the Court notes that it need not, and does not, consider these additional factual allegations submitted by Plaintiff in opposition to the pending

motion as effectively amended his pleading. The Court construes *Gill v. Mooney,* which considered an affidavit submitted in opposition to a motion to dismiss by a *pro se* plaintiff, as not controlling here, where Plaintiff has already amended his complaint once. *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *see, e.g., Abascal v. Hilton,* 04-CV-1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan. 13, 2008) (Kahn, J., adopting, on de novo review, Report-Recommendation by Lowe, M.J.) ("Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.") (collecting cases), *aff'd,* 357 F. App'x 388 (2d Cir. 2009); *cf. Foman v. Davis,* 371 U.S. 178, 182 (1962) (holding that denial of leave to amend is not abuse of discretion where movant has repeatedly failed to cure deficiencies in pleading). In any event, the additional factual allegations contained in Dkt. No. 24 cannot fairly be said to be "consistent" with the allegations contained in Dkt. No. 6 (which, despite being 34 pages long, is conspicuously absent of any of these factual allegations).

**\*6** As a result, Plaintiff's First Claim is dismissed as against Defendant Knapp.

### 2. Whether Plaintiff's First Claim Should Be Dismissed to the Extent It Seeks Monetary Damages Based on the Doctrine of Qualified Immunity

After carefully considering the matter, the Court denies Defendants' motion to dismiss Plaintiff's First Claim for monetary damages based on the doctrine of qualified immunity.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982]). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir. 2004), *accord, Higazy v. Templeton,* 505 F.3d 161,

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 241 of 267

Ennis v. Annucci, Not Reported in Fed. Supp. (2019)

2019 WL 2743531

169, n.8 (2d Cir. 2007). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

As the Second Circuit noted in *Birzon v. King*, "when a convict is conditionally released on parole, the Government retains a substantial interest in insuring [sic] that its rehabilitative goal is not frustrated and that the public is protected from further criminal acts by the parolee." 469 F.2d 1241, 1243 (2d Cir. 1972). Therefore, "[a]lthough a parolee should enjoy greater freedom in many respects than a prisoner, ... [the] Government may ... impose restrictions on the rights of the parolee that are reasonably and necessarily related to the interests that the Government retains after his conditional release." *Birzon*, 469 F.2d at 1243.

The Supreme Court has treated the right to familial association as "a fundamental element of personal liberty." *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618 [1984]); *see also United States v. Meyers*, 426 F.3d 117, 125 (2d Cir. 2005) (citing *Wilkinson v. Russell*, 182 F.3d 89, 103-04 [2d Cir. 1999] ["It is well established that a parent's interest in maintaining a relationship with his or her child is protected by the Due Process Clause of the Fourteenth Amendment"] ); *United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013) ("A condition of supervised release that prevents a father from seeing his children outside the presence of an approved monitor is a severe one subject to careful scrutiny"). However, the degree of "protection varies in accordance with the nature of the parent-child bond." *Yunus v. Robinson,* 17-CV-5839, 2018 WL 3455408, at *34 (S.D.N.Y. June 29, 2018); *see also Meyers*, 426 F.3d at 128 (remanding for fact-finding where the supervised releasee had never been the child's custodian and presented "no evidence" in support of his claim that he played "an active role in the life of his son" before he was incarcerated); *Doe v. Lima*, 270 F. Supp. 3d 684, 701-03 (S.D.N.Y. 2017) (applying strict scrutiny where state police officers expelled sex offender parolee from his marital home after his wife gave birth to a son, without conducting any individualized inquiry into whether parolee was a danger to the infant).

**\*7**  In *Singleton v. Doe*, the court considered special conditions placed on a parolee who was designated a "discretionary sex offender." *Singleton v. Doe*, 210 F. Supp. 3d 359, 371-72 (E.D.N.Y. 2016). There, unlike here, the

plaintiff had not been convicted of a crime that was sexual in nature. *Singleton*, 210 F. Supp. 3d at 362-63.[5]  Instead, based on the plaintiff's conduct while incarcerated, he was designated a "discretionary sex offender" and, as a condition of his release, he agreed to comply with specific sex offender conditions imposed by his parole officer. *Id.*  The district court held that "neither the Supreme Court nor the Second Circuit has clearly established the process that is due to a discretionary sex offender before he is subject to certain special conditions of parole." *Id.* at 374. As a result, the doctrine of qualified immunity shielded the parole officers from monetary damages.

[5]

> It is not clear to the Court exactly what crime Plaintiff was convicted of that resulted in his parole. (*See generally* Dkt. No. 6.) However, it is apparent that Plaintiff's conviction was sexual in nature. (Dkt. No. 6, at 8-11.)

Unlike the plaintiff in *Singleton*, Plaintiff is not a *discretionary* sex offender. In addition, the issues raised by Plaintiff are not what process is due to him as a discretionary sex offender before any special conditions of parole may be imposed. Instead, Plaintiff's concerns are with the specific (1) Family Contact Condition and (2) Computer Condition. (Dkt. No. 6.)

The Second Circuit has clearly established that a parent's interest in maintaining a relationship with his child is protected by the Due Process Clause of the Fourteenth Amendment. *Myers*, 426 F.3d at 126. Plaintiff has alleged facts plausibly suggesting that Defendants Pettit and Delaney, acting in their individual capacities, abused their discretion and violated his due process rights by imposing the Family Contact Condition without considering less-restrictive alternatives.

As a result, Defendants Pettit and Annucci are not, at this stage of the proceeding, entitled to qualified immunity for their alleged deprivation of Plaintiff's procedural due process rights.[6]

[6]

> The Court notes that Plaintiff cannot recover monetary damages against Defendant Annucci in his official capacity. *Jackson v. Ramirez*, 691 F. App'x 45, 46 (2d Cir. 2017). The Eleventh Amendment precludes suits against states unless the state expressly waives immunity or Congress abrogates it. *CSX Transp., Inc. v. N.Y. State Office*

**Ennis v. Annucci, Not Reported in Fed. Supp. (2019)**
2019 WL 2743531

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 242 of 267

*of Real Prop. Servs.*, 306 F.3d 87, 95 (2d Cir. 2002). A claim against state officials in their official capacities is likewise barred. *Davis v. New York*, 316 F.3d 93, 101-02 (2d Cir. 2002). New York State has not waived its immunity, *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39 (2d Cir. 1977), nor has Congress abrogated it, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990).

### 3. Whether Plaintiff's First Claim Should Be Dismissed to the Extent It Seeks a Permanent Injunction

Plaintiff concedes that his request for injunctive relief against Defendants Pettit, Kellar, and White is inappropriate and should be dismissed. (Dkt. No. 24, at 10.) In addition, as set forth above in Part III.A.1.c. of his Decision and Order, Plaintiff's First Claim is dismissed as against Defendant Knapp. (Dkt. No. 24, at 10.)

After carefully considering the matter, the Court denies Defendants' motion to dismiss Plaintiff's claims for permanent injunctive relief as against Defendants Delaney and Annucci.

"The Due Process Clause requires that the parole conditions imposed by the State of New York or its agents be 'reasonably related to [the parolee's] prior conduct or to the government's interest in his rehabilitation.'" *Yunus*, 2018 WL 3455408, at *35 (quoting *Singleton*, 210 F. Supp. 3d at 374). "A parolee may seek judicial intervention-including 'tailoring or invalidation'-where 'the condition is not related to the parolee's criminal history or to the State's interests.'" *Id.* (quoting *Robinson v. New York*, 09-CV-0455, 2010 WL 11507493, at *6 [N.D.N.Y. Mar. 26, 2010] [Sharpe, J.] ). "This 'limited due process right,' which entitles a parolee to 'conditions of parole that are reasonably related to his prior conduct or to the government's interest in his rehabilitation,' *Singleton*, 210 F. Supp. 3d at 374, may be enforced in federal court." *Id.* (citing *Maldonado v. Fischer*, 11-CV-1091, 2013 WL 5487429, at *4 [W.D.N.Y. Sept. 30, 2013]).

**\*8** As a result, the Court rejects Defendants' argument that Plaintiff must pursue an Article 78 proceeding in New York State courts to obtain the permanent injunction he seeks. (Dkt. No. 21, Attach. 1, at 14-16.) While Plaintiff could have sought review of his parole conditions in an Article 78 proceeding, he was not required to. *Yunus*, 2018 WL 3455408, at *4; *see also Maldonado*, 2013 WL 5487429, at *4 ("Should plaintiff be granted parole at some point in the future, and should parole

officials impose similar conditions, plaintiff may seek review of those conditions through an article 78 petition or another action in this court"). [7]

[7]   Defendants do not cite to, and the Court is not aware of, any case in which a request for a permanent injunction was dismissed because the plaintiff could have brought an Article 78 proceeding in New York State court to review the special conditions of his or her parole.

The Amended Complaint alleges facts plausibly suggesting that, notwithstanding the permissive language in the Family Contact Condition that allows for permission from his parole officer, the Family Contact Condition is a bar on Plaintiff's ability to live with his minor son. In addition, the Family Contact Condition clearly prohibits any unsupervised contact between Plaintiff and his minor son.

As a result, Defendants are not entitled to dismissal of the First Claim to the extent it seeks injunctive relief against Defendants Annucci and Delaney.

### B. Plaintiff's Second Claim

#### 1. Whether the Amended Complaint Alleges Facts Plausibly Suggesting the Personal Involvement of Defendants Kellar and White

After carefully considering the matter, the Court grants Defendants' motion to dismiss the Second Claim as against Defendants Kellar and White because the Amended Complaint fails to allege facts that plausibly suggest their personal involvement in the imposition or enforcement of the Computer Condition for the reasons stated in Defendants' memoranda of law and as discussed above in Parts III.A.1.a. and III.A.1.b. of this Decision and Order. (Dkt. No. 21, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 25 [Defs.' Reply Letter].)

#### 2. Whether Plaintiff's Second Claim Should Be Dismissed to the Extent It Seeks Monetary Damages Based on the Doctrine of Qualified Immunity

After carefully considering the matter, the Court grants in part and denies in part Defendants' motion to dismiss Plaintiff's

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 243 of 267
Ennis v. Annucci, Not Reported in Fed. Supp. (2019)
2019 WL 2743531

Second Claim to the extent it seeks monetary damages based on the doctrine of qualified immunity.

As set forth above in Part III.A.2. of this Decision and Order, "[t]he doctrine of qualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [1982]).

On June 19, 2017, in *Pakingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court held for the first time that registered sex offenders cannot be routinely or categorically barred from social media, even where–as in the North Carolina at issue there–the prohibition extends only to websites that could be used by minors. *Yunus*, 2018 WL 3455408, at *30. "Following *Packingham*, state and federal cases around the country have invalidated a variety of broad-based internet or social media restrictions imposed on sex offenders simply because they are sex offenders. To survive a constitutional challenge, any such restriction must be narrowly tailored to the history or known proclivities of the individual parolee." *Id.* (*see, e.g., Doe v. Kentucky*, 283 F. Supp. 3d 608, 613 [E.D. Ky. 2017] [holding that statute prohibiting registered sex offender from accessing all social media websites that could be used by minors was not sufficiently "tailored" to pass constitutional muster, notwithstanding Doe's conviction for possessing child pornography, and enjoining defendants from enforcing the statute "not only against Mr. Doe, but altogether"]; *Mutter v. Ross*, 240 W.Va. 336, 811 S.E.2d 866, 873 [W. Va. 2018] [noting that "*Packingham* made no exception for parolees" and invalidating special condition of parole preventing sex offender from accessing the internet where he had no "history of using the internet to engage in criminal behavior"]; *cf. United States v. Rock*, 863 F.3d 827, 830-32 [D.C. Cir. 2017] [upholding supervised release condition prohibiting sex offender from possessing a computer or going online without prior approval because Rock pleaded guilty to "distributing" child pornography "over the internet," such that as to him the restriction was "narrowly tailored" and not "arbitrary"] ). Before *Packingham*, which was decided on June 19, 2017, this right was not clearly established.

**\*9** The Amended Complaint alleges that Plaintiff was not charged with any internet-related criminal conduct, sexual or otherwise. (Dkt. No. 6, at 4-5.) However, Defendants imposed several special conditions on Plaintiff regarding his use of a computer, technology, and the internet. (*Id.* at 27, 30-34.) For example, the Amended Complaint alleges that Plaintiff has not been permitted to use the computer at the Jefferson County Law Library to conduct legal research or to type and print his court motions. (*Id.* at 16.) In addition, the Amended Complaint alleges that Plaintiff has not been permitted to own a laptop to continue his education and conduct business. (*Id.*)

As a result, Defendants Knapp, Delaney, and Pettit [8] are entitled to the doctrine of qualified immunity for "any First Amendment deprivations that [P]laintiff suffered at [their] hands prior to June 19, 2017, when *Packingham* was decided" because "[p]rior to *Packingham*, it was not 'clearly established' that a social media [or computer] ban would violate the constitutional rights of parolees such as [P]laintiff." *Yunus*, 2018 WL 3455408, at *33. As to any First Amendment deprivations that Plaintiff allegedly suffered after June 19, 2017, these three Defendants are not entitled to the doctrine of qualified immunity with regard to this claim.

[8]     Plaintiff cannot recover monetary damages against Defendant Annucci in his official capacity. *See, supra,* note 6 of this Decision and Order.

### 3. Whether Plaintiff's Second Claim Should Be Dismissed to the Extent It Seeks a Permanent Injunction

As set forth above in Part III.A.3. of this Decision and Order, Plaintiff is entitled to seek review of the conditions of his parole in federal court. The Amended Complaint alleges facts plausibly suggesting that, notwithstanding the permissive language in the Computer Condition which allows for permission from his parole officer, that the condition is a bar on Plaintiff's ability to use a computer or other technology for legitimate purposes.

As a result, Defendants are not entitled to dismissal of the Second Claim to the extent it seeks injunctive relief against Defendants Knapp, Annucci, and Delaney.

For all of these reasons, Defendants' motion to dismiss the Amended Complaint is granted in part and denied in part.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 21) is **GRANTED in part** and **DENIED in part**, in that Plaintiff's Amended Complaint is **DISMISSED** against

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 244 of 267

**Ennis v. Annucci, Not Reported in Fed. Supp. (2019)**

2019 WL 2743531

Defendants Kellar and White, Plaintiff's First Claim is **DISMISSED** against Defendant Knapp, Plaintiff's First Claim **SURVIVES** against Defendant Pettit for monetary damages, against Defendant Delaney for monetary damages and injunctive relief, and against Defendant Annucci for injunctive relief, and Plaintiff's Second Claim **SURVIVES** against Defendant Pettit for monetary damages for any actions that occurred after June 19, 2017, against Defendant Delaney for monetary damages for any actions that occurred after June 19, 2017, against Defendant Knapp for monetary damages for any actions that occurred after June 19, 2017, and injunctive relief, and against Defendant Annucci for injunctive relief;

**ORDERED** that the remaining Defendants (Knapp, Pettit, Delaney, and Annucci) file an Answer to the Plaintiff's Amended Complaint (Dkt. No. 6) within **FOURTEEN (14) DAYS** of the date of this Decision and Order pursuant to Fed. R. Civ. P. Rule 12(a)(4)(a), and this case is referred back to U.S. Magistrate Judge Thérèse Wiley Dancks for the setting of pretrial scheduling deadlines.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2743531

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2419142
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Posr A. POSR, Plaintiff,

v.

The CITY OF NEW YORK; Mayor Michael Bloomberg,
in his individual and official capacity; the New York
Police Department; New York Police Commissioner
Raymond Kelly, in his individual and official capacity;
New York Police Officer Peter Ueberacher, in his
individual and official capacity; New York Police
Officer Pedro Rivera, in his individual and official
capacity; and Police Officer Christine Pimentel, in
her individual and official capacity, Defendants.

No. 10 CIV 2551(RPP).
|
June 4, 2013.

Attorneys and Law Firms

Posr A. Posr, Howard Beach, NY, pro se.

Brian Jeremy Farrar, Assistant Corporation Counsel, New
York City Law Department, New York, NY, for Defendants.

## OPINION & ORDER

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Pursuant to 42 U.S.C. § 1981, § 1983, and New York
State law, *pro se* plaintiff Posr A. Posr brings this action
against the City of New York (the "City"), New York
City Mayor Michael Bloomberg, the New York City Police
Department ("NYPD"), NYPD Commissioner Raymond
Kelly, and NYPD Officers Peter Ueberacher, Pedro Rivera,
and Christine Pimentel (collectively, Defendants). (*See* Am.
Compl. at 1, April 2, 2012, ECF No. 42.) Defendants move
for dismissal of several of Plaintiff's claims under Rule 12(c)
of the Federal Rules of Civil Procedure and for summary
judgment under Rule 56 on all of Plaintiff's remaining claims.
(*See* Mot. to Dismiss Am. Compl., ECF No. 46; *see also*
Mem. in Supp. of Mot. to Dismiss ("Dismiss Mem."), ECF
No. 47 (incorporating arguments raised in Mem. in Supp. of
Mot. for Summ. J. ("Summ. J. Mem."), ECF No. 27).) For the
reasons stated below, the Court grants Defendants' motions,

dismisses Plaintiff's claims, and enters summary judgment in
favor of Defendants.

## I. FACTUAL BACKGROUND

### A. The Incident at West 123rd Street on March 9, 2009

Describing himself as "a male of Black African
ancestry," (Am.Compl.1), Plaintiff alleges that, at
approximately 11:03 a.m. on Monday, March 9, 2009, he
emerged from the Pelham Fritz Recreation Facility in Marcus
Garvey Park, walked one block north, turned onto 123rd
Street, and started walking west, (*id.* ¶¶ 1–2); that he then
stopped walking at 10 West 123rd Street, [1] where he put his
gym bag down on "a 1.5 foot concrete cube," which he viewed
as marking "the boundary between the public sidewalk ...
and the courtyard of [a] private property;" and that he next
unzipped his gym bag, retrieved his wallet from inside his
bag, zipped the bag closed, lifted the bag, and proceeded west
towards his residence at 136 West 123rd Street. (*Id.* ¶¶ 3, 5–7.)

[1]     Plaintiff and Defendants both agree that Plaintiff
was on West 123rd Street in the vicinity of Marcus
Garvey Park West and Malcolm X Boulevard
at approximately 11:00 a.m. on March 9, 2009.
(*See* Am. Compl. at 1; Answer to Am. Compl.
("Answer") ¶ 8, ECF No. 43.) Plaintiff asserts,
however, that he stopped walking in front of
10 West 123rd Street, (Am.Compl.¶ 3), whereas
Officer Ueberacher stated that he observed Plaintiff
standing at 6 West 123rd Street, (Decl. of Brian
J. Farrar in Supp. of Mot. for Summ. J. ("Farrar
Summ. J. Decl.") Ex. C ("Ueberacher Decl.") ¶ 2,
July 22, 2011, ECF No. 28). Neither Plaintiff nor
Defendants discuss the discrepancy between these
addresses, and so the Court finds that the difference
is immaterial to resolving the issues presented here.
In addition, 10 West 123rd Street and 6 West 123rd
Street are both located between Marcus Garvey
Park West and Malcolm X Boulevard, which is also
called Lenox Avenue. In their letters and briefings,
parties refer to both of these street names, but for
simplicity, the Court adopts Malcolm X Boulevard
as its reference.

In his response declaration, Officer Ueberacher stated that,
on March 9, 2009, he was on 123rd Street, driving west in a
marked patrol car, when he observed Plaintiff as follows:

I observed Plaintiff Posr A. Posr standing in the courtyard of 6 West 123rd Street in Manhattan. The front door of that location was open and I observed Plaintiff placing unidentified objects into a red duffle bag. I had been advised by my command that there had been a recent spike in burglaries in that location. I was further advised that suspects committing these burglaries often strike during the midday hours and steal items that can easily be concealed in bags and knapsacks. (Ueberacher Decl. ¶ 2; *see also* Am. Compl. ¶¶ 9–12.) After observing Plaintiff pick up his bag and start walking, Officer Ueberacher pulled his car over and approached Plaintiff. (Ueberacher Decl. ¶ 3; Am. Compl. ¶¶ 12–15.)

Officer Ueberacher declared that, after he approached Plaintiff, the following interaction ensued:

I asked Plaintiff whether he lived at 6 West 123rd Street and he informed me that he did not. I then asked Plaintiff why he was standing in front of that location and he refused to answer. I asked Plaintiff for his identification but he also refused. I explained to Plaintiff that I was asking these questions because there ha[d] been a high incidence of burglaries in that particular area.

**\*2**  (Ueberacher Decl. ¶ 4.)

In his Amended Complaint, Plaintiff alleges that Officer Ueberacher observed him "put his bag down, bend over his bag, move his arms about his bag, pick up the bag, and proceed west," (Am.Compl.¶ 12); that Officer Ueberacher then approached and asked Plaintiff where he had come from,

(*id.* ¶¶ 14–15); that Plaintiff did not respond to the question, and instead asked "why [Officer Ueberacher] wanted to know, or was there a problem, or some such question;" (*id.* ¶ 16); that Officer Ueberacher thereafter asked him for identification, (*id.* ¶ 20), but that, rather than turning over any identification, Plaintiff asked if a crime had been committed, (*id.* ¶ 21); that Officer Ueberacher responded to the question by stating Plaintiff had been observed putting a duffel bag down and putting something into the bag, (*id.* ¶ 22); that Plaintiff asked Officer Ueberacher if doing so was a crime, (*id.* ¶ 23); and that Officer Ueberacher replied, "it was not a crime," (*id.* ¶ 24), but that "there had been a lot of burglaries in the area," (*id.* ¶ 25).

Next, Plaintiff alleges that he inquired "if a burglary at 10 West 123rd Street had been reported," (*id.* ¶ 27); that Officer Ueberacher responded that "he was investigating a burglary." (*id.* ¶ 29); that Plaintiff queried if he "fit the description of a burglar," (*id.* ¶ 31); but that Officer

Ueberacher "did not say Plaintiff fit the description of a burglar," (*id.* ¶ 33); that he told Officer Ueberacher "if this were a white neighborhood, this wouldn't be happening," (*id.* ¶ 36); that Officer Ueberacher responded, "Do you want me to stop a white guy?" (*id.* ¶ 37); that Plaintiff replied yes, and pointed out a white person whom he thought Officer Ueberacher should stop, (*id.* ¶¶ 3 8, 40); and that Officer Ueberacher refused to stop this white person because the person was carrying a clipboard, (*id.* ¶ 41).

Plaintiff further alleges that, after Officer Ueberacher allegedly refused to stop the white passerby, Plaintiff asked to speak with Officer Ueberacher's supervisor, (*id.* ¶ 45; *see also* Ueberacher Decl. ¶ 5); that Officer Ueberacher placed a call on the radio for his sergeant, Yolanda Cuadrado, to respond, (*id.*); that while Officer Ueberacher was on the radio, Plaintiff called 911 on his cell phone, (Am.Compl.¶ 48); that, within minutes of Plaintiff's 911 call, four uniformed police officers arrived on the scene, (*id.* ¶ 49); that these officers stood around him in a threatening semi-circle, (*id.* ¶ 51); that Sergeant Cuadrado arrived shortly thereafter and spoke with Officer Ueberacher and then with Plaintiff, (Am. Compl. ¶¶ 53–57; Ueberacher Decl. ¶¶ 5–6; and that she then spoke with Plaintiff and told him that he "was free to go;" and that, as soon as she did so, he left the scene, (Am.Compl.¶ 57).

Plaintiff alleges, however, that prior to Sergeant Cuadrado telling him that he was free to go, he twice asked Officer Ueberacher if he could go, (*id.* ¶¶ 34, 43); that he also asked

the four responding 911 officers if he could go (*id.* ¶ 50); and that, each time he asked, he was told that he was not free to go. (*id.* ¶¶ 35, 44, 51). Officer Ueberacher disputed this contention, stating:

> **\*3** The entire interaction with Plaintiff lasted less than ten minutes. Plaintiff was not handcuffed during this encounter. No physical force was used on Plaintiff, no threats were made, and Plaintiff was free to leave at any time.

(Ueberacher Decl. ¶ 7.)

Following the March 9, 2009 incident on West 123rd Street, Officer Ueberacher completed a report for the NYPD Stop, Question & Frisk System (the "Stop & Frisk Report"). (*See* Letter from Defs. to the Court dated Nov. 16, 2012, Ex. B, ECF No. 62.) In the report, Officer Ueberacher wrote that he had stopped a person, whose name was listed as "Unknown," after observing that person for two minutes. (*Id.*) The report indicated that the stop had lasted for seventeen minutes and included the following notes:

*Circumstances Leading to Stop*

— Suspects, Actions–Fits Description;

— Suspects, Actions–Other–At location putting unknown objects in duffle bag.

*Additional Factors*

— Report from Victim/Witness/Officer;

— Area has high incidence of reported offense;

— Evasive, false, or inconsistent responses to officers' questions;

-Other: Door to 6 West 123rd Street left open where subject 1st observed.

(*Id.*)

**B. Plaintiff's Freedom of Information Law Act Complaints**

i. *March 12, 2009 Request*

On March 12, 2009, three days after the incident with Officer Ueberacher, Plaintiff submitted a request pursuant to New York State's Freedom of Information Law Act ("FOIL"). seeking: (1) the audio tape and SPRINT Report of the 911 call that he had made from his cell phone on March 10, 2009;[2] (2) information on the number of areas in Harlem that the NYPD had designated as "high burglary" between March 10, 2008 and March 10, 2009; and (3) information on the NYPD's guidelines for designating an area as "high burglary." (*See* Letter from Defs. to Court dated Feb. 23, 2012, Ex. B ("Pl.'s 2009 FOIL File") at 2–5, ECF No. 39; *see also* Am. Compl. ¶¶ 68–70, 76–77.) Plaintiff alleges that he submitted this FOIL request to Officer Rivera, and that after he did so, Officer Rivera "refused to time-stamp or otherwise render a receipt" acknowledging the submission of Plaintiff's request. (Am.Compl.¶¶ 68–72.)

[2]    Plaintiff entered the wrong date in his FOIL request as the 911 call that Plaintiff made during his encounter with Officer Ueberacher occurred on *March 9, 2009,* not on *March 10, 2009.* (*See* Am. Compl. ¶ 77.)

On April 13, 2009, Sergeant James Russo sent Plaintiff a letter acknowledging the receipt of Plaintiff's March 12, 2009 FOIL request. (*Id.* at 10.) In the letter, Sergeant Russo informed Plaintiff that, "[d]ue to the large volume of pending FOIL requests, which are processed in the order in which they are received, and due to the fact that NYPD records are kept in many offices located in five counties," a determination on Plaintiff's request would not be reached until July 17, 2009.(*Id.*) A few weeks later, on April 29, 2009, Sergeant Russo assigned Plaintiff's FOIL request to Officer Pimentel. (*Id.* at 6–7.) Thereafter, the Tape and Records Unit of the NYPD Communications Division searched for the record of a 911 call made from Plaintiff's cell phone on March 10, 2009–the date that Plaintiff's FOIL request had specified-but the search returned "negative results." (*Id.* at 2–5, 7–8.) On August 11, 2009, Sergeant Russo sent Plaintiff a letter stating that the NYPD FOIL Unit had been "unable to locate records responsive to [his] request based on the information provided." (*Id.* at 9.) The letter advised that, if Plaintiff desired, he could appeal the decision in writing within thirty days. (*Id.*) However, Plaintiff does not claim, nor does his FOIL file indicate, that he appealed this decision.

ii. *April 13, 2012 Request*

Case 5:20-cv-00535-BKS-TWD    Document 45    Filed 08/24/22    Page 248 of 267
Posr v. City of New York, Not Reported in F.Supp.2d (2013)
2013 WL 2419142

**\*4** On April 13, 2012, Plaintiff filed an additional FOIL request seeking verification that he had "signed in" to the Pelham Fritz Recreation Facility in Marcus Garvey Park on March 9, 2009. (*See* Nov. 16, 2012 Letter Ex. A ("Pl.'s 2012 FOIL File").) In response, on June 12, 2012, a New York City Parks & Recreation Records Access Officer mailed Plaintiff a copy of his "Membership Usage Report." [3] (*Id.* at 2, 4–11.) The Membership Usage Report showed that Plaintiff had signed in to the Pelham Fritz Recreation Facility on March 9, 2009 at 9:59 a.m. (*Id.* at 5.) The report did not reflect the time when Plaintiff left the facility. (Cf.*id.*)

[3]   On November 16, 2012, Defendants submitted a letter to the Court, copied to Plaintiff, stating that the "NYC Parks Department ... attempted to provide Plaintiff with copies of his attendance records, pursuant to Plaintiff's April 13, 2012 FOIL request, [but] the mailing was returned to sender when Plaintiff failed to update his current address." (Nov. 16, 2012 Letter at 1.)

## II. PROCEDURAL HISTORY

### A. The Complaint

On March 4, 2010, Plaintiff filed his original Complaint against the City of New York, Mayor Bloomberg, the NYPD, Commissioner Kelly, and Officer Ueberacher. [4] (*See* Orig. Compl. at 1, ECF No. 2.) Pursuant to 42 U.S.C. § 1983, the Complaint alleged that Officer Ueberacher had violated Plaintiff's right to be free from unreasonable seizure under the Fourth Amendment, his right to equal protection under the Fourteenth Amendment, and his right to be free from an assault on his dignity under the Ninth Amendment. (*id.* ¶¶ 52.1–57.) The Complaint further alleged that Officer Ueberacher had violated 42 U.S.C. § 1981, (*id.* ¶ 53), as well as numerous New York State laws, (*id.* ¶¶ 44–52). In addition, the Complaint alleged that the NYPD and the City of New York, with support from Mayor Bloomberg and Commissioner Kelly, had violated Plaintiff's Fourteenth and Ninth Amendment rights by "adopting, condoning, and executing a policy of seizing Blacks walking in Harlem without probable cause to believe such Blacks ha[d committed] or [we]re about to commit a crime." (*id.* ¶¶ 50–51.)

[4]   Plaintiff's original Complaint named additional defendants, but because these parties are not relevant to the disposition of Defendants' motions,

they will not be discussed herein. The Court will also not recount the full procedural history of this case as it has already been set forth in previous orders. (*See, e.g.,* Order Granting Plaintiff's First Mot. to Compel (the "First Compel Order"), Jan. 4, 2012, ECF No. 36.)

On July 22, 2011, Defendants filed a Rule 56 motion arguing that they were entitled to summary judgment because:

> (1) Plaintiff fail[ed] to state a cognizable § 1983 claim; (2) Defendant Officer Ueberacher [wa]s entitled to qualified immunity; (3) Plaintiff fail[ed] to state a claim for racial discrimination; (4) Defendants Raymond Kelly and Michael Bloomberg had no personal involvement in the incident alleged in the Complaint; (5) Plaintiff fail[ed] to state a *Monell* claim; [and] (6) the New York City Police Department [wa]s not a suable entity.

(Summ. J. Mem. at 3). Defendants also requested that the Court decline to exercise its jurisdiction over any of Plaintiff's state law claims. (*Id.*)

### B. Plaintiff's First Motion to Compel

In response to Defendants' Rule 56 motion, Plaintiff submitted a motion to compel production of records that he considered material to his opposition to summary judgment. (Mot. to Compel, ECF No. 30.) Following briefing and letters from both parties, (see ECF Nos. 31–35), the Court issued an Order granting Plaintiff's motion to compel in its entirety, (First Compel Order at 12). The Order directed Defendants to provide Plaintiff with:

**\*5** (1) The entire SPRINT report and [the audio-taped] 911 call (or [to] provide sufficient evidence that an appropriate search ... [was] made and that th[e records] do not exist; and

(2) Evidentiary support for [Officer] Ueberacher's assertion that prior to March 9, 2009, he had been advised by his command "that there had been a recent spike of burglaries" in the vicinity of West 123rd Street between Marcus

Garvey Park West and Malcolm X Boulevard, and that the burglaries often occurred "during the midday hours, and involved items that c[ould] easily be concealed in bags and knapsacks."

(*Id.* (citing Ueberacher Decl. ¶ 2) (alterations in original omitted).)

In accordance with the Court's Order, Defendants provided Plaintiff with: (1) a copy of his March 12, 2009 FOIL file showing that the his 911 call records had been searched for on August 11, 2009; (2) a copy of the NYPD's audio retention policy stating that the NYPD records all 911 calls and digitally stores them on a voice recording system for 180 days, at which point a computer program automatically deletes them; and (3) proof that the audio file of Plaintiff's 911 call no longer existed because the call had been recorded more than 180 days prior to the Court's Order. (*See* Feb. 23, 2012 Letter.) Additionally, Defendants provided Plaintiff with an affidavit from Sergeant Cuadrado. (*See id.* Ex. C ("Cuadrado Aff." dated Jan. 25, 2012).) In the Affidavit, Sergeant Cuadrado stated that, as the Patrol Sergeant for the NYPD's 28th Precinct from December 2008 until November 2010, she "was responsible for informing the officers under [her] command of crimes that had occurred within the confines of the precinct, and the locations of the crimes." (*id.* ¶ 3.) She explained that "[t]he purpose of informing them of such, was so that when the officers went on patrol, they would pay special attention to the areas where crimes had been occurring." (*Id.*) Sergeant Cuadrado also stated:

> From approximately March 1, 2009 to March 9, 2009, I informed the patrol officers at the start of their tours, including Police Officer Ueberacher, that there was a spike in residential burglaries within the confines of the 28th Precinct, which includes the vicinity of Marcus Garvey Park West and Malcolm X Boulevard in Manhattan. The officers, including Police Officer Ueberacher, were informed that many of these burglaries were occurring during the daytime hours, and involved stolen items that could easily be concealed in a backpack or duffle bag.

(*id.* ¶ 4.)

**C. The Amended Complaint**

On January 27, 2012, Plaintiff sought leave to amend his original Complaint so that he could add claims related to his March 12, 2009 FOIL request. (Not. of Mot. to Am. Compl. at 1, 3–4, ECF No. 37.) The Court granted Plaintiff leave to amend on March 13, 2012. (Order, Mar. 13, 2012, ECF No. 40.) On April 2, 2012, Plaintiff filed his Amended Complaint, alleging that the City of New York had violated Plaintiff's Fifth Amendment due process rights by maintaining a policy of not time-stamping any FOIL requests, (*id.* ¶ 109), and that Officer Rivera had violated Plaintiff's Fifth Amendment due process rights by refusing to time-stamp his particular FOIL request, (*id.* ¶¶ 111–14). In addition, the Amended Complaint alleged that Officer Pimentel had violated Plaintiff's Fifth Amendment rights by withholding the burglary data and the 911 call records requested by Plaintiff.[5] (*id.* ¶¶ 109.)

[5]    When filed, Plaintiff's Amended Complaint named Officer Rivera and "NYPD X" as the defendants involved in the processing of his March 12, 2009 FOIL request. (Am. Compl. at 1.) Plaintiff later requested that "NYPD X" be identified as Officer Christine Pimentel. (Pl.'s Letter to the Court, July 2, 2012, ECF No. 55.) Defendants opposed this request "because the three year statute of limitations for [Plaintiff's] claim pursuant to § 1983 against Pimentel had lapsed." (Defs.' Letter to Court at 1, Aug. 10, 2012, ECF No. 56.) By Order dated November 5, 2012, this Court granted Plaintiff's request to substitute Officer Pimentel with "NYPD X" without prejudice to Defendants' Motion to Dismiss on statute of limitation grounds. (Order at 4, Nov. 5, 2012, ECF No. 59.)

**\*6** On April 16, 2012, Defendants filed an Answer to Plaintiff's Amended Complaint. The Answer included a footnote, arguing that Defendants' July 22, 2011 summary judgment motion remained pending, and that Plaintiff's claims should all be dismissed for the reasons set forth in their summary judgment motion and in letters that they had sent to the Court on February 23, 2012 and March 9, 2012. (Answer at 1 n. 3.) In an Order dated April 20, 2012, the Court directed Defendants to "serve and file a separate submission stating these grounds explicitly so [that] Plaintiff [could] ha[ve] notice of Defendants' grounds." (Order, Apr. 20, 2012, ECF No. 44.) Thereafter, on May 5, 2012, Defendants filed

2013 WL 2419142

a Rule 12(c) motion to dismiss the FOIL-related claims that Plaintiff had included in his Amended Complaint. (Dismiss Mem. at 2.) As to Plaintiff's other claims arising from the March 9, 2009 incident with Officer Ueberacher, Defendants "respectfully refer[ed]" Plaintiff and the Court to the summary judgment motion that they had filed on July 22, 2011, and to the February 23, 2012 letter and March 9, 2012 letter attached to their motion to dismiss. (*Id.; see also* Dismiss Mem. Exs. C & E.)

**D. Plaintiff's Request for a Second Order to Compel**

After Defendants filed their motion to dismiss, Plaintiff submitted multiple letters to the Court requesting additional discovery and seeking an extension of time in which to respond to "Defendants' summary judgment motion." (*See* Letter from Plaintiff to Court dated May 17, 2012, ECF No. 52; *see also* Order ("Second Compel Order"), Nov. 5, 2012, ECF No. 59 (summarizing letters filed by Plaintiff on May 17, July 2, and Aug. 22, 2012, as well as Defendants' Aug. 10, 2012 response letter).) In one of his letters, Plaintiff reported that Defendants had failed to provide him with (1) a copy of Officer Ueberacher's Stop & Frisk Report; (2) the burglary data that he had requested in his March 12, 2009 FOIL request and upon which Sergeant Cuadrado had relied in her Affidavit; and (3) the park attendance records that he had asked for in his April 13, 2012 FOIL request. (*See* Letter from Plaintiff to Court dated July 2, 2012, ECF No. 55.) Thus, on November 5, 2012, the Court issued an order directing Defendants to produce these records to Plaintiff. (Second Compel Order at 3–4.)

Accordingly, on November 16, 2012, Defendants submitted a copy of Officer Ueberacher's Stop & Frisk Report and a copy of Plaintiff's park attendance "Membership Usage" records. (*See* Nov. 16, 2012 Letter Exs. A & B; *see also* supra n. 4.) In the letter transmitting these materials, Defendants stated that they were "unaware of any 'data' ... relied on by Sergeant Cuadrado," but that they were "continuing to look into this matter." (*Id.* at 1.) Defendants closed their letter by requesting that their "July 2011 motion for summary judgment and [their] May 2012 motion to dismiss be granted." (*Id.* at 2.) The Court then directed Defendants to "advise [it] and Plaintiff of the result of their investigation [into the burglary data] by December 7, 2012." (*See id.* at 3 (endorsement by Court).) Thus, on December 7, 2012, Defendants submitted a letter stating that they remained unaware of any specific data relied on by Sergeant Cuadrado because "the information she [had] conveyed to the police officers under her command ... was generated by word-of-mouth, and communicated verbally

among supervisors." (Letter from Defs. dated Dec. 7, 2012, ECF No. 64.) The Court issued an Order directing Plaintiff to file any further papers by February 4, 2013. (Order, Jan. 24, 2012, ECF No. 65.) Plaintiff did not submit any additional papers to the Court, and the issues are now deemed to be fully briefed.

## III. APPLICABLE LAW—42 U.S.C. § 1983

### A. Individual Liability

**\*7** Section 1983 provides a remedy to persons who, under color of state law, have been deprived of "any rights, privileges, or immunities secured by the Constitution." 42 U.S.C.

§ 1983. The Supreme Court has explained that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Thus, in order to be held liable under § 1983, a state actor must be, or have been, personally involved in the violation alleged. *See Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution."). When a state actor is sued under § 1983 for being personally involved in a constitutional violation, he may be granted qualified immunity from suit. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (explaining rationale behind offering government officials qualified immunity). To determine if a state actor is entitled to such immunity, a court must decide (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right;" and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal references omitted). A court may approach this two-pronged analysis in whatever order that it deems appropriate. *Id.* at 236.

### B. Municipal Liability

Conversely, a plaintiff seeking to sue a municipality under § 1983 must show that an identified municipal "policy," "custom," or "practice" was the "moving force" behind the harm alleged. *See Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611

2013 WL 2419142

(1978). It is not enough for a plaintiff to allege that a municipality's employee acted unconstitutionally in a single instance, or that a municipality's employees are guilty of some wrongdoing. *See id.* at 691 ("A municipality cannot be held liable under § 1983 on a respondeat superior theory."). Rather, a plaintiff must prove (1) that a written discriminatory policy exists; or (2) that "the discriminatory practices of city officials are ... so permanent and well settled as to constitute a custom or usage with the force of law;" or that (3) "the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870–71 (2d Cir.1992) (internal quotation marks omitted).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard [6]

[6]    The Court is mindful that Plaintiff is proceeding *pro se* in this civil rights action. Plaintiff's submissions will therefore be held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) ( "[T]he pleadings of a pro se plaintiff must be read liberally and should be interpreted to raise the strongest arguments that they suggest.") (internal quotation marks omitted). The Court's liberal construction of Plaintiff's submissions does not, however, relieve Plaintiff of his burden to show that his pleadings contain factual allegations sufficient to raise a "right to relief above the speculative level." *See Bridgewater v. Taylor,* 698 F.Supp.2d 351, 357 (S.D.N.Y.2010) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Nor does a party's *pro se* status relieve him from the usual summary judgment requirements. *See Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995).

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996); *see also Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010) (explaining that "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and that "[a] fact is material if it might affect the outcome of the suit under governing law"). A party moving for summary judgment bears the burden of proving that no genuine issue of material fact exists, or that the evidence supporting the non-moving party's case is so slight that no rational jury could find in the non-moving party's favor. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994). The party opposing summary judgment must then come forward with facts sufficient to show that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In so doing, the opposing party must show more than "[t]he mere existence of a scintilla of evidence in support of [its] position." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Plaintiff's Fourth Amendment Claim

**\*8** Plaintiff's Fourth Amendment claim alleges that Officer Ueberacher stopped Plaintiff "without reasonable or probable cause to believe a crime had been, was being, or was about to be committed and without reasonable or probable cause to believe that Plaintiff had committed, was committing, or was about to commit a crime." (Am.Compl.¶ 104.) The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const., amend. IV. The Supreme Court has made clear that a "seizure" occurs when a police officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Terry,* 392 U.S. 1, at 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Said another way, Fourth Amendment scrutiny is triggered when a reasonable person would have believed that he was not free to leave and go about his business. *See INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Where an individual does not consent to a police encounter and a police officer has reasonable articuable suspicion that "criminal activity may be afoot," the Fourth Amendment permits that officer to briefly detain and question a person for investigative purposes. *See Terry,* 392 U.S. at 30. For such

an investigative stop, reasonable suspicion demands that an officer be "able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Reasonable suspicion may, however, be based on "a series of acts, each perhaps innocent in itself, but which taken together warrants further investigations." Terry, 392 U.S. at 22.

i. *The encounter between Officer Ueberacher and Plaintiff constituted an investigative stop under the Fourth Amendment.*

As the party opposing summary judgment, Plaintiff is entitled to have the evidence construed in the light most favorable to him and to have all inferences drawn in his favor. *See Thomas,* 165 F.3d at 142. Thus, for the purpose of deciding Defendants' summary judgment motion, the Court assumes that, as Plaintiff asserts, Officer Ueberacher told Plaintiff that he was not free to leave the scene of his encounter with Officer Ueberacher. (*See* Am. Compl. ¶¶ 34–35, 43–44.) The Court also assumes that, when the four unnamed responding 911 officers arrived at the scene, they stood around Plaintiff in a threatening semi-circle and at least one of these officers told Plaintiff that he was not free to leave. (*id.* ¶¶ 50–52.) Under these circumstances, a reasonable person would not have felt free to disregard the police and to go about his business. *See Hodari D.,* 499 U.S. at 628.

**\*9** In addition, the Court notes that Plaintiff reported not feeling free to leave the scene and that he did not actually leave the scene until Sergeant Cuadrado told him that he could go. (Am.Compl.¶¶ 53–57.) The Court further notes that Officer Ueberacher completed a report for the NYPD's Stop, Question & Frisk System after his encounter with Plaintiff, a fact which suggests that Officer Ueberacher also viewed the encounter to be non-consensual. (*See* Nov. 16, 2012 Letter Ex. B.) Thus, considering these factors together, it is clear that Plaintiff did not consent to the encounter with Officer Ueberacher. Fourth Amendment scrutiny is therefore required as to whether Officer Ueberacher had reasonable articuable suspicion to perform an investigative stop on Plaintiff. See *Mendenhall,* 446 U.S. at 553–54 (concluding that "foundation ... for invoking constitutional safeguards" exists "only when" an individual shows that his freedom of movement has been restrained by "means of physical force or a show of authority"); *see also* Terry, 392 U.S. at 30.

ii. *Officer Ueberacher had reasonable articuable suspicion to perform an investigative stop on Plaintiff.*

Both Plaintiff and Officer Ueberacher agree that Officer Ueberacher approached Plaintiff only *after* observing him "put his bag down, bend over his bag, move his arms about his bag, pick up the bag, and proceed west." (Am. Comp. ¶ 12; *see also* Ueberacher Decl. ¶ 2.) Officer Ueberacher stated that he was suspicious of Plaintiff's activities at that time because the front door of a building at 6 or 10 West 123rd Street was ajar-an observation which Plaintiff has not contradicted. (*See* Ueberacher Decl. ¶ 2.) Officer Ueberacher also stated that he was particularly suspicious of Plaintiff's activities because he had previously been told by his commanding officer of "a recent spike in burglaries" in the location around where Plaintiff was observed and that the "suspects committing these burglaries often str[uck] during the midday hours and st[ole] items that c[ould be] easily be concealed in bags and knapsacks." (*Id.*) To this end, at or around the time of the incident, Officer Ueberacher recorded in his Stop & Frisk Report that he had observed Plaintiff in an area with a "high incidence of reported offense." (Nov. 16, 2012 Letter Ex. B.) Moreover, the affidavit submitted by Sergeant Cuadrado confirms that, prior to March 9, 2009, she was also aware of, and did in fact inform, Officer Ueberacher about the burglary pattern in the area. (Cuadrado Aff. ¶ 4.)

Although Plaintiff's presence in the "high-crime area" where he was observed, is not, by itself, sufficient to justify the investigative stop at issue here, the fact that Officer Ueberacher had been told about a recent spike in midday burglaries-taken together with the undisputed facts that a front door near to Plaintiff was open and that near to this open door, Plaintiff was observed bending over his duffle bag and moving his arms about his bag-establish that Officer Ueberacher had reasonable suspicion to briefly stop and question Plaintiff. [7] (*See* Am. Compl. ¶¶ 7, 11; Ueberacher Decl. ¶ 2); *see also Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *Floyd v. City of New York,* 813 F.Supp.2d 417, 442–43 (S.D.N.Y.2011) (concluding that officers had reasonable suspicion to stop and frisk two men whom they observed attempting to unlock front door of a house with a number of different keys in a location that had a midday burglary pattern).

[7]     In arriving at this conclusion, the Court does not reach the question of whether Plaintiff was standing in the courtyard of a building at 6 or 10 West

123rd Street or on the public sidewalk in front of a
building at 6 or 10 West 123rd Street.

**\*10** Moreover, the scope and duration of the investigative
stop that Officer Ueberacher performed on Plaintiff was
reasonable in light of Officer Ueberacher's articulable
suspicion. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d
Cir.1995) ("If an investigative detention is properly premised
upon articulable suspicion, the next inquiry is whether its
scope and duration are reasonable."). The encounter between
Plaintiff and Officer Ueberacher lasted less than twenty
minutes, including the time that Plaintiff waited for the arrival
of Sergeant Cuadrado, whose presence he had requested, and
the officers who were responding to his 911 call. *See Florida
v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229
(1983) ("[A]n investigative detention must be temporary and
last no longer than is necessary to effectuate the purpose of
the stop."). Moreover, the questions that Officer Ueberacher
asked Plaintiff were appropriately tailored to his articulable
suspicion about Plaintiff's actions. *See Terry*, 392 U.S. at 20
(explaining that an investigative stop must be "reasonably
related in scope to the circumstances which justified the
intervention in the first place"). Finally, the investigative stop
performed on Plaintiff was limited to Officer Ueberacher's
questions alone, as Plaintiff was not frisked, searched, or
handcuffed during the encounter. *Cf. Royer*, 460 U.S. at 500
(requiring that whatever investigative methods are employed
be "the least intrusive means reasonably available to verify or
dispel [an] officer's suspicion in a short period of time").

Thus, for the reasons just discussed and in light of the
totality of the circumstances presented, the Court concludes
that Officer Ueberacher had reasonable articuable suspicion
to approach, briefly detain, and question Plaintiff. *See
United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct.
744, 151 L.Ed.2d 740 (2002) (A court "must look at the
totality of the circumstances of each case to see whether
the detaining officer ha[d] a particularized and objective
basis for suspecting legal wrongdoing."). Moreover, because
neither the duration nor the scope of Officer Ueberacher's
investigative stop was unreasonable, summary judgment is
granted to Defendants on Plaintiff's Fourth Amendment claim
against Officer Ueberacher. [8]

[8]     Because Officer Ueberacher did not violate
        Plaintiff's Fourth Amendment rights, there is no
        need to consider if Officer Ueberacher is entitled to
        qualified immunity.

### C. Plaintiff's Fourteenth Amendment Claims

Summary judgment is likewise granted to Defendants on
Plaintiff's Fourteenth Amendment claims. (*See* Am. Compl.
¶¶ 65, 102, 106.) The Fourteenth Amendment prohibits a
state from depriving any person of life, liberty, or property
without due process of law and it also prohibits a state
from denying any person equal protection of the law. U.S.
Const., amend. XIV. Here, Plaintiff claims that the encounter
with Officer Ueberacher on March 9, 2009 led to the
violation of his Fourteenth Amendment rights by Officer
Ueberacher, the City of New York, Mayor Bloomberg, and
Commissioner Kelly. (*id* . ¶ 106.) In addition, Plaintiff claims
that the NYPD, Mayor Bloomberg, and Commissioner Kelly
violated his Fourteenth Amendment rights by "adopting,
condoning, orchestrating, and executing a policy of seizing
Blacks in Harlem and throughout the City of New York
without probable or reasonable cause to believe such Blacks
have committed, are committing, or are about to commit a
crime." [9] (*id.* ¶¶ 65, 102.)

[9]     Plaintiff raises this claim without identifying
        a specific cause of action, but the Court
        construes Plaintiff's claim to be made under the
        Fourteenth Amendment's equal protection clause.
        *See Graham*, 89 F.3d at 79 (emphasizing that a *pro
        se* plaintiff's pleadings must be read liberally and
        interpreted to raise strongest arguments that they
        suggest).

**\*11** As has just been shown, however, Officer Ueberacher
had reasonable articulable suspicion to perform the brief
investigative stop at issue here. By contrast, Plaintiff has
not shown that Officer Ueberacher had reasonable suspicion
to stop, but then declined to stop, the white passerby.
Accordingly, Plaintiff has failed to show that Officer
Ueberacher violated his

Fourteenth Amendment equal protection rights by
impermissibly stopping him on the basis of his race, or on
any other improper ground. *See Floyd*, 813 F.Supp.2d at 444
(dismissing equal protection claim against defendant officers
where court found that officers had reasonable suspicion
to perform investigative stop). Similarly, because Officer
Ueberacher's investigative stop was lawful, Plaintiff has not
shown that the City of New York or the NYPD [10] maintained
an unlawful, racially-motivated municipal policy, custom,
or practice that caused the deprivation of his Fourteenth
Amendment rights. *See Vippolis v. Vill. of Haverstraw,*

768 F.2d 40, 44 (2d Cir.1985) (requiring that, if § 1983 municipal liability to attach, a "causal connection" between a municipality's policy and the deprivation of a plaintiff's constitutional rights must be established), *cert denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987).

10        In addition to failing on the merits, all of Plaintiff's claims against the NYPD must be dismissed because, pursuant to New York City's Charter, the NYPD is not a suable entity. *See* N.Y. City Charter § 396. Section 396 of the Charter specifically states that "[a]ll actions and proceedings for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." *Id.; see also Williams v. New York City Police Dep't,* 930 F.Supp. 49, 54 (S.D.N.Y.1996) ("As an agency of the City of New York, the Police Department is not a suable entity."); *East Coast Novelty Co., Inc. v. City of New York,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992) (dismissing claims against NYPD because district court found that New York City Charter precluded such action against the agency).

Nor has Plaintiff shown that Mayor Bloomberg or Commissioner Kelly adopted a racially-motivated municipal policy or were otherwise personally involved in Plaintiff's encounter with Officer Ueberacher. *See Iqbal,* 556 U.S. at 676 (requiring a plaintiff to "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Plaintiff's Amended Complaint, for example, does not allege that either Mayor Bloomberg or Commissioner Kelly was physically present at or near the West 123rd Street location where Plaintiff's encounter with Officer Ueberacher took place; and it also fails to include any allegations that either defendant directly participated in the investigative stop that Officer Ueberacher performed on Plaintiff. *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (affirming dismissal of claims against defendants where complaint failed to include allegations of personal involvement in the underlying constitutional violations).

Finally, the Court notes that the injunctive relief requested by Plaintiff on his Fourteenth Amendment claims is mooted by New York State law. Specifically, Plaintiff requests that the Court order the City of New York, Mayor Bloomberg, and Commissioner Kelly to "purge and effect a complete erasure of the information in [a] 'profiling database' " that Plaintiff alleges the City maintains. (Am.Compl. § 103.) But Article

140.50 of New York Criminal Procedure Law already forbids a police officer from recording in a computerized or electronic database the name, address, or social security number of a person, such as Plaintiff, who has been stopped, questioned, or frisked by a police officer, but is then released without further legal action. *See* N.Y.Crim. P. Law § 140.50(4) (McKinney). Indeed, Plaintiff's own name was not even recorded by Officer Ueberacher in the Stop & Frisk Report. (*See* Nov. 16, 2012 Letter, Ex. B.)

**D. Plaintiff's Ninth Amendment Claim**

**\*12** Defendants are also granted summary judgment on Plaintiff's Ninth Amendment claim, alleging that Officer Ueberacher, Mayor Bloomberg, and Commissioner Kelly, by "racially profiling and targeting Plaintiff for seizure and search, used state power to assault Plaintiff's value, esteem, worth, and nature as a human being, which assault amounted to an assault on Plaintiff's dignity." (Am.Compl.¶ 107.) Also unsuccessful is Plaintiff's separate claim against the City of New York, Mayor Bloomberg, Commissioner Kelly, and Officer Pimentel for a "declaratory judgment that the Ninth Amendment protects the individual right to dignity and that racial group profiling necessarily assaults an individual's dignity as a human being." (*id.* ¶ 108.)

The Ninth Amendment states that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const., amend. IX. Plaintiff's claims under this amendment fail because the Ninth Amendment is "not an independent source of individual rights." *Jenkins v. C.I.R.,* 483 F.3d 90, 92 (2d Cir.2007). Rather, the amendment "provides a 'rule of construction,' " which "dictates that 'the full scope of the specific guarantees in the Constitution is not limited by the text, but embraces their purpose.' " *Id.* (quoting *United States v. Bifield,* 702 F.2d 342, 349 (2d Cir.1983)). Accordingly, the Ninth Amendment "cannot serve as the basis for a § 1983 claim," and Plaintiff's claims under this Amendment must be dismissed. *See Brown v. City of New York,* No. 11 CIV 1068, 2013 WL 491926, at \*4 (S.D.N.Y. Feb. 8, 2013) (dismissing § 1983 claim premised on violation of Ninth Amendment); *see also Subgidio v. Graiani,* No. 05 CIV 4065, 2006 WL 648229, at \*7 (S.D.N.Y. Mar. 16, 2006) (holding that a Plaintiff's Ninth Amendment claim failed "because that amendment cannot be enforced by means of an action under § 1983").

**E. Plaintiff's Claim Pursuant to 42 U.S.C. § 1981**

In addition to the § 1983 claims just discussed, Defendants have also moved for summary judgment on Plaintiff's § 1981 claim against Officer Ueberacher. (Summ. J. Mem. at 12–13.) Specifically, Plaintiff alleges that Officer Ueberacher, by offering and then "refus[ing] to seize a white person as he had seized Plaintiff," denied Plaintiff "the same right to be secure in his person, papers, and effects from unreasonable seizures as is enjoyed [by] white citizens." (Am.Compl.¶ 105.)

Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

§ 1981(a). "The statute has long been viewed as prohibiting certain forms of discrimination based on race, and its reference to rights enjoyed by white citizens establishes the racial character of the rights being protected." *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988) (internal citations and quotation marks omitted). Thus, to establish a claim under § 1981, a plaintiff must allege facts showing that: (1) the plaintiff is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See Mian v. Donaldson, Lufkin, Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993).

**\*13** Here, given that Officer Ueberacher had reasonable articulable suspicion to perform a brief investigative stop on Plaintiff, Plaintiff has failed to show that Officer Ueberacher "had an intent to discriminate against him on the basis of race." *See id.* Furthermore, the fact that Officer Ueberacher did not stop the white passerby as Plaintiff requested, (*see* Am. Compl. ¶¶ 36–41), does not give rise to the inference that Officer Ueberacher stopped Plaintiff on the basis of his race. The circumstances in which this passerby was allegedly observed were not reasonably comparable to those surrounding the investigative stop of Plaintiff. Indeed, the white passerby was not observed standing in front of an open door, nor was there reason to believe he was placing any

potentially stolen items in a bag. In fact, he was reported to be carrying only a clipboard, (*id.* ¶ 41), thus making it unlikely that he was concealing stolen items. Hence, Defendants are granted summary judgment on Plaintiff's Section 1981 claim.

## V. DEFENDANTS' RULE 12(c) MOTION TO DISMISS

### A. Legal Standard

Rule 12(c) provides that, "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c); *see also Patel v. Searles,* 305 F.3d 130, 135 (2d Cir.2002). In considering a Rule 12(c) motion, a court applies "the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Thus, a pleading will survive a Rule 12(c) motion only if it is supported by allegations that put forth underlying facts sufficient to state a claim to relief that is "plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal,* 556 U.S. at 678. In considering a motion to dismiss, a court must disregard claims that amount only to "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *id.,* and must confine its consideration to the pleadings and any matters that are subject to judicial notice, *see* Fed.R.Civ.P. 12(d).

### B. Plaintiff's FOIL–Related Due Process Claims

Plaintiff claims that the City of New York violated his Fifth Amendment procedural due process rights by maintaining a policy of not time-stamping any FOIL requests, (*id.* ¶ 109), and that Officer Rivera violated his Fifth Amendment due process rights by refusing to time-stamp his particular FOIL request, (*id.* ¶¶ 111–14). Plaintiff contends that Officer Rivera's refusal to time-stamp his FOIL submission was "for the purpose of thwarting Plaintiff's ability to obtain burglary information in relation to an instance of racial profiling." (*Id.*) In addition, Plaintiff alleges that Officer Pimentel violated his due process rights by withholding the burglary data and the 911 call records that he had requested in his FOIL request on March 12, 2009. (*id.* ¶¶ 115–16, 80–86.)

**\*14** This Court is without jurisdiction to consider Plaintiff's FOIL-related claims and thus Defendants' request to dismiss

these claims will be granted. Under New York state law, if an agency or government official fails to comply with the provisions of FOIL, the person submitting the FOIL request must pursue an administrative appeal or seek remedies in state court pursuant to N.Y. C.P.L.R. Article 78. *See* N.Y. Pub. Off. Law § 89; *see also Schuloff v. Fields,* 950 F.Supp. 66, 67–68 (E.D.N.Y.1997) ("The appropriate vehicle for challenging denials of access guaranteed by [FOIL] is a state court proceeding pursuant to N.Y. C.P.L.R. Article 78 upon exhaustion of administrative remedies."); *Sonds v. Cuomo,* No. 9:11 CIV 895, 2012 WL 952540, at *3 (N.D.N.Y. Feb.3, 2012) ("Plaintiff's state FOIL request cannot be the basis of a federal action."); *Zimmelman v. Teachers' Ret. Sys. of City of New York,* No. 08 CIV 6958, 2010 WL 1172769, at* 14 (S.D.N.Y. Mar. 8, 2010) (ruling that where a plaintiff has not exhausted his remedies under an administrative appeal process, a federal court has no jurisdiction to consider an alleged failure to comply with city policies).

In addition, assuming *arguendo* that Plaintiff could bring his FOIL-related claims in this Court and that Plaintiff could also show that either the City maintained a policy of refusing to time-stamp FOIL requests or that Officer Rivera refused to time-stamp Plaintiff's particular FOIL submission, Plaintiff's FOIL-related claims would still fail. Plaintiff, in order to make out a due process claim for property deprivation, must show that he had a federal protectable property interest. *See Matthews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). But, as several courts within this Circuit have found, "a plaintiff has no property interest in obtaining FOIL documents." [11] *Blount v. Brown,* No. 10 CIV 01548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010); *see also Billups v. Millet,* No. 91 CIV 6326, 1996 WL 99399, at *4 (S.D.N.Y. Mar.6, 1996) ("FOIL documents are an expectation .... [and New York state law] does not require that documents be produced as of right, but only after request and investigation."); *Webb v. Ashburn,* No. 96 CIV 0325, 1997 WL 118355, at *5–6 (S.D.N.Y. Mar. 17, 1997) (same). Likewise, Plaintiff's allegations about Officer Pimentel would also fail on the merits. Plaintiff, who acknowledges that he specified the wrong 911 call date in his FOIL request, offers no support for his conclusory allegation that Officer Pimentel failed to inform him about having located the SPRINT report and audio-taped recording of his 911 call because she "was aware of, condoned, and supported the City of New York's Stop–and–Frisk–Black–people policy." (*id.* ¶¶ 83, 85–87.)

[11]   Additionally, even though submissions beyond the pleadings may not be considered in deciding Defendants' motion to dismiss, the Court notes in passing that Plaintiff has also not shown any causal connection between the deprivation of his constitutional rights and the City's alleged time-stamping policy or the refusal of Officer Rivera to time-stamp his FOIL request. On April 13, 2009, the NYPD FOIL Unit sent Plaintiff a letter acknowledging the submission of his March 12, 2009 FOIL request, and on August 11, 2009, the NYPD FOIL Unit sent Plaintiff a letter stating that their search had returned negative results. (*See* Feb. 23, 2012 Letter Ex. B.) These facts show that the City responded appropriately to Plaintiff's FOIL request.

## VI. STATE LAW CLAIMS

The Court, having dismissed or entered summary judgment on all of the federal claims alleged in Plaintiff's Amended Complaint, now dismisses all of the pendent state law claims, (*see* Am. Compl. ¶¶ 94–97), alleged therein pursuant to 28 U.S.C. § 1367(c)(3). *See Pitchell v. Callan,* 13 F.3d 545, 547 (affirming district court' dismissal of pendent state law claims on basis that "[i]t is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims"); *see also Carnegie–Melon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federallaw claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.).

## VII. CONCLUSION

 **\*15**  For the reasons stated above, Defendants' motion for snmmary judgment and motion to dismiss are granted. Plaintiff's Amended Complaint is hereby dismissed with prejudice.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2013 WL 2419142

2013 WL 2419142

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3110033
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Dwayne SINGLETON, Plaintiff,

v.

Jane DOE, Housing Works Psychologist,
Parole Officer Glenda Bubb, and Parole
Supervisor (Officer) Denise Granum, Defendants.

No. 14–CV–0303 (MKB).
|
Signed July 7, 2014.

**Attorneys and Law Firms**

Dwayne Singleton, Comstock, NY, pro se.

### *MEMORANDUM & ORDER*

MARGO K. BRODIE, District Judge.

**\*1** Plaintiff Dwayne Singleton, proceeding *pro se* and currently incarcerated at Great Meadows Correctional Facility, brings this action against Defendant Jane Doe, a Housing Works Psychologist, and parole officers, Defendants Glenda Bubb and Denise Granum pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Jane Doe made a "false sex allegation" against him, and Bubb and Granum imposed new conditions of his parole as a result of the false accusation and confiscated his cellular telephone. Plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 is granted. For the reasons set forth below, Plaintiff's Section 1983 claim against Jane Doe is dismissed, and Plaintiff is granted thirty (30) days leave from the date of this Memorandum and Order to file an amended complaint against Jane Doe. Plaintiff's Section 1983 claims against Bubb and Granum shall proceed.

### I. Background

For the purposes of this decision, the allegations in the Complaint are assumed to be true. According to Plaintiff, on or about December 2010, while on parole, he was forced "to take a sex offender program and had to endure further restrictions as well" when Jane Doe, a psychologist at Housing Works in Manhattan, accused him of "touching

her feet[ ] in a sexual manner" during a "mandatory court-ordered" therapeutic session. (Compl.4.) Parole officers Granum and Bubb "confiscated [his] cell phone" and parole officer Bubb "was very strict [with him]." (*Id.*) Plaintiff complained of this conduct to Bubb and was "forced to take additional therapeutic programs for a false charge and ... was penalized." (*Id.*) Plaintiff seeks compensatory damages and injunctive relief against Defendants. [1]

[1]   Over two years ago, Plaintiff sued several individuals, including Bubb and Granum alleging, among other claims, false imprisonment. *See Singleton v. Davis,* No. 11–CV–5709 (E.D.N.Y. Nov.17, 2011). The allegations in that case were based on much of the same allegations made in the instant Complaint, including that "Parole Officer Bubb ... confiscated [Plaintiff's] cell phone" and Bubb and Granum imposed "harsh treatment" after a "false allegation" was made against Plaintiff. *See* Sec. Am. Com pl. 20–21, No. 11–CV–5709, *Singleton v. Davis* (E.D.N.Y.2011). The Honorable John Gleeson dismissed Plaintiff's claims against Bubb and Granum without prejudice, (No. 11–CV–5709, Docket Entry No. 4), and Plaintiff never filed an amended complaint against Bubb and Granum, although he filed an amended complaint against others, (No. 11–CV–5709, Docket Entry No. 9). The prior action was reassigned to this Court on March 27, 2012, and on October 11, 2012, the parties filed a stipulation of settlement, discontinuing the action. (No. 11–CV–5709, Docket Entry No. 29.)

### II. Discussion

### a. Standard of Review

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* In reviewing a *pro se* complaint, the court must be mindful that the Plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes*

*v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotation marks omitted); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (noting that even after *Twombly,* the court "remain[s] obligated to construe a *pro se* complaint liberally"). Nevertheless, the court must screen "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and "dismiss the complaint or any portion of the complaint," if it is frivolous, malicious, or fails to state a claim upon which relief may be granted. 28 U.S.C.1915A; *see Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). Similarly, the court is required to dismiss *sua sponte* an *in forma pauperis* action, if the court determines that it is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *Abbas,* 480 F.3d at 639.

**b. Defendant Jane Doe**

**\*2** Plaintiff has failed to state a claim under Section 1983 against Jane Doe. In order to sustain a claim for relief under Section 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mt. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (citation and internal quotation marks omitted). The actions of a private entity may be deemed state action only if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* at 52 (citation and internal quotation marks omitted); *see also Sykes v. Bank of Am.,* 723 F.3d 399, 406 (2d Cir.2013) (same). "Whether such a 'close nexus' exists ... depends on whether the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [action] must in law be deemed to be that of the state." *Sullivan,* 526 U.S. at 52 (citation and internal quotation marks omitted). State action is satisfied if the private actor was a "willful participant in joint activity with the State or its agents." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324 (2d Cir.2002) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

Here, Plaintiff does not specify which rights or privileges were violated by Jane Doe's conduct. It appears that Plaintiff may be trying to state a § 1983 claim for deprivation of liberty and/or due process based on the theory that Plaintiff was "ordered" to endure certain restrictions of his parole due to a false accusation, and was subsequently "penalized" when he complained of the conduct. (Compl.2–4.) *See Maldonado v. Fischer,* No. 11–CV–1091, 2012 WL 4461647, at \*5 (W.D.N.Y. Sept.24, 2012) ("[plaintiff's] allegations concerning the [parole] restrictions and resulting hardships ... 'sufficiently allege[ ] a due process claim' "); *Taylor v. Sullivan,* 980 F.Supp. 697, 705 (S.D.N.Y.1997) ("[A]n intentionally false report, directly causing the loss of liberty, can state a cause of action for deprivation of a parolee's constitutional rights."). [2] However, Plaintiff fails to plead any facts indicating that Jane Doe, a private psychologist at Housing Works, was acting under the color of state law when she allegedly falsely accused him of "touching her feet[ ] in a sexual manner" causing Plaintiff to have to participate in a sex offender program and endure other restrictions of his parole. (Compl.4.) A mere allegation that a private party provided information to the police, even if false, is insufficient to state a claim under § 1983. *See Stewart v. Victoria's Secret Stores, LLC,* 851 F.Supp.2d 442, 446 (E.D.N.Y.2012) ("A private party supplying information or seeking police assistance 'does not become a state actor ... unless the police officers were improperly influenced or controlled by the private party.' " (alteration in original) (citations omitted)); *Baez v. JetBlue Airways,* 745 F.Supp.2d 214, 221 (E.D.N.Y.2010) (holding that one incident of providing false information was not sufficient to make a private party an actor under the color of law); *Castro v. Cnty. of Nassau,* 739 F.Supp.2d 153, 173 (E.D.N.Y.2010) ("[T]he provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of § 1983."). Without more factual allegations indicating Jane Doe was acting under color of state law, Plaintiff fails to state a valid claim pursuant to § 1983. [3] In light of Plaintiff's *pro se* status, the Court grants him leave to amend the Complaint to allege facts, if possible, to show that Jane Doe acted under color of state law when she allegedly made a false accusation against Plaintiff.

[2]    The holding in *Taylor v. Sullivan* was expressly limited to a *"parolee's* liberty interest in not having his conditional release unfairly revoked." *Taylor,* 980 F.Supp. at 705, n. 13. It did not directly

**Singleton v. Doe, Not Reported in F.Supp.3d (2014)**

2014 WL 3110033

address whether a parolee has a liberty interest in parole restrictions imposed as a result of a false accusation.

3    The Court is also not aware of any legal support for the notion that a private psychologist acts under the color of state law when treating a parolee during a court-ordered therapeutic session. It is well established that other private professionals such as attorneys do not become state actors for the purposes of § 1983 liability "merely by virtue of their position[s]," even when appointed by the court. *Delarosa v. Serita,* No. 14–CV–737, 2014 WL 1672557, at *3 (E.D.N.Y. Apr. 28, 2014) (collecting cases regarding private attorneys, public defenders and court-appointed counsel); *Garcia v. City of New York,* No. 12–CV–4655, 2013 WL 153757, at *3 (E.D.N.Y. Jan. 14, 2013) ("It is well established that court-appointed attorneys, including attorneys associated with a legal aid organization, do not act under color of state law when performing traditional functions of counsel."); *Elmasri v. England,* 111 F.Supp.2d 212, 221 (E.D.N.Y.2000) (finding that a court appointed legal guardian was not a state actor for the purposes of § 1983). Rather, a plaintiff must allege sufficient facts demonstrating a close nexus between the private entity or individual and the State such that the Court can infer that the private entity or individual was acting under the color of state law. *See Sullivan,* 526 U.S. at 52.

**c. Defendants Bubb and Granum**

*3   Plaintiff claims that as a result of Jane Doe's false accusation, Bubb "ordered [him] to take a sex offender program and ... to endure further restrictions [of his parole]." (Compl.4.) Plaintiff also states that Bubb and Granum were "very strict," "rude," "unprofessional" and "denied [him] the right to ride the subway." (Compl.4.) The Court notes that "[a] parolee has no constitutionally protected interest in being free of a special condition of parole." *Boddie v. Chung,* No. 09–CV–4789, 2011 WL 1697965, at *1 (E.D.N.Y. May 4, 2011) (citations omitted); *see also* N.Y. Comp.Codes. R. & Regs. tit. 9, § 8003.3. ("A special condition may be imposed upon a [parolee] either prior or subsequent to release," memorialized by "a written copy of each special condition imposed."). Moreover, review of parole conditions are generally reserved to the state courts, *Boddie,* 2011 WL 1697965, at *2 (citations omitted), and

"parole conditions are not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner," *id.* (citations omitted). "[T]he imposition of conditions—whether imposed prior to or subsequent to release, by the parole board or a field parole officer—must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses." *Robinson v. New York,* No. 09–CV–0455, 2010 U.S. Dist. LEXIS 144553, at *14 (N.D.N.Y. Mar. 26, 2010).

However, while Plaintiff does not have a protected liberty interest to be free from special conditions of parole, he may have a viable due process claim pursuant to § 1983 based on the substance of the conditions and/or the basis for imposing such conditions. *See Maldonado v. Fischer,* 2012 WL 4461647, at *5 (finding a due process claim under Section 1983 where allegations relate to "the *substance* of the special conditions at issue ... and the basis for their imposition") (citing *Robinson,* 2010 U.S. Dist. LEXIS 144553, at *26).

A liberal interpretation of the Complaint indicates that Plaintiff's § 1983 claims against Bubb and Granum are based on the allegations that, as a result of a false accusation of sexual misconduct made against Plaintiff, Bubb "forced" him to participate in a sexual offender program and both Bubb and Granum "denied [him] the right to ride the subway." (Compl.4.) These allegations against Bubb and Granum challenge the substance of the parole conditions placed on Plaintiff and accordingly, are sufficient, at this juncture, to state a claim for deprivation of due process in violation of § 1983. *Maldonado,* 2012 WL 4461647, at *5 (Plaintiff's "allegations concerning the restrictions and resulting hardships that the [parole] conditions imposed on him have had ... 'sufficiently allege [ ] a due process claim regarding the substance of the special conditions at issue ... and the basis for their imposition.' "); *Robinson,* 2010 U.S. Dist. LEXIS 144553, at *25–26 (same). [4]

4        In *Maldonado,* the plaintiff, seeking to proceed *in forma pauperis,* brought an action for violations of § 1983, the Ex Post Facto Clause of the United States Constitution, and the Eight Amendment to the Constitution. Plaintiff alleged that upon his release on parole, he was given "special conditions" of his parole that are typically given to sex offenders. *Maldonado v. Fischer,* No. 11–CV–1091, 2012 WL 4461647, at *1–2 (W.D.N.Y. Sept.24, 2012). Plaintiff claimed that

2014 WL 3110033

these conditions were imposed on him because of a prior conviction for sexual misconduct and not related to the conviction for which he was on parole. *Id.* at \*2. The Court found that while the plaintiff had no protected liberty interest "to be free from the special conditions of parole," it would allow the plaintiff's due process claim to go forward "to the extent it can be construed as objecting to the *substance, i.e.,* the nature and extent of, the conditions imposed upon him and their relation to his offenses." *Id.* at \*5.

> Similarly, in *Robinson,* the plaintiff objected to the imposition of new conditions placed on his parole, arguing that they violated, *inter alia,* § 1983. *Robinson v. New York,* No. 09–CV0455, 2010 U.S. Dist. LEXIS 144553, at \*1–3 (N.D.N.Y. Mar. 26, 2010). The court denied the defendant's motion for judgment on the pleadings as to the plaintiff's § 1983 due process claim, finding that the plaintiff "sufficiently alleged a due process claim regarding the substance of the special conditions at issue ... and the basis for their imposition." *Id.* at \*25–26.

**\*4** Plaintiff also claims that Bubb and Granum confiscated his cellular telephone and refused to return it to him. (Compl.4.) Plaintiff can also proceed on this claim as it is unclear whether Plaintiff, as a parolee and not a detained prisoner, had an adequate post-deprivation remedy for the loss of his property available to him. *See Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.").

**III. Conclusion**

For the reasons set forth above, Plaintiff is granted leave to amend the Complaint to replead his claim against Jane Doe in accordance with this Memorandum and Order. The amended complaint must be filed within 30 days of the date of this Memorandum and Order, or the claim against Jane Doe will be dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2)(B). Plaintiff is advised that if he files an amended complaint, it will completely replace the original Complaint. The amended complaint must be captioned "Amended Complaint" and shall bear the same docket number as this Memorandum and Order. No summons shall issue as to Jane Doe.

Plaintiff's claims against Bubb and Granum shall proceed. The Clerk of Court shall issue a summons for Bubb and Granum and the United States Marshal Service is directed to serve the summons, Complaint and a copy of this Memorandum and Order upon Bubb and Granum without prepayment of fees. The Clerk of Court shall mail a courtesy copy of the same papers to the Attorney General for the State of New York. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3110033

---

**End of Document** <span>© 2022 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag - Negative Treatment

Distinguished by Singleton v. Doe, E.D.N.Y., September 28, 2016

2006 WL 3626930
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Earline ROBINSON, Plaintiff,

v.

L. PAGAN, N.Y. State Parole Agent, L.G. Walker,
Supervisor, Bronx Special Operations Group-Sex
Offender Unit, C. Davis-Atkinson, N.Y. State Parole
Agent; S. Pennister, N.Y. State Parole Agent; John
and Jane Does, 1 through 100, et al., Defendant.

No. 05 Civ. 1840(DAB).
|
Dec. 12, 2006.

**Attorneys and Law Firms**

Earline Robinson, Bronx, NY, pro se.

*ADOPTION OF REPORT AND RECOMMENDATION,
AND FURTHER ORDER OF THE COURT*

BATTS, J.

 **\*1** On February 15, 2006, United States Magistrate Judge
Ronald L. Ellis issued a Report and Recommendation
("Report"), recommending that Defendant's Summary
Judgment motion be GRANTED, and that Plaintiff's Motion
for an Extension of Time and for Discovery be DENIED
as futile. (Report at 6). In addition, Plaintiff has filed a
Motion for Injunctive Relief, which was received by this
Court on May 4, 2006. For the reasons contained herein,
Magistrate Judge Ellis' Report and Recommendation shall be
ADOPTED, and Plaintiff's Motion for Injunctive Relief shall
be DENIED.

*I. ADOPTION OF REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1)(C), "[w]ithin ten days after
being served with a copy [of the Magistrate Judge's Report
and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations."
28 U.S.C. § 636(b)(1)(C); *see also* Fed.R.Civ.P. 72(b) (stating
that "[w]ithin 10 days after being served with a copy of
the recommended disposition, a party may serve and file
specific, written objections to the proposed findings and
recommendations"). The District Court is required under 28
U.S.C. § 636(b)(1)(C) to make a "de novo determination of
those portions of the report or specified proposed findings or
recommendations to which objection is made."

Plaintiff states in his Affidavit In Opposition To The
Defendants' Motion For Summary Judgment [1] that he
"objects to each, every, and all of the Magistrate Judge's
Report & Recommendation...." Where a party only raises
general objections, "a district court need only satisfy itself
there is no clear error on the face of the record." *Nelson
v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985); *see also
Brown v. Peters,* 1886 WL 5999355, 1997 U.S. Dist. LEXIS
14718, at \*7 (N.D.N.Y. Sept. 22, 1997) (where only general
objections are filed to report and recommendation, a court
need only review for clear error) (citing cases). Indeed,
"objections that are merely perfunctory responses argued in
an attempt to engage the district court in a rehashing of
the same arguments set forth in the original [papers] will
not suffice to invoke de novo review...." *Vega v. Artuz,* No.
97 Civ. 3775, 2002 WL 31174466, at \*1 (S.D.N.Y. Sept.
30, 2002). Such objections "would reduce the magistrate's
work to something akin to a meaningless dress rehearsal."
*Id.* (citations and internal quotations marks omitted). *See also
Kiggins v. Barnhart,* 2004 WL 1124169, at \*1 (S.D.N.Y.
May 20, 2004) (reviewing the report and recommendation
for clear error where objections were essentially reiterations
of arguments made in earlier submissions and conclusory
accusations). After conducting the appropriate level of
review, the Court may then accept, reject, or modify, in whole
or in part, the findings or recommendations made by the
Magistrate. 28 U.S.C. § 636(b)(1)(C); *see also* Local Civil
Rule 72.1(d).

1
    Though the title of this Affidavit does not denote
that it consists of Plaintiff's objections, it
was filed ten days after the entry of the Report and
Recommendation. For this reason, and because the
Affidavit states therein that Plaintiff objects to the
Report and Recommendation, this Court presumes
that the Affidavit is meant as Plaintiff's objections.

Because Plaintiff's objections either are general or reassert
arguments already submitted to the Magistrate Judge, this

Case 5:20-cv-00535-BKS-TWD   Document 45   Filed 08/24/22   Page 263 of 267
**Robinson v. Pagan, Not Reported in F.Supp.2d (2006)**
2006 WL 3626930

Court need only review the Report and Recommendation for clear error. Having found no clear error on the record, the Report and Recommendation of United States Magistrate Judge Ronald L. Ellis, dated February 15, 2006, is APPROVED, ADOPTED and RATIFIED by the Court in its entirety . [2]

[2]   Even were Plaintiff's January 14, 2006 Motion for an extension of discovery granted, there is no discovery that would ultimately prove favorable to Plaintiff. For example, Plaintiff contends that he was arrested without a warrant, but Defendants have produced a copy of the warrant for the record. Plaintiff also contends that he was subject to unconstitutional parole conditions, but parolees' liberty rights are limited, and do not shield Plaintiff from supervision conditions he deems onerous. *Pena v. Travis,* 2002 WL 31886175 at *13 (S.D.N.Y. Dec. 27, 2002) ("Conditions of parole are discretionary and not subject to judicial review in the absence of a showing that the board or its agents acted in an arbitrary and capricious manner. Review of conditions of parole are generally matters for state courts."). Granting additional discovery to Plaintiff would be futile.

## II. DENIAL OF INJUNCTIVE RELIEF

 **\*2**  Plaintiff also has moved this Court for injunctive relief pursuant to Rule 65(a) and Rule 65(b) of the Federal Rules of Civil Procedure. His Motion asks the Court to enjoin Defendants from imposing certain parole conditions upon him. Not only do the Court records indicate that this document was never served on Defendants, but Plaintiff's Motion also fails on its merits. The Special Conditions of Release to Parole Supervision (*see* Pl.'s Mot. at Ex. B) pertain to the fraudulent accosting charges to which Plaintiff pled guilty on August 21, 2000. These parole conditions are not related to the dismissed sexual molestation charges against him. This is evidenced by the "Date of Release" as listed on the form-June 9, 2003-which predates the sexual molestation charges by more than a year. Moreover, the termination date for parole supervision-October 28, 2006-is also the "Parole Violation Max Date" listed on the August 24, 2001 decision of the Pennsylvania Board of Probation and Parole. (*See* Defs.' Mem. of Law in Opp. To Pl.'s Objections to the Report and Recommendation, Ex. A.) That decision was rendered

pursuant to the fraudulent accosting charges (*see id.*), not the sexual molestation charges.

Because these parole conditions do not pertain to the dismissed sexual molestation charges, and because parolees' liberty rights are limited, *see* Pena, 2002 WL 31886175 at *13, Plaintiff's Motion for an Injunction is hereby DENIED.

## III. CONCLUSION

For the reasons contained herein, the February 15, 2006 Report and Recommendation of Magistrate Judge Ronald L. Ellis is APPROVED, ADOPTED, and RATIFIED. Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's January 14, 2006 Motion for an Extension of Time is DENIED. Plaintiff's Motion for Injunctive Relief also is DENIED.

The Clerk of Court is directed to CLOSE THE DOCKET for this case.

SO ORDERED.

## REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

### I. INTRODUCTION

Plaintiff, Earline Robinson, brings this *pro se* action under 42 U.S.C. §§ 1983, 1985, and 1988 against defendants, New York State Parole Officers L. Pagan, C. David-Atkinson, and S. Penister; and L.G. Walker, Supervisor of the Bronx Special Operations Group, Sex Offender Unit, for alleged First, Eighth, Ninth, and Fourteenth Amendment violations. Robinson seeks declaratory and injunctive relief, and compensatory and punitive damages from the Court. On June 24, 2005, defendants moved to dismiss the complaint pursuant to Rule 12(b)(1) and 12(b)(6), Federal Rules of Civil Procedure. This matter was referred to the undersigned on August 8, 2005, for resolution of dispositive motions.

After reviewing the record and the parties arguments, the Court found that material factual assertions were in dispute, and that it could not decide the motion to dismiss without considering matters outside of the pleadings. Pursuant to Rule 12(c), by order dated December 8, 2005 ("December

8 Order"), the Court treated the motion to dismiss as one for summary judgment, and directed the parties to submit supporting affidavits and documentation pertinent to a motion under Rule 56, Federal Rules of Civil Procedure. Defendants submitted the Affidavit of Cheryl David-Atkinson, dated January 25, 2006, in support of their summary judgment motion. Robinson filed a motion, dated January 14, 2006 ("January 14 motion"), for an extension of time to respond, and discovery, but failed to otherwise submit documentation pertinent to the resolution of the summary judgment motion. For the reasons which follow, I recommend that Robinson's January 14 motion be DENIED as futile, and defendants' summary judgment motion be GRANTED.

## II. BACKGROUND

**\*3** Robinson is under the supervision of the New York State Department of Parole. On March 14, 1985, he was convicted and sentenced in Pennsylvania to a term of four and a half to ten years incarceration. Complaint, Facts. [1] On April 7, 1994, he was released on parole, and subsequently allowed to serve his parole in New York under the supervision of Parole Officer Penister. *Id.* In 1999, Robinson was arrested on fraudulent accosting charges. *Id .* On August 21, 2000, he pled guilty. *Id.* On May 9, 2003, he was released on parole under David-Atkinson's supervision. *Id.* On September 18, 2004, [2] Robinson was arrested on child molestation charges. *Id.* He was released from custody on September 19, 2004. David-Atkinson received notification of the arrest on September 20, 2004. David-Atkinson interviewed Robinson on September 21, 2004, regarding the nature of his arrest. On September 28, 2004, David-Atkinson arrested Robinson during a scheduled office visit. Robinson maintains that his September 28 arrest was effectuated without a warrant or probable cause. *Id.* at Count I. He contends that he was subject to unreasonable and excessive force during the arrest and detention. *Id.* He was subsequently released from custody on December 24, 2004. The child molestation charge was dismissed on September 29, 2005, by the New York Supreme Court, Bronx County. January 14 motion. Robinson also alleges that defendants made false statements to his neighbors, and that they sanctioned him unfairly by forcing him to relocate from his home, and to participate in a sex offenders program. Complaint at Count III.

[1]    References to the complaint cannot be more specific because paragraph numbers are lacking.

[2]    The dates in the complaint are not consistent with other dates in the record. For consistency, the Court will use the dates that seem appropriate based on the parties arguments, and the evidence on the record.

## III. DISCUSSION

### A. Legal Standard

In evaluating a summary judgment motion the Court reviews the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, to determine if there exists a genuine issue of material fact to preclude the moving party from a judgment as a matter of law. Rule 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A pre-discovery motion, as in this case, is viewed by the Court with significant caution. *See Serendip LLC v. Franchise Pictures LLC,* 2000 WL 1277370, at *8 (S.D.N.Y. Sept. 7, 2000). However, summary judgment is appropriate where no reasonable trier of fact could find in favor of the nonmoving party, *H.L. Hayden Co. of New York, Inc. v. Siemes Med. Sys., Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989), thereby "dispos[ing] of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987).

The moving party bears the burden of showing that no genuine issues of material fact exist. *Celotex,* 477 U.S. at 323. Where the Court is considering the claims of a *pro se* litigant, the pleadings must be construed liberally, especially if the complaint alleges civil rights violations. *See Arnold v. Goetz,* 245 F.Supp.2d 527, 534 (S.D.N.Y.2003). However, a nonmoving party cannot rely merely on conclusory allegations or speculation, and "may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996). A genuine issue of fact exists if there is a basis for a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250. If the nonmoving party fails to respond by "affidavits or as otherwise provided in [Rule 56] ... summary

2006 WL 3626930

judgment, if appropriate, shall be entered against the adverse party." Rule 56(e).

**B. Robinson's Opposition Papers Do Not Raise New Claims**

**\*4** Robinson maintains that his arrest on September 28, 2004, was unlawful because it was conducted without a warrant or probable cause. Complaint, Count I. Defendants argue that Robinson, in his opposition papers, asserts for the first time that this action stems from their failure to procure a warrant and conduct a parole violation hearing, and ask the Court to disregard these claims. Defendants' Reply Memorandum of Law ("Def.Reply") at 4. The Court finds that defendants' argument is unpersuasive. Robinson, in his complaint, alleges that defendants deprived him of due process, and that they failed to make a determination of probable cause prior to his arrest. Complaint, Count I. Reading Robinson's complaint with the liberality afforded to *pro se* litigants the Court finds that the arguments in Robinson's opposition papers do not raise new claims, and are, in fact, consistent with his complaint.

**C. Robinson's Unreasonable Seizure and False Arrest Claims**

Robinson argues that his September 28 arrest was effectuated without a warrant. Complaint, Count I. A parolee is "entitled to some quantum of Fourth Amendment protection against 'unreasonable searches and seizures.' " *United States ex rel. Randazzo v. Follette,* 418 F.2d 1319, 1322 (2d Cir.1969). Under New York law if a parolee violates a parole condition, "a parole officer shall report such fact to a member of the board or a designated officer." N.Y. Comp.Codes R. & Regs. Tit. 9, § 8004.2(a). The "member or designated officer may issue a warrant ... provided that the designated officer issuing the warrant shall not also be the officer recommending issuance of the warrant." *Id.* at § 8004.2(b).

Defendants contend that Robinson's September 28 arrest was conducted pursuant to a warrant. David-Atkinson Aff. at 1-2. The record supports defendants' contention. *See* Warrant for Retaking and Detaining a Paroled or Conditionally released Prisoner, dated September 28, 2004 ("warrant"), attached to David-Atkinson Aff. as Exh. A. Robinson's arrest was effectuated pursuant to an administrative warrant issued by the parole board based on reasonable cause to believe that he violated the conditions of his release. *Id.; see* N.Y. Exec. Law. § 259-i(3)(a)(i); *see also William G. v. Pataki,* 2005 WL 1949509 (S.D.N.Y. Aug. 12, 2005). The warrant was issued because of Robinson's September 18 arrest, and for failing to

report his arrest to David-Atkinson. David-Atkinson Aff. at 2. Robinson has failed to controvert defendants' evidence, and has otherwise failed to submit factual or evidentiary support for his contention that a warrant was not procured.

Once a warrant is issued, a preliminary hearing is held, and the adjudicatory process begins. N.Y. Comp.Codes R. & Regs. Tit. 9, § 8004.3; *see also Scotto v. Almenas,* 143 F.3d 105 (2d Cir.1998). Robinson alleges that defendants lacked probable cause to arrest him, and failed to conduct a preliminary hearing to revoke his parole. A preliminary hearing is held if "a parolee has not been convicted of a crime committed while under [parole] supervision ... [and] denies that he has violated any condition of his release." 28 C.F.R. § 2.49(a). The hearing must take place no later than fifteen days from the date the warrant was executed. N.Y. Exec. Law. § 259-i(3)(a)(i). The standard of proof at the hearing is "probable cause to believe that the ... parolee ... has violated one or more conditions of his ... parole ... in an important respect ." *Id.*

**\*5** Evidence in the record indicates that defendants held a parole violation hearing on October 8, 2004. *See* Decision and Judgment, Preliminary Violation Hearing, State of New York Board of Parole, dated October 8, 2004, attached as Exh. D to David-Atkinson Aff. The hearing officer found there was probable cause that Robinson violated the conditions of his release. *Id.* With respect to the parole revocation hearing, Robinson has also failed to controvert defendants' evidence, and to otherwise submit factual or evidentiary support for his allegation.

Robinson also asserts that his September 28 arrest and subsequent detention was unlawful because his child molestation charges were eventually dismissed. *See* Certificate of Disposition, New York Supreme Court, Bronx County, dated October 14, 2005, attached to Robinson's January 14 motion as Exh. A. However, "[section] 1983 claims for false arrest or false imprisonment are barred unless the underlying criminal proceedings, in this case the revocation of parole, was terminated in [his] favor." *Hinton v. Mortiz,* 11 F.Supp.2d 272, 275 (W.D.N.Y.1998). Robinson's claims for false imprisonment is barred because the parole revocation hearing did not terminate in his favor. The record indicates that the decision of the parole revocation hearing supported Robinson's arrest and detention. Since probable cause to believe that specific crimes were committed by the parolee is not required, *Follette,* 418 F.2d at 1319, the hearing determination is sufficient to effectuate Robinson's arrest.

Based on the record, the parties arguments, and defendants's evidence, the Court finds that, with respect to the false arrest and imprisonment claims, there is no genuine issue of material fact. Robinson, however, asks the Court for an extension of time, and for discovery, presumably to include additional facts. January 14 motion. Such an extension would be unwarranted and futile in this case. The record clearly indicates that defendants provided Robinson with due process by procuring a warrant, and conducting a parole revocation hearing. No material facts are left in dispute. Since additional time and discovery could not provide relevant information, the motion is DENIED, and I recommend that Robinson's unreasonable seizure and false arrest claims be DISMISSED.

### D. Robinson's Claims are Unsubstantiated

Robinson also alleges that: 1) he was subjected to unreasonable and excessive force during his arrest and detention (Complaint, Count I); 2) his September 28 arrest and detention constituted a violation of his privacy and his right to be free from unjustified intrusion upon his physical security (Complaint, Count II); 3) Walker was involved in the deprivation of his constitutional rights (Complaint, Count II); 4) he suffered great emotional injury and trauma (Complaint, Count III); and 5) defendants have violated his equal protection rights (Complaint, Count IV).

Although Robinson had an opportunity to substantiate these allegations in both his response to defendants' motion, and supplemental submission to the Court following the December 8 Order, he makes only vague and conclusory statements without any specific or particularized facts to support these claims. He has also failed to show that discovery will produce supporting evidence. Defendants maintain that the Court should dismiss these allegations because they are legal conclusions that are not accompanied by supporting facts. Def. Mem. at 9. Although the Court evaluates Robinson's pleadings with the liberality afforded to *pro se* litigants, "bald assertions and conclusions of law will not suffice to state a claim," *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000). The Court may dismiss a claim if it is not adequately articulated in the pleadings. *See Sanders v. New York,* 692 F.Supp. 308, 312 (S.D.N.Y.1988).

**\*6** Robinson's status as a parolee also affords him limited constitutional rights, and no liberty interest in being free from special parole conditions. "Parole is not freedom. A parolee is a convicted criminal who has been sentenced to a term of imprisonment and who has been allowed to serve a portion of that term outside prison walls." *United States v. Polito,* 583 F.2d 48, 54 (2d Cir.1978). "Parole releases him from immediate physical imprisonment but it imposes conditions which significantly confine and restrain his freedom." *Id.* (citation omitted). In light of Robinson's parolee status, and since he made only conclusory allegations in the pleadings, I recommend that the Court DISMISS these claim.

### G. Robinson's Conspiracy Claim

Robinson alleges that defendants "individually and collectively devised a scheme to continue [his] harassment" after his release from detention on December 24, 2004. Complaint, Count III. To support a conspiracy allegation Robinson must demonstrate that an agreement existed between defendants. *See Whitfield v. Forest Electrical Corp.,* 772 F.Supp. 1350, 1353 (S.D.N.Y.1991). He must proffer more than conclusory allegations in order to support a civil rights conspiracy complaint. *See Hyman v. Holder,* 2001 WL 262665, at \*5 (S.D.N.Y. Mar. 15, 2001) (citation omitted). Robinson, however, has failed to support his conspiracy allegation by alleging any facts from which the Court could infer a conspiracy. The record does not show that an agreement existed between defendants to harass Robinson. Robinson has not alleged any facts from which the Court can infer a conspiracy. I, therefore, recommend that the Court DISMISS the conspiracy claim in Count III of the complaint.

### H. Robinson's Defamation Claim

Robinson also contends that defendants made false and malicious statements concerning his child molestation charges, and exhibited his photograph to neighbors, and members of the community. Complaint, Count III. Defendants maintain that a free-standing defamatory statement is not a constitutional deprivation, and that defamation by itself is a tort actionable only under state law.

To support a defamation allegation under § 1983, Robinson must show a deprivation of a protected liberty interest as a consequence of a probably false statement. *See Velez v. Levy,* 401 F.3d 75 (2d Cir.2005). Robinson argues that he was forced to move from his home, and participate in a program for sex offenders. He maintains that this is unfair and discriminatory. As a parolee, Robinson does not have the protected liberty interest in being free from special conditions. *See Pena v. Travis,* 2002 WL 31886175 at \*13 (S.D.N.Y. Dec. 27, 2002). It is well within the Division of Parole's discretion to impose supervision conditions that the parolee deems onerous. *Id.* at \*9. As the court noted in *Pena,* conditions of parole are discretionary and not subject to judicial review in the

absence of a showing that the board or its agents acted in an arbitrary or capricious manner. *Id.* The record shows that the conditions defendants imposed on Robinson were the result of his September 18 arrest. Robinson's arguments, and the record, does not indicate that he was deprived of a protected liberty interest. I recommend, therefore, that the defamation claim in Count III be DISMISSED.

I. Claims Against Penister

**\*7** Robinson alleges that on October 2, 1999, Penister "intentionally, fraudulently informed [him] that he was no longer on parole." Complaint, Count IV. Defendants assert that Robinson's claims against Penister "must be dismissed because they are barred by the doctrine of collateral estoppel and the statute of limitations." Def. Mem. at 14. The Court finds that defendant's argument has merit. "[T]he statute of limitations for a claim under § 1983 that accrued in New York is three years." *Jaghory v. New York State Dept. of Educ.,* 131 F.3d 326, 331 (2d Cir.1997). Robinson's last contact with Penister was on October 2, 1999. Since this date is five years before Robinson filed this action, I recommend that the Court DISMISS this claim.

J. Immunity

Defendants maintain that all claims against defendants in their official capacities are barred by the Eleventh Amendment. They also contend that they are entitled to qualified immunity. Since the Court recommends that all claims against defendants be dismissed, the Court does not reach this issue.

III. CONCLUSION

For the foregoing reasons, I recommend that Robinson's January 14 motion for an extension of time, and discovery be DENIED as futile, and defendants's summary judgment motion be GRANTED.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3626930

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.